**RECORD NOS. 21-1721(L); 21-2005**

In The

# United States Court of Appeals

### For The Fourth Circuit

## DMARCIAN, INC.,

*Plaintiff – Appellee,*

**v.**

## DMARCIAN EUROPE BV,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT ASHEVILLE**

---

**JOINT APPENDIX
VOLUME I OF VI
(Pages 1 – 532)**

---

Pressly M. Millen
Samuel B. Hartzell
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina  27601
(919) 755-2112

David A. Dorey
BLANK ROME LLP
1201 North Market Street,
  Suite 800
Wilmington, Delaware  19801
(302) 425-6418

Pamela S. Duffy
SHARPLESS MCCLEARN
  LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina  27401
(336) 333-6389

*Counsel for Appellant*      *Counsel for Appellee*      *Counsel for Appellee*

**TABLE OF CONTENTS**
**VOLUME I OF VI**

**Appendix Page**

Docket Entries ................................................................................1

Complaint,
With Exhibits,
    filed March 12, 2021 ...............................................13

    Exhibits:

    A.   United States Trademark Registration for DMARCIAN
           dated January 31, 2012...........................................54

    B.   Dmarcian Europe BV Registration
           undated ............................................................56

    C.   Dmarcian Europe BV Registration
           undated ............................................................57

Plaintiff's Motion Pursuant to Fed. R. Civ. P. No. 65
Seeking Temporary Restraining Order and Preliminary Injunction
    filed March 25, 2021 ...............................................58

Declaration of Shannon Draegen,
With Exhibits,
    executed March 25, 2021..........................................65

    Exhibits:

    A.   Domains Causing Traffic to be Diverted to
           BV-Controlled Websites Article
           undated ............................................................75

    B-1.  Dmarcian DMARC SaaS Platform
           undated ............................................................80

    B-2.  DMARC SaaS Platform
           dated March 25, 2021 .......................................103

<u>Exhibits</u>, continued:

**B-3.  DMARC SaaS Platform**
       dated March 25, 2021 ...................................................... 106

**B-4.  DMARC SaaS Platform**
       dated August 7, 2019 ...................................................... 108

**C-1.  DMARC SaaS Platform**
       undated ............................................................................. 114

**C-2.  DMARC SaaS Platform**
       dated March 25, 2021 ...................................................... 136

**C-3.  DMARC SaaS Platform**
       dated March 25, 2021 ...................................................... 138

**C-4.  DMARC SaaS Platform**
       undated ............................................................................. 139

**D.    Dmarcian Registration**
       undated ............................................................................. 143

**E.    Dmarcian Data Breach Forum**
       undated ............................................................................. 144

**F.    Email Correspondence**
       various dates .................................................................... 154

**G-1.  Email Correspondence**
       various dates .................................................................... 156

**G-2.  Judgment**
       dated February 1, 2021 .................................................... 160

Declaration of Timothy Draegen,
With Exhibits,
> executed March 25, 2021.......................................................................165

    <u>Exhibits:</u>

    A.    Email to Martijn Groeneweg, Alwin de Bruin, and
           Eline van der Vorm from
           Tim Draegen
           Re:  PIIA and MNDA
                dated December 7, 2016......................................................174

    B.    Email Correspondence
                dated December 7, 2016......................................................184

Notice of Appearance and Request for Briefing Schedule,
With Exhibits,
> filed March 29, 2021...........................................................................186

    <u>Exhibits:</u>

    A.    Beschikking
                undated ..........................................................................190

    B.    Vonnis
                undated ..........................................................................219

Defendant's Memorandum in Opposition to
Motion for Temporary Restraining Order,
With Exhibits,
> filed March 30, 2021...........................................................................230

    <u>Exhibits:</u>

    1.    Declaration of Timothy Draegen in
           Support of Motions to Quash Service of
           Summons for Lack of Personal Jurisdiction
                executed November 8, 2019 ...............................................243

    A.    Entity Details
                undated ..........................................................................248

Order of
The Honorable Martin Reidinger
Re:  Denying Plaintiff's Motion for Temporary Restraining Order
        filed March 31, 2021 ................................................................250

Supplemental Declaration of Shannon Draegen,
With Exhibits,
        executed April 7, 2021 .............................................................265

        Exhibits:

        H.    European Union Intellectual Property
              Office Certificate of Registration
                    undated ...............................................................272

        I.    Timeline
                    various dates ......................................................275

        J.    Log
                    various dates ......................................................276

        K.    Letter to
              Martin Groeneweg from
              Timothy D. Pecensye
              Re:  Unauthorized Use of Dmarcian's Intellectual Property
                    dated February 17, 2021.......................................285

        L.    Chat with DME Employee
                    undated ...............................................................287

Supplemental Declaration of Timothy Draegen,
With Exhibit,
        executed April 7, 2021 .............................................................298

        Exhibit:

        C.    Dmarcian Registration
                    dated April 1, 2021 .............................................303

        D.    Dmarcian Europe Linkedin
                    undated ...............................................................305

Declaration of Timo Jansen,
With Exhibits,
    executed April 7, 2021 ...................................................................306

    Exhibits:

    A.    Letter to
           Mr. Harmeling from
           Timo S. Jansen
           Re:  Conditional Notice of Termination
               dated January 22, 2021 ..................................................320

    B.    Email Correspondence
               various dates ..................................................................338

    C.    Email Correspondence
               various dates ..................................................................341

    D.    Email Correspondence
               dated January 28, 2021 ..................................................344

    E.    Email Correspondence
               dated January 29, 2021 ..................................................369

    F.    Judgment
               dated February 1, 2021 .................................................422

    G.    Writ
               dated April 6, 2021 .......................................................427

Plaintiff's Motion to Extend Time for Filing of Supplemental Evidence
    filed April 7, 2021 .....................................................................436

First Amended Complaint,
With Exhibits,
    filed April 7, 2021 .....................................................................439

    Exhibits:

    A.    United States Trademark Registration for DMARCIAN
               dated January 31, 2012 ..................................................485

<u>Exhibits</u>, continued:

**B.**     **Dmarcian Europe BV Registration**
       **undated** .............................................................487

**C.**     **Dmarcian Europe BV Registration and**
     **Red Line Version of First Amended Complaint**
       **undated** .............................................................488

# TABLE OF CONTENTS
## VOLUME II OF VI

**Appendix Page**

**Plaintiff's Notice of Filing and Translated Documents from
Foreign Proceedings,
With Exhibits,**
 filed April 9, 2021 ....................................................................533

 **Exhibits:**

 1. **Notice of Objection in Preliminary Relief Proceedings**
   undated ................................................................536

 2. **Notice of Objection in Preliminary Relief Proceedings**
   undated ................................................................552

**Defendant's Motion to Dismiss**
 filed April 19, 2021................................................................589

**Defendant's Notice of Filing,
With Attachments,**
 filed April 19, 2021................................................................591

 **Attachments:**

 1. **Declaration of Hub J. Harmeling,
   With Exhibits,**
   sworn April 19, 2021...........................................592

  **Exhibits:**

  A. **Beschikking**
   undated ..................................................605

  B. **Vonnis**
   dated February 1, 2021...............................634

  C. **Dmarcian Website**
   undated ..................................................645

**Defendant's Notice of Filing,**
**With Attachments,**
    **filed April 19, 2021, continued:**

<u>**Attachments**</u>**, continued:**

2.    **Declaration of Alfred Meijboom,**
      **With Exhibits,**
         **sworn April 19, 2021**............................................................**648**

      <u>**Exhibits:**</u>

      A.   **Service Documents**
           **various dates** ............................................................**656**

      B.   **Email Correspondences**
           **various dates** ........................................................... **711**

      C.   **Service Documents**
           **various dates** ............................................................**744**

3.    **Declaration of Martijn Groeneweg,**
      **With Exhibits,**
         **dated April 19, 2021** ............................................................**783**

      <u>**Exhibits:**</u>

      A.   **Email Correspondence and Attachments**
           **dated December 7, 2016** .............................................**793**

      B.   **Email Correspondence and Attachments**
           **dated December 7, 2016** .............................................**804**

      C.   **Email Correspondence**
           **various dates** ............................................................**806**

      D.   **Email Correspondence**
           **various dates** ............................................................**808**

      E.   **Email Correspondence**
           **various dates** ........................................................... **811**

<u>Exhibits</u>, continued:

F.    Email Correspondence and Attachments
        various dates ............................................................. 813

G.    Printout of Slack Conversation
        undated ................................................................... 838

H.    Letter to
      Tim and Ed from
      Martijn Groeneweg
      Re: Software
        undated ................................................................... 840

I.    Email Correspondence
        various dates ............................................................. 848

J.    Sales Analysis
        dated April 12, 2021 ................................................... 850

Certificate
      filed April 21, 2021 ......................................................... 853

Transcript of Motions Hearing Proceeding before
The Honorable Martin Reidinger
      on April 23, 2021............................................................. 857

**TABLE OF CONTENTS**
**VOLUME III OF VI**

**Appendix Page**

**Second Supplemental Declaration of Timothy Draegen,**
**With Exhibits,**
      **executed April 30, 2021** ........................................................ 1070

      Exhibits:

      E.    Servers/Services
             undated ................................................................... 1088

      F.    Department Meetings
             various dates ....................................................... 1090

      G.    Flight Information and Photographs
             dated January 19, 2021...................................... 1091

      H.    Email Correspondence
             dated April 27, 2021.......................................... 1095

**Defendant's Brief on Proposed Voluntary Commitments**
      **filed April 30, 2021**.................................................... 1106

**Plaintiff's Brief in Support of Its Proposed Requests for**
**Restraints on Defendant's Conduct,**
**With Exhibits,**
      **filed April 30, 2021**....................................................1112

      Exhibits:

      A.    Plaintiff's Proposed Restraints for Injunctive Relief
             undated ................................................................. 1129

      B.    Email Correspondence
             various dates ....................................................... 1136

Exhibits, continued:

C.     Email to
       Press Millen and Samuel Hartzell from
       Pamela Duffy
       Re:  Proposed Restraint Terms
              dated April 27, 2021 ........................................................... 1139

D.     Email Correspondence
              various dates .................................................................... 1142

E.     Dmarcian Inc. Claim/Evidence Chart
              undated ........................................................................... 1145

Defendant's Reply Memorandum in Support of Motion to Dismiss,
With Attachment,
       filed May 7, 2021 ......................................................................... 1153

Attachments:

1.     Second Declaration of Martijn Groeneweg,
       With Exhibits,
              executed May 7, 2021 ...................................................... 1165

Exhibits:

A.     Agreement SaaS
              undated ...........................................................................1171

B.     Partner Agreement
              undated ...........................................................................1181

C.     District Court of North Holland Judgment
              dated May 7, 2021...........................................................1191

Order and Preliminary Injunction of
The Honorable Martin Reidinger
       filed May 26, 2021 ....................................................................... 1224

Order of
The Honorable Martin Reidinger
Re:  Granting Plaintiff's Motion for Leave of Court to Supplement the
Plaintiff's Complaint and Denying as Moot Defendant's Consent Motion for
Extension of Tine to Respond to Complaint
     filed June 15, 2021 ................................................................ 1302

Plaintiff's Motion for Order to Show Cause
     filed June 22, 2021 ................................................................ 1304

Fourth Declaration of Shannon Draegen,
With Exhibits,
     executed June 22, 2021 .......................................................... 1309

    Exhibits:

    1.    Email Correspondence
         various dates ................................................. 1321

    2.    Email Correspondence
         various dates ................................................. 1328

    3.    Email Correspondence
         various dates ................................................. 1332

    4.    Email Correspondence
         various dates ................................................. 1343

    5.    Deletion Requests
         dated May 27, 2021 ...................................... 1348

    6.    Email Correspondence
         various dates ................................................. 1349

    7.    Email Correspondence
         various dates ................................................. 1352

**Fourth Declaration of Timothy Draegen,**
**With Exhibits,**
    executed June 22, 2021..................................................................1354

    <u>Exhibits</u>:

    1.    **Videos**
            dated June 1, 2021............................................1358

    2.    **DMarc Advisor**
            undated ............................................................1359

    3.    **Letter to Customer from**
        **The Board of Dmarcian Europe BV**
        **Re:  Support**
            undated ............................................................1360

    4.    **DMarc Advisor Log In**
            undated ............................................................1364

    5.    **Dmarcian Twitter**
            undated ............................................................1365

**Declaration of Philip Blazer Catzen,**
**With Exhibits,**
    executed on June 21, 2021............................................................1366

    <u>Exhibits</u>:

    1.    **Catzen Forensic**
            undated ............................................................1370

    2.    **Screen Shot from www.dmarcadvisor.com**
            undated ............................................................1376

    3.    **Screen Shot from dmarcian.nl**
            undated ............................................................1387

    4.    **Geo Statement**
            undated ............................................................1393

**Second Declaration of Timo Jansen,**
**With Exhibits,**
>       executed June 22, 2021 ........................................................ 1394

>       Exhibits:

>       1.     **Email Correspondence**
>              various dates ................................................ 1397

>       2.     **Judgment**
>              dated May 31, 2021 ....................................... 1402

>       3.     **Email Correspondence**
>              various dates ................................................ 1420

>       4.     **Wijzigingsformulier**
>              dated March 2, 2021 ...................................... 1423

**Notice of Filing,**
**With Exhibits,**
>       filed June 22, 2021 ........................................................... 1424

>       Exhibits:

>       1.     **Letter to**
>              **Press Millen from**
>              **Pamela Duffy**
>              **Re:  Changes to Website**
>              dated June 3, 2021 ........................................ 1427

>       2.     **Letter to**
>              **Press Millen from**
>              **Pamela Duffy**
>              **Re:  Changes to Website**
>              dated June 7, 2021 ........................................ 1430

>       3.     **Letter to**
>              **Pamela Duffy from**
>              **Press Millen**
>              **Re:  Issues**
>              dated June 9, 2021 ........................................ 1434

Exhibits, continued:

4.   Letter to
     Press Millen from
     Pamela Duffy
     Re:  Issues
          dated June 14, 2021...........................................................1438

5.   Letter to
     Pamela Duffy from
     Press Millen
     Re:  Issues
          dated June 21, 2021...........................................................1443

6.   Letter to
     Alfred Meijboom from
     Timo Jansen
     Re:  Judgment
          dated June 21, 2021...........................................................1445

Second Amended Complaint,
With Exhibits,
     filed June 22, 2021 ...............................................................1449

Exhibits:

A.   United States Trademark Registration for DMARCIAN
          dated January 31, 2012.......................................................1497

B.   dBV Message to Customers
          undated ..........................................................................1499

C.   GDPR False Data Breach Notice
          undated ..........................................................................1500

D.   False Trial Signups
          undated ..........................................................................1501

E.   Dmarcian.com Terms of Service
          undated ..........................................................................1504

Exhibits, continued:

F.    Message to Customers from
      Court Appointed Director Hameling
            dated March 19, 2021 ........................................................ 1508

G.    Interference with Contract Emails
            various dates ...................................................................... 1510

H.    UK Trademark Registration for DMARCIAN
            dated February 26, 2021 .................................................... 1516

I.    EU Trademark Registration for DMARCIAN
            dated March 22, 2021 ........................................................ 1517

Defendant's Notice of Appeal
      filed June 25, 2021 .................................................................. 1519

Show Cause Order of
The Honorable Martin Reidinger
      filed June 28, 2021 .................................................................. 1520

## <u>TABLE OF CONTENTS</u>
## VOLUME IV OF VI

**<u>Appendix Page</u>**

**Defendant's Second Notice of Filing,**
**With Attachments,**
  **filed July 6, 2021** ................................................................. 1524

**<u>Attachments:</u>**

1. **Second Declaration of Alfred Meijboom,**
  **With Exhibits,**
   **executed July 1, 2021** ...................................... 1529

**<u>Exhibits:</u>**

 1. **Letter to**
  **Mr. Jansen from**
  **Alfred Meijboom**
   **dated July 1, 2021**................................... 1546

 2. **Evidence of Delivery of**
  **Rotterdam Court Order to dInc in the U.S.**
   **dated February 1, 2021**............................. 1552

 3. **Email to**
  **Shannon C. Draegen and Tim Draegen from**
  **Hub. J. Harmeling**
   **dated February 19, 2021**.......................... 1569

 4. **Copyright Assignment Agreement between**
  **BeLean and dBV**
   **dated February 25, 2021** ......................... 1572

 5. **Copyright Assignment Agreement between**
  **Dmarcian Bulgaria and dBV**
   **dated January 27, 2021**............................. 1579

**Exhibits,** continued:

6.  **Legal Opinion of Violetta Kunze of
    Djingov, Gouginski, Kyutchukov and Velichkov**
    **dated January 28, 2021**..............................1583

7.  **Copyright Assignment Agreement between
    Kaman, Measuremail and dBV**
    **dated June 29, 2021**...................................1587

8.  **Copyright Assignment Agreement between
    Kalkman, Sportadvertentie.nl and dBV**
    **dated June 25, 2021**...................................1592

10. **Declaration of Rosalie Brand,**
    **executed July 2, 2021**.........................................1596

11. **Second Declaration of Hub J. Harmeling**
    **executed July 6, 2021**.........................................1599

**Exhibits:**

A.  **Email to
    Shannon C. Draegen and Tim Draegen from
    Hub J. Harmeling
    Re:  Resolution**
    **dated February 19, 2021**..............................1646

B.  **Email to
    Shannon C. Draegen and Tim Draegen from
    Hub J. Harmeling
    Re:  Resolution**
    **dated February 2, 2021** ..............................1649

C.  **Screenshot of Website**
    **dated July 5, 2021**....................................1652

D.  **Email Correspondence**
    **various dates** .........................................1660

Exhibits, continued:

   E.   Email Correspondence
      various dates .......................................................... 1664

   F.   Email Correspondence
      dated April 6, 2021.............................................. 1674

18.   Third Declaration of Martijn Groeneweg,
   With Exhibits,
      executed July 6, 2021 .......................................... 1676

Exhibits:

   A.   Product Changelog
      various dates .......................................................... 1699

   B.   Task to Remove all Old Code from Source Code
      dated November 7, 2019........................................... 1724

   C.   Copyright Statement Added to Website by Rob Wise
      dated December 9, 2019 .......................................... 1726

   D.   Chart of Repositories, Features and IPR
      various dates .......................................................... 1731

   E.   Dmarcian.com Pricing Page
      dated June 27, 2021................................................ 1733

   F.   Dmarcian.com Home Page and Tools Page
      dated July 4, 2021.................................................. 1735

   G.   Email Correspondence
      dated March 1, 2021............................................... 1743

   H.   Software Development Costs
      various dates .......................................................... 1745

   I.   Source Data Added to Version Control
      undated .................................................................. 1747

<u>Exhibits</u>, continued:

      J.     Actions Taken by dBV
             various dates ........................................................... 1750

      K.    Dmarcadvisor.com Website
             dated May 29, 2021 ..................................................... 1752

      L.     Version of dmarcadvisor.com Website
             dated July 6, 2021 ...................................................... 1757

      M.   Blog Posts
             various dates ........................................................... 1759

      N.    Condor Cycles Quote and Invoice
             various dates ........................................................... 1766

      O.    Aber Instruments Quote and Invoice
             various dates ........................................................... 1770

      P.     Workingham District Council Quote and Invoice
             various dates ........................................................... 1774

      Q.    1do Via Partner Promax Quote, Invoice and
           Partner Agreement
             various dates ........................................................... 1778

      R.     Email Indicating Sirvoy had Completed Migration
             dated May 18, 2021 ................................................... 1791

Defendant's Motion to Stay Pending Appeal or, in the
Alternative, to Modify or Clarify
        filed July 6, 2021 ........................................................ 1793

Defendant's Response to Show Cause Order
        filed July 6, 2021 ........................................................ 1795

Defendant's Notice of Intent to Defend, and if Deemed Necessary, Motion for
Extension Pending Appeal
        filed July 6, 2021 ........................................................ 1820

**Fifth Declaration of Shannon Draegen,**
**With Exhibits,**
    executed July 13, 2021 ........................................................ 1824

    Exhibits:

    1.    **Email Correspondence**
        various dates .................................................. 1830

    2.    **dBV's Website Page**
        undated ........................................................ 1831

    3.    **Dmarcian Website Page**
        undated ........................................................ 1836

    4.    **Email Correspondence**
        various dates .................................................. 1837

    5.    **Email Correspondence**
        various dates .................................................. 1839

    6.    **Email Correspondence**
        various dates .................................................. 1842

    7.    **Email Correspondence**
        various dates .................................................. 1848

**Second Declaration of Philip Blazer Catzen,**
**With Exhibits,**
    executed July 13, 2021 ........................................................ 1852

    Exhibits:

    1.    **www.eu.dmarcadvisor.com Log in Page**
        undated ........................................................ 1856

    2.    **DMARC Scorecards**
        undated ........................................................ 1857

    3.    **"DMARC XML to Human Converter"**
        undated ........................................................ 1858

<u>Exhibits</u>, continued:

4.     **Cover Page to Video Exhibit 4**
       undated ............................................................ 1859

5.     **Geo Statement**
       undated ............................................................ 1860

6.     **Cover Page to Video Exhibit 6**
       undated ............................................................ 1861

7.     **Cover Page to Video Exhibit 7**
       undated ............................................................ 1862

8.     **Google Search for "Meet the Team"**
       dated July 12, 2021 ...................................... 1863

9.     **Codes**
       undated ............................................................ 1864

10.    **URL Paths**
       dated July 12, 2021 ...................................... 1865

**Sixth Declaration of Shannon Draegen,**
**With Exhibits,**
       executed July 20, 2021 ................................. 1866

<u>Exhibits:</u>

1.     **Email Correspondence**
       various dates ................................................. 1870

2.     **Email Correspondence**
       various dates ................................................. 1873

**Plaintiff's Motion to Strike**
       filed July 20, 2021 ........................................ 1878

Fourth Declaration of Martijn Groeneweg,
With Exhibits,
    executed July 27, 2021 .......................................................... 1884

    <u>Exhibits</u>:

    A.    Quotation with dBV
            dated December 15, 2020 ................................................ 1889

    B.    Email Correspondence
            various dates ...................................................... 1893

    C.    HTML Source Code of the Homepage of the Website
            undated ........................................................... 1896

    D.    DMARC Record of Canaccordgenuity.com
            undated ........................................................... 1910

    E.    Maps
            various dates ...................................................... 1912

    F.    Dmarcian Europe BV Partner Agreement
            undated ........................................................... 1918

Transcript of Motions Hearing before
The Honorable Martin Reidinger
    on July 28, 2021 ................................................................. 1928

Fifth Declaration of Martijn Groeneweg,
    executed August 6, 2021 .................................................... 2028

Show Cause Order of
The Honorable Martin Reidinger
    filed August 11, 2021 ......................................................... 2030

# TABLE OF CONTENTS
## VOLUME V OF VI

**Appendix Page**

**Order of**
**The Honorable Martin Reidinger**
**Re:  Denying Defendant's Motion to Stay Pending Appeal or, in the**
**Alternative, to Modify or Clarify**
        **filed August 11, 2021** ............................................................2057

**Amended Preliminary Injunction**
        **filed August 11, 2021** ............................................................2075

**Sixth Declaration of Martijn Groeneweg,**
**With Exhibit,**
        **executed August 25, 2021**.......................................................2079

        **Exhibit:**

        **A.      Screen Shots of Website**
                        **undated** .........................................................2083

**Declaration of Pamela S. Duffy,**
**With Exhibits,**
        **executed September 3, 2021**...................................................2089

        **Exhibits:**

        **1.      Billing Cycle**
                        **dated August 25, 2021** .................................2097

        **2.      Travel Related Costs**
                        **undated** .........................................................2100

        **3.      Invoices Charged by Carolina Digital Forensics for**
                **Mr. Catzen's Time**
                        **various dates** ................................................2101

Exhibits, continued:

4.    Letter to
      Pressly M. Millen and Samuel B. Hartzell from
      Pamela S. Duffy
      Re:  Domain Issues
              dated August 23, 2021 ................................................. 2105

5.    Letter to
      Pamela Duffy from
      Samuel B. Hartzell
      Re:  Mail Exchange Records
              dated September 2, 2021 ................................................. 2107

Declaration of David A. Dorey,
With Exhibit,
      executed September 3, 2021................................................. 2110

Exhibit:

1.    Redacted Invoice
              dated June 23, 3021 ........................................... 2120

Declaration of Mark A. Nebrig
      filed September 3, 2021 ................................................. 2148

Defendant's Second Notice of Appeal
      filed September 10, 2021 ................................................. 2153

Defendant's Notice of Filing of Investigation Report,
With Exhibits,
      filed September 10, 2021 ................................................. 2155

Exhibits:

A.    Investigation Report filed with the Enterprise Court
              dated September 3, 2021 ................................................. 2157

B.    English Translation of Investigation
      Report filed with the Enterprise Court
              dated September 3, 2021 ................................................. 2295

## <u>TABLE OF CONTENTS</u>
## VOLUME VI OF VI

**<u>Appendix Page</u>**

**Defendant's Notice of Filing of Investigation Report,**
**With Exhibits,**
> **filed September 10, 2021, continued:**

> **<u>Exhibits</u>, continued:**

> **C.    Exhibits 1 through 52 to English Translation of**
> **Investigation Report filed with the**
> **Enterprise Court dated September 3, 2021**
> > various dates ...................................................................2404

> **D.    Exhibits 53 through 104 to English Translation of**
> **Investigation Report filed with the**
> **Enterprise Court dated September 3, 2021**
> > various dates ................................................................... 2712

> **E.    Decision of the Enterprise Court Confirming**
> **Receipt of the Investigation Report**
> > dated September 3, 2021 .................................................2860

> **F.    English Translation of Decision of the**
> **Enterprise Court Confirming Receipt of the**
> **Investigation Report dated September 3, 2021**
> > various dates .................................................................2864

12/2/21, 11:26 AM                    CM/ECF - LIVE DATABASE - NCWD

**Query     Reports     Utilities     Help     Log Out**

APPEAL

# U.S. District Court
## Western District of North Carolina (Asheville)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00067-MR

Dmarcian, Inc. v. Dmarcian Europe BV                    Date Filed: 03/12/2021
Assigned to: Chief Judge Martin Reidinger              Jury Demand: Plaintiff
Case in other court: 4th Circuit, 21-01721            Nature of Suit: 820 Copyright
                4th Circuit, 21-02005    Jurisdiction: Federal Question
Cause: 17:501 Copyright Infringement

**Plaintiff**

**Dmarcian, Inc.**                    represented by  **David A. Dorey**
                                              Blank Rome LLP
                                              1201 N. Market Street, Suite 800
                                              Wilmington, DE 19801
  302-425-6418
  Fax: 302-425-6464
  Email: dorey@blankrome.com
  *LEAD ATTORNEY*
  *PRO HAC VICE*
  *ATTORNEY TO BE NOTICED*

  **Pamela S. Duffy**
  Sharpless McClearn Lester Duffy, PA
  200 South Elm Street, Suite 400
  Greensboro, NC 27401
  336-333-6389
  Fax: 336-333-6399
  Email: pduffy@sharplesslaw.com
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Dmarcian Europe BV**                    represented by  **Pressly M. Millen**
  Womble Bond Dickinson (US) LLP
  555 Fayetteville St., Suite 1100
  P. O. Box 831 (27602)
  Raleigh, NC 27601
  919-755-2135
  Fax: 919-755-6067
  Email: Press.Millen@wbd-us.com
  *ATTORNEY TO BE NOTICED*

  **Samuel B. Hartzell**
  Womble Bond Dickinson (US) LLP

-1-

555 Fayetteville St., Suite 1100
Raleigh, NC 27601
919-755-2112
Email: Sam.Hartzell@wbd-us.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/12/2021 | 1 | COMPLAINT against Dmarcian Europe BV with Jury Demand (Filing fee $402 receipt number 0419-4937815), filed by Dmarcian, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Duffy, Pamela) Modified text on 3/15/2021 (rhf). (Entered: 03/12/2021) |
| 03/15/2021 | | Case assigned to Chief Judge Martin Reidinger and Magistrate Judge W. Carleton Metcalf. Notice: You must click this link to retrieve the **Case Assignment Packet**. *This is your only notice - you will not receive a separate document.* (rhf) (Entered: 03/15/2021) |
| 03/15/2021 | 2 | Summons Issued Electronically as to Dmarcian Europe BV. **NOTICE: Counsel shall print the summons and serve with other case opening documents in accordance with Fed.R.Civ.P.4** . (rhf) (Entered: 03/15/2021) |
| 03/15/2021 | | ***Assignment made in error. Magistrate Judge W. Carleton Metcalf no longer assigned to case. (khm) (Entered: 03/15/2021) |
| 03/16/2021 | 3 | REPORT on the Filing of of a copyright action. (rhf) Modified text on 3/16/2021 (rhf). (Entered: 03/16/2021) |
| 03/17/2021 | 4 | Corporate Disclosure Statement by Dmarcian, Inc. (Duffy, Pamela) (Entered: 03/17/2021) |
| 03/23/2021 | 5 | MOTION for Leave to File Excess Pages by Dmarcian, Inc.. Responses due by 4/6/2021 (Duffy, Pamela) (Entered: 03/23/2021) |
| 03/24/2021 | | **TEXT-ONLY ORDER granting 5 Motion for Leave to File Excess Pages** *Text of Order: The Plaintiff's Motion is GRANTED, and the Plaintiff shall have leave to file a brief in excess of 25 pages. Such brief shall not exceed 38 pages, exclusive of caption and signature pages, and shall be double-spaced and in 14-point font. So Ordered.* **Entered by Chief Judge Martin Reidinger on 3/24/21. (LMR)** (Entered: 03/24/2021) |
| 03/25/2021 | 6 | MOTION for Temporary Restraining Order, MOTION for Preliminary Injunction by Dmarcian, Inc. Responses due by 4/8/2021. (Duffy, Pamela) Added additional motion relief for Preliminary Injunction on 3/31/2021. (khm) (Entered: 03/25/2021) |
| 03/25/2021 | 7 | MEMORANDUM in Support re 6 MOTION for Temporary Restraining Order *and Preliminary Injunction* by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 03/25/2021) |
| 03/25/2021 | 8 | DECLARATION re 6 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit SD Exh A, # 2 Exhibit SD Exh B-1, # 3 Exhibit SD Exh B-2, # 4 Exhibit SD Exh B-3, # 5 Exhibit SD Exh B-4, # 6 Exhibit SD Exh C-1, # 7 Exhibit SD Exh C-2, # 8 Exhibit SD Exh C-3, # 9 Exhibit SD Exh C-4, # 10 Exhibit SD Exh D, # 11 Exhibit SD Exh E, # 12 Exhibit SD Exh F, # 13 Exhibit SD Exh G-1, # 14 Exhibit SD Exh G-2)(Duffy, Pamela) (Entered: 03/25/2021) |
| 03/25/2021 | 9 | DECLARATION of Timothy Draegen re 6 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit TD Exh A, # 2 Exhibit TD Exh B)(Duffy, Pamela) (Entered: 03/25/2021) |
| 03/29/2021 | 10 | NOTICE OF Appearance and REQUEST for Briefing Schedule by Pressly M. Millen on behalf of Dmarcian Europe BV (Attachments: # 1 Exhibit A - Enterprise Court Orders of |

| | | |
|---|---|---|
| | | Sept. 7 and 10, 2020, # 2 Exhibit B - Order of Roterdam Court February 1, 2021)(Millen, Pressly) Modified on 3/29/2021 to change event to a motion. (khm) (Entered: 03/29/2021) |
| 03/29/2021 | | **TEXT-ONLY ORDER granting in part and denying in part 10 REQUEST for Briefing Schedule.** *Text of Order: The Defendant's request to submit briefing is hereby granted in part and denied in part. Specifically, the request is granted to the extent that the Defendant shall have until 12:00 pm on March 30, 2021 to respond to the Plaintiff's motion for a temporary restraining order and the Defendant shall have until April 19, 2021 to respond to the Plaintiff's motion for preliminary injunction. So Ordered.* **Entered by Chief Judge Martin Reidinger on 3/29/2021. (khm)** (Entered: 03/29/2021) |
| 03/30/2021 | 11 | MEMORANDUM in Opposition re 6 MOTION for Temporary Restraining Order *and Preliminary Injunction* by Dmarcian Europe BV. Replies due by 4/6/2021 (Attachments: # 1 Exhibit Declaration of Timothy Draegen in Support of Motions to Quash Service of Summons for Lack of Personal Jurisdiction)(Millen, Pressly) (Entered: 03/30/2021) |
| 03/31/2021 | 12 | **ORDER that Plaintiff's 6 MOTION for Temporary Restraining Order is DENIED; Plaintiff's 6 MOTION for Preliminary Injunction is HELD IN ABEYANCE pending further presentation of evidence and briefing by the parties. Plaintiff may supplement its evidence in support of its Motion for Preliminary Injunction within 7 days of the entry of this Order. Defendant's response to Plaintiff's Motion for Preliminary Injunction shall be filed no later than 4/19/2021, with Plaintiff's reply to be filed by 4/21/2021. The parties shall appear on 4/23/2021 at 10:00 a.m. in Courtroom 1, United States Courthouse, 100 Otis Street, Asheville, North Carolina 28801, before Chief Judge Martin Reidinger for a hearing on the Plaintiff's Motion for Preliminary Injunction. Signed by Chief Judge Martin Reidinger on 3/31/2021. (khm)** (Entered: 03/31/2021) |
| 03/31/2021 | | NOTICE of Hearing on Motion re: 6 MOTION for Preliminary Injunction: Motion Hearing set for 4/23/2021 at 10:00 AM in Courtroom 1, 100 Otis St, Asheville, NC 28801 before Chief Judge Martin Reidinger. *This is your only notice - you will not receive a separate document.* (khm) (Entered: 03/31/2021) |
| 04/01/2021 | 13 | MOTION for Leave to Appear Pro Hac Vice as to David A. Dorey Filing fee $ 288, receipt number 0419-4967159. by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 04/01/2021) |
| 04/06/2021 | 14 | **ORDER granting 13 Motion for Leave to Appear Pro Hac Vice added David A. Dorey for Dmarcian, Inc.** *(Pro Hac Vice Attorney served via NEF)* **Signed by Chief Judge Martin Reidinger on 4/6/2021. (khm)** (Entered: 04/06/2021) |
| 04/06/2021 | | Notice to David A. Dorey: Pursuant to Local Rule 83.1 you are required to **Register** for ECF Account **Application Link**. *(Attorney served via NEF)* Deadline by 4/13/2021. (khm) Modified text on 4/6/2021. (khm) (Entered: 04/06/2021) |
| 04/07/2021 | 15 | DECLARATION of Shannon Draegen *(Supplemental)* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit H, # 2 Exhibit I, # 3 Exhibit J, # 4 Exhibit K, # 5 Exhibit L) (Duffy, Pamela) (Entered: 04/07/2021) |
| 04/07/2021 | 16 | DECLARATION of Timothy Draegen *(Supplemental)* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit C, # 2 Exhibit D)(Duffy, Pamela) (Entered: 04/07/2021) |
| 04/07/2021 | 17 | DECLARATION of Timo Jansen filed by Dmarcian, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Duffy, Pamela) (Entered: 04/07/2021) |
| 04/07/2021 | 18 | MOTION for Extension of Time for Filing of Supplemental Evidence by Dmarcian, Inc.. |

| | | |
|---|---|---|
| | | Responses due by 4/21/2021 (Duffy, Pamela) (Entered: 04/07/2021) |
| 04/07/2021 | 19 | AMENDED COMPLAINT *(First)* with Jury Demand against Dmarcian, Inc., filed by Dmarcian, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Duffy, Pamela) (Entered: 04/07/2021) |
| 04/08/2021 | | **TEXT-ONLY ORDER granting 18 Motion for Extension of Time for Filing of Supplemental Evidence** *Text of Order: For the reasons stated in the Plaintiff's Motion to Extend Time [Doc. 18], and with the Defendant's consent, Plaintiff's Motion is GRANTED, and the deadline to file the supplemental evidence specifically referred to in Plaintiff's Motion is hereby extended to April 9, 2021. So Ordered.* **Entered by Chief Judge Martin Reidinger on 4/8/21. (TWG)** (Entered: 04/08/2021) |
| 04/09/2021 | 20 | NOTICE *of Filing of Translated Documents from Foreign Proceedings* by Dmarcian, Inc. re 6 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Duffy, Pamela) (Entered: 04/09/2021) |
| 04/19/2021 | 21 | Consent MOTION for Leave to File Excess Pages *(Defendant's Motion on Consent for Permission to Exceed Page Limit)* by Dmarcian Europe BV. Responses due by 5/3/2021 (Millen, Pressly) (Entered: 04/19/2021) |
| 04/19/2021 | | **TEXT-ONLY ORDER granting 21 Motion for Leave to File Excess Pages** *Text of Order: The Defendant's Motion is GRANTED, and the Defendant shall have leave to file a brief in excess of 25 pages. Such brief shall not exceed 38 pages, exclusive of caption and signature pages, and shall be double-spaced and in 14-point font. So Ordered.* **Entered by Chief Judge Martin Reidinger on 4/19/21. (LMR)** (Entered: 04/19/2021) |
| 04/19/2021 | 22 | MOTION to Dismiss by Dmarcian Europe BV. Responses due by 5/3/2021 (Millen, Pressly) (Entered: 04/19/2021) |
| 04/19/2021 | 23 | MEMORANDUM in Support re 22 MOTION to Dismiss by Dmarcian Europe BV. (Millen, Pressly) (Entered: 04/19/2021) |
| 04/19/2021 | 24 | NOTICE of Appearance by Samuel B. Hartzell on behalf of Dmarcian Europe BV (Hartzell, Samuel) (Entered: 04/19/2021) |
| 04/19/2021 | 25 | MEMORANDUM in Opposition re 6 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction by Dmarcian Europe BV. Replies due by 4/26/2021 (Millen, Pressly) (Entered: 04/19/2021) |
| 04/19/2021 | 26 | NOTICE *of Filing* by Dmarcian Europe BV re 22 MOTION to Dismiss (Attachments: # 1 Exhibit 1-Declaration of Hub J. Harmeling, # 2 Exhibit A-Annex 2 - Enterprise Court Order of September 7 and 10, 2020, # 3 Exhibit B-Order of Rotterdam Court February 1, 2021, # 4 Exhibit C-Message from Court-appointed director of dmarcian Europe BV via dmarcian.eu, # 5 Exhibit 2-Declaration of Alfred Meijboom, # 6 Exhibit A-Service Documents re Summons, # 7 Exhibit B-Emails re Rotterdam Decision, # 8 Exhibit C-Service Documents re Rotterdam Decision and Amendment Decision, # 9 Exhibit 3-Declaration of Martijn Groeneweg, # 10 Exhibit A-2016-12-07 Email from Draegen, # 11 Exhibit B-2016-12-07 Email from Groeneweg, # 12 Exhibit C-2016-12-08 Email from Groeneweg, # 13 Exhibit D-2016-12-08 Email from Draegen, # 14 Exhibit E-2017-09-29 Email from Draegen, # 15 Exhibit F-2018-08-06 Email from Draegen, # 16 Exhibit G-2019-08-21 Slack, # 17 Exhibit H-2019-12-03 Attachment to Email from Exhibit C - 2016-12-08 Email from Groeneweg, # 18 Exhibit I-2019-12-04 Email from Draegen, # 19 Exhibit J-2021-04-12 Sales 2020-21)(Millen, Pressly) (Entered: 04/19/2021) |
| 04/20/2021 | 27 | MOTION for Leave to File Excess Pages *in Reply Brief* by Dmarcian, Inc.. Responses due by 5/4/2021 (Duffy, Pamela) (Entered: 04/20/2021) |

| | | |
|---|---|---|
| 04/21/2021 | | **TEXT-ONLY ORDER granting 27 Motion for Leave to File Excess Pages** *Text of Order: The Plaintiff's Motion is GRANTED, and the Plaintiff shall have leave to file a reply brief in excess of 10 pages. Such brief shall not exceed 15 pages, exclusive of caption and signature pages, and shall be double-spaced and in 14-point font. So Ordered.* **Entered by Chief Judge Martin Reidinger on 4/21/21. (LMR)** (Entered: 04/21/2021) |
| 04/21/2021 | 28 | SUMMONS Returned Executed by Dmarcian, Inc.; Dmarcian Europe BV served on 4/15/2021, answer due 5/6/2021. (Duffy, Pamela) NEF Regenerated. Modified text on 4/21/2021 (hms). (Entered: 04/21/2021) |
| 04/21/2021 | | Set/Reset Deadlines: Dmarcian Europe BV answer due 5/6/2021. (hms) (Entered: 04/21/2021) |
| 04/21/2021 | 29 | REPLY to Response to Motion re 6 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction by Dmarcian, Inc.. (Attachments: # 1 Exhibit A) (Duffy, Pamela) (Entered: 04/21/2021) |
| 04/23/2021 | | Minute Entry: MOTION HEARING held before Chief Judge Martin Reidinger on 4/23/2021 re: 6 Motion for Preliminary Injunction. Motion taken under advisement. Counsel to file their joint, or individual brief(s), as outlined by the court, by 4/30/2021. Plaintiff's attorneys: Pamela S. Duffy and David A. Dorey. Defendants' attorneys: Pressly M. Millen and Samuel B. Hartzell. Court reporter: Tracy Dunlap (828-771-7217). (maf) Modified text on 4/26/2021 to correct Brief(s) due date to 4/30/2021. NEF Regenerated. (kby) (Entered: 04/23/2021) |
| 04/23/2021 | | Set Deadlines: Brief(s) with respect to the 6 Motion for Preliminary Injunction due by 4/30/2021. (maf) (Entered: 04/23/2021) |
| 04/30/2021 | 30 | DECLARATION of Timothy Draegen *(Second Supplemental)* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit E, # 2 Exhibit F, # 3 Exhibit G, # 4 Exhibit H)(Duffy, Pamela) (Entered: 04/30/2021) |
| 04/30/2021 | 31 | RESPONSE in Opposition re 22 MOTION to Dismiss by Dmarcian, Inc.. Replies due by 5/7/2021 (Duffy, Pamela) (Entered: 04/30/2021) |
| 04/30/2021 | 32 | MEMORANDUM/BRIEF *(Defendant's Brief on Proposed Voluntary Commitments)* by Dmarcian Europe BV (Millen, Pressly) (Entered: 04/30/2021) |
| 04/30/2021 | 33 | MEMORANDUM in Support re 6 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *Proposed Restraints* by Dmarcian, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Duffy, Pamela) (Entered: 04/30/2021) |
| 05/05/2021 | 34 | TRANSCRIPT of Motion for Temporary Restraining Order held on April 23, 2021 before Judge Martin Reidinger. Court Reporter Tracy Rae Dunlap, telephone number 828.771.7217. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request*. **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 8/2/2021. (Reporter: Tracy Dunlap, 828-771-7217) (Entered: 05/05/2021) |
| 05/07/2021 | 35 | REPLY to Response to Motion re 22 MOTION to Dismiss by Dmarcian Europe BV. (Attachments: # 1 Exhibit Second Declaration of Martijn Groeneweg, # 2 Exhibit A to 2nd Dec. of M. Groeneweg-Agreement Saas, # 3 Exhibit B to 2nd Dec. of M. |

| | | |
|---|---|---|
| | | Groeneweg-Partner Agreement, # 4 Exhibit C to 2nd Dec. of M. Groeneweg-Dist. Court of N. Holland Judgment 5.7.21)(Millen, Pressly) (Entered: 05/07/2021) |
| 05/19/2021 | 36 | MOTION to Amend/Correct 19 Amended Complaint by Dmarcian, Inc.. Responses due by 6/2/2021 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Duffy, Pamela) (Entered: 05/19/2021) |
| 05/19/2021 | 37 | Exhibit to 36 Motion to Amend/Correct *Exhibits to Proposed Second Amended Complaint* by Dmarcian, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Duffy, Pamela) Modified text on 5/20/2021 (kby). (Entered: 05/19/2021) |
| 05/19/2021 | 38 | MEMORANDUM/BRIEF by Dmarcian, Inc. re: 36 Motion to Amend/Correct (Duffy, Pamela) (Entered: 05/19/2021) |
| 05/26/2021 | 39 | **ORDER and PRELIMINARY INJUNCTION. (See Order for details.) The Plaintiff shall post a bond in the amount of $25,000. Signed by Chief Judge Martin Reidinger on 5/26/2021. (khm)** (Entered: 05/26/2021) |
| 05/27/2021 | | Cash BOND in the amount of $ 25,000.00 posted by Dmarcian, Inc. Receipt number CHD065744. (tlj) (Entered: 05/27/2021) |
| 06/01/2021 | 40 | RESPONSE to Motion re 36 MOTION to Amend/Correct 19 Amended Complaint by Dmarcian Europe BV. Replies due by 6/8/2021 (Millen, Pressly) (Entered: 06/01/2021) |
| 06/09/2021 | 41 | Consent MOTION for Extension of Time to Answer re: 19 Amended Complaint by Dmarcian Europe BV. (Millen, Pressly) (Entered: 06/09/2021) |
| 06/15/2021 | 42 | **ORDER granting Plaintiff's 36 Motion for Leave of Court to Supplement the Plaintiff's Complaint, and the Plaintiff shall file its Second Amended Complaint within 7 days of the entry of this Order. FURTHER ORDERED that the Defendant's 41 Consent Motion for Extension of Time to Respond to Complaint is DENIED AS MOOT. ( Amended Pleadings due by 6/22/2021.) Signed by Chief Judge Martin Reidinger on 6/15/2021. (khm)** (Entered: 06/15/2021) |
| 06/22/2021 | 43 | MOTION for Order to Show Cause by Dmarcian, Inc.. Responses due by 7/6/2021 (Duffy, Pamela) (Entered: 06/22/2021) |
| 06/22/2021 | 44 | DECLARATION of Shannon Draegen re 43 MOTION for Order to Show Cause filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1 - Condor Cycles, # 2 Exhibit 2 - Aber Instruments, # 3 Exhibit 3 - WBC-Phoenix, # 4 Exhibit 4 - 1Do - Promax, # 5 Exhibit 5 - Delete Requests, # 6 Exhibit 6 - Sirvoy, # 7 Exhibit 7 - Signature Block - Rema)(Duffy, Pamela) (Entered: 06/22/2021) |
| 06/22/2021 | 45 | DECLARATION of Timothy Draegen re 43 MOTION for Order to Show Cause filed by Dmarcian, Inc. (Attachments: # 1 Cover Sheet Exh 1 - videos, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Duffy, Pamela) (Entered: 06/22/2021) |
| 06/22/2021 | 46 | DECLARATION of Philip Blazer Catzen re 43 MOTION for Order to Show Cause filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Duffy, Pamela) (Entered: 06/22/2021) |
| 06/22/2021 | 47 | DECLARATION of Timo Jansen re 43 MOTION for Order to Show Cause filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Duffy, Pamela) (Entered: 06/22/2021) |
| 06/22/2021 | 48 | NOTICE *of Filing* by Dmarcian, Inc. re 43 MOTION for Order to Show Cause (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Duffy, Pamela) (Entered: 06/22/2021) |

| 06/22/2021 | 49 | MEMORANDUM in Support re 43 MOTION for Order to Show Cause by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 06/22/2021) |
| --- | --- | --- |
| 06/22/2021 | 50 | MOTION for Discovery *Early under LR 16.1* by Dmarcian, Inc.. Responses due by 7/6/2021 (Duffy, Pamela) (Entered: 06/22/2021) |
| 06/22/2021 | 51 | SECOND AMENDED COMPLAINT with Jury Demand against Dmarcian Europe BV, filed by Dmarcian, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Duffy, Pamela) Modified text on 6/23/2021 (kby). (Entered: 06/22/2021) |
| 06/25/2021 | 52 | NOTICE OF APPEAL as to 39 Order on Motion for Preliminary Injunction, Order on Motion to Dismiss by Dmarcian Europe BV. Filing fee $ 505, receipt number 0419-5091869. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Millen, Pressly) (Main Document 52 replaced with corrected pdf on 6/25/2021) NEF Regenerated. (khm) (Entered: 06/25/2021) |
| 06/25/2021 | 53 | Transmission of Notice of Appeal to US Court of Appeals re 52 Notice of Appeal. (khm) (Entered: 06/25/2021) |
| 06/28/2021 | 54 | **SHOW CAUSE ORDER: Within eight (8) days of the entry of this Order, the Defendant shall SHOW CAUSE in writing why the Court should not impose sanctions for failure to comply with the preliminary injunction imposed on May 26, 2021. The Defendant's filing shall include an explanation for the Defendants decision to withhold the Court's May 26, 2021 Order from the Dutch court. Signed by Chief Judge Martin Reidinger on 6/28/2021. (kby)** (Entered: 06/28/2021) |
| 06/28/2021 | 55 | USCA Case Number 21-1721 for 52 Notice of Appeal, USCA Case Manager: Rickie Edwards. (rhf) (Entered: 06/29/2021) |
| 06/29/2021 | 56 | NOTICE *of Conventionally submitted Exhibit* by Dmarcian, Inc. re 45 Declaration. (Attachments: # 1 Cover Letter) (1 USB Flash Drive Located in Asheville Clerk's Office). (rhf) (Entered: 06/29/2021) |
| 07/06/2021 | 57 | NOTICE *of Filing (2nd Notice of FIling)* by Dmarcian Europe BV (Attachments: # 1 Exhibit Second Declaration of Alfred Meijboom, executed July 1, 2021, # 2 Exhibit 1 to 2nd Declaration of Alfred Meijboom, Letter of July 1, 2021 to Mr. Jansen, # 3 Exhibit 2 to 2nd Declaration of Alfred Meijboom, Evidence of delivery of Rotterdam Court Order of February 1, 2021 to dInc in the U.S, # 4 Exhibit 3 to 2nd Declaration of Alfred Meijboom, Email by Mr. Harmeling to Mr. and Mrs. Draegen of February 19, 2021, # 5 Exhibit 4 to 2nd Declaration of Alfred Meijboom, Copyright assignment agreement between BeLean and dBV, # 6 Exhibit 5 to 2nd Declaration of Alfred Meijboom, Copyright assignment agreement between dmarcian Bulgaria and dBV, # 7 Exhibit 6 to 2nd Declaration of Alfred Meijboom, Legal opinion of Violetta Kunze ofDjingov, Gouginski, Kyutchukov & Velichkov, # 8 Exhibit 7 to 2nd Declaration of Alfred Meijboom, Copyright assignment agreement between Kalman, Measuremail and dBV, # 9 Exhibit 8 to 2nd Declaration of Alfred Meijboom, Copyright assignment agreement between Kalkman, Sportadvertentie.nl and dBV, # 10 Exhibit Declaration of Rosalie Brand, executed July 2, 2021, # 11 Exhibit Second Declaration of Hub. J. Harmeling, executed July 6, 2021, # 12 Exhibit A to 2nd Declaration of Hub. J. Harmeling, email dated February 19, 2021, # 13 Exhibit B to 2nd Declaration of Hub. J. Harmeling, email dated February 2, 2021, # 14 Exhibit C to 2nd Declaration of Hub. J. Harmeling, website screenshot dated July 5, 2021, # 15 Exhibit D to 2nd Declaration of Hub. J. Harmeling, emails from February 2021, # 16 Exhibit E to 2nd Declaration of Hub. J. Harmeling, email dated March 8, 2021, # 17 Exhibit F to 2nd Declaration of Hub. J. Harmeling, |

| | | |
|---|---|---|
| | | email dated April 6, 2021, # 18 Exhibit Third Declaration of Martijn Groeneweg, executed July 6, 2021, # 19 Exhibit A to 3rd Declaration of Martijn Groeneweg, Product Changelog, # 20 Exhibit B to 3rd Declaration of Martijn Groeneweg, November 7, 2019 Task to remove all old code from source code, # 21 Exhibit C to 3rd Declaration of Martijn Groeneweg, December 9, 2019, Copyright statement added to website by Rob Wise, # 22 Exhibit D to 3rd Declaration of Martijn Groeneweg, Chart of Repositories, features and IPR, # 23 Exhibit E to 3rd Declaration of Martijn Groeneweg, June 27, 2021 dmarcian.com pricing page, # 24 Exhibit F to 3rd Declaration of Martijn Groeneweg, July 4, 2021 dmarcian.com home page and tools page, # 25 Exhibit G to 3rd Declaration of Martijn Groeneweg, March 1, 2021 email, # 26 Exhibit H to 3rd Declaration of Martijn Groeneweg, software development costs, # 27 Exhibit I to 3rd Declaration of Martijn Groeneweg, source data added to Version Control, # 28 Exhibit J to 3rd Declaration of Martijn Groeneweg, Actions taken by dBV, # 29 Exhibit K to 3rd Declaration of Martijn Groeneweg, May 29, 2021 dmarcadvisor.com website, # 30 Exhibit L to 3rd Declaration of Martijn Groeneweg, July 6, 2021 version of dmarcadvisor.com website, # 31 Exhibit M to 3rd Declaration of Martijn Groeneweg, blog posts, # 32 Exhibit N to 3rd Declaration of Martijn Groeneweg, Condor Cycles quote and invoice, # 33 Exhibit O to 3rd Declaration of Martijn Groeneweg, Aber Instruments quote and invoice, # 34 Exhibit P to 3rd Declaration of Martijn Groeneweg, Workingham District Council quote and invoice, # 35 Exhibit Q to 3rd Declaration of Martijn Groeneweg, 1do via partner Promax quote, invoice and partner agreement, # 36 Exhibit R to 3rd Declaration of Martijn Groeneweg, May 18, 2021 email indicating Sirvoy had completed migration)(Millen, Pressly) (Entered: 07/06/2021) |
| 07/06/2021 | 58 | RESPONSE in Opposition re 50 MOTION for Discovery *Early under LR 16.1* by Dmarcian Europe BV. Replies due by 7/13/2021 (Millen, Pressly) (Entered: 07/06/2021) |
| 07/06/2021 | 59 | MOTION to Stay *Pending 52 Notice of Appeal, or, in the Alternative, to Modify or Clarify* by Dmarcian Europe BV. Responses due by 7/20/2021 (Millen, Pressly) Modified text on 7/7/2021. (khm) (Entered: 07/06/2021) |
| 07/06/2021 | 60 | MEMORANDUM in Support re 59 MOTION to Stay *Pending 52 Notice of Appeal, or, in the Alternative, to Modify or Clarify* by Dmarcian Europe BV. (Millen, Pressly) Modified text on 7/7/2021. (khm) (Entered: 07/06/2021) |
| 07/06/2021 | 61 | RESPONSE to Motion re 43 MOTION for Order to Show Cause, 54 Show Cause ORDER, by Dmarcian Europe BV. Replies due by 7/13/2021 (Millen, Pressly). Modified text on 7/7/2021. (khm) (Entered: 07/06/2021) |
| 07/06/2021 | 62 | NOTICE *of Intent to Defend and, if Deemed Necessary, Motion for Extension Pending Appeal* by Dmarcian Europe BV re 51 Amended Complaint, (Millen, Pressly) (Entered: 07/06/2021) |
| 07/12/2021 | 63 | MOTION for Leave to File Excess Pages by Dmarcian, Inc.. Responses due by 7/26/2021 (Duffy, Pamela) (Entered: 07/12/2021) |
| 07/12/2021 | | **TEXT-ONLY ORDER granting 63 Motion for Leave to File Excess Pages** *Text of Order: The Plaintiff's Motion for Permission to Exceed Page Limit in Reply Brief is GRANTED. So Ordered.* **Entered by Chief Judge Martin Reidinger on 7/12/2020. (JD)** (Entered: 07/12/2021) |
| 07/13/2021 | 64 | DECLARATION of Shannon Draegen *(Fifth)* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Duffy, Pamela) (Entered: 07/13/2021) |
| 07/13/2021 | 65 | DECLARATION of Philip Blazer Catzen *(Second)* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 |

| | | |
|---|---|---|
| | | Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Duffy, Pamela) (Entered: 07/13/2021) |
| 07/13/2021 | 66 | RESPONSE in Support re 43 MOTION for Order to Show Cause by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 07/13/2021) |
| 07/13/2021 | 67 | REPLY to Response to Motion re 50 MOTION for Discovery *Early under LR 16.1* by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 07/13/2021) |
| 07/14/2021 | | NOTICE of Hearing on Motion re: 43 MOTION for Order to Show Cause: Motion Hearing set for 7/28/2021 at 9:00 AM in Courtroom 1, 100 Otis St, Asheville, NC 28801 before Chief Judge Martin Reidinger. All counsel or record are directed to be present. *This is your only notice - you will not receive a separate document.*(khm) (Entered: 07/14/2021) |
| 07/19/2021 | 68 | Exhibit-flash drive containing exhibits 65-4, 65-6, 65-7 by Dmarcian, Inc.. Exhibit to 65 Declaration. (Attachments: # 1 Envelope)(thh) (Entered: 07/20/2021) |
| 07/20/2021 | 69 | DECLARATION of Shannon Draegen *(Sixth)* filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Duffy, Pamela) (Entered: 07/20/2021) |
| 07/20/2021 | 70 | MOTION to Strike by Dmarcian, Inc.. Responses due by 8/3/2021 (Duffy, Pamela) (Entered: 07/20/2021) |
| 07/20/2021 | 71 | MEMORANDUM in Support re 70 MOTION to Strike by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 07/20/2021) |
| 07/20/2021 | 72 | MEMORANDUM in Opposition re 59 MOTION to Stay re 57 Notice, 52 Notice of Appeal *Pending Appeal, or, in the Alternative, to Modify or Clarify* by Dmarcian, Inc. Replies due by 7/27/2021 (Duffy, Pamela) Modified text on 7/20/2021. (khm) (Entered: 07/20/2021) |
| 07/27/2021 | 73 | REPLY to Response to Motion re 59 MOTION to Stay re 57 Notice, 52 Notice of Appeal *Pending Appeal, or, in the Alternative, to Modify or Clarify* by Dmarcian Europe BV. (Millen, Pressly) Modified text on 7/28/2021 (kby). (Entered: 07/27/2021) |
| 07/27/2021 | 74 | DECLARATION of Martijn Groeneweg re 73 Reply to Response to Motion *(Fourth Declaration)* filed by Dmarcian Europe BV (Attachments: # 1 Exhibit A - Affarsverken Karlskrona AB Materials, # 2 Exhibit B - Email with Affarsverken, # 3 Exhibit C - Souce Code of dmarcadvisor.com, # 4 Exhibit D - Canaccord Genuity Corp. RUA, # 5 Exhibit E - Channel IT Locations, # 6 Exhibit F - Cysoft Hellas Ltd. Contract)(Millen, Pressly) (Entered: 07/27/2021) |
| 07/28/2021 | | Minute Entry: MOTION HEARING held before Chief Judge Martin Reidinger on 7/28/2021 re 43 MOTION for Order to Show Cause. Motion taken under advisement. Order to issue. Plaintiff's attorneys: Pamela S. Duffy and David A. Dorey. Defendants' attorneys: Pressly M. Millen and Samuel B. Hartzell. Court reporter: Tracy Dunlap (828-771-7217). (maf) (Entered: 07/28/2021) |
| 07/29/2021 | 75 | NOTICE *of Supplemental Authority in Relation to Order to Show Cause* by Dmarcian, Inc. re 54 Order to Show Cause, (Duffy, Pamela) (Entered: 07/29/2021) |
| 07/29/2021 | 76 | TRANSCRIPT of Motion to Show Cause held on July 28, 2021 before Judge Martin Reidinger. Court Reporter Tracy Rae Dunlap, telephone number 828.771.7217. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day** |

| | | |
|---|---|---|
| | | deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov Release of Transcript Restriction set for 10/25/2021. (Reporter: Tracy Dunlap, 828-771-7217) (Entered: 07/29/2021) |
| 08/03/2021 | 77 | RESPONSE in Opposition re 70 MOTION to Strike by Dmarcian Europe BV. Replies due by 8/10/2021 (Millen, Pressly) (Entered: 08/03/2021) |
| 08/06/2021 | 78 | DECLARATION of Martijn Groeneweg re 54 Order to Show Cause, filed by Dmarcian Europe BV (Millen, Pressly) (Entered: 08/06/2021) |
| 08/06/2021 | 79 | REPLY to Response to Motion re 70 MOTION to Strike by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 08/06/2021) |
| 08/11/2021 | 80 | **ORDER that the Defendant is hereby held in civil contempt of the Court's 39 Preliminary Injunction. The Defendant shall pay to the Plaintiff $5,000.00 for each day after the entry of the Preliminary Injunction, starting from 5/29/2021, that Defendant continues to use the "dmarcian" domain name. FURTHER ORDERED that Defendant shall pay the Plaintiff's attorneys' fees and costs in litigating this matter. Plaintiff shall file a brief detailing its reasonable costs, fees, and expenses incurred in this action within 14 days of the entry of this Order. FURTHER ORDERED that Defendant shall provide a copy of this Order to any and all Dutch courts in any proceedings in which the Plaintiff and the Defendant are parties. (Plaintiff's brief due by 8/25/2021.) Signed by Chief Judge Martin Reidinger on 8/11/2021. (khm) (Main Document 80 replaced with correct pdf on 8/11/2021) NEF Regenerated. (khm) (Entered: 08/11/2021)** |
| 08/11/2021 | | **TEXT-ONLY ORDER denying as moot 50 Motion for Discovery** *Text of Order: The Plaintiff's Motion for Early Court-Enforceable Discovery [Doc. 50] is denied as moot. So Ordered.* **Entered by Chief Judge Martin Reidinger on 8/11/21. (LMR) (Entered: 08/11/2021)** |
| 08/11/2021 | 81 | **ORDER granting in part and denying in part 70 Plaintiff's Motion to Strike. Specifically, the Motion is DENIED as to evidence of events occurring after 4/23/2021, but is otherwise GRANTED. FURTHER ORDERED granting in part and denying in part 59 Defendant's Motion to Stay Pending Appeal or, in the Alternative, to Modify or Clarify. The Motion is GRANTED with regard to Paragraph 6 of the decretal section in the preliminary injunction, which will be amended to read as stated in this Order. The Defendant's Motion to Stay Pending Appeal or, in the Alternative, to Modify or Clarify is otherwise DENIED. An Amended Preliminary Injunction will be entered contemporaneously herewith.. Signed by Chief Judge Martin Reidinger on 8/11/2021. (khm) (Entered: 08/11/2021)** |
| 08/11/2021 | 82 | **AMENDED PRELIMINARY INJUNCTION. Signed by Chief Judge Martin Reidinger on 8/11/2021. (khm) (Entered: 08/11/2021)** |
| 08/23/2021 | 83 | MOTION for Extension of Time for Filing of Papers Relating to Plaintiff's Petition For Fees by Dmarcian, Inc.. Responses due by 9/7/2021 (Duffy, Pamela) (Entered: 08/23/2021) |
| 08/24/2021 | | **TEXT-ONLY ORDER re 83 MOTION for Extension of Time for Filing of Papers Relating to Plaintiff's Petition For Fees.** *Text of Order: The Plaintiff's Motion is GRANTED, and the Plaintiff shall file its petition for fees with supporting materials and memorandum of law by September 3, 2021. The Defendant shall file its response no later than September 24, 2021. Any reply by the Plaintiff shall be filed no later than October 1, 2021. So Ordered.* **Entered at the direction of Chief Judge Martin Reidinger on 8/24/2021. (khm) (Entered: 08/24/2021)** |
| 08/25/2021 | 84 | DECLARATION of Martijn Groeneweg re 80 Order *(Sixth Declaration of Martijn* |

|  |  | *Groeneweg*) filed by Dmarcian Europe BV (Attachments: # 1 Exhibit A - Error Messages)(Millen, Pressly) Modified text on 8/26/2021 (kby). (Entered: 08/25/2021) |
|---|---|---|
| 09/03/2021 | 85 | DECLARATION of Pamela S. Duffy re 80 Order filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Duffy, Pamela) Modified text on 9/7/2021. (khm) (Entered: 09/03/2021) |
| 09/03/2021 | 86 | DECLARATION of David A. Dorey re 80 filed by Dmarcian, Inc. (Attachments: # 1 Exhibit 1)(Duffy, Pamela) Modified on 9/7/2021. (khm) (Entered: 09/03/2021) |
| 09/03/2021 | 87 | DECLARATION of Mark A. Nebrig re 80 Order filed by Dmarcian, Inc. (Duffy, Pamela) Modified on 9/7/2021. (khm) (Entered: 09/03/2021) |
| 09/03/2021 | 88 | MOTION for Attorney Fees *and Costs* by Dmarcian, Inc.. Responses due by 9/24/2021. (Duffy, Pamela) Modified on 9/07/2021 to change response deadline. NEF Regenerated. (khm) (Entered: 09/03/2021) |
| 09/03/2021 | 89 | MEMORANDUM in Support re 88 MOTION for Attorney Fees *and Costs* by Dmarcian, Inc. (Duffy, Pamela) (Entered: 09/03/2021) |
| 09/08/2021 | 90 | MOTION to Set a Deadline for Issue to be Joined and for a Scheduling Conference (Attachments: # 1 Exhibit 1)(Duffy, Pamela) Modified on 9/8/2021 to change from miscellaneous filing to a motion. NEF Regenerated. (khm) (Entered: 09/08/2021) |
| 09/08/2021 | 91 | *MEMORANDUM/BRIEF in Support re 90 Motion to Set Deadlines and Scheduling Conference by Dmarcian, Inc. (Duffy, Pamela) Modified text on 9/8/2021. (khm) (Entered: 09/08/2021)* |
| 09/10/2021 | 92 | SECOND* NOTICE OF APPEAL as to 80 Order, 81 Order, 82 Preliminary Injunction by Dmarcian Europe BV. Filing fee $ 505, receipt number ANCWDC-5213374. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Millen, Pressly) Modified text* on 9/13/2021 (ejb). (Entered: 09/10/2021) |
| 09/10/2021 | 93 | NOTICE *of Filing of Investigation Report* by Dmarcian Europe BV (Attachments: # 1 Exhibit A-September 3, 2021, Investigation Report filed with the Enterprise Court, # 2 Exhibit B-English translation of Investigation Report, # 3 Exhibit C-Exhibits 1 through 52 to Investigation Report, # 4 Exhibit D-Exhibits 53 through 104 to Investigation Report, # 5 Exhibit E-September 3, 2021, Decision of the Enterprise Court confirming receipt of the Investigation Report, # 6 Exhibit F-English translation of September 3, 2021, Decision)(Millen, Pressly) (Entered: 09/10/2021) |
| 09/13/2021 | 94 | Transmission of Notice of Appeal to US Court of Appeals re 92 Second Notice of Appeal. (ejb) (Entered: 09/13/2021) |
| 09/14/2021 | 95 | USCA Case Number 21-2005 for 92 Notice of Appeal, USCA Case Manager: Rickie Edwards. (hms) (Entered: 09/14/2021) |
| 09/14/2021 | 96 | ORDER of USCA to consolidate case Appeal Case numbers: [21-2005] and Case No. [21-1721], as to 52 Notice of Appeal, 92 Notice of Appeal. (hms) (Entered: 09/14/2021) |
| 09/20/2021 | 97 | MOTION to Withdraw as Attorney *RaShawnda T. Murphy Only* by Dmarcian, Inc.. Responses due by 10/4/2021 (Duffy, Pamela) (Entered: 09/20/2021) |
| 09/21/2021 | 98 | Notice of Withdrawal of document by Dmarcian, Inc. ***Documents terminated: 97 MOTION to Withdraw as Attorney *RaShawnda T. Murphy Only* filed by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 09/21/2021) |

| 09/22/2021 | 99 | RESPONSE in Opposition re 90 MOTION *to Set a Deadline for Issue to Be Joined and for a Scheduling Conference* by Dmarcian Europe BV. Replies due by 9/29/2021 (Attachments: # 1 Exhibit A - US 4th Cir. Court of Appeals Docketing Statement) (Millen, Pressly) (Entered: 09/22/2021) |
| 09/24/2021 | 100 | NOTICE *of Filing* by Dmarcian, Inc. re 88 MOTION for Attorney Fees *and Costs* (Attachments: # 1 Exhibit 1)(Duffy, Pamela) (Entered: 09/24/2021) |
| 09/24/2021 | 101 | RESPONSE in Opposition re 88 MOTION for Attorney Fees *and Costs* by Dmarcian Europe BV. Replies due by 10/1/2021 (Millen, Pressly) (Entered: 09/24/2021) |
| 09/28/2021 | 102 | MOTION for Extension of Time to File Response/Reply by Dmarcian, Inc.. Responses due by 10/12/2021 (Duffy, Pamela) (Entered: 09/28/2021) |
| 09/28/2021 | | **TEXT-ONLY ORDER granting 102 Motion for Extension of Time to File Response/Reply re 90 MOTION. Replies due by 10/1/2021** *Text of Order: The Plaintiff's Motion is GRANTED, and the Plaintiff shall have until October 1, 2021, to file a reply brief in support of the Motion for Scheduling Conference. So Ordered.* **Entered by Chief Judge Martin Reidinger on 9/28/21. (LMR)** Modified text on 9/28/2021. (khm) (Entered: 09/28/2021) |
| 10/01/2021 | 103 | REPLY to Response to Motion re 88 MOTION for Attorney Fees *and Costs* by Dmarcian, Inc.. (Duffy, Pamela) (Entered: 10/01/2021) |
| 10/01/2021 | 104 | REPLY to Response to Motion re 90 MOTION *to set deadline and scheduling conference* by Dmarcian, Inc. (Duffy, Pamela) Modified text on 10/4/2021. (khm) (Entered: 10/01/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/02/2021 11:26:15 | | |
| **PACER Login:** | tl0027 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00067-MR |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: _____ -CV-_____

| | | |
|---|---|---|
| DMARCIAN, INC. | | |
| Plaintiff, | | |
| v. | | COMPLAINT |
| DMARCIAN EUROPE BV | | |
| Defendant. | | |

Plaintiff dmarcian, Inc. ("Plaintiff" or "dmarcian Inc.") alleges as an action against dmarcian Europe BV, a Dutch private company ("Defendant" or "dmarcian BV" or "BV") as follows:

### NATURE OF THE ACTION

1.      This Eleven Count Complaint is an action for preliminary and permanent injunctive relief and monetary damages for (i) breach of written contract, (ii) alternatively, breach of oral contract, (iii) copyright infringement in violation of Title 17 United States Code, (iv) infringement of a Federally Registered Trademark in violation of §32 of the Lanham Trademark Act of 1946 (the "Lanham Act"), as amended, 15 U.S.C. Section 1051 *et seq*.; (v) the use of false designations of origin in violation of §43(a) of the Lanham Act, 15 U.S.C. § 1125; (vi) defamation; (vii) misappropriation of trade secrets; (viii) computer trespass; (ix) tortious interference with contract; (x) tortious interference with prospective economic advantage; and (vi) unfair or deceptive business practices in violation of N.C. Gen. Stat. §75-1.1.

1

2.      Plaintiff is the owner of a software product that provide email validation to customers to protect their accounts from phishing attacks (described in greater detail below). Defendant is a business partner who has hijacked Plaintiff's business as part of efforts to separate European operations from Plaintiff's operations. In doing so, Defendant has engaged in multiple and brazen infringements of Plaintiff's intellectual property rights and has embarked on a scheme to deceive customers to move from Plaintiff's platform to Defendant's platform by: cloning the content and appearance of Plaintiff's website; using Plaintiff's trademarks; falsely advertising Plaintiff's executives and employees as ongoing members of Defendant's team to falsely bolster Defendant's apparent expertise; and misrepresenting to customers that there was a data breach in order to induce them to shift away from Plaintiff's platform to Defendant's platform. Absent emergent relief to protect Plaintiff's intellectual property and business, continued conduct by Defendant will result in total destruction of Plaintiff's brand, business and reputation.

## THE PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff dmarcian, Inc. is a Delaware corporation formed in 2014 with principal place of business in Brevard, North Carolina.

4.      Plaintiff alleges that at all times relevant herein, Defendant dmarcian Europe BV is a Dutch private company with offices at 3311 JG Dordrecht, Burgemeester de Raadtsingel 93, enrolled at the Netherlands Chamber of Commerce, number 57518793.

5.      This Court has exclusive subject matter jurisdiction over this action pursuant to 17 U.S.C. §101 et seq., and 28 U.S.C. §§ 1331, 1338(a), 1338(b) and 1367(a), pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1121 and 1125, and under the supplemental jurisdiction of the Lanham Act, among other things.

6.      This Court has supplemental jurisdiction over the State law claims asserted herein because they form part of the same case and controversy as the claims arising under Federal law.

2

7.      This Court has personal jurisdiction over dmarcian Europe BV on several grounds. The Defendant has contracted with Plaintiff within this state, the contract and agreements at issue herein have a substantial connection to this state, and Defendant has created continuing obligations between itself and the residents of this forum.   In addition, the contract's negotiations, contemplated future consequences of the parties' agreement, the terms of the contract and the parties' actual course of dealing (including without limitation a substantial part of the contract's performance necessarily occurs and is based in, and emanates from North Carolina, and Defendant's representatives have visited Plaintiff's offices in North Carolina for training and planning purposes under said agreement) establish that the parties' agreement has a substantial connection with North Carolina so that jurisdiction exercised over Defendant in this Court is consistent with Due Process.

8.      Further, the source code at issue in this dispute, while maintained on a cloud-based platform, is owned, controlled and maintained by Plaintiff from its North Carolina offices, and all customer relationships Defendant enjoyed/profited from using the Plaintiff's source code are maintained and serviced from Plaintiff's North Carolina-based principal place of business.

9.      Further, most if not all financial transactions (customers paying for the use of the Plaintiff-owned software) run through Plaintiff's North Carolina office and internal computer infrastructure and software systems.

10.     Simply put, Defendant could not and cannot possibly realize the ill-gotten gains from its infringing activities and contract breaches without the services and work on all such transactions coming from and flowing through Plaintiff's North Carolina office.

11.     The following diagram illustrates that all transactions at issue with Defendant necessarily and integrally involve, and cannot exist without Plaintiff's North Carolina-based foundational support and maintenance.   The top row lists customer activities after the customer takes action in response to the first marketing hit, through the trial period, and then final sign up and payment.   The second row outlines Plaintiff's indispensable involvement in providing all

3

marketing worldwide and capturing customer leads (all of which, *worldwide,* come through and are developed, established, routed but permanently maintained from Plaintiff's North Carolina office) and Plaintiff's continuing North Carolina-based customer maintenance activities.  And the third row outlines, once Plaintiff routes BV customer leads to BV in Europe, BV's first involvement—on the back end--after such routing.



12.     Plaintiff's customer base includes multinational companies which have a presence in both Europe and the United States.  Defendant's misuse of Plaintiff's brand and IP to service such customers in Europe necessarily and adversely impacts Plaintiff's relationships with those same customers in the United States.

13.     Venue is proper in this district because, among other reasons, under 28 U.S.C. §1391(c)(3) a defendant not resident in the United States may be sued in any judicial district.  <u>See also</u> *In re HTC Corporation*, 888 F.3d 1349 (2018).

4

## FACTUAL ALLEGATIONS

### I.   DMARC, and Pioneering Development by Tim Draegen

14.     Plaintiff is a leading technology company in DMARC email protection products and services.

15.     DMARC, which stands for "Domain-based Message Authentication, Reporting & Conformance," is an email authentication policy and reporting protocol.  It is essentially an email validation system that vests organizations with greater control over their email channels, and it protects their brands from being used in phishing[1] attacks.

16.     Ubiquitous, untrustworthy email solicitations that appear to come from—but are not from—valid, legitimate organizational sites tarnish that organization's brand and reputation.

17.     Thus, implementation of a DMARC service is invaluable to a company that seeks to prevent use and abuse of its valid domain by others to launch such cyber-attacks.

18.     The native XML format in which DMARC data is transmitted is not intended for human consumption.

19.     Plaintiff's predecessor provided DMARC services since the DMARC specification's 2012 inception.

20.     Plaintiff's DMARC SaaS[2] platform receives, processes and classifies mail observed from its customers' domain namespaces and makes sense of such data for its customers.  Plaintiff's platform visualizes the data in powerful and meaningful ways so its customers can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of their domains.

---

[1] "Phishing" involves the use of deceptive emails that appear to be (but is actually not) from an organization's valid domain/website to gather personal information.
[2] "SaaS," which stands for "Software as a Service," is a cloud-based service that runs a software application (like dmarcian's platform) through an internet browser, as opposed to the user downloading for use the software to a desktop computer or business network.

5

21.    In addition to aggregating DMARC data, Plaintiff's platform provides domain administration teams with the necessary features to adopt DMARC with clarity.  The dmarcian reporting platform sits atop a very accurate source classification engine and affords users with assurances of the true origin of a particular mail stream.

22.    From small governmental organizations to Fortune 500 companies, Plaintiff dmarcian, Inc. has an international track record for helping organizations across the globe and of all sizes successfully deploy DMARC.

23.    Plaintiff's former Chief Executive Officer, Tim Draegen, was a primary author of DMARC and, among other things, wrote the Outbound Deployment Guide for a non-profit DMARC advocacy group called OTA (Online Trust Alliance) in late 2012.

24.    Until recently, Plaintiff was owned and operated by Tim Draegen and his wife, Shannon Draegen.  Recently, Tim Draegen—who owns a majority interest in the Defendant--stepped down as CEO of Plaintiff.  Shannon Draegen is now the Plaintiff's CEO.

25.    One might say that Tim Draegen is the father of the DMARC interoperability standard and convention.  He pioneered its development and worldwide implementation.  And this work and reputation is exactly why a Dutch gentleman named Martijn Groeneweg, who ultimately partnered with Draegen to form the Defendant (as outlined below), reached out to and connected with Draegen to do DMARC business together.

26.    While at Cisco Systems as a Standards Engineer during 2007-2008, Tim Draegen conceptualized what is now known as the DMARC email authentication model.  From late 2009 until DMARC was made public in early 2012, Tim worked on DMARC's core design team, from concept to specification, from prototyping to proving the technology through production deployment among top US financial institutions.

6

27.     In partnership with the Financial Services Roundtable (now known as the Bank Policy Institute or BPI), in February 2013, Tim co-authored the seminal "Email Authentication Policy and Deployment Strategy for Financial Services Firms".

28.     To facilitate worldwide adoption of DMARC, from late 2011 to early 2013, Tim chaired the Online Trust Alliance's Email Authentication Committee (now a part of The Internet Society), authoring documents such as the "OTA Deployment Guide - Outbound Email Authentication" and earning the "Online Trust Alliance's Member of the Year" in October of 2012.

29.     Recognizing that great technology still requires dedicated advocacy and professional support, Tim founded dmarcian.com in early 2012 to provide DMARC tools and services to organizations of all sizes across the globe.

30.     Tim then worked to grow the company without outside investment, traveled when needed to advocate and educate regarding DMARC, formed partnerships with non-profit technology advocacy groups, and continued to marshal the technology as Chair of the Internet Engineering Task Force's DMARC Working Group from 2014-2019.  Tim's professional work and dmarcian's established brand has resulted in a steady stream of business without the need for traditional outbound or "cold calling" sales strategies.

3031.  Prior to doing business with Plaintiff, Defendant and its sponsors had no commercial DMARC experience whatsoever.

**II.  <u>The Contract</u>**

32.     In or about 2015, Plaintiff and Mr. Groeneweg started talking about a way that they could do business together.  Mr. Groeneweg had a small company consulting regarding email marketing, not involving DMARC.

33.     Mr. Groeneweg initiated contact with Plaintiff when he reached out directly to Mr. Draegen at Plaintiff's North Carolina home office and, through a series of email and text messages, and over several months, Plaintiff and Defendant (with Mr. Groeneweg forming Defendant for the purpose of entering into the agreement discussed herein), in or around January 2016, entered into

7

a contract (the "Contract") that included, among others, the following key points:

(a)    A new entity would be created in the Netherlands in order to promote dmarcian products and services in the EU.

(b)    Messrs. Groeneweg and Draegen would split ownership of the entity with Draegen having controlling ownership.[3]  Draegen agreed to this part-ownership in order to incentivize Groeneweg to help expand DMARC throughout the European Union ("EU").

(c)    Once Plaintiff fielded new customer inquiries from around the world, Plaintiff would route such appropriate customers to the Dutch entity who would best benefit from a point of contact closer to the customer for sales and service, although all aspects of operations, technical support and platform maintenance were fully owned and controlled by Plaintiff.

(d)    Plaintiff granted the Defendant the right to offer and sell Plaintiff's products and services.

(e)    Plaintiff would continue developing, supplying, and operating the DMARC SaaS services, products, and technology for all customers from its North Carolina home office.

(f)    Plaintiff would manage from North Carolina all email domains, manage combined information technology services, and would supply sales leads to Defendant.

(g)    Initially, Plaintiff provided its proprietary DMARC source code to Defendant for continued product and software development efforts by a group of Bulgarian developers, and in exchange, Defendant agreed that all original and newly-developed products, software, copyrights, trade secrets, intellectual property, and technical development would continue to be owned by (with IP rights from developed products accruing to) Plaintiff, and would be assigned to and owned by Plaintiff.  After some time of operation, Defendant was able to fund continued development (after subsidies from Plaintiff in the form of foregone license fees) and as further consideration for the assignment back to Plaintiff of the IP rights, Plaintiff agreed to continue not to charge Defendant licensing fees (which Defendant clearly had the

---

[3] Plaintiff's CEO, Mr. Draegen, owns a majority of the equity in Defendant.

ability to pay).

(h)    dmarcian Inc. also agreed to provide the BV with all operational costs and functions including business development until the BV could self-sustain (i.e., Defendant would be 100% subsidized by Plaintiff until the Defendant was able to contribute to development costs which did not occur until early 2017).

34.    In fact, once the parties agreed to these concepts, the following occurred:

(a)    Defendant was formed using an existing Dutch legal entity partially owned by Groeneweg.

(b)    Messrs. Groeneweg and Tim Draegen eventually split ownership of the newly formed entity with Draegen having controlling ownership as follows:

   i.    Tim Draegen owns 50.01% of Defendant

   ii.    The Digital Xpedition Holding B.V. ("TDX") is a 49.99% shareholder of Defendant

   iii.    Individuals Martin Groeneweg and Herwert Kalkman each own 50% of TDX.

(c)    The Plaintiff fielded all leads in North Carolina and routed certain leads to the Dutch entity (the Defendant) which began serving customers in the European Union, Russia and Africa that Plaintiff.

(d)    Plaintiff continued developing, supplying, and operating the DMARC SaaS services, products, and technology from its North Carolina home location.

(e)    Plaintiff managed from North Carolina all email domains, managed and combined information technology services, and supplied a steady stream of sales leads to Defendant, on which Defendant capitalized.

(f)    And, as planned, rather than paying royalties to Plaintiff, Defendant's contribution was to fund further development of Plaintiff's source code, including *inter alia* efforts by a group of Bulgarian developers with the understanding that all such work product of Defendant

9

and/or the Bulgarian developers was to be assigned to and belong to Plaintiff.

**III. The Breach**

35.     However, eventually, Defendant betrayed Plaintiff.

36.     Prior to December 2019, Defendant and the Bulgarian developers made changes to the Code on Plaintiff's servers in the US in a manner that was integrated with changes being made by the US Team and Plaintiff thereby controlled and had possession of all such source code.  Commencing in or around December 2019, and continuing up to the present, Defendant began asserting for the first time in the parties' relationship that new code developed by Defendant's employees and the Bulgarian developers belonged to BV and not Plaintiff. Defendant's assertions triggered a conversation between Plaintiff and Defendant about needing a formal assignment of any such development work consistent with the original agreement. When Plaintiff made that request, Defendant, through Groenewig, refused.

37.     Defendant refused to remedy the breach unless the minority shareholder TDX which is 50% owned by the only managing director and sole member of the Defendant's Board—received a buyout offer from Plaintiff or its principals.

38.     Defendant used Plaintiff's products, software, copyrights, trade secrets, intellectual property, and technology for years with no payments required to be made Plaintiff based on the Defendant's agreement to assign any intellectual property rights to Plaintiff. Defendant's refusal to acknowledge Plaintiff's intellectual property rights in all such work product by Defendant and the Bulgarian Developer in December of 2019 and its refusal to abide by the agreement and assign the work to Plaintiff resulted in absolutely no consideration whatsoever being paid to Plaintiff for Plaintiff's contributions to the agreement.

39.     Worse, Defendant began an intricate plan.  As described below, Defendant forcibly commandeered and used the Plaintiff's source code and other intellectual to break entirely from Plaintiff's platform and operations.  Defendant stole Plaintiff's protected software code, and it created and developed websites and domains that are intentionally confusingly

10

similar to (and actually cloned) Plaintiff's unique brand and Mark (as defined below).  In essence, Defendant cloned Plaintiff's business, stole and improperly implemented Plaintiff's intellectual property, capitalized on Plaintiff's global brand, and stole and misappropriated Plaintiff's trade secrets, confidential information and customer lists and database to profit exclusively on Plaintiff's assets, to Plaintiff's compete exclusion and detriment.

## IV. The Copyright

40.     Before reviewing these illegal efforts, understanding the development, establishment, and protection of Plaintiff's intellectual property rights is critical.

41.     The dmarcian products, software, intellectual property, source code, and technology (the "dmarcian Code") was authored by, and is owned by, Plaintiff, and the Plaintiff is the sole owner in all copyrights to the dmarcian Code.

42.     Other than the Contract, Defendant had no agreement with Plaintiff authorizing it to make, use, or sell, the dmarcian Code.

43.     On or about February 18, 2021, Plaintiff filed a registration claim for the dmarcian Code with the United States Copyright Office.

44.     The registration has been accepted and confirmed by the Copyright Office and it bears Registration number TX0008941559.

## V. The Trademark

45.     Plaintiff is the owner of the federally registered trademark DMARCIAN® with Federal Trademark Registration No. 5,702,379 (sometimes referred to herein as "Plaintiff's Mark").  Plaintiff first used this trademark in 2012, and the mark has been registered with the United States Patent and Trademark Office since 2019.  (A copy of the federal registration is attached hereto as **Exhibit A).**

46.     Plaintiff's Federal Trademark Registration is current, outstanding and valid.

11

47.     Continuously since in or about 2012, Plaintiff has used the DMARCIAN® mark to identify its products, services and software for ensuring the security of electronic mail services and to distinguish them from those offered by others, by, among other things, prominently displaying Plaintiff's Mark on its websites, advertising, business communications, and business documents, among many other things.

48.     In addition to possessing exclusive rights to the registered DMARCIAN mark, by virtue of its use in commerce, Plaintiff also owns common law rights in the dmarcian stylized mark (collectively, with the DMARCIAN mark, the "DMARCIAN Mark"). Indeed, Plaintiff has made longstanding, continuous, and exclusive use of the DMARCIAN Mark on its website (located at <dmarcian.com>) and promotional and marketing materials in connection with the provision of its software services.

49.     Through Plaintiff's extensive use and promotion of the DMARCIAN Mark since 2012, the DMARCIAN Mark has become distinctive and famous as the indication of origin of such services.  The DMARCIAN Mark is instantly recognizable and has undoubtedly acquired valuable goodwill.

**VI. Defendant's Intentional, Deliberate, and Willful Infringement and Website Cloning**

50.     In September of 2019, following commencement of some litigation against Plaintiff and others earlier in the year, Mr. Groeneweg suggested restructuring all dmarcian entities with a Dutch holding company parent for asset protection purposes.

51.     Mr. Groeneweg shared his then-recent experience with Dutch-based intellectual property laws and suggested that it might be possible to move intellectual property from the US to a Dutch holding company.

52.     Plaintiff rejected those suggestions since the original agreement required that all intellectual property rights belonged to Plaintiff.  Mr. Draegen reminded Mr. Groeneweg that, during creation of the Bulgarian subsidiary Mr. Draegen had again made clear that all intellectual property rights were to be assigned to Plaintiff.  The matter was not further discussed until

12

Defendant breached in December 2019.

53.    Following the breach in December 2019,  Plaintiff's founder and former CEO, Tim Draegen, worked to get Defendant back into compliance with the agreement under which Defendant had the right to offer and sell Plaintiff's products and services in exchange for an assignment of intellectual property.

54.    Rather than taking the breach seriously or working to resolve the breach, the representative of Defendant's managing director, Martijn Groeneweg, made demands that the managing director's interest in Defendant be bought out for an outrageous amount.

55.    When it became clear that Defendant would never voluntarily cure the breach, Mr. Draegen, as majority shareholder in Defendant, called a shareholders' meeting of the Defendant for the purpose of replacing the managing director.

56.    In order to thwart Mr. Draegen's exercise of his majority interest in Defendant to replace the managing director, in or about September 2020, Defendant's managing director, TDX, filed an action with a tribunal in the Netherlands known as the "Enterprise Chamber."

57.    The Enterprise Chamber exists to try to help resolve disputes among owners of a Netherlands entity.

58.    The parties to the Enterprise Chamber proceeding were Defendant, TDX, and Tim Draegen individually.  The Plaintiff dmarcian, Inc. was not a party to these proceedings.

59.    Just before initiating the Enterprise Chamber proceeding, in or around the summer of 2020, Defendant compounded the December 2019 breach by arranging for assignment to Defendant of intellectual property rights from the Bulgarian affiliate.  These were the rights that Defendant agreed to assign to Plaintiff upon development as a condition of and as part of the consideration for Plaintiff providing to Defendant its source code for use and development as part of the original contract.

13

60.   Once the Enterprise Chamber proceeding was initiated, the Enterprise Chamber acknowledged that, since there was no fully integrated agreement, the Defendant was mismanaged, and (i) prevented TDX from being replaced, (ii) appointed Hub Harmeling as an additional managing director of Defendant, and (iii) appointed Yvette Borrius as proxy to hold all ownership interests in Defendant other than 1 share for each of Mr. Draegen and TDX, effectively divesting Mr. Draegen, as majority shareholder, of any control over the affairs of the Defendant.

61.   Mr. Harmeling conflated Mr. Draegen and Plaintiff even though they are, and always have been, two separate legal entities.  Ignoring the legal significance of Plaintiff as a corporation separate and apart from Mr. Draegen individually, and despite Plaintiff having no representation (particularly as a party disconnected from the internal corporate governance affairs and disputes of the Netherlands Defendant) in, or jurisdictional attachment in the Enterprise chamber proceeding, and despite Plaintiff having many stakeholders other than Mr. Draegen, Mr. Harmeling began making demands on Plaintiff, ostensibly through Mr. Draegen.

62.   Despite this disenfranchisement of Mr. Draegen, and despite that Plaintiff was not involved and not represented in the Enterprise Chamber proceeding, and as a way of informally seeking to resolve all disputes, Mr. Draegen attempted to discuss and resolve the Defendant's breaches during the fall of 2020.

63.   These efforts were unsuccessful.  The shareholder dispute was not resolved and neither Mr. Harmeling nor Defendant attempted to cure Defendant's breach of its agreement with Plaintiff through assignment of the intellectual property derived from Plaintiff's source code, nor were any other steps taken by Defendant to cure the breach.

**Netherlands Action**

64.   On or about January 22, 2021 Plaintiff notified Defendant that, "dmarcian is no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to," Defendant.

14

65.     Plaintiff offered a draft Settlement Agreement and a draft Distribution Agreement into which it was prepared to enter with Defendant, and informed Defendant that if a new, separate agreement was not reached, "dmarcian will terminate cooperation between the parties with immediate effect as per February 1, 2021."

66.     Defendant did not make any attempt to cure the breach or negotiate new agreements.

67.     Rather, on or about February 1, 2021, Defendant commenced an action against Plaintiff in a Rotterdam court without notice to Plaintiff, without issuance of appropriate legal process and without compliance with due process requirements.  Despite lacking personal jurisdiction over Plaintiff, Defendant sought and the Rotterdam Court issued a mandatory injunction against Plaintiff that for the duration of the Enterprise Chamber proceeding (estimated to be at least another year) requiring Plaintiff to restore all access to Plaintiff's platform to Defendant's employees until the agreement between the parties is validly terminated._Neither the Defendant nor the Rotterdam Court gave any recognition to Plaintiff's intellectual property rights.  Consistent with their pattern of deceptive, illegal and fraudulent conduct outlined herein, Defendant provided untrue and deceptively misleading/incorrect information to the Rotterdam Court.

68.     The Rotterdam Court (i) made no explanation of what the agreement between the parties included or said, or how it would or could be terminated, (ii) did not inquire about or consider in any way Plaintiff's several claims of intellectual property infringement alleged herein, and (iii) did not take notice that Plaintiff had been claiming breach for over a year.

69.     In contrast to the Defendants' contacts with North Carolina as described herein, the Rotterdam Court has no jurisdiction whatsoever over Plaintiff, nor does that Court have any standing to enforce Plaintiff's US-registered intellectual property rights.  Therefore, the only place that full justice can be done to protect and enforce Plaintiff's rights is in this Court.

15

**Defendant's Illegal Use of Plaintiff's Marks and Copyrighted Code to Deceive and Divert Plaintiff's Customers, and Ultimately to Create its Own Separate Cloned Platform Independent of Plaintiff**

70.     To protect its business pending its efforts to resolve its differences with Defendant, Plaintiff reduced Defendant's access to Plaintiff's cloud platform to allow Defendant to only service existing customers.  In response, Defendant began a calculated effort to put in place various steps to ultimately generate and steal both new and established dmarcian Inc customers through both illegal infringement of Plaintiff's protected rights in its copyright and Marks, AND by falsely and deceptively lying to customers by contending that Plaintiff had compromised their customer data and they therefore had to move to a new platform.  Those communications falsely implied that the new platform was still maintained by the Plaintiff when in fact it was the Defendant's illegally sponsored platform set up for the purposes of diverting business from Plaintiff to Defendant.

71.     As described in more detail below, Defendant engaged in a three-step process to deceive the public and move new and established dmarcian customers into leaving dmarcian Inc. and moving those customers to Defendant's illegal platform:

> (a)  Defendant intentionally copied Plaintiff's website and used Plaintiff's trademarks to trick consumers, customers and potential customers into believing its website is Plaintiff's website;
>
> (b)  Defendant included its own contact information to divert consumers from Plaintiff to Defendant, routing Plaintiff's customers to an infrastructure controlled by Defendant and then routing the customers back to Plaintiff in what is known as a "man in the middle attack";
>
> (c)  Defendant used the cloned website to solicit third parties to purchase Plaintiff's copyrighted software and source code, which also constitutes a confidential and protected trade secret, misleading them into believing that

16

Plaintiff was the party selling and servicing the software despite the fact that
Defendant had diverted the business to its own platform.

72.    In September 2019, while discussing with Mr. Draegen a lawsuit involving
Plaintiff, Mr. Groeneweg suggested that all dmarcian intellectual property ownership could be
transferred to a newly formed BV entity in order to shield it from a possible judgment in the
United States.

73.    If Defendant actually had any interest or rights in any of Plaintiff's intellectual
property, Mr. Groeneweg's suggestion would have made no sense, since intellectual property
resident in the Netherlands and owned by Defendant would have not needed shielding.

74.    Plaintiff is informed, and believes, and thereon alleges that it was in or about
September of 2019 when Defendant made the decision to breach its Agreement with Plaintiff and
refuse to assign the intellectual property it had agreed to assign.

75.    Disputes between the parties grew more pronounced by September 2020.  Despite
the parties' differences, and in order to do what it could within its control to support customer
relationships and protect its own reputation, Plaintiff continued to provide technology, services,
customers, and use of its trademarks to Defendant, while Defendant selfishly continued to refuse
to recognize and respect the proceeds of Plaintiff's business efforts, i.e. Defendant was exploring
transferring operational control of dmarcian.eu and generally denying the arrangements set out in
the parties' agreement.  Defendant continued to refuse or recognize and respect the proceeds of
Plaintiff's  business efforts, i.e. by challenging Plaintiff's IP rights, then stealing and using them,
then transferring to itself operational control of dmarcian.eu, and generally refusing to abide by
the arrangements set out in the December 2016 e-mails that form the basis of the parties'
agreement and which were the foundation of the parties' intended relationship.

76.     Due to Defendant's breaches and its refusal to return to the terms of the original
Contract,  Plaintiff was no longer prepared or able to continue providing technology, services,
customers, and use of its trademarks to Defendant and ceased doing so on January 22, 2021.

17

77.     When the parties' discussions for an amicable resolution were not fruitful and Plaintiff took the aforementioned steps to protect its business in January of 2021, in February and March of 2021 and continuing to present, Defendant sought to take by force what it could not obtain by agreement.  Defendant began a stepped process to establish itself as a separate "dmarcian" company that is confusingly and strikingly similar in website portrayal to Plaintiff, including but not limited to willful Copyright and trademark infringement.

78.     **First,** Defendant created websites which were strikingly similar to plaintiff's website using domain names that had been previously secured for the parties' joint benefit.  The domain names use the protected name "dmarcian" and then the country code for the host site. Examples include "dmarcian.co.uk," "dmarcian.nl," etc.  Defendant began posting those websites for public access in late February and continuing into March 2021.

79.     The Defendants copied, in many instances word-for-word, the website pages from dmarcian. Inc., even, without authorization, populating these pages with the likenesses and backgrounds of more than a dozen of Plaintiff's employees without notice or permission.

80.     Screen shot examples of pages from Plaintiff's dmarcian Inc. site ("dmarcian.com") compared to copied, unauthorized pages of one of Defendant's sites (dmarcian.co.uk) which also advertise, use and employ **without** any authorization the likenesses, experience and reputation of individuals from Plaintiff's organization:

18

Plaintiff's site:

Defendant's UK site (with offending individuals associated with Defendant circled):




81.    None of these Plaintiff executives or employees gave any permission to Defendant to use their likeness (nor did Defendant ask about it or advise it intended to do so) for Defendant to deceptively induce new and existing customers to engage Defendant through its cloned websites, rather than through Plaintiff's site and control.  The websites contain many other strikingly similar pages which are designed to cause confuse customers into thinking that they continue to deal with the Plaintiff.

82.    **<u>Second</u>**, Defendant used that cloned website to divert both new and existing customers, re-routing them to Defendant's independent platform using Plaintiff's protected code, websites/pages, likenesses, and Marks.

83.    Defendant has now created a platform called "dmarc advisor."  And with that platform, comprising Plaintiff's copyrighted code (without which Defendant could not possibly conduct this illegal business), Defendant can fully operate independent of Plaintiff's legitimate control and influence over its business and its customers that Defendant is stealing through its deceptively cloned websits and through, misrepresentations to customers regarding Plaintiff's

19

alleged responsibility for data breaches of customer data.  There in fact has been no data breach except for the data that *that the Defendant* itself misappropriated.

84.    Specifically, Defendant's representatives have falsely informedestablished Plaintiff customers (who had been previously routed to Defendant under the parties' agreement) that Plaintiff has allowed a breach of their data, and the Defendanttricked the customers into providing to Defendant their access to their accounts on Plaintiff's own platform (which Plaintiff had, since January 22, limited Defendant's access).  Defendant then accesses the data (under the deceitful guise that it is the customer accessing its own data) and then downloads and copyies that data it draws from Plaintiff's systems to establish those accounts and data *on Defendant's illegal platform.*

85.    Technically speaking, this occurs when Defendant tells a current Plaintiff customer to update their Domain Name Server ("DNS" – essentially the prime source of domain rules) to point its data directly to the DMARC administrator on Defendant's "dmarc advisor" platform.  In that way all current and future developed data transfers directly to Defendant's platform and away from Plaintiff's platform and control.  Defendant is using the Plaintiff's protected name, Marks, and intellectual property rights to induce current and future customers to send their data to a specific system and platform *that is <u>not</u> Plaintiff's.*

86.    In these ways, Defendant as set up a system that, using Plaintiff's copyrighted code, protected Marks, and Plaintiff's executives' and employees' likenesses (and using their established reputations and DMARC business experience to make current customers think the continuity of control through Plaintiff continues when it clearly is not, and induce new customers to go with Defendant and its internal "experts"—Plaintiff's executives and even the DMARC pioneer himself, Tim Draegen), completely mirrors and transfers the entire business to its own, Plaintiff-excluded control.

20

87.    More recently, dmarcian has expanded the provision of its software services under its widely recognized DMARCIAN Mark, a mark it has used in commerce since at least as early as January 31, 2012.

88.    Recently, Defendant and its principal, Martin Groeneweg, began using Plaintiff's intellectual property (i.e., the DMARCIAN Mark and the source code) to unlawfully solicit business to brazenly operate separate and independent of Plaintiff and Plaintiff's North Carolina-based and maintained operations, while continuing to capitalize on the name and reputation Plaintiff built in the DMARCIAN Mark.

89.    Without Plaintiff's consent or authorization, Defendant used the Dmarcian trademark, trade name, and logo to pass itself off as an affiliate called "dmarcian Europe," which Defendant is not.

90.    Evidence of Defendant's unlawful use can be found on http://dmarcian.nl/. Through that site, Defendant has illegally solicited third parties to purchase Plaintiff's copyrighted software, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.  Defendant removed operational control of the dmarcian.eu domain from dmarcian, Inc. and continues to aggravate by creating and using the dmarcian-europe domain to redirect business away from dmarcian, Inc.

91.    In addition, Defendant's employees proceeded to clone dmarcian.com's marketing website, where most business leads originate, and alter it with false information, such as redirecting all sales, support, partners, and invoices to *dmarcian-europe.com* email addresses and by placing themselves back on the "our team" (initially referencing Plaintiff's "team") page. The cloned platform (dmarc advisor) runs on stolen-from-Plaintiff dmarcian Inc. copyrighted code, and operates on www.dmarcadvisor.com.[4]

---

[4] Compare this illegal, rogue website and platform Defendant created with the Plaintiff's own website: www.dmarcian.com.  They are virtually identical in appearance and content, except the Defendant's site includes prime offender Groeneweg and other BV-connected people as part of "his" team (in addition to the unauthorized use

21

92.     The Defendant's actions have caused significant damage to Plaintiff, including expending hours of employee time to monitor, develop, and make changes to attempt to remedy the Defendant's illegal actions, and time triaging confused and misled customers.

93.     The Plaintiff has suffered and will continue to suffer irreparable harm through the unlawful redirecting of Plaintiff's business to a fraudulent website, which dramatically harms Plaintiff's brand.  The loss of business to the cloned sites is also difficult to quantify and determined because customers will incorrectly associate bad customer experiences with Plaintiff when the Defendant's sites don't work and do not provide easy points of entry for potential customers, Or in the event that the security of their data is compromised.  Any defective service by Defendants will be confusingly and mistakenly attributed to Plaintiff due to Defendant's deceptive use of the Plaintiff's Marks.

~~94.~~     Plaintiff sent on February 16, 2021 to Defendant a "cease and desist" letter but to date, Defendant has completely ignored Plaintiff's demands.

95.     The avaricious pattern of conduct did not stop there.  Defendant further deceived the public through its intentional copying of Plaintiff's website to trick consumers, customers and potential customers into believing *its website is Plaintiff's website*.

96.     In fact, ***Defendant included its own contact information*** to divert consumers from Plaintiff to Defendant.

97.     Worse, and most egregiously, ***Defendant has solicited third parties to purchase Plaintiff's copyrighted software***, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.

98.     Defendant's continued recalcitrance led to Plaintiff filing a Complaint in accordance with the Uniform Domain Name Dispute Resolution Policy ("UDRP") on February 25, 2021.

---

of Plaintiff's executives and employees' likenesses, *and* their connection to dmarcian Inc.   There can be no greater, clear, undeniable illustration of these rogue violations than that comparison, and the others contained herein.

99.    Defendant does not have any right or license to use Plaintiff's Mark.

100.    Defendant's use of Plaintiff's Mark in this and other unauthorized and illegal ways is infringing, among other things.

101.    Defendant's infringing use of Plaintiff's Mark includes its name, domain names, advertising materials, and websites, among many other things.

102.    Such infringing use of Plaintiff's Mark by Defendant is without permission or authorization of Plaintiff and all such use by Defendant is likely to cause, and actually has caused, confusion, or mistake, or to deceive, and falsely imply Plaintiff's affiliation with and/or sponsorship of such use.

103.    Defendant has known for several years that Plaintiff's Mark is registered in the U.S. Patent and Trademark Office.  Plaintiff has requested that Defendant cease and desist from its acts of trademark infringement.  Defendant refused, and continues to refuse, to cease such acts.

104.    By reason of Defendant's acts alleged herein, Plaintiff has and will suffer damage to its business, reputation and good will and the loss of profits Plaintiff would have made but for Defendant's acts.

105.    Defendant threatens to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to Plaintiff's irreparable damage.  It will be difficult to ascertain the amount of damages which would afford Plaintiff adequate relief for such continuing acts.  Plaintiff's remedy at law, therefore, is not adequate to compensate it for injuries actual and threatened.

**Defendant Engineers Data Breach to Steal Customer Data**

106.    Since February 1, 2021, Defendant has run roughshod through Plaintiff's systems, copying code and data where it could, engaging in rogue communications with Plaintiff's employees, and establishing dozens of domains using the DMARCIAN mark.

23

107.    GDPR (the General Data Protection Regulation of Europe) requires that all, "[C]ontroller[s] and processor[s] [of confidential data] shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk, including inter alia as appropriate…(b) the ability to ensure the ongoing confidentiality, integrity, availability and resilience of processing systems and services," among many other things.

108.    All users of dmarcian's platforms--including those on the previously Plaintiff-controlled EU platform--agree to dmarcian's Terms, Privacy, GDPR, and other privacy policies when signing up for an account.  This includes all users that Plaintiff eventually routed to Defendant for handling per their original arrangement.  EU credit card payers become Plaintiff's customers, and some after routing from Plaintiff become Defendant's customers (when they pay for services by check or wire with Defendant getting them to sign their contract).

109.    Defendant's actions since February 1, 2021 have caused, and continue to cause, a violation of GDPR, which subjects Plaintiff to potential liability under GDPR Article 82.  And as described below, Defendant has falsely stated to Plaintiff's customers that Plaintiff has failed to protect their personal data and that data has been compromised, when it is the Defendant's actions that have caused that to occur.

110.    An example of this just occurred on March 5, 2021.  On that date, Defendant updated the DNS (defined below) entry for "ag.dmarcian.eu" to point to infrastructure outside of dmarcian Inc.'s control, specifically for email that is destined to "CUSTOMER-TOKEN@ag.dmarcian.eu".  Through this method, Defendant gave itself access to Plaintiff's customer data to which it had no legal right.  In other words, Defendant is intercepting customer data that it never (and does not now) have a right to.

111.    In the days preceding the filing of this Complaint, Defendant also falsely representing to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

24

and falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and that Defendant is in charge of development. A copy of Defendant's false messages to customers is attached hereto as **Exhibit B.**

112. In addition, there are countless dmarcian Inc. (Plaintiff) users on the Defendant's fraudulent european platform that are having their data routed to infrastructure controlled by Defendant, and then Defendant at times routes the data back to dmarcian's real platform. This is a "man in the middle attack" that effectively results in Defendant stealing confidential, privileged customer data in violation of confidentiality obligations to acquire and use for its own platform moving forward, and to steal and then sustain those dmarcian Inc. customer relationships.

113. These unauthorized Defendant actions also may violate Plaintiff's US-based SOC2 security controls, obliging Plaintiff to inform all "affected" customers, which means every single new customer coming to Plaintiff's site via dmarcian.eu (which still points to our platform) and existing customers of the past few years. The cost to remedy and potential exposure for these fraudulent actions committed intentionally and knowingly by Defendant are enormous.

<div align="center">

**COUNT ONE**
**(Breach of Written Contract)**

</div>

114. Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

115. Plaintiff and Defendant entered into the Contract for the terms set forth above and the Contract was supported by consideration.

116. In or around December 2019 Defendant breached the Contract, has failed and refused to cure such breach, is still in breach, and that breach is continuing (collectively, the "Breach"), insofar as Defendant has and continues to use Plaintiff's intellectual property without assigning back to Plaintiff any further developed software and without paying any other consideration for the previously permitted use of Plaintiff's intellectual property.

117. Through the time of the Breach and thereafter, Plaintiff fully performed its

<div align="center">

25

</div>

obligations under the Contract.

118.    Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

## COUNT TWO
### (Breach of Oral Contract)

119.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

120.    Pleading in the alternative to a writing, Plaintiff asserts that the Contract was agreed and confirmed several times by Plaintiff and Defendant orally in conversations.

121.    Plaintiff and Defendant orally entered into the Contract and the Contract was supported by consideration as outlined previously.

122.    In or around December 2019 Defendant committed the Breach.

123.    Through the time of the Breach and thereafter, Plaintiff fully performed its obligations under the Contract.

124.    Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

## COUNT THREE
### (Copyright Infringement; 17 U.S.C. §501)

125.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

126.    Plaintiff owns the copyright in the dmarcian Code.

127.    Defendant has infringed Plaintiff's copyright in the dmarcian Code through its continued use, copying, sales, and distribution of the dmarcian Code, and Defendant's infringement continues through the present.

128.    Defendant's use of the dmarcian Code is without permission or authorization of Plaintiff.

129.    Defendant's acts are willful, intentional, and in disregard of Plaintiff's exclusive rights in the dmarcian Code.

26

27

130.    Following the Breach Plaintiff has demanded that Defendant cease and desist all such infringing use of the dmarcian Code, but Defendant has failed and refused and continues to fail and refuse to cease such infringing use.

131.    Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

132.    Unless enjoined by this Court, Defendant's acts of infringement will continue.

133.    As a further direct and proximate result of Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).

134.    Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

135.    Defendant's deliberate and wrongful acts of infringement have caused and continue to cause great injury and damage to Plaintiff's exclusive rights, which injury and damage cannot be adequately quantified.  As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer irreparable damage for which there is no adequate remedy at law

136.    As a result of such infringement, Plaintiff is entitled to damages, costs of suit, reasonable attorney's fees, and injunctive relief against Defendant.

## <u>COUNT FOUR</u>
### (Trademark Infringement Under The Lanham Act, 15 U.S.C. §1114)

137.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

138.    Defendant has infringed Plaintiff's Mark in interstate and international commerce by various acts, including continued use of Plaintiff's Mark in its name, continued use of Plaintiff's Mark in several domain names including dmarcian.eu, dmarcian.co.uk, finance.dmarcian.eu, among many others.

28

139.    Defendant's use of Plaintiff's Mark in this manner was done so to advertise, promote, offer and market Defendant's alleged independent services and DMARC platform on the internet.

140.    Such use was without authorization or permission of Plaintiff.

141.    Defendant's willful use of Plaintiff's registered Mark is likely to cause confusion or mistake among consumers, customers, and their employees as to the origin, sponsorship or approval of Defendant's goods or services.

142.    The foregoing deceptive, intentional and willful acts constitute infringement of Plaintiff's exclusive rights in its Mark in violation of 15 U.S.C. § 1114.

143.    Defendant's unauthorized use of Plaintiff's Mark has caused, is causing, will continue to cause, and is likely to cause, confusion or mistake or to deceive as to the source or origin of Defendant's products and services and as to the relationship between Plaintiff and Defendant.

144.    Plaintiff has demanded that Defendant cease and desist all such infringing, confusing and improper use of any and all confusingly similar marks, and Defendant has failed and refused and continues to fail and refuse to cease such improper use.

145.    Defendant's heretofore alleged acts of trademark infringement have been committed with the intent to cause confusion, mistake and to deceive.

146.    Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

147.    Unless enjoined by this Court, Defendant's acts of infringement will continue.

148.    As a result of such infringement, Plaintiff is entitled to damages, costs of suit and injunctive relief against Defendant.

29

<u>**COUNT FIVE**</u>
**(False Designation under Section 43(a) of The Lanham Act, 15 U.S.C. §1125(a))**

149.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

150.    Defendant is intentionally using Plaintiff's Mark as part of its company name and in doing business in interstate and international commerce, with the false designation and representation that it is affiliated with Plaintiff.

151.    This use of Plaintiff's Mark is a false designation of origin which is likely to cause, and actually has caused, confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, or approval of Defendant's products and services.

152.    This use by Defendant of Plaintiff's Mark and Defendant's false designation of origin have actually caused confusion among those with whom Plaintiff does business.

153.    These acts by Defendant are in violation of Plaintiff's rights under 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a), in that Defendant has used and is using a false designation of origin, a false or misleading description and representation of fact which is likely to cause confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, and approval of Defendant's services and commercial activities by Plaintiff.

154.    Defendant committed these acts willfully, intentionally and maliciously.

155.    Unless enjoined by this Court, Defendant will continue its acts of false designation of origin.

156.    Moreover, as a direct and proximate result of Defendant's counterfeiting of the Plaintiff's Mark, Plaintiff is entitled to reasonable attorney's fees pursuant to 15 U.S.C. § 1117(b). In addition, at Plaintiff's election, Plaintiff is entitled to the maximum statutory damages pursuant to 15 U.S.C. § 1117(c).

30

157.    As a result of Defendant's acts, Plaintiff has suffered and continues to suffer substantial harm, and is entitled to damages, costs and other remedies against Defendant.

## COUNT SIX
### (Defamation)

158.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

159.    Defendant has made false statements of fact to Plaintiff's customers and potential customers concerning Plaintiff which are damaging to its reputation:

   a. a Setting up cloned websites which use Plaintiff's marks and the likenesses and information of Plaintiff's employees to falsely represent that Plaintiff's employees and executive continue to be involved in Defendant's business, and to falsely suggest that the customers continue to do business with Plaintiff when in fact it is Defendant's pirated business site;

   b. Asserting that Plaintiff has had a data breach requiring Plaintiff's customers to move to a new platform, namely Defendant's pirated and unlawful new platform.

   c. Falsely representing to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

   d. Falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and falsely representing the extent of its responsibility for development of the Code.

160.    Defendant's defamatory statements have and proximately caused actual damages to Plaintiff in an amount to be proven at trial, and were also willful, wanton and malicious so as to warrant punitive damage.

31

## COUNT SEVEN
### (Misappropriation of Trade Secrets)

161.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

162.    Plaintiff is the owner of certain Trade Secrets, including:

(a) The source code for dmarcian;

(b) The customer database which includes all historical customer data, customer service requirements such as data that exposes threats and reports Plaintiffs to the customers of the various threats which is then used to provide better protection to the customers' infrastructure and protection of their domain presence, and separates the threats from legitimate mail;

(c)  Account registrations for new customers or potential customers who sign up for a trial in the platform;

(e) Business and market intelligence which comes from all account registrations for new customers or potential customers in trial on the platform;

(f) The application database which includes all customer internet domains, reporting preferences, and all customers DMARC XML data as well as DMARC forensic data; and,

(c) Sales leads information from prospective customers who contacted Plaintiff.

163.    Defendant knew or should have known of the Trade Secrets.

164.    The Trade Secrets are not known or made available to the public, nor are they readily ascertainable through independent development.

165.    Plaintiff takes reasonable measures to protect the Trade Secrets from disclosure, including but not limited to:

(a) Taking security measures including protecting customer data from disclosure through logins and passwords, and two factor authentication to verify those passwords, and redundant identity checks before support is given to any

32

account;

(b) Yearly penetration tests to make sure no one can get into the site or access the Plaintiff's code;

(c) Protecting source code by restricting access to a need to know basis;

(d) Plaintiff has adopted Terms of Service and a Privacy Policy;

(e) Paintiff's employees are required to signed confidentiality agreements and NDAs and appropriate use policies.

166.    Defendant had the specific opportunity acquire the Trade Secrets through access to Plaintiff's cloud database acquired during its business and contractual relationship with Plaintiff in which Plaintiff entrusted Defendant with login and password access for the purposes of sales and servicing of Plaintiff's European customers.

167.    Defendant did in fact acquire and use the Trade Secrets for its own and separate benefit without the Plaintiff's express or implied consent or authority, and thereby misappropriated the Plaintiff's trade secrets within the meaning of N.C.G.S. §66-152.

168.    Plaintiff is entitled to a preliminary injunction against the continued misappropriation and misuse of its Trade Secrets pursuant to N.C.G.S. §66-154(a).

169.    Plaintiff has suffered actual damages proximately caused by Defendant's misappropriation of Plaintiff's trade secrets in an amount to be proven at trial pursuant to N.C.G.S. §66-154(b).

170.    Defendant's misappropriation of trade secrets was willful and wanton and Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C.G.S. §66-154(c).

171.    Defendant's misappropriation was in bad faith and was willful and wanton, and Plaintiff is therefore entitled to recover its attorneys' fees from Defendant pursuant to N.C.G.S. §66-154(d).

33

## COUNT EIGHT
### (Computer Trespass)

172.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

173.    Plaintiff has a subscription to a service that controls a server which stores the data. Employees of both Plaintiff and Defendant, as well as employees of the Bulgarian developer, each had a dmarcian.com email address [i.e. Plaintiff's email account] which everyone logged into as a centrally located email address.  These individuals used their dmarcian.com credentials to get what the needed from the Code to make further developments to the Code.  Upon information and belief, Defendant used this access to misappropriate Code for its own purposes and to store it on a platform separate from Plaintiff's system contrary to the parties' agreement and past practice.  In or about 2021, upon information and belief Defendant began to utilize such Code for its own separate purposes.

174.    Defendant has unlawfully accessed Plaintiff's computer networks without authority and with the intent to make or cause an unauthorized copy of Plaintiff's customer data produced by the computer networks that receive DMARC data and is attempting to send it to Defendant's platform. In January of 2021, Defendant's employees were attempting to exploit a bug in Plaintiff's system to try work around Plaintiff's access controls and gain access to new customer data.

175.    Defendant's conduct constitutes computer trespass within the meaning of N.C.G.S. §14-458.

176.    Plaintiff suffered actual damages as a result of Defendant's computer trespass and is entitled to recover such damages pursuant to N.C.G.S. §1-539.2A.

34

## COUNT NINE
### (Tortious Interference with Contract)

177.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

178.    All customers of Plaintiff as well as Defendant come through Plaintiff's site and accept Plaintiff's terms of service.  When they sign up for either a trial or an account, there is a digital registration with Plaintiff for each such customer. This occurs before any customers is sent over to Defendant for continued service, and those original terms of service continue to apply. Plaintiff has valid contracts with its customers to provide services to such customers on a monthly or a yearly basis or multiyear period.

179.    Defendant knew of Plaintiff's terms of service with said customers by virtue of Defendant's prior work with Plaintiff, referrals made by Plaintiff to Defendant, and Defendant's access to Plaintiff's database.

180.    Defendant intentionally induced Plaintiff's existing customers to switch from Plaintiff's platform to Defendant's platform, thereby effectively terminating the Plaintiff's services to such customers and diverting their business from Plaintiff to Defendant.

181.    Defendant induced Plaintiff's customers to switch platforms by:

(a)    Misleading them into believing that they were continuing to deal with Plaintiff by use of a false and deceptive website which cloned the information, look, and appearance of Plaintiff's website and falsely identified Plaintiff's personnel as working for Defendant.

(b)    Defendant put up a banner or notification on their platform instructing customers to "update" their DMARC records to dmarcadvisor.com as opposed to dmarcian.com, falsely suggesting that it was necessary due to a purported data breach.  A copy of such banner is attached hereto as **Exhibit C.**

35

(c)    Making false statements as set forth in **Exhibit B** about Defendant's involvement and responsibility for development of Plaintiff's Code.

182.    Defendant's actions in inducing the Plaintiff's customers to leave Plaintiff's platform were without justification.

183.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

184.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

185.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to interfere with its contracts with customers, and Plaintiff is entitled to a preliminary and permanent injunction.

<div align="center">

**COUNT TEN**
**(Tortious Interference with Prospective Economic Advantage)**

</div>

186.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

187.    Prospective customers interested in Plaintiff's DMARC product and services contact Plaintiff through its website and sign up for trials.

188.    Information about prospective customers who have signed up for trials gets funneled into sales leads as shown in the diagram in Paragraph 10 herein.

189.    Plaintiff typically has approximately average of 800 customers a month who sign up for trials, and of those customers approximately 40% become ongoing customers of Plaintiff.

190.    Plaintiff reasonably expects that customers who sign up for trials will grow into a continued customer relationship.

191.    Defendant obtained information about sales leads and prospective customers who signed up for trial periods which have a presence in Europe.  Defendant diverted such customers to its own independent platform.

192.    Defendant diverted those prospective customers by misleading them into thinking

<div align="center">36</div>

they were continuing to deal with Plaintiff based on their misleading cloned website and other communications.

193.    Defendant thereby intentionally induced the prospective customers not to do business with Plaintiff and instead misappropriated such prospective customers for themselves through wrongfully obtaining information from Plaintiff's system and through misleading information provided to such customers as described above.

194.    Defendant intentionally induced Plaintiff's prospective customer away from Plaintiff's platform and diverted them to Defendant's platform.

195.    Defendant's new and unauthorized website makes it appear to the customers that they are doing business with Plaintiff when in fact the Defendant acquired the new accounts to the exclusion of Plaintiff.

196.    Defendant's actions in inducing the Plaintiff's prospective customers to do business with Defendant and not do to business with Plaintiff was without justification.

197.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

198.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

199.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to misappropriate Plaintiff's prospective customers, and Plaintiff is entitled to a preliminary and permanent injunction.

## COUNT ELEVEN
### (Unfair or Deceptive Business Practices)

200.    Plaintiff realleges and incorporates herein by references paragraphs 1-114 and paragraphs 138-200 of this complaint as though fully set forth herein.

201.    Defendant's conduct as set forth in Counts Four through Ten of the Complaint is unfair and deceptive within the meaning of N.C. Gen. Stat. §75-1.1.

37

202.    Defendant's unfair and deceptive conduct is in and affecting commerce.

203.    Defendant's unfair and deceptive conduct proximately caused actual damages to Plaintiff.

204.    Plaintiff is entitled to recover treble damages from Defendant pursuant to N.C.G.S. §75-16.

205.    Plaintiff is entitled to recover its reasonable attorneys' fees from Defendant pursuant to N.C.G.S. §75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff dmarcian, Inc. prays for judgment against Defendant dmarcian Europe BV. as follows:

A.    Entry of a preliminary injunction, to be effective throughout the pendency of this action, enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1)    from making, using, distributing, and selling the dmarcian Code.

(2)    from directly or indirectly using the Plaintiffs DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive;

(3)    from infringing Plaintiff's copyright in the afore-described computer program/software; and

(4)    from otherwise unfairly competing with Plaintiff.

B.    Entry of a permanent injunction perpetually enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1)    from making, using, distributing, and selling the dmarcian Code.

38

        (2)     from engaging in any other activity constituting an infringement of the dmarcian Code;

        (3)     from directly or indirectly using Plaintiff's DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive; and

        (4)     from otherwise unfairly competing with Plaintiff.

        (5)     from engaging in any other activity constituting an infringement of Plaintiff's Mark or constituting unfair competition with Plaintiff; and

        (6)     from assisting, aiding and abetting any other person or business entity in engaging in any activities referred to in subparagraphs (1) through (5) above.

C.     Entry of judgment ordering that all labels, signs, prints, promotions, advertisements, letterhead, business cards, collateral literature and media, domain names, and web pages in the possession or control of Defendant bearing Plaintiff's Mark and all plates, molds, matrices and other means of making the same, shall be delivered to Plaintiff for destruction.

D.     Entry of judgment requiring transfer to Plaintiff of all dmarcian domains Defendant and that are not otherwise destined for destruction.

E.     Entry of judgment requiring Defendant, within thirty days after the service of judgment upon it, to file with the Court, and serve upon counsel for Plaintiff, a written report under oath setting forth in detail the manner in which Defendant has complied with paragraphs A through C above.

F.     Damages according to proof for Defendant's Breach of the written Contract.

G.     In the alternative, Damages according to proof for Defendant's Breach of the oral Contract.

H.      Entry of judgment finding that Defendant, through its copying, use, reproduction, distribution, and sales of the dmarcian Code has infringed Plaintiff's copyright in the dmarcian Code under 17 U.S.C. §501;

I.      Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has infringed Plaintiff's registered mark under 15 U.S.C. §1114;

J.      Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has created false designations of origin and false or misleading descriptions of fact in violation of 15 U.S.C. §1125(a);

K.      Entry of judgment that the unfair or deceptive acts or practices of Defendant were committed willfully or knowingly, and that Plaintiff be awarded up to three times its actual damages together with its costs and attorney's fees as a result of the same;

L.      Entry of judgment requiring Defendant to account to Plaintiff for any and all profits derived by Defendant from the sale of its services and for all damages sustained by Plaintiff by reason of Defendant's infringement and unfair competition complained of herein.

M.      Entry of judgment awarding Plaintiff punitive and exemplary damages due to Defendant's wilful acts and infringement complained of herein.

N.      Entry of judgment awarding Plaintiff its attorney's fees and costs incurred in the prosecution of this action pursuant to the Lanham Act, 15 USC §1117, and pursuant to 17 U.S.C. §505, together with such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all claims or issues so triable.


This the 12th day of March, 2021.


/s/ Pamela S. Duffy
Pamela S. Duffy, N.C. Bar. No. 18329
pduffy@sharplesslaw.com
Sharpless McClearn Lester Duffy, PA
200 S. Elm Street, Suite 400
Greensboro, NC 27401
Telephone: (336) 333-6389
Attorney for Plaintiff

OF COUNSEL:


/s/ David Dorey
David Dorey, DE #5283
Blank Rome, LLP
Dorey@BlankRome.com
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6418
Attorney for Plaintiff

41

# United States of America
## United States Patent and Trademark Office

# DMARCIAN

**Reg. No. 5,702,379**

**Registered Mar. 19, 2019**

**Int. Cl.: 9**

**Trademark**

**Principal Register**

dmarcian, Inc. (DELAWARE CORPORATION)
Po Box 1007
Brevard, NORTH CAROLINA 28712

CLASS 9: Software for ensuring the security of electronic mail

FIRST USE 1-31-2012; IN COMMERCE 1-31-2012

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY
PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 88-062,994, FILED 08-02-2018

Director of the United States
Patent and Trademark Office

EXHIBIT
A

## REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at h** ttp://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.



**dmarcian**

**CLICK HERE TO ACTIVATE YOUR ACCOUNT ON OUR SAFE NEW PLATFORM: 1) TYPE YOUR EMAIL ADDRESS 2) CLICK "RESET PASSWORD"**

It is important for you to know that more than 50% of the dmarcian application (the use of which was always shared between the cooperating parties) was in fact developed by our development teams in Dordrecht (Netherlands) and Varna (Bulgaria). In addition, more than 80% of development capacity since 2018 as well as future development capacity of dmarcian software is managed out of dmarcian Europe.

Dmarcian, Inc. is spreading misleading information about the relation between dmarcian, Inc. and dmarcian Europe BV regarding licensing and software ownership. If you receive such information, we are grateful if you would share such information with us via securityofficer@dmarcadvisor.com.

In case you would like to read more about the mentioned dispute regarding licensing and software ownership, please read the Enterprise Court ruling of September 2020: https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:GHAMS:2020:2536.

**Of course we offer you assistance**

We apologize for the inconvenience caused as a result of the actions mentioned above. We are committed to taking our user's data security seriously and, consequently, we see no other way of guaranteeing your data privacy and business continuity for the future.

In case any of the above is unclear, or if you would like (free) assistance from one of our DMARC experts, please do not hesitate to contact us at support@dmarcadvisor.com. For inquiries about the data breach, you can reach out to our security officer at securityofficer@dmarcadvisor.com. We will help you in any way we can to make the transition as smooth as possible.

We hope to welcome you soon on our safe new platform!

Kind regards,

The board of dmarcian Europe BV

©2021 Dmarcian.eu, Dmarcian Europe BV

EXHIBIT
B

eu.dmarcadvisor.com/accounts/register/?_ga=2.215580432.625092276.1615321230-1580272456.1615321230

Sign Up Free    Login

# dmarcian

We help people deploy DMARC

As of GDPR compliance, we strongly advise to update your DMARC records:

Please change your RUA to <your-unique-token>@ag.eu.dmarcadvisor.com. Please change your RUF to <your-unique-token>@fr.eu.dmarcadvisor.com.
If this is already the case, you can ignore this message. If you have questions, please contact support@dmarcadvisor.com

## Get Started On Your Free Trial

So that we can offer you the trial experience that will best serve your needs, please complete the form below. You will receive an email upon creating your account, asking you to confirm. From there, we will email you important information relevant to your free trial and provide support if needed.

If this account is for personal use, with less than 10,000 messages per month and no more than 2 domains, it will qualify for our Free pricing tier.

Email Address*

You will use it to login into your account.

Domain Name*

You can always change it or add more domains to your account later.

Enterprise

Select the type of account you would like to trial.

You are registering with
dmarcAdvisor Europe/Africa/Russia

EXHIBIT

-57-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

        Plaintiff,

    v.

DMARCIAN EUROPE BV

        Defendant.

MOTION OF PLAINTIFF
PURSUANT TO FED.R.CIV.P. NO.
65 SEEKING TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

---

NOW COMES Plaintiff dmarcian Inc. ("Plaintiff"), by and through its undersigned counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 65, and 15 U.S. Code §1116 to issue a temporary restraining order and preliminary injunction enjoining Defendant Dmarcian Europe BV ("Defendant"), its employees, agents, officers, successors, and assigns, or others in privity or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it from: (1) making, using, distributing, and/or selling dmarcian software Code/derivative works; (2) directly or indirectly using Plaintiff's Marks or any other similar mark, word, or name similar  likely to cause confusion, mistake, or deceive;

1

(3) infringing Plaintiff's registered copyright; (4) misrepresenting its present affiliation with Plaintiff; and (5) interfering with customer relationships, contacting, posting false notice to, and misrepresenting falsely to customers that Plaintiff caused a breach of customer data. In support of this motion, Plaintiff shows the Court as follows:

1.    As set forth in the Complaint, Plaintiff owns a copyright in the dmarcian computer software at issue in the Complaint which has been registered with the U.S. Copyright Office, bearing Registration number TX0008941559. Plaintiff also owns the federally registered trademark DMARCIAN® with Federal Trademark Registration No. 5,702,379 which was first used in 2012 and was registered in 2019. Since 2012, Plaintiff has used the DMARCIAN® mark to identify its products, services and software for ensuring the security of electronic mail services and to distinguish them from those offered by others, by, *inter alia,* prominently displaying Plaintiff's Mark on its websites, advertising, business communications, and business documents. Plaintiff also owns common law rights in the  stylized mark used on its website and promotional materials which it extensively used and promoted since 2012.

2

2.    The instantly recognizable DMARCIAN Mark has become distinctive and famous as the indication of origin of such services and is a key source of goodwill in Plaintiff's business.

3.    Plaintiff also owns certain trade secrets which are not known or readily ascertainable by the public, including: the dmarcian Code; the customer database which includes all historical customer data; customer service requirements including threat history which helps protect the customer's infrastructure domain presence and separates the threats from legitimate mail; account registrations for potential customers who sign up for a trial in the platform and the business and market intelligence which comes from those trials; the application database which includes all customer internet domains, reporting preferences, and their DMARC XML data as well as DMARC forensic data; and, sales leads information from prospective customer contacts (collectively, "Trade Secrets").

4.    Among other destructive misconduct, Defendant has misappropriated Plaintiff's copyrighted software, Plaintiff's DMARCIAN® trademarks, and Plaintiff's Trade Secrets for its own use, and without immediate restraints, Plaintiff will continue to suffer immediate and irreparable harm, leading to the destruction of its business and hard-earned reputation and goodwill.

3

5.    For the reasons set forth in Plaintiff's Complaint, including grounds for relief based on all Federal and State law claims over which this Court has supplemental jurisdiction, the Declarations of Shannon Draegen and Tim Draegen and the exhibits attached thereto, all of which are incorporated herein by reference, and Plaintiff's Memorandum of Law supporting this application filed contemporaneously with this motion, Plaintiff is entitled to the relief requested because Plaintiff has no adequate remedy at law; there is a strong possibility that Plaintiff will succeed on the merits of this action; Plaintiff will suffer irreparable harm if interim relief is not granted; the balancing of the relative harm favors Plaintiff, and the public interest will not be disserved by the issuance of a restraining order or injunction.

6.    If required, Plaintiff is ready, willing and able to post security in connection with the temporary restraining order and preliminary injunction as necessary.

7.    Plaintiff sent the Complaint to Defendant to the attention of Martijn Groeneweg (principal of Defendant) and Hub Harmeling (acting managing director of Defendant) by email and has asked for waiver of service.  In response Plaintiff's counsel was contacted by Dutch counsel for Defendant.  To date we have not been notified of any US counsel, despite

4

requests to be notified.  Dutch counsel, Alfred Meijboom, requested that further communications be directed to him.  Pursuant to Rule 65(b)(1)(B), Plaintiff's counsel is providing a copy of all such filings to Mr. Meijboom with a copy to Mr. Groeneweg by email.  Notice should not be required before issuance of temporary relief due to the ongoing misappropriation of Plaintiff's intellectual property and customer interference and commercial defamation of Plaintiff which is causing irreparable harm daily.  Defendant has failed and refused to cease such behavior notwithstanding demands by Plaintiff.

Therefore, Plaintiff seeks the issuance of a Temporary Restraining Order and Preliminary Injunction imposing the restraints outlined above and in the accompanying Memorandum of Law, specifically, Plaintiff seeks a temporary restraining order and to preliminarily enjoin Defendant, its employees, agents, officers, successors, and assigns, or others in privity or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it from:

(1) making, using, distributing, and selling dmarcian Code/derivative works;

(2) directly or indirectly using Plaintiff's Marks or any other similar mark, word, or name likely to cause confusion, mistake, or deceive;

5

(3) infringing Plaintiff's copyright; and,

(4) misrepresenting its present affiliation with Plaintiff;

(5) interfering with customer relationships, contacting, posting false notice to, and misrepresenting falsely to customers that Plaintiff caused a breach of customer data; and,

(6)  such other and further relief the Court deems just and equitable.

This the 25th day of March, 2021.

> /s/ Pamela S. Duffy
> Pamela S. Duffy,
> N.C.S.B. No. 18329
> pduffy@sharplesslaw.com
> Sharpless McClearn Lester Duffy,
>   PA
> 200 S. Elm Street, Suite 400
> Greensboro, NC 27401
> Telephone:  (336) 333-6389
> Attorney for Plaintiff
>
> OF COUNSEL:
>
> David Dorey, DE #5283
> Blank Rome, LLP
> Dorey@BlankRome.com
> 1201 Market Street, Suite 800
> Wilmington, DE 19801
> Telephone: (302) 425-6418
> Attorney for Plaintiff

6

### CERTIFICATE OF SERVICE

I hereby certify that Defendant has been served a copy of MOTION OF PLAINTIFF PURSUANT TO FED.R.CIV.P. NO. 65 SEEKING TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION by email immediately upon filing:

dmarcian Europe BV
c/o Martijn Groeneweg, Managing Director
Burgemeester de Raadtsingel 93
3311 JG Dordrecht
The Netherlands
martijn@tdx.nl
martin@dmarcadvisor.com

A courtesy copy has also been sent to Plaintiff's Dutch Counsel, Alfred Meijboom at Alfred.Meijboom@kvdl.com, as no US counsel has yet made an appearance. Plaintiff shall also serve a hard copy on Defendant by Federal Express at the above address on March 26, 2021 and will file an additional certificate of service upon completion.

This the 25th day of March, 2021.

/s/ Pamela S. Duffy_____
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiffs*

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

        Plaintiff,

    v.

DMARCIAN EUROPE BV

        Defendant.

DECLARATION OF
SHANNON DRAEGEN

NOW COMES the undersigned Declarant and states that the following is true of her own personal knowledge:

1.    I am the Chief Executive Officer of dmarcian, Inc. ("dmarcian"). My husband, Tim Draegen, is the former CEO and the found of dmarcian. I have worked with him at dmarcian since the company's inception in 2012. Prior to becoming the CEO, I acted in the capacity of Chief Operating Officer.

2.    I have read the Complaint and confirm that the facts set forth in that Complaint are true of my own personal knowledge, except as to things stated upon information and belief.

3.    Plaintiff dmarcian was formed to operate globally to promote dmarcian's Software as a Service ("SaaS"). SaaS software is licensed on a subscription basis and is centrally located. In dmarcian's case, the SaaS software and customer data for all customers, globally, is centrally located on dmarcian's gitlab.com account hosted in the United States. The accounts for all customers, both in the United States and in the EU, are hosted by dmarcian.

1

Document Ref: UQPYE-MSTXK-VW3KS-JP82S

Page 1 of 8

-65-

4.    Dmarcian has built its brand by working closely with multinational companies, many of which are American companies with a global presence like Tesla (based in California), General Mills (based in Minnesota), Lyft (based in California), Huntington Bancshares (based in Ohio), FIS (based in Florida), Slack Technologies (based in California), Ascensus (based in Pennsylvania), Gartner (based in Connecticut), Mathworks (based in Massachusetts), AmpX Technologies (based on Maryland), DC Advisory Group (based in New York) and Confluence (based in Pennsylvania), and many others.

5.    Dmarcian Europe BV ("DME") was established to service customers based in the European Union ("EU"). Dmarcian was to continue servicing all the American companies with EU offices, however over time DME began servicing some of those companies including, for example, Gartner, Mathworks, AmpX, DC Advisory and Confluence.

6.    The website for dmarcian is located at www.dmarcian.com. During the course of the parties' discussions on setting up a business which ultimately became DME, , Mr. Groeneweg registered websites at www.dmarcian.nl and www.dmarcian.eu ("the DME Websites") both of which redirected users to dmarcian.com and were not operated as independent websites. Dmarcian's tech operations set up the DME Websites. Accordingly, the websites utilized (with dmarcian's permission) dmarcian's name, trademarks and branding during the time that the parties were engaged in business together.

7.    In February of 2021, DME ceased redirecting the DME Websites to dmarcian.com and DME operated the sites independent of dmarcian, without dmarcian's permission.

8.    During the time that the parties were in business together, DME also acquired a number of domain names across Europe for the parties' joint benefit, such

2

Document Ref: UQPYE-MSTXK-VW3KS-JP8Z8

-66-

as www.dmarcian.co.uk, www.dmarcian.es, www.dmarcian.fr, and many others (collectively "the New EU Websites"). A list prepared by me is attached hereto as **Exhibit A.** These websites were not live websites until recently.

9.      In March 2021, the New EU Websites went live. Dmarcian did not direct for them to go live. The sites were not redirected to dmarcian.com. Dmarcian granted no permission whatsoever for the use of these sites.

10.     The branding and text on the DME Websites and the New EU Websites are virtually identical to the dmarcian.com website. I attach, by way of example only, copies of portions of the dmarcian.com website (**Exhibit B-1 and B-2**) and portions of the dmarcian.co.uk website (**Exhibit C-1 and C-2**).[1] The other New EU Websites are similar to the dmarcian.co.uk website, although may appear in other languages.

11.     On its websites and other marketing materials, dmarcian used its well-known common law trademark dmarcian . See **Exhibit B-1, B2, B3** This was the same brand that EU customers would see in working with DME, as the DME website directed back to the dmarcian website.

12.     Beginning in or about March of 2021, after DME separated to its independent platform, the distinctive brand of dmarcian used by DME on the DME Websites and the EU Websites is almost identical, except that beginning in March of 2021, DME altered dmarcian's stylized logo to write the word "EUROPE" in tiny letters below the letter "n" in the name "dmarcian", appearing as follows: dmarcian. See **Exhibit C-1, C-2, C-3.** Dmarcian gave no authorization for DME's independent use of this brand.

---

[1] For examples of one-to-one direct comparisons of a dmarcian page compared to the DME page that is a clone of that dmarcian page, the reader should compare Ex. B-1 (dmarcian site) to Ex. C-1 (same page on DME site), B-2 to C-2, B-3 to C-3, and B-4 to C-4.

3

Document Ref: UOPYE-MSTXK-VW3KS-JP82S

Page 3 of 8

**-67-**

13.    The graphics and appearance of the New EU Websites are virtually identical to the graphics and appearance of dmarcian's site which DME's customers were accustomed to seeing.  Compare **Exhibit B-1** (pages from the dmarcian site) and **Exhibit C-1** (pages from dmarcian.co.uk).  These are examples only, and the striking similarity in graphics and appearance continues throughout New EU Websites as well as the DME Websites now being operated independently of dmarcian.

14.    The text in the DME Websites and New EU Websites are also confusingly similar (essentially identical) to dmarcian's website.  The words on the DME and New EU Websites are essentially verbatim and the appearance of the graphics are basically identical to the dmarcian.com website that EU customers were accustomed to seeing due to the fact that DME's Websites previously redirected DME customers to the dmarcian.com website.  Compare **Exhibit B-1 & B-2** (pages from the dmarcian site) and **Exhibit C-1 & C-2** (pages from dmarcian.co.uk).[2]  Again these are examples only, and the virtually identical wording between websites is pervasive on each of the pages.

15.    As recently as March 25, 2021, the date of this Declaration, the DME Websites and New EU Websites also misleadingly refer to "dmarcian" repeatedly, as if it is dmarcian Inc. and not DME's independent platform which is provided to the customer. See circled references on **Exhibit B-2.**

16.    DME's Websites and the New EU Websites also reference the same global customers of dmarcian that are on dmarcian's websites, including several of the American multinational companies referenced in Paragraph 4 above.  Compare **Exhibit**

---

[2] These are printed to show the website origin and do not show all of the graphics as they appear on the live site.  These exhibits are for the purpose of showing the identical nature of the text.

4

Document Ref: UQPYE-MSTXK-VW3KS-JP828

**B-3 (**home page from the dmarcian.com site) with **Exhibit C-3** (home page from the dmarcian.co.uk, site)[3]

17.    DME's Websites and the New EU Websites also include videos, written, filmed and narrated by Tim Draegen for dmarcian Inc., hosted on dmarcian's website, which videos dmarcian created to explain the business value proposition of DMARC and dmarcian's SaaS.  Compare **Exhibit B-4 (**from the dmarcian.com site) with **Exhibit C-4** (from the dmarcian.co.uk, site)[4]

18.    At the time of the filing of the Complaint, the DME Websites and the New EU Websites also had the likenesses of Tim Draegen and other dmarcian employees along with their biographical information, representing them as part of the DME team on what was now DME's separate platform.  As noted in the complaint, that was done without the permission of dmarcian or the affected employees.  Since the filing of the complaint and since the time the Complaint was emailed to Mr. Groeneweg, those individuals have been removed from DME's Websites and the New EU Websites.

19.    The identical nature of the websites gave every appearance of being dmarcian's business when in fact DME had separated onto its own separate platform developed from dmarcian's copyright-protected software.  Essentially, DME surreptitiously stole dmarcian's copyright source code to create its independent platform.  DME's website even acknowledges that it is using dmarcian's SaaS platform. (See **Exhibit C-2,** describing "dmarcian's DMARC SaaS platform").

20.    After posting these new websites, as set forth in the Complaint, DME claimed a false data breach and gave customers instructions to move to DME's newly

---

[3] These are also printed to show the website origin and do not show all of the graphics as they appear on the live site.
[4] These are also printed to show the website origin and do not show all of the graphics as they appear on the live site.

5

established platform, www.dmarcadvisor.com, which was independent of dmarcian.com and not authorized by dmarcian. See **Exhibit D.**

21.    Dmarcian has no control over dmarcadvisor.com. DME gave customers DME's own contact information, routing them to DME's dmarcadvisor.com – an infrastructure controlled solely by DME, and then routed the customers back to dmarcian. This is known in the industry as a "man in the middle" attack.

22.    DME's representation that there had been a data breach necessitating them to move their data was false and was designed to scare customers into thinking they had to migrated to dmarcadvisor.com to secure their data.

23.    The only data breach dmarcian had was DME's own unauthorized copying of the dmarcian Code and the customer data. This has created its own set of problems and potential liability for dmarcian, requiring dmarcian to notify customers.

24.    Customer postings and messages to dmarcian reflect their understandable confusion and concern over DME's communications. Although dmarcian has received many more such messages,  examples of such communications are attached hereto as **Exhibit E.**

25.    The assertion of a false data breach is extremely damaging to dmarcian's brand and reputation, as customers contract with dmarcian for the very purpose of protecting their data. The irony (and insult) are remarkable. Dmarcian's entire business is email security, protecting customers against email fraud, and yet, dmarcian Inc. is suffering from an ex-partner—DME—using that same platform to commit the very type of email fraud that dmarcian Inc. created the platform to prevent. We have spent numerous hours reassuring customers which has been an extensive distraction from normal day to day operations.

26.    There are 15,574 dmarcian.com accounts on Plaintiff's EU platforms, including existing customers as well as prospective customers who have signed up for

6

Document Ref: UQPYE-MSTXK-VW3KS-JP82S

Page 6 of 8

-70-

trials. Dmarcian is involved in servicing and managing data for all of these customers. All of these customers agreed to dmarcian's Terms and Policies. Of these accounts, there are 638 accounts which are paid for by check or wire, or what dmarcian refers to as "Subscribed Manual Accounts", for which payment is directed to DME, whereas credit card payments by EU customers are paid to dmarcian. In other words, DME has a contractual relationship with approximately 4% of Plaintiff's customer base, at most.

27. DME's messages to dmarcian's customers which claimed a false data breach and directed them to move to DME's separate "dmarcadvisor" platform and instructed them on how to do that went out to Plaintiff's *entire* customer base, and not just the 4% which have a servicing relationship with Defendant.

28. Not only have DME's actions resulted in diversion of business from dmarcian to DME, but it has also opened an opportunity for competitors to take advantage of the chaos that DME has caused. An example of a competitor's solicitation that was forwarded to us is attached hereto as **Exhibit F.** This compounds the detrimental impact on dmarcian's reputation resulting from DME's actions.

29. DME is not licensed to sell dmarcian's SaaS services on a platform independent from dmarcian and built on code stolen from dmarcian.

30. Having established cloned websites which looked and felt like dmarcian's websites, and having saved the specter of the false data breach to move to a new platform which they initially made to seem like a dmarcian platform, DME began communicating to customers that it had to establish separate websites to protect their data *from dmarcian*, claiming that it had the right to do so because of a preliminary relief ruling that a Rotterdam court issued without Plaintiff ever having been served. A copy of a communication forwarded to dmarcian is attached hereto as **Exhibit G-1)** and the translated Judgment attached to that communication is attached as **Exhibit G-2.**

7

Document Ref: UQPYE-MSTXK-VW3KS-JP82S

Page 7 of 8

-71-

31.    As noted in the Judgment on preliminary relief attached to that email,
dmarcian was not properly served with that lawsuit and the ruling was entered in
dmarcian's absence based on one-sided information.  Even with that heavy advantage,
the Court did not find that dmarcian was in breach of its agreement; rather it found the
issue of performance to be "insufficiently determinable" and disallowed several of
DME's claims given that they were still under investigation by the Enterprise Chamber in
a separate proceeding involved Tim Draegen and DME and its other owners (to which
dmarcian is not a party).  (**Exhibit G-2,** Judgment, ¶¶2.12, 2.14, 3.10).  The Judgment
makes no findings as to who owns the intellectual property.  Yet DME falsely paints the
Rotterdam decision as evidence that DME was in the right in moving customers to its
new platform.

32.    DME's actions in defaming the dmarcian brand discredits our years of
dedication and long-standing reputation with devastating effects not just on our EU
markets but also on our US commerce.  Dmarcian has invested over $1,400,000.00 just
since 2016 in building dmarcian's brand and reputation as well as DME's reputation as
part of its joint operations with dmarcian.  Referral of our business comes from large
networks that refer enterprise-level business, and some of our EU customers are offices
of US-based companies.

I declare under penalty of perjury that the foregoing is true and correct.

This the 25th day of March, 2021.

*Shannon Draegen*

_____

SHANNON DRAEGEN

Document Ref: UQPYE-MSTXK-VW3KS-JP82S

Page 8 of 8

# Signature Certificate

Document Ref.: UQPYE-MSTXK-VW3KS-JP82S

Document signed by:



Verified E-mail:
shannon@dmarcian.com

*Shannon Draegen*

IP: 68.235.242.215     Date: 25 Mar 2021 21:34:54 UTC

Document completed by all parties on:
25 Mar 2021 21:34:54 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



## *CERTIFICATE OF SERVICE*

I hereby certify that Defendant has been served by email immediately upon filing with the foregoing DECLARATION as follows:

dmarcian Europe BV
c/o Martijn Groeneweg, Managing Director
Burgemeester de Raadtsingel 93
3311 JG Dordrecht
The Netherlands
martijn@tdx.nl
martin@dmarcadvisor.com

A courtesy copy has also been sent to Plaintiff's Dutch Counsel, Alfred Meijboom at Alfred.Meijboom@kvdl.com, as no US counsel has yet made an appearance. Plaintiff shall also serve a hard copy on Defendant by Federal Express at the above address on March 26, 2021 and will file an additional certificate of service upon completion.

This the 25th day of March, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER
DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiffs*

1

# Domains causing traffic to be diverted to BV-controlled websites

- This is a list of domains that have had activity regarding the spurious websites that have seen activity over the past 6 months.
- This is **not** a full list of domains that dmarcian BV has control of that the Inc needs to get under its management.
- The change history for these does not necessarily go back as far as the 7 months, as some of the domains only came under my radar and therefore the monitoring, at different points over the timeframe.
- The "No data yet" lines indicate the first time I put the domain into the monitoring service.
- 

DMARCIAN.NL - This site has been up for awhile, and has traditionally linked to the Inc-managed EU site, but this was adjusted in Feb to point to the rogue dmarcian-europe/dmarcian.co.uk site



DMARCIAN.EU - This is a production "dmarcian app" domain
I did not enter this into the monitoring service until 2020/10/06, which was after the BV moved the "NS" records from my control over to a BV-managed DNS server.  They populated it, at the time with a near-copy of what we had in production.  But with them having full control over it, it is a simple flip of some settings that they manage that will cause all of our EU customers' legitimate traffic going to our APP server to go be hijacked and to go to a BV-controlled site.  This is a major, major vulnerability for us that I cannot stress enough.

DMARCIAN.FR



recently stood up, redirects to EU registrations to the BV's **eu.dmarcadvisor.com** site

DMARCIAN.BE



It now redirects to the BV-controlled **dmarcian.nl** site

DMARCIAN.APP



It now redirects to the BV controlled **dmarcian.co.uk** site

DMARCIAN.AT



It now redirects to the BV controlled **dmarcian.co.uk** site

DMARCIAN.EMAIL



It now redirects to the BV controlled **dmarcian.co.uk** site

DMARCIAN.IO



It now redirects to the BV controlled **dmarcian.co.uk** site

DMARCIAN.ES



 recently stood up, redirects to EU registrations to the BV's **eu.dmarcadvisor.com** site

DMARCIAN.FRL



recently stood up, redirects to dmarcian.nl, which directs EU registrations to the BV's **eu.dmarcadvisor.com** site

DMARCIAN.JP



| Sub | TLD | Whois | FQDN | Type | Value | Last Good | Last Error | Last Change (v) | |
|---|---|---|---|---|---|---|---|---|---|
| ☑ | dmarcian.jp | [W] | dmarcian.jp [web] | A | 01: A: 167.71.9.172 | 2021-03-03 16:22:53Z | — | 2021-03-03 00:18:21Z | |
| | | History | | DEL | n/a | No data yet | | | 2021-02-18 19:34:08Z |
| | | | | ADD | A | 51.77.27.81 | | | 2021-02-18 19:34:08Z |
| | | | | DEL | A | 51.77.27.81 | | | 2021-03-03 00:18:21Z |
| | | | | ADD | A | 167.71.9.172 | | | 2021-03-03 00:18:21Z |

Recently stood up, redirects to the BV's **dmarcian.co.uk** site.

## DMARCIAN.CN

| Sub | TLD | Whois | FQDN | Type | Value | Last Good | Last Error | Last Change (v) | |
|---|---|---|---|---|---|---|---|---|---|
| ☑ | dmarcian.cn | [W] | dmarcian.cn [web] | A | 01: A: 167.71.9.172 | 2021-03-03 16:22:42Z | — | 2021-03-03 04:22:45Z | |
| | | History | | DEL | A | No data yet | | | 2020-12-10 23:06:25Z |
| | | | | ADD | A | 51.77.27.81 | | | 2020-12-10 23:06:25Z |
| | | | | DEL | A | 51.77.27.81 | | | 2021-03-03 00:22:42Z |
| | | | | ADD | A | 167.71.9.172 | | | 2021-03-03 00:22:42Z |
| | | | | DEL | A | 167.71.9.172 | | | 2021-03-03 01:16:59Z |
| | | | | ADD | A | 51.77.27.81 | | | 2021-03-03 01:16:59Z |
| | | | | DEL | A | 51.77.27.81 | | | 2021-03-03 04:22:45Z |
| | | | | ADD | A | 167.71.9.172 | | | 2021-03-03 04:22:45Z |

Recently modified; it now redirects to the BV's **dmarcian.co.uk** site.

## DMARCIAN.HK

| Sub | TLD | Whois | FQDN | Type | Value | Last Good | Last Error | Last Change (v) | |
|---|---|---|---|---|---|---|---|---|---|
| ☑ | dmarcian.hk | [W] | dmarcian.hk [web] | A | 01: A: 167.71.9.172 | 2021-03-03 16:22:50Z | — | 2021-03-03 05:18:06Z | |
| | | History | | DEL | A | No data yet | | | 2020-12-10 23:06:04Z |
| | | | | ADD | A | 51.77.27.81 | | | 2020-12-10 23:06:04Z |
| | | | | DEL | A | 51.77.27.81 | | | 2021-03-03 00:22:54Z |
| | | | | ADD | A | 167.71.9.172 | | | 2021-03-03 00:22:54Z |
| | | | | DEL | A | 167.71.9.172 | | | 2021-03-03 04:18:06Z |
| | | | | ADD | A | 51.77.27.81 | | | 2021-03-03 04:18:06Z |
| | | | | DEL | A | 51.77.27.81 | | | 2021-03-03 05:18:06Z |
| | | | | ADD | A | 167.71.9.172 | | | 2021-03-03 05:18:06Z |

Recently modified; it now redirects to the BV's **dmarcian.co.uk** site.

*Dmarcian*-interest domains currently being monitored that we do not have control over

| Domain Name | Created | Expiration | Managed by | Comment 1 | Comment 2 |
|---|---|---|---|---|---|
| dmarcian-ap.com | | 2021-03-29 | dm INC | INC: Production Web Server, Alternate Address (AP) | |
| Dmarcian-eu.com | | | dm INC | INC: Production Web Server, Alternate Address (EU) | |
| Dmarcian-europe.com | | | BV | **Redirects to dmarcian.co.uk** | |
| Dmarcian.app | 2018-05-08 | 2021-05-08 | BV | **Redirects to dmarcian.co.uk** | |
| Dmarcian.at | | | BV | **Redirects to dmarcian.co.uk** | |
| Dmarcian.be | 2018-05-08 | | BV | **Redirects to dmarcian.nl** | |
| Dmarcian.bg | | | BV | **Misconfigured gtranslate site** | |
| Dmarcian.ca | | | dm INC | no DNS in place yet | |
| Dmarcian.ch | | | BV | **Misconfigured gtranslate site** | |
| Dmarcian.cn | 2019-11-05 | 2021-11-05 | "marcaria.com LLC" | **Redirects to dmarcian.co.uk** | |
| Dmarcian.co.jp | 2019-11-05 | 2021-11-30 | "Taka Oyama LLP" | No website responds | |
| Dmarcian.co.uk | 2018-05-11 | 2021-05-11 | BV | | |
| Dmarcian.com | 2012-01-31 | 2028-01-31 | dm INC | INC: Primary Marketing Site | |
| Dmarcian.cz | | | BV | **gtranslate'd site** | |
| Dmarcian.de | | | BV | updated 2020-09-08 | directs to dmarcian.com |
| Dmarcian.dev | | | (available??) | may not exist | |
| Dmarcian.dk | 2014-03-13 | 2021-03-31 | dm INC | **gtranslate'd site** | |

| Domain | Date 1 | Date 2 | BV | Notes | |
|---|---|---|---|---|---|
| Dmarcian.email | 2018-07-03 | 2021-07-03 | BV | Redirects to dmarcian.co.uk | |
| Dmarcian.es | | | BV | gtranslate'd site | |
| Dmarcian.eu | | | BV | INC: Production Web Server for EU Region | |
| Dmarcian.fr | 2018-06-01 | 2021-06-01 | BV | gtranslate'd site | |
| Dmarcian.frl | 2019-09-19 | 2021-09-19 | BV | Redirects to dmarcian.nl | |
| Dmarcian.hk | | | BV | Redirects to dmarcian.co.uk | |
| Dmarcian.ie | | | (available??) | Working to secure incorporation so that we can legally obtain this | |
| Dmarcian.in | 2018-05-31 | 2021-05-31 | BV | Misconfigured gtranslate site | |
| Dmarcian.io | 2018-07-03 | 2021-07-03 | BV | Redirects to dmarcian.co.uk | |
| Dmarcian.it | 2018-09-06 | 2021-09-06 | BV | Misconfigured gtranslate site | |
| Dmarcian.jp | 2019-11-05 | 2021-11-30 | BV | Redirects to dmarcian.co.uk | |
| Dmarcian.me | | | (available??) | No website responds | |
| Damarcian.net | 2018-05-11 | 2021-05-11 | BV | No website responds | |
| Dmarcian.nl | 2014-07-04 | | BV | BV Controlled Website; EU links hijack to eu.dmarcadvisor.com | |
| Dmarcian.org | | | BV | No website responds | |
| Dmarcian.org.uk | 2019-12-11 | 2021-12-11 | BV | *Wordpress site; partially set up; bad!* | |
| Dmarcian.pl | 2018-05-31 | 2021-05-31 | BV | Misconfigured gtranslate site | |
| Dmarcian.ru | | | (available??) | No website responds | |
| Dmarcianeurope.com | 2019-12-09 | 2021-12-09 | BV | (no hypen) | No website responds |






### DMARC SaaS Platform

Allow our application to process and visualize DMARC
data in ways that expose authentication gaps
(SPF/DKIM) and unauthorized use of your domains.

Recommended for organizations of all sizes and
DMARC needs.

LEARN MORE

### Deployment Services

Have confidence and expedite your DMARC project
timeline by allowing our Deployment Managers to take
you through our project-based approach.

Ideal for organizations new to DMARC or ones needing



We use cookies to give you the best experience on our website.

I accept    Learn More    ✕



# DMARC alignment

By themselves, SPF and DKIM can associate a piece of
email with a domain. DMARC attempts to tie the results
of SPF and DKIM to the content of email, specifically to
the domain found in the From: header of an email. The
domain found in the From: header of a piece of email is
the entity that ties together all DMARC processing.

Because anyone can buy a domain and put SPF and
DKIM into place (including criminals), the results of
processing SPF and DKIM have to be related to the
domain found in the From: header to be relevant to
DMARC. This concept is referred to as Identifier
Alignment.

Identifier Alignment is how existing email authentication
technologies are made relevant to the content of an
email. Getting identifiers to align ends up being a large
part of the work of deploying DMARC.

## Are your SPF and DKIM identifiers aligned?

When your email is sent, the "From domain" has your
domain name after the @ within the email address.
Your DKIM signature should also contain the same
domain name embedded into the key string. If they

We use cookies to give you the best experience on our website.

I accept    Learn More    ✕



## Configuring third-party sources

Third-party sources (eg. SendGrid, Amazon SES, Salesforce, etc.) often use their domain name space to get SPF and DKIM to pass. Configuring these third-party sources to use your own domain name space will bring about alignment. Each third-party source has varying capabilities in this area. dmarcian has cataloged and detailed over 900 third-party sources, their capabilities, and instructions on how to configure related settings.



Register

Login

Tools

    DMARC Domain Checker

    DMARC Inspector

    DMARC Record Wizard

    SPF Surveyor

    DKIM Inspector

    DKIM Validator

    Phishing Scorecard

    XML to Human Converter

    DMARC Data Providers

Why DMARC

    What is SPF?

    What is DKIM?

    DMARC Alignment

    Getting started with DMARC

Solutions

    DMARC SaaS Platform

    Deployment Services

    Dedicated Support

News & Knowledge

    Blog

    Forums

Pricing

Product Changelog

About

We use cookies to give you the best experience on our website.

I accept    Learn More



Become a Partner

MSPs & MSSPs

Employment Opportunities

Contact Us

Meet our Team

dmarcian's Impact

Status

Legal

Security and Compliance

Privacy Policy

Cookie Policy

Terms of Service

GDPR

SIGN UP TO RECEIVE OUR NEWSLETTER

Email address: *

Sign up

We use cookies to give you the best experience on our website.

I accept    Learn More

×







## What is DKIM?

# DKIM Explained

**DKIM** stands for **DomainKeys Identified Mail** and is used for the authentication of an email that's being sent. Like SPF, DKIM is an open standard for email authentication that is used for DMARC alignment. A DKIM record exists in the DNS, but it is a bit more complicated than SPF. DKIM's advantage is that it can survive forwarding, which makes it superior to SPF and a foundation for securing your email.

Starting in 2004 from merging two similar efforts, "enhanced DomainKeys" from Yahoo and "Identified Internet Mail" from Cisco and has since been widely adopted for email authentication.



## What is a DKIM Record?

A domain owner adds a DKIM record, which is a modified TXT record, to the DNS records on the sending

We use cookies to give you the best experience on our website.

I accept    Learn More



# Deployment Services

dmarcian Deployment Services are project-based
initiatives that help you achieve your DMARC objectives
and milestones. Each project maintains the necessary
education, training and policy enactments to ensure you
can be self-sufficient in managing your domain catalog
and email footprint when the project comes to
conclusion.

Deployment projects commence with education and
training modules to ensure you understand the entirety
of the program scope and can take action with the
appropriate context. Subsequent sessions will take the
form of weekly meetings championed by the
Deployment Manager. Most sessions will include a
screen-share meeting room, option to record, and
leave-behind assets.



Over the last six years, **dmarcian** has developed a project-based approach—our AIM model—for policy enforcement that addresses technical compliance and how it affects different aspects of your organization.

**Phase 1: Assess**
The Assess phase starts with gathering your organizational domains and collecting data about them using the DMARC policy of $p=none$. Then we'll perform an impact analysis on the results in order to categorize the domains and create an accurate implementation plan.

**Phase 2: Implement**
The Implement phase focuses on enabling email authentication based on the plan created during the Assess stage. The goal here is to make each email source DMARC compliant by deploying SPF and DKIM technologies. Once an agreed-upon coverage is reached, we'll move away from monitoring mode to a $p=reject$ DMARC policy.

**Phase 3: Manage**
The last phase of the project is focused on preparing your organization for the future on two main fronts: unexpected problems and planned changes. We'll enable reports and alerts for cases when we see infrastructure hurdles. Most importantly, we'll establish a new business process for onboarding new digital assets.



We use cookies to give you the best experience on our website.

| I accept | Learn More |

×

**dmarcian** was founded by one of DMARC's primary authors, and we have an international track record for helping businesses and governmental organizations across the globe and of all sizes successfully deploy DMARC. We can tailor to the needs of your organization, from light-touch initial onboarding through full outsourcing of all DMARC-related functions and monitoring. Contact us to get started.



Get your domains into compliance. Try out dmarcian for free!

SIGN UP FREE

CONTACT US

Register

Login

Tools

    DMARC Domain Checker

    DMARC Inspector

    DMARC Record Wizard

    SPF Surveyor

    DKIM Inspector

    DKIM Validator

    Phishing Scorecard

    XML to Human Converter

    DMARC Data Providers

We use cookies to give you the best experience on our website.

I accept    Learn More

✕

What is SPF?

What is DKIM?

DMARC Alignment

Getting started with DMARC

Solutions

DMARC SaaS Platform

Deployment Services

Dedicated Support

News & Knowledge

Blog

Forums

Pricing

Product Changelog

About

About dmarcian

Partners

Find a Partner

Become a Partner

MSPs & MSSPs

Employment Opportunities

Contact Us

Meet our Team

dmarcian's Impact

Status

Legal

Security and Compliance

Privacy Policy

Cookie Policy

Terms of Service

We use cookies to give you the best experience on our website.

I accept     Learn More





# DMARC SaaS Platform

dmarcian's DMARC SaaS platform receives, processes and classifies mail observed from your domain namespace and makes sense of it for you. The native XML format in which DMARC data is transmitted is not intended for human consumption. Our platform visualizes the data in powerful and meaningful ways so you can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of your domains.

In addition to aggregating DMARC data, our platform provides domain administration teams with the necessary features to adopt DMARC with clarity and confidence. The dmarcian reporting platform sits atop the most accurate source classification engine in the industry and affords users with assurances of the true origin of a particular mail stream.

**dmarcian has been processing DMARC data since the inception of the specification in 2012.**



We use cookies to give you the best experience on our website.

I accept    Learn More    ✕

## Without dmarcian

This—times a whole lot
more, depending on the
amount of email you send.



## With dmarcian

DMARC's XML feedback
contains useful
information, and
**dmarcian** helps you make
sense of it.

### Domain Overview

The Domain Overview contains a summary of the
status of all your domains and sources. The
geographical location of recent abuse is also shown.
View the state of your domains at a glance, and get
to work locking down your email domains.

We use cookies to give you the best experience on our website.

I accept    Learn More    ✕



## Detail Viewer

The Detail Viewer allows you to explore your DMARC data in a variety of ways. It shows a timeline of your data along with search parameters such as From and To date selectors, domain and data-provider pickers, and a filter option that can be used to show *what would have* happened had a DMARC policy been in place.



The Detail Viewer also shows your data grouped into four high-level tabs: DMARC-capable, Non-compliant, Forwarding, and Threat/Unknown. Each tab shows groups of infrastructure and details on DMARC compliance. You can find more information on how to get DMARC compliant per source. You can reveal more detail about each group and discover the sources of your domain's email and combine data from multiple providers across specific

We use cookies to give you the best experience on our website.

I accept    Learn More

×



**API**

Integrate our DMARC SaaS Platform seamlessly into your own dashboards or SOC by using our API. This is an Enterprise plan only feature.

**Domain Discovery**

Not sure what domains you have registered? **dmarcian** can help. Using Domain Discovery, dmarcian can automatically discover your digital assets and add them to your catalogue. This is an Enterprise plan only feature.



**Source Viewer**

The Source Viewer shows an overview of the DMARC Capable Sources we have found across all of your domains or domain groups.



We use cookies to give you the best experience on our website.

[ I accept ]　[ Learn More ]　　×

## Single Sign-On

Our DMARC SaaS Platform allows our customers to extend their security setup using Single Sign-On. Single Sign-On lets organizations define/manage access requirements and simplifies provisioning and deprovisioning of users. We currently support SAML V2.0. This is an Enterprise-only feature.



## Automatic Subdomain Detection

Our DMARC SaaS Platform automatically detects, processes, sorts and displays subdomains and gives users the option to choose which subdomains are valuable to them.





Get your domains into compliance. Try out dmarcian for free!

SIGN UP FREE

CONTACT US

We use cookies to give you the best experience on our website.

I accept　　Learn More

Register

Login

Tools

DMARC Domain Checker

DMARC Inspector

DMARC Record Wizard

SPF Surveyor

DKIM Inspector

DKIM Validator

Phishing Scorecard

XML to Human Converter

DMARC Data Providers

Why DMARC

What is SPF?

What is DKIM?

DMARC Alignment

Getting started with DMARC

Solutions

DMARC SaaS Platform

Deployment Services

Dedicated Support

News & Knowledge

Blog

Forums

Pricing

Product Changelog

About

About dmarcian

We use cookies to give you the best experience on our website.

I accept    Learn More

×





We use cookies to give you the best experience on our website.

I accept    Learn More



## Solutions

### DMARC SaaS Platform

Allow our application to process and visualize DMARC data in ways that expose authentication gaps (SPF/DKIM) and unauthorized use of your domains.

Recommended for organizations of all sizes and DMARC needs.

LEARN MORE



### Deployment Services

Have confidence and expedite your DMARC project timeline by allowing our Deployment Managers to take you through our project-based approach.

Ideal for organizations new to DMARC or ones needing assistance bringing about change.

LEARN MORE

We use cookies to give you the best experience on our website.

I accept     Learn More



**Dedicated Support**

Get on-demand support when needs arise. We can help
you manage DMARC-related incidents, regular data
reviews, ongoing compliance, and embedding DMARC
into daily operations.

Best for organizations that need incident-response
assurances or intermittent support.

LEARN MORE



# 142
partners
# +2,502,448
monitored domains

We use cookies to give you the best experience on our website.

I accept    Learn More    ×

customers

+7,033,288,932

DMARC XML records processed

Get your domains into compliance. Try out dmarcian for free!

SIGN UP FREE

CONTACT US

Register

Login

Tools

    DMARC Domain Checker

    DMARC Inspector

    DMARC Record Wizard

    SPF Surveyor

    DKIM Inspector

    DKIM Validator

    Phishing Scorecard

    XML to Human Converter

    DMARC Data Providers

Why DMARC

    What is SPF?

    What is DKIM?

We use cookies to give you the best experience on our website.

I accept    Learn More

×

DMARC Software & Reportings Services - DMARC SaaS - dmarcian

https://dmarcian.com/dmarc-saas-platform/



# DMARC SaaS Platform

dmarcian's DMARC SaaS platform receives, processes and classifies mail observed from your domain namespace and makes sense of it for you. The native XML format in which DMARC data is transmitted is not intended for human consumption. Our platform visualizes the data in powerful and meaningful ways so you can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of your domains.

In addition to aggregating DMARC data, our platform provides domain administration teams with the necessary features to adopt DMARC with clarity and confidence. The dmarcian reporting platform sits atop the most accurate source classification engine in the industry and affords users with assurances of the true origin of a particular mail stream.

dmarcian has been processing DMARC data since the inception of the specification in 2012.



Domain Overview, Source Viewer & Detail Viewer

**Without dmarcian**

This—times a whole lot more, depending on the amount of email you send



**With dmarcian**

DMARC's XML feedback contains useful information, and dmarcian helps you make sense of it.



EXHIBIT
B-2

We use cookies to give you the best experience on our website.
I accept    Learn More

Case 1:21-cv-00067-MR   Document 8-3   Filed 03/25/21   Page 1 of 3

Page 1 of 3

3/25/2021, 12:24 PM

Getting started with DMARC. Protect Your Domain - dmarcian                    https://dmarcian.com/start-dmarc/

    Why DMARC   Solutions   Pricing   Tools   News and Knowledge   About              Sign Up Free   Login

# Getting started with DMARC

DMARC, (Domain-based Message Authentication Reporting, & Conformance) an open source standard, uses a concept called *alignment* to tie the result of two other open source standards, SPF (a published list of servers that are authorized to send email on behalf of a domain) and DKIM (a tamper-evident domain seal associated with a piece of email), to the content of an email. If not already deployed, putting a DMARC record into place for your domain will give you feedback that will allow you to troubleshoot your SPF and DKIM configurations if needed.

Adopting DMARC involves creating a DMARC record, publishing it, and using the information that is generated to gain insight and control over the way your domains are handling email. DMARC helps legitimize your email by doing two things:

- Gives feedback about the email itself, including information about SPF or DKIM alignment.
- Tells email receivers (like Gmail and Yahoo) how to handle messages that fail to align with those protocols.

dmarcian can assist your organization in every step of the way, from deploying the underlying technologies of DMARC to making sense of the data that it generates, to gaining full insight and control to the way your email domains are being used.

## Assess

The work required to deploy DMARC is directly related to the size and complexity of an organization's email infrastructure. DMARC is a domain-based email control and email domains are a shared resource within most organizations, with spanning from employees to entire departments, external parties that send email on behalf of the organization, and the organization's own internet-facing applications.

When deploying DMARC, it's best to roll it out across all of an organization's domains instead of focusing on individual domains. When DMARC is deployed at an organization across the entire domain portfolio, the process of deployment itself becomes much easier as there is complete organizational visibility, and managers get new tools to ensure all email is being sent in compliance with the organization's standards.

## Publishing a DMARC record

To start generating DMARC data, you must first publish a DMARC record for each domain you wish to monitor. dmarcian's DMARC Record Wizard makes it easy to create a DMARC record.

A DMARC record exists as part of your Domain Name System (DNS) record, which routes traffic on the internet. You can include additional information in the DNS, like your domain's DMARC record—a text entry within the DNS record that tells the world your email domain's policy based on the configured SPF and DKIM protocol.

Here are instructions on how to publish a DMARC record with your DNS host.

Once you've published DMARC records, DMARC data will typically begin to generate within a day or two in the form of reports that give you insight into the way your domains are handling email. These reports are XML-based and can be difficult for humans to read and make sense of, especially when they can number in the thousands. dmarcian's DMARC SaaS Platform specializes in processing these reports and identifying the steps needed so that DMARC can be more easily deployed throughout an organization. We categorize sources of email and present you with DMARC compliance status (based on email source, DKIM and SPF), and we alert you if there are any potential threats to or abuse on your domains.

## Getting data to dmarcian

There are different ways of getting data processed by dmarcian:

> **Send Data Directly to dmarcian.**
The most convenient option to have data processed is by sending your DMARC reports directly to dmarcian for processing. Upon creation of your account, you will receive an email address where you can send DMARC reports to be processed.

> **Forward Data to your dmarcian account.**
If you already have DMARC reports being generated, or don't wish to send reports directly to dmarcian, you can forward DMARC reports to the address provided when you register.

> **Upload Data Directly to dmarcian.**
If you already have DMARC XML data, you can upload it using the XML-to-Human Converter. You will be given a detailed report of your data, but your data history will not be stored unless you are logged in.

## DMARC policy

For an email message to be considered DMARC-compliant, the domain found in the "From:" header must match the domain validated by SPF or the source domain found in a valid DKIM signature. If the domains match and at least one             

We use cookies to give you the best experience on our website.
I accept    Learn More

Getting started with DMARC. Protect Your Domain - dmarcian

https://dmarcian.com/start-dmarc/



Dmarcian - Protect Your Email and Domain with DMARC                    https://dmarcian.com/

dmarcian          Why DMARC  Solutions  Pricing  Tools  News and Knowledge  About          Sign Up Free   Login

# Secure your domains from email impersonation and phishing attacks with DMARC.

**Is your domain protected?**

CHECK MY DOMAIN

### DMARC SaaS Platform

Allow our application to process and visualize DMARC data in ways that expose authentication gaps (SPF/DKIM) and unauthorized use of your domains.

Recommended for organizations of all sizes and DMARC needs.

LEARN MORE

### Deployment Services

Have confidence and expedite your DMARC project timeline by allowing our Deployment Managers to take you through our project-based approach.

Ideal for organizations new to DMARC, or ones needing assistance bringing about change.

LEARN MORE

### Dedicated Support

Get on-demand support when needs arise. We can help you manage DMARC-related incidents, regular data reviews, ongoing compliance, and embedding DMARC into daily operations.

Ideal for organizations that need isolated response assurance or intermittent support.

LEARN MORE

| +157 | +1,701,220 | +50,830 | +867,000,000,000 |
|---|---|---|---|
| partners | monitored domains | customers | Email Volume Processed |

**Trusted by**

Huntington   slack   ___   ascensus   ___   Rabobank

FIS   ___   lyft

## dmarcian helps you protect your brand and identity online

🔒 **Security**
Prevent unauthorized use of your email domain to protect people from spam, fraud, and phishing.

👁 **Visibility**
dmarcian's tools shows you who and what across the internet is sending email using your email domain.

✉ **Delivery**
dmarcian gives you access to the same modern plumbing that mega companies use to deliver email.

👤 **Identity**

We use cookies to give you the best experience on our website.
I accept    Learn More

EXHIBIT
B-3
S. Draegin

Case 1:21-cv-00067-MR   Document 8-4   Filed 03/25/21   Page 1 of 2

Page 1 of 2

**-106-**

Dmarcian - Protect Your Email and Domain with DMARC

https://dmarcian.com/







We're very pleased to feature a series of short, technical videos that walk through various aspects of DMARC. These videos draw upon the best of our training courses, are freely available and can be viewed at your leisure.

These videos stand by themselves and should be accessible even to the less technically inclined among us. If you've got an hour and you'd like to become an expert in DMARC, view them in order and then let us know how you feel!

1. DMARC – Overview
2. DMARC – How It Works
3. DMARC – Benefits
4. DMARC – Return on Investment
5. DMARC – Deployment Process
6. SMTP Overview
7. SPF Overview
8. DKIM Overview
9. DMARC – Technical Overview



We use cookies to give you the best experience on our website.

I accept    Learn More    ×



Are you interested in learning how our platform can help you achieve your DMARC goals? Take a look at a few features of our reporting platform, specifically the Domain Overview, Source Viewer and Detail Viewer.



*Want to continue the conversation? Head over to the dmarcian Forum*

**Tags:**    DMARC    Video



We use cookies to give you the best experience on our website.    I accept    Learn More    ✕



Search...                                    Search

TAGS

BIMI   COVID-19   Cybercrime   Deliverability   DKIM   DMARC

DMARC Benefits   Dmarcian   DMARC Receivers   DMARC Records   ESP

GDPR   Google   Office 365   Podcast   Reporting

Sending On Behalf Of Others   SPF   Tools   Video   Webinar

White Paper   Yahoo

MOST VIEWED POSTS

1   DKIM Records: How to Create and Add to Your DNS
1 June 2020

2   How to Publish a DMARC Record
3 June 2020

3   Monitor Your Domains with Alert Central
8 December 2020

4   Track DMARC Compliance with Account Progress Report
25 January 2021

5   SPF Management Challenges
23 March 2020

CATEGORIES

Case Studies

Deployment

dmarcian Platform

Ecosystem News

Email Technology

Inside dmarcian

We use cookies to give you the best experience on our website.

I accept        Learn More                              ✕

Videos

Webinars and Podcasts

White Paper



Get your domains into compliance. Try out dmarcian for free!

SIGN UP FREE

CONTACT US

Register

Login

Tools

   DMARC Domain Checker

   DMARC Inspector

   DMARC Record Wizard

   SPF Surveyor

   DKIM Inspector

   DKIM Validator

   Phishing Scorecard

   XML to Human Converter

   DMARC Data Providers

Why DMARC

We use cookies to give you the best experience on our website.

I accept   Learn More

DMARC Alignment

Getting started with DMARC

Solutions

DMARC SaaS Platform

Deployment Services

Dedicated Support

News & Knowledge

Blog

Forums

Pricing

Product Changelog

About

About dmarcian

Partners

Find a Partner

Become a Partner

MSPs & MSSPs

Employment Opportunities

Contact Us

Meet our Team

dmarcian's Impact

Status

Legal

Security and Compliance

Privacy Policy

Cookie Policy

Terms of Service

GDPR

We use cookies to give you the best experience on our website.

I accept     Learn More





Menu ≡



Protect your domains against email abuse and phishing with DMARC
Monitor and control your DMARC process with dmarcian

**GET STARTED WITH A 14 DAY FREE TRIAL**

## Is your domain protected?

mydomain.com

**Check my domain**

### DMARC SaaS Platform

Allow our application to process and visualize DMARC data
in ways that expose authentication gaps (SPF/DKIM) and
unauthorized use of your domains.

**LEARN MORE**





EXHIBIT
C-1
S. Draegen

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings

Case 1:21-cv-00067-MR   Document 8-6   Filed 03/25/21   Page 1 of 22

-114-





# DMARC Aligment

By themselves, SPF and DKIM can associate a piece of email with a domain. DMARC attempts to tie the results of SPF and DKIM to the content of email, specifically to the domain found in the From: header of an email. The domain found in the From: header of a piece of email is the entity that ties together all DMARC processing.

Because anyone can buy a domain and put SPF and DKIM into place (including criminals), the results of processing SPF and DKIM have to be related to the domain found in the From: header to be relevant to DMARC. This concept is referred to as Identifier Alignment.

Identifier Alignment is how existing email authentication technologies are made relevant to the content of an email. Getting identifiers to align ends up being a large part of the work of

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings



# Are your SPF and DKIM identifiers aligned with the 'From: domain'?

When your email is sent, the "From domain" has your domain name after the @ within the email address. Your DKIM signature should also contain the same domain name embedded into the key string. If they match, then they are aligned. Having the SPF and the DKIM align means your email will pass DMARC verification.



## Configuring third-party sources

Third party sources (eg. SendGrid, Amazon SES, Salesforce, etc.) often use their domain name space to get SPF and DKIM to pass. Configuring these third-party sources to use your own domain

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept    Settings



Menu ☰

instructions on how to configure related settings.



Get your domains into compliance. Try out dmarcian for free!

**SIGN UP FREE**

**PLAN A DEMO**

Contact

sales@dmarcian-europe.com

support@dmarcian-europe.com

partners@dmarcian-europe.com

invoice@dmarcian-europe.com

Tel: +31 78 632 0242

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept    Settings



Menu ☰

DMARC Inspector

DMARC Record Wizard

DKIM Inspector

DKIM Validator

SPF Surveyor

XML to Human Converter

Services

DMARC SaaS Platform

Deployment Services

Dedicated Support

Sources

News & Knowledge

Terms of Service

GDPR

About dmarcian

Copyright © Dmarcian Europe BV

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the **settings [/ setting]**.

Accept    Settings



Menu ☰

## How does DKIM work?

DKIM gives emails a signature header that is added to the email and secured with encryption. This DKIM signature acts like a tamper-proof seal for email to verify that it has actually come from the domain it says it does and that it hasn't been tampered with.

To use DKIM, email servers are configured to attach special signatures to the emails they send. These signatures travel with the emails and are verified along the way by the email servers that move the emails toward their final destination.



## What is a DKIM

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings



Menu ≡

## Deployment Services

dmarcian Deployment Services are project-based initiatives that help you achieve your DMARC objectives and milestones. Each project maintains the necessary education, training and policy enactments to ensure you can be self-sufficient in managing your domain catalog and email footprint when the project comes to conclusion.

Deployment projects commence with education and training modules to ensure you understand the entirety of the program scope and can take action with the appropriate context. Subsequent sessions will take the form of weekly meetings championed by the Deployment Manager. Most sessions will include a screen-share meeting room, option to record, and leave-behind assets.



We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept    Settings



Menu ≡

compliance and how it affects different aspects of your organization.

### Phase 1: Assess

The Assess phase starts with gathering your organizational domains and collecting data about them using the DMARC policy of p=none. Then we'll perform an impact analysis on the results in order to categorize the domains and create an accurate implementation plan.

### Phase 2: Implement

The Implement phase focuses on enabling email authentication based on the plan created during the Assess stage. The goal here is to make each email source DMARC compliant by deploying SPF and DKIM technologies. Once an agreed-upon coverage is reached, we'll move away from monitoring mode to a p=reject DMARC policy.

### Phase 3: Manage

The last phase of the project is focused on preparing your organization for the future on two main fronts: unexpected problems and planned changes. We'll enable reports and alerts for cases when we see infrastructure hurdles. Most importantly, we'll establish a new business

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the **settings [/ setting].**

Accept    Settings







Menu ☰

## DMARC SaaS Platform

dmarcian's DMARC SaaS platform receives, processes and classifies mail observed from your domain namespace and makes sense of it for you. The native XML format in which DMARC data is transmitted is not intended for human consumption. Our platform visualizes the data in powerful and meaningful ways so you can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of your domains.

In addition to aggregating DMARC data, our platform provides domain administration teams with the necessary features to adopt DMARC with clarity and confidence. The dmarcian reporting platform sits atop the most accurate source classification engine in the industry and affords users with assurances of the true origin of a particular mail stream.

**dmarcian has been processing DMARC data since the inception of the specification in 2012.**

We use cookies to give you the best experience on our site. You can find more information about which cookies we are using or disable them in the <u>settings [/ setting]</u>.

Accept    Settings



Menu ☰



Without dmarcian

This – times a whole lot
more, depending on the
amount of email you
send.



We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the **settings [/ setting].**

Accept    Settings



Menu ≡

DMARC's XML feedback
contains useful
information,
and **dmarcian** helps you
make sense of it.



## Domain Overview

The Domain Overview contains a summary of the
status of all your domains and sources. The
geographical location of recent abuse is also
shown. View the state of your domains at a
glance, and get to work locking down your email
domains.

## Detail Viewer

The Detail Viewer allows you to explore your

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the **settings [/ setting].**

**Accept**    Settings




option that can be used to show what would have happened had a DMARC policy been in place.



The Detail Viewer also shows your data grouped into four high-level tabs: DMARC-capable, Non-compliant, Forwarding, and Threat/Unknown. Each tab shows groups of infrastructure and details on DMARC compliance. You can find more information on how to get DMARC compliant per source. You can reveal more detail about each group and discover the sources of your domain's email and combine data from multiple providers across specific timelines.

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept    Settings



Menu ☰

### API

Integrate our DMARC SaaS Platform seamlessly into your own dashboards or SOC by using our API. This is an Enterprise plan only feature.

### Domain Discovery

Not sure what domains you have registered? **dmarcian** can help. Using Domain Discovery, dmarcian can automatically discover your digital assets and add them to your catalogue. This is an Enterprise plan only feature.

---

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the **settings [/ setting].**

[ Accept ]    [ Settings ]

dmarcian

Menu ≡



## Source Viewer

The Source Viewer shows an overview of the DMARC Capable Sources we have found across all of your domains or domain groups.

## Single Sign-On

Our DMARC SaaS Platform allows our customers to extend their security setup using Single Sign-On. Single Sign-On lets organizations define/manage access requirements and simplifies provisioning and deprovisioning of users. We currently support SAML V2.0. This is an Enterprise-only feature.



We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the **settings [/ setting].**

**Accept**   Settings



## Automatic Subdomain Detection

Our DMARC SaaS Platform automatically detects, processes, sorts and displays subdomains and gives users the option to choose which subdomains are valuable to them.

Get your domains into compliance. Try out dmarcian for free!

**SIGN UP FREE**

**PLAN A DEMO**

**dmarcian** EUROPE

Contact

sales@dmarcian-europe.com

support@dmarcian-europe.com

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept   Settings





## Solutions

### DMARC SaaS Platform

Allow our application to process and visualize DMARC data in ways that expose authentication gaps (SPF/DKIM) and unauthorized use of your domains.

Recommended for organizations of all sizes and DMARC needs.

learn more



### Deployment Services

Have confidence and expedite your DMARC project timeline by allowing our Deployment

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings



needing assistance bringing about change.

Learn more



## Dedicated Support

Get on-demand support when needs arise. We
can help you manage DMARC-related incidents,
regular data reviews, ongoing compliance, and
embedding DMARC into daily operations.

Best for organizations that need incident-
response assurances or intermittent support.

Learn more



We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings





DKIM Inspector

DKIM Validator

SPF Surveyor

XML to Human Converter

Services

DMARC SaaS Platform

Deployment Services

Dedicated Support

Sources

News & Knowledge

Terms of Service

GDPR

About dmarcian

Copyright © Dmarcian Europe BV



We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings



Why DMARC   Solutions   Pricing   Tools   News and Knowledge   Contact     Sign Up Free   Login

# DMARC SaaS Platform

dmarcian's DMARC SaaS platform receives, processes and classifies mail observed from your domain namespace and makes sense of it for you. The native XML format in which DMARC data is transmitted is not intended for human consumption. Our platform visualizes the data in powerful and meaningful ways so you can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of your domains.

In addition to aggregating DMARC data, our platform provides domain administration teams with the necessary features to adopt DMARC with clarity and confidence. The dmarcian reporting platform sits atop the most accurate source classification engine in the industry and affords users with assurances of the true origin of a particular mail stream.

dmarcian has been processing DMARC data since the inception of the specification in 2012.



Domain Overview, Source Viewer & Detail Viewer



**Without dmarcian**

This – times a whole lot more, depending on the amount of email you send.

**With dmarcian**

DMARC's XML feedback contains useful information, and dmarcian helps you make sense of it.

The Domain Overview contains a summary of the status of all your domains and sources. The geographical location of recent abuse is also shown. View the state of your domains at a glance, and get to work locking down your email domains.

The Detail Viewer allows you to explore your DMARC data in a variety of ways. It shows a timeline of your data along with search parameters such as From and To date selectors, domain and data-provider pickers, and a filter option that can be used to



EXHIBIT

C-2

Getting started with DMARC. Protect Your Domain - dmarcian                    https://dmarcian.co.uk/start-dmarc/



Why DMARC   Solutions   Pricing   Tools   News and Knowledge   Contact                    Sign Up Free   Login

# Getting Started with DMARC

DMARC, (Domain-based Message Authentication Reporting, &
Conformance) an open source standard, uses a concept called
alignment to tie the result of two other open source standards, SPF
(a published list of servers that are authorized to send email on
behalf of a domain) and DKIM (a tamper-evident domain seal
associated with a piece of email), to the content of an email. If not
already deployed, putting a DMARC record into place for your
domain will give you feedback that will allow you to troubleshoot
your SPF and DKIM configurations if needed.

Adopting DMARC involves creating a DMARC record, publishing it,
and using the information that is generated to gain insight and
control over the way your domains are handling email. DMARC helps
legitimize your email by doing two things:

- Gives feedback about the email itself, including information
  about SPF and/or DKIM alignment.
- Tells email receivers (like Gmail and Yahoo) how to handle
  messages that fail to align with those protocols.

dmarcian can assist your organization in every step of the way, from
deploying the underlying technologies of DMARC, to making sense of
the data that it generates, to gaining full insight and control to the
way your email domains are being used.

**Assess**          The work required to deploy DMARC is directly related to the size
and complexity of an organization's email infrastructure. DMARC is a
domain-based email control and email domains are a shared
resource within most organizations, with use spanning from
employees to entire departments, external parties that send email
on behalf of the organization, and the organization's own internet-
facing applications.

When deploying DMARC, it's best to roll it out across all of an
organization's domains instead of focusing on individual domains.
When DMARC is deployed at an organization across the entire
domain portfolio, the process of deployment itself becomes much
easier as there is complete organizational visibility, and managers
get new tools to ensure all email is being sent in compliance with the
organization's standards.

**Publishing a**     To start generating DMARC data, you must first publish a DMARC
**DMARC record**    record for each domain you wish to monitor. dmarcian's DMARC
Record Wizard makes it easy to create a DMARC record.

A DMARC record exists as part of your Domain Name System (DNS)
record, which routes traffic on the internet. You can include
additional information in the DNS, like your domain's DMARC
record—a text entry within the DNS record that tells the world your
email domain's policy based on the configured SPF and DKIM
protocol.

Here are instructions on how to publish a DMARC record with your
DNS host.

Once you've published DMARC records, DMARC data will typically
begin to generate within a day or two in the form of reports that give
you insight into the way your domains are handling email. These
reports are XML-based and can be difficult for humans to read and
make sense of, especially when they can number in the thousands.
dmarcian's DMARC SaaS Platform specializes in processing these
reports and identifying the steps needed so that DMARC can be

Dmarcian - Protect your Email and Domain with DMARC

https://dmarcian.co.uk/





Menu ☰

## Videos on all things DMARC

We're very pleased to feature a series of short, technical videos that walk through various aspects of DMARC. These videos draw upon the best of our training courses, are freely available and can be viewed at your leisure.

These videos stand by themselves and should be accessible even to the less technically inclined among us. If you've got an hour and you'd like to become an expert in DMARC, view them in order and then let us know how you feel!

1. DMARC – Overview
2. DMARC – How It Works
3. DMARC – Benefits
4. DMARC – Return on Investment
5. DMARC – Deployment Process
6. SMTP Overview
7. SPF Overview
8. DKIM Overview
9. DMARC – Technical Overview



Looking for a quick DMARC overview in less than

We use cookies to give you the best experience on our site.
You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept     Settings





Are you interested in learning how our platform can help you achieve your DMARC goals? Take a look at a few features of our reporting platform, specifically the Domain Overview, Source Viewer and Detail Viewer.



Get your domains into compliance. Try out dmarcian for free!

**SIGN UP FREE**

**PLAN A DEMO**

We use cookies to give you the best experience on our site. You can find more information about which cookies we are using or disable them in the settings [/ setting].

Accept    Settings

Case 1:21-cv-00067-MR   Document 8-9   Filed 03/25/21   Page 2 of 4







As of GDPR compliance, we strongly advise to update your DMARC records:

Please change your RUA to <your-unique-token>@ag.eudmarcadvisor.com. Please change your RUF to <your-unique-token>@fr.eudmarcadvisor.com.
If this is already the case, you can ignore this message. If you have questions, please contact support@dmarcadvisor.com

## Get Started On Your Free Trial

So that we can offer you the trial experience that will best serve your needs, please complete the form below. You will receive an email upon creating your account, asking you to confirm. From there, we will email you important information relevant to your free trial and provide support if needed.

If this account is for personal use, with less than 10,000 messages per month and no more than 2 domains, it will qualify for our Free pricing tier.

**Email Address***

You will use it to login into your account.

**Domain Name***

You can always change it or add more domains to your account later

Enterprise

Select the type of account you would like to trial.

You are registering with

dmarcadvisor Europe/Africa/Russia

**Exhibit D**



### dmarcian Data Breach?

Woke up to a long-winded and somewhat confusing email from dmarcian <securityofficer@dmarcian-europe.com> today, claiming they suffered some type of data breach.

The full email is way too long to include here, so I've put it on pastebin: https://pastebin.com/tkPVrAyL

> Dear customer of dmarcian Europe BV,
>
> Recently we had to inform many of our users and the Dutch Data Protection Authority of a data breach caused by dmarcian, Inc. As a result of the breach we have launched a new and dedicated European instance with the dmarcian application which is securely under our control. Although we do not yet have control of all historic data, the impact of the data breach is now more and more limited.

I can't really decipher what actually happened from the email, and if it was an actual cybersecurity breach or some legal dispute between the US and EU divisions of the company.

Has anyone heard more about this, or can validate/comment on any of the claims they're making? We never received any of the previous emails referenced in today's email.

The email goes on to ask us to set up a new account on a new, dedicated EU platform...

The whole thing smells off.

**Exhibit E**

forum.dmarcian.com/t/dmarcian-eu-data-breach/1494

Apps    dmarcian Intranet    David's Meet    dmarcian Intranet    dmarcian - Googl...    dmarcian - Login...    dmarcian EU/Afric...

dmarcian

Edit this banner >>

# DMARCian EU data breach ✎

**B**    bill    4d

What is the meaning of the post here: Dmarcian.eu  10

I received a confusing e-mail with nearly the same content. They are asking me to change the DNS of all my domains on the European instance. My domains on other instances can be accessed normally.

What's going on?

| created | last reply | 6 | 129 | 4 | 8 | 2 |
|---|---|---|---|---|---|---|
| B 4d | u 1d | replies | views | users | likes | links |

D  B

♡  🔗  ⋯    ↩ Reply

>

🔄    This is the first time 4nd3r5 has posted — let's welcome them to our community!

4nd3r5    3d

I totally agree.
I haven't got an email, but this is very confusing and very unprofessional.
My account has been on dmarcian.eu, and has now been moved to eu.dmarcian.com.
It seems like the group behind dmarcian.eu seems to think there has been a data breach.
Please find a common ground as quickly as possible, this is bad for everyone.

♡  🔗  ⋯    ↩ Reply

-145-



dmarcian customers are serviced through *dmarcian.com* and customers should be suspicious of anyone or any service pushing their business and their data away from our trusted *dmarcian.com* domain.

Always check the URLs of where you and your data are being directed to. All legitimate dmarcian communications and service will come from *dmarcian.com* in all other regions as well.

**Other sites are NOT associated with *dmarcian.com* and therefore, do not have the rights to use our brand or sell our services**

⬆ 2 ⬇    💬 Reply   Share   Save   Edit   •••

lirettype 3 days ago

So as a customer, who created his account on dmarcian.eu, who owns what? And worse, who am I sending my dmarc data to, right now?

⬆ 3 ⬇    💬 Reply   Give Award   Share   Report   Save

dmarcianCEO 2 days ago

Please contact me at brand-abuse@dmarcian.com and I can help you find these answers regarding your account.

⬆ 2 ⬇    💬 Reply   Share   Save   Edit   •••

**imwearingatowel** 🔹 2 days ago

This whole situation has been handled absolutely horribly, by both parties. This situation should be dealt with privately in the courts. Instead, you're dragging your customers into the fight, like mommy and daddy fighting in front of the kids during a divorce.

All of this has completely eroded any faith we have in dmarcian (US and EU). We'll be moving to a new provider.

⬆ 2 ⬇    💬 Reply   Give Award   Share   Report   Save

emailsecuritygeek 1 day ago

We moved to OnDMARC if you're interested in checking them out

⬆ 3 ⬇    💬 Reply   Give Award   Share   Report   Save



**Annalisa** 9:13 AM

Unfortunately, I had to change my DMarc record twice during the trial and so have not yet gained any useful data. I contacted support who said they would extend the trial. I assume that didn't happen?

Gentleman emailed me at EoT regarding an extension he requested through support. No one on our side had seen a request, so I asked who he contacted.

Hello. Sorry I don't know
However, the trial now shows end date of 15/4/2021 so all is good

he included this screenshot showing the BV site he is accessing.
https://dmarcian.pipedrive.com/deal/64161

image.png ▾

161

image.png ▾

2 replies

**Ben** 5 hours ago

here we should reach out saying something like: 'please be aware that you are NOT on dmarcian.com. Instead you have been signed up to a platform called dmarcadvisor.com. If this was your intention, all is ok.

If you wanted and expected to have an account on dmarcian.com please let us know.'

I have a similar situation with a partner who just signed with EU a few weeks ago and had the impression (and also wanted) to work with dmarcian.com. Nobody from EU pointed out the difference. Now they want to switch to us.

Message #advisorresponse

Case 1:21-cv-00067-MR  Document 21-10  Filed 03/25/21  Page 4 of 10

-147-

**Tomki** 🔥 1 hour ago

Trustpay "Since 11.3. we do not see any DMARC data in our console. Could you please verify what could be the problem?"

Rapha Racing "Subject: **All my data is gone**

```
I am in the EU region.
My Domain Overview shows now data for the last 7 days
however the DMARC validator shows my DMARC records for RUA
etc as being correct
and the DataReporters shows reports received up until
today.
What has gone wrong ?
Do I need to start using the dmarcian.eu website now ?"
```

**Shannon** 📓 1 hour ago

What? where are they signing in from?
As far as the letter. The lawyers are working on that content and will have that to us after the file the Temporary Restraining Order agains the BV today or tomorrow,

New

**Tomki** 🔥 1 hour ago

Rapha racing: The ticket was submitted via our in-app support page, so they're using the correct site.

- they're a basic-chargebee EU account
- They followed the illicit advice and have reporting changed to dmarcadvisor.com.
- the domain Overview DMARC record indicator is green(it's a validly formatted DMARC record), and so is the output from our other DMARC tools.

## Pamela Duffy

| | |
|---|---|
| **Subject:** | FW: customer reaction messaging |
| **Attachments:** | Screen Shot 2021-03-19 at 11.17.40.png |

-------- Forwarded Message --------
**Subject:** customer reaction messaging
  **Date:** Fri, 19 Mar 2021 11:16:37 -0700
  **From:** Tomki Camp <tomki@dmarcian.com>
    **To:** Shannon Draegen <shannon@dmarcian.com>



Login Password reset

Good Morning,

I now understand that your old domain dmarcian.eu login has been taken over and
redirects to dmarcadvisor once there it will try to get you to reset your password then
redirect your dmarc reports to them.

I did reset my password as per the instructions. I did not redirect my dmarc reports to
them. After resetting the password I did not receive a link from them which I thought
was strange. After about 20 minutes I realised that there was something not correct
and I manged to successfully login to https://eu.dmarcian.com/login and I then went
on to change my login password (within 20 minutes of falling for the rest scam) with
your new domain https://eu.dmarcian.com/login I also added 2 factor verification.

MY question is
What information will these scammers have gained? And how will they intend to use
it? As far I can see they will have my login details and old password which I do not use
anywhere else. Should I be concerned and is there anything else that I am required to
do. Will this affect the reliability of my email (it currently has spf, dkim and dmarc all
set up ok). My account is personal use only and a free account so I do not think they
have any other details. What is the relationship with you and this company and why
did someone from dmarcian not contact its users to warn them of the scam?

Thank you in advance for your help.

Best Wishes,

Ian



**Gj (gerrit) Jansen** started the conversation

Dear sir/madam,

Achmea Interne Diensten N.V. Zeist, Netherlands has a DMARCIAN subscription Enterprise contract since September 1, 2020. With Quotation number 1996 / v1. Unfortunately, we now see that access to the API has been blocked. We require you to regain access to the API as this is part of the concluded contract. We trust that you will make the API and all other services freely accessible and available again soon as was previously the case.

Kind regards,

**Achmea IT | S&G IT Security Scanning & Engineering**
Gerrit Jansen

Laan van Malkenschoten 20 | 7333 NP Apeldoorn
Postbus 9150 | 7300 HZ Apeldoorn
Aanwezig op maandag, dinsdag, woensdag, donderdag



**Khadija.el-Attar-Sofi@renault.com** started the conversation

To:
Cc:

Dear dmarcian Inc team,

On the 15th of March 2021 we were notified of a conflict involving dmarcian Inc. and dmarcian BV, which strongly impacted our relations that started in November 2019 with dmarcian BV.
Due to the risks we are now exposed to in terms of data protection regulations, we require from you to delete all data and reports concerning the Renault account without delay and no later than 26/03/2021.
We expect you to confirm in writing that the deletion has been completed (on the main servers and any backups and/or archives).

Best regards,

Cordialement,

Khadija EL ATTAR SOFI
http://group.renault.com/RCW_BINARIES/signature_renault/EMAIL_LOGOS_Groupe_Renault.png

**DI-RS - Sécurité Informatique IS/IT**
API : FREQVNOV352
13, Av Paul Langevin
92359 Le Plessis Robinson CEDEX
www.groupe.renault.com



sktransport.co.uk                                    #29972  ACTIVE

**Lesli Speers** started the conversation        3 hrs ago
                                                  Arizona, Active

Hi

Can you tell me why there has been no DMARC reports on my domain for the past week?

Kind regards
Lesli

**Lesli Speers**
MSc BSc (Hons) MCIHT MCILT
Director

SK

Please click here for our current COVID-19 policy

SK Transport Planning Ltd

Albion Wharf, Manchester, M1 5LN

07809 876 704

ls@sktransport.co.uk

sktransport.co.uk

Email Disclaimer

Registered in England & Wales 6001445



**Tomki Camp**
**Service Director**
tomki@dmarcian.com

--

Shannon Draegen
CEO | dmarcian.com
shannon@dmarcian.com

4

40 mins ago
Anyone, Active

**marco.foglio@4wardpro.it** started the conversation

A user has submitted a **question**.

## User Information

| User ID | 19477 |
|---|---|
| User e-mail address | **marco.foglio@4wardpro.it** |
| Account ID | **7689** |
| Account | **Progel SpA** |
| Tier | enterprise |
| Subscription | subscriber |
| Partner | Yes |
| Region | **eu** |
| Origin page | **/domain-overview/** |

## Question

Subject: **DMARCIAN EUROPE B.V vs DMARCIAN INC**

Dear support,

I wanted to ask for some information about the legal dispute between DMARCIAN EUROPE B.V and DMARCIAN INC.

It is unclear whether our subscriptions are still valid and which company we are paying the bills to.

Now we are confused because we feel like we have customer data on both platforms

We would also like to understand for new European customers what information to give for these issues:

1.   In which datacenter is the data present and from which internet provider is managed by?

2.    which company is the data owner

or more generally what are your compliance policies for the EU GDPR?

Thanks in advance for your cooperation

-153-

**Pamela Duffy**

Subject:                    FW: Fwd: Act now

-------- Forwarded Message --------
Subject: Act now
Date: Tue, 23 Mar 2021 07:52:58 +0000
From: Frank Lindberg <flin@tdc.dk>
To: Tomki Camp <support@dmarcian.com>
CC: Tim Draegen <tim@dmarcian.com>

Hi,

See message below. I guess you need to fight for your users in Europa... and send them a message...

Venlig hilsen / Best wishes

Frank Lindberg

TDC A/S

TDC Group Security

Anti Abuse Desk

Tlf. +45-24 25 96 68

*Fra:* x
*Sendt:* 22. marts 2021 16:00
*Til:* Frank Lindberg <flin@tdc.dk>
*Cc:* x
*Emne:* Fwd: [EXT] DMARC

Just FYI,

Mvh

Niclas



Get Outlook for iOS
<https://eur02.safelinks.protection.outlook.com/?url=https%3A%2F%2Faka.ms%2Fo0ukef&data=04%7C01%7C%7C8c3c
b953190d4c83a50f08d8ed432673%7Ce8dcf6e63acc4af99cb277f688cb688b%7C0%7C0%7C637520219950770353%7CU
nknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&sda
ta=jPRDm9BLfAweq1PeptkTcCX%2B99wW8mbQWQbZUEkveO0%3D&reserved=0>

--------------------------------------------------------

1

*From:* x <@sl.mimecast.com <mailto:adecarne@sl.mimecast.com>>
*Sent:* Monday, March 22, 2021 3:47 PM
*To:* x
*Subject:* [EXT] DMARC

*UK: *Please have a look at the FROM emailaddress. Do you trust the sender and does the content of the email relate to the from emailaddress. If you are a TDC employee and you find this email suspicious, then please click the PhishAlarm-button in the top right corner of Outlook.
*DK: *Kig venligst på afsender emailadressen. Har du tillid til afsender emailadressen og stemmer indhold og afsender overens. Virker emailen mistænkelig og er du TDC ansat, så klik på PhishAlarm-knappen i det øverste højre hjørne af Outlook.

Dear x,

When doing a DMARC check on your main email domain I see that you are using Dmarcian's solution to protect your email domain(s).

Due to the current situation within DMARCIAN we have received many requests for our DMARC Analyzer from many of their users in the Nordics region. They are mainly concerned about the recent developments within the European branch of the company and the related licensing issues. The reason why I am contacting you is to see if TDC Group is making similar considerations.

At Mimecast you can use a similar tool, DMARC Analyzer, which like DMARCIAN is self-service oriented, and on top of that you have the assurance that your data stays within Europe.

I would be happy to discuss the possibilities in more detail in a personal meeting. Please let me know if you are interested.

Thank you in advance.

Kind regards,
x

2

**Pamela Duffy**

**Subject:**                FW: FW: Follow-up GDPR breach: activate your account on our safe new platform

-------- Forwarded Message --------
**Subject:** FW: Follow-up GDPR breach: activate your account on our safe new platform
  **Date:** Mon, 22 Mar 2021 11:51:11 +0100
  **From:** Ton Fernandes <ton@dmarcian.com>
    **To:** Shannon Draegen <shannon@dmarcian.com>
    **CC:** Ben van der Laan <ben.vdl@dmarcian.com>

Hi Shannon,

This is the email they are now sending to customers / partners.

1. New platform
2. New functionality

Cheers,

Ton Fernandes | Account Director | Mobile: +31 6 8131 5232 | dmarcian | www.dmarcian.com

**Van:** Pawel Wielopolski <pawi@sdc.dk>
**Verzonden:** donderdag 18 maart 2021 09:38
**Aan:** ton@dmarcian.com
**CC:** Torben Hedam Christensen <thc@sdc.dk>; Jakub Sikora <JKSX@sdc.dk>; Pawel Barankiewicz <pbax@sdc.dk>
**Onderwerp:** FW: Follow-up GDPR breach: activate your account on our safe new platform

Hi Ton,

Thank You for call. Could You please provide us more details in written how SDC and our customers will be impacted or not due to of internal issue in dmarcian? Who now will issue new invoice for us? Will You provide contact details.

Med venlig hilsen/Kind regards/Pozdrawiam

**Pawel Wielopolski**
SAM Manager & Teamlead
SDC Infrastructure Services

Mail: pawi@sdc.dk
Room: 10, floor 8, Warsaw Office



1

Cell phone: +48 505510360 or +45 30 60 13 01



SDC A/S - CVR 16568158
Borupvang 1A, DK-2750 Ballerup
Phone: +45 4465 7111
Mail: sdc@sdc.dk
Web: www.sdc.dk

---

**Fra:** Security Officer dmarcian Europe B.V. <securityofficer@dmarcian-europe.com>
**Sendt:** 12. marts 2021 13:52
**Til:** Security Officer <securityofficer@dmarcadvisor.com>
**Emne:** Follow-up GDPR breach: activate your account on our safe new platform

Dear customer of dmarcian Europe BV,

Recently we had to inform many of our users and the Dutch Data Protection Authority of a data breach caused by dmarcian, Inc. As a result of the breach we have launched a new and dedicated European instance with the dmarcian application which is securely under our control. Although we do not yet have control of all historic data, the impact of the data breach is now more and more limited.

**Dmarcian Europe BV is launching a safe new platform**

We are confident that having full and exclusive control over our new dedicated European platform will benefit our users in more ways than just security. We expect to develop and offer you feature upgrades on this new platform, which have been long due. Our first priority now is, therefore, to migrate our customers with subscribed and trial accounts to our new platform.

Once you are migrated you may benefit from the launch of a new feature that will reduce your time to get to p=reject with at least 20%. Also, several UI improvements will be implemented. These features can now be realized and will not be available on the old platform.

Moving to the safe new platform does however require a limited number of specific adjustments from our users. We will do our utmost to limit this inconvenience for you and are available to assist at your request.

**How to login**

Your account has already been set up on the new platform including all users and domains. Please make sure all users actually activate their account on the new platform by following the 4 steps below and it will be fully available to all of your users:

1. Go to https://eu.dmarcadvisor.com/accounts/password/reset/
2. Type your email address
3. Click on "Reset password"
4. A password reset link will be sent to your email address

After that make sure to login via https://eu.dmarcadvisor.com/login. Please update your bookmarks.

**Updating your DMARC records**

Here's an example to illustrate the required change to send data into the new platform. Your current DMARC record will probably look something like this:

2

```
NAME   dmarc.domain.com
TYPE: TXT
CONTENT: v=DMARC1; p=none; rua=mailto:<your-unique-account-token>@ag.dmarcian-eu.com;
ruf=mailto:<your-unique-account-token>@fr.dmarcian-eu.com;
```

or

```
NAME   dmarc.domain.com
TYPE: TXT
CONTENT: v=DMARC1; p=none; rua=mailto:<your-unique-account-token>@ag.dmarcian.eu;
ruf=mailto:<your-unique-account-token>@fr.dmarcian.eu;
```

The part in front of the '@' (your unique account token, for example *2o4frnqie*) will remain the same, only the domains used in the reporting address will change. The required update to your DMARC record will be as follows:

```
NAME   dmarc.domain.com
TYPE: TXT
CONTENT: v=DMARC1; p=none; rua=mailto:<your-unique-account-token>@ag.eu.dmarcadvisor.com;
ruf=mailto:<your-unique-account-token>@fr.eu.dmarcadvisor.com;
```

If you do not wish to receive forensic reports, you can leave out the "ruf=" parameter from the record. In that case, the new DMARC record will be as follows:

```
NAME   dmarc.domain.com
TYPE: TXT
CONTENT: v=DMARC1; p=none; rua=mailto:<your-unique-account-token>@ag.eu.dmarcadvisor.com;
```

If you receive DMARC reports in your own mailbox and use an automatic forward rule to send the data to our platform, please update that rule so data will be sent to the new reporting address.

**Legal situation**

We took serious issue with the fact that dmarcian, Inc. (US-based company) (ab)used its role as our partner and deliberately blocked the access of dmarcian Europe BV (Netherlands-based company) to our customer accounts. The Rotterdam Court acknowledged that dmarcian, Inc. did this to force us to unjustified concessions in a legal conflict. Both dmarcian, Inc. and its former CEO and founder Tim Draegen were ordered to restore access to all our customer data and to continue the cooperation with and services to our company as before. Please refer to the website of the Dutch judicial authorities featuring the ruling by the Rotterdam court of February 1, 2021 (https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:RBROT:2021:939). An informal translation is attached for your convenience.

However, dmarcian, Inc. and Tim Draegen refused to abide by the Rotterdam Court decision, but also failed to appeal the decision. Dmarcian, Inc. has rather been sending messages to many of you without any reference to the Court order.

As a result and due to our responsibility towards our customers to safeguard your data, and following our contractual obligations, we are happy to confirm the following solution. dmarcian Europe BV has set up a safe new platform with a secure instance for handling your data. User data will be securely protected under the GDPR, hosted in the EU, and cannot be accessed by anyone outside the European territory.

dmarcian Europe BV has already moved a substantial part of its customer data and business to the safe domain dmarcadvisor.com which is securely out of reach of third parties, including dmarcian, Inc.

It is important for you to know that more than 50% of the dmarcian application (the use of which was always shared between the cooperating parties) was in fact developed by our development teams in Dordrecht

3

(Netherlands) and Varna (Bulgaria). In addition, more than 80% of development capacity since 2018 as well as future development capacity of dmarcian software is managed out of dmarcian Europe.

Dmarcian, Inc. is spreading misleading information about the relation between dmarcian, Inc. and dmarcian Europe BV regarding licensing and software ownership. If you receive such information, we are grateful if you would share such information with us via securityofficer@dmarcadvisor.com.

In case you would like to read more about the mentioned dispute regarding licensing and software ownership, please read the Enterprise Court ruling of September 2020: https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:GHAMS:2020:2536.

**Of course we offer you assistance**

We apologize for the inconvenience caused as a result of the actions mentioned above. We are committed to taking our user's data security seriously and, consequently, we see no other way of guaranteeing your data privacy and business continuity for the future.

In case any of the above is unclear, or if you would like (free) assistance from one of our DMARC experts, please do not hesitate to contact us at support@dmarcadvisor.com. For inquiries about the data breach, you can reach out to our security officer at securityofficer@dmarcadvisor.com. We will help you in any way we can to make the transition as smooth as possible.

We hope to welcome you soon on our safe new platform!

Kind regards,
The board of dmarcian Europe BV

4

# Judgment

**COURT OF ROTTERDAM**

Commerce and Port Team

case number / case list number: C/10/612223 / KG ZA 21-63

**Judgment in interim relief proceedings dated 01 February 2021**

in the matter of

The private company with limited liability **DMARCIAN EUROPE B.V.,**
having its registered office in Dordrecht,
claimant,
attorney: *mr.* M.R.S. Bacon in Amsterdam,

versus

1.   the legal entity incorporated under foreign law **DMARCIAN INC.,**
      having its registered office in Brevard (North Carolina, United States of America)
2.   **TIMOTHY GEORGE DRAEGEN,**
      residing in Brevard (North Carolina, United States of America),
defendants,
having failed to appear.

Below, the parties will be referred to as "dmarcian Europe", "dmarcian Inc." and "Draegen".

**1.   The Proceedings**

1.1   The course of the proceedings is apparent from:
–   the subpoena of 29 January 2021, with exhibits;
–   the oral hearing on 01 February 2021;
–   the supplementary exhibits submitted during the oral hearing.

1.2   Pronouncement of judgment was fixed for today.



2.   **The Adjudication**

2.1   With regard to the facts and the claims reference is made to the arguments in the attached copy of the subpoena.

2.2   dmarcian Inc. and Draegen have failed to appear in the proceedings. With regard to the question of whether leave to proceed in default can be granted against them, the following is considered.

2.3   The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters of 15 November 1965 established in The Hague (the "Hague Service Convention") is applicable. Both the United States and the Netherlands are parties to this Convention.

2.4   In accordance with the Hague Service Convention on Jurisdiction and the Implementation Act of the Convention in conjunction with Section 55 subsection 1 of the Code of Civil Procedure, dmarcian Europe have delivered the writ addressed to dmarcian Inc. and Draegen on 29 January 2021 by delivering the writ to the public prosecutor's office at the Court of Rotterdam, leaving two copies of the writ and requesting that the writ be served on the defendants and/or be notified on the defendants in accordance with Articles 3 through 6 of the Hague Service Convention by service or notification in the manner prescribed by the laws of the United States of America for the service or notification of documents drawn up in that country and intended for persons residing in that country.
In addition, dmarcian Europe had a copy of the subpoena – with an English translation – sent by emails of 29 January 2021 to (the director of) dmarcian Inc. and Draegen on the email addresses used by them (since the Enterprise Section proceedings to be referred to below) and to the Dutch attorneys of dmarcian Inc. and Draegen.

2.5   There is no evidence that the subpoena was served or delivered in person to the defendant in accordance with Article 15(1) (and 2) of the Hague Service Convention. Pursuant to Article 15(3) of the Hague Service Convention, the court hearing an application for interim relief may grant leave to proceed in default of appearance against a defendant domiciled abroad without it being necessary, in urgent cases, to prove that the conditions of Article 15(1) of the Hague Service Convention have been met. However – with due regard for the required urgency – it will have to be ensured, as much as possible in accordance with the objective of the Hague Service Convention, that an issued writ has actually reached the addressee and – if, as in this case, it concerns a subpoena – in time so that this addressee still has the opportunity to put forward a defense (see *inter alia* Supreme Court, 14 December 2007, ECLI:NL:HR:2007:BB7192).

2.6   On behalf of dmarcian Inc., by emailed letter dated 22 January 2021 T. Jansen, attorney in Amsterdam, conditionally terminated the agreement with dmarcian Europe as of 01 February 2021, and gave notice that as of that date dmarcian Europe will no longer have access to the (computer) systems.
In an emailed letter of that same day to a (fellow) shareholder of dmarcian Europe, F. Henke and P.A. Josephus Jitta, attorneys in Amsterdam, referred to this termination letter on behalf of Draegen (CEO of dmarcian Inc.). By mails dated 25 January 2021 on behalf of dmarcian Europe, attorney V. van Druenen demanded dmarcian Inc. and Draegen via their (Dutch) attorneys to restore access to the systems. She also announced that interim relief proceedings would be brought. By mails dated 26 January 2021, the attorneys of dmarcian Inc. and Draegen informed

dmarcian Europe that their clients would not comply with this demand. By mail dated 27 January 2021, Draegen's attorney informed dmarcian Europe that his client would not elect domicile at his office.

2.7    In view of the termination letter dated 22 January 2021, the (by now partially implemented) denial of access of dmarcian Europe to the (computer) systems and the loss alleged by dmarcian Europe, the urgency of the relief sought by dmarcian Europe is sufficiently plausible.

2.8    Furthermore, it is sufficiently plausible that the subpoena sent to the (usual) e-mail addresses of dmarcian Inc. and Draegen and their attorneys have reached dmarcian Inc. and Draegen in time and that they were able to take note of it. The following aspects have been considered in this adjudication: (i) that the termination of the agreement and the notice of termination of the access to the systems were sent by the Dutch attorney of dmarcian Inc.; (ii) that Draegen was aware of this termination and the deadlines given, as appears from the e-mail of his (Dutch) attorney; (iii) that prior to these interim relief proceedings the Dutch attorneys of dmarcian Inc. and Draegen have corresponded on this matter. Given the deadlines set by dmarcian Inc. and Draegen and the communication via their (Dutch) attorneys, the (digital) dispatch is sufficient guarantee that they have timely received the subpoena, whether or not through their Dutch attorneys.
Under application of Article 15 (3) of the Hague Service Convention, there is sufficient ground to grant leave to proceed in default of appearance.

2.9    As dmarcian Europe and Draegen are domiciled in the United States, the judge in interim relief proceedings must base his competence on the provisions of the Code of Civil Procedure (CCP). With regard to the claims against dmarcian Inc., the judge in interim relief proceedings is competent under Section 6a CCP, as it is plausible that the contractual obligation on which the claim of dmarcian Europe is based (granting access to the systems) must be executed in the Netherlands. With regard to the claims against Draegen, the judge in interim relief proceedings is competent under Section 6e CCP, as it is plausible that the harmful event (the *Erfolgsort*) is located in the Netherlands.

2.10    In view of what is stated in the subpoena, the interim relief judge will apply Dutch law.

2.11    The Court does not consider the claims to be unlawful or unfounded, so that they will be awarded in the manner to be described below.

2.12    In the subpoena, dmarcian Europe asserted that the dispute between the parties concerns the substance of the agreement between dmarcian Europe and dmarcian Inc.. In this context, dmarcian Europe referred to the decision to be referred to below of the Enterprise Section of the Court of Appeal. In view of this, the primary claim under 1a (performance of the agreement) is insufficiently determinable. Therefore, this claim is not allowable.

2.13    By decision of 7 September 2020 in proceedings between (*inter alia*) dmarcian Europe and Draegen, the Enterprise Section ordered an investigation into the policy and course of affairs of dmarcian Europe. In this decision, the Enterprise Section considered that dmarcian Europe and dmarcian Inc. have not put sufficient regulations in place. Subsequently, the Enterprise Section considered that the parties have at least agreed on the following:

     o that dmarcian Europe has a license for the use and the sale of the software
      originating from dmarcian Inc.;

     o that dmarcian Europe is responsible for the sale of that software (and the
      provision of associated services) to customers in Europe, Russia and Africa.

2.14 In view of this, and in view of the ordered investigation and the recent appointment
   of an investigator, the interim relief judge deems the alternative claim under 1b
   allowable, on the understanding that this should in any case include the contents of
   the agreement as established by the Enterprise Section. In line with this allowance,
   dmarcian Inc. and Draegen, as claimed under 2 and partly under 4, must grant
   dmarcian Europe access to the (computer) systems necessary to service its
   customers.

2.15 The term within which dmarcian Inc. must grant this access is set at 24 hours after
   service of this judgment.

2.16 The penalties claimed will be moderated and maximized as mentioned in the
   decision.

2.17 As the parties ruled against, dmarcian Inc. and Draegen will be ordered – jointly and
   severally – to pay the costs of the proceedings. The costs on the part of which
   dmarcian Europe are estimated at:

| | | |
|---|---|---:|
| – service of notice to appear | € | 85,81 |
| – court registry fee | € | 667.00 |
| – attorney's fees | € | 656.00 |
| Total | € | 1,408.81 |

2.18 The subsequent costs and the statutory interest will be allowed as mentioned in the
   decision.

## 3. The Decision

The Court, giving judgment in interim proceedings:

3.1. grants leave to proceed in default against the defendants who failed to appear;

3.2. orders dmarcian Inc., as a disciplinary measure, during the investigation ordered by
   the Enterprise Section, to perform the agreement existing between the parties and
   prohibits it from terminating that agreement during that period;

3.3. orders dmarcian Inc. within 24 hours after service of this judgment to lift the
   blockade of (the employees of) dmarcian Europe to the SaaS platform and the
   (computer) systems required for the execution of its business activities and to keep it
   lifted until the existing agreement between the parties has been legally terminated;

3.4. orders dmarcian Inc. to pay a penalty of €20,000 to dmarcian Europe for each day or
   part of a day that it fails to comply with the main order issued in operative parts 3.2
   and 3.3., until a maximum of €500,000 is reached;

3.5. orders Draegen to refrain from any action undertaken by himself or through a company managed by him, expressly including dmarcian Inc., which impedes the business operations of dmarcian Europe, until or as a result of the investigation ordered by the Enterprise Section, or as a result of a judgment on the merits, clarity has been created about the contents and scope of the license agreement granted to dmarcian Europe and the ownership of the IP rights to the dmarcian software;

3.6. orders Draegen to pay a penalty to dmarcian Europe of €20,000 for each day or part of a day that it fails to comply with the main order pronounced in operative part 3.4., until a maximum of €500,000 is reached;

3.7. orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs of the proceedings, estimated to date at €1,408.81 on the part of dmarcian Europe, plus the statutory interest as referred to in Section 6:119 DCC on this amount starting fourteen days after service of this judgment until the day of full payment;

3.8. orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs incurred after this judgment, estimated at €163.00 for the attorney's fees, to be increased, on condition that dmarcian Inc. and Draegen have not complied with the judgment within 14 days after notice was given and service was subsequently effected, by an amount of €85.00 for attorney's fees and the costs of serving notice of the judgment, and to be increased by the statutory interest as referred to in art. 6:119 DCC on the subsequent costs starting fourteen days after service of this judgment until the date of payment;

3.9. declares this judgment provisionally enforceable up to here,

3.10. dismisses all other claims.

This judgment was rendered by Judge P. de Bruin and pronounced in open court on 1 February 2021.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

        Plaintiff,

v.

DMARCIAN EUROPE BV

        Defendant.

DECLARATION OF
TIMOTHY DRAEGEN

---

NOW COMES the undersigned Declarant and states that the following is true of his own personal knowledge:

1.     I am the founder and former Chief Executive Officer of dmarcian, Inc. ("dmarcian").

2.     I have read the Complaint and confirm that the facts set forth in that Complaint are true of my own personal knowledge, except as to things stated upon information and belief. Below, I provide an overview of the communications I have had with the other participants in dmarcian's business in Europe which leads up to the current dispute.

3.     Dmarcian's business sells "Software as a Service" ("SaaS") relating to "DMARC"--"Domain-based Message Authentication, Reporting & Conformance." DMARC is an email validation system that vests organizations with greater control over their email channels and protects customer's brands from being used in phishing[1] attacks. I was the original author of the copyright-registered source code which has

---

[1] "Phishing" involves the use of deceptive emails that appear to be (but are actually not) from an organization's valid domain/website to gather personal information.

1

Document Ref: YCWW8-VZMAQ-MZJXN-AEQLY

-165-

and continues to provide DMARC SaaS to customers, and which Code is the subject of this lawsuit.

4.     I registered the domain name "dmarcian.com" in early 2012 to provide DMARC tools and services to organizations of all sizes across the globe. Dmarcian is a made-up word and is not itself a technical term. Although I started using the name "dmarcian" in 2012 as a d/b/a of my company Eudaemonic Development, LLC, I ultimately incorporated under the name "dmarcian, Inc." in Delaware on September 16, 2014.

5.     As described in greater detail in the Complaint, I worked to grow the company without outside investment, heavily participated in DMARC advocacy groups, and chaired the Internet Engineering Task Force's DMARC Working Group from 2014-2019. My professional work and dmarcian's established brand has resulted in a steady stream of business without the need for traditional outbound or "cold calling" sales strategies.

6.     I was first contacted by Martijn Groeneweg in 2013. He identified himself as having an email consulting firm called "Measuremail" in the Netherlands and expressed an interest in marketing dmarcian's product. Neither he nor his company had any prior DMARC experience (i.e., no previous experience with the dmarcian Code, Trademarks, trade secrets and other intellectual property, nor did he have experience with the DMARC concept).

2

Document Ref: YCWW6-VZMAQ-MZJXN-AEQLY    Page 2 of 7

-166-

7.    On July 10 2014, Mr. Groeneweg wrote to me that he had registered the
internet domains of dmarcian.eu and dmarcian.nl and redirected them to dmarcian.com
as "governmental regulations in the Netherlands and Europa is is a really strict
requirement, that systems that are used are running in the Netherlands of some other
EU country" and asked "Is there any possibility to install a dmarcian environment in
Europa, preferable in the Netherlands?" We resolved the issue by making dmarcian.eu
an alias of dmarcian.com (so that any user with an @dmarcian.com address could also
use the same @dmarcian.eu address).

8.    I continued discussions with Mr. Groeneweg over an extended period of
time and Mr. Groeneweg made a variety of proposals over time.  On January 28, 2015,
he expressed a desire to run dmarcian's software on top of Measuremail's
infrastructure.  I responded that I would consider such a proposal under a licensing
agreement that would protect dmarcian from software misappropriation.

9.    The parties' discussions continued throughout 2015 and related to several
different possible structures and ventures.  In January of 2016, I traveled to the
Netherlands to meet with potential partners, taking the opportunity to meet with Mr.
Groeneweg to discuss the structure and cooperation first mentioned September 1,
2015. Mr. Groeneweg and I agreed to a structure where a new European legal entity
would be created to develop the European DMARC market using dmarcian technology,
I would be given a controlling interest, and Mr. Groeneweg would otherwise be granted
as much ownership as possible as an incentive for Mr. Groeneweg to develop the
European market. The agreement was not immediately memorialized but was
summarized in the form of a series of emails exchanged in late 2016. By that time, we

3

Document Ref: YCWW8-VZMAQ-MZJXN-AEOLY

were discussing the creation of an entity called "dmarcian Europe," which ultimately was formally named dmarcian Europe, BV, the Defendant in this action ("DME").

10.    On December 7, 2016, I sent an email attaching "Proprietary Information and Inventions Agreements" ("PIIA") and "Non-Disclosure Agreements" ("NDA"), indicating that DME employees would need to execute such documents. A copy of that email with the attachments is attached hereto as **Exhibit A.**   The PIIA provided that the intellectual property of any employee belonged to dmarcian.

11.    On that same day, Mr. Groeneweg responded positively about finalizing the PIAA and NDA agreements, stating, *"I also would like to formalize our agreement we made on EU for our mutual benefits and clarity together with the PIIA and MNDA. Below is a list of those agreements."*  He then laid out other points about how the structure would work, including among other things that I would own 51% of DME to "maintain control over strategic direction" of DME.  A copy of his response is attached hereto as **Exhibit B.**

12.    DME had no funds to pay licensing fees for dmarcian's Source Code at the time, nor to contribute to its development.  Neither Mr. Groeneweg nor his entities ("TDX" or MailMerk BV) paid monetary consideration to dmarcian for being able to use dmarcian's product or its name and brand.  Instead, consideration for the use of dmarcian's intellectual property came in other forms as outlined in the Complaint.  I originally agreed to Mr. Groeneweg's ownership interest in DME to incent him to develop business in the EU for the joint benefit of dmarcian and DME.

4

Document Ref: YCWWB-VZMAQ-MZJXN-AEOLY

Page 4 of 7

**-168-**

13.    The name of Mr. Groeneweg's entity Mailmerk, BV was ultimately changed to dmarcian Europe, BV and shares were ultimately transferred to me on July 13, 2018 granting me a controlling interest in DME per our agreement (as we ultimately concluded it was simpler to transfer the interest to me individually rather than to a corporate entity).

14.    Atlhough DME promoted dmarcian's product and services as the 2016 agreement anticipated, I also personally helped in efforts to promote dmarcian's product in the EU and to promote DME by engaging in meetings with prospects in Europe and various promotional events.  Additionally, dmarcian subsidized DME's growth through free use of technology, sales enablement, and direct customer transfers.

15.    In March of 2017, conversations with a dmarcian contractor who resided in Bulgaria led to the idea that development talent could be hired from Bulgaria and managed by the contractor to further development of dmarcian's Code. Mr. Groeneweg suggested that it might be easier to hire Bulgarian developers through DME  due to EU membership, but did not suggest that this would entail any change to the ownership structure of the intellectual property rights in the Code (as had been reaffirmed in the parties' discussions as recently as December 2016).

16.    At this time (early 2017), dmarcian was continuing to subsidize time, money and resources to continue to support and promote DME's business to take advantage of market opportunities there, and it was anticipated that the DME's growth would offset the costs of continued development of dmarcian's Code, which development is a work derived from the copyright-protected Code.

5

Document Ref: YCWW8-VZMAQ-MZJXN-AEQLY

-169-

17.    In May of 2017, Mr. Groeneweg indicated a willingness and ability to pay for development out of DME revenue once a forecasted sales pipeline matured.  There was no discussion or even suggestion of altering dmarcian's ownership of its intellectual property in any way, nor would we have entertained such an alteration.  We continued to expect that all intellectual property ownership would remain with dmarcian.

18.    After hiring enough Bulgarian developers through a contracting agency to justify the creation of a dedicated subsidiary, Bulgarian developers were converted to employees of a subsidiary of DME and began to make changes to dmarcian's Code which were all saved on dmarcian's US source code platform.

19.    DME and dmarcian never executed formal PIIA and NDA agreements as contemplated by their email exchange, but we operated based on that email agreement and all parties acted consistently with that agreement until approximately September of 2019.

20.    In December of 2019, in connection with litigation with another party, Mr. Groeneweg began to recast our relationship.  He asserted, for the first time, that my interest in DME was only a 50% interest and that DME had a "perpetual and exclusive" license for dmarcian's Code and the sole right to service customers in Europe, Russia and Africa.

21.    In relation to that lawsuit, Mr. Groeneweg suggested to me that we transfer dmarcian's intellectual property to DME, ostensibly for asset protection

22.    While we had been operating with an understanding that DME was authorized to service customers in Europe and was authorized to make changes and improvements to dmarcian's Code with ownership of such changes to remain with

6

Document Ref: YCWWB-VZMAQ-M2JXN-AEQLY

Page 6 of 7

-170-

dmarcian, no written licensing agreement granting an "perpetual and exclusive license" was executed.  Indeed, as our dispute unfolded and DME began to assert rights contrary to our agreement and making demands for an "perpetual and exclusive license", I noted that we should further memorialize with appropriate terms the benefits that DME had been enjoying and what dmarcian was supposed to be getting in return for that benefit.

23.    In summary, dmarcian, Inc. gave Defendant access to the dmarcian Code for the parties' joint benefit, and to date has not granted such access to others.  The parties' email exchange reflects that the parties' understanding that any derivative works would belong to Plaintiff and could not be used by Defendant independently of Plaintiff.  The current form of platform is derived from the dmarcian Code I authored, and neither dmarcian's current platform or the separate one DME illegally created and is using exists or could function without the original dmarcian Code as their primary element.

I declare under penalty of perjury that the foregoing is true and correct.

This the 25 day of March, 2021.

*Tim Draegen*

TIMOTHY DRAEGEN

Document Ref: YCWW8-VZMAQ-MZJXN-AEOLY

Page 7 of 7

# Signature Certificate

Document Ref.: YCWW8-VZMAQ-MZJXN-AEQLY

Document signed by:



**Tim Draegen**

Verified E-mail:
tim@dmarcian.com

IP: 172.58.156.160    Date: 25 Mar 2021 22:04:38 UTC

*Tim Draegen*

Document completed by all parties on:
25 Mar 2021 22:04:38 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



*CERTIFICATE OF SERVICE*

I hereby certify that Defendant has been served by email immediately upon filing with the foregoing DECLARATION as follows:

dmarcian Europe BV
c/o Martijn Groeneweg, Managing Director
Burgemeester de Raadtsingel 93
3311 JG Dordrecht
The Netherlands
martijn@tdx.nl
martin@dmarcadvisor.com

A courtesy copy has also been sent to Plaintiff's Dutch Counsel, Alfred Meijboom at Alfred.Meijboom@kvdl.com, as no US counsel has yet made an appearance. Plaintiff shall also serve a hard copy on Defendant by Federal Express at the above address on March 26, 2021 and will file an additional certificate of service upon completion.

This the 25th day of March, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER
DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiffs*

1

PIIA and MNDA between dmarcian-inc and y'all

**Subject:** PIIA and MNDA between dmarcian–inc and y'all
**From:** Tim Draegen <tim@dmarcian.com>
**Date:** 12/7/16, 4:12 PM
**To:** Martijn Groeneweg <martijn@dmarcian.com>, Alwin de Bruin <alwin@dmarcian.com>, Eline van der Vorm <eline@dmarcian.com>

Hi people in the Netherlands,

To square away dmarcian, inc. employee/contractor documentation, I need the PIIA forms from everyone, and the just the MNDA between dmarcian, inc. and Mailmerck to be signed.

dmarcian, inc's counsel is going through exercise to make sure the corporation can be defended if need be (can't have a competitor do discovery on us and learn that we don't have basic docs in place!). This is a step of larger effort to bring everyone "in house".

I'm emailing all of you as any issues are likely related to being in NL, so why not save some time and review them together at once?

=- Tim

— Attachments

| | |
|---|---|
| Form of Proprietary Information and Inventions Agreement.docx | 22.7 KB |
| Non–Disclosure Agreement – Mutual form.docx | 22.3 KB |



EXHIBIT
A
T. Draegen Dec

I of 1

7/31/20, 2:22 PM

## PROPRIETARY INFORMATION
## AND INVENTIONS AGREEMENT

**DMARCIAN, INC.**

Dear dmarcian, inc.:

The following confirms an agreement between me and dmarcian, inc., a Delaware Corporation (the "Company" which term includes the Company's subsidiaries), which is a material part of the consideration for my employment by the Company or my retention by the Company as an independent contractor, as the case may be.

1.    I recognize that the Company is engaged in a continuous program of research, development and production respecting its business, present and future, and that the Company possesses and will continue to create, discover, develop, learn, and possess information (including without limitation information created by, discovered or developed by, or made known to, me during the period of or arising out of my employment or retention by the Company) and/or in which property or proprietary rights have been assigned or otherwise conveyed to the Company, which such information has commercial value in the business in which the Company is engaged.  All of the aforementioned information is hereinafter called "Proprietary Information."  By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, formulas, product development efforts, data and know-how, hardware designs, software programs, improvements, inventions, techniques, marketing plans, strategies, financial and other forecasts, computer programs, copyrightable material, and customer lists.

2.    I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to any Proprietary Information:

      a.    applicable to the business of the Company; or

      b.    applicable to the business of any client, customer, vendor or affiliate of the Company, which may be made known to me by the Company or by any client, customer, vendor or affiliate of the Company, or learned by me during the period of my employment or retention.

3.    In consideration of my continued employment or retention by the Company, as applicable, and the compensation received by me from the Company from time to time, I hereby agree as follows:

      a.    All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights and other rights in connection therewith.  I hereby assign to the Company any rights I may have or acquire in such Proprietary Information.  I acknowledge that any copyrightable work written, authored, prepared, produced or developed by me, in whole or in part, individually or jointly with others, is a work made for hire for the Company, within the definition of Section 101 of Title 17 of the United States Code.  At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust all Proprietary Information, and will not use or disclose any

Proprietary Information or anything relating to such Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties for the Company.

b.    All documents, records, apparatus, equipment and other physical property, whether or not pertaining to Proprietary Information, furnished to me by the Company or produced by myself or others in connection with my employment shall be and remain the sole property of the Company and shall be returned to the Company immediately as and when requested by the Company. Even if the Company does not so request, I shall return and deliver all such property upon termination of my employment by me or by the Company for any reason and I will not take with me any such property or any reproduction of such property upon such termination.

c.    I will promptly disclose to the Company, or any persons designated by it, all improvements, inventions, formulas, ideas, processes, techniques, know-how and data, whether or not patentable, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the term of my employment (or if a Consultant, relating to the services I render to the Company) and (subject to reasonable confidentiality restrictions) for six (6) months thereafter (all such improvements, inventions, formulas, ideas, processes, techniques, know-how and data shall be hereinafter collectively called "Inventions").

d.    I agree that all Inventions which I develop or have developed (in whole or in part, either alone or jointly with others) and (i) use or have used equipment, supplies, facilities or Proprietary Information of the Company, or (ii) use or have used the hours or time for which I am to be or was compensated by the Company, or (iii) which relate to the business of the Company or to its actual or demonstrably anticipated research and development or (iv) which result in whole or in part, from work performed by me for the Company, shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights and other rights in connection therewith. I hereby assign to the Company any rights I may have or acquire in such Inventions. I acknowledge that any copyrightable work written, prepared, produced or developed by me, in whole or in part, individually or jointly with others, is a work made for hire for the Company, within the definition of Section 101 of Title 17 of the United States Code. I further agree as to all such Inventions and improvements to assist the Company in every reasonable way (but at the Company's expense) to obtain, and from time to time enforce, patents, copyrights or other rights in such Inventions and improvements in any and all countries, and to that end will execute all documents for use in applying for and obtaining such patents and copyrights thereon and enforcing same, as the Company may desire, together with any assignments thereof to the Company or persons designated by the Company. My obligation to assist the Company in obtaining and enforcing patents, copyrights or other proprietary rights for such Inventions and improvements in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after such termination, for time actually spent by me at the Company's request on such assistance. In the event that the Company is unable for any reason whatsoever to secure my signature or execute any patent, copyright or other application with respect to such Inventions and improvements (including renewals, extensions, continuations, divisions or continuations in part thereof), I hereby irrevocably designate and appoint the Company and its duly

- 2 -

authorized officers and agents, as my agents and attorneys-in-fact to act for and in my behalf and instead of me, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other rights thereon, with the same legal force and effect as if executed by me.

        e.    As a matter of record I attach hereto (in Exhibit A) a complete list of all Inventions or improvements relevant to the subject matter of my employment by the Company which have been made or conceived or first reduced to practice by me, alone or jointly with others, prior to my employment with the Company that I desire to remove from the operation of this Agreement, and I covenant that such list is complete. If no such list is attached to this Agreement, I represent that I have no such Inventions and improvements at the time of my signing this Agreement.

        f.    I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

        g.    I represent that execution of this Agreement, my employment with, or retention by, the Company and my performance of my proposed duties to the Company in the development of its business will not violate any obligations I may have to any former employer.

        h.    This Agreement does not require assignment of any Inventions which an employee cannot be obligated to assign under Section 2870 of the California Labor Code (hereinafter called "Section 2870"). However, I will disclose any Inventions to the Company as required by Section 3(c) hereof regardless of whether I believe the Invention is protected against required assignment by Section 2870. Such disclosure shall be received in confidence by the Company, to the extent that the Company has no interest in or ownership of the Information, Invention or other disclosure disclosed to the Company.

    4.    This Agreement shall be effective as of the date that I first provided services to the Company.

    5.    This Agreement shall be binding upon me, my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its successors and assigns.

    6.    If I am employed by the Company, I understand that such employment is not for a specific term and can be terminated by myself or the Company at any time for any reason or for no reason, with or without cause, and for no cause. Any contrary representations which may have been made or which may be made by the Company or any agent or representative of the Company are superseded by this Section 6.

    7.    If I am providing services to the Company as an independent contractor, I acknowledge that I am not an employee of the Company, that I control the means by which I accomplish any tasks or projects assigned to me by the Company, that I am not an agent for or

- 3 -

representative of the Company and cannot represent or bind the Company and that this Agreement does not create any partnership, joint venture, employment or unincorporated association by or between myself and the Company.

8.    Without limiting the foregoing, I understand that in the event I am not employed by the Company and not providing services as an independent contractor to the Company I will not be limited in owning, operating, managing, being employed by or otherwise being involved in a similar business.

**By:** _____

**Print Name:** _____

Accepted and Agreed to by:

**DMARCIAN, INC.**

**By:** _____
**Title:** _____

- 4 -

## EXHIBIT A

**DMARCIAN, INC.**

Dear dmarcian, inc.:

      1.     The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by dmarcian, inc. (the "Company") that have been made or conceived or first reduced to practice by me, alone or jointly with others, prior to my employment or retention by the Company, that I desire to remove from the operation of the Company's Proprietary Information and Inventions Agreement.

_____     No inventions or improvements.

_____     See below:  Any and all inventions regarding

_____     Additional sheets attached.

      2.     I propose to bring to my employment, or retention, as the case may be, the following materials and documents of a former employer:

_____     No materials or documents.

_____     See below:

 

_____

**Employee or Consultant**

## MUTUAL NONDISCLOSURE AGREEMENT

**THIS MUTUAL NONDISCLOSURE AGREEMENT** is made and entered into effective as of this _____ day of _____, 2016, by and between **dmarcian, inc.**, a Delaware corporation, and the person or company set forth on the signature page hereto with reference to the following:

**WHEREAS**, Each party hereto desires to obtain certain Confidential Information (as defined herein) from the other party hereto and, under the terms and conditions of this Agreement, each party is willing to provide such Confidential Information to the other; and

**WHEREAS,** each party acknowledges that the Confidential Information furnished and to be furnished by the other is and shall be secret, confidential and proprietary to the disclosing party; and

**WHEREAS,** the party disclosing such Confidential Information shall herein be referred to as the "Disclosing Party," and the party receiving Confidential Information from the other party hereto shall be referred to herein as the "Reviewer;"

**NOW, THEREFORE,** in consideration for each party hereto furnishing to the other party hereto Confidential Information and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      Confidential Information.  The term "Confidential Information" shall mean all trade secrets, concepts, designs and all other information of a secret, confidential and proprietary nature involving the Disclosing Party, derived from or in any way relating to, or to the existing and proposed business activities of, such Disclosing Party including, without limitation, all specifications, instructions, processes, formulas, systems, programs, instrumentation, schematics, source code, data, printouts, patterns, compilations, devices, methods, techniques, procedures and other technical information; products or services developed or sold by the Disclosing Party; the identity and other information regarding the Disclosing Party's existing and potential suppliers, customers, licensees or sublicensees; proprietary financial data regarding the Disclosing Party or any aspect of its business, including, without limitation, marketing plans, market research, market surveys, distribution plans, distribution agreements, corporate structure, information relating to the cost of its technology, products or services, its pricing, its employee compensation, its royalties or other consideration from customers, licensees or sublicensees; the existing and proposed business operating methods of the Disclosing Party; and all other information which, if known, would be of advantage to others competing with, or which may compete with, the Disclosing Party or would be of disadvantage to the Disclosing Party, whether or not subject to patent, trademark, trade secret, copyright or other statutory protection.

2.      Receipt of Confidential Information.  In consideration of being made privy to the Confidential Information, the Reviewer hereby acknowledges receipt of the Confidential Information, and agrees to all of the terms and conditions of this Agreement.

3.      Proprietary Nature of Confidential Information.  The Reviewer acknowledges that the Confidential Information is claimed as secret, confidential and proprietary to the Disclosing Party.  The Reviewer shall have no claim, right, title, property or interest of any form in the Confidential Information disclosed by the Disclosing Party.

4.      Confidentiality and Prohibition on Use.  The Reviewer shall not use, apply, employ, practice, exploit or engage, in any fashion, any such Confidential Information disclosed by the Disclosing Party for any

- 1 -

purpose, without the express written authorization of the Disclosing Party. The Reviewer shall keep secret and confidential the Confidential Information disclosed by the Disclosing Party and shall not disclose, transfer, provide, give, disseminate, divulge, reveal, or permit any employee, affiliate or representative to disclose, transfer, provide, give, disseminate, divulge or reveal, any Confidential Information to any person or entity. The Reviewer shall take all reasonable steps necessary to prevent the unauthorized disclosure, copying or use of such Confidential Information.

5.    Efforts to Maintain Secrecy. Reviewer acknowledges that, as between Reviewer and the Disclosing Party, the Confidential Information has been the subject of efforts by the Disclosing Party that were reasonable under the circumstances to maintain the secrecy of the Confidential Information.

6.    Return of Confidential Information. Within three (3) business days following demand by the Disclosing Party, Reviewer shall return to the Disclosing Party all Confidential Information and any materials containing or relating to the Confidential Information. Reviewer shall not make any copies or reproduction of any Confidential Information, whether magnetic, digital, photocopy, handwritten notes, recorded, or otherwise, in any method or form, without the prior written approval of the Disclosing Party, exercisable in the Disclosing Party's absolute and sole discretion.

7.    Injunction. Reviewer expressly acknowledges and agrees that any breach of any provision of this Agreement by Reviewer would immediately place the Disclosing Party in jeopardy of irreparable harm, that money damages would be inadequate and insufficient to compensate the Disclosing Party, and that the Disclosing Party should be awarded immediate temporary and preliminary injunctive relief. Reviewer further agrees that in the event of issuance of any injunction concerning or relating to misuse, wrongful disclosure or misappropriation of the Confidential Information, or other breach of this Agreement a bond or undertaking of no greater than Three Thousand Dollars ($3,000) shall provide full and adequate protection for Reviewer. Reviewer acknowledges that should Reviewer either intentionally or unintentionally misuse or disclose the Confidential Information, any balancing of the equities would weigh in the Disclosing Party's favor inasmuch as such misuse or disclosure is not permitted hereunder. This Section 7 shall not apply to information that is generally known to the public, customarily disclosed to others without restrictions on disclosure, obtained from a third party without breach of a non-disclosure obligation, or independently derived.

8.    Indemnification. Reviewer shall indemnify and hold harmless the Disclosing Party and each of the Disclosing Party's employees, officers, directors and agents against any losses, damages, costs, liabilities, claims or actions (including, without limitation, any attorneys' fees and costs incurred in the defense of any such claims or actions, in seeking enforcement of this indemnity or otherwise), and shall pay to the Disclosing Party any compensation realized by Reviewer, as a result of, arising out of, or in connection with any breach by Reviewer of any provision of this Agreement.

9.    Notification. Reviewer shall notify the Disclosing Party immediately of any circumstances of which it has notice concerning any access, possession or use of the Confidential Information not authorized by this Agreement. Such notification shall be made by Reviewer to the Disclosing Party at its principal office address, in the most expeditious fashion available.

10.    No Conflict. Reviewer represents to the Disclosing Party that Reviewer is not a party to or otherwise bound by any agreement that could conflict in any manner with any of Reviewer's obligations hereunder. Reviewer shall not undertake to perform services for others that are in conflict with (or that, if Reviewer were to perform such services fully, would create a conflict with) any of such obligations.

- 2 -

11.     No Warranties.   Reviewer acknowledges and agrees that any Confidential Information provided to Reviewer hereunder is provided as is, where at, and with all faults; and that the Disclosing Party makes no representations or warranties, express or implied, concerning such Confidential Information, including no warranties of fitness for any particular purpose whether or not the Disclosing Party had been apprised of such particular purpose and no warranties of merchantability.

12.     Governing Law.   The terms of this Agreement shall be governed by and construed in accordance with the laws of the State of California excluding any conflicts-of-law principles or rules that might otherwise cause the laws of another jurisdiction to apply.   All actions or proceedings with respect to, arising directly or indirectly in connection with, out of, related to or from this Agreement shall be litigated exclusively in courts having situs in the County of San Mateo, California.   The parties hereby submit to the jurisdiction of any local, state or federal court located in the County of San Mateo, California.

13.     Invalidity.   In the event any provision of this Agreement or the application of such provision shall be held by a court of competent jurisdiction, for any reason, to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

14.     Attorneys' Fees.   In the event of litigation or arbitration arising out of, or concerning, this Agreement, or any asserted breach of this Agreement, the prevailing party shall be entitled to recover reasonable costs of suit and attorney's fees in addition to monetary damages or equitable relief.

15.     Entire Agreement; Amendments.   This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings of the parties concerning the subject matter hereof.   No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party hereto, except as specifically set forth in this Agreement.   No amendment or modification of this Agreement may be made except by an instrument in writing signed by both parties.

16.     Notices.   Except as otherwise provided in Section 9 hereof, all notices required to be given hereunder shall be in writing and shall be effective upon receipt.

17.     Headings.   The titles and subtitles of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

18.     Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

19.     No Assignment.   Neither party shall assign this Agreement, or the rights or obligations hereunder, except for any assignment pursuant to operation of law in connection with a merger, consolidation or sale of all or substantially all of the assets of either party.   Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

20.     No Rules of Construction.   No rules of construction are intended by the parties, nor shall be invoked or applied in the interpretation of this Agreement and, for all purposes hereunder, both parties shall be deemed to be the authors hereof.

21.     Subscription and Acceptance.     In the event that this Agreement is presented to Reviewer with or at the same time as the Confidential Information is provided to Reviewer and the Disclosing Party is unable to, or does not, confirm subscription by Reviewer to this Agreement and its terms and conditions by

- 3 -

signature, Reviewer expressly agrees to be bound by this Agreement and all of its terms and conditions, upon Reviewer's examination, review, acceptance or study of any of the Confidential Information, even in the event that Reviewer or an authorized agent of Reviewer does not sign and deliver this Agreement.

**IN WITNESS WHEREOF,** the parties to this Agreement have duly executed it effective as of the day and year first above written.

**dmarcian, inc.,
a Delaware corporation**

By: _____
Name: _____
Title: _____

**COMPANY**

By: _____
Name: _____
Address: _____
_____
Telephone: _____
Facsimile: _____

- 4 -

Re: PIIA and MNDA between dmarcian-inc and y'all

**Subject:** Re: PIIA and MNDA between dmarcian-inc and y'all
**From:** Martijn Groeneweg <martijn@dmarcian.com>
**Date:** 12/7/16, 6:31 PM
**To:** Tim Draegen <tim@dmarcian.com>

Hi Tim,

I really like the formalization of everything we do together. When we grow bigger and are more visible to the world, it's important we protect the things we do as far as it's possible. I also would like to formalize our agreement we made on EU for our mutual benefits and clarity together with the PIIA and MNDA. Below a list of those agreements:

1. dmarcian inc. (or you in person or any other entity you want) gets 51% of the shares of Mailmerk BV, so dmarcian inc. has the majority so you are in control of the strategic direction
2. we rename Mailmerk BV (Dutch inc) to dmarcian Europe BV
3. dmarcian Europe BV and dmarcian inc. work based on the principle of "Drag Along en Tag Along"
4. dmarcian Europe is responsible for all customers located in Russia, EU or Africa
5. dmarcian Europe can sell dmarcian tooling and revenues remain at dmarcian Europe to let the EU organization grow
6. all knowledge build at Mailmerk from 2012 can be used worldwide

Always difficult to write down those things in a clear way. If you have any remarks or something needs to be added to the list, please let me know.
I really would prefer to do the above transaction, because it can be done quick en clean when I ask Rolf to make the concept documents in Dutch and English.

We also discussed creating an entity above dmarcian inc., dmarcian Europe BV and dmarcian APAC that could own 100% of all 3 entities. Have you discussed that with any specialist yet? Creating a holding company in a so called tax paradise could be nice. See https://nl.wikipedia.org/wiki/Belastingparadijs. It's in Dutch, I couldn't find the English version. The Netherlands is also on that list, see http://www.mossfon.com/news/tax-advantages-dutch-holding-companies. Lots of artists have their holding in NL, probably because of low or no tax on royalty payments.
I have dinner next week with some study friends. One of them is https://nl.linkedin.com/in/alexander-van-den-bosch-4073632. I'll ask him whether he has any free advice on those possibilities.

Regards,
Martijn Groeneweg
+31651284506

Op 7 dec. 2016, om 22:12 heeft Tim Draegen <tim@dmarcian.com> het volgende geschreven:

Hi people in the Netherlands,



1 of 2

8/27/19, 10:38 PM

Re: PIIA and MNDA between dmarcian-inc and y'all

To square away dmarcian, inc. employee/contractor documentation, I need the PIIA forms from everyone, and the just the MNDA between dmarcian, inc. and Mailmerck to be signed.

dmarcian, inc's counsel is going through exercise to make sure the corporation can be defended if need be (can't have a competitor do discovery on us and learn that we don't have basic docs in place!). This is a step of larger effort to bring everyone "in house".

I'm emailing all of you as any issues are likely related to being in NL, so why not save some time and review them together at once?

=- Tim


<Form of Proprietary Information and Inventions Agreement.docx><Non-Disclosure Agreement - Mutual form.docx>

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**BREVARD DIVISION**
**Case No. 1:21-CV-00067**

|                          |     |                                  |
|--------------------------|-----|----------------------------------|
| DMARCIAN, INC.,          | )   |                                  |
|                          | )   |                                  |
| *Plaintiff*,             | )   |                                  |
|                          | )   | **NOTICE OF APPEARANCE AND**     |
| v.                       | )   | **REQUEST FOR BRIEFING SCHEDULE**|
|                          | )   |                                  |
| DMARCIAN EUROPE BV,      | )   |                                  |
|                          | )   |                                  |
| *Defendant*.             | )   |                                  |
|                          | )   |                                  |

Pressly M. Millen of Womble Bond Dickinson (US) LLP, 555 Fayetteville Street, Suite 1100, Raleigh, North Carolina 27601, hereby gives notice of his appearance as counsel for Defendant dmarcian Europe BV ("dmarcian Europe"), solely for the purpose of contesting the jurisdiction of this Court and the propriety of injunctive relief against dmarcian Europe. Counsel also requests that this Court issue a briefing schedule in this case to allow for dmarcian Europe BV to file an opposition to the pending Motion for Temporary Restraining Order and Preliminary Injunction.

Counsel further states to the Court that:

1.      He has only been engaged by dmarcian Europe, through its court-appointed independent director (more fully described below), as of today and solely for the purpose of filing this limited Notice of Appearance and to seek a fair and orderly briefing schedule with respect to the pending motion. As a result, counsel has not had sufficient time to fully evaluate the facts and law related to this action. The statements herein are based on such facts as have been brought to counsel's attention to date.

2        dmarcian Europe is a Dutch company without apparent sufficient minimum contacts with the State of North Carolina to permit exercise of personal jurisdiction over it by this Court.  In addition, dmarcian Europe has not yet been served with process in this case according to the procedures outlined by the Hague Convention on Service.

3.        As a result of a controversy between the majority shareholder of dmarcian Europe (dmarcian, Inc. founder, Timothy Draegen) and its minority shareholder over governance issues and intellectual property rights to software developed by dmarcian Europe, on September 7 and 10, 2020, the Enterprise Court of the Amsterdam Court of Appeal issued decisions appointing an independent director of dmarcian Europe with a decisive vote and certain special duties, and transferring Draegen's shares (as well as those of the minority shareholder) in trust to an independent administrator appointed by that Court.  (Copies of those decisions (with English translations) are attached hereto as Exhibit A.)

4.        Thereafter, on February 1, 2021, the Court of Rotterdam entered judgment in a proceeding instituted by dmarcian Europe through its independent director against dmarcian, Inc. and Draegen concerning their interference with dmarcian Europe's access to the computer systems necessary to service its customers, ordering dmarcian, Inc. and Draegen to grant such access within 24 hours or pay a penalty of €20,000 for each day of non-compliance.  (A copy of the Judgment (with its English translation) is attached hereto as Exhibit B.)

5.        Draegen and dmarcian, Inc. have not complied with the judgment of the Rotterdam Court, but, instead, instituted this proceeding on March 12, 2021, and filed their motion for preliminary relief nearly two weeks later, on March 25, 2021.

6.        In addition to the service and jurisdictional issues identified above, counsel intends to investigate (without limitation) the following issues:

      a.     Whether the decisions and judgment of the Dutch courts are *res judicata* with respect to some or all of the issues raised in this case;

      b.     Whether this Court is a *forum non conveniens* with respect to this dispute;

      c.     Whether this action should be appropriately stayed pending resolution of the dispute between the parties in the Dutch courts;

      d.     Whether dmarcian Europe is subject to claims of (i) copyright infringement (count three), (ii) trademark infringement (count four); (iii) false designation of origin (court five); "computer trespass" (count eight); or unfair or deceptive business practices (count eleven) under U.S. and/or North Carolina law given the fact that it does not do business in the U.S.; and

      e.     Whether dmarcian, Inc. can otherwise satisfy the requirements for the issuance of injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

      7.     In light of the foregoing, counsel respectfully suggests that he be granted the opportunity to fully evaluate the facts and law related to this action and to file an opposition to the pending Motion for Temporary Restraining Order and Preliminary Injunction no later than 21 days from this date, April 19, 2021. Counsel makes this suggestion without waiving any defense of dmarcian Europe, including (without limitation) the defense of lack of personal jurisdiction. *Cf. ABC Phones of N. Carolina, Inc. v. Yahyavi*, No. 5:20-CV-0090-BR, 2020 WL 4208923, at *3 (E.D.N.C. July 22, 2020) (holding that defendant's "participation in the litigation—filing a notice of appearance, a notice of removal, and response to plaintiff's motion for a temporary restraining order with objections to personal jurisdiction before being served—does not constitute waiver by active participation in litigation").

      This the 29th day of March, 2021.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Pressly M. Millen
_____

Pressly M. Millen, NC State Bar No. 16178
Post Office Box 831
Raleigh, North Carolina 27602
Phone: (919) 755-2135
Fax: (919) 755-6067
Email*:* Press.Millen@wbd-us.com

*Counsel for Defendant dmarcian Europe BV*

# EXHIBIT A

# beschikking

**GERECHTSHOF AMSTERDAM**
**ONDERNEMINGSKAMER**

zaaknummer: 200.281.257/01 OK

beschikking van de Ondernemingskamer van 7 september 2020

inzake

de besloten vennootschap met beperkte aansprakelijkheid
**THE DIGITAL XPEDITION (TDX) HOLDING B.V.,**
gevestigd te Dordrecht,
**VERZOEKSTER,**
advocaten: **mr. M.C. Luiten, mr. V.R.M. Appelman** en **mr. L. Geldof,** allen
kantoorhoudende te Rotterdam,


t e g e n


de besloten vennootschap met beperkte aansprakelijkheid
**DMARCIAN EUROPE B.V.,**
gevestigd te Dordrecht,
**VERWEERSTER,**
advocaten: **mr. A. van Bunge** en **mr. J. Kloots,** beiden kantoorhoudende te Rotterdam,


e n t e g e n


Timothy George **DRAEGEN,**
wonende te Brevard, North Carolina, Verenigde Staten van Amerika,
**BELANGHEBBENDE,**
advocaten: **mr. F. Henke** en **mr. P.A. Josephus Jitta,** kantoorhoudende te Amsterdam
respectievelijk Den Haag.

1.     **Het verloop van het geding**

1.1    Verzoekster, verweerster en belanghebbende worden hierna respectievelijk aangeduid met
       TDX, dmarcian Europe en Draegen.

1.2    TDX heeft bij op 28 juli 2020 ingekomen verzoekschrift met producties de
       Ondernemingskamer verzocht, na wijziging van haar verzoek bij op 17 augustus 2020
       ingediende akte, bij beschikking uitvoerbaar bij voorraad, een onderzoek te bevelen naar het
       beleid en de gang van zaken van dmarcian Europe over de periode vanaf januari 2016 tot en
       met 17 augustus 2020 en bij wijze van onmiddellijke voorzieningen voor de duur van het
       geding, zakelijk weergegeven, primair:
       i    een derde persoon te benoemen tot bestuurder van dmarcian Europe met
            doorslaggevende stem en met bepaalde bijzondere taken;
       ii   te bepalen dat het bestuur bevoegd is om namens dmarcian Europe overeenkomsten met
            aandeelhouders en/of derden te sluiten zonder goedkeuring van de aandeelhouders,
            althans om de statuten zodanig (tijdelijk) aan te passen dat hierin wordt bepaald dat het
            bestuur de hiervoor genoemde bevoegdheid heeft en daarbij te bepalen dat de uitspraak
            van de Ondernemingskamer zo nodig ex art. 2:8 BW jº 3:300 BW dezelfde kracht heeft
            en kan dienen als vervanging van alle benodigde goedkeuringen, besluiten,
            afstandsverklaringen of rechtshandelingen van/door aandeelhouders (individueel of als
            vergadering);
       iii  te verbieden dat op de aandeelhoudersvergadering van 7 september 2020 (a) TDX wordt
            ontslagen als bestuurder van dmarcian Europe en (b) Vision Management Europe Ltd.
            (hierna: Vision), althans een derde, wordt benoemd tot bestuurder van dmarcian Europe,
            op straffe van het verbeuren van een dwangsom;
       iv   te bepalen dat de door de Ondernemingskamer te benoemen bestuurder bevoegd is een
            aandeelhoudersvergadering bijeen te roepen, met uitsluiting van de in artikel 22 lid 4,
            laatste zin van de statuten bepaalde bevoegdheid van een individuele aandeelhouder zelf
            een aandeelhoudersvergadering bijeen te roepen;
       v    het stemrecht op de aandelen van Draegen in het kapitaal van dmarcian Europe te
            schorsen althans deze aandelen ten titel van beheer over te dragen aan een door de
            Ondernemingskamer te benoemen beheerder;
       subsidiair een andere voorziening te treffen die de Ondernemingskamer juist acht, en in
       beide gevallen om dmarcian Europe te veroordelen in de kosten van het geding.

1.3    Bij verweerschrift met producties van 11 augustus 2020 heeft dmarcian Europe de
       Ondernemingskamer verzocht, bij beschikking uitvoerbaar bij voorraad, het verzoek van

TDX toe te wijzen, met dien verstande dat het verzochte onderzoek wordt bevolen over de periode vanaf januari 2016 tot en met 20 augustus 2020.

1.4    Eveneens op 11 augustus 2020 heeft Draegen bij verweerschrift met producties, de Ondernemingskamer verzocht het verzoek van TDX af te wijzen en bij wijze van zelfstandig verzoek de Ondernemingskamer verzocht, bij beschikking uitvoerbaar bij voorraad, een onderzoek te bevelen naar het beleid en de gang van zaken van dmarcian Europe over de periode vanaf januari 2016 tot en met augustus 2020 en bij wijze van onmiddellijke voorzieningen voor de duur van het geding, zakelijk weergegeven,
- primair TDX te ontslaan en subsidiair TDX te schorsen als bestuurder van dmarcian Europe;
- een derde persoon te benoemen tot bestuurder van dmarcian Europe;
- de aandelen in het kapitaal van dmarcian Europe, met uitzondering van 49% van de aandelen van TDX en 49% van de aandelen van Draegen, althans een zodanig percentage als de Ondernemingskamer juist acht, ten titel van beheer over te dragen aan een door de Ondernemingskamer te benoemen beheerder;
- dan wel een andere voorziening te treffen die de Ondernemingskamer juist acht;
telkens met veroordeling van TDX in de kosten van het geding.

1.5    De verzoeken zijn behandeld ter openbare terechtzitting van de Ondernemingskamer van 20 augustus 2020. Bij die gelegenheid hebben de advocaten de standpunten van de onderscheiden partijen toegelicht aan de hand van aan de Ondernemingskamer en de wederpartij overgelegde aantekeningen en (wat mrs. Geldof en Van Bunge betreft) onder overlegging van – op voorhand aan de Ondernemingskamer en de wederpartij gezonden – nadere producties 34 tot en met 37 van de zijde van TDX en nadere producties 19 tot en met 34 van de zijde van dmarcian Europe. Partijen en hun advocaten hebben vragen van de Ondernemingskamer beantwoord en inlichtingen verstrekt.

## 2.    De feiten

De Ondernemingskamer gaat uit van de volgende feiten:

2.1    dmarcian Europe is op 21 maart 2013 opgericht en heette aanvankelijk Mailmerk B.V. TDX en Draegen houden respectievelijk 49,99% en 50,01% van de aandelen in dmarcian Europe. TDX is bestuurder van dmarcian Europe. Volgens de statuten van dmarcian Europe kunnen bestuurders door de algemene vergadering bij meerderheid van stemmen worden benoemd, geschorst en ontslagen.

2.2    Martijn Groeneweg (hierna: Groeneweg) en Herwert Jente Kalkman (hierna: Kalkman) zijn ieder via hun persoonlijke vennootschappen indirect houder van 50% van de aandelen in TDX en tevens indirect bestuurder van TDX.

2.3    dmarcian Europe werkt vanaf 2016 samen met dmarcian, Inc., een vennootschap naar het recht van Delaware (Verenigde Staten van Amerika). Beide vennootschappen drijven een onderneming die zich bezighoudt met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen. dmarcian Europe maakt daarbij gebruik van software die afkomstig is van dmarcian, Inc. Tevens doet dmarcian Europe aan product- en softwareontwikkeling. Zij heeft daartoe niet alleen zelf ontwikkelaars in dienst, maar maakt ook gebruik van ontwikkelingsactiviteiten in Bulgarije, aanvankelijk door tussenkomst van de Bulgaarse vennootschap BeLean OOD en vanaf 1 november 2018 door middel van dmarcian Bulgaria EOOD (hierna: dmarcian Bulgaria), een Bulgaarse vennootschap waarin dmarcian Europe alle aandelen houdt.

2.4    Draegen is CEO van dmarcian, Inc. en houdt de meerderheid van de aandelen in deze vennootschap. C. Swenberg (hierna: Swenberg), een per 31 mei 2018 ontslagen werknemer van dmarcian, Inc., houdt een minderheidsaandelenbelang in dmarcian, Inc. Swenberg is een gerechtelijke procedure begonnen tegen dmarcian, Inc., Draegen en Groeneweg, waarin hij onder meer aanspraak maakt op aandelen in dmarcian, Inc. die hij bij het voortduren van zijn dienstverband zou hebben ontvangen.

2.5    TDX en Draegen twisten over de afspraken die in 2016 aan de samenwerking tussen dmarcian Europe en dmarcian, Inc./Draegen ten grondslag zijn gelegd. Volgens TDX hebben dmarcian Europe, dmarcian, Inc., TDX en Draegen op 22 januari 2016 een mondelinge overeenkomst gesloten waarop hun samenwerking is gebaseerd. Volgens Draegen hebben partijen de in december 2016 gevoerde e-mailcorrespondentie tussen hem en Groeneweg over het formaliseren van hun samenwerking, waarbij Draegen documenten ter ondertekening heeft toegestuurd (die niet zijn ondertekend), altijd beschouwd als de basis van hun samenwerking. In ieder geval staat tussen partijen vast dat zij in 2016 ten minste zijn overeengekomen:
-    dat dmarcian Europe een licentie heeft voor het gebruik en de verkoop van software afkomstig van dmarcian, Inc.;
-    dat dmarcian Europe verantwoordelijk is voor de verkoop van die software (en het leveren van bijbehorende diensten) aan klanten in Europa, Rusland en Afrika;
-    dat dmarcian, Inc. en/of Draegen in ruil daarvoor het meerderheidsaandelenbelang in dmarcian Europe heeft kunnen kopen tegen betaling van € 1.

zaaknummer 200.281.257/01 OK                                                                 - 5 -

2.6    Op 6 augustus 2018 heeft Draegen Groeneweg onder meer het volgende gemaild:
       *"There are 2 main parts to consider: 1. (...) 2. Where is global IP located? (...) About
       location of IP: since EU has been licensing tech, it is likely impossible to home IP into the
       EU by default.. even though EU is paying to continue to develop (as US is also paying
       developers – so it's sort of a mixed issue). This means that some sort of asset transfer has
       to be made (...) along with a proper valuation of said IP".*

2.7    Groeneweg heeft op 4 december 2019 aan Draegen een e-mail gezonden met onder meer de
       volgende inhoud:
       *"This document describes the current situation that software owned by dmarcian
       Europe BV can't be sold by dmarcian, Inc. nor Dmarcian Asia Pacific Pty Ltd to
       customers as there's no license agreement in place to do so. Before this problem is solved
       new software including but not limited to DMARC delegation can't go live on other
       instances than the EU instance. This document describes a detailed solution for the
       above problem as well."*

       Als bijlage bevat de e-mail een document dat de volgende weergave van de volgens
       Groeneweg in 2016 gemaakte afspraken inhoudt:
       *"(...) Operational and license agreement between dmarcian inc and Mailmerk BV*
       *a. Perpetual and exclusive free license for SaaS Software from dmarcian, Inc. to
       Mailmerk BV.*
       *b. dmarcian, Inc. will take care of software development.*
       *c. Mailmerk BV becomes dmarcian Europe BV exclusively handling all dmarcian
       customers from Russia, Europe and Africa.*
       *d. All revenue generated from dmarcian customers from Russia, Europe and Africa will
       be dmarcian Europe BV revenue.*
       *e. Both dmarcian, Inc. and dmarcian Europe BV keep operating as separate entities
       under 1 brand."*

       Verder heeft Groeneweg in het document voorstellen gedaan voor toekomstige
       samenwerking met dmarcian, Inc. en Draegen alsook om TDX buiten schot te houden in de
       Swenberg-rechtszaak (2.4).

2.8    Draegen heeft eveneens op 4 december 2019 op het voorstel in het document van Groeneweg
       voor de toekomstige samenwerking gereageerd. Draegen schrijft: *"I agree we'll need a
       licensing agreement to be put into place. Without going into details over email, it makes
       sense to reflect the perpetual and exclusive license that Europe BV has enjoyed. (...) The
       proposed solution (...) isn't something I can support (...)".* Op 6 december 2019 heeft hij in
       een e-mail aan onder andere Groeneweg enkele *"rather unpleasant surprises"* uit het

document aan de orde gesteld. Draegen heeft daarbij opgemerkt: *"The initial terms described around 22 January 2016 are either wrong or inaccurate"*, waarna hij zijn visie heeft gegeven op hetgeen in 2016 is overeengekomen. In de afsluiting van de e-mail staat dat de fouten in het document van Groeneweg: *"have raised serious red flags"* en dat het document *"issues that cannot be ignored"* heeft doen ontstaan.

2.9　　Draegen heeft tijdens een *all hands meeting* op vrijdag 6 december 2019 aan alle dmarcian-werknemers wereldwijd verklaard:

> *"(...) Right now, I wear two hats. The CEO of the US legal entity, and the majority owner of the Dutch BV. With my CEO hat on, I have to protect the assets of the US company, including intellectual property. (...) I have to protect the property of the company, and need to interpret the letter* [de e-mail van Groeneweg van 4 december 2019, toev. Ondernemingskamer] *as an attempt to replace existing terms with new ones. We're now in a legal limbo (...) BV employee access has to be suspended and pretty much everything related to resources provided to the BV by the US entity has to be suspended"*.

Tijdens de meeting werd aan alle werknemers van dmarcian Europe de toegang ontzegd tot de (computer)systemen. Deze toegang is grotendeels hersteld op maandag 9 december 2019 vóór kantooruren. Daarnaast heeft Draegen een *Director of Software* benoemd voor (onder andere) dmarcian Europe en dmarcian Bulgaria.

2.10　dmarcian Europe en Draegen/dmarcian, Inc. hebben vervolgens voorstellen gedaan om tot een oplossing te komen, maar die is er niet gekomen.

2.11　Draegen heeft bij e-mail van 3 juli 2020 aan Groeneweg en Kalkman verzocht een aandeelhoudersvergadering van dmarcian Europe bijeen te roepen, met op de agenda het voorstel TDX te ontslaan als bestuurder van dmarcian Europe en Vision als zodanig te benoemen. dmarcian Europe heeft, conform haar statuten, een aandeelhoudersvergadering bijeengeroepen voor 13 augustus 2020 waarvoor deze onderwerpen geagendeerd stonden. Met het oog op deze enquêteprocedure is de aandeelhoudersvergadering verplaatst naar 7 september 2020.

2.12　Op 29 juli 2020 heeft dmarcian Europe een *non-binding indicative offer* tot overname van de aandelen in dmarcian Europe ontvangen van Valimail, Inc., een in San Francisco, Verenigde Staten van Amerika, gevestigde concurrent van de dmarcian-vennootschappen. Het bod is toegevoegd aan de agenda van de aandeelhoudersvergadering van dmarcian Europe op 7 september 2020. Valimail, Inc. wenst een due diligence-onderzoek uit te voeren alvorens zij een bindend bod zal kunnen doen.

2.13  Tijdens de mondelinge behandeling op 20 augustus 2020 hebben partijen ermee ingestemd dat de voor 7 september 2020 bijeengeroepen aandeelhoudersvergadering van dmarcian Europe niet zal plaatsvinden voordat de Ondernemingskamer uitspraak heeft gedaan op de verzoeken van TDX en Draegen.

## 3.  De gronden van de beslissing

3.1  TDX heeft aan haar stelling dat er gegronde redenen zijn voor twijfel aan een juist beleid en een juiste gang van zaken van dmarcian Europe en dat gelet op de toestand van de vennootschap onmiddellijke voorzieningen dienen te worden getroffen, kort gezegd het volgende ten grondslag gelegd:

i  De verstandhouding tussen Draegen enerzijds en dmarcian Europe (inclusief haar werknemers) en TDX anderzijds is ernstig verstoord geraakt door gedragingen van Draegen in de afgelopen jaren en wordt inmiddels gekenmerkt door wantrouwen. Dit is veroorzaakt door de discussie tussen partijen over de intellectuele eigendom die vanaf 4 december 2019 is geïntensiveerd en ontspoord. dmarcian Europe heeft met betrekking tot de door haar (en dmarcian Bulgaria) zelf ontwikkelde software, waarin zij € 900.000 heeft geïnvesteerd, een overeenkomst voorgesteld aan dmarcian, Inc., waarbij – bij wijze van spiegelbeeld van de op 22 januari 2016 gesloten overeenkomst – aan dmarcian, Inc. een licentie voor het gebruik en de verkoop van die software wordt verleend. Draegen is daarop op ramkoers gaan liggen door van dmarcian Europe te verlangen dat de intellectuele eigendom op die software om niet wordt overgeheveld naar dmarcian, Inc. Met dat doel en dus oneigenlijk stuurt hij aan op ontslag van TDX als bestuurder van dmarcian Europe. Zodoende trekt hij ten onrechte de macht binnen dmarcian Europe naar zich toe. Door zich aldus te gedragen misbruikt Draegen zijn positie als meerderheidsaandeelhouder ten nadele van dmarcian Europe ten behoeve van zijn eigen positie als grootaandeelhouder van dmarcian, Inc. en is er sprake van ongeoorloofde belangenverstrengeling. Daarnaast heeft een geschil tussen TDX en Draegen over het dividendbeleid voor verstoring van de onderlinge verstandhouding gezorgd.

ii  Er is ook overigens sprake van ongewenste inmenging door Draegen in de dagelijkse bedrijfsvoering van dmarcian Europe. TDX heeft in dat kader gewezen op Draegens verklaring tijdens de *all hands meeting* van 6 december 2019 (2.9), het vervolgens ontzeggen van de toegang tot de vitale (computer)systemen aan werknemers van dmarcian Europe en het vooruitlopen door Draegen op het ontslag van TDX als bestuurder van dmarcian Europe. Hierdoor is grote onrust onder de werknemers van dmarcian Europe ontstaan. Daarnaast heeft Draegen klanten van dmarcian Europe

benaderd met de incorrecte boodschap dat dmarcian, Inc. alle software beheert en een *Director of Software* van dmarcian Europe en dmarcian Bulgaria aangesteld.

De verzochte onmiddellijke voorzieningen zijn nodig om te voorkomen dat Draegen een machtsgreep pleegt en de intellectuele eigendom van dmarcian Europe naar zich toe trekt.

3.2    dmarcian Europe onderschrijft het standpunt van TDX.

3.3    Draegen heeft gemotiveerd verweer gevoerd tegen het verzoek van TDX. De Ondernemingskamer zal hieronder waar nodig op dit verweer ingaan. Aan zijn zelfstandig verzoek heeft Draegen ten grondslag gelegd dat er andere gegronde redenen zijn voor twijfel aan een juist beleid en een juiste gang van zaken van dmarcian Europe en dat gelet op de toestand van de vennootschap onmiddellijke voorzieningen dienen te worden getroffen. Ter toelichting heeft hij – kort samengevat – het volgende naar voren gebracht:

a.    TDX en dmarcian Europe claimen ten onrechte intellectuele eigendomsrechten op software die aan dmarcian, Inc. toebehoort. Hierdoor schenden TDX en dmarcian Europe de in 2016 tussen partijen gesloten overeenkomst op grond waarvan dmarcian Europe onder licentie van dmarcian, Inc. software gebruikt en verkoopt. TDX heeft door middel van zijn brief en document van 4 december 2019 (2.7) getracht die overeenkomst te herzien om er zelf beter van te worden. Hiermee heeft TDX een bom onder de samenwerking gelegd.

b.    Verder is er sprake van falend bestuur door TDX, omdat dmarcian Europe heeft verzuimd met dmarcian Bulgaria een overeenkomst te sluiten over de intellectuele eigendom van door werknemers van dmarcian Bulgaria ontwikkelde software (voor zover deze los staat van de software afkomstig van dmarcian, Inc.). Hierdoor komen de intellectuele eigendomsrechten op deze software niet aan dmarcian Europe toe.

c.    Aangezien Kalkman als softwareontwikkelaar niet in dienst is van dmarcian Europe en zijn managementovereenkomst met dmarcian Europe geen IP-assignmentclausule bevat, dreigt de intellectuele eigendom op door hem ontwikkelde software in TDX achter te blijven, zodat deze niet aan dmarcian Europe toekomt. Aangezien dit een bedreiging vormt voor dmarcian Europe, heeft Draegen meermaals om opheldering hierover verzocht, maar TDX en dmarcian Europe hebben deze niet verstrekt.

TDX heeft sinds december 2019 aangestuurd op een exit als aandeelhouder en heeft door een conflict over de intellectuele eigendomsrechten te veroorzaken en het bod van concurrent Valimail, Inc. uit te lokken, getracht de prijs van haar aandelen op te drijven. Hiermee laat TDX ten onrechte haar eigen belang zwaarder wegen dan het belang van dmarcian Europe, aldus Draegen.

3.4    De Ondernemingskamer overweegt als volgt. De controverse over de intellectuele
eigendomsrechten op de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde
software(applicaties) vormt de kern van het geschil tussen partijen. TDX stelt dat deze
software(applicaties) los staat/staan van de door dmarcian, Inc. ontwikkelde software,
zodanig dat de intellectuele eigendom daarvan aan dmarcian Europe toekomt. Aan het
mogen gebruiken en verkopen van deze software(applicaties) door dmarcian, Inc. dient een
door dmarcian Europe te verlenen licentie ten grondslag te liggen, aldus TDX.
Daartegenover stelt Draegen dat de door dmarcian Europe (en dmarcian Bulgaria)
ontwikkelde software niet meer omvat dan aanvullende *features* voor verbeterd gebruik van
de van dmarcian, Inc. afkomstige software, zodat de intellectuele eigendom daarvan
eveneens bij dmarcian, Inc. berust. De Ondernemingskamer stelt voorop dat voor de
juridische beoordeling van dat geschil slechts de gewone burgerlijke rechter bevoegd is. Wel
kan de Ondernemingskamer constateren dat dit geschil ontwrichtend is voor de
onderneming van dmarcian Europe; het ontwikkelen en verkopen van software is haar *core
business* en de samenwerking met dmarcian, Inc. is daarvoor een noodzakelijke voorwaarde.
Desondanks is deze samenwerking noch in het algemeen, noch ter zake van de intellectuele
eigendomsrechten op ontwikkelde en te ontwikkelen software(applicaties) en (de reikwijdte
van) de in verband daarmee verleende/te verlenen licenties in het bijzonder, door partijen
voldoende geregeld. Hierover zijn geen eenduidig vastgelegde afspraken voorhanden, met als
gevolg dat de samenwerking op het spel is komen te staan door de huidige discussie
daarover, hetgeen een serieuze belemmering vormt voor de bedrijfsvoering van dmarcian
Europe. Naar het oordeel van de Ondernemingskamer levert het bestaan van voornoemde
situatie voldoende gegronde redenen op om te twijfelen aan een juist beleid en een juiste
gang van zaken van dmarcian Europe. De Ondernemingskamer zal, gelijk door zowel TDX
als Draegen is verzocht, een onderzoek gelasten naar het beleid en de gang van zaken van
dmarcian Europe, en wel vanaf 1 januari 2016 tot 20 augustus 2020.

3.5    Met partijen acht de Ondernemingskamer het met het oog op de toestand van dmarcian
Europe noodzakelijk om bij wijze van onmiddellijke voorziening een derde tot bestuurder
van dmarcian Europe met doorslaggevende stem te benoemen, die zelfstandig bevoegd is
dmarcian Europe te vertegenwoordigen. Deze bestuurder mag het mede tot zijn taak rekenen
te proberen duidelijkheid te verkrijgen over de vraag waar de intellectuele eigendom op de
door dmarcian Europe (en dmarcian Burgaria) ontwikkelde software(applicaties) berust,
althans daarover met dmarcian, Inc. voldoende duidelijke afspraken te maken en deze vast
te leggen. De Ondernemingskamer ziet tevens aanleiding om de aandelen in dmarcian
Europe – met uitzondering van één aandeel van ieder van de aandeelhouders – ten titel van
beheer aan een door haar te benoemen beheerder over te dragen.

3.6    De te benoemen bestuurder mag het bovendien tot zijn taak rekenen een minnelijke regeling
       tussen partijen te beproeven.

3.7    Voor het treffen van andere onmiddellijke voorzieningen, zoals het schorsen van TDX als
       bestuurder van dmarcian Europe, ziet de Ondernemingskamer (vooralsnog) geen aanleiding.

3.8    De Ondernemingskamer zal de kosten van het onderzoek en de te benoemen bestuurder en
       beheerder ten laste brengen van dmarcian Europe.

3.9    De Ondernemingskamer zal de aanwijzing van een onderzoeker vooralsnog aanhouden
       opdat kan worden bezien of reeds door de te treffen onmiddellijke voorzieningen een
       oplossing van het geschil kan worden bereikt. Ieder der partijen of de door de
       Ondernemingskamer benoemde bestuurder dan wel beheerder kan op elk moment de
       Ondernemingskamer verzoeken de onderzoeker aan te wijzen.

3.10   De Ondernemingskamer zal het bedrag dat het onderzoek ten hoogste mag kosten niet
       aanstonds vaststellen. De Ondernemingskamer zal, nadat de onderzoeker zal zijn
       aangewezen, de onderzoeker vragen om binnen zes weken een plan van aanpak en een
       begroting van de kosten van het onderzoek te maken en deze aan de Ondernemingskamer
       toe te zenden. De Ondernemingskamer zal partijen in de gelegenheid stellen zich uit te laten
       over die begroting en vervolgens het bedrag vaststellen dat het onderzoek ten hoogste mag
       kosten.

3.11   De Ondernemingskamer acht ten slotte termen aanwezig de kosten van het geding tussen de
       verschenen partijen te compenseren zoals hierna te vermelden.


4.     **De beslissing**

       De Ondernemingskamer:

       beveelt een onderzoek naar het beleid en de gang van zaken van dmarcian Europe B.V. over
       de periode vanaf 1 januari 2016 tot 20 augustus 2020 zoals omschreven in rechtsoverweging
       3.4 van deze beschikking;

       bepaalt dat de kosten van het onderzoek ten laste komen van dmarcian Europe B.V. en dat
       zij voor de betaling daarvan ten genoegen van de onderzoeker voor de aanvang van diens
       werkzaamheden zekerheid dient te stellen;

houdt in verband met het bepaalde in rechtsoverweging 3.10 de vaststelling van het bedrag dat het onderzoek ten hoogste mag kosten aan;

benoemt mr. A.J. Wolfs tot raadsheer-commissaris, zoals bedoeld in artikel 2:350 lid 4 BW;

benoemt bij wijze van onmiddellijke voorziening met onmiddellijke ingang en vooralsnog voor de duur van het geding – voor zover nodig in afwijking van de statuten – een nader aan te wijzen en aan partijen bekend te maken persoon tot bestuurder van dmarcian Europe B.V. met doorslaggevende stem en bepaalt dat deze bestuurder zelfstandig bevoegd is dmarcian Europe B.V. te vertegenwoordigen;

bepaalt vooralsnog voor de duur van het geding dat de aandelen in dmarcian Europe B.V. – met uitzondering van één aandeel van ieder van de aandeelhouders – ten titel van beheer met ingang van heden zijn overgedragen aan een nader aan te wijzen en aan partijen bekend te maken persoon;

bepaalt dat het salaris en de kosten van de bestuurder en de beheerder van aandelen ten laste komen van dmarcian Europe B.V. en bepaalt dat dmarcian Europe B.V. voor de betaling daarvan ten genoegen van de bestuurder en de beheerder zekerheid dient te stellen vóór de aanvang van hun werkzaamheden;

compenseert de kosten van het geding tussen de verschenen partijen aldus dat iedere partij de eigen kosten draagt;

verklaart deze beschikking uitvoerbaar bij voorraad;

wijst af hetgeen meer of anders is verzocht.

Deze beschikking is gegeven door mr. A.J. Wolfs, voorzitter, mr. A.W.H. Vink en mr. M.P. Nieuwe Weme, raadsheren, en drs. C. Smits-Nusteling RC en drs. J.S.T. Tiemstra RA, raden, in tegenwoordigheid van mr. F.L.A. Straathof, griffier, en in het openbaar uitgesproken op 7 september 2020.

# decision

AMSTERDAM COURT OF APPEAL
ENTERPRISE COURT

case number: 200.281.257/01 OK

decision of the Enterprise Court dated September 7, 2020

in the case of


the private company with limited liability
**THE DIGITAL XPEDITION (TDX) HOLDING B.V.,**
with its registered office in Dordrecht,
**APPLICANT,**
lawyers: **M.C. Luiten, V.R.M. Appelman** and **L. Geldof**, all with offices in Rotterdam,


versus

the private company with limited liability
**DMARCIAN EUROPE B.V.,**
with its registered office in Dordrecht,
**RESPONDENT,**
lawyers: **A. van Bunge** and **J. Kloots**, both with offices in Rotterdam,


and versus

**Timothy George DRAEGEN,**
residing in Brevard, North Carolina, United States of America,
**INTERESTED PARTY,**
lawyers: **F. Henke** and **P.A. Josephus Jitta**, with offices in Amsterdam and The Hague respectively.

Case number 200.281.257/01 OK                                 -2-

**1.      The course of the proceedings**

1.1     The applicant, the respondent and the interested party are hereinafter referred to as TDX, dmarcian Europe and Draegen, respectively.

1.2     In its application with exhibits filed on July 28, 2020, TDX requested the Enterprise Court, after amending its application by deed filed on August 17, 2020, to order, by provisionally enforceable decision, an investigation into the policies and course of affairs of dmarcian Europe over the period from January 2016 to August 17, 2020, and by way of immediate relief for the duration of the proceedings, in essence, primarily:

   i.    to appoint a third person as director of dmarcian Europe with a decisive vote and with certain special duties;

   ii.   to rule that the board of directors is authorized to enter into agreements with shareholders and/or third parties on behalf of dmarcian Europe without the approval of the shareholders, or at least to amend the articles of association (temporarily) in such a way that it is determined therein that the board of directors has the aforementioned authority and to rule in this respect that, if necessary pursuant to Section 2:8 of the Dutch Civil Code in conjunction with Section 3:300 of the Dutch Civil Code. the ruling of the Enterprise Court has the same force and can serve as a substitute for all necessary approvals, resolutions, waivers or legal acts of/by shareholders (individually or as a meeting);

   iii.  to prohibit that at the shareholders' meeting of September 7, 2020 (a) TDX is dismissed as a director of dmarcian Europe and (b) Vision Management Europe Ltd. (hereinafter to be referred to as Vision), or at least a third party, is appointed as a director of dmarcian Europe, subject to forfeiture of a penalty;

   iv.  to rule that the director to be appointed by the Enterprise Court is authorized to convene a shareholders' meeting, excluding the power of an individual shareholder to convene a shareholders' meeting himself as provided for in Article 22, paragraph 4, last sentence of the articles of association;

   v.   to suspend the voting rights on Draegen's shares in the capital of dmarcian Europe, or at least to transfer these shares in trust to an administrator to be appointed by the Enterprise Court; alternatively, to take such other measures as the Enterprise Court may deem appropriate, and in either case to order dmarcian Europe to pay the costs of the proceedings.

1.3     By statement of response with exhibits dated August 11, 2020, dmarcian Europe requested that the Enterprise Court, by provisionally enforceable decision, grant TDX's request, with the proviso that the requested investigation be ordered to cover the period from January 2016 through August 20, 2020.

Case number 200.281.257/01 OK                                                                -3-

1.4     Also on August 11, 2020, Draegen, by statement of response with exhibits, requested the
        Enterprise Court to reject TDX's request and, by way of independent request, requested the
        Enterprise Court to order, by provisionally enforceable decision, an investigation into the
        policies and course of affairs of dmarcian Europe over the period from January 2016 through
        August 2020 and by way of immediate relief for the duration of the proceedings, in essence,
        −     primarily to dismiss TDX and alternatively to suspend TDX as a director of dmarcian
              Europe;
        −     to appoint a third person as a director of dmarcian Europe;
        −     to transfer the shares in the capital of dmarcian Europe, with the exception of 49% of the
              shares of TDX and 49% of the shares of Draegen, or at least such a percentage as the
              Enterprise Court deems appropriate, in trust to an administrator to be appointed by the
              Enterprise Court;
        −     or to take such other measures as the Enterprise Court deems appropriate; in each case
              ordering TDX to pay the costs of the proceedings.

1.5     The applications were heard at the public hearing of the Enterprise Court on August 20, 2020.
        On that occasion, the lawyers clarified the positions of the various parties on the basis of notes
        submitted to the Enterprise Court and the counterparty and (as regards lawyers Geldof and Van
        Bunge) with submission of further exhibits 34 up to and including 37 on the part of TDX and
        further exhibits 19 up to and including 34 on the part of dmarcian Europe, sent to the Enterprise
        Court and the counterparty in advance. The parties and their lawyers answered questions from
        the Enterprise Court and provided information.

## 2.     The facts

The Enterprise Court assumes the following facts:

2.1     dmarcian Europe was incorporated on March 21, 2013 and was initially called Mailmerk B.V.
        TDX and Draegen hold 49.99% and 50.01% of the shares in dmarcian Europe, respectively. TDX is
        a director of dmarcian Europe. According to dmarcian Europe's articles of association, directors
        may be appointed, suspended and dismissed by the general meeting by a majority vote.

Case number 200.281.257/01 OK                                                    -4-

2.2    Martijn Groeneweg (hereinafter referred to as Groeneweg) and Herwert Jente Kalkman
        (hereinafter referred to as Kalkman) each indirectly hold 50% of the shares in TDX through their
        personal companies and are also indirect directors of TDX.

2.3    dmarcian Europe has partnered with dmarcian, Inc. as of 2016, a company incorporated under
        the laws of Delaware (United States of America). Both companies are engaged in conducting a
        business that provides products and services in the area of identity protection of email
        addresses. For this purpose, dmarcian Europe uses software originating from dmarcian, Inc.
        dmarcian Europe also engages in product and software development. To this end, it not only
        employs developers, but also uses development activities in Bulgaria, initially through the
        Bulgarian company BeLean OOD and, as of November 1, 2018, through dmarcian Bulgaria EOOD
        (hereinafter referred to as dmarcian Bulgaria), a Bulgarian company in which dmarcian Europe
        holds all shares.

2.4    Draegen is CEO of dmarcian, Inc. and holds the majority of the shares in this company. C.
        Swenberg (hereinafter referred to as Swenberg), an employee of dmarcian, Inc. who was
        dismissed as of May 31, 2018, holds a minority equity interest in dmarcian, Inc. Swenberg
        commenced legal proceedings against dmarcian, Inc., Draegen and Groeneweg, claiming, among
        other things, shares in dmarcian, Inc. that he would have received upon continued employment.

2.5    TDX and Draegen are disputing the agreements underlying the 2016 collaboration between
        dmarcian Europe and dmarcian, Inc./Draegen. According to TDX, on January 22, 2016, dmarcian
        Europe, dmarcian, Inc., TDX and Draegen entered into an oral agreement on which their
        cooperation is based. According to Draegen, the parties have always based their collaboration
        on the email correspondence of December 2016 between him and Groeneweg about
        formalizing their collaboration, in which Draegen sent documents for signature (which were not
        signed). In any event, it is undisputed between the parties that in 2016 they agreed on at least:
        –    that dmarcian Europe is licensed to use and sell software originating from dmarcian, Inc;
        –    that dmarcian Europe is responsible for selling that software (and providing related
             services) to customers in Europe, Russia and Africa;
        –    that in return, dmarcian, Inc. and/or Draegen was able to purchase the majority equity
             interest in dmarcian Europe against payment of C 1.

Case number 200.281.257/01 OK                                                -5-

2.6    On August 6, 2018, Draegen emailed Groeneweg, among other things, the following:
       *"There are 2 main parts to consider: 1. (. ..) 2. Where is global IP located? (...) About
       location of IP: since EU has been licensing tech, it is likely impossible to home IP into the
       EU by default.. even though EU is paying to continue to develop (as US is also paying
       developers - so it's sort of a mixed issue). This means that some sort of asset transfer has
       to be made (...) along with a proper valuation of said IP".*

2.7    Groeneweg sent Draegen an email on December 4, 2019, which included the following content:
       *"This document describes the current situation that software owned by dmarcian Europe
       BV can't be sold by dmarcian, Inc. nor Dmarcian Asia Pacific Pty Ltd to customers as
       there's no license agreement in place to do so. Before this problem is solved new
       software including but not limited to DMARC delegation can't go live on other instances
       than the EU instance. This document describes a detailed solution for the above problem
       as well."*

       As an attachment, the email includes a document that includes the following representation of
       what Groeneweg says was agreed to in 2016:
       *"(...) Operational and license agreement between dmarcian Inc. and Mailmerk BV*
       a.  *Perpetual and exclusive free license for SaaS Software from dmarcian, Inc. to
           Mailmerk BV.*
       b.  *dmarcian, Inc. will take care of software development.*
       c.  *Mailmerk BV becomes dmarcian Europe BV exclusively handling all dmarcian
           customers from Russia, Europe and Africa.*
       d.  *All revenue generated from dmarcian customers from Russia, Europe and Africa will
           be dmarcian Europe BV revenue.*
       e.  *Both dmarcian, Inc. and dmarcian Europe BV keep operating as separate entities
           under 1 brand."*
       Furthermore, Groeneweg made proposals in the document for future cooperation with
       dmarcian, Inc. and Draegen, as well as for keeping TDX out of the Swenberg lawsuit (2.4).

2.8    On December 4, 2019, Draegen also responded to the proposal in Groeneweg's document for
       future collaboration. Draegen writes: *"I agree we'll need a licensing agreement to be put into
       place. Without going into details over email, it makes sense to reject the perpetual and exclusive
       license that Europe BV has enjoyed. (...) The proposed solution (...) isn't something I can support(
       ...)"*. On December 6, 2019, in an email to Groeneweg and others, he addressed some of the
       *"rather unpleasant surprises"* in the document.

Case number 200.281.257/01 OK                                                    -6-

In doing so, Draegen noted, *"The initial terms described around 22 January 2016 are either wrong or inaccurate"*, after which he offered his views on what was agreed upon in 2016. The conclusion of the email states that the errors in Groeneweg's document: "*have raised serious red flags"* and that the document has raised *"issues that cannot be ignored".*

2.9     On Friday, December 6, 2019, Draegen stated to all dmarcian employees worldwide during an *all hands meeting*:

> *"(...) Right now, I wear two hats. The CEO of the US legal entity, and the majority owner of the Dutch BV. With my CEO hat on, I have to protect the assets of the US company, including intellectual property. (...) I have to protect the property of the company, and need to interpret the letter* [Groeneweg's email of December 4, 2019, addn. Enterprise Court] *as an attempt to replace existing terms with new ones. We're now in a legal limbo (...) BV employee access has to be suspended and pretty much everything related to resources provided to the BV by the US entity has to be suspended".*

During the meeting, all employees of dmarcian Europe were denied access to the computer and other systems. This access was largely restored on Monday, December 9, 2019 before business hours. In addition, Draegen appointed a *Director of Software* for (among others) dmarcian Europe and dmarcian Bulgaria.

2.10    dmarcian Europe and Draegen/dmarcian, Inc. then made proposals to reach a solution, but none was forthcoming.

2.11    By email dated July 3, 2020 to Groeneweg and Kalkman, Draegen requested that a shareholders' meeting of dmarcian Europe be convened, with the agenda to include the proposal to remove TDX as a director of dmarcian Europe and to appoint Vision as such. dmarcian Europe, in accordance with its articles of association, convened a shareholders' meeting for August 13, 2020 for which these items were on the agenda. In view of these inquiry proceedings, the shareholders' meeting has been rescheduled for September 7, 2020.

2.12    On July 29, 2020, dmarcian Europe received a *non-binding indicative offer* to acquire the shares in dmarcian Europe from Valimail, Inc. a competitor of the dmarcian companies based in San Francisco, United States of America. The offer was added to the agenda of dmarcian Europe's shareholders' meeting on September 7, 2020. Valimail, Inc. wishes to conduct due diligence before it will be able to make a binding offer.

Case number 200.281.257/01 OK                                                                    -7-

2.13    At the oral hearing on August 20, 2020, the parties agreed that the dmarcian Europe
        shareholders' meeting convened for September 7, 2020, would not take place until the
        Enterprise Court had ruled on the applications of TDX and Draegen.

3.      The grounds for the decision

3.1     TDX has based its claim, alleging that there are reasonable grounds for doubting the proper
        policy and course of affairs of dmarcian Europe and that, in view of the company's condition,
        immediate relief should be given, on the following, in brief:

        i.      The relationship between Draegen on the one hand and dmarcian Europe (including its
                employees) and TDX on the other has been seriously disrupted by Draegen's conduct
                over the past few years and is now characterized by distrust. This was caused by the
                discussion between the parties regarding intellectual property, which intensified and
                became derailed as of December 4, 2019. dmarcian Europe proposed an agreement to
                dmarcian, Inc. regarding the software developed by it (and dmarcian Bulgaria), in which
                it had invested € 900,000, whereby - by way of mirror image of the agreement
                concluded on January 22, 2016 - dmarcian, Inc. is granted a license for the use and sale
                of that software. Draegen then went on a collision course by requiring dmarcian Europe
                to transfer the intellectual property in that software to dmarcian, Inc. for no
                consideration. To that end, and thus improperly, he is pressing for TDX's resignation as
                director of dmarcian Europe. Thus, he is unfairly inveigling power within dmarcian
                Europe for himself. By behaving in this manner, Draegen is abusing his position as
                majority shareholder to the detriment of dmarcian Europe for the benefit of his own
                position as major shareholder of dmarcian, Inc., and there is an impermissible conflict of
                interest. In addition, a dispute between TDX and Draegen over dividend policy caused a
                rupture between them.

Case number 200.281.257/01 OK                                                      -8-

    ii.    Incidentally, there is also unwanted interference by Draegen in the day-to-day operations of dmarcian Europe. In that context, TDX has pointed out Draegen's statement at the all hands meeting on December 6, 2019 (2.9), the subsequent denial of access to the vital computer and other systems for employees of dmarcian Europe, and Draegen's anticipation of TDX's resignation as a director of dmarcian Europe. This has caused significant unrest among the employees of dmarcian Europe. In addition, Draegen approached customers of dmarcian Europe with the incorrect message that dmarcian, Inc. manages all software and appointed a *Director of Software* of dmarcian Europe and dmarcian Bulgaria.

The requested immediate relief is necessary to prevent Draegen from making a power grab and taking over the intellectual property of dmarcian Europe.

3.2    dmarcian Europe endorses TDX's position.

3.3    Draegen has put forward a reasoned defense against TDX's application. The Enterprise Court will address this defense below where appropriate. Draegen based his independent application on the fact that there are other well-founded reasons for doubting the proper policy and course of affairs of dmarcian Europe and that, in view of the company's situation, immediate relief should be given. By way of explanation, he has put forward - in brief - the following:

    a.    TDX and dmarcian Europe falsely claim intellectual property rights in software belonging to dmarcian, Inc. By doing so, TDX and dmarcian Europe are violating the 2016 agreement between the parties under which dmarcian Europe uses and sells software under license from dmarcian, Inc. Through its letter and document dated December 4, 2019 (2.7), TDX sought to revise that agreement to benefit itself. By doing so, TDX put a bomb under the collaboration.

    b.    Furthermore, there has been a failure of governance by TDX because dmarcian Europe failed to enter into an intellectual property agreement with dmarcian Bulgaria regarding software developed by employees of dmarcian Bulgaria (to the extent that this is separate from the software originating from dmarcian, Inc.). As a result, the intellectual property rights to this software do not accrue to dmarcian Europe.

    c.    Since Kalkman, as a software developer, is not employed by dmarcian Europe and his management agreement with dmarcian Europe does not contain an IP assignment clause, the intellectual property on software developed by him risks being left behind in TDX, so it does not accrue to dmarcian Europe. As this poses a threat to dmarcian Europe, Draegen has requested clarification on this matter on several occasions, but TDX and dmarcian Europe have not provided it.

TDX has been pushing for an exit as a shareholder since December 2019 and has sought to drive up the price of its shares by causing a conflict over intellectual property rights and provoking the bid from competitor Valimail, Inc. In doing so, TDX is unfairly allowing its own interests to outweigh the interests of dmarcian Europe, according to Draegen.

Case number 200.281.257/01 OK                                                              -9-

3.4    The Enterprise Court holds as follows. The controversy over the intellectual property rights to
       the software and software applications developed by dmarcian Europe (and dmarcian Bulgaria)
       is at the heart of the dispute between the parties. TDX alleges that this software and software
       applications is/are separate from the software developed by dmarcian, Inc. such that the
       intellectual property thereof belongs to dmarcian Europe. The right to use and sell this software
       and software applications by dmarcian, Inc. must be based on a license to be granted by
       dmarcian Europe, TDX alleges. On the other hand, Draegen argues that the software developed
       by dmarcian Europe (and dmarcian Bulgaria) does not include more than additional features for
       improved use of the software sourced from dmarcian, Inc. so that the intellectual property
       thereof also belongs to dmarcian, Inc. The Enterprise Court first notes that only the ordinary civil
       court is competent for the legal assessment of that dispute. However, the Enterprise Court can
       note that this dispute is disruptive to dmarcian Europe's business; developing and selling
       software is its core business and the cooperation with dmarcian, Inc. is a necessary condition for
       this. Nevertheless, this cooperation is not sufficiently regulated by the parties, neither in
       general, nor with regard to the intellectual property rights to software and software applications
       that has been and will be developed and the licenses granted/to be granted in that connection
       (and their scope) in particular. There are no unambiguous agreements on this available, with the
       result that the collaboration has been put at risk by the current discussion on this, which is a
       serious obstacle to dmarcian Europe's business operations. In the opinion of the Enterprise
       Court, the existence of the aforementioned situation provides sufficient legitimate reasons to
       doubt the proper policy and course of affairs of dmarcian Europe. The Enterprise Court, as
       requested by both TDX and Draegen, will order an investigation into the policies and course of
       affairs of dmarcian Europe from January 1, 2016 to August 20, 2020.

3.5    Along with the parties, the Enterprise Court deems it necessary in view of the situation of
       dmarcian Europe, by way of an immediate relief, to appoint a third party as director of dmarcian
       Europe with a decisive vote, who is independently authorized to represent dmarcian Europe. It
       will also be the duty of such director to try to obtain clarity as to the question of where the
       intellectual property rights to the software and software applications developed by dmarcian
       Europe (and dmarcian Bulgaria) lie, or at least to make sufficiently clear agreements with
       dmarcian, Inc. about this and to record these. The Enterprise Court also sees reason to transfer
       the shares in dmarcian Europe - with the exception of one share held by each of the
       shareholders - in trust to an administrator to be appointed by it.

Case number 200.281.257/01 OK                                    -10-

3.6    The duty of the director to be appointed will also be to try to reach an amicable settlement
       between the parties.

3.7    The Enterprise Court sees no reason (as yet) for giving other immediate relief, such as
       suspending TDX as director of dmarcian Europe.

3.8    The Enterprise Court will order dmarcian Europe to pay the costs of the investigation and the
       director and administrator to be appointed.

3.9    The Enterprise Court will, for the time being, defer the appointment of an investigator so that it
       can be seen whether a solution to the dispute can already be achieved through the immediate
       relief to be given. Any of the parties or the director or administrator appointed by the Enterprise
       Court may at any time request the Enterprise Court to appoint the investigator.

3.10   The Enterprise Court will not immediately determine the maximum amount that the
       investigation may cost. After the investigator has been appointed, the Enterprise Court will ask
       the investigator to draw up a plan of action and an estimate of the costs of the investigation
       within six weeks and to send these to the Enterprise Court. The Enterprise Court will give the
       parties the opportunity to comment on that budget and then determine the maximum amount
       that the investigation may cost.

3.11   Finally, the Enterprise Court deems there to be grounds present to set off the costs of the
       proceedings between the appearing parties as stated below.

**4.    The decision**

The Enterprise Court:

orders an investigation into the policy and course of affairs of dmarcian Europe B.V. over the
period from January 1, 2016 to August 20, 2020 as described in paragraph 3.4 of this decision;

orders that the costs of the investigation will be borne by dmarcian Europe B.V. and that it will
provide security for the payment thereof to the satisfaction of the investigator before the
commencement of his work;

Case number 200.281.257/01 OK                                           -11-

stays, in connection with the provisions of paragraph 3.10 above, the determination of the maximum amount that the investigation may cost;

appoints Mr A.J. Wolfs as examining justice, as referred to in Section 2:350(4) of the Dutch Civil Code;

appoints by way of an immediate relief with immediate effect and for the time being for the duration of the proceedings - as far as necessary in deviation from the articles of association - a person to be designated and to be made known to the parties as director of dmarcian Europe B.V. with a decisive vote and rules that this director is independently authorized to represent dmarcian Europe B.V;

rules, for the time being for the duration of the proceedings, that the shares in dmarcian Europe B.V. - with the exception of one share held by each of the shareholders - are transferred in trust to a person to be designated and to be made known to the parties with effect from today;

rules that the salary and expenses of the director and the administrator of shares will be borne by dmarcian Europe B.V. and rules that dmarcian Europe B.V. will provide security for the payment thereof to the satisfaction of the director and the administrator before the commencement of their work;

sets off the costs of these proceedings between the appearing parties in the sense that each party bears their own costs;

declares this decision to be provisionally enforceable; dismisses all other applications.

This decision was given by A.J. Wolfs, chair, A.W.H. Vink and M.P. Nieuwe Weme, justices, and C. Smits-Nusteling RC and J.S.T. Tiemstra RA, members, in the presence of F.L.A. Straathof, clerk of the court, and pronounced in public on September 7, 2020.

[signature]                                                          [signature]

# beschikking

**GERECHTSHOF AMSTERDAM**
**ONDERNEMINGSKAMER**

zaaknummer: 200.281.257/01 OK

beschikking van de Ondernemingskamer van 10 september 2020

inzake

de besloten vennootschap met beperkte aansprakelijkheid
**THE DIGITAL XPEDITION (TDX) HOLDING B.V.,**
gevestigd te Dordrecht,
**VERZOEKSTER,**
advocaten: **mr. M.C. Luiten, mr. V.R.M. Appelman** en **mr. L. Geldof,** allen
kantoorhoudende te Rotterdam,


t e g e n


de besloten vennootschap met beperkte aansprakelijkheid
**DMARCIAN EUROPE B.V.,**
gevestigd te Dordrecht,
**VERWEERSTER,**
advocaten: **mr. A. van Bunge** en **mr. J. Kloots,** beiden kantoorhoudende te Rotterdam,


e n t e g e n


**Timothy George DRAEGEN,**
wonende te Brevard, North Carolina, Verenigde Staten van Amerika,
**BELANGHEBBENDE,**
advocaten: **mr. F. Henke** en **mr. P.A. Josephus Jitta,** kantoorhoudende te Amsterdam
respectievelijk Den Haag.

zaaknummer 200.281.257/01 OK                                                  - 2 -

1.    **Het verloop van het geding**

1.1    Verweerster wordt hierna aangeduid met dmarcian Europe.

1.2    Voor het verloop van het geding verwijst de Ondernemingskamer naar haar beschikking van
7 september 2020.

1.3    Bij die beschikking heeft de Ondernemingskamer een onderzoek bevolen naar het beleid en
de gang van zaken van dmarcian Europe over de periode vanaf 1 januari 2016 tot
20 augustus 2020 zoals omschreven in rechtsoverweging 3.4 van die beschikking en is bij
wijze van onmiddellijke voorziening met onmiddellijke ingang en vooralsnog voor de duur
van het geding – voor zover nodig in afwijking van de statuten – een nader door de
Ondernemingskamer aan te wijzen en aan partijen bekend te maken persoon benoemd tot
bestuurder van dmarcian Europe met doorslaggevende stem en bepaald dat deze bestuurder
zelfstandig bevoegd is dmarcian Europe te vertegenwoordigen en is bepaald vooralsnog voor
de duur van het geding dat de aandelen in dmarcian Europe – met uitzondering van één
aandeel van ieder van de aandeelhouders – ten titel van beheer zijn overgedragen aan een
nader door de Ondernemingskamer aan te wijzen en aan partijen bekend te maken persoon.

2.    **De gronden van de beslissing**

De Ondernemingskamer zal thans de hierna te vermelden personen aanwijzen als
bestuurder en beheerder van aandelen, een en ander zoals bedoeld in de beschikking van
7 september 2020.

3.    **De beslissing**

De Ondernemingskamer:

wijst aan als bestuurder zoals bedoeld in de beschikking van 7 september 2020 in deze zaak:
mr. H.J.M. Harmeling te Heemstede;

wijst aan als beheerder van aandelen zoals bedoeld in de beschikking van 7 september 2020
in deze zaak: mr. Y. Borrius te Amsterdam;

-214-

zaaknummer 200.281.257/01 OK                                                     - 3 -

verklaart deze beschikking uitvoerbaar bij voorraad.

Deze beschikking is gegeven door mr. A.J. Wolfs, voorzitter, mr. A.W.H. Vink en mr. M.P. Nieuwe Weme, raadsheren, en drs. C. Smits-Nusteling RC en drs. J.S.T. Tiemstra RA, raden, in tegenwoordigheid van mr. F.L.A. Straathof, griffier, en in het openbaar uitgesproken op 10 september 2020.




# decision

**AMSTERDAM COURT OF APPEAL**
**ENTERPRISE COURT**

case number: 200.281.257/01 OK

decision of the Enterprise Court dated September 10, 2020

in the case of

the private company with limited liability
**THE DIGITAL XPEDITION (TDX) HOLDING B.V.,**
with its registered office in Dordrecht,
**APPLICANT,**
lawyers: **M.C. Luiten, V.R.M. Appelman** and **L. Geldof**, all with offices in Rotterdam,

versus

the private company with limited liability
**DMARCIAN EUROPE B.V.,**
with its registered office in Dordrecht,
**RESPONDENT**,
lawyers: **A. van Bunge** and **J. Kloots**, both with offices in Rotterdam,

and versus

**Timothy George DRAEGEN,**
residing in Brevard, North Carolina, United States of America,
**INTERESTED PARTY,**
lawyers: **F. Henke** and **P.A. Josephus Jitta**, with offices in Amsterdam and The Hague respectively.

case number 200.281.257/ 01 OK                                                                    -2-

**1.      The course of the proceedings**

1.1      The respondent will be referred to below as dmarcian Europe.

1.2      For the course of the proceedings, the Enterprise Court refers to its decision of September 7, 2020.

1.3      In that decision , the Enterprise Court ordered an investigation into the policy and course of affairs of dmarcian Europe over the period from January 1, 2016 to August 20, 2020 as described in legal ground 3.4 of that decision and by way of immediate relief with immediate effect and for the time being for the duration of the proceedings - to the extent necessary in deviation from the articles of association - a person to be designated by the Enterprise Court and to be made known to the parties was appointed as director of dmarcian Europe with a decisive vote and it was ruled that this director is independently authorized to represent dmarcian Europe and it was ruled for the time being for the duration of the proceedings that the shares in dmarcian Europe - with the exception of one share of each of the shareholders - have been transferred in trust to a person to be appointed by the Enterprise Court and to be made known to the parties.

**2.      The grounds for the decision**

The Enterprise Court will now appoint the persons listed below as director and administrator of shares, all as referred to in the order of September 7, 2020.

.      **The decision**

The Enterprise Court:

appoints as director as referred to in the decision of September 7, 2020 in this case: H.J.M. Harmeling in Heemstede;

appoints as administrator of shares as referred to in the decision of September 7, 2020 in this case:   . Borrius in Amsterdam;

case number 200.281.257/ 01 OK                                                    -3-

declares the decision to be provisionally enforceable.

This decision was given by A.J. Wolfs, chair, A.W.H. Vink and M.P. Nieuwe Weme, justices, and C. Smits-Nusteling RC and J.S.T. Tiemstra RA, members, in the presence of F.L.A. Straathof, clerk of the court, and pronounced in public on September 10, 2020.


[signature]                                                              [signature]

# EXHIBIT B

# vonnis

**RECHTBANK ROTTERDAM**

Team handel en haven

zaaknummer / rolnummer: C/10/612223 / KG ZA 21-63

**Vonnis in kort geding van 1 februari 2021**

in de zaak van

de besloten vennootschap met beperkte aansprakelijkheid
**DMARCIAN EUROPE B.V.,**
gevestigd te Dordrecht,
eiseres,
advocaat mr. M.R.S. Bacon te Amsterdam,

tegen

1.      de rechtspersoon naar vreemd recht
**DMARCIAN INC.,**
gevestigd te Brevard (North Carolina, Verenigde Staten van Amerika)
2.      **TIMOTHY GEORGE DRAEGEN**,
wonende te Brevard (North Carolina, Verenigde Staten van Amerika),
gedaagden,
niet verschenen.

Partijen worden hierna dmarcian Europe, dmarcian Inc. en Draegen genoemd.

**1.      De procedure**

1.1.    Het verloop van de procedure blijkt uit:
- de dagvaarding van 29 januari 2021, met producties;
- de mondelinge behandeling gehouden op 1 februari 2021;
- de tijdens de mondelinge behandeling overgelegde aanvullende producties.

1.2.    Vonnis is bepaald op heden.

**2.      De beoordeling**

2.1.    Voor de feiten en het gevorderde wordt verwezen naar het gestelde in de
aangehechte kopie van de dagvaarding.

2.2.    dmarcian Inc. en Draegen zijn niet in de procedure verschenen. Met betrekking tot
de vraag of tegen hen verstek kan worden verleend wordt het volgende overwogen.

C/10/612223 / KG ZA 21-63                                                                                    2
1 februari 2021

2.3.      Van toepassing is het op 15 november 1965 te Den Haag tot stand gekomen
Verdrag inzake de betekening en de kennisgeving in het buitenland van gerechtelijke en
buitengerechtelijke stukken in burgerlijke en in handelszaken (hierna: het Haags
Betekeningsverdrag). Zowel de Verenigde Staten als Nederland zijn daarbij partij.

2.4.      dmarcian Europe hebben het voor dmarcian Inc. en Draegen bestemde exploot op
29 januari 2021 overeenkomstig het Haags Betekeningsverdrag en de Uitvoeringswet van
het verdrag juncto artikel 55 lid 1 Wetboek van Burgerlijke Rechtsvordering door het
uitbrengen van het exploot aan het parket van de ambtenaar van het Openbaar Ministerie bij
de rechtbank Rotterdam, met achterlating van twee afschriften van het exploot en met het
verzoek het exploot aan gedaagden te doen betekenen c.q. daarvan aan haar kennis te doen
geven overeenkomstig de artikelen 3 tot en met 6 van het Haags Betekeningsverdrag door
betekening of kennisgeving met inachtneming van de vormen die in de wetgeving van de
Verenigde Staten zijn voorgeschreven voor de betekening of kennisgeving van stukken die
in dat land zijn opgemaakt en bestemd zijn voor zich aldaar bevindende personen.
Daarnaast heeft dmarcian Europe een afschrift van de dagvaarding – voorzien van een
Engelse vertaling – per e-mails van 29 januari 2021 doen verzenden aan (de bestuurder van)
dmarcian Inc. en Draegen op de door hen (sinds de hierna nog te noemen OK-procedure)
gebruikte e-mailadressen en aan de Nederlandse advocaten van dmarcian Inc. en Draegen.

2.5.      Niet is gebleken dat de dagvaarding overeenkomstig artikel 15 lid 1 (en 2) van het
Haags Betekeningsverdrag is betekend of in persoon aan gedaagde is afgegeven. Op grond
van artikel 15 lid 3 van het Haags Betekeningsverdrag kan de voorzieningenrechter echter in
een kort geding verstek tegen een in het buitenland woonachtige gedaagde verlenen zonder
dat in spoedeisende gevallen behoeft te blijken dat aan de voorwaarden van artikel 15 lid 1
van het Haags Betekeningsverdrag is voldaan. Wel zal – met inachtneming van de vereiste
spoed – zoveel mogelijk overeenkomstig de doelstelling van het Haags Betekeningsverdrag,
gewaarborgd moeten zijn dat een uitgebracht exploot degene voor wie het is bestemd
daadwerkelijk heeft bereikt en – indien het zoals hier om een dagvaarding gaat – zo tijdig
dat deze nog de mogelijkheid heeft verweer te voeren (zie o.a. Hoge Raad 14 december
2007, ECLI:NL:HR:2007:BB7192).

2.6.      Bij ge-e-mailde brief van 22 januari 2021 heeft de mr. T. Jansen, advocaat te
Amsterdam namens dmarcian Inc. de overeenkomst met dmarcian Europe voorwaardelijk
opgezegd tegen 1 februari 2021 en aangezegd dat dmarcian Europe per die datum geen
toegang meer heeft tot de (computer)systemen. In een op diezelfde dag aan een
(mede)aandeelhouder van dmarcian Europe ge-e-mailde brief hebben mrs. F Henke en P.A.
Josephus Jitta, advocaten te Amsterdam, namens Draegen (de CEO van dmarcian Inc.) naar
die opzeggingsbrief verwezen. Bij e-mails van 25 januari 2021 heeft mr. V. van Druenen
namens dmarcian Europe dmarcian Inc. en Draegen via hun (Nederlandse) advocaten
gesommeerd om de toegang tot de systemen te herstellen. Daarbij heeft zij een kort geding
aangezegd. Bij e-mails van 26 januari 2021 hebben de advocaten van dmarcian Inc. en
Draegen aan dmarcian Europe laten weten dat hun cliënten aan deze sommatie geen gehoor
geven. Bij e-mail van 27 januari 2021 heeft de advocaat van Draegen aan dmarcian Europe
bericht dat zijn cliënt geen domicilie kiest op zijn kantoor.

2.7.      Gelet op de opzeggingsbrief van 22 januari 2021, de (inmiddels deels
doorgevoerde) ontzegging van dmarcian Europe tot de (computer)systemen en de door

C/10/612223 / KG ZA 21-63                                                    3
1 februari 2021

---

dmarcian Europe gestelde schade is het spoedeisend karakter van de door dmarcian Europe
gevorderde voorzieningen voldoende aannemelijk.

2.8.      Voorts is voldoende aannemelijk dat de aan de (gebruikelijke) e-mailadressen van
dmarcian Inc. en Draegen en hun advocaten verzonden dagvaarding dmarcian Inc. en
Draegen tijdig heeft bereikt en dat zij daarvan kennis hebben kunnen nemen. Bij dit oordeel
is mede in aanmerking genomen dat (i) de opzegging van de overeenkomst en de
aanzegging van de beëindiging van de toegang tot de systemen is verzonden door de
Nederlandse advocaat van dmarcian Inc.; (ii) Draegen blijkens de e-mail van zijn
(Nederlandse) advocaat van die opzegging en de gegeven termijnen op de hoogte was; (iii)
voorafgaand aan dit kort geding door de Nederlandse advocaten van dmarcian Inc. en
Draegen over deze zaak is gecorrespondeerd. Gelet op de door dmarcian Inc. en Draegen
gehanteerde termijnen en de communicatie via hun (Nederlandse) advocaten, is met
(digitale) verzending voldoende gewaarborgd dat zij de dagvaarding, al dan niet via hun
Nederlandse advocaten, tijdig hebben ontvangen.
Er bestaat dan ook voldoende grond om met toepassing van artikel 15 lid 3 van het Haags
Betekeningsverdrag over te gaan tot verstekverlening.

2.9.      Nu dmarcian Europe en Draegen hun woonplaats hebben in de Verenigde Staten,
dient de voorzieningenrechter haar bevoegdheid te baseren op de bepalingen van het
Wetboek van Burgerlijke Rechtsvordering (Rv). Met betrekking tot de vorderingen tegen
dmarcian Inc. is de voorzieningenrechter bevoegd op grond van artikel 6a Rv, omdat
aannemelijk is dat de contractuele verbintenis die aan de eis van dmarcian Europe ten
grondslag ligt (het toegang verschaffen tot de systemen) in Nederland moet worden
uitgevoerd. Met betrekking tot de vorderingen tegen Draegen is de voorzieningenrechter
bevoegd op grond van artikel 6e Rv, aangezien voldoende aannemelijk is dat het
schadebrengende feit (het Erfolgsort) in Nederland gelegen is.

2.10.     Gelet op het gestelde in de dagvaarding, past de voorzieningenrechter Nederlands
recht toe.

2.11.     Het gevorderde komt de voorzieningenrechter niet onrechtmatig of ongegrond
voor, zodat het – op de wijze zoals hierna vermeld – wordt toegewezen.

2.12.     In de dagvaarding heeft dmarcian Europe gesteld dat de inhoud van de
overeenkomst tussen dmarcian Europe en dmarcian Inc. tussen partijen in geschil is. Zij
heeft in dit verband onder meer verwezen naar de hierna vermelde beschikking van de
Ondernemingskamer. Gelet hierop is de primaire vordering onder 1a (nakoming van de
overeenkomst) onvoldoende bepaalbaar. Deze vordering is daarom niet toewijsbaar.

2.13.     Bij beschikking van 7 september 2020 heeft de Ondernemingskamer in een
procedure tussen onder meer dmarcian Europe en Draegen een onderzoek gelast naar het
beleid en de gang van zaken van dmarcian Europe. In deze beschikking heeft de
Ondernemingskamer overwogen dat dmarcian Europe en dmarcian Inc. onvoldoende
hebben geregeld. Vervolgens heeft de Ondernemingskamer overwogen dat partijen wel ten
minste het volgende zijn overeengekomen:
  • dat dmarcian Europe een licentie heeft voor het gebruik en de verkoop van de
    software afkomstig van dmarcian Inc.;

C/10/612223 / KG ZA 21-63                                                    4
1 februari 2021

- dat dmarcian Europe verantwoordelijk is voor de verkoop van die software (en het leveren van bijbehorende diensten) aan klanten in Europa, Rusland en Afrika.

2.14.    Gelet hierop, en op het gelaste onderzoek en de recente benoeming van een onderzoeker, acht de voorzieningenrechter de subsidiaire vordering onder 1b toewijsbaar, met dien verstande dat hieronder in ieder geval dient te worden verstaan de inhoud van de overeenkomst zoals deze door de Ondernemingskamer is vastgesteld. In het verlengde van deze toewijzing dienen dmarcian Inc. en Draegen, zoals onder 2 en deels onder 4 gevorderd, dmarcian Europe toegang te verlenen tot de (computer)systemen die nodig zijn om haar klanten te bedienen.

2.15.    De termijn waarbinnen dmarcian Inc. de toegang moet verlenen wordt bepaald op 24 uur na betekening van dit vonnis.

2.16.    De gevorderde dwangsommen worden gematigd en gemaximeerd zoals in de beslissing vermeld.

2.17.    dmarcian Inc. en Draegen worden als de in het ongelijk gestelde partijen, hoofdelijk, in de proceskosten veroordeeld. De kosten aan de zijde van dmarcian Europe worden begroot op:
- betekening oproeping    €         85,81
- griffierecht            €        667,00
- salaris advocaat        €        656,00
Totaal                    €      1.408,81

2.18.    De nakosten en de wettelijke rente worden toegewezen zoals in de beslissing vermeld.

## 3.    De beslissing

De voorzieningenrechter:

3.1.    verleent verstek tegen de niet verschenen gedaagden;

3.2.    gebiedt dmarcian Inc., bij wijze van ordemaatregel, gedurende het door de Ondernemingskamer gelaste onderzoek de tussen partijen bestaande overeenkomst na te komen en verbiedt haar gedurende die periode die overeenkomst te beëindigen;

3.3.    gebiedt dmarcian Inc. binnen 24 uur na betekening van dit vonnis de blokkade van (de medewerkers van) dmarcian Europe tot het SaaS-platform en de voor de uitoefening van haar bedrijfsactiviteiten vereiste (computer)systemen op te heffen en opgeheven te houden totdat de tussen partijen bestaande overeenkomst rechtsgeldig is beëindigd;

3.4.    veroordeelt dmarcian Inc. om aan dmarcian Europe een dwangsom te betalen van € 20.000,00 voor iedere dag of gedeelte daarvan dat zij niet aan de in dictumonderdeel 3.2 en 3.3. gegeven hoofdveroordeling voldoet, tot een maximum van € 500.000,00 is bereikt;

C/10/612223 / KG ZA 21-63                                                    5
1 februari 2021

3.5.      veroordeelt Draegen zich te onthouden van iedere handeling zelf of via een door
hem bestuurde vennootschap waaronder expliciet begrepen dmarcian Inc., die de
bedrijfsvoering van dmarcian Europe belemmert, totdat dan wel als gevolg van het door de
Ondernemingskamer gelaste onderzoek, dan wel als gevolg van een gerechtelijk
bodemvonnis, duidelijkheid ontstaat over de inhoud en reikwijdte van de aan dmarcian
Europe verstrekte licentieovereenkomst en de eigendom van de IE- rechten op de dmarcian
software;

3.6.      veroordeelt Draegen om aan dmarcian Europe een dwangsom te betalen van
€ 20.000,00 voor iedere dag of gedeelte daarvan dat hij niet aan de in dictumonderdeel 3.4
gegeven hoofdveroordeling voldoet, tot een maximum van € 500.000,00 is bereikt;

3.7.      veroordeelt dmarcian Inc. en Draegen, hoofdelijk, in de proceskosten, aan de zijde
van dmarcian Europe tot op heden begroot op € 1.408,81, te vermeerderen met de wettelijke
rente als bedoeld in art. 6:119 BW over dit bedrag met ingang van veertien dagen na
betekening van dit vonnis tot de dag van volledige betaling;

3.8.      veroordeelt dmarcian Inc. en Draegen, hoofdelijk, in de na dit vonnis ontstane
kosten, begroot op € 163,00 aan salaris advocaat, te vermeerderen, onder de voorwaarde dat
dmarcian Inc. en Draegen niet binnen 14 dagen na aanschrijving aan het vonnis hebben
voldaan en er vervolgens betekening van de uitspraak heeft plaatsgevonden, met een bedrag
van € 85,00 aan salaris advocaat en de explootkosten van betekening van de uitspraak, en te
vermeerderen met de wettelijke rente als bedoeld in art. 6:119 BW over de nakosten met
ingang van veertien dagen na de betekening van dit vonnis tot aan de voldoening;

3.9.      verklaart dit vonnis tot zover uitvoerbaar bij voorraad;

3.10.    wijst het meer of anders gevorderde af.

Dit vonnis is gewezen door mr. P. de Bruin en in het openbaar uitgesproken op
1 februari 2021.

3077/2009

# Judgment

**COURT OF ROTTERDAM**

Commerce and Port Team

case number / case list number: C/10/612223 / KG ZA 21-63

**Judgment in interim relief proceedings dated 01 February 2021**

in the matter of

The private company with limited liability **DMARCIAN EUROPE B.V.,**
having its registered office in Dordrecht,
claimant,
attorney: *mr.* M.R.S. Bacon in Amsterdam,


versus


1.  the legal entity incorporated under foreign law **DMARCIAN INC.,**
    having its registered office in Brevard (North Carolina, United States of America)
2   **TIMOTHY GEORGE DRAEGEN,**
    residing in Brevard (North Carolina, United States of America),
defendants,
having failed to appear.

Below, the parties will be referred to as "dmarcian Europe", "dmarcian Inc." and "Draegen".




**1.      The Proceedings**


1.1    The course of the proceedings is apparent from:
–       the subpoena of 29 January 2021, with exhibits;
–       the oral hearing on 01 February 2021;
–       the supplementary exhibits submitted during the oral hearing.

1.2    Pronouncement of judgment was fixed for today.

**2.    The Adjudication**

2.1    With regard to the facts and the claims reference is made to the arguments in the attached copy of the subpoena.

2.2    dmarcian Inc. and Draegen have failed to appear in the proceedings. With regard to the question of whether leave to proceed in default can be granted against them, the following is considered.

2.3    The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters of 15 November 1965 established in The Hague (the "Hague Service Convention") is applicable. Both the United States and the Netherlands are parties to this Convention.

2.4    In accordance with the Hague Service Convention on Jurisdiction and the Implementation Act of the Convention in conjunction with Section 55 subsection 1 of the Code of Civil Procedure, dmarcian Europe have delivered the writ addressed to dmarcian Inc. and Draegen on 29 January 2021 by delivering the writ to the public prosecutor's office at the Court of Rotterdam, leaving two copies of the writ and requesting that the writ be served on the defendants and/or be notified on the defendants in accordance with Articles 3 through 6 of the Hague Service Convention by service or notification in the manner prescribed by the laws of the United States of America for the service or notification of documents drawn up in that country and intended for persons residing in that country.
In addition, dmarcian Europe had a copy of the subpoena – with an English translation – sent by emails of 29 January 2021 to (the director of) dmarcian Inc. and Draegen on the email addresses used by them (since the Enterprise Section proceedings to be referred to below) and to the Dutch attorneys of dmarcian Inc. and Draegen.

2.5    There is no evidence that the subpoena was served or delivered in person to the defendant in accordance with Article 15(1) (and 2) of the Hague Service Convention. Pursuant to Article 15(3) of the Hague Service Convention, the court hearing an application for interim relief may grant leave to proceed in default of appearance against a defendant domiciled abroad without it being necessary, in urgent cases, to prove that the conditions of Article 15(1) of the Hague Service Convention have been met. However – with due regard for the required urgency – it will have to be ensured, as much as possible in accordance with the objective of the Hague Service Convention, that an issued writ has actually reached the addressee and – if, as in this case, it concerns a subpoena – in time so that this addressee still has the opportunity to put forward a defense (see *inter alia* Supreme Court, 14 December 2007, ECLI:NL:HR:2007:BB7192).

2.6    On behalf of dmarcian Inc., by emailed letter dated 22 January 2021 T. Jansen, attorney in Amsterdam, conditionally terminated the agreement with dmarcian Europe as of 01 February 2021, and gave notice that as of that date dmarcian Europe will no longer have access to the (computer) systems.
In an emailed letter of that same day to a (fellow) shareholder of dmarcian Europe, F. Henke and P.A. Josephus Jitta, attorneys in Amsterdam, referred to this termination letter on behalf of Draegen (CEO of dmarcian Inc.). By mails dated 25 January 2021 on behalf of dmarcian Europe, attorney V. van Druenen demanded dmarcian Inc. and Draegen via their (Dutch) attorneys to restore access to the systems. She also announced that interim relief proceedings would be brought. By mails dated 26 January 2021, the attorneys of dmarcian Inc. and Draegen informed

dmarcian Europe that their clients would not comply with this demand. By mail dated 27 January 2021, Draegen's attorney informed dmarcian Europe that his client would not elect domicile at his office.

2.7    In view of the termination letter dated 22 January 2021, the (by now partially implemented) denial of access of dmarcian Europe to the (computer) systems and the loss alleged by dmarcian Europe, the urgency of the relief sought by dmarcian Europe is sufficiently plausible.

2.8    Furthermore, it is sufficiently plausible that the subpoena sent to the (usual) e-mail addresses of dmarcian Inc. and Draegen and their attorneys have reached dmarcian Inc. and Draegen in time and that they were able to take note of it. The following aspects have been considered in this adjudication: (i) that the termination of the agreement and the notice of termination of the access to the systems were sent by the Dutch attorney of dmarcian Inc.; (ii) that Draegen was aware of this termination and the deadlines given, as appears from the e-mail of his (Dutch) attorney; (iii) that prior to these interim relief proceedings the Dutch attorneys of dmarcian Inc. and Draegen have corresponded on this matter. Given the deadlines set by dmarcian Inc. and Draegen and the communication via their (Dutch) attorneys, the (digital) dispatch is sufficient guarantee that they have timely received the subpoena, whether or not through their Dutch attorneys.
Under application of Article 15 (3) of the Hague Service Convention, there is sufficient ground to grant leave to proceed in default of appearance.

2.9    As dmarcian Europe and Draegen are domiciled in the United States, the judge in interim relief proceedings must base his competence on the provisions of the Code of Civil Procedure (CCP). With regard to the claims against dmarcian Inc., the judge in interim relief proceedings is competent under Section 6a CCP, as it is plausible that the contractual obligation on which the claim of dmarcian Europe is based (granting access to the systems) must be executed in the Netherlands. With regard to the claims against Draegen, the judge in interim relief proceedings is competent under Section 6e CCP, as it is plausible that the harmful event (the *Erfolgsort*) is located in the Netherlands.

2.10   In view of what is stated in the subpoena, the interim relief judge will apply Dutch law.

2.11   The Court does not consider the claims to be unlawful or unfounded, so that they will be awarded in the manner to be described below.

2.12   In the subpoena, dmarcian Europe asserted that the dispute between the parties concerns the substance of the agreement between dmarcian Europe and dmarcian Inc.. In this context, dmarcian Europe referred to the decision to be referred to below of the Enterprise Section of the Court of Appeal. In view of this, the primary claim under la (performance of the agreement) is insufficiently determinable. Therefore, this claim is not allowable.

2.13   By decision of 7 September 2020 in proceedings between (*inter alia*) dmarcian Europe and Draegen, the Enterprise Section ordered an investigation into the policy and course of affairs of dmarcian Europe. In this decision, the Enterprise Section considered that dmarcian Europe and dmarcian Inc. have not put sufficient regulations in place. Subsequently, the Enterprise Section considered that the parties have at least agreed on the following:

o   that dmarcian Europe has a license for the use and the sale of the software
    originating from dmarcian Inc.;

o   that dmarcian Europe is responsible for the sale of that software (and the
    provision of associated services) to customers in Europe, Russia and Africa.

2.14   In view of this, and in view of the ordered investigation and the recent appointment
       of an investigator, the interim relief judge deems the alternative claim under 1b
       allowable, on the understanding that this should in any case include the contents of
       the agreement as established by the Enterprise Section. In line with this allowance,
       dmarcian Inc. and Draegen, as claimed under 2 and partly under 4, must grant
       dmarcian Europe access to the (computer) systems necessary to service its
       customers.

2.15   The term within which dmarcian Inc. must grant this access is set at 24 hours after
       service of this judgment.

2.16   The penalties claimed will be moderated and maximized as mentioned in the
       decision.

2.17   As the parties ruled against, dmarcian Inc. and Draegen will be ordered – jointly and
       severally – to pay the costs of the proceedings. The costs on the part of which
       dmarcian Europe are estimated at:

| – service of notice to appear | € | 85,81 |
|---|---|---|
| – court registry fee | € | 667.00 |
| – attorney's fees | € | 656.00 |
| Total | € | 1,408.81 |

2.18   The subsequent costs and the statutory interest will be allowed as mentioned in the
       decision.

**3.       The Decision**

The Court, giving judgment in interim proceedings:

3.1.   grants leave to proceed in default  against the defendants who failed to appear;

3.2.   orders dmarcian Inc., as a disciplinary measure, during the investigation ordered by
       the Enterprise Section, to perform the agreement existing between the parties and
       prohibits it from terminating that agreement during that period;

3.3.   orders dmarcian Inc. within 24 hours after service of this judgment to lift the
       blockade of (the employees of) dmarcian Europe to the SaaS platform and the
       (computer) systems required for the execution of its business activities and to keep it
       lifted until the existing agreement between the parties has been legally terminated;

3.4.   orders dmarcian Inc. to pay a penalty of €20,000 to dmarcian Europe for each day or
       part of a day that it fails to comply with the main order issued in operative parts 3.2
       and 3.3., until a maximum of €500,000 is reached;

3.5.  orders Draegen to refrain from any action undertaken by himself or through a company managed by him, expressly including dmarcian Inc., which impedes the business operations of dmarcian Europe, until or as a result of the investigation ordered by the Enterprise Section, or as a result of a judgment on the merits, clarity has been created about the contents and scope of the license agreement granted to dmarcian Europe and the ownership of the IP rights to the dmarcian software;

3.6.  orders Draegen to pay a penalty to dmarcian Europe of €20,000 for each day or part of a day that it fails to comply with the main order pronounced in operative part 3.4., until a maximum of €500,000 is reached;

3.7.  orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs of the proceedings, estimated to date at €1,408.81 on the part of dmarcian Europe, plus the statutory interest as referred to in Section 6:119 DCC on this amount starting fourteen days after service of this judgment until the day of full payment;

3.8.  orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs incurred after this judgment, estimated at €163.00 for the attorney's fees, to be increased, on condition that dmarcian Inc. and Draegen have not complied with the judgment within 14 days after notice was given and service was subsequently effected, by an amount of €85.00 for attorney's fees and the costs of serving notice of the judgment, and to be increased by the statutory interest as referred to in art. 6:119 DCC on the subsequent costs starting fourteen days after service of this judgment until the date of payment;

3.9.  declares this judgment provisionally enforceable up to here,

3.10.    dismisses all other claims.


This judgment was rendered by Judge P. de Bruin and pronounced in open court on 1 February 2021.

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**BREVARD DIVISION**
**Case No. 1:21-CV-00067**

| | |
|---|---|
| DMARCIAN, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>DMARCIAN EUROPE BV,<br><br>*Defendant*. | ) <br> ) <br> ) <br> ) <br> )   **MEMORANDUM IN OPPOSITION TO** <br> )       **MOTION FOR TEMPORARY** <br> )        **RESTRAINING ORDER** <br> ) <br> ) <br> ) <br> ) |

Defendant dmarcian Europe BV ("dmarcian Europe") files this memorandum in opposition to the Motion of Plaintiff Pursuant to Fed. R. Civ. P. No. 65 Seeking Temporary Restraining Order and Preliminary Injunction (ECF No. 6).  dmarcian Europe has not been served with the Summons or Complaint, and it intends to present a Rule 12 motion based on, among other things, lack of personal jurisdiction at the appropriate time.  dmarcian Europe reserves all such Rule 12 defenses and appears here solely to explain why Plaintiff has failed to establish jurisdiction for this Court to grant emergency injunctive relief against dmarcian Europe.

## <u>INTRODUCTION</u>

Plaintiff asks this Court to enjoin dmarcian Europe – a Dutch company that has not been served with process – from operating its email-protection business in Europe, Russia, and Africa. This interruption would be fatal to dmarcian Europe's business because customers demand continuous, reliable protection from cyber threats.  An injunction that prevents dmarcian Europe from serving those customers would also contradict a Dutch court's recent judgment that Plaintiff and its founder must "grant dmarcian Europe access to the (computer) systems necessary to service its customers." Court of Rotterdam Judgment ¶ 2.14, ECF No. 8-14.

The Court should deny Plaintiff's Motion because Plaintiff has not shown, as it must, that this Court has personal jurisdiction over dmarcian Europe. *See R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir. 1999). There is no reference to this Court's jurisdiction in Plaintiff's Motion (ECF No. 6) or in its 39-page Memorandum of Law (ECF No. 7). Nor is there any reference in those documents to a purported connection between dmarcian Europe and North Carolina. Instead, Plaintiff alleges that dmarcian Europe is taking various actions *in Europe* in violation of Plaintiff's intellectual property and associated rights. This Court has no jurisdiction over that European conduct.

This dispute between Plaintiff and dmarcian Europe must be resolved in Europe, where legal proceedings have already resulted in a February 1, 2021, injunction requiring Plaintiff to stop interfering with dmarcian Europe's business. *See* Court of Rotterdam Judgment ¶ 2.14. Rather than comply with that Judgment, Plaintiff filed this lawsuit on March 12, 2021. Then, on March 25, 2021 – 52 days after the Rotterdam Judgment – Plaintiff moved for a temporary restraining order and argued that "*immediate* restraints" are necessary to protect Plaintiff given events taking place "over the past 4–6 weeks" following that Judgment. Pl.'s Mem. at 1–2, ECF No. 7. Plaintiff accuses dmarcian Europe of making "false statements" in the Dutch proceeding, and it faults the Court of Rotterdam for issuing a "purported" injunction requiring "Plaintiff to restore all access to Plaintiff's platform, regardless of Plaintiff's intellectual property rights." *Id*. at 11. These complaints about Plaintiff's conduct in the Netherlands and about the proceedings in Dutch court must be resolved in the Netherlands (or another venue with personal and subject matter jurisdiction). Plaintiff is wrong to ask a U.S. Court to interfere with those proceedings and decide whether – as a matter of European, Russian, and African law – dmarcian Europe can continue to operate its business in those locations.

In no event should this Court issue a restraining order that would kill a European business, in contravention of a European judgment, based on allegations of European conduct related to customers in Europe, Russia, and Africa. That result would reward Plaintiff for violating the Dutch injunction, inflict irreparable harm on dmarcian Europe, and offend traditional notions of fair play and substantial justice.

## BACKGROUND

Timothy Draegen ("Draegen") is the "founder and former Chief Executive Officer" of Plaintiff. Decl. of Draegen ¶ 1, ECF No. 9. Plaintiff sells software relating to DMARC, "an email validation system." *Id*. ¶ 3. dmarcian Europe is a Dutch legal entity that has existed since 2013. In January 2016, Plaintiff, dmarcian Europe, and others entered into an oral agreement under which dmarcian Europe would "*develop the European DMARC market* using dmarcian technology." *Id*. ¶ 9 (emphasis added).

No written agreement was ever executed regarding the relationship between Plaintiff and dmarcian Europe. *See id*. ¶¶ 9, 19. Nonetheless, "it is undisputed" by Draegen that Plaintiff, dmarcian Europe, and others "entered into an oral agreement" under which the parties agreed (among other things) that (1) "dmarcian Europe is licensed to use and sell software originating from [Plaintiff]," and (2) "dmarcian Europe is responsible for selling that software (and providing related services) to customers in Europe, Russia and Africa." Amsterdam Court of Appeal Decision ¶ 2.5, ECF No. 10-1; *accord* Court of Rotterdam Judgment ¶ 2.7.

In the years since dmarcian Europe began selling the software in Europe, Russia, and Africa, the relationship between Plaintiff and dmarcian Europe was "seriously disrupted by Draegen's conduct." Amsterdam Court of Appeal Decision ¶ 3.1(i). In particular, Draegen denied "all employees of dmarcian Europe . . . access to the computer and other systems" for two days in December 2019. *Id*. ¶ 2.9.

This disruptive conduct spurred a lawsuit between Draegen, dmarcian Europe, and others in Dutch court. Draegen argued to the Enterprise Court of the Amsterdam Court of Appeal that his conduct was justified because "dmarcian Europe falsely claim[s] intellectual property rights in software belonging to [Plaintiff]." *Id*. ¶ 3.3(a). In response to this allegation, the Enterprise Court "order[ed] an investigation into the policies and course of affairs of dmarcian Europe from January 1, 2016 to August 20, 2020." *Id*. ¶ 3.4.

While that investigation was ongoing, Plaintiff "terminated the agreement with dmarcian Europe as of 01 February 2021, and gave notice that as of that date dmarcian Europe will no longer have access to the (computer) systems." Court of Rotterdam Judgment ¶ 2.6. Plaintiff and Draegen then "failed to appear in the proceedings" before the Court of Rotterdam to explain their actions. *Id*. ¶ 2.2. The Court of Rotterdam determined that there was "sufficient ground to grant leave to proceed in default of appearance," *id*. ¶ 2.5, and it ordered Plaintiff and Draegen to "grant dmarcian Europe access to the (computer) systems necessary to service its customers," *id*. ¶ 2.14. The Court of Rotterdam has also fixed the penalty for non-compliance: €20,000 ($23,600) per day, up to €500,000 ($590,000) in total. *Id*. ¶ 3.4.[1] This €500,000 penalty is significantly less than the "€900,000" ($1,062,000) that dmarcian Europe has "invested" in "the software developed by it." Amsterdam Court of Appeal Decision ¶ 3.1(i).

Plaintiff did not comply with the Dutch Judgment. Plaintiff instead sued dmarcian Europe in this Court. Plaintiff claims that dmarcian Europe is "serving customers in the European Union, Russia and Africa," Compl. ¶ 34(c), ECF No. 1, using domain names such as "dmarcian.eu, dmarcian.co.uk, [and] finance.dmarcian.eu," *id*. ¶ 138, all in purported violation of Plaintiff's intellectual property rights. Plaintiff also faults dmarcian Europe for asserting that "new code

---

[1] All conversions from Euros to United States Dollars are based on an exchange ratio of 1:1.18,

developed by [dmarcian Europe]'s employees and the Bulgarian developers belonged to [dmarcian

Europe] and not Plaintiff." *Id*. ¶ 36.  Plaintiff asks this Court to prohibit dmarcian Europe – a

"Dutch private company," Compl. ¶ 2 – from

> (1) making, using, distributing, and/or selling dmarcian software Code/derivative
> works; (2) directly or indirectly using Plaintiff's Marks or any other similar mark,
> word, or name similar likely to cause confusion, mistake, or deceive; (3) infringing
> Plaintiff's registered copyright; (4) misrepresenting its present affiliation with
> Plaintiff; and (5) interfering with customer relationships, contacting, posting false
> notice to, and misrepresenting falsely to customers that Plaintiff caused a breach of
> customer data,

Mot. TRO at 1–2, ECF No. 6.

On March 29, 2021, counsel for dmarcian Europe appeared in this action "solely for the

purpose of contesting the jurisdiction of this Court and the propriety of injunctive relief against

dmarcian Europe."  Notice Appearance & Req. Br. Scheduling at 1, ECF No. 10.  Counsel

explained that he had been retained that day and "respectfully suggest[ed] that he be granted the

opportunity to fully evaluate the facts and law related to this action and to file an opposition to the

pending Motion for Temporary Restraining Order and Preliminary Injunction no later than 21 days

from this date, April 19, 2021." *Id*. at 3 ¶ 7.  That same day, the Court ordered that dmarcian

Europe "shall have until 12:00 pm on March 30, 2021 to respond to the Plaintiff's motion for a

temporary restraining order."  Mar. 29, 2021 Text-Only Order.  Counsel for dmarcian Europe now

files this opposition based on the limited information available at this stage.

## STANDARD OF REVIEW

A temporary restraining order is an "emergency procedure and is appropriate only when

the applicant is in need of immediate relief." *Smith v. Buncombe Cty.*, No. 1:14-CV-00224-MR-

DLH, 2014 WL 4245030, at \*2 (W.D.N.C. Aug. 26, 2014).  A plaintiff seeking a temporary

restraining order "must demonstrate that: (1) it is likely to succeed on the merits; (2) it will likely

suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in its favor; and (4) the injunction is in the public interest." *Coble v. Lake Norman Charter Sch., Inc.*, No. 3:20-CV-596, 2020 WL 6545871, at *3 (W.D.N.C. Nov. 6, 2020). Further, under the "mandatory and unambiguous" language of Rule 65(c), the "district court must fix a bond whenever it grants a preliminary injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).

## ARGUMENT

This Court should deny the temporary restraining order because Plaintiff is asking this Court to rule on matters taking place outside the United States. This Court lacks personal jurisdiction over dmarcian Europe, and it lacks subject matter jurisdiction to apply U.S. intellectual property and related law to conduct allegedly taking place in Europe, Russia, and Africa. If the Court nonetheless issues an injunction, the Court should require Plaintiff to provide security in the amount fixed by the Court of Rotterdam: $590,000.

**I.    The Motion for Temporary Restraining Order Should Be Denied Based on Plaintiff's Failure to Establish Personal Jurisdiction over dmarcian Europe.**

"Injunctive relief, by its very nature, can only be granted in an in personam action commenced by one party against another in accordance with established process." *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir. 1999). Thus, "a party cannot obtain injunctive relief against another without first obtaining in personam jurisdiction over that person or someone in legal privity with that person." *Id.*; *accord Gilchrist v. Gen. Elec. Cap. Corp.*, 262 F.3d 295, 301 (4th Cir. 2001) ("any injunction entered against individuals is an in personam action that may be enforced against individuals only over whom the court has personal jurisdiction"). This Court should not enter injunctive relief against dmarcian Europe because Plaintiff has failed to show personal jurisdiction in North Carolina.

6

Personal jurisdiction for all claims in this action must be founded upon the jurisdictional statutes of the State in which this Court sits. *See Vishay Intertechnology, Inc. v. Delta International, Corp.*, 696 F.2d 1062, 1064–65 (4th Cir. 1982). Thus, the propriety of the exercise of jurisdiction over dmarcian Europe will be determined under the North Carolina long-arm statute, N.C. Gen. Stat. § 1-75.4. *See id.*

Plaintiff makes various conclusory assertions in its Complaint that the Court "has personal jurisdiction over dmarcian Europe BV on several grounds," Compl. ¶ 7, but those allegations are unsupported and, in any event, do not make out the required showing under N.C. Gen. Stat. § 1-75.4 with respect to the quantity or quality of dmarcian Europe's contacts with North Carolina.

As the North Carolina Supreme Court has held,

> resolving the question of the existence of *in personam* jurisdiction involves a two-step inquiry. A court attempting to exercise personal jurisdiction over a nonresident defendant must first determine whether a statute, such as N.C.G.S. § 1–75.4(5), permits the court to entertain an action against the defendant. If there is a statute authorizing the court to act, the court must further determine whether the nonresident defendant has sufficient, minimum contacts with the state so that maintenance of the suit within the courts of North Carolina will not offend "traditional notions of fair play and substantial justice."

*Johnston Cty. v. R.N. Rouse & Co.*, 331 N.C. 88, 95–96, 414 S.E.2d 30, 35 (1992) (citations omitted) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)); *accord Beem USA Ltd.-Liab. Ltd. P'ship v. Grax Consulting LLC*, 838 S.E.2d 158, 161 (N.C. 2020).

### A.    Plaintiff has not Established Jurisdiction over dmarcian Europe Under the Specific Provisions of the North Carolina Long-Arm Statute.

Plaintiff cannot show that the conduct it complains of is covered under the long-arm statute. Section 1-75.3(b) of the North Carolina General Statutes provides that a "court of this state having jurisdiction of the subject matter may render a judgment against a party personally only if there

7

exists one or more of the jurisdictional grounds set forth in G.S. 1-75.4 or G.S. 1-75.7." Plaintiff

does not identify which, if any, of those jurisdictional grounds it believes apply here. *See* Compl.

¶¶ 7–12. Nonetheless, there are only two conceivable bases for jurisdiction applicable to Plaintiff.

Such bases are set forth in N.C. Gen. Stat. § 1-75.4(4) & (5) and are as follows:

> (4)    Local Injury; Foreign Act. -- In any action for wrongful death occurring
> within this State or in any action claiming injury to person or property
> within this State arising out of an act or omission outside this State by the
> defendant, provided in addition that at or about the time of the injury either:
>
> > a.   Solicitation or services activities were carried on within this State by or
> > on behalf of the defendant; [or]
> >
> > b.   Products, materials or thing processed, serviced or manufactured by the
> > defendant were used or consumed, within this State in the ordinary
> > course of trade . . . .
>
> (5) Local Services, Goods or Contracts.--In any action which:
>
> > a.   Arises out of a promise, made anywhere to the plaintiff or to some third
> > party for the plaintiff's benefit, by the defendant to perform services
> > within this State or to pay for services to be performed in this State by
> > the plaintiff; or
> >
> > b.   Arises out of services actually performed for the plaintiff by the
> > defendant within this State, or services actually performed for the
> > defendant by the plaintiff within this State if such performance within
> > this State was authorized or ratified by the defendant . . . .

N.C. Gen. Stat. § 1-75.4. Both of these provisions, however, are inapplicable because there is no

allegation, let alone evidence, that dmarcian Europe – as required by subsection (4) – solicited

within the State or provided products used within the State – or that dmarcian Europe – as required

under subsection (5) – perform any services within the State. Thus, Plaintiff cannot satisfy the

first prong of the jurisdictional test, demonstrating that the language of the jurisdictional statute

"authoriz[es] the court to act." *R.N. Rouse & Co.*, 331 N.C. at 96, 414 S.E.2d at 35.

B.    **Plaintiff has not Established that dmarcian Europe has Minimum Contacts with North Carolina for the Purpose of Exercising Personal Jurisdiction in Accordance with Due Process.**

"The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has 'certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (alteration in original) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"  *Id*. (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

In this case, it would offend the traditional notions of fair play at the heart of due process to exercise personal jurisdiction over dmarcian Europe.  None of the claimed contacts with North Carolina, either separately or in the aggregate, are sufficient to establish personal jurisdiction over it.  Plaintiff alleges that dmarcian Europe "contracted with Plaintiff within this state" and that "the contract and agreements at issue herein have a substantial connection to this state," Compl. ¶ 7, but "the plaintiff cannot be the only link between the defendant and the forum," *Walden v. Fiore*, 571 U.S. 277, 285 (2014); *accord Phoenix Am. Corp. v. Brissey*, 46 N.C. App. 527, 532, 265 S.E.2d 476, 480 (1980) ("[T]he mere act of entering into a contract with a forum resident, as here, will not provide the necessary minimum contacts with the forum state, especially when all the elements of the defendants' performance, as here, are to take place outside the forum.").  Instead, the defendant must reach out into the forum "by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Walden*, 571 U.S. at 285 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985)).

There is no allegation or evidence here that dmarcian Europe had continuing, wide-reaching contacts with North Carolina or took advantage of this state's laws.  Accordingly, this

9

case falls squarely within a line of cases from the North Carolina appellate courts in which a nonresident defendant is sought to be haled into court in North Carolina based upon a single contract with a North Carolina plaintiff.  In the words of the North Carolina Court of Appeals:

> In determining whether a single contract may serve as a sufficient basis for the exercise of in personam jurisdiction, it is essential that there be some act by which defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.  For only then will the non-resident have acted in such a way such that he can reasonably anticipate being haled into court there.  Otherwise, exercise of in personam jurisdiction over a non-resident would violate standards of fair-play and substantial justice.

*CFA Med., Inc. v. Burkhalter*, 95 N.C. App. 391, 394–95, 383 S.E.2d 214, 216 (1989) (internal quotations and citations omitted).  In *CFA Medical*, for example, the court refused to find sufficient minimum contacts with respect to a nonresident defendant who entered into a contract with the plaintiff, a North Carolina corporation, agreeing "to make sales calls on potential customers and solicit orders on behalf of plaintiff in several states other than North Carolina."  *Id.* at 392, 383 S.E.2d at 214.

In reaching its decision, the court relied on a number of factors including that:

- "there is no provision in the contract requiring the defendant to perform services within North Carolina," *id*. at 396, 383 S.E.2d at 217;

- "defendant has performed all services under the contract outside North Carolina," *id*.;

- "for the life of the contract the defendant has not been in the state for any purpose," *id*.; and

- "defendant has not originated contact with any North Carolina market or industry," *id*.

The allegations of the Complaint appear to show that each of these factors is present in this case.  Moreover, the *CFA Medical* Court found that "the mere mailing of a payment from outside the state is not sufficient to sustain *in personam* jurisdiction in the forum state."  *Id.*

In addition, other factors discussed in *CFA Medical* and other North Carolina appellate cases under its long-arm statute also counsel in favor of declining to find sufficient minimum contacts here. The North Carolina Court of Appeals has held on numerous occasions, "[t]he mere act . . . of entering into a contract with a resident of a forum state will not provide sufficient minimum contacts with that forum." *Tutterow v. Leach*, 107 N.C. App. 703, 708, 421 S.E.2d 816, 820 (1992). This is particularly so when, as here, "the defendant's performance is to occur exclusively outside the forum." *CFA Medical*, 95 N.C. App. at 396, 383 S.E.2d at 217; *see also Tutterow*, 107 N.C. App. at 709, 421 S.E.2d 816, 820 (refusing to find sufficient minimum contacts when "no provision in the contract requir[ed] defendant to perform services in North Carolina"); *Curvcraft, Inc. v. J.C.F. & Associates, Inc.*, 84 N.C. App. 450, 452, 352 S.E.2d 848, 849 (1987) (refusing to find sufficient minimum contacts when "services to be performed under the contract were to occur outside North Carolina"); *Marion v. Long*, 72 N.C. App. 585, 588, 325 S.E.2d 300, 303 (1985) (refusing to find sufficient minimum contacts when "services contracted for . . . were to be performed exclusively in Georgia"); *Mod. Globe, Inc. v. Spellman*, 45 N.C. App. 618, 624, 263 S.E.2d 859, 863 (1980) (refusing to find sufficient minimum contacts when "there is no provision in the contract requiring defendant to perform services within North Carolina").

In this case, nothing in the oral agreement between Plaintiff and dmarcian Europe appears or purports to require – or even permit – dmarcian Europe to perform any act or service in North Carolina and there is, in any event, no evidence showing that it performed any in North Carolina for Plaintiff or anyone else. As Draegen explained in a November 2019 declaration filed in the Superior Court of California:

> dmarcian, Inc. and dmarcian Europe BV are distinct separate entities, owned and operated separately. They share the dmarcian name and there is one dmarcian.com website to keep the customer experience simple. Once a customer makes an account and selects its geographic region, the customer is directed to the appropriate entity

> depending on its geography. The dmarcian brand website only mentions "dmarcian Europe BV" on the "Contact US" page, which also identifies the other legal entities involved. dmarcian, Inc. and dmarcian Europe BV are separate legal entities . . . . Once customer leads are assigned, dmarcian Europe BV maintains its own [Customer Relations Management System] that is entirely distinct from the [System] used by dmarcian, Inc.

Decl. of Timothy Draegen ¶¶ 15–16 (Nov. 8, 2019) (attached as Exhibit 1). In short, dmarcian Europe is a separate entity operating in its own geographic region, comprising Europe, Russia, and Africa. It does not do business in the United States (or North Carolina). Plaintiff's allegations that dmarcian Europe is operating in Europe, Russia, and Africa in violation of Plaintiff's rights cannot establish minimum contacts with North Carolina.

**II.    If a Temporary Restraining Order is Entered, Plaintiff Should Be Required to Post a Bond in the Amount of the Judgment Against it in the Rotterdam Court.**

Federal Rule of Civil Procedure 65(c) authorizes a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In determining the amount of this security, "the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Great Am. Ins. Co. v. Glob. Team Elec., LLC*, No. 320CV00218RJCDSC, 2020 WL 2527034, at *7 (W.D.N.C. May 18, 2020) (quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999)).

Here, Plaintiff is seeking an injunction that conflicts with the February 1, 2021, Judgment of the Court of Rotterdam requiring "[Plaintiff] and Draegen" to "grant dmarcian Europe access to the (computer) systems necessary to service its customers." Court of Rotterdam Judgment ¶ 2.14. The Court of Rotterdam also fixed the penalty for noncompliance at €500,000 ($590,000). *Id*. ¶ 3.4.

12

-241-

If this Court determines that it can and should issue a temporary restraining order that contradicts the Court of Rotterdam Judgment, the Court should require Plaintiff to post security of $590,000 to protect dmarcian Europe for the harm it will have suffered from the interference with that Dutch Judgment. The Court of Rotterdam fixed that $590,000 amount because of the value of dmarcian Europe software and customer relationships. Plaintiff's efforts to interfere with dmarcian Europe are causing significant harm to its business, and Plaintiff should have to post $590,000 in security as a condition for any injunction that further interferes with dmarcian Europe's business, the Dutch proceedings, or both.

## CONCLUSION

The Court should deny Plaintiff's motion for a temporary restraining order. If it grants that motion, the Court should require $590,000 in security.

This the 30th day of March, 2021.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Pressly M. Millen
Pressly M. Millen, NC State Bar No. 16178
Samuel B. Hartzell, NC State Bar No. 49256
Post Office Box 831
Raleigh, North Carolina 27602
Phone: (919) 755-2135
Fax: (919) 755-6067
Email*:* Press.Millen@wbd-us.com
         Sam.Hartzell@wbd-us.com

*Counsel for Defendant dmarcian Europe BV*

# Exhibit 1

Case 1:21-cv-00067-MR   Document 11-1   Filed 03/30/21   Page 1 of 7

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON    11/8/2019
By    /s/ Jennifer Tannous
Deputy Clerk

1  ALISON P. BUCHANAN – BAR NO. 215710
   LAURA C. RIPARBELLI – BAR NO. 311226
2  HOGE, FENTON, JONES & APPEL, INC.
   60 South Market Street, Suite 1400
3  San Jose, California 95113-2396
   Phone: 408.287.9501
4  Fax: 408.287.2583

5  Attorneys Specially Appearing
   for Defendants
6  TIMOTHY DRAEGEN and
   MARTIJN GROENEWEG

7

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN MATEO

10

11  CHARLES E. SWENBERG,              Case No. 19CIV02896

12         Plaintiff,                 DECLARATION OF TIMOTHY DRAEGEN
                                      IN SUPPORT OF MOTIONS TO QUASH
13     v.                             SERVICE OF SUMMONS FOR LACK OF
                                      PERSONAL JURISDICTION
14  DMARCIAN, INC., et al.,

15         Defendants.                Date:        November 18, 2019
                                      Time:        9:00 a.m.
16                                    Department:  Law and Motion

17
                                      Action Filed:    May 31, 2019
18

19         I, TIMOTHY DRAEGEN, declare:

20         1.    I am a Defendant in the above-captioned matter. I have personal

21  knowledge of the matters set forth below, unless otherwise indicated, and could testify

22  thereto if called upon to do so.

23         2.    I am the founder and CEO of dmarcian, Inc.  dmarcian, Inc. markets and

24  sells an email authentication protocol specification (called "DMARC") that assists

25  customers in streamlining email communications by filtering out spam, malware, and

26  phishing emails from email inboxes.

27         3.    I am a resident of North Carolina, currently residing in Brevard, North

28  Carolina. I have lived in North Carolina since 2008, well before all events as alleged in

3548345                                    -1-
DECLARATION OF TIMOTHY DRAEGEN IN SUPPORT OF MOTIONS TO QUASH SERVICE OF
SUMMONS FOR LACK OF PERSONAL JURISDICTION

1  the Complaint allegedly took place.

2      4.    I do not own any real property in California.  I do not pay any California
3  taxes and do not vote in California elections.

4      5.    It would be a significant burden for me, a resident of North Carolina, to be
5  forced to defend against Plaintiff's allegations in a foreign jurisdiction on the other side of
6  the country.

7      6.    On or about September 19, 2014, dmarcian, Inc. was incorporated in the
8  State of Delaware.  A true and correct copy of the information located on the Delaware
9  Secretary of State's website, which accurately reflects that dmarcian, Inc. is incorporated
10  in Delaware, is attached hereto as **Exhibit A**.

11      7.    On or about April 19, 2016, dmarcian, Inc. registered as a foreign entity in
12  North Carolina.  dmarcian, Inc.'s  principal office is located at 43 S. Broad Street, Suite
13  203, Brevard, North Carolina 28712.

14      8.    On or about December 12, 2016, dmarcian, Inc. registered in California as
15  a foreign entity.

16      9.    Plaintiff is incorrect when he argues that Martijn Groeneweg owns any
17  portion of dmarcian, Inc.  Mr. Groeneweg does not own any interest in dmarcian, Inc., nor
18  has he ever held an ownership  interest in dmarcian, Inc.

19      10.    In 2017, I considered and discussed with Mr. Groeneweg the possibility of
20  merging dmarcian, Inc. with dmarcian Europe BV.  We did not finalize any agreement
21  and no merger occurred.

22      11.    Today, dmarcian, Inc. and dmarcian Europe BV remain separate entities.
23  Mr. Groeneweg is not and never has been a shareholder in dmarcian, Inc., nor does he
24  have any affiliation with dmarcian, Inc.   Plaintiff is unable to present corporate
25  documents showing that dmarcian, Inc. and dmarcian Europe BV are the same company
26  because **no such documents exist**.

27      12.    Lastly, regarding the declaration of Sean Venkersammy in support of
28  Plaintiff's Opposition, Mr. Venkersammy is a former employee of dmarcian, Inc.

3548345                                -2-

DECLARATION OF TIMOTHY DRAEGEN IN SUPPORT OF MOTIONS TO QUASH SERVICE OF
SUMMONS FOR LACK OF PERSONAL JURISDICTION

1    13.    Mr. Venkersammy's employement with dmarcian, Inc. was terminated in
2    October 2019 for being unable to perform the functions of his job duties.

3    14.    While an employee, Mr. Venkersammy was not involved in any discussions
4    or decisions regarding company mergers or acquisitions.  Indeed, such discussions or
5    decisions were well above his pay grade and he would not have been privy to such
6    discussions or decisions.  Any representation to the contrary is false.  Specifically, in
7    paragraph 4 of his declaration, Mr. Venkersammy testifies that "after 2017, dmarcian and
8    dmarcian EU merged and became a single entity."  Aside from the fact that an employee
9    at his level would have no knowledge of such discussions, this statement is patently
10   false.  Mr. Venkersammy's statements in paragraph 6 and 7, stating that dmarcian EU
11   and dmarcian, Inc. merged and that there are is no distinction between the two entities is
12   also false and unsupported by any evidence.  Mr. Venkersammy's statements are self-
13   serving (having been recently terminated from the company) and false.

14   15.    dmarcian, Inc. and dmarcian Europe BV are distinct separate entities,
15   owned and operated separately.  They share the dmarcian name and there is one
16   dmarcian.com website to keep the customer experience simple.  Once a customer makes
17   an account and selects its geographic region, the customer is directed to the appropriate
18   entity depending on its geography.  The dmarcian brand website only mentions
19   "dmarcian Europe BV" on the "Contact US" page, which also identifies the other legal
20   entities involved.  dmarcian, Inc. and dmarcian Europe BV are separate legal entities and
21   Martijn Groeneweg has no ownership interest in dmarcian, Inc.

22   //
23   //
24   //
25   //
26   //
27   //
28   //

3548345                                              -3-
DECLARATION OF TIMOTHY DRAEGER IN SUPPORT OF MOTIONS TO QUASH SERVICE OF
SUMMONS FOR LACK OF PERSONAL JURISDICTION

16. Plaintiff argues that dmarcian, Inc. paid for the Customer Relations Management System ("CRM") software used by dmarcian Europe BV. This is false. Once customer leads are assigned, dmarcian Europe BV maintains its own CRM that is entirely distinct from the CRM used by dmarcian, Inc.

I declare under penalty of perjury under the laws of the State of California that the above facts are within my personal knowledge; that I can testify to the same if called to do so in a court of law; that the foregoing is true and correct; and that this declaration was executed on the 8th day of November, 2019, at London, England.

Timothy Draegen

3548345                                                -4-
DECLARATION OF TIMOTHY DRAEGEN IN SUPPORT OF MOTIONS TO QUASH SERVICE OF SUMMONS FOR LACK OF PERSONAL JURISDICTION

Case 1:21-cv-00067-MR   Document 11-1   Filed 03/30/21   Page 5 of 7

-247-

# Exhibit A



# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL CASE NO. 1:21-cv-00067-MR

| | | |
|---|---|---|
| DMARCIAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **O R D E R** |
| | ) | |
| DMARCIAN EUROPE BV | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on the Plaintiff's Motion for Temporary Restraining Order.  [Doc. 6].

On March 12, 2021, dmarcian, Inc. (the "Plaintiff") filed this action against dmarcian Europe BV (the "Defendant"), asserting claims for breach of contract; copyright infringement under 17 U.S.C. § 101 (the "Copyright Act"; trademark infringement under 15 U.S.C. § 1051 et seq. (the "Lanham Act"); false designations of origin under the Lanham Act; defamation; misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq.; computer trespass; tortious interference with contract; tortious interference with prospective economic advantage; and unfair or deceptive trade practices under N.C. Gen. Stat. §

75-1.1. [Doc. 1 at ¶¶ 114-205]. The Plaintiff's Complaint included a request for a preliminary injunction. [Id. at 38].

On March 25, 2021, the Plaintiff filed the present Motion seeking a temporary restraining order and preliminary injunction enjoining the Defendant from (1) making, using, distributing, and/or selling dmarcian software Code/derivative works; (2) directly or indirectly using Plaintiff's [trademarks] or any other similar mark, word, or name similar likely to cause confusion, mistake, or deceive; (3) infringing Plaintiff's registered copyright; (4) misrepresenting its present affiliation with Plaintiff; and (5) interfering with customer relationships, contacting, posting false notice to, and misrepresenting falsely to customers that Plaintiff caused a breach of customer data." [Doc. 6 at 1-2].

On March 29, 2021, the Defendant's counsel filed a notice of appearance and requested an opportunity to submit briefing in response to the Plaintiff's request for a temporary restraining order and a preliminary injunction. [Doc. 10]. On the same date, the Court entered an order allowing the Defendant to submit an opposition brief by noon on March 30, 2021. [Text-Only Order Entered March 29, 2021]. On March 30, 2021, the Defendant submitted its brief opposing the Plaintiff's request for a temporary

2

restraining order, arguing that the Court lacks personal jurisdiction over the Defendant.  [Doc. 11].

## I.   PERSONAL JURISDICTION

A court cannot issue a temporary restraining order absent personal jurisdiction over all parties.  See Land-O-Nod Co. v. Bassett Furniture Indus., 708 F.2d 1338, 1340 (8th Cir. 1983); Kroger Co. v. Malease Foods Corp., 437 F.3d 506, 510 (6th Cir. 2006).  When, as here, a district court considers a question of personal jurisdiction based on the allegations of a complaint, motions papers, affidavits, and supporting memoranda, the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction.  Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014); Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016).  In deciding whether the plaintiff has met this burden, "the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."   Universal Leather, 773 F.3d at 558 (internal quotation marks and citation omitted).  "Nevertheless, either at trial or at a pretrial evidentiary hearing, the plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence."  Public Impact, LLC v. Boston Consulting Group, Inc., 117 F.Supp.3d 732, 737 (M.D.N.C.

3

Aug. 3, 2015) (citing <u>New Wellington Fin. Corp. v. Flagship Resort Dev.</u> <u>Corp.</u>, 416 F.3d 290, 294 n. 5 (4th Cir. 2005)).  The Plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence<u>.</u> <u>Grayson</u>, 816 F.3d at 267 (4th Cir. 2016) (citing <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989)).

    For the Court to have personal jurisdiction, the Plaintiff must show that exercising jurisdiction will (1) comply with the forum state's long-arm statute and (2) comport with the due process requirements of the Fourteenth Amendment.  <u>See</u> <u>Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers,</u> <u>Inc.</u>**,** 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted).  Because North Carolina's long-arm statute has been construed to extend as far as due process allows, <u>Christian Sci. Bd. of Directors of First Church of Christ,</u> <u>Scientist v. Nolan</u>, 259 F.3d 209, 215 (4th Cir. 2001), this two-pronged test is collapsed into the single inquiry of whether the exercise of personal jurisdiction over the defendant comports with due process.   <u>Universal</u> <u>Leather</u>, 773 F.3d at 559.   A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has sufficient "minimum contacts" with the forum, such that to require the defendant to defend its interest in that state "does not offend traditional notions of fair play and substantial justice."  <u>Int'l Shoe Co. v. Washington,</u>

4

326 U.S. 310, 316 (1945) (internal quotation marks omitted). The sufficiency of the contacts depends on the circumstances of the case. A court can have personal jurisdiction over a defendant for all claims if the defendant's contacts with the forum state are continuous and systematic. This is referred to as "general jurisdiction."[1] However, more limited contacts can be sufficient to establish personal jurisdiction over a defendant where those contacts relate to the substance of the particular claim being asserted. This is referred to as "specific jurisdiction." See e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984). In determining whether specific jurisdiction exists, the Court considers (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002).

The first prong of the specific jurisdiction inquiry is grounded on the premise that "a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." Universal Leather, 773 F.3d at 559 (quoting Tire Eng'g

---

[1] The Plaintiff does not contend that the Court has general jurisdiction over the Defendant.

5

& Distribution, LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292,
301 (4th Cir. 2012)).   In determining whether a foreign defendant has
purposefully availed itself of the privilege of conducting business in a forum
state, the Court asks whether "the defendant's conduct and connection with
the forum [s]tate are such that he should reasonably anticipate being haled
into court there." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th
Cir. 1989) (quoting World-Wide Volkswagen v. Woodsen, 444 U.S. 286, 297
(1980)).  This analysis is flexible and "depends on a number of factors that
courts consider on a case-by-case basis." Universal Leather, 773 F.3d at
560 (citing Tire Eng'g, 682 F.3d at 302).   In the business context, those
factors include, but are not limited to: (1) whether the defendant maintains
offices or agents in the forum state; (2) whether the defendant owns property
in the forum state; (3) whether the defendant reached into the forum state to
solicit or initiate business; (4) whether the defendant deliberately engaged in
significant or long-term business activities in the forum state; (5) whether the
parties contractually agreed that the law of the forum state would govern
disputes; (6) whether the defendant made in-person contact with the resident
of the forum in the forum state regarding the business relationship; (7) the
nature, quality and extent of the parties' communications about the business
being transacted; and (8) whether the performance of contractual duties was

6

to occur within the forum.  Id. (quotation marks and citation omitted).  The Fourth Circuit "generally [has] concluded that a foreign defendant has purposefully availed itself of the privilege of conducting business in the forum state when the defendant 'substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.'"  Id. (citing Tire Eng'g, 682 F.3d at 302).

The alleged facts in this case appear to meet the first prong.  The Plaintiff alleges that the Defendant entered into a contractual agreement with a North Carolina corporation; visited North Carolina to participate in training and planning sessions in furtherance of that contract's purpose;[2] and performed under that contract for several years by paying compensation to a North Carolina corporation and accepting client referrals that were directed through a North Carolina corporation.  [Doc. 1 at ¶¶ 7-12].[3]  Those

---

[2] While the Defendant contends that "[t]he allegations of the Complaint appear to show that" the Defendant "has not been in [North Carolina] for any purpose," [Doc. 11 at 10], the Complaint alleges that "the Defendant's representatives have visited Plaintiff's offices in North Carolina for training and planning purposes" under the parties' agreement.  [Doc. 1 at ¶ 7].  That fact, taken as true at this stage, supports the exercise of personal jurisdiction over the Defendant.

[3] The Plaintiff further alleges that the Defendant's actions after the breach of contract were directed at the forum state, including using the Plaintiff's trademarks and copyrights in United States commerce generally.  [Doc. 7 at 23, 35 (citing Doc. 1 at ¶¶ 45-49, 138-40, 144-46, 150-55)].  It is unclear if those allegations create personal jurisdiction over the Defendant under Federal Rule of Civil Procedure 4(k)(2).  ISI Intern., Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 551 (7th Cir. 2001).  Nevertheless, the Court need not address this issue given its finding of specific personal jurisdiction in the forum state.

7

allegations, taken as true, establish that the Defendant reached into the forum state to solicit or initiate business; deliberately engaged in long-term business activities in the forum state; made in-person contact with a resident of the forum in the forum state regarding the business relationship; and engaged in extensive communications about the business being transacted. Universal Leather, 773 F.3d at 560.  In short, the Defendant has engaged in a course of conduct over several years through which it has purposefully availed itself of the privilege of conducting business in the forum state.  See Herrmann Int'l, Inc. v. Herrmann Int'l Eur., No. 1:17-cv-00073-MR, 2018 WL 4682344, at *5 (W.D.N.C. Sept. 28, 2018) (Reidinger, C.J.).  Because that substantial collaboration between the Plaintiff and the Defendant appears to have resulted in a joint enterprise between the parties, Universal Leather, 773 F.3d at 560 (citing Tire Eng'g, 682 F.3d at 302), the Defendant "should reasonably anticipate being haled into court" in North Carolina.  See World-Wide Volkswagen, 444 U.S. at 297.

With respect to the second prong of specific jurisdiction, once purposeful availment is satisfied, a court looks to whether "the plaintiff's claims arise out of activities directed at the forum state."  Tire Eng'g, 682 F.3d at 303.  Where the activity in the forum state is the genesis of the dispute, this prong is easily satisfied.  Id. (internal quotation marks and

8

citation omitted). Similarly, this prong is satisfied if "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Id. Here, the Plaintiff's claims arise from the Defendant's purposefully directed activities in the forum state, including that the Defendant stole intellectual property belonging to a North Carolina corporation and maintained and controlled inside of North Carolina; directed defamatory statements about the Plaintiff into North Carolina and the United States; and interfered with the Plaintiff's relationships with clients in North Carolina and the United States. [Id. at ¶¶ 78-96; 112-113]. This conduct, combined with the substantial collaboration between the parties, including the Plaintiff as a North Carolina corporation, forms an integral part of the Plaintiff's claims. Accordingly, the second prong is satisfied.

The Court turns to the final prong of the analysis: whether the exercise of personal jurisdiction would be constitutionally "reasonable." This prong "ensures that litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a severe disadvantage in comparison to his opponent." CFA Institute v. Institute of Chartered Financial Analysis of India, 551 F.3d 285, 296 (4th Cir. 2009) (quoting Nolan, 259 F.3d at 217). "The burden on the defendant, interests of the forum state, and the plaintiff's interest in

9

-258-

obtaining relief guide [the Court's] inquiry."  Tire Eng'g, 682 F.3d at 303 (citation omitted).

The Defendant is a Dutch private company organized and existing pursuant to the laws of the Netherlands.  A corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome.  Id.  Nevertheless, the Fourth Circuit recognizes that a foreign defendant's "ability to secure counsel in the forum state and its choice to do business with a forum resident – which also made the prospect of litigation in the state foreseeable – counseled that defending the suit would not be particularly burdensome."  Id.

Here, the Defendant has secured counsel to represent it in this matter and, at least according to the Plaintiff's allegations, chose to do business with forum residents.  [Doc. 1 at   Further, in this case, North Carolina maintains a "substantial interest" in resolving the grievances of its businesses, particularly when North Carolina law governs or informs some of the claims.  [Doc. 1 at ¶¶ 114-124, 158-205].  Finally, the Plaintiff has a substantial interest in protecting its trademark and business interests "after having 'carved out a market niche by cultivating' [its] distinctive mark and products."  Tire Eng'g, 682 F.3d at 303 (quoting Nolan, 259 F.3d at 297).  As such, the third prong of the test for specific personal jurisdiction is met.

Based on this limited record and briefing, the Court concludes that it has personal jurisdiction over the Defendant in this action. Notwithstanding this abbreviated analysis, this conclusion is without prejudice to the Defendant submitting a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) that more fully challenges the Court's jurisdiction. If the Defendant files such a motion, the Court will allow both parties to fully brief that issue.

## II.    TEMPORARY RESTRAINING ORDER

A plaintiff seeking a temporary restraining order must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) injunctive relief is in the public interest. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). Thus, in each case the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). A plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court. See Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

Before this action was commenced, the Defendant filed an action in Rotterdam, Netherlands challenging the Plaintiff's decision to terminate the

11

Defendant's access to its computer systems. [Doc. 1 at ¶ 67-69]. The parties agree that the Rotterdam Court entered an injunction ordering the Plaintiff to restore the Defendant's access to those systems. [Doc. 1 at 15; Doc. 11 at 12]. While the Plaintiff contends that the Rotterdam Court lacked jurisdiction to enter that injunction, [Doc. 1 at ¶¶ 67], those proceedings appear to have partially determined the legal relationship between the parties and may therefore have a preclusive effect on the Plaintiff's claims in this action. The Plaintiff has presented no argument from which the Court can determine the preclusive effect, if any, that those proceedings may have on the Plaintiff's claims or the parties' relationship here. For instance, the Plaintiff's breach of contract claim in this action may be entirely precluded by the findings of the Rotterdam Court. Because the effect of the Rotterdam proceedings is unclear, the Court cannot determine if the Plaintiff is likely to succeed on any of its claims.

The Plaintiff nevertheless contends that this Court should exercise jurisdiction over this dispute because the Rotterdam proceedings did not address the Plaintiff's intellectual property rights. [Doc. 1 at ¶¶ 67-69]. The Plaintiff's intellectual property claims in this action arise under the Lanham Act, the Copyright Act, and the North Carolina Trade Secrets Protection Act. [Id. at ¶¶ 125-157, 161-171]. Those claims appear to assert that the

12

Defendant infringed on the Plaintiff's intellectual property rights through actions taking place outside of the United States.

The Plaintiff has not addressed, and it is therefore unclear, whether the North Carolina Trade Secrets Protection Act applies to extraterritorial conduct.[4] Moreover, the Plaintiff has not addressed the difficult legal issues presented by an attempt to apply the Lanham Act or the Copyright Act to such extraterritorial conduct. See generally Herrmann, No. 1:17-cv-00073-MR, 2021 WL 861712, at *8-*17 (W.D.N.C., Mar. 8, 2021) (Reidinger, C.J.). Although the Plaintiff's allegations suggest that there may be some connection between the Defendant's conduct and the United States, the Plaintiff has not established that it is ultimately likely to prove that the Defendant's conduct falls within the Lanham Act as "commerce which may lawfully be regulated by Congress[,]" Steele v. Bulova Watch Co., 344 U.S. 280, 286 (1952), that such conduct constitutes a "predicate act" to support jurisdiction under the Copyright Act. Tire Eng'g, 682 F.3d at 306 (citing Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)), or that the North Carolina Trade Secrets Protection Act applies here. Accordingly, the Court concludes that the Plaintiff's showing with regard to a

_____

[4] Because the Plaintiff does not present a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1832 et seq., only North Carolina law is relevant to this issue.

13

Temporary Restraining Order is insufficient to establish a likelihood of success on the merits of its claims under the Lanham Act, the Copyright Act,[5] or the North Carolina Trade Secrets Protection Act at this time.

For these reasons, the Court concludes that the Plaintiff's Motion for a Temporary Restraining Order [Doc. 6] should be denied.  The Court reserves the issue of whether the Plaintiff is entitled to preliminary injunctive relief pending further presentation of evidence and briefing by the parties.

### O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Temporary Restraining Order [Doc. 6] is **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Preliminary Injunction [Doc. 6] is **HELD IN ABEYANCE** pending further presentation of evidence and briefing by the parties.  The Plaintiff may supplement its evidence in support of its Motion for Preliminary Injunction within seven (7) days of the entry of this Order.  The Defendant's response to the Plaintiff's Motion for Preliminary Injunction shall be filed no later than **April 19, 2021**, with the Plaintiff 's reply to be filed by **April 21, 2021**.  The parties shall appear on **April 23, 2021, at 10:00 a.m.** in Courtroom 1, United States

---

[5] The Plaintiff has also not explained why this Court, rather than the Rotterdam Court, should resolve the claims arising under the Copyright Act.  Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd., 61 F.3d 696, 702 (9th Cir. 1995).

14

Courthouse, 100 Otis Street, Asheville, North Carolina 28801, for a hearing

on the Plaintiff's Motion for Preliminary Injunction.

**IT IS SO ORDERED**.

Signed: March 31, 2021

Martin Reidinger
Chief United States District Judge

15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

                Plaintiff,

    v.

DMARCIAN EUROPE BV

                Defendant.

SUPPLEMENTAL DECLARATION OF
SHANNON DRAEGEN

NOW COMES the undersigned Declarant and states that the following is true of her own personal knowledge:

1.    I am the Chief Executive Officer of dmarcian, Inc. ("dmarcian"). My husband Tim Draegen and I together own 77% of dmarcian, Inc., with the balance being owned by a minority shareholder, Mr. Swenberg.

2.    In addition to the US trademarks referenced in the Complaint, dmarcian, Inc. owns the registered trademarks for "dmarcian" in the European Union, the United Kingdom and Ireland. See **Exhibit H** attached hereto.

3.    I searched our database for US customers who changed their "RUA" to dmarcadvisor.com from dmarcian.com. A rua address (not a true acronym – it just means "reports in aggregate") is placed in a DMARC record which reflects who is servicing the account. When the rua is directed to our company dmarcian Inc, it pulls all the customer owned data and feedback from the customer's email domain performance and sends it to dmarcian Inc. Those reports are sent to us for analysis and then

1

Document Ref: MBEJC-YLVHA-XCLG3-NM7FI

Page 1 of 5

-265-

dmarcian provides a report back to the customer identifying the risks and other information in an understandable format.

4.    I found that there is at least one such example in our system where a rua for a US company was changed from Plaintiff's dmarcian-eu.com to Defendant's dmarcadvisor.com.  That address dmarcian-eu.com redirected back to the Plaintiff's dmarcian.com platform under the arrangements we historically had with the Defendant.  Clarizen is a US company based in San Mateo, California and upon information and belief was recently acquired by Planview, a US company based in Austin, Texas.  Plainitff dmarcian monitored Clarizen's US based domains for phishing risks.  Clarizen changed their rua from dmarcian-eu.com (which was redirected to the Plaintiff's US platform) to the Defendant's platform "dmarcadvisor.com" on March 17, 2021 as shown in **Exhibit I** hereto.  Clarizen was originally acquired as a customer by our US based dmarcian sales employee approximately three years ago.  Invoices were sent to San Mateo for the services.

5.    In my original declaration, I referenced the judgment issued by the Rotterdam Court (Doc. 8-14).  The Court's order included a requirement that dmarcian provide access to Defendant dmarcian Europe BV ("DME") in order to service customers.  (Doc. #8-14, ¶3.3).

6.    A true and accurate copy of the audit logs from dmarcian's platform shows that Defendant DME's employees had access to the application data throughout February and up until March 4, 2021.  See **Exhibit J** hereto.  The names listed on this log are names of DME employees.  Log in records show DME employees last accessed application data on March 4, 2021 which is when dmarcian shut off all access to dmarcian's platform due to actions taken by DME after the February 1, 2021 injunction was issued.  Application data is different from the Customer Relationship Management ("CRM") data, as it contains historical information that is used to help service customers

2

Document Ref: MBEJC-YLVHA-XQLG3-NM7FI

Page 2 of 6

-266-

and identify risks specific to customers.  DME has its own copy of the CRM data, as explained in Tim Draegen's supplemental data.

7.    After the February 1, 2021 decision in Rotterdam, a series of very concerning events occurred which led to our decision to terminate access to all dmarcian data on March 4, 2021:

   a. On February 9, 2021, we first learned that DME had cloned dmarcian, Inc's "marketing website" which has always served as the sole entrance "landing page" to dmarcian's service. This conduct was described in more detail in my prior Declaration and in the Complaint.

   b. On or about February 15, 2021, we learned that DME distributed a GDPR Breach Notification via email to all EU-based customers falsely claiming that there was a "personal data breach" under Article 33 of GDPR which is a European law governing data breaches, again discussed in more detail in our prior filings.

   c. On or about February 23, 2021, several days after dmarcian sent its February 16, 2021 cease and desist letter (attached as Exhibit K), DME cloned dmarcian's platform using dmarcian's source code and updated their cloned "marketing website"  "Start trial/ Sign Up" links to lead to this cloned platform instead of dmarcian's platform, therefore leading ALL business away from dmarcian, Inc.  In response to these actions, dmarcian file a UDRP complaint with the governing body that addresses domain name disputes, but DME continued its course of conduct.

   d. On or about March 1, 2021, we became aware that Defendant DME was informing customers to move their data to Defendant's separate platform, dmarcadvisor.com.

3

Document Ref: MBEJC-YLVHA-XOLG3-NM7FI

Page 3 of 5

-267-

8.    On March 1, 2021, only after DME engaged in this course of conduct, did dmarcian Inc. cut off non-customer facing DME employees, namely after the stolen platform went live and DME posted cloned websites. The only affected DME employees were Martijn Groenewig, Herwert Kalkman, Dennis Seller, and Tim Groeneweg. The logs in **Exhibit J** show that other DME employees continued to have access until March 4.

9.    On March 2, 2021, we saw that DME put up new websites in France and Spain, with others following shortly thereafter. They included likenesses of me, my husband Tim, and several other employees in North Carolina. A screenshot of those likenesses appears in dmarcian's Complaint.

10.    On March 4, 2021, after DME instructed customers to migrate their data to dmarcadvisor.com. At that point, we terminated DME's access to dmarcian's data and systems.

11.    On or about March 5, 2021, early morning EU time, DME utilized their improperly claimed "ownership" of the *dmarcian.eu* top level domain to start forwarding all customer data (on the EU instance) to *dmrcgw.nl* (the "man in the middle attack" referenced in dmarcian's Complaint).

12.    Customers continue to express considerable confusion about who they are dealing with and whether DME's instructions are real or a phishing attack (the very thing that they hired dmarcian to protect them against). A customer forwarded to me a chat they had with a DME employee in which the DME employee himself expresses that he understands why the customer is confused. See **Exhibit L** hereto.

4

Document Ref: MBEJC-YLVHA-XOLG3-NM7FI

Page 4 of 6

-268-

# Signature Certificate

Document Ref.: MBEJC-YLVHA-XOLG3-NM7FI

Document signed by:

Verified E-mail:
shannon@dmarcian.com

*Shannon Draegen*

IP: 68.235.242.215    Date: 07 Apr 2021 18:16:20 UTC

Document completed by all parties on:
07 Apr 2021 18:16:20 UTC
Page 1 of 1

Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing SUPPLEMENTAL DECLARATION OF SHANNON DRAEGEN was served upon counsel for all other parties to this action listed below pursuant to N.C. R. Civ. P.5(b) by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorney for dmarcian Europe BV*

This the 7th day of April, 2021.

*/s/ Pamela S. Duffy*
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER
DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiff*

1



**EUROPEAN UNION INTELLECTUAL PROPERTY OFFICE**

# CERTIFICATE OF REGISTRATION

This Certificate of Registration is hereby issued for the European Union trade mark identified below. The corresponding entries have been recorded in the Register of European Union trade marks.

*Registered / Enregistré 22/03/2021*

*No 018347405*

DMARCIAN

**OFFICE DE L'UNION EUROPÉENNE POUR LA PROPRIÉTÉ INTELLECTUELLE**

# CERTIFICAT D'ENREGISTREMENT

Le présent Certificat d'Enregistrement est délivré pour la marque de l'Union européenne identifiée ci-joint. Les mentions et les renseignements qui s'y rapportent ont été inscrits au Registre des Marques de l'Union Européenne.



www.euipo.europa.eu

*The Executive Director / Le Directeur exécutif*

*Christian Archambeau*

**Exhibit H**



EUROPEAN UNION INTELLECTUAL PROPERTY OFFICE

OFFICE DE L'UNION EUROPÉENNE POUR LA PROPRIÉTÉ INTELLECTUELLE

| | |
|---|---|
| 210 | 018347405 |
| 220 | 01/12/2020 |
| 400 | 11/12/2020 |
| 151 | 22/03/2021 |
| 450 | 23/03/2021 |
| 186 | 01/12/2030 |
| 541 | DMARCIAN |
| 521 | 0 |
| 732 | dmarcian, Inc<br>43 South Broad Street, Suite 203<br>Brevard North Carolina 28712<br>US |
| 740 | REDDIE & GROSE LLP<br>The White Chapel Building, 10 Whitechapel High Street<br>London E1 8QS<br>GB |
| 270 | EN FR |
| 511 | BG - 9 |

BG - 9
Софтуер за осигуряване безопасността на електронна поща.

ES - 9
Software de seguridad de correo electrónico.

CS - 9
Software na zajištění bezpečnosti elektronické pošty.

DA - 9
Software til sikring af sikkerhed i forbindelse med elektronisk post.

DE - 9
Software zur Sicherung von E-Mails.

ET - 9
Tarkvara elektronposti turvalisuse tagamiseks.

EL - 9
Λογισμικό για διασφάλιση της ασφάλειας ηλεκτρονικού ταχυδρομείου.

EN - 9
Software for ensuring the security of electronic mail.

FR - 9
Logiciels de sécurisation du courrier électronique.

IT - 9
Software per garantire la sicurezza della posta elettronica.

LV - 9
Programmatūra elektroniskā pasta drošības nodrošināšanai.

LT - 9
Elektroninio pašto saugumo užtikrinimo programinė įranga.

HR - 9
Računalni programi za sigurnosnu zaštitu elektroničke pošte.

HU - 9
Elektronikus levelek biztosításáról gondoskodó szoftverek.

MT - 9
Softwer biex tiżgura s-sigurtà tal-posta elettronika.

NL - 9
Software voor de beveiliging van e-mailverkeer.

PL - 9
Oprogramowanie do zapewnienia bezpieczeństwa poczty elektronicznej.

PT - 9
Software para garantir a segurança de correio eletrónico.

RO - 9
Software pentru asigurarea securității poștei electronice.

SK - 9
Softvér na zabezpečovanie bezpečnosti elektronickej pošty.

SL - 9
Programska oprema za zagotavljanje varnosti elektronske pošte.

FI - 9
Ohjelmistot sähköpostin turvallisuuden varmistamiseen.

SV - 9
Programvara för att säkra elektronisk post.

No 018347405



# TRADE MARKS REGISTRY

# REGISTRATION CERTIFICATE

Trade Marks Act 1994 of

Great Britain and Northern Ireland

I certify that the mark shown below has been registered under No. UK00003548498 effective as of the date 26/10/2020 and has been entered in the register on 26/02/2021

Signed this day at my direction



Tim Moss
REGISTRAR

Representation of Mark
DMARCIAN

The mark has been registered in respect of:
Class 9:
Software for ensuring the security of electronic mail.

In the name of dmarcian, Inc
Incorporated in US
Delaware

Intellectual Property Office is an operating name of the Patent Office



**Exhibit I**

eu.dmarcian.com/timeline/

dmarcian Intranet · David's Meet · dmarcian Intranet · dmarcian - Googl... · dmarcian - Login... · dmarcian EU/Afric... · dmarcian forum · dmarcian-stg - Lo... · Gmail- dmarcian

2021-03-17

| 12:41 PM EST | DMARC | CLARIZENTB.COM | RUA ✚ | RUA ━ |
| 11:59 AM EST | DMARC | PARTNERS.CLARIZEN.COM | RUA ✚ | RUA ━ |
| 11:53 AM EST | DMARC | GAPPS.CLARIZEN.COM | RUA ✚ | RUA ━ |
| 11:43 AM EST | DMARC | SOLUTIONS.CLARIZEN.COM | RUA ✚ | RUA ━ |
| 11:27 AM EST | DMARC | HELLO.CLARIZEN.COM | RUA ✚ | RUA ━ |
| 11:21 AM EST | DMARC | STATUSPAGE.CLARIZEN.COM | RUA ✚ | RUA ━ |
| 11:16 AM EST | DMARC | CLARIZEN.COM | RUA ✚ | RUA ━ |

Changes

- RUA added: cmgivkzx@ag.eu.dmarcadvisor.com
- RUA removed: cmgivkzx@ag.dmarcian-eu.com

New Record
v=DMARC1;p=reject;pct=100;rua=mailto:cmgivkzx@ag.eu.dmarcadvisor.com;

Old Record
v=DMARC1;p=reject;pct=100;rua=mailto:cmgivkzx@ag.dmarcian-eu.com;

Case 1:21-cv-00067-MR   Document 15-2   Filed 04/07/21   Page 1 of 1

```
JP:
martijn@dmarcian.com
          2021-02-15 13:27:28.474462+00:00
lars@dmarcian.com
          2021-02-23 12:12:01.211685+00:00
eline@dmarcian.com
          2021-03-04 14:56:03.095762+00:00
          2021-03-03 09:29:23.516532+00:00
          2021-02-25 09:34:11.232673+00:00
          2021-02-18 20:11:40.707744+00:00
          2021-02-16 14:42:10.614231+00:00
          2021-02-10 08:48:13.879742+00:00
          2021-02-06 12:12:46.358017+00:00
          2021-02-04 09:29:08.197857+00:00
          2021-02-02 18:49:17.358153+00:00
          2021-02-02 18:29:09.578887+00:00
          2021-02-01 07:34:08.491778+00:00
          2021-01-31 20:07:04.670657+00:00


AP:
lars@dmarcian.com
          2021-02-11 07:37:53.901045+00:00
martijn@dmarcian.com
          2021-02-15 13:25:41.687726+00:00


EU:
assem@dmarcian.com
          2021-02-15 16:28:28.511991+00:00
          2021-02-15 07:49:53.695470+00:00
          2021-02-14 20:28:08.502623+00:00
          2021-02-13 15:56:46.359699+00:00
          2021-02-12 08:40:03.685030+00:00
          2021-02-11 09:53:08.977859+00:00
          2021-02-10 17:07:18.337224+00:00
          2021-02-10 09:18:15.431807+00:00
          2021-02-09 08:50:10.509224+00:00
          2021-02-08 14:43:44.411840+00:00
          2021-02-08 08:43:16.835110+00:00
          2021-02-06 14:45:42.485952+00:00
          2021-02-05 08:30:48.536500+00:00
          2021-02-04 08:39:13.097164+00:00
          2021-02-03 22:00:51.355743+00:00
          2021-02-03 08:12:42.221244+00:00
          2021-02-02 08:05:54.868667+00:00
          2021-02-01 08:22:01.608651+00:00
          2021-03-04 08:03:09.850015+00:00
          2021-03-03 09:09:58.365992+00:00
          2021-03-02 08:10:44.287921+00:00
          2021-03-01 08:17:06.557462+00:00
          2021-02-26 08:42:09.532733+00:00
```

**Exhibit J**

```
          2021−02−25 15:05:29.531380+00:00
          2021−02−24 08:21:32.645645+00:00
          2021−02−23 08:39:07.093017+00:00
          2021−02−22 16:25:27.446462+00:00
          2021−02−22 08:45:55.956521+00:00
          2021−02−19 13:15:11.359178+00:00
          2021−02−19 08:06:08.428111+00:00
          2021−02−18 15:19:01.569497+00:00
          2021−02−18 09:42:50.466020+00:00
          2021−02−17 14:23:34.376340+00:00
          2021−02−17 08:37:24.410345+00:00
          2021−02−16 08:20:48.814436+00:00
dennis@dmarcian.com
          2021−02−23 10:23:14.072802+00:00
          2021−02−20 10:17:04.951035+00:00
          2021−02−19 08:37:05.604417+00:00
          2021−02−18 13:36:41.859031+00:00
          2021−02−15 10:08:27.691306+00:00
          2021−02−08 10:39:19.338160+00:00
          2021−02−05 19:53:23.500665+00:00
          2021−02−05 18:55:22.420645+00:00
          2021−02−05 10:24:37.014659+00:00
          2021−02−03 09:14:56.869810+00:00
          2021−02−02 13:01:09.739256+00:00
          2021−02−02 12:12:35.509833+00:00
          2021−02−01 15:38:24.429521+00:00
eline@dmarcian.com
          2021−03−04 16:11:35.979029+00:00
          2021−03−04 15:42:19.026232+00:00
          2021−03−04 15:40:37.526975+00:00
          2021−03−04 15:38:54.567690+00:00
          2021−03−04 15:16:20.137326+00:00
          2021−03−04 15:12:46.522003+00:00
          2021−03−04 13:47:36.511133+00:00
          2021−03−04 09:17:38.425277+00:00
          2021−03−03 12:02:18.353148+00:00
          2021−03−03 09:27:31.876587+00:00
          2021−03−02 15:32:36.269321+00:00
          2021−03−02 12:06:06.607378+00:00
          2021−03−02 11:23:08.343326+00:00
          2021−03−02 09:08:45.625565+00:00
          2021−03−01 15:55:51.257626+00:00
          2021−03−01 10:11:11.725039+00:00
          2021−03−01 08:25:58.799515+00:00
          2021−03−01 08:25:56.154791+00:00
          2021−02−26 15:43:11.199504+00:00
          2021−02−26 11:38:22.512419+00:00
          2021−02−26 11:31:00.368737+00:00
          2021−02−26 11:10:34.239751+00:00
          2021−02−26 08:42:22.893287+00:00
```

```
2021-02-25 16:38:34.112414+00:00
2021-02-25 13:47:39.758072+00:00
2021-02-25 12:22:52.308619+00:00
2021-02-25 11:19:00.064835+00:00
2021-02-25 10:04:08.831255+00:00
2021-02-25 09:40:38.167246+00:00
2021-02-25 09:30:34.719058+00:00
2021-02-25 09:20:09.296985+00:00
2021-02-25 07:48:40.565374+00:00
2021-02-24 15:42:45.831036+00:00
2021-02-24 13:06:56.959955+00:00
2021-02-24 13:04:48.205408+00:00
2021-02-24 10:34:35.212252+00:00
2021-02-24 09:45:28.592492+00:00
2021-02-23 15:12:34.979906+00:00
2021-02-23 13:55:42.067110+00:00
2021-02-23 12:59:15.458420+00:00
2021-02-23 12:26:18.435296+00:00
2021-02-23 12:11:06.524185+00:00
2021-02-23 12:07:30.279905+00:00
2021-02-23 12:06:29.310625+00:00
2021-02-23 11:54:03.287750+00:00
2021-02-23 11:50:00.739755+00:00
2021-02-23 08:59:07.326132+00:00
2021-02-23 08:49:30.219233+00:00
2021-02-23 08:48:52.865319+00:00
2021-02-22 20:16:21.331148+00:00
2021-02-22 13:38:50.992201+00:00
2021-02-22 09:44:51.834716+00:00
2021-02-22 09:18:58.657952+00:00
2021-02-19 17:08:49.434596+00:00
2021-02-19 15:57:43.924630+00:00
2021-02-19 15:31:00.516364+00:00
2021-02-19 14:16:55.736128+00:00
2021-02-19 12:29:25.528458+00:00
2021-02-19 09:41:47.385795+00:00
2021-02-18 20:09:50.064755+00:00
2021-02-18 14:58:13.085102+00:00
2021-02-18 10:20:14.622592+00:00
2021-02-18 09:18:42.278146+00:00
2021-02-18 08:32:53.025306+00:00
2021-02-17 11:21:08.884332+00:00
2021-02-16 19:24:05.177894+00:00
2021-02-16 14:39:50.378156+00:00
2021-02-16 14:06:14.943138+00:00
2021-02-16 13:15:27.779492+00:00
2021-02-16 09:52:24.144777+00:00
2021-02-16 08:37:55.341581+00:00
2021-02-16 08:26:07.031807+00:00
2021-02-15 15:20:50.247334+00:00
```

```
        2021-02-15 14:30:52.996856+00:00
        2021-02-12 11:08:21.809971+00:00
        2021-02-12 09:53:38.861678+00:00
        2021-02-11 09:29:04.196070+00:00
        2021-02-11 08:03:47.512831+00:00
        2021-02-10 14:39:57.660184+00:00
        2021-02-10 14:08:25.225361+00:00
        2021-02-10 13:03:39.745714+00:00
        2021-02-10 08:52:23.165820+00:00
        2021-02-10 08:46:10.017669+00:00
        2021-02-09 15:55:01.639634+00:00
        2021-02-09 14:52:52.432808+00:00
        2021-02-09 14:13:58.214817+00:00
        2021-02-09 08:38:35.703842+00:00
        2021-02-09 08:02:06.257970+00:00
        2021-02-08 11:46:22.281422+00:00
        2021-02-06 12:36:36.125568+00:00
        2021-02-06 12:33:54.749090+00:00
        2021-02-06 12:10:20.073237+00:00
        2021-02-05 10:00:37.166517+00:00
        2021-02-05 08:59:35.100156+00:00
        2021-02-05 08:27:24.223872+00:00
        2021-02-04 14:58:21.042500+00:00
        2021-02-04 11:56:37.488060+00:00
        2021-02-04 09:27:15.603759+00:00
        2021-02-04 09:05:47.603416+00:00
        2021-02-03 20:39:10.629558+00:00
        2021-02-03 14:31:37.411912+00:00
        2021-02-03 10:20:42.044014+00:00
        2021-02-03 09:10:54.094416+00:00
        2021-02-02 18:47:23.898307+00:00
        2021-02-02 18:25:58.618639+00:00
        2021-02-02 12:16:22.306701+00:00
        2021-02-02 11:55:39.342495+00:00
        2021-02-02 10:14:12.555448+00:00
        2021-02-02 10:02:44.356693+00:00
        2021-02-02 09:43:52.068697+00:00
        2021-02-02 09:35:54.759193+00:00
        2021-02-02 09:06:12.086019+00:00
        2021-02-01 15:33:35.078115+00:00
        2021-02-01 07:32:23.638517+00:00
joost@dmarcian.com
        2021-03-02 13:34:09.951603+00:00
        2021-02-04 08:24:04.722879+00:00
        2021-02-02 07:01:42.685396+00:00
        2021-02-01 13:12:27.355760+00:00
lars@dmarcian.com
        2021-03-04 07:32:03.739523+00:00
        2021-03-03 08:37:27.422557+00:00
        2021-03-02 07:34:31.655786+00:00
```

```
          2021-03-01 07:11:41.800750+00:00
          2021-02-26 07:31:10.101761+00:00
          2021-02-25 08:06:54.977629+00:00
          2021-02-24 08:26:09.980928+00:00
          2021-02-23 07:14:22.116503+00:00
          2021-02-22 07:07:17.882001+00:00
          2021-02-19 06:42:39.619703+00:00
          2021-02-18 14:48:28.641405+00:00
          2021-02-18 08:40:37.166215+00:00
          2021-02-17 07:29:40.451707+00:00
          2021-02-16 06:45:51.281430+00:00
          2021-02-15 07:21:38.141270+00:00
          2021-02-13 08:59:28.782054+00:00
          2021-02-11 07:37:59.038364+00:00
          2021-02-10 07:21:08.488422+00:00
          2021-02-09 08:31:10.392878+00:00
          2021-02-08 07:11:31.501415+00:00
          2021-02-06 11:13:10.606726+00:00
          2021-02-05 08:17:21.743124+00:00
          2021-02-04 08:27:54.194615+00:00
          2021-02-03 07:19:17.846427+00:00
          2021-02-02 17:29:02.889868+00:00
          2021-02-02 08:04:34.644794+00:00
          2021-02-01 11:32:21.499523+00:00
          2021-02-01 07:18:05.984742+00:00
lex@dmarcian.com
          2021-03-04 08:27:42.597777+00:00
          2021-03-03 08:15:38.436520+00:00
          2021-03-02 09:38:45.751118+00:00
          2021-03-01 11:10:28.761222+00:00
          2021-03-01 09:50:21.360870+00:00
          2021-03-01 08:19:09.419418+00:00
          2021-02-26 08:24:00.822023+00:00
          2021-02-25 15:23:56.239132+00:00
          2021-02-25 08:09:06.901846+00:00
          2021-02-23 08:32:03.211801+00:00
          2021-02-22 10:06:10.140625+00:00
          2021-02-19 13:31:52.476493+00:00
          2021-02-19 08:12:00.852372+00:00
          2021-02-11 08:56:15.089543+00:00
          2021-02-10 08:16:19.099531+00:00
          2021-02-09 11:07:25.942873+00:00
          2021-02-04 08:19:09.624178+00:00
          2021-02-02 07:31:13.412329+00:00
          2021-02-01 14:55:27.920544+00:00
martijn@dmarcian.com
          2021-03-01 13:59:04.847870+00:00
          2021-02-28 12:59:51.598790+00:00
          2021-02-26 10:52:20.124048+00:00
          2021-02-26 09:13:30.467411+00:00
```

```
          2021-02-25 21:38:47.171939+00:00
          2021-02-25 14:04:48.770310+00:00
          2021-02-24 00:58:47.980718+00:00
          2021-02-23 18:03:51.546493+00:00
          2021-02-23 09:18:31.320956+00:00
          2021-02-22 23:01:24.038223+00:00
          2021-02-22 10:18:26.167127+00:00
          2021-02-21 12:14:59.146369+00:00
          2021-02-20 21:58:52.691650+00:00
          2021-02-19 13:06:07.343928+00:00
          2021-02-17 13:11:39.806142+00:00
          2021-02-16 23:55:33.404687+00:00
          2021-02-16 14:08:58.027686+00:00
          2021-02-16 01:53:38.124014+00:00
          2021-02-15 11:12:52.691492+00:00
          2021-02-14 23:07:39.180770+00:00
          2021-02-14 16:24:17.521990+00:00
          2021-02-14 12:02:45.019848+00:00
          2021-02-13 19:37:57.341333+00:00
          2021-02-11 15:13:54.665398+00:00
          2021-02-11 10:47:32.594519+00:00
          2021-02-09 10:56:38.630646+00:00
          2021-02-08 08:36:55.913366+00:00
          2021-02-05 22:16:24.416674+00:00
          2021-02-05 00:23:34.982351+00:00
          2021-02-04 09:32:14.600830+00:00
          2021-02-03 21:37:09.001088+00:00
          2021-02-03 13:24:55.965268+00:00
          2021-02-02 22:50:05.519258+00:00
          2021-02-02 18:30:32.852768+00:00
          2021-02-02 10:45:54.728592+00:00
          2021-02-01 12:32:26.625834+00:00
max@dmarcian.com
          2021-03-04 10:14:20.261280+00:00
          2021-03-03 12:27:58.060199+00:00
          2021-03-01 08:20:51.728076+00:00
          2021-02-25 09:16:14.220105+00:00
          2021-02-24 12:53:47.036924+00:00
          2021-02-19 07:58:42.709066+00:00
          2021-02-18 14:20:34.624476+00:00
          2021-02-17 14:47:01.554016+00:00
          2021-02-15 18:16:13.321142+00:00
          2021-02-15 13:08:06.051658+00:00
          2021-02-12 14:04:28.360026+00:00
          2021-02-12 08:16:03.277676+00:00
          2021-02-11 10:04:19.089929+00:00
          2021-02-10 09:07:14.531687+00:00
          2021-02-08 15:47:48.933929+00:00
          2021-02-05 10:52:11.692634+00:00
          2021-02-04 08:19:32.211911+00:00
```

```
              2021-02-04 08:08:40.727152+00:00
              2021-02-03 08:53:08.700704+00:00
              2021-02-01 13:01:35.739977+00:00
mohammed@dmarcian.com
              2021-03-04 11:19:29.646161+00:00
              2021-03-03 09:54:24.087609+00:00
              2021-03-02 11:31:53.542148+00:00
              2021-03-01 10:10:40.740581+00:00
              2021-02-26 09:35:09.136952+00:00
              2021-02-25 12:29:00.282838+00:00
              2021-02-24 08:54:53.154148+00:00
              2021-02-23 11:38:34.867540+00:00
              2021-02-22 10:01:47.023564+00:00
              2021-02-19 10:03:57.709377+00:00
              2021-02-18 10:15:52.679559+00:00
              2021-02-17 08:58:40.395071+00:00
              2021-02-16 12:59:02.803310+00:00
              2021-02-15 09:24:56.254582+00:00
              2021-02-12 10:45:38.668994+00:00
              2021-02-11 09:24:24.550250+00:00
              2021-02-10 21:51:34.951035+00:00
              2021-02-10 08:55:17.968633+00:00
              2021-02-09 09:28:02.991030+00:00
              2021-02-08 09:28:09.631947+00:00
              2021-02-05 09:11:17.042685+00:00
              2021-02-04 10:26:35.086635+00:00
              2021-02-03 08:58:28.137141+00:00
              2021-02-02 09:42:27.403621+00:00
              2021-02-01 09:35:23.205619+00:00
rick@dmarcian.com
              2021-03-04 07:54:42.648962+00:00
              2021-03-03 08:50:48.948098+00:00
              2021-03-02 14:10:10.021224+00:00
              2021-03-02 10:02:10.133860+00:00
              2021-03-01 08:32:03.322670+00:00
              2021-02-26 07:50:03.288081+00:00
              2021-02-25 09:53:35.187736+00:00
              2021-02-25 07:46:20.630540+00:00
              2021-02-24 08:51:55.383423+00:00
              2021-02-23 08:14:07.520388+00:00
              2021-02-22 07:45:49.300190+00:00
              2021-02-19 14:39:31.091238+00:00
              2021-02-19 10:14:20.820355+00:00
              2021-02-19 08:55:43.135184+00:00
              2021-02-19 08:07:18.282416+00:00
              2021-02-19 08:06:48.009451+00:00
              2021-02-18 08:50:38.216700+00:00
              2021-02-17 10:47:26.859781+00:00
              2021-02-16 14:16:41.627153+00:00
              2021-02-16 08:32:50.675769+00:00
```

```
          2021-02-15 08:48:26.629625+00:00
          2021-02-14 19:27:55.789529+00:00
          2021-02-12 08:31:54.993072+00:00
          2021-02-11 07:55:37.703563+00:00
          2021-02-10 12:03:24.240028+00:00
          2021-02-09 08:35:01.680573+00:00
          2021-02-08 07:33:00.343716+00:00
          2021-02-05 08:40:10.149868+00:00
          2021-02-04 12:11:24.625963+00:00
          2021-02-04 08:48:04.413615+00:00
          2021-02-03 08:15:32.258623+00:00
          2021-02-02 09:15:06.402835+00:00
          2021-02-02 07:37:36.994700+00:00
          2021-02-01 13:25:15.503574+00:00
          2021-02-01 09:36:05.355775+00:00
roy@dmarcian.com
          2021-03-04 08:24:59.317599+00:00
          2021-03-03 12:51:39.728646+00:00
          2021-03-03 08:20:11.212265+00:00
          2021-03-02 09:54:04.085798+00:00
          2021-03-01 17:06:21.088392+00:00
          2021-03-01 08:31:12.990809+00:00
          2021-02-26 08:12:20.827609+00:00
          2021-02-25 09:20:23.160539+00:00
          2021-02-24 08:23:34.650200+00:00
          2021-02-22 13:21:21.037233+00:00
          2021-02-22 08:10:31.366108+00:00
          2021-02-19 13:55:57.183474+00:00
          2021-02-19 07:58:24.963397+00:00
          2021-02-18 08:58:29.828945+00:00
          2021-02-17 14:28:26.027957+00:00
          2021-02-15 11:21:26.103403+00:00
          2021-02-12 08:17:47.607683+00:00
          2021-02-11 09:54:09.601546+00:00
          2021-02-10 08:49:17.933060+00:00
          2021-02-08 15:23:43.064222+00:00
          2021-02-08 08:07:09.603592+00:00
          2021-02-05 09:34:25.557555+00:00
          2021-02-04 08:16:35.436399+00:00
          2021-02-03 08:04:40.176786+00:00
          2021-02-01 09:34:34.788443+00:00
svet@dmarcian.com
          2021-02-01 11:40:01.795105+00:00


US:

assem@dmarcian.com
          2021-03-04 15:17:06.501347+00:00
          2021-03-01 14:47:36.842942+00:00
          2021-02-14 20:28:34.139815+00:00
```

```
            2021-02-09 16:01:20.625597+00:00
            2021-02-05 12:32:11.737452+00:00
            2021-02-04 10:01:34.813474+00:00
            2021-02-04 08:48:26.906798+00:00
            2021-02-03 12:45:37.776766+00:00
eline@dmarcian.com
            2021-03-04 14:54:38.949966+00:00
            2021-03-04 09:22:44.854811+00:00
            2021-03-03 09:28:33.941069+00:00
            2021-02-25 09:41:00.986850+00:00
            2021-02-25 09:31:38.634817+00:00
            2021-02-18 20:10:48.088945+00:00
            2021-02-16 14:41:17.175985+00:00
            2021-02-10 08:47:25.257312+00:00
            2021-02-06 12:11:46.938244+00:00
            2021-02-04 09:28:19.093140+00:00
            2021-02-02 18:48:25.523784+00:00
            2021-02-02 18:28:08.309503+00:00
            2021-02-01 07:32:28.516565+00:00
lars@dmarcian.com
            2021-02-23 11:36:54.996046+00:00
martijn@dmarcian.com
            2021-02-15 13:26:02.236687+00:00
            2021-02-13 19:46:37.055920+00:00
mohammed@dmarcian.com
            2021-03-01 15:55:32.426009+00:00
roy@dmarcian.com
            2021-02-04 14:50:14.394787+00:00
            2021-02-04 14:34:19.911353+00:00
            2021-02-04 13:36:24.759274+00:00
```

# BLANKROME

One Logan Square
130 North 18th Street | Philadelphia, PA 19103-6998
blankrome.com

Phone:      (215) 569-5619

Email:      pecsenye@blankrome.com

February 17, 2021

<u>**VIA EMAIL**</u>

Martijn Groeneweg
The Digital Xpedition (TDX) Holding B.V.
Hub Harmeling
Dmarcian Europe B.V.
3311 JG Dordrecht
Burgemeester de Raadtsingel 93
Tel: +31 78 632 0242
support@dmarcian-europe.com

Re:      <u>Unauthorized Use of Dmarcian's Intellectual Property</u>

Dear Messrs. Groeneweg and Harmeling:

This firm represents dmarcian, inc. ("dmarcian"), a well-known, international software company that provides secure email ecosystems to clients around the world. Recently, it has come to our attention that you are using dmarcian's intellectual property to unlawfully solicit business on the following website: http://dmarcian.nl/. Without dmarcian's consent or authorization, you have used the dmarcian trademark, trade name, and logo to pass yourself off as an affiliate called "dmarcian Europe," which you certainly are not. Evidence of your unlawful use can be found on the following website: http://dmarcian.nl/. You have also solicited third parties to purchase dmarcian's copyrighted software, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.

Please be advised that dmarcian is the exclusive owner of the DMARCIAN® trademark in the United States in connection with software for ensuring the security of email systems and messages. The DMARCIAN® mark is registered under Registration No. 5702379. It has been registered for more than a year, and has consequently acquired distinctiveness and significant goodwill among consumers.

Your unauthorized use of the DMARCIAN® mark, its trade name, its logo, and its copyrighted software is a serious concern, constituting actionable trademark infringement, copyright infringement, and trade secret misappropriation. dmarcian will not tolerate your

**Exhibit K**

BLANKROME

February 17, 2021
Page 2

unlawful attempts to trade off of its reputation and goodwill. Nor, fundamentally, can dmarcian afford to allow your continued, unauthorized use of its intellectual property that directly encroaches upon its firmly-held rights. Accordingly, we make this formal demand upon you to:

1.  Cease and desist immediately from any and all use of or plans to use the DMARCIAN® mark, its trade name, its logo, and any other mark, name, logo, key search word, domain name, or other indicia of source that is identical, confusingly similar to, or that is premised in whole or in part upon the DMARCIAN® mark, trade name, and logo;

2.  Provide an accounting of all products and services sold, listed for sale, created, or distributed by you which bear the DMARCIAN® mark, trade name, or logo, or were advertised with the DMARCIAN® mark, trade name, or logo;

3.  Provide an accounting of all software sold, listed for sale, copied, or distributed by you which were created by or derived from dmarcian's copyrighted software;

4.  Contact us to discuss the recall, recapture, and destruction of all products sold, listed for sale, created, or distributed by you which bear the DMARCIAN® mark, trade name, or logo;

5.  Provide written assurances by no later than **March 3, 2021** that you will comply with the above requests and will permanently refrain from further infringement of dmarcian's intellectual property rights, and provide written assurances no later than **March 10, 2021** that you have done so.

This letter is being sent in an attempt to achieve a prompt resolution of this matter, and to avoid unnecessary expense. Nothing contained in this letter is intended to be, or should be considered as an admission of any fact or a waiver of any right, all of which are expressly reserved. We look forward to your prompt response concerning this matter.

Please do not hesitate to contact the undersigned if you have any questions.

Sincerely yours,

TIMOTHY D. PECENSYE

TDP:JMT



Do you need any help?

Yes

Would you like to live chat with one of our team members?

Yes

Could I have your name?

Martin

Thank you!
What's your company's name?

F&P

Wait a moment, please. You'll be connected with one of our team members  soon.

Roy Hoogkamer joined the conversation

Hi Roy

Hi Martin my name is Roy how can I help you?

I am not sure but I think I may have clicked on a Phishing link
I was log'in in to dmarcian

**Exhibit L**

but choosed this site
https://dmarcadvisor.com/
Do know know this site?

Yes this is the new website of  dmarcian Europe BV we recently launched a new environment that is fully managed by the EU (dmarcian Europe)
Did someone from the sales team already helped you with migrating your account to this new environment?



Great News
I do not have to change my password
:)

Yes it is and I can tottaly understand the confusion



No I did not know
but what's the procedure?
regarding the new environment

You will need to reset your password before you can login on the new environment. Can you please provide me with the account name and the name of your accountmanager?



my account is

The reason why you need to reset your password is because we created all user accounts in the platform that will be activated once the password has been reset



mca@forsikringogpension.dk

I will take a look one moment please



ok thanks

Okay the account of F&P hasn't been migrated yet so there is now user account for you on the new environment. I could do this for you if you would like

Did you pay mannually per invoice or Chargebee?



It's by invoice

Okay I see the account has been set up, but there was no user created for you

I will add you as a user and transfer the ownership of the account as well

I will let you know when you can change your password



Great thanks

Okay Martin you should have received a password reset email



So there will be a lot of new feautures?

Ok I will tjeck

Yes I got it

great!

It seems that we haven't send you an invoice. I think you paid per creditcard?



Great I am in

Great to hear that it's working!



Looks a lot like the "earlier site

What have been changed?

The parts has changed that this environment is fully managed by the EU so no one except dmarcian Europe BV employees can see your data



Ok - Great I understand

So it has nothing to do with new functionality?

It's for internal security (and for our security)

I know we have recieved invoices

I will check

Yes it's for your security

I personnaly think that you paid with ChargeBee (creditcard) because we don't see an invoice and signed quotation in our system at the moment



hmm ok. My collegue June Maya nielsen talked about a invoice from dmarcian the other day

I should see the paiment info in the portal

Yes you can login into the "old" platform and you should be able to see the payment info in there

If you pay per credit card you should cancel it because it isn't linked with the new environment anymore

Can you please provide me with the end date of the subscription



just a moment I will tjeck

Sure thing!



In the new portal. I have: You are currently subscribed to the Plus plan.
I cannot click on the manage your account button

Yes I have done that by myself



no response

Because you mentioned you already subscibed



ok

This is the URL of the "old" platform eu.dmarcian.com/login/
you should be able to login there and see the payment details



Got It
I am logged in to the old platform also
2 sec

Okay great!



hmm
I am searching
where can I find the paiment details
on the old site

In the top right corner you will see your username right?



yep

Hoover of this and go to billing and ussages
You should be able to see your subscription and billing



I have..
To many windows open :)
2 sec

Sure I will wait



I have Account XML Data
Preferences
Manage users
Acces control
logout

Underneath you should also see billing and usages
underneath Account XML Dat
a



underneath I have Prefeereces

Okay that's weird

Could you send me a screenshot of this via email?



Maybe it's not an admin account I have
With those access rights

You can send it to me at roy@dmarcadvisor.com

Okay yes I think the admin account has access to it



Ok I think servicedesk@forsikringogpension.dk
is the admin

Can you login into that account?



Do not have the password, but I can reset it
Let me check

But you will have to reset it on the old platform



ok

just a moment

Let me know if you're loggedin



I got it. I checked to Password manager
the account is dmarcian@forsikringogpension.dk
I will log in

Great!



Got it
it was sercicedesk@forsikringogpension.dk :-)
servicedesk@...

Can you now see Billing & Usages?



2021-04-13
end date
That soon

Okay great I will set that in the backend of your account

Can you also see if you pay per creditcard



I check

Because you will need to cancel it then other wise the dmarcian, Inc. in the US will still charge you for it



By creditcard
June Lekfeldt

I would like to advice you to cancel the payment via creditcard



Ok I will do that

I will setup everything for you on the new environment



Great thanks

Would you like to pay per invoice when you subscription will need to be renewed?



Ohh that would be great

Or do you want to stick with Creditcard



Invoice is less administrative

Okay great :-)

Martin I will set everything up for you in the backend of the account. All you will need to do is to cancel the creditcard on the old platform and add users in the new environment :-)



There are some invoice information I have to add
I will add that in the new portal under billing (simple information) Like CVR number
Invoices gets sent to faktura@forsikringogpension.dk

I will email you tomorrow and I can provide you with a quotation and the information that we will need is that okay with you!
?



In the new portal what about the admin account
You said to add new users

Your email address is now the admin account, but you will need to add them as a user because those weren't in the new portal yet



ATEA (Outspurcing partner) is helping us to implement Dmark so I will just add that account again in the new portal
makes sence?

Yes you can invite who ever you think needs to use the account of F&P



Ok great

So martin I will provide you with a quotation tomorrow morning via email and ask for the information that we will need



You are very helpfull

Is that okay with you?



I did not know

I'm always happy to assist you :-)



I thougt when I wrote that is was Phishing :) that address

:-)

OK Great

Hahaha noo luckly not, but we had to migrate to a new environment and we want to keep all EU users safe



I will cancell payment now in the old portal

Great Martin!

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

Plaintiff,

v.

DMARCIAN EUROPE BV

Defendant.

SUPPLEMENTAL DECLARATION OF
TIMOTHY DRAEGEN

NOW COMES the undersigned Declarant and states that the following is true of his own personal knowledge:

1.    I am the founder and former Chief Executive Officer of dmarcian, Inc. ("dmarcian").

2.    I provided a declaration in litigation in California brought by a minority shareholder in dmarcian which was submitted by Defendant dmarcian Europe BV ("DME") at Docket #11-1. The plaintiff in the California case was trying to show that dmarcian and DME had merged into one company and had made some allegations about the Customer Relationship Management ("CRM") system as being the same system for both companies.

3.    To respond to the allegations by the plaintiff in the California case, I stated in my California declaration that DME maintained its own distinct CRM system. That statement is true. All leads were originated by dmarcian's global platform (including Europe-based) and routed into dmarcian's CRM system. Leads that originated from the Europe-based dmarcian platform were routed from dmarcian's US-based CRM system

1

Document Ref: DGHVW-W4EPN-AGMXK-HKCNJ

Page 1 of 3

-298-

to DME for follow up. DME then imported the data into in its own CRM system for easier tracking. Virtually all the data on DME's CRM initially came from dmarcian platform, although DME might have had a small number of customers originate in Europe which it stored on its own CRM along with the CRM data provided by dmarcian. DME also retained access to the dmarcian CRM system also which has US customer data, including US customers with European offices among others. DME's access to dmarcian's CRM was used by DME to discover Europe-based clients that might have opted to use the non-European platform and to augment DME's CRM with data from dmarcian's US-based CRM.

4.      The CRM contains all the information about the customer, including how and when they access the platform, their billing history, their contact information, market information collected about the client's company, and emails with the customer about their account. This data supports sales and customer relationships.

5.      The CRM database is different from dmarcian's application database. DME did not have its own separate application database (what we refer to as "the platform") which runs in a number of different locations, including the United States among other locations across the globe. The application is populated with DMARC data which is separate and distinct from the CRM data. CRM is an operational resource for client relationship management.

6.      The historical customer data and service requirements and other forensic data used to identify threats to help us protect client's domain presence and infrastructure is stored on the application platform, not the CRM system, as well as all customers' DMARC XML data. Nor is the source code stored on the CRM.

7.      On April 1, 2021, I reviewed the dmarcian.co.uk website. Attached as **Exhibit C** hereto is a screenshot and printed version of the registration page used by DME, as well as a printed copy which shows the date and that it comes from the

Document Ref: DGHVW-W4EPN-AGMXK-HKCNJ

dmarcian.co.uk website.  This registration page reflects that it is targeted to customers across the globe, including "the Americas", with shading that includes the United States. Although the registration page says "Register on our American Instance of dmarcian" (which suggests dmarcian, Inc., when I clicked the registration page and it took me to DME's new and separate platform.

8.    DME's registration page is, from the user's perspective, identical to dmarcian's page which shows the same geographic regions and gives the same registration options.

9.    DME has also posted a page using a dmarcian's logo (the square with the "d" which we have used since 2012) on LinkedIn.com reflecting DME's intent to market "across the globe" and not just in Europe.   A screenshot is attached as **Exhibit D** hereto.

I declare under penalty of perjury that the foregoing is true and correct.

This the 7\_\_\_ day of April, 2021.

*Tim Draegen*

_____
TIMOTHY DRAEGEN

3

Document Ref: DGHVW-W4EPN-AGMXK-HKCNJ

Page 3 of 3

-300-



# Signature Certificate

Document Ref.: DGHVW-W4EPN-AGMXK-HKCNJ

Document signed by:

**Tim Draegen**
Verified E-mail:
tim@dmarcian.com

*Tim Draegen*

IP: 68.235.242.215    Date: 07 Apr 2021 18:25:39 UTC

Document completed by all parties on:
07 Apr 2021 18:25:39 UTC
Page 1 of 1

Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing SUPPLEMENTAL DECLARATION OF TIMOTHY DRAEGEN was served upon counsel for all other parties to this action listed below pursuant to N.C. R. Civ. P.5(b) by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorney for dmarcian Europe BV*

This the 7th day of April, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER
DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiff*

Register an Account at dmarcian - dmarcian Europe BV                    https://dmarcian.co.uk/register/



Why DMARC    Solutions    Pricing    Tools    News    Sign Up Free        Login
Contact

# Choose your region

If you are interested in becoming a reseller or a referral -or- if you are an ESP/ISP or MSP/MSSP, we have resources for you!

## No payment details required to start your 14 day Free Trial.

            

### Americas
Register on our American instance of dmarcian.

### Europe/Africa /Russia
European data stays within Europe to fully comply with data protection regulations.

### APAC
Register on our Asia-Pacific instance of dmarcian.

### Japan
Japanese data stays within Japan to remove issues related to APPI cross-border data transfer.

SIGN UP FREE        SIGN UP F



Hello! Can I help you?

**Exhibit C**

1 of 1                                                                      4/1/2021, 12:58 PM

dmarcian EUROPE

Why DMARC    Solutions    Pricing    Tools    News and Knowledge    Contact    Sign Up Free    Login

# Choose your region

If you are interested in becoming a reseller or a referral -or- if you are an ESP/ISP or MSP/MSSP, we have resources for you!

No payment details required to start your 14 day Free Trial.

## Americas

Register on our American instance of dmarcian.

SIGN UP FREE

## Europe/Africa/Russia

European data stays within Europe to fully comply with data protection regulations.

SIGN UP FREE

## APAC

Register on our Asia-Pacific instance of dmarcian.

SIGN UP FREE

## Japan

Japanese data stays within Japan to remove issues related to APPI cross-border data transfer.

Hello! Can I help you?

-304-

**Linked** in    Jobs ▼    dmarcian Europe    Worldwide    ● www.linkedin.com/company/dmarcian-europe/    🔍    Join now    Sign in

**dmarcian Europe**
Computer & Network Security

Dordrecht, ZH · 21 followers

We're on a mission to spread DMARC across the globe to make email and the internet safer for all.

Follow

🧑‍🤝‍🧑 View all 13 employees

## About us

dmarcian Europe B.V. helps people deploy DMARC - Domain-based Message Authentication, Reporting and Conformance.

Dmarcian is dedicated to upgrading the world's email by making DMARC accessible to all. dmarcian brings together thousands of senders, vendors and operators in a common effort to build DMARC into the email ecosystem. Our customers range from banks and top internet properties to governments, marketing agencies, telecoms, nonprofits, and commercial enterprises of all sizes. dmarcian is the leading full-service provider of DMARC services.

Used by thousands and recommended by support teams around the globe, dmarcian users enjoy access to expert support, human friendly articles and videos, and a growing global network of DMARC deployment partners. dmarcian has an international track record for helping businesses and governmental organizations across the globe and of all sizes deploy DMARC.

With offices in The Netherlands and Bulgaria, dmarcian Europe B.V. prides itself on being a champion of DMARC and of secure email.

| | |
|---|---|
| Website | https://dmarcian-europe.com ⧉ |
| Industries | Computer & Network Security |
| Company size | 11-50 employees |
| Headquarters | Dordrecht, ZH |

### Similar pages

🔵 **dmarcian**
Computer & Network Security
Brevard, NC

### Browse jobs

**Technical Lead jobs**
99,457 open jobs

**Architect jobs**
78,996 open jobs

**Data Analyst jobs**
39,864 open jobs

**Account Manager jobs**
74,017 open jobs

**Manager jobs**
1,210,389 open jobs

**Analyst jobs**
467,790 open jobs

**Customer Assistant jobs**
124,013 open jobs

× **You're signed out**
Sign in for the full experience

Sign in

Join now

Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

           Plaintiff,

    v.

DMARCIAN EUROPE BV

           Defendant.

DECLARATION OF
TIMO JANSEN

NOW COMES the undersigned Declarant and states that the following is true of her own personal knowledge:

1.    I am Dutch counsel to dmarcian, Inc., the Plaintiff in the above captioned matter ("dmarcian", "Inc." or "Plaintiff") and I make this declaration in relation to the proceedings ongoing in the United States District Court, Western District of North Carolina.

2.    I was retained in November 2020 by dmarcian, although my significant work began in late January 2021.

3.    On Friday 22 January 2021, I sent a conditional notice of termination to Dmarcian Europe BV ("Defendant") i.e. Hub Harmeling, its court appointed director. A true and correct copy of the notice is attached hereto as Exhibit A.

4.    The purport of the conditional notice of termination was that since his appointment by decision of the Enterprise Chamber of 10 September 2020, dmarcian has on various occasions urged the necessity of immediate interventions in the

1

business operations of Defendant but, unfortunately, these calls to action were to no avail.

5.    Consequently, the unwarranted circumstances that existed since December 2019 continued and from a business continuity perspective, dmarcian was no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to Defendant. Violating the parties' agreement, Defendant refused to recognise and respect the proceeds of dmarcian's business efforts, i.e. challenging dmarcian's IP rights, transferring operational control of dmarcian.eu and generally denying the arrangements set out in the December 2016 e-mails that were constituent of the cooperation between the parties.

6.    dmarcian considered under which conditions it was prepared to continue its cooperation with Defendant, set those conditions out in a distribution agreement and a settlement agreement that were attached to the notice, and indicated that if these agreements were not in place by 1 February 2021, dmarcian would terminate the cooperation between the parties as per 1 February 2021.

7.    Instead of entering into good faith negotiations on the agreements offered, Hub Harmeling instructed Dutch counsel to initiate summary proceedings ("*kort geding*"). On Monday 25 January 2021, dmarcian was given notice that Defendant would initiate summary proceedings at the shortest term possible, in which it would request an order to continue the agreement between the parties. A true and correct copy of the e-mail of 25 January 2021 and an unofficial translation is attached hereto as Exhibit B.

8.    On Tuesday 26 January 2021, I responded on behalf of dmarcian that the position Defendant was in, was the direct result of the misconception of its legal position and its subsequent behaviour since December 2019 that undermined the once promising cooperation between the parties. Although dmarcian had been fore bearing

2

since December 2019 while the parties' business relationship in terms of adding and servicing dmarcian customers continued, no movement toward a resolution occurred and dmarcian was no longer prepared to let Defendant run its course. In this light the anticipated termination and measures indicated in the 22 January letter were necessary and appropriate to protect dmarcian's legitimate business interests and its IP rights. In this e-mail, it was specifically indicated that Defendant could decide to resolve to initiate summary proceedings in The Netherlands, but Dutch courts have no competence over dmarcian and, consequently, a Dutch judgment cannot be enforced against it in its jurisdiction of residence. Consequently, taking such a legal measure would be to no avail. The appropriate way to resolve the concerns expressed by Defendants Dutch counsel was by coming to terms with dmarcian. A true and correct copy of my e-mail of Tuesday 26 January 2021 is attached hereto as Exhibit C.

9.      Nonetheless, Defendant pursued summary proceedings and informed Shannon Draegen, Tim Draegen and myself as counsel to dmarcian, by e-mail of Thursday 28 January 2021 that a date for a hearing in summary proceedings was set on Monday 1 February 2021 between 09:00 and 10:30 hrs. CET at the District Court in Rotterdam. True and correct copies of these e-mails of Tuesday 26 January 2021 are attached hereto as Exhibit D.

10.     On Friday 29 January 2021, 17:44 CET, Dutch counsel to Defendant sent a copy of an English translation of the writ of summons that was served on the Public Prosecutors Office in Rotterdam for service on dmarcian under the Hague Convention of 15 November 1965 on the service abroad in Civil Matters to Shannon Draegen and Tim Draegen. A true and correct copy of this e-mail of Friday 29 January 2021 is attached hereto as Exhibit E.

11.     On Monday 1 February 2021, the hearing in the summary proceedings initiated by Defendant occurred. dmarcian did not appear in said proceedings as it

3

contests jurisdiction of the adjudicated court and was not able to prepare for said hearing or make travel arrangements to attend, given the undue term upon which the hearing was scheduled.

12.    Nonetheless, the president of the Rotterdam District Court gave a default judgment that same day, ordering dmarcian to continue to perform under a provisionally assumed agreement with defendant and subsequently to restore Defendant's access to the dmarcian platform. A true and correct copy of the English translation of the judgment of 1 February 2021 is attached hereto as Exhibit F.

13.    In the Order of 31 March 2021 of the United States District Court, Western District of North Carolina, the Court questioned whether the Rotterdam proceedings could have partially determined the legal relationship between the parties and may therefore have a preclusive effect on the Plaintiff's claims brought before it.

14.    In response to this, it must firstly be noted that the nature of the summary proceedings under Dutch law, precludes that such proceedings result in a determination of the legal relationship between the parties in such proceedings. These proceedings can only result in provisional measures, not declaratory judgments or decisions on the merits, and they do not prejudice the parties' rights, if jurisdiction is satisfied, to adjudicate on the merits in main proceedings.  These rules follow from Articles 254 and 257 of the Dutch Code of Civil Proceedings (**DCCP**).

15.    Secondly, the 1 February 2021 Rotterdam judgment is a default – *ex parte* – judgment. Consequently, the proceedings which resulted in this judgment can be reopened by serving a writ of summons with which the claims are opposed.  After service of such a writ, the proceedings in first instance will be reopened as adversarial proceedings, resulting in an adversarial judgment in first instance that can be appealed.

16.    On 6 April 2021, we served such a writ on Defendant and therewith the Rotterdam summary proceedings will be continued with a hearing on 10 May 2021,

4

resulting in an adversarial judgment thereafter, usually within two weeks. A true and correct copy of the writ of 6 April 2021 is attached hereto as Exhibit G. An English translation is forthcoming.

17.    As indicated in the writ of 6 April 2021, dmarcian contends that Dutch courts lack jurisdiction to consider this matter and that the legal relationship between the parties is governed by foreign law. I believe very firmly that the court will accept this line of reasoning in its adversarial judgment and will consider itself not competent in this matter. What follows below in this Declaration are summaries of points we have made on behalf of dmarcian in the writ of 6 April.

18.    In § 6.2.1 of its writ of 29 January 2021 (**Writ**) Defendant contended that Dutch Courts have jurisdiction in this matter on the basis of Article 6 DCCP: *"With respect to dmarcian Europe's claims against dmarcian Inc., there is an obligation arising from an agreement. Article 6{a) DCCP stipulates that the Dutch court has jurisdiction in such a case, if the obligation underlying the claim or request has been performed or is to be performed in the Netherlands. In the event of a contract for services, the Netherlands is considered to be the place of performance if the contract stipulates that the services were provided or should have been provided in the Netherlands (Article 6a DCCP). This applies in this case. Under the Agreement, dmarcian Europe was responsible for the sale of the software and the provision of the accompanying services to customers in Europe, Russia and Africa (cf. para. 2.5 of the Enterprise Court's decision dated 7 September 2020). dmarcian Europe performed these services from its place of business, the Netherlands. For this reason, the Dutch court has jurisdiction to hear this dispute pursuant to Article 6(1) DCCP."*

19.    However, this argument wrongfully denies that Article 6(a) DCCP only creates jurisdiction *if the obligation underlying the claim or request has been performed or is to be performed in the Netherlands*. This is obviously not the case, as Defendant

claims performance under the alleged contract by dmarcian and access to the dmarcian platform, all of which occurs in the United States. In other words, performance of these claims is to be effectuated in the United States of America, dmarcian's country of residence and the locus of its business activities. Consequently, Dutch courts have no jurisdiction to consider the claims of Defendant on dmarcian.

20.     That Dutch courts have no jurisdiction is sensible in light of the fact that under Dutch international private law the relationship between dmarcian and Defendant is governed by US law. This  follows from the fact that, following § 3.1 of its 29 January Writ, Defendant 's legal ground for its claims for performance and access is the oral agreement, allegedly concluded on 22 January 2016 between Tim Draegen, dmarcian, TDX and Defendant (then called Mailmerk): "*Under this Agreement, dmarcian Inc granted dmarcian Europe, in exchange for an option provided to dmarcian Inc and/or Draegen to acquire a majority interest in dmarcian Europe, a perpetual, exclusive license for the use of the dmarcian software and the licensing thereof to customers in Europe. Russia and Africa*", § 3.2 Writ.

21.     Leaving aside that no verbal agreement with these terms was concluded by Tim Draegen, dmarcian, TDX and Defendant on 22 January 2016 and that dmarcian has a different view on the contract terms in fact between the parties, as set out in its Memorandum of Law of 25 March 2021 submitted to the United States District Court, it is *in confesso* between the parties that the licensing of Defendant by dmarcian is the most characteristic performance in the legal relationship between the parties. That the license aspect of the contract and not Defendant's sale activities in its territory is most characteristic to the legal relationship between the parties, not only follows from the factual statements of Defendant itself, see § 1.1, § 2.14, § 2.31, § 2.33, § 2.34, § 3.2, § 3.3, § 3.4 en § 3.10 of its Writ, but it also follows from recital 2.5 of the 7 September 2020 Decision of the Enterprise Chamber of the Amsterdam court of Appeals and the

6

fact that the parties did not transact on the manner according to which Defendant was to sell dmarcian software in its territory.  Under these circumstances it follows from Article 4 of Regulation (EC) No 593/2008 of the European Parliament and of the Council on the law applicable to contractual obligations (Rome I) that the contract between dmarcian and Defendant shall be governed by the law of the United States of America, the country where dmarcian, the party required to effect the characteristic performance of the contract, has its habitual residence. In other words, the law where the Licensor is located (here, dmarcian located in the United States) applies to the relationship.

22.    The contract is also most closely connected to the law of the United States of America, which is another ground for assuming it to be governed by American law following Article 4 Rome I Regulation,  as its subject matter concerns software, brands and images that are developed in the United States and are protected by American intellectual property rights. Moreover, the claim for access concerns the dmarcian platform, which is managed by dmarcian in the United States.

23.    Consequently, it follows from Article 4, par. 2 and 4, Rome I  Regulation that the contract between dmarcian and Defendant is governed by the law of the United States of America, which then in particular governs: interpretation; performance; the consequences of a breach of obligations; termination and prescription of obligations; and nullity. And under those consequences and the others discussed above, the Rotterdam Court has no authority to exercise jurisdiction over dmarcian.

24.    In addition, the boundaries of the authority of the Enterprise Chamber court of Appeals where Defendant started an inquiry in August 2020 are limited to internal corporate governance matters, in this case, those internal corporate governance matters of Defendant.  As we have said on our own firm's website (https://www.lexence.com/en/inquiry-proceedings-before-the-enterprise-chamber/), the "purpose of inquiry proceedings is to request an investigation by a court-appointed

7

expert into the affairs of a company (or another entity running a business enterprise) based on alleged mismanagement. Factors often leading to such a request include a deadlock in the decision-making process, an alleged failure by the board to adequately inform minority shareholders or a conflict within or between the company's corporate bodies."

25.    Remedies that can come from an Enterprise Chamber proceeding include the appontment of a provisional director or other measures to resolve a deadlock within the company.  The Enterprise Chamber has no authority over third parties that may have contracts with the entity whose internal affairs are brought before the Enterprise Chamber.

26.    Tim Draegen in his individual capacity is a majority shareholder in Defendant.  dmarcian has no relation to the internal corporate affairs of Defendant.


I declare under penalty of perjury that the foregoing is true and correct. This the 7ᵗʰ day of April, 2021.

TIMO JANSEN

door TJA op 19:23,  7-4-2021

4/7/2021                                      Timo Jansen - Lexence





**LAWYER, PARTNER**
# Timo Jansen

PHONE NUMBER
**+31 20 5736 842**

MOBILE
**+31 65 1335 998**

E-MAIL
**t.jansen@lexence.com**

EXPERTISE
**Litigation**

⌄

menu          🔍

Case 1:21-cv-00067-MR   Document 17   Filed 04/07/21   Page 9 of 14

-314-

# About Timo Jansen

Timo Jansen has extensive experience in the prevention and resolution of corporate and contractual disputes, particularly in the areas of pre-contractual liability, M&A, joint ventures, directors'/shareholders' liability and franchises/distribution. He also acts in professional liability and fraud cases. His clients come mainly from the insurance, retail (food and non-food) and telecommunications sectors.

Timo has been with Lexence since 2010 and is a member of the management board since 2019. He studied law at Universiteit Utrecht where he also completed the Law & Economics master's program. Since then he has studied corporate litigation and advanced financial statement analysis in postgraduate specialization courses at, respectively, Grotius Academie and Amsterdam Institute of Finance. Timo was admitted to the Dutch Bar in 1998.

Chambers (2021)

*"Timo Jansen advises a client roster of banks and other financial institutions, as well as private individuals, on a range of contentious cases, including shareholder disputes and professional liability cases. Market commentators highlight his focus on commercial litigation."*

CHAMBERS

menu

International listings

Publications

# Latest news

Read more



Legal Operations: just settlements in the shadow of the law

**PUBLICATION**

 



menu

PUBLICATION

# Litigation and alternative dispute resolution – Annual review

PUBLICATION



advocaten & notarissen
Amstelveenseweg 500
1081 KL Amsterdam
The Netherlands
T +31 20 5736 736
info@lexence.com

Quick links                                              menu

-317-

4/7/2021                                         Timo Jansen - Lexence

© 2021 Lexence

Cookie statement      General terms and conditions      Privacy statement

menu

-318-

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing DECLARATION OF TIMO JANSEN was served upon counsel for all other parties to this action listed below pursuant to N.C. R. Civ. P.5(b) by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorney for dmarcian Europe BV*

This the 7th day of April, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER
DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiff*

1



**BY E-MAIL**

dmarcian Europe B.V.

H.J. Harmeling

Burgemeester de Raadtsingel 93

3311JG   DORDRECHT

**hub.j@icloud.com**

| | |
|---|---|
| Place, date | Amsterdam, 22 January 2021 |
| Our reference: | /47463/7045440.2 |
| Re: | Conditional notice of termination |
| Your reference: | Continuing issues |
| From: | Timo Jansen, Lawyer, Partner |
| Telephone: | Fax: | E-mail: |
| +31 20 5736 812 | +31 20 5736 884 | t.jansen@lexence.com |

Dear Mr. Harmeling,

On behalf of dmarcian, Inc. (**dmarcian**) I inform you as follows.

Following your appointment by decision of the Enterprise Chamber of 10 September 2020 as director of dmarcian Europe B.V. (**DME**), dmarcian has on various occasions urged the necessity of immediate interventions at the DME level. Reference is made to the 14 and 16 September 2020 e-mails sent by dmarcian's US counsel and the subsequent course of events. Unfortunately, these calls to action were to no avail.

Consequently, the unwarranted circumstances that have existed since December 2019 continue. From a business continuity perspective, dmarcian is no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to DME, whereas DME refuses to recognise and respect the proceeds of dmarcian's business efforts, i.e. challenging dmarcian IP rights, transferring operational control of dmarcian.eu and generally denying the arrangements set out in the December 2016 e-mails that were constituent of the cooperation between dmarcian and DME.

dmarcian has considered under which conditions it is prepared to continue its cooperation with DME.

These conditions have been set out in the attached Distribution Agreement and Settlement Agreement. You will appreciate that the Distribution Agreement changes the scope of the cooperation between the parties considerably. This is explained by the breach of trust caused by the sequence of events triggered by DME in December 2019. Moreover, you will

**Exhibit A**

Amstelveenseweg 500, 1081 KL Amsterdam · T:+31 (0)20 5736 736 · F :+31 (0)20 5736 737 · KvK: 34191068 · btw: NL812001217B01
Postbus 75999, 1070 AZ Amsterdam, Nederland · E: info@lexence.com · W: www.lexence.com · Member of Meritas Law Firms Worldwide

Op alle dienstverlening door of namens Lexence N.V. zijn exclusief van toepassing de algemene voorwaarden van Lexence N.V., gedeponeerd bij het handelsregister te Amsterdam onder nummer 34191068. De algemene voorwaarden bevatten een aansprakelijkheidsbeperking, worden op verzoek verstrekt en zijn te vinden op www.lexence.com. Alle opdrachten worden, met terzijdestelling van artikelen 7:404, 7:407 lid 2 en 7:409 BW, uitsluitend aanvaard en uitgevoerd door Lexence N.V.

All services by or on behalf of Lexence N.V. are exclusively governed by the general terms and conditions deposited with the trade register in The Netherlands under number 34191068. The general terms and conditions contain a limitation of liability, will be sent on request and are to be found on www.lexence.com. Under exclusion of Sections 404, 407(2) and 409 of Book 7 of the Dutch Civil Code, all assignments will be exclusively accepted and performed by Lexence N.V.



appreciate that the Settlement Agreement serves to formalize and settle the constituent arrangements referred to above.

Please inform me whether DME will agree to the attached agreements before **1 February 2021, 17:00 CET**.

If the agreements are not in place by then, dmarcian will terminate the cooperation between the parties with immediate effect as per 1 February 2021. This means that, from that day on, all access to the dmarcian systems will be terminated and the use of the dmarcian brand name, domain names, other IP rights and materials is no longer allowed.

I can imagine that these demands may appear strict but I trust that you, as a seasoned IP lawyer, understand that under the current circumstances dmarcian does not have any other option to force a breakthrough.

Please feel free to contact me for a further explanation if necessary.

Yours sincerely,



Timo S. Jansen

door TJA op 12:28,  22-1-2021

**Copy: M.C. Luiten; L. Geldof; Y. Borrius; F. Henke; and P.A. Josephus Jitta.**

**DMARCIAN, INC.**
**DISTRIBUTION AGREEMENT SIGNATURE PAGE**

1.      <u>Company</u>:  dmarcian, inc., a Delaware corporation (the "<u>Company</u>").

2.      <u>Distributor Name and Address</u>:  dmarcian Europe BV, a Netherlands private company with limited liability with principal offices at 3311 JG Dordrecht, Burgemeester de Raadtsingel 93 (the "<u>Distributor</u>").

3.      <u>Effective Date</u>: January _____, 2021.

4.      <u>Term</u>:  The term shall commence on the Effective Date and shall continue until terminated by either party on not less than ninety (90) days' notice.

5.      <u>License</u>:  Company grants to distributor a non-exclusive, territorial, limited, terminable, right and license to market, offer, distribute, and resell Company's technology, software, DMARC SaaS platform, maintenance services, deployment services, and second level email support services (collectively, the "<u>Services</u>") to help Distributor's customers secure their email (the "<u>License</u>").  The License is limited to, and only for customers with principal offices in the following territory:  The European Union (the "<u>Territory</u>")

6.      <u>Royalties</u>:  Distributor shall pay to Company eighty percent (80%) of the Net Revenue received by Distributor from its customers in connection with such customers' receipt of the Services (the "<u>Royalties</u>").  Once each calendar month the Distributor shall provide to the Company an accounting of the Net Revenue received by the Distributor from Distributors customers during the prior calendar month, including the kind of revenue received as set forth hereinabove, and shall accompany such report with a check to the Company for Royalties due for such prior month.

        This Distribution Agreement (the "<u>Agreement</u>") incorporates the Terms and Conditions attached hereto and is entered into by and between the Company and the Distributor as of the Effective Date.

**dmarcian, inc.**                          **dmarcian Europe BV**


By: _____      By: _____
Name: Shannon Draegen                       Name: _____
Title:  Director                            Title: _____

**TERMS AND CONDITIONS**

These Terms and Conditions are part of and incorporated into the dmarcian inc. distribution Agreement to which they are attached, and are made by and between the Company and the Distributor as of the Effective Date set forth therein.

**1.      DEFINITIONS AND INTERPRETATION**

"**Confidential Information**" means all information disclosed (whether in writing, orally or in machine readable form) by a party to the other party whether before or after the date of the Agreement, including, without limitation, non-public personal information and data, information relating to a party's products, Distributors, operations, processes, plans or intentions, product and pricing information, market opportunities and business affairs, technical data, financial data or know-how including but not limited to, that which relates to each party's research, software, documentation, analysis, conversion methodologies, software source and object code, services, development, inventions, techniques, designs and engineering.  Distributor acknowledges and agrees that Company's Confidential Information contains highly confidential, unique, secret and valuable information and constitutes trade secret information and protectable industrial "know how" and "show how".

"**Intellectual Property Rights**" include copyrights, registered designs, patents, trademarks, service marks, design rights (whether registered or unregistered), semiconductor topography rights, mask work rights; applications for any of the above, rights to extract data, trade secrets, rights of confidence and all other similar rights recognized in any part of the world.

"**Net Revenue**" means amounts received in consideration for use of the Services by Distributors' customers' with principal offices in the Territory, less chargebacks, refunds, and taxes.

"**Taxes**" means all sales, use, excise, value added, and other taxes and duties however and wherever designated and which a taxing authority indicates are assessable.  Taxes will not include any (a) corporate, business and franchise taxes of Company, (b) withholding taxes and personnel-related taxes of Company, or (c) levies by taxing authorities that are based upon the net income of Company.

**1.1**      All items defined on the signature page to which these terms and conditions are attached have the meanings set forth therein.

**1.2**      The headings in the Agreement are for ease of reference only and in no way affect the interpretation of the provisions of the Agreement.

**2.      SERVICES**

**2.1**      Company agrees to furnish the Services to the Distributor customers and Distributor agrees to use its best efforts to market, offer, advertise, distribute and sell the Services to its customers.

**2.2**      The Company may modify the Services from time to time during the Term.

**2.3**      In the event that any custom work, modifications, or professional services are requested by Distributor on behalf of itself or a customer, the Company and Distributor shall negotiate in good faith concerning the features, timing, charges, and payment for development by the Company of the requested custom work, modifications, or professional services, including the features, timing, charges, and payment with regard to the customer.

1

**2.4**    Distributor shall provide first level support to its customers.  Distributor shall communicate with its customers, manage its customers' issues, and ensure appropriate resolution of such issues.  In connection therewith, the Company will communicate with Distributor and assist Distributor in resolving such customers' issues.

**3.    TERM**

**3.1**    Upon expiration of the initial Term, the Agreement shall automatically renew and extend for successive one (1) year periods (each, an extension of the Term), unless contrary notice in writing is given by Distributor or Company at least sixty (60) days prior to expiration of the then-current Term. At the end of the initial Term and any extension of the Term, Company may increase the Royalties payable hereunder for the subsequent extension of the Term by notifying Distributor in writing of such increase at least sixty (60) days prior to the end of the then-current Term.

**4.    GENERAL RESPONSIBILITIES**

**4.1**    Company is entitled to rely on the accuracy of all information provided by Distributor. Distributor agrees to promptly inform Company of any such data or information that is inaccurate or incorrect and bears the costs of correction.  Distributor will have the sole responsibility and liability for the adequacy, completeness, accuracy of data, documents and other records of or relating to it and or its customers provided by Distributor to Company, and Distributor acknowledges that Company is entitled to rely upon and act in accordance with any instructions, guidelines or information provided to Company by Distributor.

**4.2**    Company will have no liability related to the reliability or continued availability of internet connections, telephone lines and other communications equipment used by Distributor and Distributor's customers.

**4.3**    Each party is responsible for compliance with all applicable laws, rules, and regulations applicable to its provision or receipt of the Services, as applicable.

**5.    COMPANY RESPONSIBILITIES**

**5.1**    Company may subcontract the performance of all or substantially all of the Services.

**6.    WARRANTIES**

**6.1**    Company represents and warrants that it owns or has all necessary rights, authorizations and licenses in all Intellectual Property Rights in and to the Services to enable Company to perform the Services; provided that the sole and exclusive remedy of Distributor in connection with any breach of the foregoing with regard to any third party claims shall be to indemnify Distributor for any resulting claims.

**6.2**    Company shall not be in breach of any warranty contained in this Section 6 to the extent such breach is caused by the acts or omissions of Distributor, including any failure of Distributor to follow the instructions contained in any written instructions that Company provides in any forum for use of the Services.

**6.3**    EXCEPT FOR THE WARRANTIES PROVIDED IN THIS SECTION 6, THE SERVICES ARE PROVIDED "AS IS" AND "WITH ALL FAULTS" AND NEITHER COMPANY NOR ANY OF ITS AFFILIATES MAKES, AND EACH HEREBY FULLY DISCLAIMS, ANY OTHER

2

REPRESENTATIONS, WARRANTIES AND/OR CONDITIONS REGARDING THE SERVICES, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, AND WHETHER ARISING BY STATUTE OR OTHERWISE IN LAW, OR FROM A COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, INCLUDING ANY REPRESENTATION, WARRANTY OR CONDITION THAT THE SERVICES WILL MEET THE REQUIREMENTS OF DISTRIBUTOR AND ITS AFFILIATES OR THAT THEIR USE WILL BE UNINTERRUPTED OR ERROR-FREE, OR REGARDING MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE EVEN IF THE COMPANY HAS BEEN ADVISED OF SUCH PURPOSE. IN ADDITION, COMPANY SHALL NOT BE HELD RESPONSIBLE FOR ACTS OR OMISSIONS OF DISTRIBUTOR OR DISTRIBUTOR'S CUSTOMERS IN CONNECTION WITH ITS USE OF THE SERVICES IN ANY MANNER NOT SPECIFICALLY AUTHORIZED HEREBY, INCLUDING FOR DISTRIBUTOR'S FAILURE TO TAKE APPROPRIATE PRECAUTIONS REGARDING THE MARKETING, OFFERING, DISTRIBUTION, AND SALE OF THE SERVICES AND THE RESULTS THEREOF, OR DISTRIBUTOR'S FAILURE TO USE THE SERVICES IN ACCORDANCE WITH APPLICABLE LAWS.

## 7. ROYALTIES

**7.1**    The Royalties for the Services will be as specified on the Signature Page above.

**7.2**    All Royalties quoted herein are net of Taxes. If required by applicable National, State, or local laws or regulations, Company will add the amount of any applicable Taxes to the invoice, and upon receipt of payment from Distributor, will remit all applicable Taxes to the appropriate taxing authorities.

## 8. TERMS OF PAYMENT

**8.1**    Company may charge late charges of one and one-half percent (1½%) on any past due payment, and may charge interest at the greater or 10% per annum simple interest or the highest rate allowed by law, per month, on any payment received more than thirty (30) days after the date such payment is due. Company may suspend the Services if non-payment exceeds sixty (60) days past the due date.

**8.2**    For a period of twenty-four (24) months after the month for which a payment is due Distributor will maintain complete and accurate accounting records in connection with the customers and Services for which such payment was due. Upon Company's request, Distributor shall provide Company with reasonable access to such records.

## 9. DISTRIBUTOR RESPONSIBILITIES

**9.1**    Distributor shall ensure that (i) the Services are only provided to Distributor's customers, and (ii) each new customer domain is set up as a group specific to that customer and that no domains not owned or controlled by that customer are included in that customer's account.

**9.2**    Distributor will provide to Company all necessary, appropriate, or requested documentation concerning its customers. In the event that a customer of Distributor exceeds Company's then current "Enterprise Distributor" threshold, then such Distributor customer shall be billed at Company's then current "Enterprise Distributor" rates.

**9.3**    Distributor will cooperate with, make available appropriate resources and provide reasonable

3

assistance to Company in order to assist Company in carrying out its obligations under the Agreement. Company shall not be responsible for any delays or failures of the Services to the extent resulting from (i) Distributor's failure to provide access to required facilities or personnel or (ii) delay or deficient performance by Distributor or Distributor's third party service providers in performing any obligation it or they may have as part of the Agreement.  If Company is required to perform any additional work as a result of the foregoing, all resulting non-productive or additional service time will be chargeable to Distributor at Company's then current professional services rates.

**9.4**    Distributor acknowledges and agrees on behalf of itself and its customers and affiliates that neither Company nor its affiliates shall be deemed to have any obligation or liability to Distributors' customers or any other third party in relation to the Services or use thereof by them as may be permitted pursuant to the Agreement.

**9.5**    Distributor will comply with all operating instructions for the Services that are issued by Company from time to time.  Distributor will develop and maintain operational procedures as they relate to the administration of its customers and the accuracy of data reported to the Company and perform such other Distributor obligations as identified by the Company from time to time.

**9.6**    Distributor, at its expense, will maintain all insurance and fidelity bond coverage required of Distributor by the applicable regulatory authorities related to Distributor's business activities in connection with the Services received under the Agreement.

**9.7**    Distributor shall not (a) reverse engineer, disassemble, decompile, or otherwise attempt to derive source code from the Services, (b) make the Services available to any third parties other than its customers for whom Distributor is paying the Company, or as prohibited by this Agreement, (c) modify, adapt, translate, or create derivative works from the Services, (d) reproduce any portion of the Services, or (e) permit or authorize any person to do any of the foregoing.

## 10. GENERAL INDEMNITIES

**10.1**    Distributor will indemnify and hold Company, its affiliates, and all of their respective officers, directors, agents and employees (each, an "<u>Indemnitee</u>") harmless against any and all claims, actions, damages, liabilities, loss, injury, obligation, assessment, demand, fine, penalty, costs, and expenses (including without limitation, payment of reasonable attorney's and professional's fees and expenses as and when incurred) asserted by a third party to the extent arising out of or resulting from:  (A) Distributor's negligent acts, omissions, or willful misconduct; (B) any violation by Distributor of any applicable law, (C) claims related to combination or use of the Services with products or services not supplied by Company; (D) claims related to Company's compliance with designs or specifications furnished by or on behalf of Distributor; (E) Distributor's breach of any provision of this Agreement, and (F) Distributor's offer or use of the Services in any unauthorized manner.

**10.2**    In the event that a claim is commenced by a third party Company shall promptly notify Distributor in writing of any such claim, provided, however, the failure by Company to give such notice shall not relieve Distributor of its obligations under this Section, except to the extent that Distributor is materially prejudiced as a result of such failure.

## 11. OWNERSHIP

**11.1**    All rights, title and interest (including, without limitation, Intellectual Property Rights) in the Services, Company technology and software, and any updates, upgrades, enhancements or

4

modifications thereto and any other intellectual property developed by Company (whether conceived or developed individually or jointly with Distributor) will vest in Company.

**11.2**    Distributor will have no right to any copyrighted material, logos, trade names, trademarks or service marks used by Company in connection with the Services other than as provided hereunder. Distributor hereby sets over and assigns to the Company all right, title and interest in all suggestions and improvements by Distributor and its customers.

## 12. LIMITATION OF LIABILITY

**12.1**    COMPANY WILL HAVE NO LIABILITY FOR LOSS OF PRODUCTION, CORRUPTION TO DATA, LOSS OF USE OF BUSINESS OR REVENUE, GOODWILL OR PROFITS, OR FOR SPECIAL, INDIRECT, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, WHETHER IN NEGLIGENCE, TORT OR IN CONTRACT, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WITH RESPECT TO, ARISING OUT OF OR IN CONNECTION WITH ITS OBLIGATIONS UNDER THE AGREEMENT OR THE SERVICES.

**12.2**    LIABILITY OF COMPANY UNDER OR IN CONNECTION WITH ANY CAUSE OF ACTION UNDER OR IN CONNECTION WITH THE AGREEMENT, INCLUDING BUT NOT LIMITED TO THOSE ARISING EITHER FROM BREACH OF CONTRACT, TORT, OR FROM NEGLIGENCE IN THE PERFORMANCE OF SERVICES, WILL NOT EXCEED THE AMOUNT OF ANY ROYALTIES PAID BY DISTRIBUTOR DURING THE TWELVE (12) MONTH PERIOD PRIOR TO THE DATE OF THE EVENT GIVING RISE TO SUCH CLAIM. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIMITATIONS OF LIABILITY IN THIS SECTION 12 SHALL NOT APPLY TO CLAIMS CONCERNING CONFIDENTIAL INFORMATION OR INTELLECTUAL PROPERTY, OR ARISING FROM GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

## 13. ASSIGNMENT

**13.1**    The Agreement may not be assigned or transferred (by operation of law or merger) by Distributor without Company's prior written consent, which consent will not be unreasonably withheld or delayed, except that either party may assign this Agreement in connection with the sale or other transfer of substantially all of its equity or assets.  To the extent assignment is permitted, the Agreement will be binding upon and will inure to the benefit of Company and Distributor and their respective successors and assigns.

## 14. PUBLICITY

**14.1**    Notwithstanding any other provision of this Agreement that may appear to be to the contrary, neither party may issue any press release or endorsement or other public announcement or statement that references the other party or includes statements attributable to the other party without the prior written consent of the other party, which consent may be withheld in the sole discretion of such party. Notwithstanding the foregoing, Company may provide such information regarding the Agreement and its relationship with Distributor as its legal counsel deems reasonably necessary for securities related transactions or filings, or as reasonably necessary for financial disclosure requirements, or as otherwise required by law but in each case in a manner consistent with its obligations hereunder.

## 15. CONFIDENTIALITY

**15.1**    A party receiving Confidential Information of the other party will:  (i) Not use the Confidential Information for any purpose other than the performance of its obligations under the Agreement, (ii) not disclose Confidential Information to any third party except with the prior written consent of the disclosing party, (iii) protect the Confidential Information using the same procedures and practices as the receiving party uses to protect its own Confidential Information, but in no event less than reasonable efforts, (iv) require its employees, agents and subcontractors who may gain access to the Confidential Information during the performance of their duties under the Agreement to comply with the provisions hereof, and (v) require its professional advisers (who may gain access to the Confidential Information as reasonably necessary to fulfill their fiduciary responsibilities to the receiving party) to comply with the provisions hereof.  Each party shall be responsible for any acts or omissions which are in violation of the terms and conditions of an Agreement by any agent or contractor to whom it has disclosed Confidential Information.   For clarity, no information concerning Distributor's customers is Confidential Information.

**15.2**    During the Term, the receiving party may disclose Confidential Information to any of its or its affiliates' directors, officers, employees, agents, or professional advisers to the extent that disclosure is necessary for the purposes of the Agreement or to fulfill such person's fiduciary responsibilities to the receiving party.  The receiving party will ensure that each such recipient is made aware of and complies with the receiving party's obligations of confidentiality under the Agreement as if such recipient were a party to the Agreement.

**15.3**    Each party undertakes within ten (10) business days of receipt of written request of the other party or on termination of the Agreement, whichever is earlier:  (i) To return the Confidential Information in its possession, custody or control or in the possession, custody or control of any of its other recipients, together with all copies thereof, (ii) on direction by the disclosing party, to destroy by shredding or incineration all documents and other material in its possession, custody or control which bear or incorporate any part of the disclosing party's Confidential Information and to certify to the disclosing party that this has been done; and (iii) further, to expunge (other than archival copies) all Confidential Information from any computer, word processor or similar device into which it was loaded, and to certify to the disclosing party that this has been done. Notwithstanding the foregoing, each party may retain copies of the Confidential Information to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information will remain subject to the terms and conditions of the Agreement.

## 16. TERMINATION

**16.1**    If either party commits any breach of the Agreement and, in the case of a breach capable of remedy, fails to commence such remedy within ten (10) days after written notice from the other party stating with particularity the claim of default, to remedy such breach, (and thereafter diligently pursue such remedy to completion), the non-defaulting party will be entitled to terminate the Agreement by giving written notice.

**16.2**    If either party:  (i) Passes a resolution for voluntary winding up or a court of competent jurisdiction makes an order that such party be wound up except for the purposes of bona fide reconstruction while solvent; or (ii) makes a composition or arrangement with its creditors; or (iii) has a receiver or manager or provisional liquidator or administrator appointed over the whole or a substantial part of its business or undertaking, or circumstances arise which would entitle a court of competent jurisdiction or a creditor to appoint the same, then the other party may terminate the Agreement by giving written notice of termination to that party with immediate effect.

**16.3**    On termination or expiration of this Agreement, each party shall pay to the other party all amounts due through the date of termination as required hereunder and Distributor shall immediately cease marketing, offering, distributing, and selling the Services.

**16.4**    This Agreement may be terminated by either party on not less than ninety (90) days' notice. In the event of such termination, the Distributor shall continue to pay Royalties to the Company for as long as Distributor's customers continue using the Services.

## 17. SURVIVAL OF OBLIGATIONS UPON TERMINATION

**17.1**    Sections which by their nature and to be effective should survive this Agreement will survive the termination or expiry of the Agreement, and will continue indefinitely, along with any additional Sections necessary for the interpretation of the above Sections, and all accrued right of actions and remedies referred to in the Agreement will, to the extent necessary for such interpretation, survive such termination or expiry and continue indefinitely.

**17.2**    The termination or the expiry of this Agreement will not prejudice or affect any right of action or remedy which has accrued to either party prior to such termination or expiry.

## 18. FORCE MAJEURE

**18.1**    Neither party will be liable for delay in performing any of its obligations insofar as the performance of such obligation is delayed by an event that is beyond its reasonable control. Any delay by a party in performing its obligations arising from the occurrence of such an event must be notified to the other party as soon as possible, together with details of the circumstances giving rise to the event.

## 19. COMPLETE AGREEMENT; SEVERABILITY

**19.1**    This Agreement constitutes the final, complete and exclusive agreement between the parties with respect to the subject matter hereof, and supersedes any prior or contemporaneous agreement, either written or oral. Any pre-printed terms and conditions on any materials that either party uses (e.g., purchase orders, order forms, invoices, website terms and conditions, browse-wrap or click-wrap terms and conditions) are specifically disclaimed and not agreed, and null and void and of no consequence whatsoever in interpreting the parties' legal rights and responsibilities hereunder.

**19.2**    If any provision of the Agreement is held invalid, illegal or unenforceable for any reason, that provision will be severed and the remainder of the provisions of the Agreement will continue in full force and effect as if the Agreement had been executed with the invalid provision eliminated. In the event of invalidity so fundamental as to prevent the accomplishment of the purpose of the Agreement, the parties will immediately commence negotiations in good faith to remedy that invalidity, whilst achieving the purposes of the Agreement.

## 20. APPLICABLE LAW

**20.1**    The Agreement and the transactions contemplated therein and all matters arising out of or relating thereto, including any Claims, shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of conflicts of law principles of the State of Delaware other than its choice of law rules. Each party hereby irrevocably consents to the exclusive jurisdiction and venue of the state and federal courts in Kent County, Delaware in connection with any dispute or the enforcement of any right or obligation arising from the Agreement.    EACH OF THE PARTIES HERETO

IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE PARTIES IN THE PERFORMANCE OR ENFORCEMENT HEREOF.

**20.2**     The prevailing party in an action brought against the other to enforce the terms of the Agreement or any rights or obligations hereunder, shall be entitled to receive its reasonable costs and expenses of bringing such action including its reasonable attorney's and other professionals' fees in addition to any other recoverable damages.

## 21. INJUNCTION

**21.1**     The parties acknowledge that the breach or threatened breach of Section 15, or any infringement or misappropriation of either Party's Intellectual Property Rights by the other party, would cause irreparable harm to the non-breaching party, the extent of which would be difficult to ascertain.  Accordingly, each party agrees that, in addition to any other rights or remedies to which a party may be legally entitled, a party may seek immediate temporary and preliminary injunctive relief in the event of a breach or threatened breach of such provisions by the other party or any of such party's employees, directors, subcontractors, agents, or representatives.

## 22. EXPORT RESTRICTIONS; LAWS; FCPA.

**22.1**     Distributor shall comply with all then current applicable laws, rules, and regulations relating to the export of technical data, including, but not limited to any regulations of the United States Bureau of Export Administration and other applicable governmental agencies.  Distributor shall not export directly or indirectly technical data (including via remote access, FTP or other means) to any country for which a validated license is required under United States law without first obtaining a validated license.  Distributor represents and warrants that it is not considered a national entity of, or under the control of, any country that the United States has currently imposed an embargo of goods.

**22.2**     Distributor shall not violate any law, statute, or regulation and shall at all times comply with the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq.

## 23. NOTICES

**23.1**     Any notice or other communication (other than a request for support) which is given under the Agreement to a party will be effective on receipt.

## 24. AMENDMENTS

**24.1**     No modification, amendment or variation of the Agreement will be effective or binding on the parties unless in writing and signed by the authorized representative of the party to be charged.

## 25. WAIVER

**25.1**     The failure of either party to seek redress for any breach or to insist upon the strict performance of any term, condition or provision of the Agreement or the failure of either party to exercise any right or remedy to which it is entitled under the Agreement, will not constitute a waiver and will not cause a diminution of the obligations established by the Agreement.

**25.2**   A waiver of any breach will not constitute a waiver of any other breach.

**25.3**   No waiver of any of the terms, conditions or provisions of the Agreement will be effective unless it is in writing, specifically referencing the right or obligation waived.

## 26. INDEPENDENT CONTRACTOR

**26.1**   Distributor is acting as an independent contractor to the Company, and not as a partner, joint venturer or agent.  The parties do not intend to create an employer-employee relationship.  Each party retains control over its personnel, and the employees of one party shall not be considered employees of the other party.  Neither party will be bound by any representation, act or omission of the other party to any third party.  Neither party has any right, power or authority to create any obligation, express or implied, on behalf of the other party.

## 27. INSURANCE

**27.1**   Distributor, at its sole cost and expense, shall maintain adequate insurance coverage for itself, including its affiliates, from any losses that arise out of the marketing, offer, distribution, and resale of the Services and its obligations under this Agreement.

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") dated as of January ___, 2021, is made by and between **dmarcian, inc.**, a Delaware corporation (the "<u>Company</u>") and **dmarcian Europe B.V.** (the "<u>BV</u>"). Its purpose is to set forth the parties' agreement regarding all intellectual property rights as between and among them, and the mutual waivers and releases the parties are giving each other.

**WHEREAS**, the ownership of certain intellectual property rights as between them are at issue and the parties wish to resolve fully and forever all such issues;

**NOW, THEREFORE,** for good and mutual consideration the sufficiency and receipt of which are hereby acknowledged by each party, the parties agree as follows:

1. **Assignment**. BV hereby sells, assigns and transfers, and by these presents does hereby sell, assign and transfer unto the Company, its successors, assigns, and legal representatives, BV's entire right, title and interest in and throughout the World and all jurisdictions, in and to the dmarcian Intellectual Property as defined herein. Such assignment includes assignment of all current and future patent rights, including but not limited to provisionals, non-provisionals, continuations, divisionals, reissues, reexaminations, extensions, and substitutions of patents and patent applications within the patent rights or such other patents, and any right, title and interest BV may have in applications to which the patent rights claim priority. The Company may hold and own for its own use and on behalf of and for its successors, assigns and legal representatives, to the full end of the term for which such dmarcian Intellectual Property may exist. BV hereby conveys all of its rights arising under or pursuant to any and all national and international laws and agreements, treaties or laws relating to the protection of industrial property by filing any such applications, including but not limited to any cause(s) of action and damages accruing prior to this Assignment. BV hereby acknowledges that this Assignment, being of BV's entire right, title and interest in and to the dmarcian Intellectual Property carries with it the right in the Company to apply for and obtain from competent authorities in all countries of the world any and all patents by attorneys and agents of the Company's selection and the right to procure the grant of all patents to the Company in its own name as the assignee of BV's entire right, title and interest therein.

1.1. **Intellectual Property.** The Intellectual Property means any and all (a) patents, patent applications of any kind, patent rights, inventions, discoveries and invention disclosures (whether or not patented), (b) rights in registered and unregistered trademarks, service marks, trade names, trade dress, logos, packaging design, slogans and internet domain names, and registrations and applications for registration of any of the foregoing, (c) copyrights in both published and unpublished works, including, without limitation, all compilations, databases and computer programs, source code, manuals and other documentation and all copyright registrations and applications, and all derivatives, translations, adaptations and combinations of the above, (d) rights in know-how, show-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, techniques, beta testing procedures and beta testing results, (e) any and all other intellectual property rights and/or proprietary rights relating to any of the foregoing; (f) goodwill; and (g) claims of infringement and misappropriation against third parties.

1

Notwithstanding the above, Intellectual Property shall not include those certain intellectual property rights set forth on Exhibit 1 hereto.

1.2. **dmarcian Intellectual Property.** dmarcian Intellectual Property means all Intellectual Property developed by BV, including its employees, contractors, affiliates, and agents, since its inception and all Intellectual Property concerning or related to the Company's business as now conducted and as demonstrably anticipated to be conducted.

1.3. **Further Assurances.** BV hereby further agrees for itself and its successors, assigns, affiliates, agents, and legal representatives to execute upon request any other lawful documents and likewise to perform any other lawful acts which may be deemed necessary to secure fully the dmarcian Intellectual Property to the Company, its successors, assigns, and legal representatives, as well as to third parties at the request of the Company including the execution of documents (including, without limitation, petitions, specifications, oaths, assignments, disclaimers, declarations and affidavits) relating to non-provisional, substitution, continuation, divisional, reissue, reexamination, or corresponding foreign or international patent applications within the dmarcian Intellectual Property, as requested by the Company, and generally do everything possible to aid the Company, its successors, assigns and legal representatives to obtain, record, maintain, and enforce full protection for the Inventions in all countries, but in each instance at the Company's reasonable expense.

1.4. **Interferences.** BV hereby further agrees to provide statements or testimony in any interference or other proceeding in which any of the dmarcian Intellectual Property may be involved.

1.5. **No Prior Conveyance.** BV hereby warrants that it has not knowingly conveyed to others any rights in the dmarcian Intellectual Property or the inventions or copyrights or any license other than to an end user to use the dmarcian Intellectual Property or to make, use or sell anything embodying or utilizing any of the inventions therein, and that it has good right and title to assign the inventions and the dmarcian Intellectual Property without encumbrance.

2. **Representations and Warranties of BV.** The BV, by its execution and delivery of this Agreement, represents and warrants to the Company that: (i) This Agreement constitutes a valid and legally binding obligation of the BV, enforceable in accordance with its terms, except as such enforcement may be limited by application of equitable remedies or any bankruptcy, insolvency, moratorium or any similar law, (ii) BV has not, except as set forth herein, obligated itself to transfer, entered into any agreement to transfer, sold, pledged, hypothecated, mortgaged, collateralized, granted participation in, or otherwise transferred, any intellectual property rights, (iii) there are not in effect any liens, security interests, mortgages or other possessory or non-possessory interest in the IP, other than held by BV, nor is BV aware of any basis therefore.

3. **Representations and Warranties of the Company.** The Company, by the Company's execution and delivery of this Agreement, represents and warrants to the BV that this Agreement constitutes a valid and legally binding obligation of the Company, enforceable in accordance with its terms, except as such enforcement may be limited by application of equitable remedies or any bankruptcy, insolvency, moratorium or any similar law.

4. **Trademarks and Affiliates.** Within thirty (30) days of the date of this Agreement

2

the BV shall (i) cease using any of the Company's rights in registered and unregistered trademarks, service marks, trade names, trade dress, logos, packaging design, slogans and internet domain names, and registrations and applications for registration of any of the foregoing including, without limitation, use of the name dmarcian Europe BV and all internet domains which include use of dmarcian, (ii) transfer to the Company all of its interests in that certain Bulgarian affiliate (EOOD) which has been performing software and technology development work on dmarcian software and technology, in consideration for payment from the Company of €10,000.

5.     **General Mutual Release.**   In exchange for the consideration provided in this Agreement, the adequacy of which is hereby acknowledged, each party hereto, on behalf of itself and its successors and assigns, hereby fully releases and forever discharges the other party hereto, including each of such party's officers, directors, agents, contractors, attorneys, parents, affiliates and/or subsidiaries, from any and all claims, actions and liabilities of any kind or character whatsoever, arising in law or in equity, known or unknown, suspected or unsuspected, that such party has ever had, now has or may now have against the other party, including, without limitation, all claims directly or indirectly related to or arising out of the BV's intellectual property claims. This waiver and release specifically includes, but is not limited to, all claims, if any, whether arising in tort or in contract, related to such intellectual property, including any and all claims for breach of contract, infringement, non-assignment, ownership, breach of implied covenant of good faith and fair dealing; claims for breach of fiduciary duty; claims for breach of express or implied contract or for further monetary compensation by way of additional fees or payments due or allegedly due to BV by reason of its development of any intellectual property; and all other claims, based on common law or U.S., Dutch, international, federal or state statute.

Each party further understands and expressly agrees that this Agreement specifically extends to all claims, whether those claims are presently known to the party or not, or suspected by the party or not.  By signing below, each party expressly waives the benefits of Section 1542 of the California Civil Code, which provides:

> **"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."**

Company and BV agree that they have not assigned or transferred, in whole or in part, any of the claims, actions or liabilities released by them herein.

6.     **No Admission of Liability**.   The parties deny that either one of them has any liability to the other.  Neither this Agreement, nor the consideration the parties are receiving under it, shall be deemed or construed as an admission of liability by any party.

7.     **Confidentiality**.   Each party agrees that the terms and conditions of this Agreement are and shall remain strictly confidential, and that none of them, nor anyone acting on his or its behalf, will disclose those terms and conditions to any third party:  (i) Except that the Company may disclose the terms to its directors, officers, and shareholders, and as required under securities laws, (ii) except for BV's tax or legal advisors or his spouse, or (iii) unless compelled by law to do so.

3

8.  **Non-Disparagement**.  Both parties expressly agrees that they will not make any disparaging remarks of any sort or otherwise communicate any disparaging comments about the other party or any of their officers, directors, agents, contractors, parents, affiliates and/or subsidiaries to any third party, including without limitation any of their agents, affiliates, vendors, competitors, clients or any other person or entity.

9.  **Miscellaneous.**

9.1  Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, representatives, successors and assigns of the parties hereto.

9.2  Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

9.3  Headings.  The subject headings of the sections and subsections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

9.4  Waivers.  Any party to this Agreement may waive any right it may have hereunder or any breach or default hereunder by any other party hereto; provided that no such waiver will be effective against the waiving party unless it is in writing and specifically refers to this Agreement.  No waiver will be deemed to be a waiver of any subsequent or other right, breach or default of the same or similar nature.

9.5  Entire Agreement.  This Agreement, including the documents and things anticipated to be delivered hereby embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements or understandings (whether written or oral) among the parties, in respect to the subject matter contained herein.  This Agreement may not be modified, amended or terminated except by written agreement signed by both parties specifically referring to this Agreement.

9.6  Governing Law and Venue.  This Agreement is deemed to have been made in the State of Delaware and shall be governed by, and construed in accordance with, the laws of the State of Delaware for contracts made and to be performed within Delaware.  Venue for any action concerning this Agreement or the asserted breach hereof shall be proper only in the state or federal courts in the State of Delaware, County of New Castle, having subject matter jurisdiction thereof.

9.7  Severability.  Any provision of this Agreement which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.

9.8  No Rules of Construction.  No rules of construction are intended by the parties hereto or shall be invoked in the interpretation hereof and, for all purposes, the parties hereto shall all be deemed to be joint authors hereof.

9.9  Notices.  All notices, demands and other communications provided for

4

hereunder shall, unless otherwise stated herein, be in writing and shall be personally delivered or sent by nationally recognized overnight courier, with delivery acknowledged.

       9.10   <u>Remedies</u>.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  The party against whom enforcement is sought shall pay on demand all losses, costs and expenses, if any, of the party seeking enforcement (including attorneys' and other professionals' fees actually incurred) in connection with the enforcement of this Agreement.

    **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers or representatives thereunto duly authorized, this Agreement to become effective as of the date first above written.

                     **DMARCIAN, INC.,**
                     **a Delaware Corporation**

**By:**      _____

                     **Shannon Draegen, Director**

                     **DMARCIAN EUROPE B.V.,**
                     **a Netherlands private company with limited liability**

**By:**      _____

                     **The Digital Xpedition (TDX) Holding B.V., by its legal representative, M. Groeneweg Holding B.V., by its legal representative Martijn Groeneweg**

5

**Attachment 1**

**<u>Excluded Intellectual Property</u>**

| | |
|---|---|
| **From:** | Timo Jansen |
| **Sent:** | Wednesday, April 7, 2021 10:12 AM |
| **To:** | Timo Jansen |
| **Subject:** | FW: dmarcian Europe / dmarcian Inc. - sommatie en aankondiging kort geding [URGENT] [LEXENCE-L.FID641175] |

---

**Sensitivity:** Private

The e-mail below reads:

"*Dear colleague,*

*Reference is made to your letter of Friday 22 January 2021 on behalf of dmarcian, Inc. ("**dmarcian Inc.**") to dmarcian Europe B.V. ("**dmarcian Europe**"). In response thereto, I inform you as follows on behalf of dmarcian Europe.*

***Termination of cooperation, announcement of injunctive relief proceedings***
*I your letter dmarcian Inc announces that it will terminate the cooperation with dmarcian Europe as per 1 February 2021 with immediate effect, if dmarcian Europe does not consent to the Distribution Agreement and Settlement agreement attached thereto. In that case, dmarcian Inc. threatens to block all access of dmarcian Europe to the dmarcian systems as per 1 February 2021.*

*There is no legal ground for such a termination of the cooperation between the parties and dmarcian Europe and its clients will suffer severe and irreparable damages by it. Moreover, dmarcian Europe noted that the announced termination is part of a (simultaneous) offer made by Mr. Draegen on the shares held by TDX in dmarcian Europe. In this sense, the intended termination is used as leverage, which, moreover, unacceptably intervenes with the enterprise chamber proceedings. In said proceedings, the enterprise chamber ordered provisional measures - and an investigation – aimed at solving the IP situation.*

*For this reason, dmarcian Europe will initiate injunctive relief proceedings at the shortest term possible, in which it will request an order to continue the agreement between the parties. In that regard, please provide me with the dates on which dmarcian Inc. is not available for a hearing in this week, **ultimately tomorrow (26 January 2021) at 10:00 CET**. Note that to the extent dmarcian's unavailability precludes a hearing this week, dmarcian Europe will request the district court to set a date this week, ignoring dmarcian Inc.'s availability.*

***Blocking of access to dmarcian systems***
*Further, dmarcian Inc has – contrary to the content of its letter – blocked the access of dmarcian Europe to the dmarcian systems last Friday. This action also lacks any ground and therewith dmarcian Inc causes dmarcian Europe to suffer severe damages. dmarcian Europe demands that dmarcian Inc immediately restores access to its systems, in the absence of which it will request the injunctive relief judge to order such access under pain of penalty. dmarcian Europe holds dmarcian Inc. wholly and fully liable for all damages it has suffered and will suffer as a consequence of the blockade.*

*dmarcian Europe is only prepared to abstain from initiating injunctive relief proceedings if you unconditionally confirm in writing, ultimately **Tuesday 26 January 2021, at 10:00 CET**, that: i) the announced termination of the cooperation will be revoked; ii) the blockade of access of dmarcian Europe personnel will be undone immediately; and iii) such a blockade will not be effectuated in the future. If not, I look forward to receiving your dates of impediment, in the absence of which I will assume that you are available for a hearing all week.*

# Exhibit B

*Under reservation of all rights. A copy is sent to M.C. Luiten, L. Geldof, Y. Borrius, F. Henke en P.A. Josephus Jitta (op cc)."*

*Apparently, our letters of Friday rattled the dmarcian Europe people and resulted in this - not unexpected - reaction. I suggest to send the following e-mail in response, either tonight or tomorrow morning before the indicated time of 10:00 CET. Our plan in this regard is in my view apparent from the draft e-mail. I already discussed this line of reasoning with Paul J.J. and he agrees. Please let me know if this is good to go.*

---

**Van:** Veerle van Druenen <Veerle.van.Druenen@kvdl.com>
**Verzonden:** maandag 25 januari 2021 21:48
**Aan:** Timo Jansen <t.jansen@lexence.com>
**CC:** sanne.geldof@baseadvocaten.nl; max.luiten@baseadvocaten.nl; yvette.borrius@florent.nl; p.josephusjitta@burenlegal.com; f.henke@burenlegal.com; Alfred Meijboom <Alfred.Meijboom@kvdl.com>; Michael Bacon <Michael.Bacon@kvdl.com>
**Onderwerp:** dmarcian Europe / dmarcian Inc. - sommatie en aankondiging kort geding [URGENT]
**Urgentie:** Hoog

Geachte confrère,

Ik verwijs naar uw brief van vrijdag 22 januari 2021 namens dmarcian, Inc. ("**dmarcian Inc.**") aan dmarcian Europe B.V. ("**dmarcian Europe**"). In reactie daarop bericht ik u namens dmarcian Europe als volgt.

**Beëindiging van de samenwerking, aankondiging kort geding procedure**
In uw brief kondigt dmarcian Inc. aan dat zij de samenwerking met dmarcian Europe per 1 februari 2021 met onmiddellijke ingang zal beëindigen, indien dmarcian Europe niet instemt met de daarbij gevoegde *Distribution Agreement* en *Settlement Agreement*. In dat geval dreigt dmarcian Inc. per 1 februari 2021 onder meer alle toegang van dmarcian Europe tot de dmarcian systemen blokkeren.

Voor een dergelijke beëindiging van de samenwerking tussen partijen bestaat geen enkele juridische grond en dmarcian Europe en haar klanten zullen daardoor ernstige en onomkeerbare schade lijden. dmarcian Europe constateert voorts dat de aangekondigde beëindiging een onderdeel vormt van het (gelijktijdig) gedane bod van de heer Draegan op de door TDX gehouden aandelen in dmarcian Europe. Daarmee vormt de voorgenomen beëindiging een pressiemiddel, waarmee bovendien de procedure bij de Ondernemingskamer op onaanvaardbare wijze wordt doorkruist. In laatstbedoelde procedure heeft de Ondernemingskamer immers juist maatregelen getroffen – alsook een onderzoek bevolen – gericht op het oplossen van de situatie rondom de intellectuele eigendomsrechten.

dmarcian Europe zal om die reden op een zo kort mogelijke termijn een kort geding aanhangig maken, waarin zij (onder meer) zal vragen om een gebod tot voortzetting van de overeenkomst tussen partijen. Graag ontvang ik dat verband **uiterlijk morgen (26 januari 2021) om 10:00 uur CET** van u de eventuele verhinderingen aan de zijde van dmarcian Inc. voor deze week. Daarbij merk ik vast op dat voor zover die verhinderingen het onmogelijk maken om nog deze week een mondelinge behandeling in te plannen, dmarcian Europe de rechtbank zal verzoeken om die buiten beschouwing te laten.

**Blokkade toegang dmarcian systemen**
dmarcian Inc. heeft verder – in afwijking van wat zij stelt in haar brief – afgelopen vrijdag gelijktijdig met de verzending van haar brief de toegang van dmarcian Europe tot de dmarcian systemen al geblokkeerd. Ook daarvoor bestaat geen enkele grond en dmarcian Inc. brengt dmarcian Europe daarmee ernstige schade toe. **dmarcian Europe sommeert dmarcian Inc. dan ook haar toegang tot de systemen met onmiddellijke ingang te herstellen**, bij gebreke waarvan zij daartoe een gebod op straffe van een dwangsom aan de voorzieningenrechter zal vragen. Dmarcian Europe houdt dmarcian Inc. aansprakelijk voor alle schade die zij als gevolg van deze blokkade lijdt en zal lijden.

dmarcian Europe is enkel bereid om van een kort geding af te zien indien u mij uiterlijk morgen, **dinsdag 26 januari 2021 uiterlijk om 10:00 uur CET**, schriftelijk en zonder voorbehoud namens dmarcian Inc. bevestigt dat (i) de aangekondigde beëindiging van de samenwerking wordt ingetrokken, (ii) de blokkade van de toegang van medewerkers van dmarcian Europe tot het dmarcian platform onmiddellijk wordt opgeheven én (iii) een dergelijke blokkade niet meer zal plaatsvinden. Zo niet, dan zie ik uw eventuele verhinderingen graag tijdig tegemoet, bij gebreke waarvan ik er vanuit ga dat er geen verhinderingen zijn.

dmarcian Europe behoudt zich al haar rechten voor. Een kopie van deze e-mail stuur ik aan mrs. M.C. Luiten, L. Geldof, Y. Borrius, F. Henke en P.A. Josephus Jitta (op cc).

Met vriendelijke groet,
Veerle van Druenen

**Veerle van Druenen**
Advocaat / Attorney-at-law

**Kennedy Van der Laan**
**T** +31205506688  **M** +31641195478
**F** +31205506788
Amsterdam | Eindhoven
www.kvdl.com

LinkedIn | Instagram | Mediareport | Nieuwsbrief

Deze e-mail bevat vertrouwelijke informatie en mag uitsluitend worden gebruikt door de geadresseerde of andere personen binnen de organisatie van de geadresseerde die bevoegd zijn om kennis te nemen van de informatie die deze e-mail bevat. Alle diensten worden verricht door Kennedy Van der Laan N.V. op basis van onze algemene voorwaarden die u kunt raadplegen, uitprinten en downloaden op www.kvdl.com. Deze algemene voorwaarden bevatten een beperking van aansprakelijkheid. Kennedy Van der Laan N.V. is in het Handelsregister ingeschreven onder nummer 34261155.

This e-mail contains privileged information and may be used only by the addressee or other persons within the addressee's organization authorized to access the information contained herein. All services are provided by Kennedy Van der Laan N.V. on the basis of our general terms and conditions which can be accessed, printed and downloaded at www.kvdl.com. These general terms and conditions contain a limitation of liability. Kennedy Van der Laan N.V. is registered in the Company Register under number 34261155.

| From: | Timo Jansen |
|---|---|
| Sent: | Tuesday, January 26, 2021 3:15 AM |
| To: | 'Veerle van Druenen' |
| Cc: | sanne.geldof@baseadvocaten.nl; max.luiten@baseadvocaten.nl; yvette.borrius@florent.nl; p.josephusjitta@burenlegal.com; f.henke@burenlegal.com; Alfred Meijboom; Michael Bacon; Luca Veth |
| Subject: | RE: dmarcian Europe / dmarcian Inc. - sommatie en aankondiging kort geding [URGENT] [LEXENCE-L.FID641175] |

Dear colleague,

Thank you for your e-mail. I respond in English, as my contact persons at the client do not speak or read Dutch. Please draft future correspondence in English to promote a common understanding. Thank you in advance.

dmarcian, Inc. (**dmarcian**) will not meet the demands of dmarcian Europe B.V. (**DME**).

dmarcian is not intimidated by DME's liability claims for damages suffered. The position DME is currently in, is the direct result of the misconception of its legal position and its subsequent behaviour since December 2019 that undermined the once promising cooperation between the parties. dmarcian has been fore bearing for over a year now with no movement toward a resolution.  As indicated in last Friday's letter, dmarcian is no longer prepared to let DME run its course and the anticipated termination and measures taken last Friday are appropriate to protect dmarcian's legitimate interests. Having read consideration 3.4 of the 7 September 2020 decision and considering that the appointment of Mr. Harmeling has not resulted in any progress in resolving the conflict between the parties, dmarcian fails to see how the position taken in its letter of last Friday intervenes with the decision of the enterprise chamber.

DME may resolve to initiate injunctive relief proceedings, but Dutch courts have no competence over dmarcian and, consequently, a Dutch judgment cannot be enforced against it in its jurisdiction of residence. Consequently, this will be to no avail.

The appropriate way to resolve DME's concerns is by coming to terms with dmarcian.

I trust to have informed you adequately,

Sincerely,


T.S. (Timo) Jansen
advocaat, partner

Lexence N.V. advocaten & notarissen
T:  +31 20 5736 812
M: +31 65 1335 998
F: +31 20 5736 884
E: t.jansen@lexence.com

Amstelveenseweg 500, 1081 KL Amsterdam       T: +31 (0)20 5736 736 - F: +31 (0)20 5736 737       KvK: 34191068 - btw: NL 8120.01.217.B01
Postbus 75999, 1070 AZ Amsterdam, Nederland       E: info@lexence.com - W: www.lexence.com       Member of Meritas Law Firms Worldwide

Op alle dienstverlening door of namens Lexence N.V. zijn exclusief van toepassing de algemene voorwaarden van Lexence N.V., gedeponeerd bij het handelsregister te Amsterdam onder nummer 34191068. De algemene voorwaarden bevatten een aansprakelijkheidsbeperking, worden op verzoek verstrekt en zijn te vinden op www.lexence.com. Alle opdrachten worden, met terzijdestelling van artikelen 7:404, 7:407 lid 2 en 7:409 BW, uitsluitend aanvaard en uitgevoerd door Lexence N.V.

All services by or on behalf of Lexence N.V. are exclusively governed by the general terms and conditions deposited with the trade register in The Netherlands under number 34191068. The general terms and conditions contain a limitation of liability. The general terms and conditions will be sent on request and are to be found on www.lexence.com. Under exclusion of Sections 404, 407(2) and 409 of Book 7 of the Dutch Civil Code, all assignments will be exclusively accepted and performed by Lexence N.V.

**Van:** Veerle van Druenen <Veerle.van.Druenen@kvdl.com>
**Verzonden:** maandag 25 januari 2021 21:48
**Aan:** Timo Jansen <t.jansen@lexence.com>

**Exhibit C**

**CC:** sanne.geldof@baseadvocaten.nl; max.luiten@baseadvocaten.nl; yvette.borrius@florent.nl; p.josephusjitta@burenlegal.com; f.henke@burenlegal.com; Alfred Meijboom <Alfred.Meijboom@kvdl.com>; Michael Bacon <Michael.Bacon@kvdl.com>
**Onderwerp:** dmarcian Europe / dmarcian Inc. - sommatie en aankondiging kort geding [URGENT]
**Urgentie:** Hoog

Geachte confrère,

Ik verwijs naar uw brief van vrijdag 22 januari 2021 namens dmarcian, Inc. ("**dmarcian Inc.**") aan dmarcian Europe B.V. ("**dmarcian Europe**"). In reactie daarop bericht ik u namens dmarcian Europe als volgt.

**Beëindiging van de samenwerking, aankondiging kort geding procedure**
In uw brief kondigt dmarcian Inc. aan dat zij de samenwerking met dmarcian Europe per 1 februari 2021 met onmiddellijke ingang zal beëindigen, indien dmarcian Europe niet instemt met de daarbij gevoegde *Distribution Agreement* en *Settlement Agreement*. In dat geval dreigt dmarcian Inc. per 1 februari 2021 onder meer alle toegang van dmarcian Europe tot de dmarcian systemen blokkeren.

Voor een dergelijke beëindiging van de samenwerking tussen partijen bestaat geen enkele juridische grond en dmarcian Europe en haar klanten zullen daardoor ernstige en onomkeerbare schade lijden. dmarcian Europe constateert voorts dat de aangekondigde beëindiging een onderdeel vormt van het (gelijktijdig) gedane bod van de heer Draegan op de door TDX gehouden aandelen in dmarcian Europe. Daarmee vormt de voorgenomen beëindiging een pressiemiddel, waarmee bovendien de procedure bij de Ondernemingskamer op onaanvaardbare wijze wordt doorkruist. In laatstbedoelde procedure heeft de Ondernemingskamer immers juist maatregelen getroffen – alsook een onderzoek bevolen – gericht op het oplossen van de situatie rondom de intellectuele eigendomsrechten.

dmarcian Europe zal om die reden op een zo kort mogelijke termijn een kort geding aanhangig maken, waarin zij (onder meer) zal vragen om een gebod tot voortzetting van de overeenkomst tussen partijen. Graag ontvang ik dat verband **uiterlijk morgen (26 januari 2021) om 10:00 uur CET** van u de eventuele verhinderingen aan de zijde van dmarcian Inc. voor deze week. Daarbij merk ik vast op dat voor zover die verhinderingen het onmogelijk maken om nog deze week een mondelinge behandeling te plannen, dmarcian Europe de rechtbank zal verzoeken om die buiten beschouwing te laten.

**Blokkade toegang dmarcian systemen**
dmarcian Inc. heeft verder – in afwijking van wat zij stelt in haar brief – afgelopen vrijdag gelijktijdig met de verzending van haar brief de toegang van dmarcian Europe tot de dmarcian systemen al geblokkeerd. Ook daarvoor bestaat geen enkele grond en dmarcian Inc. brengt dmarcian Europe daarmee ernstige schade toe. **dmarcian Europe sommeert dmarcian Inc. dan ook haar toegang tot de systemen met onmiddellijke ingang te herstellen**, bij gebreke waarvan zij daartoe een gebod op straffe van een dwangsom aan de voorzieningenrechter zal vragen. Dmarcian Europe houdt dmarcian Inc. aansprakelijk voor alle schade die zij als gevolg van deze blokkade lijdt en zal lijden.

dmarcian Europe is enkel bereid om van een kort geding af te zien indien u mij uiterlijk morgen, **dinsdag 26 januari 2021 uiterlijk om 10:00 uur CET**, schriftelijk en zonder voorbehoud namens dmarcian Inc. bevestigt dat (i) de aangekondigde beëindiging van de samenwerking wordt ingetrokken, (ii) de blokkade van de toegang van medewerkers van dmarcian Europe tot het dmarcian platform onmiddellijk wordt opgeheven én (iii) een dergelijke blokkade niet meer zal plaatsvinden. Zo niet, dan zie ik uw eventuele verhinderingen graag tijdig tegemoet, bij gebreke waarvan ik er vanuit ga dat er geen verhinderingen zijn.

dmarcian Europe behoudt zich al haar rechten voor. Een kopie van deze e-mail stuur ik aan mrs. M.C. Luiten, L. Geldof, Y. Borrius, F. Henke en P.A. Josephus Jitta (op cc).

Met vriendelijke groet,
Veerle van Druenen

**Veerle van Druenen**
Advocaat / Attorney-at-law

**Kennedy Van der Laan**
**T** +31205506688  **M** +31641195478
**F** +31205506788
Amsterdam | Eindhoven
www.kvdl.com
| LinkedIn | Instagram | Mediareport | Nieuwsbrief

Deze e-mail bevat vertrouwelijke informatie en mag uitsluitend worden gebruikt door de geadresseerde of andere personen binnen de organisatie van de geadresseerde die bevoegd zijn om kennis te nemen van de informatie die deze e-mail bevat. Alle diensten worden verricht door Kennedy Van der Laan N.V. op basis van onze algemene voorwaarden die u kunt raadplegen, uitprinten en downloaden op www.kvdl.com. Deze algemene voorwaarden bevatten een beperking van aansprakelijkheid. Kennedy Van der Laan N.V. is in het Handelsregister ingeschreven onder nummer 34261155.

This e-mail contains privileged information and may be used only by the addressee or other persons within the addressee's organization authorized to access the information contained herein. All services are provided by Kennedy Van der Laan N.V. on the basis of our general terms and conditions which can be accessed, printed and downloaded at www.kvdl.com. These general terms and conditions contain a limitation of liability. Kennedy Van der Laan N.V. is registered in the Company Register under number 34261155.

| | |
|---|---|
| **From:** | Veerle van Druenen |
| **Sent:** | Thursday, January 28, 2021 10:52 AM |
| **To:** | tim@dmarcian.com; shannon@dmarcian.com |
| **Cc:** | Alfred Meijboom; Michael Bacon; Timo Jansen |
| **Subject:** | dmarcian Europe / dmarcian Inc. - date hearing summary proceedings [URGENT] |
| **Attachments:** | CONCEPT dagvaarding in kort geding.pdf |

Dear Sir, Madam,

I refer to my e-mail to your attorney dated 25 January 2021 regarding the dispute that has arisen between Dmarcian Inc. ("**dmarcian Inc.**") and dmarcian Europe B.V. ("**dmarcian Europe**").

In light of dmarcian Inc.'s refusal to meet the demands of dmarcian Europe set out in that e-mail, dmarcian Europe has proceeded and requested the District Court of Rotterdam to schedule a date for a hearing in summary proceedings. In the meantime the date for this hearing has been set. The hearing will take place on **Monday 1 February 2021 between 09:00 and 10:30 hrs at the District Court in Rotterdam**. The judge is mr. De Bruin. Attached you will find a copy of the draft writ of summons that was submitted by dmarcian Europe when requesting the court to schedule the hearing. The final writ of summons (including an English translation thereof) and the exhibits will be served tomorrow.

Note that the court has granted permission to submit the procedural documents by e-mail using the following e-mail addresses: Bvr.civiel.rb.rotterdam@rechtspraak.nl and p.de.bruin@rechtspraak.nl (with a copy to the other attorney's involved). It is not required to also submit the procedural documents per regular mail.

I further note that the court has informed us that the court room has a maximum capacity of 10 persons (not including the judge and clerk). I will contact your attorney to discuss the number of representatives that will be present for each of the parties.

I trust to have informed you sufficiently.

Kind regards,
Veerle van Druenen

**Veerle van Druenen**
Advocaat / Attorney-at-law

**Kennedy Van der Laan**
T +31205506888  M +31821175778
F +31205506788
Amsterdam | Eindhoven
www.kvdl.com
LinkedIn | Instagram | Mediareport | Niesivsbrief

Deze e-mail bevat vertrouwelijke informatie en mag uitsluitend worden gebruikt door de geadresseerde of andere personen binnen de organisatie van de geadresseerde die bevoegd zijn om kennis te nemen van de informatie die deze e-mail bevat. Alle diensten worden verricht door Kennedy Van der Laan op basis van onze algemene voorwaarden die u kunt raadplegen, uitprinten en downloaden op www.kvdl.com. Deze algemene voorwaarden bevatten een beperking van aansprakelijkheid. Kennedy Van der Laan N.V. is in het Handelsregister ingeschreven onder nummer 34261155.

This e-mail contains privileged information and may be used only by the addressee or other persons within

**Exhibit D**

the addressee's organization authorized to access the information contained herein. All services are
provided by Kennedy Van der Laan N.V. on the basis of our general terms and conditions which can be
accessed, printed and downloaded at www.kvdl.com. These general terms and conditions contain a
limitation of liability. Kennedy Van der Laan N.V. is registered in the Company Register under number
34261155.

2

**CONCEPT DAGVAARDING IN KORT GEDING OP VERKORTE TERMIJN KRACHTENS MONDELINGE LAST VAN DE VOORZIENINGENRECHTER VAN DE RECHTBANK ROTTERDAM d.d. [...... 2021]**

Heden, de                                              tweeduizend eenentwintig, op verzoek van de besloten vennootschap met beperkte aansprakelijkheid **DMARCIAN EUROPE B.V.**, gevestigd en kantoorhoudend te (3311 JG) Dordrecht aan de Burgemeester de Raadtsingel 93, in deze zaak woonplaats kiezende te (1014 BG) Amsterdam aan de Molenwerf 16, op het kantoor van Kennedy Van der Laan N.V., van welk kantoor mrs. V. van Druenen, A.P. Meijboom en M.R.S. Bacon in deze zaak tot advocaat worden gesteld en als zodanig zullen optreden;

**IN KORT GEDING GEDAGVAARD:**

1. De vennootschap naar Amerikaans recht **DMARCIAN, INC.**, gevestigd te 43 S. Broad Street, Suite 203, Brevard, North Carolina 28712, Verenigde Staten van Amerika

2. De heer Timothy George **DRAEGEN**, woonachtig aan het adres 272 Delphia Drive, Brevard, North Carolina, 28712, Verenigde Staten van Amerika

[Aanzeggingen buitenlandse gedaagden]

ONDER VERMELDING IN DEZE DAGVAARDING VAN DE VOORWAARDEN DAT:

[...]

**OM:**

Op [DATUM en TIJD], in persoon of vertegenwoordigd door een advocaat, te verschijnen ter terechtzitting van de voorzieningenrechter van de Rechtbank Rotterdam, locatie [locatie] welke zitting aldaar zal worden gehouden in het gerechtsgebouw aan de [ADRES].

**MET DE UITDRUKKELIJKE AANZEGGING DAT:**

a. indien gedaagde niet in persoon en evenmin vertegenwoordigd door een advocaat op de terechtzitting verschijnt en de voorgeschreven termijnen en formaliteiten in acht zijn genomen, de rechter verstek tegen gedaagde zal verlenen en de hierna omschreven vordering zal toewijzen, tenzij deze hem onrechtmatig of ongegrond voorkomt;

b. bij verschijning in het geding een griffierecht zal worden geheven, te voldoen binnen vier weken te rekenen vanaf het tijdstip van verschijning;

c. de hoogte van de griffierechten is vermeld in de meest recente bijlage behorend bij de Wet griffierechten burgerlijke zaken, die onder meer is te vinden op de website: www.kbvg.nl/griffierechtentabel.nl;

1

d. van een persoon die onvermogend is, een bij of krachtens de wet vastgesteld griffierecht voor onvermogenden wordt geheven, indien hij op het tijdstip waarop het griffierecht werd geheven heeft overgelegd:

1. een afschrift van het besluit tot toevoeging, bedoeld in artikel 29 van de Wet op de rechtsbijstand, of indien dit niet mogelijk is ten gevolge van omstandigheden die redelijkerwijs niet aan hem zijn toe te rekenen, een afschrift van de aanvraag, bedoeld in artikel 24, tweede lid, van de Wet op de rechtsbijstand, dan wel;

2. een verklaring van het bestuur van de raad voor rechtsbijstand, bedoeld in artikel 7, derde lid, onderdeel e, van de Wet op de rechtsbijstand waaruit blijkt dat zijn inkomen niet meer bedraagt dan de inkomens bedoeld in de algemene maatregel van bestuur krachtens artikel 35, tweede lid, van de wet;

**TENEINDE:**

alsdan namens eiseres ("**dmarcian Europe**") te horen eisen en concluderen als volgt:

**1. Inleiding**

1.1. dmarcian Europe vraagt uw Voorzieningenrechter in dit kort geding om een aantal voorlopige voorzieningen te treffen die ertoe strekken dat de ontzegging door dmarcian Inc. van de toegang van de medewerkers van dmarcian Europe tot de gezamenlijke (computer)systemen per direct wordt opgeheven, dat de werking aan de door dmarcian Inc bij brief van 22 januari 2021 aangezegde beëindiging van de samenwerking tussen partijen per 1 februari 2021 wordt ontnomen en dat gedaagden wordt bevolen de bestaande samenwerking ongewijzigd voort te zetten totdat duidelijkheid is verkregen omtrent de voorwaarden van de aan dmarcian Europe verstrekte licentie en de eigendom van de auteursrechten op de huidige versie van de door partijen geëxploiteerde software, hetgeen de kern vormt van hun geschil.

1.2. Deze zaak hangt nauw samen met de enquêteprocedure bij de Ondernemingskamer van het Gerechtshof Amsterdam. In die procedure – waarbij ook Draegan partij is – heeft de Ondernemingskamer bij beschikking van 7 september 2020 geoordeeld dat er sprake is van gegronde redenen voor twijfel aan een juist beleid van dmarcian Europe, welke redenen zijn gelegen in (kort omschreven) de door toedoen van partijen ontstane situatie dat zij hun samenwerking, noch in het algemeen noch ter zake de intellectueel eigendomsrechten op ontwikkelde en te ontwikkelen software applicaties en (de reikwijdte van) de in verband daarmee verleende / te verlenen licenties hebben geregeld. De Ondernemingskamer heeft – op verzoek van beide aandeelhouders (Draegan en TDX) – hiernaar een onderzoek bevolen. Voorts heeft de Ondernemingskamer middels het treffen van onmiddellijke voorzieningen ingegrepen, inhoudende dat een bestuurder met doorslaggevende stem is benoemd alsook dat alle aandelen in dmarcian Europe (minus één aandeel per aandeelhouder) ten titel van beheer zijn overgedragen aan een beheerder. Bij beschikking van 10 september 2020 heeft de Ondernemingskamer mr. H.J.M. Harmeling aangewezen als de bedoelde bestuurder en mr. Y. Borrius als de beheerder. Dit kort geding wordt namens dmarcian Europe gevoerd onder verantwoordelijkheid van Harmeling, teneinde de continuïteit van dmarcian Europe te waarborgen. De beschikkingen van de Ondernemingskamer van 7 en 10 september 2020 worden als Productie 1 overgelegd (**Productie 1**). dmarcian Europe komt op die beslissingen hieronder nader terug.

2

**2. Introductie partijen**

*dmarcian Europe*

2.1. dmarcian Europe is op 21 maart 2013 opgericht onder de naam Mailmerk B.V. (**Productie 2**). Zij houdt zich bezig met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen.

2.2. Mailmerk B.V. is op 22 januari 2016 een samenwerking aangegaan met dmarcian Inc. Zij heeft haar naam op 15 februari 2017 veranderd in dmarcian Europe. De toenmalig enig bestuurder en aandeelhoudster van Mailmerk B.V./dmarcian Europe, The Digital Xpedition (TDX) Holding B.V. ("**TDX**") heeft dmarcian Inc en/of Draegen in ruil voor de samenwerking een optie aangeboden om een meerderheidsbelang in dmarcian Europe te verwerven voor de prijs van € 1,-. Dit recht is uitgeoefend in juli 2018, waarbij de aandelen evenwel niet aan dmarcian Inc, maar aan haar CEO - Draegen – zijn overgedragen.

2.3. De aandelen in dmarcian Europe werden vanaf juli 2018 moment tot 7 september 2020 voor 50,01% door Draegen en voor 49,99% door TDX gehouden. Na de beschikking van de Ondernemingskamer zijn de aandelen op één aandeel per aandeelhouder na tijdelijk in beheer gegeven aan een derde partij, mr. Yvette Borius. Daarnaast is Harmeling naast TDX als bestuurder met doorslaggevende stem aangewezen.

2.4. De aandelen in TDX worden gehouden door H.J. Kalkman Beheer B.V. ("**Kalkman Beheer**") (50%) en M. Groeneweg Holding B.V. ("**Groeneweg Holding**") (50%), de persoonlijke holdings van respectievelijk de heren Martijn Groeneweg ("**Groeneweg**") en Herwert Jette Kalkman ("**Kalkman**") (**Productie 3**: *KvK-uittreksels TDX, Groeneweg Holding en Kalkman Beheer*).

2.5. Dmarcian Europe houdt op haar beurt 100% van de aandelen in het kapitaal van een Bulgaarse entiteit, genaamd dmarcian Bulgaria EOOD ("**dmarcian Bulgaria**") (**Productie 4**: *uittreksel uit het Bulgaarse handelsregister*). Tot 12 januari 2021 was de enig bestuurder van dmarcian Bulgaria de heer Nikolay Georgiev Hristov. Op 12 januari 2021 is Harmeling ingeschreven als tweede bestuurder van dmarcian Bulgaria. Beide bestuurders zijn zelfstandig bevoegd dmarcian Bulgaria te vertegenwoordigen.

*dmarcian Inc*

2.6. dmarcian Inc is een Amerikaanse vennootschap die op 19 september 2014 is opgericht en zich net als dmarcian Europe bezighoudt met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen. Zij heeft software ontwikkeld die partijen sinds 2016 gezamenlijk exploiteren.

2.7. De aandelen in het kapitaal van dmarcian Inc werden aanvankelijk voor 100% gehouden door Draegen. Een voormalig medewerker – Charles E. Swenberg - is op grond van een met dmarcian Inc in 2017 gesloten overeenkomst mede-aandeelhouder geworden. Tussen die partijen is momenteel in de Verenigde Staten een procedure aanhangig over de omvang van dat aandeel. Draegen is hoe dan ook nog altijd CEO en meerderheidsaandeelhouder binnen dmarcian Inc.

3

2.8. Anders dan de namen van de entiteiten wellicht doen vermoeden, is dmarcian Europe géén
dochtervennootschap van dmarcian Inc. De enige vennootschapsrechtelijke band tussen beide
vennootschappen, is het hiervoor genoemde meerderheidsbelang dat Draegen in 2018 heeft
verworven in het kapitaal van dmarcian Europe.

2.9. Schematisch weergegeven ziet de vennootschapsstructuur van partijen er als volgt uit:



**Het geschil**

2.10. dmarcian Europe en dmarcian Inc werken sinds 2016 samen bij de levering van de dmarcian
software en daarbij behorende diensten op het gebied van identiteitsbeveiliging van e-mailadressen
('**de dmarcian software**').[1]

2.11. Partijen bieden de dmarcian software aan als SaaS (Software as a Service) dienst. dmarcian Inc
heeft daarvoor een SaaS-platform ontwikkeld dat toegankelijk is via de website www.dmarcian.com.
Klanten kunnen de SaaS-dienst via het platform afnemen. dmarcian Europe exploiteert de SaaS-
dienst voor klanten in Rusland, Europa en Afrika; dmarcian Inc doet dat voor Noord- en Zuid Amerika.
Nieuwe klanten klikken op de website op hun regio en worden vervolgen doorgeleid naar de web-
omgeving van de voor die regio verantwoordelijke partij, die terzake exclusiviteit hebben. De web-
omgeving voor dmarcian Europe wordt gehost op servers in België en Nederland, die onder controle
van dmarcian Inc staan.

2.12. De website en het SaaS-platform worden beheerd door dmarcian Inc. dmarcian Inc regelt dus de
toegang van medewerkers van dmarcian Europe daartoe en heeft het in haar macht die toegang aan
dmarcian Europe te ontzeggen. dmarcian Europe is voor de hosting van het SaaS-platform dus
volledig van dmarcian Inc afhankelijk. Dmarcian Eiroep is daardoor voor haar bedrijfsvoering, en met
name ook voor de toegang tot haar klantgegevens en marktactiviteiten van dmarcian Inc afhankelijk.

---

[1] Zeer kort gezegd stelt eigenaren van internetdomeinnamen in staat om DMARC - open source software die is
gericht op identiteitsbeveiliging van internetmail - te implementeren. De dmarcian software verwerkt DMARC-
gegevens en geeft aan wat er qua identiteitsbeveiliging moet worden opgelost, zodat alle e-mails die tot een domein
behoren (blijven) voldoen aan de DMARC data. De domeineigenaar kan daarmee voorkomen dat nep e-mails vanuit
de domeinnaam worden verzonden.

4

2.13.  De dmarcian software is auteursrechtelijk beschermd. Bij de aanvang van de samenwerking in
januari 2016 lagen alle auteursrechten op de toenmalige versie van de dmarcian software bij
dmarcian Inc, althans bij Draegen, die de software heeft ontwikkeld, op dat moment haar enig
bestuurder en aandeelhouder. Op dat moment is afgesproken dat alleen dmarcian Inc de software
zou ontwikkelen. Partijen zijn later overeengekomen dat deze ontwikkeling ook door dmarcian Europe
en dmarcian Bulgaria zou plaatsvinden (zie 2.15). Partijen hebben voor het gebruik van de software
door dmarcian Europe en de verkoop daarvan door dmarcian Europe in Europa, Rusland en Afrika
in januari 2016 een mondelinge overeenkomst afgesloten. Partijen verschillen van mening over de
precieze inhoud van hun overeenkomst. Uit de beschikking van de Ondernemingskamer van 7
september 2020 volgt dat tussen partijen vaststaat dat zij in 2016 *ten minste* het volgende zijn
overeengekomen (r.o. 2.5):

-   Dat dmarcian Europe een licentie heeft voor het gebruik en de verkoop van de software afkomstig
    van dmarcian Inc.;
-   Dat dmarcian Europe verantwoordelijk is voor de verkoop van die software (en het leveren van
    bijbehorende diensten) aan klanten in Europa, Rusland en Afrika;
-   Dat dmarcian Inc. en/of Draegen in ruil daarvoor het meerderheidsaandelenbelang in dmarcian
    Europe kon kopen tegen betaling van EUR 1,-.

dmarcian Europe komt op de inhoud van de afspraken hieronder nog terug.

2.14.  Van de laatstgenoemde optie heeft Draegen persoonlijk gebruik gemaakt. Als gevolg daarvan heeft
hij heeft een meerderheidsbelang van 50.01% in het kapitaal van dmarcian Europe verkregen.

2.15.  dmarcian Europe heeft sinds het najaar van 2018 zelf en via haar 100% Bulgaarse
dochtervennootschap, aanzienlijke bijdragen geleverd aan de ontwikkeling van (broncode van de)
dmarcian software. Dat is gebeurd met volledige wetenschap en instemming van dmarcian Inc en
Draegen. Alle kosten voor de ontwikkeling binnen dmarcian Europe en dmarcian Bulgaria zijn door
dmarcian Europe gedragen. dmarcian Europe en dmarcian Burlgaria hebben op die bijdragen eigen
auteursrechten verworven en zijn als zodanig mede-rechthebbende geworden van de huidige versie
van de dmarcian software die beide bedrijven momenteel verkopen. dmracian Bulgaria heeft haar
auteursrechten aan dmarcian Europe overgedragen. Dmarcian Europe brengt de akte van overdracht
in het geding als **Productie 5**. Teven brengt dmarcian een verklaring in het geding van mevrouw V.P.
Kunze, partner bij het Bulgaarse advocatenkantoor Djingov, Gouginski, Kyutchukov & Velichkov te
Sofia, Bulgarije. Zij verklaart - kort gezegd - dat de overdracht naar Bulgaars recht geldig is en dat
Harmeling bevoegd was deze overdracht als zelfstandig bevoegd bestuurder van dmarcian Bulgaria
te effecturen (**Productie 6**).

2.16.  Eind 2019 is tussen partijen geschil ontstaan over de eigendom van de rechten op de door
dmarcian Europe ontwikkelde aanpassingen van en toevoegingen aan de dmarcian software.
Volgens dmarcian Inc zou uit de tussen partijen in 2016 gemaakte afspraken voorvloeien dat zij
rechthebbende op de software is, althans dat dmarcian Europe gehouden is deze rechten tegen
eenzijdig door dmarcian Inc op te leggen voorwaarden over te dragen. Dit is en wordt door dmarcian
Europe betwist. Zij wil eventueel wel meewerken aan overdracht of licentiering van de auteursrechten
op de door haar ontwikkelde software, maar niet tegen de daaraan door dmarcian Inc gestelde
voorwaarden, die dmarcian Europe kort gezegd geheel buiten spel zetten. Zij heeft dmarcian Inc

5

gemeld dat zij de door dmarcian Europe ontwikkelde softwareapplicaties niet aan derden mag verkopen zonder licentie.

2.17. Het bericht van Groeneweg is Draegen kennelijk in het verkeerde keelgat geschoten. Draegen heeft achtereenvolgens onder meer:
- medewerkers van dmarcian Europe de toegang tot de door dmarcian Inc beheerde (computer)systemen ontzegd,
- de webomgeving van dmarcian Europe op de door dmarcian Inc beheerde website (www.dmarcian.com) gemigreerd naar een Amerikaanse host,
- dmarcian Europe de toegang tot haar eigen domeinnamen <dmarcian.eu> en <dmarcian.net> ontzegd en
- zonder daartoe bevoegd te zijn een 'Director of Software' aangewezen binnen dmarcian Europe en dmarcian Bulgaria aan wie de software ontwikkelaars van dmarcian Europe en dmarcian Bulgaria zich diende te verantwoorden.

Zie uitgebreider randnummers 49 – 65 van het verzoekschrift van TDX in de procedure voor de Ondernemingskamer.

2.18. Partijen hebben na deze machtsgreep geprobeerd in onderling overleg tot een oplossing van hun geschil te komen. dmarcian Europe heeft in mei 2020 een uitgebreid schikkingsvoorstel gedaan, dat echter door Draegen van de hand is gewezen.[2] Na een bespreking op 3 juli 2020 heeft Draegen echter plotseling een AvA aangevraagd met als agendapunten het ontslag van de (enig) bestuurder en tevens minderheidsaandeelhoudster van dmarcian Europe, TDX, en de benoeming van een door Draegen aangewezen bestuurder. TDX had goede gronden om aan te nemen dat deze bestuurder na zijn aanstelling zou meewerken aan de 'gratis' overdracht van het auteursrecht van dmarcian Europe aan dmarcian Inc, waarmee dmarcian Europe berooid zou achterblijven.

2.19. TDX heeft daarop een verzoek bij de Ondernemingskamer ingediend teneinde haar ontslag en onomkeerbare schade aan dmarcian Europe te voorkomen. dmarcian Europe brengt het procesdossier van die procedure als Productie 5 in het geding (**Productie 5**). Zij verwijst voor de achtergrond van dit geschil en de aanloop naar die procedure naar de processtukken van haarzelf en TDX en de beschikkingen van de Ondernemingskamer in die procedure.

2.20. Zoals hiervoor gezegd heeft de Ondernemingskamer heeft bij beschikkingen van 7 en 10 september 2020 bij wijze van onmiddellijke voorziening Harmeling aangesteld als bestuurder en alle aandelen in dmarcia Europe (minus eén aandeel per aandeelhouder) ten titel van beheer overgedragen aan de beheerder (mr. Borrius). Daarnaast heeft de Ondernemingskamer een onderzoek gelast naar het bij dmarcian Europe tussen 1 januari 2016 tot 20 augustus 2020 gevoerde beleid. De doeleinden van het enquêterecht zijn o.a. het herstel van de gezonden verhoudingen en het verkrijgen van openheid van zaken[3]. Daarop is ook het ingrijpen van de Ondernemingskamer in de huidige zaak gericht.

2.21. Voor zover van belang heeft de Ondernemingskamer aan het gelaste onderzoek het volgende ten grondslag gelegd:

---

[2] Vgl productie 24 bij het verzoekschrift van TDX.
[3] HR 10 januari 1990, NJ 1990/466 (Ogem).

6

"3.4  De Ondernemingskamer overweegt als volgt. De controverse over de intellectuele eigendomsrechten op de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde software(applicaties) vormt de kern van het geschil tussen partijen. TDX stelt dat deze software(applicaties) los staat/staan van de door dmarcian, Inc. ontwikkelde software, zodanig dat de intellectuele eigendom daarvan aan dmarcian Europe toekomt. Aan het mogen gebruiken en verkopen van deze software(applicaties) door dmarcian, Inc. dient een door dmarcian Europe te verlenen licentie ten grondslag te liggen, aldus TDX. Daartegenover stelt Draegen dat de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde software niet meer omvat dan aanvullende features voor verbeterd gebruik van de van dmarcian, Inc. afkomstige software, zodat de intellectuele eigendom daarvan eveneens bij dmarcian, Inc. berust. De Ondernemingskamer stelt voorop dat voor de juridische beoordeling van dat geschil slechts de gewone burgerlijke rechter bevoegd is. Wel kan de Ondernemingskamer constateren dat dit geschil ontwrichtend is voor de onderneming van dmarcian Europe; het ontwikkelen en verkopen van software is haar core business en de samenwerking met dmarcian, Inc. is daarvoor een noodzakelijke voorwaarde. Desondanks is deze samenwerking noch in het algemeen, noch ter zake van de intellectuele eigendomsrechten op ontwikkelde en te ontwikkelen software(applicaties) (en (de reikwijdte van) de in verband daarmee verleende/te verlenen licenties in het bijzonder, door partijen voldoende geregeld. Hierover zijn geen eenduidig vastgelegde afspraken voorhanden, met als gevolg dat de samenwerking op het spel is komen te staan door de huidige discussie daarover, hetgeen een serieuze belemmering vormt voor de bedrijfsvoering van dmarcian Europe. Naar het oordeel van de Ondernemingskamer levert het bestaan van voornoemde situatie voldoende gegronde redenen op om te twijfelen aan een juist beleid en een juiste gang van zaken van dmarcian Europe. De Ondernemingskamer zal, gelijk door zowel TDX als Draegen is verzocht, een onderzoek gelasten naar het beleid en de gang van zaken van dmarcian Europe, en wel vanaf 1 januari 2016 tot 20 augustus 2020."

2.22.  Voorts heeft de Ondernemingskamer het volgende overwogen (r.o. 3.9):

"De Ondernemingskamer zal de aanwijzing van de onderzoeker vooralsnog aanhouden opdat kan worden bezien of reeds door de te treffen onmiddellijke voorzieningen een oplossing van het geschil kan worden bereikt. Ieder der partijen of de door de Ondernemingskamer benoemde bestuurder of beheerder kan op elk moment de Ondernemingskamer verzoeken de onderzoeker aan te wijzen."

2.23.  In reactie op de aanstelling van Harmeling op 10 september 2020 is in het opvolgende weekend vanuit Amerika gewerkt aan het opnieuw volledig afsluiten van dmarcian Europe van alle systemen, hetgeen op 14 september 2020 volledig werd geïmplementeerd. Dit was dus de tweede keer dat dmarcian Europe van de voor haar bedrijfsvoering essentiële systemen werd afgesloten. Harmeling heeft Draegen in zijn rol van aandeelhouder hierop onmiddellijk aangesproken. Draegen heeft het er op aandringen van Harmeling uiteindelijk - na enkele dagen - toe geleid dat de toegang tot de meest essentiële systemen in zodanige mate werd hersteld dat dmarcian Europe haar werk weer kon doen. Na veel en moeizame gesprekken met Draegen is dmarcian Inc er, louter door tussenkomst van Draegen, toe over te gaan om toegang te verschaffen tot andere, maar minder wezenlijke. Onbelemmerde toegang heeft echter sinds 14 september 2020 niet meer bestaan.

2.24.  Vervolgens is Harmeling begonnen met het zoeken naar wegen om tot een oplossing te komen van het tussen de aandeelhouders van dmarcian Europe gerezen geschil. Hij heeft daarbij onder meer gesproken met zijn mede bestuurder TDX, met TDX en Draegen als aandeelhouder, hij heeft contact gezocht met de andere bestuurder van dmarcian Bulgaria en alles in het werk gesteld om een oplossing voor het gerezen conflict te vinden. Een en ander ligt vast in een e-mail van Harmeling aan

7

de aandeelhouders van 27 januari 2021, die dmarcian Europe als **Productie 7** in het geding brengt. Draegen heeft echter al snel laten weten niet tot een andere oplossing bereid te zijn dan de overdracht, op zijn voorwaarden, van de IE rechten van dmarcian Europe aan dmarcian Inc.. dmarcian Europe de Ondernemingskamer inmiddels verzocht met spoed een onderzoeker te benoemen die het op 7 september 2020 gelaste onderzoek zal gaan verrichten, welk verzoek inmiddels is ingewilligd. Dmarcian Europe legt de betreffende correspondentie over als **Productie 8.**

2.25. Hoewel het gelaste onderzoek nog niet is begonnen en geenszins overeenstemming is bereikt over de juridische situatie met betrekking tot de eigendom van de intellectuele eigendomsrechten op de huidige versie van de dmarcian software, heeft dmarcian Inc bij brief van 22 januari 2021 plotseling aangekondigd de samenwerking per 1 februari 2021 te beëindigen, tenzij dmarcian Europe een bij die brief gevoegde, voor dmarcian Europe zeer ongunstige distributieovereenkomst en schikkingsovereenkomst zou tekenen. De inhoud van die overeenkomsten komt er kort gezegd op neer dat zij al haar auteursrechten om niet overdraagt in ruil voor een licentie op die rechten, waaronder zij maar liefst 80% (!) van al haar inkomsten uit de verkoop van de dmarcian software en consultancy diensten aan dmarcian Inc dient af te dragen (**Productie 9**).

2.26. De onredelijkheid en onrechtvaardigheid van deze wurgcontracten blijkt al uit het feit dat dmarcian Inc er zelf vanuit gaat dat dmarcian Europe deze niet zal willen of kunnen tekenen. Immers, hoewel dmarcian Inc de samenwerking voorwaardelijk beëindigt en aangeeft dat zij de toegang tot de (computer)systemen pas vanaf 1 februari 2021 zal blokkeren, heeft zij in werkelijkheid de medewerkers van dmarcian Europe op het moment van verzending van de brief met onmiddellijke ingang de toegang tot de (computer)systemen ontzegd.

2.27. In aanvulling op de brief van dmarcian Inc heeft Draegen bij een brief die enkele minuten na de brief van dmarcian Inc. per e-mail werd verzonden, een beroep gedaan op artikel 4 van de 'exit agreement' die Draegen en TDX in 2018 ter gelegenheid van de verwerving door Draegen van het meerderheidsbelang in dmarcian Europe hebben gesloten.[4] Op grond van dit artikel heeft iedere aandeelhouder het recht om de samenwerking tussen de aandeelhouders ('the co-operation') te beëindigen door een bod uit te brengen op de aandelen van de andere aandeelhouder. Indien de andere aandeelhouder dat bod niet accepteert, zou die aandeelhouder de verplichting hebben de eerste aandeelhouder uit te kopen.

2.28. Dit alles gebeurt zoals gezegd hangende het onderzoek naar het door dmarcian Europe gevoerde beleid, dat uitdrukkelijk is gelast vanwege de bestaande onduidelijkheid over de inhoud van de licentieovereenkomst en de eigendom van de intellectuele eigendomsrechten op de dmarcian software. Voor zover dmarcian Inc zich als grond voor de beëindiging van de samenwerking beroept op een tekortkoming, betwist dmarcian Europe dat zij de voorwaarden van die licentie heeft geschonden. Van een tekortkoming kan hoe dan ook geen sprake zijn zonder dat de inhoud van de licentieovereenkomst vast staat. Voor zover dmarcian Inc zich zou beroepen op opzegging, heeft te gelden dat partijen zijn overeengekomen dat de overeenkomst niet opzegbaar is. Maar ook daarbuiten is op geen enkele manier duidelijk waarom dmarcian Inc de enquêteprocedure (i.e. het onderzoek en de eventuele vervolgfase) niet kan afwachten. Naar de mening van dmarcian Europe bestaat onder de omstandigheden van dit geval geen enkele juridische grond, althans een voldoende

---

[4] Vgl productie X bij verweerschrift Draegen in OK-procedure.

8

zwaarwegende grond, die de opzegging van de bestaande duurovereenkomst per 1 februari 2021 rechtvaardigt.

2.29.   Door de medewerkers van dmarcian Europe de toegang te ontzeggen tot de (computer)systemen en te dreigen met een (onrechtmatige) beëindiging van de duurovereenkomst op zeer korte termijn proberen Draegen en dmarcian Inc dmarcian Europe op oneigenlijke gronden te dwingen tot overdracht van haar IE rechten op de software. Bovendien blijkt uit de huidige afsluiting van dmarcian Europe tot toegang tot haar klanten en bekende potentiele klanten waarmee al contacten zijn gelegd, de dreiging dat dmarcian Inc zich het klantenbestand van dmarcain Europe wil toeeigenen. Dmarcian Inc handelt daarmee in strijd met de redelijkheid en billijkheid die zij ten opzichte van haar contractspartner dmarcian Europe in acht dient te nemen. Dit klemt temeer nu dmarcian Europe voor haar bedrijfsvoering geheel afhankelijk is van de toegang die dmarcian Inc haar tot het SaaS-platform en computersystemen dient te geven. Draegen handelt op zijn beurt onrechtmatig jegens dmarcian Europe. Door dmarcian Inc te faciliteren in haar pogingen om dmarcian Europe klem te zetten, handelt Draegen niet alleen in strijd met de maatschappelijke zorgvuldigheid, maar tevens met zijn verplichtingen onder artikel 2:8 lid 1 BW.

*Spoedeisend belang*

2.30.   dmarcian Europe lijdt door deze acties van dmarcian Inc en Draegen onmiddellijk grote en onomkeerbare schade. De verkoop van de dmarcian software vormt de *core business* van dmarcian Europe. Zij kan door de nieuwe blokkade, inmiddels de derde, niet bij haar klantengegevens, kan bestaande klanten op dit moment niet bedienen en kan bovendien geen nieuwe *leads* voor potentiële nieuwe klanten opvolgen. Dit leidt tot ernstige onrust bij haar medewerkers.

2.31.   Indien de samenwerking en de licentieovereenkomst verder per 1 februari 2021 zouden worden beëindigd, zal dit bovendien het einde betekenen van dmarcian Europe, die voor haar bedrijfsvoering van het voortbestaan van de licentieovereenkomst afhankelijk is. Een faillissement is in dat geval onvermijdelijk. Dit zal het gevolg hebben dat 22 werknemers van dmarcian Europe en dmarcian Bulgaria per direct op staat komen te staan en de klanten van de dmarcian software in Europe, Rusland en Afrika mogelijk van de toegang tot de dmarcian software worden beroofd.

2.32.   Dmarcian Europe heeft dmarcian Inc in reactie op haar brief van 22 januari 2021 onder meer gesommeerd de blokkade van haar medewerkers op te heffen en de aangekondigde beëindiging in te trekken. Bij gebreke daarvan heeft dmarcian Europe een kort geding aangekondigd. Gezien de persoonlijke verwijten die Draegen persoonlijk treffen, zij per e-mail van gelijke datum ook verhinderdata van Draegen bij zijn advocaat opgevraagd (**Productie 10**) Zowel dmarcian Inc en Draegen hebben bij e-mailbericht van hun advocaten, dat wederom op elkaar is afgestemd, laten weten niet aan de sommaties gehoor te zullen geven (**Productie 11**). Het spoedeisend belang is daarmee gegeven.

2.33.   Gelet op de onmiddellijke en onomkeerbare gevolgen die de handelingen van Draegen en dmarcian Inc teweeg hebben gebracht, heeft dmarcian Europe voldoende spoedeisend belang bij haar vorderingen. Die strekken er immers allen toe de continuïteit van haar onderneming te waarborgen en onomkeerbare gevolgen uit te stellen totdat duidelijkheid zal zijn verkregen, dan wel via het door de Ondernemingskamer gelaste onderzoek, dan wel met een gerechtelijke uitspraak in een bodemprocedure, over de voorwaarden van de licentieovereenkomst en de eigendom van de auteursrechten op de huidige versie van de dmarcian software. dmarcian Inc heeft geen enkel belang

9

bij de wijziging van de status quo in afwachting van de door de Ondernemingskamer beoogde oplossing, welke situatie de facto al sinds december 2019 bestaat.

2.34.  dmarcian Europe gaat hieronder nader in op haar stelling dat zij (mede)auteursrechthebbende is op de huidige versie van de dmarcian software. Daarnaast zal zij dieper ingaan op de bevoegdheid van uw Voorzieningenrechter, het toepasselijke recht en de juridische onderbouwing van haar vorderingen. Zij zal een en ander waar nodig ter zitting nader toelichten.

2.35.  Uitdrukkelijk beoogt dmarcian Europe het geschil over de eigendom van de intellectuele eigendomsrechten in dit kort geding niet op te lossen. Daarvoor is nader onderzoek naar de feiten noodzakelijk, waarvoor dit kort geding zich niet leent. Naar de mening van dmarcian Europe is echter voldoende aannemelijk dat er *tenminste* onduidelijkheid bestaat over de vraag of aan dmarcian Europe auteursrechten op de dmarcian software toekomen. Zij voelt zich daarin gesteund door het oordeel van de Ondernemingskamer. De acties van gedaagden doorkruisen dit spoor en rechtvaardigen dat de gevraagde voorzieningen worden toegewezen.

3.  DE INHOUD VAN DE LICENTIEOVEREENKOMST EN DE EIGENDOM VAN DE IE RECHTEN OP DE HUIDIGE VERSIE VAN DE DMARCIAN SOFTWARE

3.1.  Op 22 januari 2016 hebben Draegen, dmarcian Inc., TDX en het toenmalige Mailmerk (nu: dmarcian Europe) een mondelinge overeenkomst gesloten met betrekking tot het gebruik en de distributie van de dmarcian software.

3.2.  Onder overeenkomst heeft dmarcian inc aan dmarcian Europe, in ruil voor een aan dmarcian Inc en/of Draegen verstrekt optierecht op een meerderheidsbelang in dmarcian Europe te verwerven een eeuwigdurende, exclusieve licentie verstrekt voor het gebruik van de dmarcian software en de verkoop daarvan aan klanten in Europa, Rusland en Afrika;

3.3.  De opbrengsten van verkoop van de dmarcian software aan klanten uit deze territoria waren op grond van de Overeenkomst uitsluitend bestemd voor dmarcian Europe.

3.4.  Partijen hebben vanaf januari 2016 conform de Overeenkomst gehandeld. dmarcian Europe bediende exclusief de Russische, Europese en Afrikaanse markt en de opbrengsten daarvan kwamen - vrijwel - volledig aan haar ten goede.[5] Dmarcian Inc heeft niet alleen conform een eeuwigdurende en exclusieve licentie gehandeld, zij bevestigt het bestaan daarvan ook expliciet in de correspondentie tussen partijen. dmarcian Europe verwijst in dit kader naar een e-mail van Draegen van 4 december 2019, waarin Draegen reageert op een bericht van Groeneweg waarin deze schrijft dat het dmarcian Inc zonder licentieovereenkomst niet is toegestaan de door dmarcian Europe ontwikkelde applicaties te verkopen (het begin van het geschil). Draegen schrijft daarin[6]:

---

[5] Vgl Verzoekschrift TDX in de OK-procedure, randnummer 26. De creditcardinkomsten van de dmarcian Europe applicatie werden en worden vanwege technische redenen volledig aan dmarcian Inc. betaald, maar ook die inkomsten kwamen en komen toe aan dmarcian Europe. Overigens gaat het daarbij om een beperkt percentage van de totale omzet (ongeveer 10%).
[6] Vgl productie 8 bij het verzoekschrift van TDX in de OK-procedure

10

*"Martijn, thanks for the input. I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed.".*

3.5. dmarcian Europe is zich vanaf 2016 in samenspraak met dmarcian Inc gaan toeleggen op de verdere ontwikkeling van de (broncode van de) dmarcian software. Dat is niet alleen binnen haar eigen organisatie gebeurd, maar vanaf 2018 ook via dmarcian Bulgaria, een 100% dochter van dmarcian Europe. Zij financierde de ontwikkeling van de software zelf, zowel binnen haar eigen onderneming als binnen dmarcian Bulgaria. Die investeringen bedroegen tot juli ca EUR 900.000. De ontwikkelingskosten bedragen momenteel ca EUR 550.000 per jaar, zijnde 35% van de totale kosten. Zij heeft deze kosten uit eigen middelen voldaan en is voor de financiering niet afhankelijk geweest van dmarcian Inc.[7]

3.6. De bijdragen die dmarcian Europe en haar dochtervennootschap tot op heden hebben gedaan bestaan onder meer uit het ontwikkelen van de dmarcian software van een twee-laags applicatie naar een drie-laags applicatie, zodat die ook API-toegankelijk zou zijn. Daarnaast hebben dmarcian Europe en dmarcian Bulgaria verschillende losstaande softwareapplicaties ontwikkeld die in combinatie met de dmarcian software konden worden gebruikt. Dmarcian Europe verwijst voor een gedetailleerdere uiteenzetting naar randnummers 31 tot en met 35 van het verzoekschrift van dmarcian Europe.

3.7. dmarcian Inc betwist dat het dmarcian Europe onder de verstrekte licentie is toegestaan de dmarcian software verder te ontwikkelen. Daargelaten dat dmarcian Inc deze stelling niet onderbouwt, is dit gelet op het voorgaande een onhoudbaar standpunt. Hoewel het juist is dat aanvankelijk de ontwikkeling van de dmarcian software uitsluitend door dmarcian Inc zou plaatsvinden (vgl hiervoor onder 2.13) hebben partijen later met elkaar afgesproken dat ook dmarcian Europe zich met de ontwikkeling van de software zou gaan bezighouden. Dat zou aanvankelijk gebeuren binnen een als 100% dochter van dmarcian Europe op te richten vennootschap (dmarcian Bulgaria) maar is later ook door dmarcian Europe zelf gebeurd. Gedaagden waren hiervan volledig op de hoogte en stemden daarmee in. Iedere betwisting daarvan is reeds ongeloofwaardig omdat dmarcian Inc., dmarcian Europe en dmarcian Bulgaria één centraal broncode ontwikkelingsplatform gebruiken, dat door dmarcian Inc. wordt beheerd en waartoe zij dmarcian Europe en dmarcian Bulgaria toegang heeft gegeven (zie hierna alinea's 3.12 en verder).

3.8. Gedaagden waren er bovendien van op de hoogte dat als gevolg van deze ontwikkeling IE rechten zouden ontstaan aan de zijde van dmarcian Europe en dmarcian Bulgaria. Tussen partijen is veelvuldig gesproken over de manier waarop met die rechten zou moeten worden omgegaan. Daarbij was ook voor dmarcian Inc niet het uitgangspunt dat die rechten om niet overgedragen zouden moeten worden aan dmarcian Inc. Integendeel, dmarcian Inc erkende het bestaan van de IE rechten aan de zijde van dmarcian Inc en onderkende dat er voor het gebruik van de rechten door dmarcian Inc een licentie nodig was, maar dat dit nog niet was overeengekomen.

3.9. Ter onderbouwing hiervan toont dmarcian Europe hieronder screenshots van correspondentie tussen Shannon Draegen, de echtgenote en CEO van dmarcian Inc, en Groeneweg. Shannon

---

[7] Vgl randnummer 3.4. – 3.5. en productie 3 bij het verweerschrift van dmarcian Europe en r.o. 3.1 van de beschikking van 7 september 2020 van de Ondernemingskamer

11

Draegen maakt op 21 augustus 2019 ten behoeve van een lopende ISO certificering ( ISO27001) een overzicht van de vennootschapsstructuur en de – volgens haar – bestaande juridische situatie met betrekking tot de IE rechten.



3.9.   Groeneweg reageert hierop via Slack (een door partijen gebruikt communicatiesysteem):

*"There's currently no licensing Agreement in place from EU to US for the software created in EU. So there should be an arrow only from USA to EU like to APAC with "Eternal License Agreement". We had a plan to merge, but as Chuck didn't agree on it, @tim and myself decided to move on as agreed on January 22 in 2016 in 2 separate entities. Arrow from US to APAC should be "Temporary License Agreement", at least from what I know."*

Shannon reageert hierop bevestigend met een duimpje omhoog en maakt vervolgens op 3 september 2019 de definitieve versie van het schema.

12



Hieruit blijkt dus dat er geen licentie vanuit dmarcian Europe aan dmarcian Inc aanwezig is en dat dit reeds voor december 2019 niet alleen bij de directie van dmarcian Inc bekend is, maar dat deze situatie ook wordt bevestigd door de directie van dmarcian Inc.

3.10.  Daarnaast verwijst dmarcan Europe naar de e-mail van  Draegen aan Groeneweg van 6 augustus 2018 waarin Draegen ook zelf onderkent dat er IE rechten bij dmarcian Europe zijn ontstaan en dat daarover afspraken moeten worden gemaakt (vgl r.o. 2.6. van de beschikking van de Ondernemingskamer van 7 september 2020):

*"There are 2 main parts to consider: 1. (...) 2. Where is global 1F located? (...) About location of IP: since EU has been licensing tech, it is likely impossible to home 1F into the EU by default.. even though EU is paying to continue to develop (as US is also paying developers — so it's sort of a mixed issue). This means that some sort of asset transfer has to be made (...) along with a proper valuation of said 1F".*

3.11. Draegen en dmarcian Inc verder volledig betrokken bij de oprichting van dmarcian Bulgaria in 2017, welke vennootschap uitdrukkelijk werd opgericht om de software verder te ontwikkelen. De aangestelde bestuurder van dmarcian Bulgaria (Hristov) is een kennis van Draegen. Uiteraard waren dmarcian Inc en Draegen dus op de hoogte van het feit dat dmarcian Europe op enig moment is gaan bijdragen aan de ontwikkeling van de dmarcian software. Sterker nog, dit is uitdrukkelijk zo afgesproken.  Voor zover de in 2016 verstrekte licentie dus niet toestond dat dmarcian Europe de dmarcian software verder zou ontwikkelen, is de reikwijdte van de licentie door de latere

13

ontwikkelingen aangepast. Van enige tekortkoming in de nakoming van de licentievoorwaarden kan dan ook geen sprake zijn en dit kan dan ook geen grond vormen de bestaande samenwerking te beëindigen.

*Auteursrecht op de door dmarcian Europe en dmarcian Bulgaria aangebrachte wijzigingen in de software.*

3.12. Voor zover dmarcian Europe aan de dmarcian software heeft gewerkt, is dat gebeurd door medewerkers van dmarcian Europe, althans door Kalkman. Op grond van artikel 7 van de Auteurswet vallen auteursrechten die in dienst van dmarcian Europe zijn gecreëerd, toe aan dmarcian Europe. De arbeidsovereenkomsten met de medewerkers van dmarcian Europe bevatten een expliciete bepaling die dit bevestigt. Dit is in lijn met het uitgangspunt van de wet – artikel 7 Auteurswet - dat de werkgever als maker van een in dienstverband gecreëerd werk wordt aangemerkt, tenzij anders is overeengekomen. Hiervoor is al uiteengezet dat de auteursrechten die bij dmarcian Bulgaria zijn ontstaan rechtsgeldig aan dmarcian Europe zijn overgedragen (vgl 2.15.)

3.13. De broncode van de dmarcian software staat op een door dmarcian Inc beheerde *repository* op gitlab.com. In de computerwetenschappen wordt de term Git wel gebruikt voor een versiecontrolesysteem, waarmee programmeurs wijzigingen in de code op een overzichtelijke wijze kunnen bijhouden en kunnen samenwerken aan het schrijven van software. Een verzameling (broncode-) bestanden die allemaal deel uitmaken van hetzelfde project, wordt een *repository* genoemd. Gitlab is een online platform dat een Git dienst voor die *repositories* aanbiedt. Op de *repository* zijn dus alle aanpassingen of bijdragen (*commits*) zichtbaar die sinds het eerste moment op en aan de (bron)code van de dmarcian software zijn gemaakt.

3.14. Dmarcian Europe heeft aan mr. ir. A. Engelfriet van ICT Recht (**'de deskundige'**) opdracht gegeven om te beoordelen of de *commits* die dmarcian Euopre en dmarcian Bulgaria aan de broncode van de dmarcian software hebben toegevoegd auteursrechtelijk zijn beschermd. Dmarcian Europe brengt het rapport van de deskundige in het geding als productie 12 (**Productie 12**).

3.15. In het rapport is omwille van de grote hoeveelheid *commits* aan de broncode van de dmarcian software gekozen voor een getalsmatige benadering. De deskundige heeft gefocust op de zogenaamde Python broncode bestanden, omdat de kans dat als gevolg van aanpassingen aan die bestanden auteursrecht ontstaat het grootst is. Gelet op de grote hoeveelheid wijzigingen die zowel dmarcian Europe als dmarcian Bulgaria vervolgens aan de zogenaamde Python broncode bestanden hebben doorgevoerd, heeft de deskundige geconcludeerd dat op de daaraan toegevoegde *commits* auteursrecht is verworven.

3.16. Dmarcian Inc neemt blijkens het verweerschrift van Draegen in de OK-procedure het standpunt in dat partijen in december 2016 hebben afgesproken dat dmarcian Europe alle auteursrechten die zij als gevolg van ontwikkeling van de dmarcian software zou verkrijgen aan dmarcian Inc zou overdragen. Zij beroept zich daarbij op overeenkomsten die nooit zijn ondertekenend en een enkele e-mail van Groeneweg van 7 december 2016.[8]. Dmarcian Europe betwist dat zij op basis van die stukken met dmarcian Inc is overeengekomen dat alle auteursrechten die zij gedurende de samenwerking zou verwerven onder eenzijdig door dmarcian Inc te bepalen voorwaarden aan haar overgedragen of gelicentieerd zouden worden.

---

[8] Vgl verweerschrift Draegen in OK-procedure randnummer 2.38 en productie 36

14

3.17. Al deze argumenten zijn ook aan de Ondernemingskamer voorgelegd. De Ondernemingskamer heeft in rechtsoverweging 3.4. overwogen dat de beoordeling van de inhoud van de licentieovereenkomst en de vraag aan wie de auteursrechten op de dmarcian software toevallen door de gewone burgerlijke rechter moet worden beantwoord, maar dat de bestaande onduidelijkheid aanleiding is om een onderzoek naar het binnen dmarcian Europe gevoerde beleid te gelasten. De Ondernemingskamer onderschrijft daarmee *tenminste* dat er omtrent de inhoud van de licentieovereenkomst en de eigendom van de intellectuele eigendomsrechten onduidelijkheid bestaat.

3.18. Concluderend is dmarcian Europe van mening dat gelet op de aard en omvang van de bijdrage die zij en dmarcian Bulgaria aan de broncode van de dmarcian software heeft doorgevoerd, de conclusies uit het rapport van de deskundige en de overdracht van auteursrecht van dmarcian Bulgaria aan dmarcian Europe voorshands voldoende aannemelijk is dat zij auteursrechten heeft op onderdelen van de dmarcian software en dat zij als mede-auteursrechthebbende op de (huidige versie van de) dmarcian software moet worden beschouwd. Maar *tenminste* staat op grond van de beschikking van de Ondernemingskamer vast dat er over de inhoud van de licentieovereenkomst en de eigendom van de intellectuele rechten onduidelijkheid bestaat. Reeds dat laatste zou moeten betekenen dat de status quo moet worden gehandhaafd totdat die onduidelijkheid is opgelost.

## 4.  Onrechtmatigheid van de opzegging en aansprakelijkheid Draegen.

4.1. De tussen partijen bestaande overeenkomst c.q. samenwerking kwalificeert als een duurovereenkomst voor onbepaalde tijd. Partijen zijn geen opzeggingsregeling overeengekomen.

4.2. Uit vaste rechtspraak van de Hoge Raad volgt dat een dergelijke overeenkomst *in beginsel* kan worden opgezegd. De eisen van redelijkheid en billijkheid in verband met de aard en de inhoud van de overeenkomst en de omstandigheden van het geval kunnen echter met zich meebrengen dat (i) opzegging slechts mogelijk is indien daarvoor een voldoende zwaarwegende grond aanwezig is en/of (ii) een bepaalde opzegtermijn in acht moet worden genomen of de opzegging gepaard moet gaan met het aanbod tot betaling van een (schade)vergoeding.[9]

4.3. Bij de beoordeling wat in dit kader naar maatstaven van redelijkheid en billijkheid van partijen gevergd kan worden, moeten alle omstandigheden van het geval worden meegewogen. Van bijzonder belang zijn daarbij:

- De belangen van partijen: het redelijk belang van de opzeggende partij bij de opzegging, afgewogen tegen het redelijk belang van de opgezegde partij bij voortzetting van de overeenkomst.

- De aard en duur van de overeenkomst c.q. relatie: de vraag of partijen lange tijd zaken met elkaar doen en/of sprake is van een hechte en/of exclusieve relatie.

- Afhankelijkheid: de mate waarin een partij afhankelijk is van de (omzet van de) andere partij en of het voortbestaan van de onderneming van de partij die wordt opgezegd in gevaar is.

---

[9] Vgl. Hoge Raad, 2 februari 2018, ECLI:NL:HR:2018:141 (Goglio v SMQ Group) r.o. 3.6.1 e.v.

15

- Wat aan de opzegging vooraf is gegaan: de wijze waarop partijen hebben samengewerkt en het vertrouwen dat de opgezegde partij mocht hebben op voortzetting van de overeenkomst (bijvoorbeeld door de wijze waarop partijen zich in dat kader over en weer naar elkaar hebben uitgelaten) en de reden voor de opzegging.

- Investeringen: de investeringen die een partij heeft gedaan. Deze kunnen worden gecompenseerd door het in acht nemen van een bepaalde opzegtermijn of – indien dat niet mogelijk is – voor schadevergoeding in aanmerking komen.

4.4. Het voorgaande laat onverlet dat een duurovereenkomst naar de bedoeling van partijen niet-opzegbaar is.

*Primair: partijen zijn overeengekomen dat de Overeenkomst niet opzegbaar is*

4.5. In dit geval geldt (primair) dat uit de bedoeling van partijen volgt dat de Overeenkomst c.q. hun samenwerking niet (althans alleen onder zeer bijzondere omstandigheden die hier niet spelen) opzegbaar is. Partijen zijn immers een *perpetual* (dus: eeuwigdurende) licentie overeengekomen. Daaruit blijkt al dat partijen de bedoeling hadden dat de licentie en daarmee ook de distributierechten van dmarcian Europe in beginsel niet beëindigd kunnen worden.

4.6. Daar komt bij dat dmarcian Europe naar haar mening intussen als mede-auteursrechthebbende op de huidige versie van de dmarcian software is geworden. Dit staat hoe dan ook aan de beëindiging van de gemaakte exploitatieafspraken in de weg.

*Subsidiair: de Overeenkomst kan (onder de huidige omstandigheden) niet of slechts met een dringende reden worden opgezegd c.q. er dient een redelijke opzegtermijn in acht le worden genomen*

4.7. Voor zover de Overeenkomst naar bedoeling van partijen wél opzegbaar zou zijn, geldt (subsidiair) dat de Overeenkomst in het licht van de eisen van redelijkheid en billijkheid en de relevante omstandigheden van dit geval: (i) (bij de huidige stand van zaken) niet, althans niet zonder dringende reden (die ontbreekt) kan worden opgezegd, dan wel (ii) dat daarbij een voldoende lange opzegtermijn (die eveneens ontbreekt) in acht dient te worden genomen.

4.8. In dat kader zijn, naast hetgeen hiervoor in het kader van de partijbedoelingen is opgemerkt, de volgende omstandigheden van belang:

- Er is sprake van een exclusieve Overeenkomst, die al tenminste vijf jaar voortduurt. Het gaat bovendien om een zeer hechte samenwerking. De bedrijfsvoering van partijen is sterk verweven, zoals onder meer blijkt uit de door partijen gebruikte (domein)namen.

- De exploitatie van de dmarcian software vormt de *core business* van dmarcian Europe. Haar onderneming is volledig ingericht op de distributie van die software en al haar klantgegevens (en gegevens van potentiele klanten) zijn opgenomen in de (back-end van de) door dmarcian Inc. beheerde SaaS-applicatie. Het voortbestaan van dmarcian Europe is daarom afhankelijk van het in stand blijven licentie en distributierechten die zij in het kader van de Overeenkomst heeft

16

verkregen en het in stand blijven van de toegang tot die applicatie. Beëindiging van de
Overeenkomst zal zonder twijfel tot haar faillissement leiden, met als gevolg dat al haar
werknemers op straat komen te staan. Het belang van dmarcian Europe bij de voortzetting van de
relatie is derhalve zeer groot.

- dmarcian Europe heeft aanzienlijke investeringen gedaan in de ontwikkeling van de dmarcian
software. Die investeringen zijn niet doorbelast aan dmarcian Inc. dmarcian Inc. was daarvan wel
op de hoogte en profiteert daar ook van door (zonder daartoe gerechtigd te zijn) de door en in
opdracht van dmarcian Europe ontwikkelde software aan te bieden aan derden.

- dmarcian Inc heeft geen enkel rechtens te respecteren belang bij een (onmiddellijke) beëindiging
van de Overeenkomst. De enige reden waarom zij de Overeenkomst thans beëindigt, is omdat zij
op dmarcian Europe op die manier in een dwangpositie wil brengen, om haar op die manier
(alsnog) zover te krijgen dat zij instemt met een overdracht van de intellectuele eigendomsrechten
en een distributieovereenkomst onder voor dmarcian Europe zeer ongunstige voorwaarden.

- Dit laatste klemt temeer nu over de eigendom van de intellectuele rechten in de software
onduidelijkheid bestaat. De Ondernemingskamer heeft in haar beschikking in verband daarmee
een onderzoek heeft naar de gang van zaken binnen dmarcian Europe. De Ondernemingskamer
heeft bovendien een tijdelijke bestuurder aangesteld, die als expliciete opdracht heeft om
duidelijkheid te krijgen over de intellectuele eigendomsrechten en om een minnelijke oplossing te
beproeven tussen de betrokken partijen (Beschikking Ondernemingskamer d.d. 7 september 2020,
r.o. 3.5 en 3.6). De acties van gedaagden maaien het gras voor de voeten van deze aangestelde
bestuurder weg en stellen de onderzoeker – nadat die zal zijn benoemd – voor een voldongen feit,
als de onduidelijkheid over de intellectuele eigendomsrechten inmiddels is opgelost doordat
dmarcian Europe die rechten onder dwang aan dmarcian Inc heeft overgedragen. Het is onduidelijk
waarom van dmarcian Inc niet zou kunnen worden gevergd dat zij *op zijn minst* de door de tijdelijk
aangestelde bestuurder c.q. het door de Ondernemingskamer gelaste onderzoek afwacht, althans
totdat in een bodemprocedure duidelijkheid is verkregen over de eigendom van de intellectuele
eigendomsrechten op de huidige versie van de dmarcian software.

4.9. In het licht van deze omstandigheden moet worden geoordeeld dat de eisen van redelijkheid en
billijkheid met zich meebrengen dat de Overeenkomst – in ieder geval bij de huidige stand van zaken,
oftewel zolang de OK-procedure nog niet is afgerond – niet, althans niet zonder zwaarwegende reden,
kan worden opgezegd. Voor de goede orde: van een zwaarwegende grond voor opzegging is in dit
geval geen sprake. Het enkele feit dat tussen partijen op dit moment nog discussie bestaat over de
vraag aan wie de intellectuele eigendomsrechten op de software toebehoren, kwalificeert in ieder
geval niet als zodanig. Dat is nu juist de reden geweest voor de Ondernemingskamer om voorlopige
maatregelen te treffen.

4.10.  De conclusie luidt dat de opzegging onrechtmatig en daarmee nietig is. Dmarcian Inc. is en blijft
daarom gehouden haar verplichtingen onder de Overeenkomst na te komen.  Die verplichtingen
omvatten in ieder geval dat zij dmarcian Europe in staat moet stellen om haar distributierechten uit te
(blijven) oefenen. Daartoe heeft zij in ieder geval (ononderbroken) toegang nodig tot de
(computer)systemen en het SaaS-platform.

17

*Meer subsidiair: verzoek tot treffen ordemaatregel*

4.11.  Voor het geval uw voorzieningenrechter voorshands onvoldoende aannemelijk vindt dat de
opzegging rechtmatig is, verzoekt dmarcian Europe uw voorzieningenrechter – meest subsidiair -
gelet op het door de Ondernemingskamer gelaste onderzoek bij wijze van ordemaatregel te bepalen
dat de status quo voor de duur van dat onderzoek wordt gehandhaafd en dat dmarcian Europe dus
weer onbeperkt toegang tot alle systemen dient te krijgen en dat de samenwerking gedurende die
periode niet kan worden beëindigd.

*Aansprakelijkheid Draegen*

4.12.  Dmarcian Europe is tevens van mening dat Draegen in strijd handelt met de normen van artikel
2:8 BW. Draegan is aandeelhouder van dmarcian Europe en heeft zich bovendien ook zelf gewend
tot de Ondernemingskamer met het verzoek in te grijpen vanwege een mede ook door zijn toedoen
ontstane situatie. Die positie brengt naar het oordeel van dmarcian Europe mee dat Draegan
hangende de enquêteprocedure de huidige status quo respecteert en dat hij niet –als bestuurder en
grootaandeelhouder van dmarcian Inc – feitelijk bewerkstelligt dat de Overeenkomst door de Inc.
wordt opgezegd. Dat deze actie als pressiemiddel dient, mag reeds volgen uit de brief van Draegan
zelf.

4.13.  Sterker nog, Draegen heeft de verhoudingen verder op scherp gezet door een beroep te doen op
artikel 4 van de exit agreement, onder de ontbindende voorwaarde dat dmarcian Europe de door
dmarcian Inc. bij de opzegbrief gevoegde *distribution agreement* en *settlement agreement* accepteert.
Hoewel de bepaling geen grond voor beëindiging van de samenwerking tussen dmarcian Inc en
dmarcian Europe vormt – zij immers zijn geen partij bij de exit agreement – en hoogstens relevantie
heeft voor de samenwerking tussen de aandeelhouders, probeert Draegen daarmee evident de druk
op (de aandeelhouders van) dmarcian Europe op te hogen om akkoord te gaan met de voornoemde
*distribution agreement* en *settlement agreement*. Het gaat daarbij om een duidelijk vooraf
gecoördineerde actie tussen dmarcian Inc. en Draegen in persoon. Dat blijkt alleen al uit het feit dat
de brieven van respectievelijk dmarcian Inc. en Draegan luttele minuten na elkaar verzonden zijn.
Draegen heeft daarmee in strijd gehandeld met de zorgvuldigheid die hij jegens dmarcian Europe in
acht behoort te nemen en de normen van artikel 2:8 BW.

4.14.  Gezien de gedragingen van partijen tot op heden, kan dmarcian Europe niet anders dan
concluderen dat dmarcian Inc. en Draegen alles in het werk zullen stellen om zich aan een oordeel
van uw Voorzieningenrechter te onttrekken. Dat blijkt ook uit de e-mail van de advocaat van dmarcian
Inc. in reactie op de aankondiging van dit kort geding. Daarin schrijft hij namens dmarcian Inc.:
"*[dmarcian Europe may resolve to initiate injunctive relief proceedings, but Dutch courts have no
competence over [dmarcian inc] and, consequently, a Dutch judgement cannot be enforced against
it in its jurisdiction. Consequently, this will be to no avail.*". dmarcian Europe heeft er om die reden
recht op en belang bij dat ook Draegen verboden wordt verdere (onrechtmatige) handelingen te
verrichten die er op gericht zijn haar te benaderen, ten behoeve van dmarcian Inc. – en daarmee
Draegen persoonlijk. Ook zijn in dit licht substantiële dwangsommen in het geval van niet nakoming
van het door uw Voorzieningenrechter te wijzen vonnis op zijn plaats.

18

**5. TOEPASSELIJK RECHT EN BEVOEGDHEID VAN DE NEDERLANDSE RECHTER**

**Toepasselijk recht**

*De relatie tussen dmarcian Europe en dmarcian Inc.*

5.1. De Overeenkomst kwalificeert aanvankelijk en primair als een distributieovereenkomst.[10] Partijen zijn geen rechtskeuze overeengekomen. Om die reden is op de Overeenkomst het recht van toepassing van het land waar dmarcian Europe als distributeur haar gewone verblijfplaats heeft (art. 4 lid 1 Rome I Verordening[11] jo art. 10:154 BW). dmarcian Europe is gevestigd in Nederland. Dat wil zeggen dat op de Overeenkomst tussen dmarcian Europe en dmarcian Inc. Nederlands recht van toepassing is. Voorts staan de servers waar het Saas-platform van dmarcian Europe op servers in België en Nederland.

*De relatie tussen dmarcian Europe en Draegen*

5.2. De handelingen van Draegen kwalificeren als een onrechtmatige daad. Op een onrechtmatige daad is het recht van toepassing van het land waar de schade zich voordoet (artikel 4 lid 1 Rome II Verordening jo. 10:159 BW).[12] De schade die het gevolg is van het handelen van Draegen doet zich voor in Nederland. Ook op de vorderingen van dmarcian Europe jegens Draegen is derhalve Nederlands recht van toepassing.

**Bevoegdheid van de Nederlandse rechter**

5.3. De Nederlandse rechter is op verschillende gronden bevoegd om van dit geschil kennis te nemen.

5.4. Ten eerste geldt dat de Nederlandse rechter op grond van artikel 6 Rv rechtsmacht heeft.

5.4.1. Ten aanzien van de vorderingen van dmarcian Europe jegens dmarcian Inc. geldt dat er sprake is van een verbintenis die voortvloeit uit een overeenkomst. Artikel 6 onder a Rv bepaalt dat de Nederlandse rechter in een dergelijk geval rechtsmacht heeft, indien de verbintenis die aan de eis of het verzoek ten grondslag ligt in Nederland is uitgevoerd of moet worden uitgevoerd. In het geval van een overeenkomst voor de verstrekking van diensten, geldt dat de plaats van de uitvoering in Nederland is gelegen, indien de diensten volgens de overeenkomst in Nederland verstrekt werden of verstrekt hadden moeten worden (art. 6a Rv). Daarvan is in dit geval sprake. dmarcian Europe was onder de Overeenkomst verantwoordelijk voor de verkoop van de software (en het leveren van de bijbehorende diensten) aan klanten in Europa, Rusland en Afrika (vgl. r.o. 2.5 Beschikking OK d.d. 7 september 2020). Deze diensten verrichtte dmarcian Europe vanuit haar vestigingsplaats Nederland. De Nederlandse rechter heeft om die reden op grond van artikel 6 lid 1 Rv de bevoegdheid om over dit geschil te oordelen.

5.4.2. Ten aanzien van Draegen geldt dat er sprake is van vorderingen die gebaseerd zijn op verbintenissen uit onrechtmatige daad. In het geval van verbintenissen uit onrechtmatige daad is de Nederlandse rechter bevoegd indien het *'schadebrengende feit'* zich in Nederland heeft voorgedaan of zich kan voordoen (art. 6 onder e Rv). Omdat artikel 6 onder e Rv gebaseerd

---

[10] In 2017 en 2018 is de relatie uitgebreid met toegang tot de broncode ten behoeve van de ontwikkeling als gevolg waarvan gezamenlijk eigendom is gestaan.
[11] VERORDENING (EG) Nr. 593/2008 VAN HET EUROPEES PARLEMENT EN DE RAAD van 17 juni 2008 inzake het recht dat van toepassing is op verbintenissen uit overeenkomst (Rome I).
[12] Verordening (EG) nr. 864/2007 van het Europees Parlement en de Raad van 11 juli 2007 betreffende het recht dat van toepassing is op niet-contractuele verbintenissen (Rome II).

19

is op (de voorlopers van) artikel 7 onder 2 Herschikte EEX-Vo[13], is voor de uitleg daarvan de rechtspraak van het Hof van Justitie over de laatstgenoemde bepaling(en) leidend. Uit die rechtspraak volgt dat onder het *schadebrengende feit* zowel de plaats waar het schadebrengende feit zich heeft voorgedaan wordt verstaan (het *Handlungsort*), als de plaats waar de schade zich heeft voorgedaan (het *Erfolgsort*).[14] In dit geval is in ieder geval het *Erfolgsort* gelegen in Nederland. Om die reden heeft de Nederlandse rechter ook ten aanzien van de vorderingen jegens Draegen op grond van artikel 6 Rv rechtsmacht.

5.5. Overigens geldt dat ook als dat anders zou zijn, de Nederlandse rechter bevoegd is om over dit geschil te oordelen. Er is sprake van een verzoek tot het treffen van bewarende maatregelen, welke voldoende relevante aanknopingspunten heeft met de Nederlandse rechtsorde. Het geschil draait immers om de opzegging van een overeenkomst die in Nederland moet worden uitgevoerd door een Nederlandse partij (en die dus beheerst wordt door Nederlands recht), en daarmee verband houdende onrechtmatige handelingen. Met die handelingen wordt bovendien getracht een beschikking van de Nederlandse rechter, te weten de Ondernemingskamer, te doorkruizen. In dergelijke omstandigheden kan de bevoegdheid van de Nederlandse rechter op grond van artikel 13 Rv niet worden betwist op de enkele grond dat de Nederlandse rechter ten aanzien van een geschil ten principale (beweerdelijk) geen rechtsmacht zou hebben.

5.6. Tot slot merkt dmarcian Europe op dat haar vorderingen jegens dmarcian Inc. en Draegen een zodanige samenhang bestaat, dat redenen van doelmatigheid een gezamenlijke behandeling rechtvaardigen. Dit houdt in dat indien de Nederlandse rechter rechtsmacht heeft ten aanzien van de vorderingen ten aanzien van één van de gedaagden, hij dat automatisch ook heeft ten aanzien van de andere gedaagden (art. 7 lid 1 Rv).

**Relatieve bevoegdheid Rechtbank Rotterdam**

5.7. Uw Voorzieningenrechter bent ook relatief bevoegd.

5.8. Op grond van artikel 102 Rv is in zaken betreffende verbintenissen uit onrechtmatige daad de rechter van de plaats waar het schadebrengende feit zich heeft voorgedaan (mede) bevoegd om over het geschil te oordelen. Het schadebrengende feit doet zich in dit geval voor in de vestigingsplaats van dmarcian Europe, te weten Dordrecht, vanuit waar zij de Overeenkomst uitvoert. Uw Voorzieningenrechter is daarom in ieder geval relatief bevoegd waar het de vorderingen jegens Draegen betreft. Nu tussen de vorderingen jegens Draegen en dmarcian Inc. een zodanige samenhang bestaat dat redenen van doelmatigheid een gezamenlijke behandeling rechtvaardigen, maakt dit dat uw Voorzieningenrechter ook ten aanzien van de vorderingen jegens dmarcian Inc. relatief bevoegd bent (art. 107 Rv).

5.9. Voor zover de voorgaande bepalingen niet van toepassing zouden zijn, geldt verder dat uw Voorzieningenrechter op grond van artikel 109 Rv bevoegd bent, nu dmarcian Europe als eiseres in Dordrecht gevestigd is.

---

[13] Verordening (EU) nr. 1215/2012 van het Europees Parlement en de Raad van 12 december 2012 betreffende de rechterlijke bevoegdheid, de erkenning en de tenuitvoerlegging van beslissingen in burgerlijke en handelszaken (Herschikte EEX Verordening).
[14] Hof van Justitie 30 november 1976, C-21/76, ECLI:EU:C:1976:166 (*Kalimijnen*).

20

6. BEKENDE VERWEREN VAN DMARCIAN INC.

6.1. Dmarcian Inc betwist dat zij aan dmarcian Europe een eeuwigdurende, exclusieve licentie op haar software heeft gegeven. Zij betwist verder dat dmarcian Europe auteursrechten op de dmarcian software heeft verworven, althans zij stelt zich op het standpunt dat dmarcian Europe gehouden is die rechten onder door dmarcian Inc te bepalen voorwaarden aan dmarcian Inc over te dragen.

7. BEWIJS

7.1. Ter onderbouwing van haar stellingen verwijst dmarcian Europe naar de bij deze dagvaarding gevoegde producties. Zonder overigens onverplicht enige bewijslast op zich te nemen, biedt dmarcian Europe daarnaast aan haar stellingen verder te bewijzen door alle middelen rechtens.


**OM DEZE REDENEN:**

Het uw Voorzieningenrechter behage om bij vonnis, voor zover mogelijk uitvoerbaar bij voorraad:

Ten aanzien van dmarcian Inc

1. dmarcian Inc te gebieden de tussen partijen bestaande overeenkomst onverkort na te komen, totdat deze rechtsgeldig is beëindigd.

2. dmarcian Inc te gebieden de blokkade van (de medewerkers van) dmarcian Europe tot het SaaS-platform en de voor de uitoefening van haar bedrijfsactiviteiten vereiste (computer)systemen met onmiddellijke ingang op te heffen en opgeheven te houden totdat de tussen partijen bestaande overeenkomst rechtsgeldig is beëindigd;

3. Dmarcian Inc te veroordelen tot betaling van een dwangsom van EUR 20.000,- per dag dat zij niet, of niet volledig voldoet aan het onder 1 en 2 gevorderde, zulks met een maximum van EUR 3.000.000,-.

Ten aanzien van Draegen

4. Draegen te veroordelen zich te onthouden van iedere handeling, zelf of via een door hem bestuurde vennootschap waaronder expliciet begrepen dmarcian Inc, die de bedrijfsvoering van dmarcian Europe belemmert, totdat dan wel als gevolg van het door de Ondernemingskamer gelaste onderzoek, dan wel als gevolg van een gerechtelijk bodemvonnis, duidelijkheid ontstaat over de inhoud en reikwijdte van de aan dmarcian Europe verstrekte licentieovereenkomst en de eigendom van de IE rechten op de dmarcian software.

5. Draegen te veroordelen tot betaling van een dwangsom van EUR 20.000,- per dag dat hij niet, of niet volledig voldoet aan het onder 4 gevorderde, zulks met een maximum van EUR 3.000.000,-.

21

<u>Ten aanzien van dmarcian Inc en Draegen</u>

    6.   Dmarcian Inc en Draegen hoofdelijk te veroordelen in de proceskosten en de nakosten, alle kosten te vermeerderen met wettelijke rente vanaf de datum van het vonnis tot aan de dag der algehele voldoening.

De kosten dezes zijn voor mij, deurwaarder, [BEDRAG]

Deze zaak wordt behandeld door mr. V. van Druenen, mr. A. Meijboom en mr. M. Bacon van Kennedy Van der Laan, Postbus 58188 te (1040 HD) Amsterdam, telefoon (020) 5506 688, fax (020) 5506 788, e-mail veerle.van.druenen@kvdl.com.

22

**PRODUCTIEOVERZICHT**

**Productie 1.**   Exploot betekening Oostenrijks Vonnis

**Productie 2.**   Opzegging d.d. 29 september 2016

23

| | |
|---|---|
| **From:** | Veerle van Druenen |
| **Sent:** | Friday, January 29, 2021 11:45 AM |
| **To:** | tim@dmarcian.com; shannon@dmarcian.com |
| **Cc:** | Alfred Meijboom; Michael Bacon; Timo Jansen |
| **Subject:** | dmarcian Europe / dmarcian Inc. - final writ of summons [URGENT] |
| **Attachments:** | Betekende dagvaarding dmarcian Europe - dmarcian Inc. c.s..pdf |

Dear Sir, Madam,

I refer to my e-mail below. For your information please find attached a copy of the final writ of summons (including an English translation). I will share the accompanying exhibits with you in two separate e-mails.

Kind regards,
Veerle van Druenen

**Veerle van Druenen**
Advocaat / Attorney-at-law

Kennedy Van der Laan
T +31205506888  M +31621175778
F +31205506788
Amsterdam | Eindhoven
www.kvdl.com
LinkedIn | Instagram | Mediareport | Nieuwsbrief

**Van:** Veerle van Druenen
**Verzonden:** donderdag 28 januari 2021 16:52
**Aan:** tim@dmarcian.com; shannon@dmarcian.com
**CC:** Alfred Meijboom <Alfred.Meijboom@kvdl.com>; Michael Bacon <Michael.Bacon@kvdl.com>; t.jansen@lexence.com
**Onderwerp:** dmarcian Europe / dmarcian Inc. - date hearing summary proceedings [URGENT]

Dear Sir, Madam,

I refer to my e-mail to your attorney dated 25 January 2021 regarding the dispute that has arisen between Dmarcian Inc. ("**dmarcian Inc.**") and dmarcian Europe B.V. ("**dmarcian Europe**").

In light of dmarcian Inc.'s refusal to meet the demands of dmarcian Europe set out in that e-mail, dmarcian Europe has proceeded and requested the District Court of Rotterdam to schedule a date for a hearing in summary proceedings. In the meantime the date for this hearing has been set. The hearing will take place on **Monday 1 February 2021 between 09:00 and 10:30 hrs at the District Court in Rotterdam**. The judge is mr. De Bruin. Attached you will find a copy of the draft writ of summons that was submitted by dmarcian Europe when requesting the court to schedule the hearing. The final writ of summons (including an English translation thereof) and the exhibits will be served tomorrow.

Note that the court has granted permission to submit the procedural documents by e-mail using the following e-mail addresses: Bvr.civiel.rb.rotterdam@rechtspraak.nl and p.de.bruin@rechtspraak.nl (with a copy to the other attorney's involved). It is not required to also submit the procedural documents per regular mail.

I further note that the court has informed us that the court room has a maximum capacity of 10 persons (not including the judge and clerk). I will contact your attorney to discuss the number of representatives that will be present for each of the parties.

**Exhibit E**

I trust to have informed you sufficiently.

Kind regards,
Veerle van Druenen

**Veerle van Druenen**
Advocaat / Attorney-at-law

Kennedy Van der Laan

T +31205506688  M +31621175778
F +31205506786

Amsterdam | Eindhoven

www.kvdl.com

Linkedin | Instagram | Mediareport | Nieuwsbrief

Deze e-mail bevat vertrouwelijke informatie en mag uitsluitend worden gebruikt door de geadresseerde of andere personen binnen de organisatie van de geadresseerde die bevoegd zijn om kennis te nemen van de informatie die deze e-mail bevat. Alle diensten worden verricht door Kennedy Van der Laan N.V. op basis van onze algemene voorwaarden die u kunt raadplegen, uitprinten en downloaden op www.kvdl.com. Deze algemene voorwaarden bevatten een beperking van aansprakelijkheid. Kennedy Van der Laan N.V. is in het Handelsregister ingeschreven onder nummer 34261155.

This e-mail contains privileged information and may be used only by the addressee or other persons within the addressee's organization authorized to access the information contained herein. All services are provided by Kennedy Van der Laan N.V. on the basis of our general terms and conditions which can be accessed, printed and downloaded at www.kvdl.com. These general terms and conditions contain a limitation of liability. Kennedy Van der Laan N.V. is registered in the Company Register under number 34261155.

CONCEPT DAGVAARDING IN KORT GEDING OP VERKORTE TERMIJN KRACHTENS MONDELINGE LAST VAN DE VOORZIENINGENRECHTER VAN DE RECHTBANK ROTTERDAM D.D. 28 FEBRUARI 2021

Heden, de negenentwintigste januari tweeduizend eenentwintig, om 13:15 uur, op verzoek van de besloten vennootschap met beperkte aansprakelijkheid DMARCIAN EUROPE B.V., gevestigd en kantoorhoudend te (3311 JG) Dordrecht aan de Burgemeester de Raadtsingel 93, in deze zaak woonplaats kiezende te (1014 BG) Amsterdam aan de Molenwerf 16, op het kantoor van Kennedy Van der Laan N.V., van welk kantoor mrs. V. van Druenen, A.P. Meijboom en M.R.S. Bacon in deze zaak tot advocaat worden gesteld en als zodanig zullen optreden;

Heb ik, Henricus Hubertus Wessels, toegevoegd gerechtsdeurwaarder ten kantore van Robert Pieter van Veenendaal, gerechtsdeurwaarder te Rotterdam en aldaar kantoorhoudende aan de Willemskade 21,

IN KORT GEDING GEDAGVAARD OP VERKORTE TERMIJN:

1. De vennootschap naar Amerikaans recht DMARCIAN, INC., gevestigd te 43 S. Broad Street, Suite 203, Brevard, North Carolina 28712, Verenigde Staten van Amerika,

daartoe heb ik uit krachte van artikel 55 lid 1 van het Wetboek van Burgerlijke Rechtsvordering mijn exploot gedaan aan het parket van de ambtenaar van het openbaar ministerie bij de Rechtbank Rotterdam, locatie Rotterdam, alwaar ik te 3072 AK ROTTERDAM aan het adres Wilhelminaplein 100-125 twee afschriften hiervan voorzien van de vertaling van die stukken in de Engels taal, heb gelaten aan:

J.W. Pollet,

aldaar werkzaam en aanwezig.

Verzocht wordt dit exploot voorzien van de vertaling van die stukken in de Engels taal, aan de vennootschap naar Amerikaans recht DMARCIAN, INC., gevestigd te 43 S. Broad Street, Suite 203, Brevard, North Carolina 28712, Verenigde Staten van Amerika te doen betekenen/kennisgeven overeenkomstig de artikelen 3 tot en met 6 van het Verdrag inzake de betekening en de kennisgeving in het buitenland van gerechtelijke en buitengerechtelijke stukken in burgerlijke- en handelszaken van 15 november 1965 (het "Verdrag"), en wel door betekening of kennisgeving met inachtneming van de vormen in de wetgeving van de aangezochte lidstaat voorgeschreven voor de betekening of de kennisgeving van stukken, die in dat land zijn opgemaakt en bestemd zijn voor zich aldaar bevindende personen, waarbij aan de in artikel 6 van het Verdrag bedoelde (centrale) autoriteit voorts verzocht wordt een afschrift van dit exploot te retourneren, vergezeld van de verklaring als bedoeld in artikel 6 van het Verdrag.

de kosten ten bedrage van USD 95,00 worden tijdig overgemaakt naar de Wells Fargo Bank, account no. 2007107119, onder vermelding van Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington 98134 USA onder vermelding van de vennootschap naar het recht harer vestiging DMARCIAN INC. gevestigd en kantoorhoudende te 28712 BREVARD, NORTH CAROLINA,

1

VERENIGDE STATEN VAN AMERIKA aan het adres Broad Street 43 S, Suite 203;

Voorts wordt een afschrift van dit exploot voorzien van de vertaling van die stukken in de Engels taal onverwijld door mij per aangetekende brief gezonden aan het adres van de vennootschap naar Amerikaans recht DMARCIAN, INC., voornoemd;

**2.** De heer Timothy George **DRAEGEN**, woonachtig aan het adres 272 Delphia Drive, Brevard, North Carolina, 28712, Verenigde Staten van Amerika,

daartoe heb ik uit krachte van artikel 55 lid 1 van het Wetboek van Burgerlijke Rechtsvordering mijn exploot gedaan aan het parket van de ambtenaar van het openbaar ministerie bij de Rechtbank Rotterdam, locatie Rotterdam, alwaar ik te 3072 AK ROTTERDAM aan het adres Wilhelminaplein 100-125 twee afschriften hiervan voorzien van de vertaling van die stukken in de Engels taal, heb gelaten aan:

*J.W. Pollet,*

aldaar werkzaam en aanwezig.

Verzocht wordt dit exploot voorzien van de vertaling van die stukken in de Engels taal, aan Timothy George Draegen, woonachtig aan het adres 272 Delphia Drive, Brevard, North Carolina, 28712, Verenigde Staten van Amerika te doen betekenen/kennisgeven overeenkomstig de artikelen 3 tot en met 6 van het Verdrag inzake de betekening en de kennisgeving in het buitenland van gerechtelijke en buitengerechtelijke stukken in burgerlijke- en handelszaken van 15 november 1965 (het "Verdrag"), en wel door betekening of kennisgeving met inachtneming van de vormen in de wetgeving van de aangezochte lidstaat voorgeschreven voor de betekening of de kennisgeving van stukken, die in dat land zijn opgemaakt en bestemd zijn voor zich aldaar bevindende personen, waarbij aan de in artikel 6 van het Verdrag bedoelde (centrale) autoriteit voorts verzocht wordt een afschrift van dit exploot te retourneren, vergezeld van de verklaring als bedoeld in artikel 6 van het Verdrag;

de kosten ten bedrage van USD 95,00 worden tijdig overgemaakt naar de Wells Fargo Bank, account no. 2007107119, onder vermelding van Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington 98134 USA onder vermelding van Timothy George Draegen, wonende te 28712 BREVARD, NORTH CAROLINA, VERENIGDE STATEN VAN AMERIKA aan het adres Delphia Drive 272;

Voorts wordt een afschrift van dit exploot voorzien van de vertaling van die stukken in de Engels taal onverwijld door mij per aangetekende brief gezonden aan het adres van Timothy George Draegen, voornoemd;

ONDER VERMELDING IN DEZE DAGVAARDING DAT VERLOF VOOR DE VERKORTING VAN DE DAGVAARDINGSTERMIJN IS VERLEEND ONDER DE VOORWAARDEN DAT:

- de dagvaarding en vertaling uiterlijk op 29 februari 2021, om 14:00, aan gedaagden worden betekend
- onverwijld aan gedaagden mededeling wordt gedaan van het tijdstip en de locatie van de zitting, onder toezending van een kopie van de conceptdagvaarding

2

**OM:**

Op 1 februari 2021, om 09:00 's ochtends, in persoon of vertegenwoordigd door een advocaat, te verschijnen ter terechtzitting van de voorzieningenrechter van de Rechtbank Rotterdam, locatie Rotterdam, welke zitting aldaar zal worden gehouden in het gerechtsgebouw aan het Wilhelminaplein 100-125, 3072 AK Rotterdam

**MET DE UITDRUKKELIJKE AANZEGGING DAT:**

- indien een gedaagde niet in persoon en evenmin vertegenwoordigd door een advocaat op de terechtzitting verschijnt en de voorgeschreven termijnen en formaliteiten in acht zijn genomen, de rechter verstek tegen gedaagde zal verlenen en de hierna omschreven vordering zal toewijzen, tenzij deze hem onrechtmatig of ongegrond voorkomt;
- indien ten minste één van gedaagden in het geding verschijnt en het griffierecht tijdig heeft voldaan, tussen alle partijen één vonnis zal worden gewezen, dat als een vonnis op tegenspraak wordt beschouwd;
- bij verschijning in het geding van ieder van gedaagden een griffierecht zal worden geheven, te voldoen binnen vier weken te rekenen vanaf het tijdstip van verschijning;
- de hoogte van de griffierechten is vermeld in de meest recente bijlage behorend bij de Wet griffierechten burgerlijke zaken, die onder meer is te vinden op de website: www.kbvg.nl/griffierechtentabel;
- van een persoon die onvermogend is, een bij of krachtens de wet vastgesteld griffierecht voor onvermogenden wordt geheven, indien hij op het tijdstip waarop het griffierecht wordt geheven heeft overgelegd:
  1. een afschrift van het besluit tot toevoeging, bedoeld in artikel 29 van de Wet op de rechtsbijstand, of indien dit niet mogelijk is ten gevolge van omstandigheden die redelijkerwijs niet aan hem zijn toe te rekenen, een afschrift van de aanvraag, bedoeld in artikel 24 lid 2, van de Wet op de rechtsbijstand, dan wel
  2. een verklaring van het bestuur van de raad voor rechtsbijstand, bedoeld in artikel 7, derde lid, onderdeel e, van de Wet op de rechtsbijstand waaruit blijkt dat zijn inkomen niet meer bedraagt dan de inkomens bedoeld in de algemene maatregel van bestuur krachtens artikel 35, tweede lid, van die wet;
- van gedaagden die bij dezelfde advocaat verschijnen en gelijkluidende conclusies nemen of gelijkluidend verweer voeren, op basis van artikel 15 van de Wet griffierechten burgerlijke zaken slechts eenmaal een gezamenlijk griffierecht wordt geheven;

3

**TENEINDE:**

alsdan namens eiseres ("**dmarcian Europe**") te horen eisen en concluderen als volgt:

## 1.  Inleiding

1.1.  dmarcian Europe vraagt uw Voorzieningenrechter in dit kort geding een aantal voorlopige voorzieningen te treffen die ertoe strekken dat de ontzegging door dmarcian Inc. van de toegang tot de medewerkers van dmarcian Europe tot de gezamenlijke (computer)systemen per direct wordt opgeheven, dat de werking aan de door dmarcian Inc bij brief van 22 januari 2021 aangezegde beëindiging van de samenwerking tussen partijen per 1 februari 2021 wordt ontnomen en dat gedaagden wordt bevolen de bestaande samenwerking ongewijzigd voor te zetten totdat duidelijkheid is verkregen omtrent de voorwaarden van de aan dmarcian Europe verstrekte licentie en de eigendom van de auteursrechten op de huidige versie van de door partijen geëxploiteerde software, hetgeen de kern vormt van hun geschil.

1.2.  Deze zaak hangt nauw samen met de enquêteprocedure bij de Ondernemingskamer van het Gerechtshof Amsterdam. In die procedure – waarbij ook Draegen partij is – heeft de Ondernemingskamer bij beschikking van 7 september 2020 geoordeeld dat er sprake is van gegronde redenen voor twijfel aan een juist beleid van dmarcian Europe, welke redenen zijn gelegen in (kort omschreven) de door toedoen van partijen ontstane situatie dat zij hun samenwerking, noch in het algemeen noch ter zake de intellectueel eigendomsrechten op ontwikkelde en te ontwikkelen software applicaties en (de reikwijdte van) de in verband daarmee verleende / te verlenen licenties hebben geregeld. De Ondernemingskamer heeft – op verzoek van beide aandeelhouders (Draegen en TDX) – hiernaar een onderzoek bevolen. Voorts heeft de Ondernemingskamer middels het treffen van onmiddellijke voorzieningen ingegrepen, inhoudende dat een bestuurder met doorslaggevende stem is benoemd alsook dat alle aandelen in dmarcian Europe (minus één aandeel per aandeelhouder) ten titel van beheer zijn overgedragen aan een beheerder. Bij beschikking van 10 september 2020 heeft de Ondernemingskamer mr. H.J.M. Harmeling (**'Harmeling'**) aangewezen als de bedoelde bestuurder en mr. Y. Borrius als de beheerder. Dit kort geding wordt namens dmarcian Europe gevoerd onder verantwoordelijkheid van Harmeling, teneinde de continuïteit van dmarcian Europe te waarborgen. De beschikkingen van de Ondernemingskamer van 7 en 10 september 2020 worden als Productie 1 overgelegd (**Productie 1**). dmarcian Europe komt op die beslissingen hieronder nader terug.

## 2.  Introductie partijen

*dmarcian Europe*

2.1.  dmarcian Europe is op 21 maart 2013 opgericht onder de naam Mailmerk B.V. (**Productie 2**). Zij houdt zich bezig met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen.

2.2.  Mailmerk B.V. is op 22 januari 2016 een samenwerking aangegaan met dmarcian Inc. Zij heeft haar naam op 15 februari 2017 veranderd in dmarcian Europe. De toenmalig enig bestuurder en aandeelhoudster van Mailmerk B.V./dmarcian Europe, The Digital Xpedition (TDX) Holding B.V. ("**TDX**") heeft dmarcian Inc en/of Draegen in ruil voor de samenwerking een optie aangeboden om een meerderheidsbelang in dmarcian Europe te verwerven voor de prijs van € 1,-. Dit recht is uitgeoefend

4

in juli 2018, waarbij de aandelen evenwel niet aan dmarcian Inc, maar aan haar CEO - Draegen – zijn overgedragen.

2.3. De aandelen in dmarcian Europe werden vanaf juli 2018 tot 7 september 2020 voor 50,01% door Draegen en voor 49,99% door TDX gehouden. Na de beschikking van de Ondernemingskamer zijn de aandelen op één aandeel per aandeelhouder na tijdelijk in beheer gegeven aan een derde partij, mr. Yvette Borius. Daarnaast is Harmeling naast TDX als bestuurder met doorslaggevende stem aangewezen.

2.4. De aandelen in TDX worden gehouden door H.J. Kalkman Beheer B.V. (50%) en M. Groeneweg Holding B.V. (50%), de persoonlijke holdings van respectievelijk de heren Martijn Groeneweg ("Groeneweg") en Herwert Jette Kalkman ("Kalkman") (**Productie 3**).

2.5. dmarcian Europe houdt op haar beurt 100% van de aandelen in het kapitaal van een Bulgaarse entiteit, genaamd dmarcian Bulgaria EOOD ("dmarcian Bulgaria") (**Productie 4**). Tot 12 januari 2021 was de enig bestuurder van dmarcian Bulgaria de heer Nikolay Georgiev Hristov ("Hristov"). Op 12 januari 2021 is Harmeling ingeschreven als tweede bestuurder van dmarcian Bulgaria. Beide bestuurders zijn zelfstandig bevoegd dmarcian Bulgaria te vertegenwoordigen.

*dmarcian Inc*

2.6. dmarcian Inc is een Amerikaanse vennootschap die op 19 september 2014 is opgericht en zich net als dmarcian Europe bezighoudt met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen. Zij heeft software ontwikkeld die partijen sinds 2016 gezamenlijk exploiteren.

2.7. De aandelen in het kapitaal van dmarcian Inc werden aanvankelijk voor 100% gehouden door Draegen. Een voormalig medewerker – Charles E. Swenberg - is op grond van een met dmarcian Inc in 2017 gesloten overeenkomst mede-aandeelhouder geworden. Tussen die partijen is momenteel in de Verenigde Staten een procedure aanhangig over de omvang van dat aandeel. Draegen is hoe dan ook nog altijd CEO en meerderheidsaandeelhouder van dmarcian Inc.

2.8. Anders dan de namen van de entiteiten wellicht doen vermoeden, is dmarcian Europe géén dochtervennootschap van dmarcian Inc. De enige vennootschapsrechtelijke band tussen beide vennootschappen, is het hiervoor genoemde meerderheidsbelang dat Draegen in 2018 heeft verworven in het kapitaal van dmarcian Europe.

2.9. Schematisch weergegeven ziet de vennootschapsstructuur van partijen er als volgt uit:

5



**Het geschil**

2.10. dmarcian Europe en dmarcian Inc werken sinds 2016 samen bij de distributie en licentiering van de dmarcian software en daarbij behorende diensten op het gebied van identiteitsbeveiliging van e-mailadressen ('**de dmarcian software**').[1]

2.11. Partijen bieden de dmarcian software aan als SaaS (Software as a Service) dienst. dmarcian Inc heeft daarvoor een SaaS-platform ontwikkeld dat toegankelijk is via de website www.dmarcian.com. Klanten kunnen de SaaS-dienst via het platform afnemen. dmarcian Europe exploiteert de SaaS-dienst voor klanten in Europa, Rusland, en Afrika; dmarcian Inc doet dat voor Noord- en Zuid Amerika. Nieuwe klanten klikken op de website op hun regio en worden vervolgens doorgeleid naar de web-omgeving van de voor de regio verantwoordelijke partij, die terzake exclusiviteit hebben. De web-omgeving voor dmarcian Europe wordt gehost op servers in België en Nederland, die onder controle van dmarcian Inc staan.

2.12. De website en het SaaS-platform worden beheerd door dmarcian Inc. dmarcian Inc regelt dus de toegang van medewerkers van dmarcian Europe daartoe en heeft het in haar macht die toegang aan dmarcian Europe te ontzeggen. dmarcian Europe is voor de hosting van het SaaS-platform dus volledig van dmarcian Inc afhankelijk. dmarcian Europe is daardoor voor haar bedrijfsvoering, en met name ook voor de toegang tot haar klantgegevens en marktactiviteiten van dmarcian Inc afhankelijk.

2.13. De dmarcian software is auteursrechtelijk beschermd. Bij de aanvang van de samenwerking in januari 2016 lag het auteursrecht op de toenmalige versie van de dmarcian software volledig bij dmarcian Inc, althans bij Draegen, die de software volgens eigen verklaring heeft ontwikkeld, op dat moment haar enig bestuurder en aandeelhouder. Op dat moment is afgesproken dat alleen dmarcian Inc de software zou ontwikkelen. Dat was tot medio 2018 de afspraak. Ter illustratie legt dmarcian Europe een bericht over van Groeneweg aan Draegen van 6 juni 2017 waarin hij schrijft: "*We agreed that dmarcian Inc will take care of software development*". In een ander bericht van 28 september 2017

---

[1] Zeer kort gezegd stelt eigenaren van internetdomeinnamen in staat om DMARC - een publiek gestandaardiseerd verificatieprotocol (https://tools.ietf.org/html/rfc7489) dat is gericht op identiteitsbeveiliging van internetmail - te implementeren. De dmarcian software verwerkt DMARC-gegevens en geeft aan wat er qua identiteitsbeveiliging moet worden opgelost, zodat alle e-mails die tot een domein behoren (blijven) voldoen aan de DMARC data. De domeineigenaar kan daarmee voorkomen dat nep e-mails vanuit de domeinnaam worden verzonden.

6

schrijft Groeneweg aan Draegen: *"We agreed on 50% each of EU as you know. You also know the terms we agreed on, where you would take care of all development cost and hosting. EU would only focus on selling software and deployment in EU to grow EU."* **Productie 5**

2.14. Hoewel partijen dus aanvankelijk afspraken dat de ontwikkeling van de dmarcian software door dmarcian Inc zou plaatsvinden, zijn partijen daarvan medio 2018 teruggekomen en zijn zij overeengekomen dat deze ontwikkeling ook door dmarcian Europe en dmarcian Bulgaria zou plaatsvinden (zie hierna onder 2.16). Zij hebben de voorwaarden van de licentie op dat moment dus uitgebreid. Partijen hebben voor het gebruik van de software door dmarcian Europe en de verkoop daarvan door dmarcian Europe in Europa, Rusland en Afrika in januari 2016 een mondelinge overeenkomst afgesloten. Partijen verschillen van mening over de precieze inhoud van hun overeenkomst. Uit de beschikking van de Ondernemingskamer van 7 september 2020 volgt dat tussen partijen vaststaat dat zij in 2016 *ten minste* het volgende zijn overeengekomen (r.o. 2.5):

- Dat dmarcian Europe een licentie heeft voor het gebruik en de verkoop van de software afkomstig van dmarcian Inc.;
- Dat dmarcian Europe verantwoordelijk is voor de verkoop van die software (en het leveren van bijbehorende diensten) aan klanten in Europa, Rusland en Afrika;
- Dat dmarcian Inc. en/of Draegen in ruil daarvoor het meerderheidsaandelenbelang in dmarcian Europe kon kopen tegen betaling van EUR 1,-.

dmarcian Europe komt op de inhoud van de afspraken hieronder nog terug.

2.15. Van de laatstgenoemde optie heeft Draegen in mei 2018 persoonlijk gebruik gemaakt. Als gevolg daarvan heeft hij een meerderheidsbelang van 50,01% in het kapitaal van dmarcian Europe verkregen.

2.16. dmarcian Europe heeft sinds het najaar van 2018 zelf en via haar 100% Bulgaarse dochtervennootschap, aanzienlijke bijdragen geleverd aan de ontwikkeling van (broncode van de) dmarcian software. Dat is gebeurd met volledige wetenschap en instemming van dmarcian Inc en Draegen. dmarcian Europe legt ter illustratie twee berichten over tussen Hristov, Draegen en Groeneweg. Het eerste bericht heeft betrekking op de oprichting van dmarcian Bulgaria. In de akte van oprichting staat onder de bedrijfsactiviteiten van dmarcian Bulgaria onder meer "software development and implementation" In het tweede bericht vraagt Draegen aan Hristov of hij (Draegen) en Groeneweg kunnen langskomen in Bulgarije omdat hij de productiecapaciteit wil vergroten. **Productie 6**. dmarcian Inc, dmarcian Europe en dmarcian Bulgaria gebruiken voorts één centraal broncode ontwikkelingsplatform, dat door dmarcian Inc. wordt beheerd en waartoe zij dmarcian Europe en dmarcian Bulgaria toegang heeft gegeven (zie hierna alinea's 3.12 en verder). De dmarcian software is door dmarcian Bulgaria onder meer ontwikkeld van een twee-laags applicatie naar een drie-laags applicatie, zodat die ook API-toegankelijk zou zijn. Het is natuurlijk uitgesloten dat dmarcian Inc daarvan niet op de hoogte was.

2.17. Alle kosten voor de ontwikkeling binnen dmarcian Europe en dmarcian Bulgaria zijn door dmarcian Europe gedragen. dmarcian Europe en dmarcian Bulgaria hebben op hun bijdragen een eigen auteursrecht verworven en zijn als zodanig mede-rechthebbende geworden van de huidige versie van de dmarcian software die beide bedrijven momenteel aan gebruikers als SaaS-oplossing licentieren. dmarcian Bulgaria heeft haar auteursrechten aan dmarcian Europe overgedragen.

7

dmarcian Europe brengt de akte van overdracht in het geding als **Productie 7**. Tevens brengt dmarcian een verklaring in het geding van mevrouw V.P. Kunze, partner bij het Bulgaarse advocatenkantoor Djingov, Gouginski, Kyutchukov & Velichkov te Sofia, Bulgarije. Zij verklaart - kort gezegd - dat de overdacht naar Bulgaars recht geldig is en dat Harmeling bevoegd was deze overdracht als zelfstandig bevoegd bestuurder van dmarcian Bulgaria te effectueren (**Productie 8**).

2.18. Eind 2019 is tussen partijen geschil ontstaan over de eigendom van de rechten op de door dmarcian Europe ontwikkelde aanpassingen van en toevoegingen aan de dmarcian software. Volgens dmarcian Inc zou uit de tussen partijen in 2018 gemaakte afspraken voortvloeien dat zij rechthebbende op die software is, althans dat dmarcian Europe gehouden is deze rechten tegen eenzijdig door dmarcian Inc op te leggen voorwaarden over te dragen. Dit is en wordt door dmarcian Europe betwist. Zij wil eventueel wel meewerken aan overdracht of licentiëring van de auteursrechten op de door haar ontwikkelde software, maar niet tegen de daaraan door dmarcian Inc gestelde voorwaarden, die dmarcian Europe kort gezegd geheel buiten spel zetten. Zij heeft dmarcian Inc. gemeld dat zij de door dmarcian Europe ontwikkelde softwareapplicaties zonder licentie niet aan derden mag licentiëren.

2.19. Het bericht van Groeneweg is Draegen kennelijk in het verkeerde keelgat geschoten. Draegen heeft achtereenvolgens onder meer:
- medewerkers van dmarcian Europe onmiddellijk de toegang tot de door dmarcian Inc beheerde (computer)systemen ontzegd (1ste blackout)
- de webomgeving van dmarcian Europe op de door dmarcian Inc beheerde website (www.dmarcian.com) gemigreerd naar een Amerikaanse host. NB: dmarcian Inc host dus nu alle systemen van dmarcian Europe en heeft het dus in haar macht om de bedrijfsvoering van dmarcian Europe volledig plat te leggen. Dit wordt door dmarcian Europe omschreven als de 'nuclear button', die nu gedeeltelijk en bij beëindiging waarschijnlijk volledig zal worden ingedrukt.
- dmarcian Europe de toegang tot haar eigen domeinnamen <dmarcian.eu> en <dmarcian.net> ontzegd
- zonder daartoe bevoegd te zijn een 'Director of Software' aangewezen binnen dmarcian Europe en dmarcian Bulgaria aan wie de software ontwikkelaars van dmarcian Europe en dmarcian Bulgaria zich diende te verantwoorden.

  Zie uitgebreider randnummers 49 – 65 van het verzoekschrift van TDX in de procedure voor de Ondernemingskamer.

2.20. Deze maatregelen zijn door Draegen binnen 48 uur weer teruggedraaid. Partijen hebben na deze machtsgreep geprobeerd in onderling overleg tot een oplossing van hun geschil te komen. dmarcian Europe heeft in mei 2020 een uitgebreid schikkingsvoorstel gedaan, dat echter door Draegen van de hand is gewezen.[2] Na een bespreking op 3 juli 2020 heeft Draegen plotseling een AvA aangevraagd met als agendapunten het ontslag van de (enig) bestuurder en tevens minderheidsaandeelhoudster van dmarcian Europe, TDX, en de benoeming van een door Draegen aangewezen bestuurder. TDX had goede gronden om aan te nemen dat deze bestuurder na zijn aanstelling zou meewerken aan de 'gratis' overdracht van het auteursrecht van dmarcian Europe aan dmarcian Inc, waarmee dmarcian Europe berooid zou achterblijven.

---

[2] Vgl productie 24 bij het verzoekschrift van TDX

8

2.21. TDX heeft daarop een verzoek bij de Ondernemingskamer ingediend teneinde haar ontslag en onomkeerbare schade aan dmarcian Europe te voorkomen. dmarcian Europe brengt het procesdossier van die procedure als Productie 9 in het geding (**Productie 9**). Zij verwijst voor de achtergrond van dit geschil en de aanloop naar die procedure naar het verzoekschrift van TDX en haar verweerschrift, welke stukken hierbij separaat worden overgelegd, (**Productie 10**), en de beschikkingen van de Ondernemingskamer in die procedure (productie 1), waarbij dmarcian Europe met name verwijst naar 2.4. tot en met 2.9. van de beschikking van 7 september 2020, dmarcian Europe zal waar nodig in deze dagvaarding en ter zitting eventueel naar dit procesdossier verwijzen.

2.22. Zoals hiervoor gezegd heeft de Ondernemingskamer heeft bij beschikking van 7 en 10 september 2020 bij wijze van onmiddellijke voorziening Harmeling aangesteld als bestuurder en alle aandelen in dmarcia Europe (minus één aandeel per aandeelhouder) ten titel van beheer overgedragen aan de beheerder (mr. Borrius). Daarnaast heeft de Ondernemingskamer een onderzoek gelast naar het bij dmarcian Europe tussen 1 januari 2016 tot 20 augustus 2020 gevoerde beleid. De doeleinden van het enquêterecht zijn o.a. het herstel van de gezonde verhoudingen en het verkrijgen van openheid van zaken². Daarop is ook het ingrijpen van de Ondernemingskamer in de huidige zaak gericht.

2.23. Voor zover van belang heeft de Ondernemingskamer aan het gelaste onderzoek het volgende ten grondslag gelegd (onderstreping advocaat):

*"3.4 De Ondernemingskamer overweegt als volgt: De controverse over de intellectuele eigendomsrechten op de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde software(applicaties) vormt de kern van het geschil tussen partijen. TDX stelt dat deze software(applicaties) los staat/staan van de door dmarcian, Inc. ontwikkelde software, zodanig dat de intellectuele eigendom daarvan aan dmarcian Europe toekomt. Aan het mogen gebruiken en verkopen van deze software(applicaties) door dmarcian, Inc. dient een door dmarcian Europe te verlenen licentie ten grondslag te liggen, aldus TDX. Daartegenover stelt Draegen dat de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde software niet meer omvat dan aanvullende features voor verbeterd gebruik van de van dmarcian, Inc. afkomstige software, zodat de intellectuele eigendom daarvan eveneens bij dmarcian, Inc. berust. De Ondernemingskamer stelt voorop dat voor de juridische beoordeling van dat geschil slechts de gewone burgerlijke rechter bevoegd is. Wel kan de Ondernemingskamer constateren dat dit geschil ontwrichtend is voor de onderneming van dmarcian Europe; het ontwikkelen en verkopen van software is haar core business en de samenwerking met dmarcian, Inc. is daarvoor een noodzakelijke voorwaarde. Desondanks is deze samenwerking noch in het algemeen, noch ter zake van de intellectuele eigendomsrechten op ontwikkelde en te ontwikkelen software(applicaties) en (de reikwijdte van) de in verband daarmee verleende/te verlenen licenties in het bijzonder, door partijen voldoende geregeld. Hierover zijn geen eenduidig vastgelegde afspraken voorhanden, met als gevolg dat de samenwerking op het spel is komen te staan door de huidige discussie daarover, hetgeen een serieuze belemmering vormt voor de bedrijfsvoering van dmarcian Europe. Naar het oordeel van de Ondernemingskamer levert het bestaan van voornoemde situatie voldoende gegronde redenen op om te twijfelen aan een juist beleid en een juiste gang van zaken van dmarcian Europe. De Ondernemingskamer zal, gelijk door zowel TDX als Draegen is verzocht, een onderzoek gelasten naar het beleid en de gang van zaken van dmarcian Europe, en wel vanaf 1 januari 2016 tot 20 augustus 2020."*

---

² HR 10 januari 1990, NJ 1990/466 (Ogem)

9

2.24. Voorts heeft de Ondernemingskamer het volgende overwogen (r.o. 3.9):

"De Ondernemingskamer zal de aanwijzing van de onderzoeker vooralsnog aanhouden opdat kan worden bezien of reeds door de te treffen onmiddellijke voorzieningen een oplossing van het geschil kan worden bereikt. Ieder der partijen of de door de Ondernemingskamer benoemde bestuurder of beheerder kan op elk moment de Ondernemingskamer verzoeken de onderzoeker aan te wijzen."

2.25. In reactie op de aanstelling van Harmeling op 10 september 2020 is in het opvolgende weekend vanuit Amerika gewerkt aan het opnieuw volledig afsluiten van dmarcian Europe van alle systemen, hetgeen op 14 september 2020 volledig werd geïmplementeerd (2e blackout). Dit was dus de tweede keer dat dmarcian Europe van de voor haar bedrijfsvoering essentiële systemen werd afgesloten. Harmeling heeft Draegen in zijn rol van aandeelhouder hierop onmiddellijk aangesproken. Draegen heeft het er op aandringen van Harmeling uiteindelijk - na enkele dagen - toe geleid dat de toegang tot de meest essentiële systemen in zodanige mate werd hersteld dat dmarcian Europe haar werk weer kon doen. Na veel en moeizame gesprekken met Draegen is dmarcian Inc er, louter door tussenkomst van Draegen, toe over te gaan om toegang te verschaffen tot andere, maar minder wezenlijke systemen. Onbelemmerde toegang heeft echter sinds 14 september 2020 niet meer bestaan.

2.26. Vervolgens is Harmeling begonnen met het zoeken naar wegen om tot een oplossing te komen van het tussen de aandeelhouders van dmarcian Europe gerezen geschil. Hij heeft daarbij onder meer gesproken met zijn medebestuurder TDX (Groeneweg en Kalkman), met TDX en Draegen als aandeelhouders, hij heeft contact gezocht met zijn medebestuurder van dmarcian Bulgaria en alles in het werk gesteld om een oplossing voor het gerezen conflict te vinden. Een en ander ligt vast in een e-mail van Harmeling aan de aandeelhouders van 18 december 2020, die dmarcian Europe als **Productie 11** in het geding brengt. Draegen heeft echter al snel laten weten niet tot een andere oplossing bereid te zijn dan de overdracht, op zijn voorwaarden, van het auteursrecht van dmarcian Europe aan dmarcian Inc. dmarcian Europe heeft de Ondernemingskamer inmiddels verzocht met spoed een onderzoeker te benoemen die het op 7 september 2020 gelaste onderzoek zal gaan verrichten, welk verzoek is ingewilligd. Dmarcian Europe legt de betreffende correspondentie over als **Productie 12**.

2.27. Hoewel het gelaste onderzoek nog niet is begonnen en geenszins overeenstemming is bereikt over de juridische situatie met betrekking tot de eigendom van de intellectuele eigendomsrechten op de huidige versie van de dmarcian software, heeft dmarcian Inc bij brief van 22 januari 2021 plotseling aangekondigd de samenwerking met dmarcian Europe per 1 februari 2021 te beëindigen, tenzij dmarcian Europe een bij die brief gevoegde, voor dmarcian Europa zeer ongunstige distributieovereenkomst en schikkingsovereenkomst zou tekenen. De inhoud van die overeenkomsten komt er kort gezegd op neer dat zij al haar auteursrecht overdraagt in ruil voor een licentie op die rechten, op grond waarvan zij maar liefst 80% (!) van al haar inkomsten uit de verkoop van de dmarcian software en consultancy diensten aan dmarcian Inc dient af te dragen (**Productie 13**). Zoals door dmarcian Inc en Draegen ook bevestigd in het verleden is niet 80% maar 20% gebruikelijk, dat percentage te berekenen uitsluitend over de gedistribueerde software. Ter onderbouwing hiervan verwijst dmarcian Europe naar de in de enqueteprocedure ingebrachte verklaring van de accountant van dmarcian Inc, die onder meer verklaart:

"20% BV Fees

10

*The company provides technology, brand, business model, and leads to the Europe BV and other dmarcian partners. The value of the services provided to other dmarcian partners is 20% of revenue. To have comparable financials between the US and BV, 20% of revenue from BV should be allocated to the US in the form of revenue to US and expense to BV."* **Productie 14**.

2.28. De onredelijkheid en onrechtvaardigheid van deze wurgcontracten blijkt al uit het feit dat dmarcian Inc er zelf vanuit gaat dat dmarcian Europe deze niet zal willen of kunnen tekenen. Immers, hoewel dmarcian Inc de samenwerking voorwaardelijk beëindigt en aangeeft dat zij de toegang tot de (computer)systemen pas vanaf 1 februari 2021 zal blokkeren, heeft zij, in werkelijkheid de medewerkers van dmarcian Europe op het moment van verzending van de brief met onmiddellijke ingang – dat wil zeggen vanaf vrijdag 22 januari 2021 om circa 16 uur – de toegang tot de (computer)systemen ontzegd (3e blackout). Dräegen heeft op 25 januari 2021 tijdens een 'all hands' meeting, waarvoor dmarcian Europe niet is uitgenodigd, aan medewerkers van dmarcian Bulgaria en de medewerkers van dmarcian Inc meegedeeld dat de blackout van dmarcian Europe van 22 januari 2021 het gevolg is van een gewijzigde relatie. Zij loopt ook daarmee dus volledig op de feiten vooruit.

2.29. In aanvulling op de brief van dmarcian Inc heeft Dräegen bij een brief die enkele minuten na de brief van dmarcian Inc per e-mail werd verzonden, een beroep gedaan op artikel 4 van de 'exit agreement' die Dräegen en TDX in 2018 ter gelegenheid van de verwerving door Dräegen van het meerderheidsbelang in dmarcian Europe hebben gesloten (**Productie 15**). Op grond van deze bepaling heeft iedere aandeelhouder het recht om de samenwerking tussen de aandeelhouders ('the co-operation') te beëindigen door een bod uit te brengen op de aandelen van de andere aandeelhouder. Indien de andere aandeelhouder dat bod niet accepteert, zou die aandeelhouder de verplichting hebben de eerste aandeelhouder uit te kopen. Dit aanbod aan de medeaandeelhouder TDX wordt gedaan onder de ontbindende voorwaarde gedaan dat dmarcian Europe akkoord gaat met de eisen van dmarcian Inc. zoals gesteld in de brief van 22 januari 2021. De duidelijke verwevenheid tussen de aandeelhouder Dräegen en de principaal dmarcian Inc is daarmee gegeven.

2.30. Dit alles gebeurt zoals gezegd hangende het onderzoek naar het door dmarcian Europe gevoerde beleid, met name betreffende de bestaande onduidelijkheid over de inhoud van de licentieovereenkomst en de eigendom van de intellectuele eigendomsrechten op de dmarcian software. Daarbij is tevens van belang dat Harmeling op 18 december 2020 aan aandeelhouders heeft medegedeeld naar oplossingen buiten de aandeelhouders om te gaan zoeken (vgl productie 11) Met name is door Harmeling aangekondigd de inrichting van de dataroom en een onafhankelijke waardebepaling uit te voeren teneinde hem in staat te stellen te voldoen aan zijn opdracht als genoemd in r.o 3.5. van de beschikking van de Ondernemingskamer van 7 september 2020. De actie van gedaagden van 22 januari 2021 lijkt hiervan het rechtstreekse gevolg.

2.31. Voor zover dmarcian Inc zich als grond voor de beëindiging van de samenwerking beroept op een tekortkoming, betwist dmarcian Europe dat zij de voorwaarden van die licentie heeft geschonden. Van een tekortkoming kan hoe dan ook geen sprake zijn zonder dat de inhoud van de licentieovereenkomst vast staat. Voor zover dmarcian Inc zich zou beroepen op opzegging, heeft te gelden dat partijen zijn overeengekomen dat de overeenkomst niet opzegbaar is. Maar ook daarbuiten is op geen enkele manier duidelijk waarom dmarcian Inc de enquêteprocedure (oftewel het onderzoek en de eventuele vervolgfase) niet kan afwachten. Naar de mening van dmarcian Europe bestaat onder de omstandigheden van dit geval geen enkele juridische grond, althans een

11

voldoende zwaarwegende grond, die de opzegging van de bestaande duurovereenkomst per 1 februari 2021 rechtvaardigt.

2.32. Door de medewerkers van dmarcian Europe de toegang te ontzeggen tot de (computer)systemen en te dreigen met een (onrechtmatige) beëindiging van de duurovereenkomst op zeer korte termijn proberen Draegen en dmarcian Inc dmarcian Europe op oneigenlijke gronden te dwingen tot overdracht van haar auteursrecht op de software. Bovendien blijkt uit de huidige afsluiting van dmarcian Europe van de toegang tot haar klanten en bekende potentiële klanten waarmee al contacten zijn gelegd, de dreiging dat dmarcian Inc zich het klantenbestand van dmarcain Europe zal willen toe-eigenen. Dmarcian Inc handelt daarmee in strijd met de redelijkheid en billijkheid die zij ten opzichte van haar contractspartner dmarcian Europe in acht dient te nemen. Dit klemt temeer nu dmarcian Europe voor haar bedrijfsvoering geheel afhankelijk is van de toegang die dmarcian Inc haar tot het SaaS-platform en computersystemen dient te geven. Draegen handelt op zijn beurt onrechtmatig jegens dmarcian Europe. Door dmarcian Inc te faciliteren in haar pogingen om dmarcian Europe klem te zetten, handelt Draegen niet alleen in strijd met de maatschappelijke zorgvuldigheid, maar tevens met zijn verplichtingen onder artikel 2:8 lid 1 BW.

*Spoedeisend belang*

2.33. dmarcian Europe lijdt door deze acties van dmarcian Inc en Draegen onmiddellijk grote en onomkeerbare schade. De verkoop van de dmarcian software vormt de *core business* van dmarcian Europe. Zij kan door de nieuwe blokkade, inmiddels de derde, niet bij haar klantengegevens, kan bestaande klanten op dit moment niet bedienen en kan bovendien geen nieuwe *leads* voor potentiële nieuwe klanten opvolgen. Dit leidt tot ernstige onrust bij haar medewerkers.

2.34. Indien de samenwerking en de licentieovereenkomst verder per 1 februari 2021 zouden worden beëindigd, zal dit bovendien het einde betekenen van dmarcian Europe, die voor haar bedrijfsvoering van het voortbestaan van de licentieovereenkomst afhankelijk is. Een faillissement is in dat geval onvermijdelijk. Dit zal het gevolg hebben dat 22 werknemers van dmarcian Europe en dmarcian Bulgaria per direct op straat komen te staan en de klanten van de dmarcian software in Europe, Rusland en Afrika mogelijk van de toegang tot de dmarcian software worden beroofd.

2.35. Dmarcian Europe heeft dmarcian Inc in reactie op haar brief van 22 januari 2021 onder meer gesommeerd de blokkade van haar medewerkers op te heffen en de aangekondigde beëindiging in te trekken. Bij gebreke daarvan heeft dmarcian Europe een kort geding aangekondigd. Gezien de verwijten die Draegen persoonlijk treffen, zijn per e-mail van gelijke datum ook verhinderdata van Draegen bij zijn advocaat opgevraagd (**Productie 16**). Zowel dmarcian Inc en Draegen hebben bij e-mailbericht van hun advocaten, dat wederom op elkaar is afgestemd, laten weten niet aan de sommaties gehoor te zullen geven (**Productie 17**). Het spoedeisend belang is daarmee gegeven.

2.36. Gelet op de onmiddellijke en onomkeerbare gevolgen die de handelingen van Draegen en dmarcian Inc teweeg hebben gebracht, heeft dmarcian Europe voldoende spoedeisend belang bij haar vorderingen. Die strekken er immers allen toe de continuïteit van haar onderneming te waarborgen en onomkeerbare gevolgen uit te stellen totdat duidelijkheid zal zijn verkregen, dan wel via het door de Ondernemingskamer gelaste onderzoek, dan wel met een gerechtelijke uitspraak in een bodemprocedure, over de voorwaarden van de licentieovereenkomst en de eigendom van de auteursrechten op de huidige versie van de dmarcian software. dmarcian Inc heeft geen enkel belang bij de wijziging van de status quo in afwachting van de door de Ondernemingskamer beoogde

12

optossing, welke status quo de facto al sinds december 2019 bestaat zonder duidelijke praktische bezwaren

2.37. dmarcian Europe gaat hieronder nader in op haar stelling dat zij (mede)auteursrechthebbende is op de huidige versie van de dmarcian software. Daarnaast zal zij dieper ingaan op de bevoegdheid van uw Voorzieningenrechter, het toepasselijke recht en de juridische onderbouwing van haar vorderingen. Zij zal een en ander waar nodig ter zitting nader toelichten.

2.38. Hoewel dmarcian Europe naar haar mening mede-auteursrechthebbende is op de dmarcian software, hoeft dat in dit kort geding niet vastgesteld te worden om de vorderingen toe te kunnen wijzen. Daarvoor is voldoende indien dmarcian Europe aantoont dat er *tenminste* onduidelijkheid bestaat over de vraag of aan dmarcian Europe auteursrechten op de dmarcian software toekomen. Dat dit het geval is, wordt bevestigd door de Ondernemingskamer. De acties van gedaagden doorkruisen dit spoor, de opdracht aan Harmeling en het onderzoek als door de Ondernemingskamer gelasten rechtvaardigen dat de gevraagde voorzieningen worden toegewezen.

3. **De inhoud van de licentieovereenkomst en het auteursrecht op de huidige versie van de dmarcian software**

3.1. Op 22 januari 2016 hebben Draegen, dmarcian Inc., TDX en het toenmalige Malimerk (nu: dmarcian Europe) een mondelinge overeenkomst gesloten met betrekking tot het gebruik en de distributie van de dmarcian software ("de Overeenkomst").

3.2. Onder deze Overeenkomst heeft dmarcian Inc aan dmarcian Europe, in ruil voor een aan dmarcian Inc en/of Draegen verstrekt optierecht om een meerderheidsbelang in dmarcian Europe te verwerven een eeuwigdurende, exclusieve licentie verstrekt voor het gebruik van de dmarcian software en de licentiering daarvan aan klanten in Europa, Rusland en Afrika;

3.3. De opbrengsten van de licentiering van de dmarcian software aan klanten uit deze territoria waren op grond van de Overeenkomst uitsluitend bestemd voor dmarcian Europe.

3.4. Partijen hebben vanaf januari 2016 conform de Overeenkomst gehandeld. dmarcian Europe bediende exclusief de Russische, Europese en Afrikaanse markt en de opbrengsten daarvan kwamen - vrijwel - volledig aan haar ten goede.[4] Dmarcian Inc heeft niet alleen conform een eeuwigdurende en exclusieve licentie gehandeld, zij bevestigt het bestaan daarvan ook expliciet in de correspondentie tussen partijen. dmarcian Europe verwijst in dit kader naar een e-mail van Draegen van 4 december 2019, waarin Draegen reageert op een bericht van Groeneweg waarin deze schrijft dat het dmarcian Inc zonder licentieovereenkomst niet is toegestaan de door dmarcian Europe ontwikkelde applicaties te licentieren (het begin van het geschil). Draegen schrijft daarin[5]:

---

[4] Vgl Verzoekschrift TDX in de OK-procedure, randnummer 26. De creditcardinkomsten van de dmarcian Europe applicatie werden en worden vanwege technische redenen volledig aan dmarcian Inc. betaald, maar ook die inkomsten kwamen en komen toe aan dmarcian Europe. Overigens gaat het daarbij om een beperkt percentage van de totale omzet (ongeveer 10%).
[5] Vgl productie 8 bij het verzoekschrift van TDX in de OK-procedure.

13

*"Martijn, thanks for the input. I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed.".*

3.5.  Zoals hiervoor gezegd is dmarcian Europe zich vanaf 2018 - in samenspraak met dmarcian Inc - zelf en via haar Bulgaarse dochter gaan toeleggen op de verdere ontwikkeling van de (broncode van de) dmarcian software. Zij financierda de ontwikkeling van de software zelf, zowel binnen haar eigen onderneming als binnen dmarcian Bulgaria. Die investeringen bedroegen tot juli 2020 ca EUR 900.000. De ontwikkelingskosten bedragen momenteel ca EUR 550.000 per jaar, zijnde 35% van de totale kosten van dmarcian Europe. Zij heeft deze kosten uit eigen middelen voldaan en is voor de financiering niet afhankelijk geweest van dmarcian Inc.[6]

3.6.  De bijdragen die dmarcian Europe en haar dochtervennootschap tot op heden hebben gedaan bestaan onder meer uit het ontwikkelen van de dmarcian software van een twee-laags applicatie naar een drie-laags applicatie, zodat die ook API-toegankelijk zou zijn. Daarnaast hebben dmarcian Europe en dmarcian Bulgaria verschillende losstaande softwareapplicaties ontwikkeld die in combinatie met de dmarcian software konden worden gebruikt. Dmarcian Europe verwijst voor een gedetailleerdere uiteenzetting naar randnummers 31 tot en met 35 van het verzoekschrift van TDX (productie 10).

3.7.  dmarcian Inc betwist dat het dmarcian Europe onder de verstrekte licentie is toegestaan de dmarcian software (verder) te ontwikkelen. Dit is een onhoudbaar standpunt. Hoewel het juist is dat aanvankelijk de ontwikkeling van de dmarcian software uitsluitend door dmarcian Inc zou plaatsvinden hebben partijen later met elkaar afgesproken dat ook dmarcian Europe en dmarcian Bulgaria zich met de ontwikkeling van de software zou gaan bezighouden (vgl hiervoor onder 2.13 – 2.17). De SaaS oplossingen die dmarcian Inc. en dmarcian Europe aan hun respectieve klanten leveren zijn een en dezelfde en bestaan uit de meest recente software, derhalve inclusief de substantiële software die dmarcian Europe en dmarcian Bulgaria hebben bijgedragen. Voor zover de in 2016 verstrekte licentie dus niet toestond dat dmarcian Europe de dmarcian software verder zou ontwikkelen, is de reikwijdte van de licentie door de latere ontwikkelingen aangepast. Van enige tekortkoming in de nakoming van de licentievoorwaarden kan dan ook geen sprake zijn en dit kan dan ook geen grond vormen de bestaande samenwerking te beëindigen.

3.8.  Gedaagden realiseerden zich bovendien terdege dat als gevolg van deze ontwikkeling auteursrechten zouden ontstaan aan de zijde van dmarcian Europe en dmarcian Bulgaria. Tussen partijen is gesproken over de manier waarop met die rechten zou moeten worden omgegaan. Daarbij was ook voor dmarcian Inc niet het uitgangspunt dat die rechten om niet overgedragen zouden moeten worden aan dmarcian Inc. Integendeel, dmarcian Inc erkende het bestaan van de auteursrechten aan de zijde van dmarcian Inc en onderkende dat er voor het gebruik van die rechten door dmarcian Inc een licentie nodig was, maar dat dit nog niet was overeengekomen.

3.9.  Ter onderbouwing hiervan legt dmarcian Europe als **Productie 18** screenshots over van correspondentie tussen Shannon Draegen, de echtgenote van Draegen en CEO van dmarcian Inc enerzijds en Groeneweg anderzijds. Shannon Draegen maakt op 21 augustus 2019 ten behoeve

---

[6] Vgl randnummer 3.4. – 3.5. en productie 3 bij het verweerschrift van dmarcian Europe en r.o. 3.1 van de beschikking van 7 september 2020 van de Ondernemingskamer

14

van een lopende ISO certificering ( ISO27001) een overzicht van de vennootschapsstructuur en de – volgens haar → bestaande juridische situatie met betrekking tot het auteursrecht op de dmarcian software.



Dit schema gaat ervan uit dat er een licentieovereenkomst over en weer bestaat en impliceert dus - terecht - dat dmarcian Europe auteursrecht op de dmarcian software heeft verworven.

3.10. Groeneweg reageert hierop via Slack (een chatfunctie op het SaaS-platform):

"There's currently no licensing Agreement in place from EU to US for the software created in EU. So there should be an arrow only from USA to EU like to APAC with "Eternal License Agreement". We had a plan to merge, but as Chuck didn't agree on it, @tim and myself decided to move on as agreed on January 22 in 2016 in 2 separate entities. Arrow from US to APAC should be "Temporary    License    Agreement",    at    least    from    what    I    know."

Shannon Draegen reageert hierop bevestigend met een duimpje omhoog en maakt vervolgens op 3 september 2019 de definitieve versie van het schema. Zij stuurt dit door middels een link:

15



Hieruit blijkt dus dat er geen licentie vanuit dmarcian Europe aan dmarcian Inc aanwezig is en dat dit reeds voor december 2019 niet alleen bij de directie van dmarcian Inc bekend is, maar dat deze situatie ook wordt bevestigd door de directie van dmarcian Inc.

3.11. Daarnaast verwijst dmarcan Europe naar de e-mail van Draegen aan Groeneweg van 6 augustus 2018 waarin Draegen ook zelf onderkent dat er intellectuele eigendomsrechten bij dmarcian Europe zijn ontstaan en dat daarover afspraken moeten worden gemaakt (vgl r.o. 2.6. van de beschikking van de Ondernemingskamer van 7 september 2020):

"There are 2 main parts to consider: 1. (...) 2. Where is global 1F located? (...) About location of IP: since EU has been licensing tech, it is likely impossible to home 1F into the EU by default.. even though EU is paying to continue to develop (as US is also paying developers — so it's sort of a mixed issue). This means that some sort of asset transfer has to be made (...) along with a proper valuation of said 1F".

3.12. Partijen hebben het ontstaan van auteursrecht aan de zijde van dmarcian Europe en dmarcian Bulgaria onderkend. Zij hebben echter nooit afgesproken wat er met die auteursrechten moet gebeuren. Daarmee kan niet worden volgehouden, zoals gedaagden lijken te doen, dat dmarcian Europe gehouden is haar auteursrecht tegen eenzijdig door dmarcian Inc op te leggen voorwaarden over te dragen.

*Auteursrecht op de door dmarcian Europe en dmarcian Bulgaria aangebrachte wijzigingen in de software.*

3.13. Voor zover dmarcian Europe aan de dmarcian software heeft gewerkt, is dat gebeurd door medewerkers van dmarcian Europe, althans door Kalkman. Op grond van artikel 7 van de Auteurswet vallen auteursrechten die in dienst van dmarcian Europe zijn gecreëerd, toe aan dmarcian Europe. De arbeidsovereenkomsten met de medewerkers van dmarcian Europe bevatten een expliciete bepaling die eventueel auteursrecht aan dmarcian Europe overdraagt. Hiervoor is al

16

uiteengezet dat de auteursrechten die bij dmarcian Bulgaria zijn ontstaan rechtsgeldig aan dmarcian Europe zijn overgedragen (vgl 2.17).

3.14. De broncode van de dmarcian software staat op een door dmarcian Inc beheerde *repository* op gitlab.com. In de computerwetenschappen wordt de term Git wel gebruikt voor een versiecontrolesysteem, waarmee programmeurs wijzigingen in de code op een overzichtelijke wijze kunnen bijhouden en kunnen samenwerken aan het schrijven van software. Een verzameling (broncode-) bestanden die allemaal deel uitmaken van hetzelfde project, wordt een *repository* genoemd. Gitlab is een online platform dat een Git dienst voor het bijhouden van *repositories* aanbiedt. Op de *repository* zijn dus alle aanpassingen of bijdragen (*commits*) zichtbaar die sinds het eerste moment op en aan de (bron)code van de dmarcian software zijn gemaakt.

3.15. dmarcian Europe heeft aan mr. ir. A. Engelfriet van ICT Recht (**'de deskundige'**) opdracht gegeven om te beoordelen of de *commits* die dmarcian Euopre en dmarcian Bulgaria aan de broncode van de dmarcian software hebben toegevoegd auteursrechtelijk zijn beschermd. Dmarcian Europe brengt het rapport van de deskundige in het geding als productie 19 (**Productie 19**).

3.16. In het rapport is omwille van de grote hoeveelheid *commits* aan de broncode van de dmarcian software gekozen voor een getalsmatige benadering. De deskundige heeft gefocust op de zogenaamde Python broncode bestanden, omdat de kans dat als gevolg van aanpassingen aan die bestanden auteursrecht ontstaat het grootst is. Gelet op de grote hoeveelheid wijzigingen die zowel dmarcian Europe als dmarcian Bulgaria vervolgens aan de zogenaamde Python broncode bestanden hebben doorgevoerd, heeft de deskundige geconcludeerd dat op de daaraan toegevoegde *commits* auteursrecht is verworven.

3.17. dmarcian Inc neemt blijkens het verweerschrift van Draegen in de OK-procedure het standpunt in dat partijen in december 2016 hebben afgesproken dat dmarcian Europe alle auteursrechten die zij als gevolg van ontwikkeling van de dmarcian software zou verkrijgen aan dmarcian Inc zou overdragen. Zij beroept zich daarbij op overeenkomsten die nooit zijn ondertekend en een enkele e-mail van Groeneweg van 7 december 2016.[7] dmarcian Europe betwist dat zij op basis van die stukken met dmarcian Inc is overeengekomen dat alle auteursrechten die zij gedurende de samenwerking zou verwerven onder eenzijdig door dmarcian Inc te bepalen voorwaarden aan haar overgedragen of gelicentieerd zouden worden.

3.18. Al deze argumenten zijn ook aan de Ondernemingskamer voorgelegd. De Ondernemingskamer heeft in rechtsoverweging 3.4. van haar beschikking van 7 september 2020 overwogen dat de beoordeling van de inhoud van de licentieovereenkomst en de vraag aan wie het auteursrecht op de dmarcian software toevalt door de gewone burgerlijke rechter moet worden beantwoord, maar dat de bestaande onduidelijkheid aanleiding is om een onderzoek naar het binnen dmarcian Europe gevoerde beleid te gelasten. De Ondernemingskamer onderschrijft daarmee *tenminste* dat er omtrent de inhoud van de licentieovereenkomst en de eigendom van de intellectuele eigendomsrechten onduidelijkheid bestaat.

3.19. Concluderend is dmarcian Europe van mening dat gelet op de aard en omvang van de bijdrage die zij en dmarcian Bulgaria aan de broncode van de dmarcian software hebben doorgevoerd, de

---

[7] Vgl. verweerschrift Draegen in OK-procedure randnummer 2.38 en productie 36

17

conclusies uit het rapport van de deskundige en de overdracht van auteursrecht van dmarcian Bulgaria aan dmarcian Europe voorshands voldoende aannemelijk is dat zij auteursrecht heeft op onderdelen van de dmarcian software en dat zij als mede-auteursrechthebbende op de (huidige versie van de) dmarcian software moet worden beschouwd. Maar *terminste* staat op grond van de beschikking van de Ondernemingskamer vast dat er over de inhoud van de licentieovereenkomst en de eigendom van de intellectuele rechten onduidelijkheid bestaat. Reeds dat laatste zou moeten betekenen dat de status quo moet worden gehandhaafd totdat die onduidelijkheid is opgelost.

4.    **Onrechtmatigheid van de opzegging en aansprakelijkheid Draegen**

4.1.   De tussen partijen bestaande overeenkomst c.q. samenwerking kwalificeert als een duurovereenkomst voor onbepaalde tijd. Partijen zijn geen opzeggingsregeling overeengekomen.

4.2.   Uit vaste rechtspraak van de Hoge Raad volgt dat een dergelijke overeenkomst *in beginsel* kan worden opgezegd. De eisen van redelijkheid en billijkheid in verband met de aard en de inhoud van de overeenkomst en de omstandigheden van het geval kunnen echter met zich meebrengen dat (i) opzegging slechts mogelijk is indien daarvoor een voldoende zwaarwegende grond aanwezig is en/of (ii) een bepaalde opzegtermijn in acht moet worden genomen of de opzegging gepaard moet gaan met het aanbod tot betaling van een (schade)vergoeding.[9]

4.3.   Bij de beoordeling wat in dit kader naar maatstaven van redelijkheid en billijkheid van partijen gevergd kan worden, moeten alle omstandigheden van het geval worden meegewogen. Van bijzonder belang zijn daarbij:

*   De belangen van partijen: het redelijk belang van de opzeggende partij bij de opzegging, afgewogen tegen het redelijk belang van de opgezegde partij bij voortzetting van de overeenkomst.

*   De aard en duur van de overeenkomst c.q. relatie: de vraag of partijen lange tijd zaken met elkaar doen en/of sprake is van een hechte en/of exclusieve relatie.

*   Afhankelijkheid: de mate waarin een partij afhankelijk is van de (omzet van de) andere partij en of het voortbestaan van de onderneming van de partij die wordt opgezegd in gevaar is.

*   Wat aan de opzegging vooraf is gegaan: de wijze waarop partijen hebben samengewerkt en het vertrouwen dat de opgezegde partij mocht hebben op voortzetting van de overeenkomst (bijvoorbeeld door de wijze waarop partijen zich in dat kader over en weer naar elkaar hebben uitgelaten) en de reden voor de opzegging.

*   Investeringen: de investeringen die een partij heeft gedaan. Deze kunnen worden gecompenseerd door het in acht nemen van een bepaalde opzegtermijn of – indien dat niet mogelijk is – voor schadevergoeding in aanmerking komen.

4.4.   Het voorgaande laat onverlet dat een duurovereenkomst naar de bedoeling van partijen niet-opzegbaar kan zijn.

---

[9] Vgl. Hoge Raad, 2 februari 2018, ECLI:NL:HR:2018:141 (Goglio v SMQ Group) r.o. 3.6.1 e.v.

18

*Primair: partijen zijn overeengekomen dat de Overeenkomst niet opzegbaar is*

4.5.  In dit geval geldt (primair) dat uit de bedoeling van partijen volgt dat de Overeenkomst c.q. hun samenwerking niet (althans alleen onder zeer bijzondere omstandigheden die hier niet spelen) opzegbaar is. Partijen zijn immers een *perpetual* (dus: eeuwigdurende) licentie overeengekomen in ruil voor een meerderheidsbelang in dmarcian Europe (vgl de e-mail van Draegen onder 3.4, en het schema van Shannon Draegen onder 3.10.). Daaruit blijkt al dat partijen de bedoeling hadden dat de licentie en daarmee ook de distributierechten van dmarcian Europe in beginsel niet beëindigd kunnen worden.

4.6.  Daar komt bij dat dmarcian Europe naar haar mening intussen mede-auteursrechthebbende op de huidige versie van de dmarcian software is geworden. Dit staat hoe dan ook aan de beëindiging van de gemaakte exploitatieafspraken in de weg.

*Subsidiair: de Overeenkomst kan (onder de huidige omstandigheden) niet of slechts met een dringende reden worden opgezegd*

4.7.  Voor zover de Overeenkomst naar bedoeling van partijen wél opzegbaar zou zijn, geldt (subsidiair) dat de Overeenkomst in het licht van de eisen van redelijkheid en billijkheid en de relevante omstandigheden van dit geval (bij de huidige stand van zaken) niet, althans niet zonder dringende reden (die ontbreekt) kan worden opgezegd.

4.8.  In dat kader zijn, naast hetgeen hiervoor in het kader van de partijbedoelingen is opgemerkt, de volgende omstandigheden van belang:

–  Er is sprake van een exclusieve Overeenkomst, die al tenminste vijf jaar voortduurt. Het gaat bovendien om een zeer hechte samenwerking. De bedrijfsvoering van partijen is sterk verweven, zoals onder meer blijkt uit de door partijen gebruikte (domein)namen en de aanwezigheid van een broncode ontwikkelplatform.

–  De exploitatie van de dmarcian software vormt de *core business* van dmarcian Europe. Haar onderneming is volledig ingericht op de distributie van die software en al haar klantgegevens (en gegevens van potentiele klanten) zijn opgenomen in de (back-end van de) door dmarcian Inc. beheerde SaaS-applicatie. Het voortbestaan van dmarcian Europe is daarom afhankelijk van het in stand blijven licentie en distributierechten die zij in het kader van de Overeenkomst heeft verkregen en het in stand blijven van de toegang tot die applicatie. Beëindiging van de Overeenkomst zal zonder twijfel tot haar faillissement leiden, met als gevolg dat al haar werknemers op straat komen te staan en haar klanten gedupeerd worden. Het belang van dmarcian Europe bij de voorzetting van de relatie is derhalve zeer groot.

–  dmarcian Europe heeft aanzienlijke investeringen gedaan in de ontwikkeling van de dmarcian software. Die investeringen zijn niet doorbelast aan dmarcian Inc. dmarcian Inc. was daarvan wel op de hoogte en profiteert daar ook van door (zonder daartoe gerechtigd te zijn) de door en in opdracht van dmarcian Europe ontwikkelde software aan te bieden aan derden.

–  dmarcian Inc heeft geen enkel rechtens te respecteren belang bij een (onmiddellijke) beëindiging van de Overeenkomst. De enige reden waarom zij de Overeenkomst thans beëindigt, is omdat zij

19

op dmarcian Europe op die manier in een dwangpositie wil brengen, om haar zo (alsnog) zover te krijgen dat zij instemt met een overdracht van de intellectuele eigendomsrechten en een distributieovereenkomst onder voor dmarcian Europe zeer ongunstige voorwaarden.

- Dit laatste klemt temeer nu over de eigendom van de intellectuele rechten in de software ten minste onduidelijkheid bestaat. De Ondernemingskamer heeft in haar beschikking in verband daarmee een onderzoek gelast naar de gang van zaken binnen dmarcian Europe. De Ondernemingskamer heeft bovendien een tijdelijke bestuurder aangesteld, die als expliciete opdracht heeft om duidelijkheid te krijgen over de intellectuele eigendomsrechten en om een minnelijke oplossing te beproeven tussen de betrokken partijen (Beschikking Ondernemingskamer d.d. 7 september 2020, r.o. 3.5 en 3.6). De acties van gedaagden maken het gras voor de voeten van deze aangestelde bestuurder weg en stellen de onderzoeker – nadat die zal zijn benoemd – voor een voldongen feit, als de onduidelijkheid over de intellectuele eigendomsrechten inmiddels is opgelost doordat dmarcian Europe die rechten onder dwang aan dmarcian Inc heeft overgedragen. Het is onduidelijk waarom van dmarcian Inc niet zou kunnen worden gevergd dat zij *op zijn minst* de door de tijdelijk aangestelde bestuurder ondernomen acties c.q. het door de Ondernemingskamer gelaste onderzoek afwacht, althans totdat in een bodemprocedure duidelijkheid is verkregen over de eigendom van de intellectuele eigendomsrechten op de huidige versie van de dmarcian software.

- Bovendien pleegt dmarcian Inc met de opzegging van de overeenkomst een onrechtmatige daad jegens dmarcian Europe omdat zij daarmee profiteert van de normschending van Draegen jegens dmarcian Europe. Deze normschending is kort gezegd dáárin gelegen dat Draegen als aandeelhouder van dmarcian Europe de verplichting jegens dmarcian Europe en overige stakeholders had om de status quo te behouden gedurende het – nota bene mede door hemzelf aangevraagde – onderzoek. Hij is in die verplichting tekortgeschoten doordat hij zijn positie als bestuurder en grootaandeelhouder van dmarcian Inc heeft gebruikt om de samenwerking op te zeggen, althans druk uit te oefenen op dmarcian Europe (zie over de normschending hierna ook paragraaf 4.12 en 4.13). dmarcian Inc zou de samenwerking niet kunnen beëindigen als haar bestuurder en grootaandeelhouder zich, in zijn hoedanigheid van (groot)aandeelhouder van dmarcian Europe, had gehouden aan zijn verplichting om ervoor te zorgen dat de status quo gedurende het gelaste onderzoek zou worden gehandhaafd. Onder het Nederlandse recht levert het profiteren van een normschending van een ander (in casu: Draegen) een zelfstandig onrechtmatige daad op indien er sprake is van wetenschap van de normschending en bijkomende omstandigheden.[9] In dit geval is aan deze vereisten voldaan. Dat dmarcian Inc. wetenschap heeft blijkt al uit de afstemming van dmarcian Inc. en Draegen omtrent de brieven en e-mails die op 22 januari jl. respectievelijk 26 januari door (de advocaten van) dmarcian Inc. respectievelijk Draegen zijn verstuurd (zie par. 2.26 hiervoor). Van de bedoelde bijkomende omstandigheden (naast de enkele wetenschap van de normschending) is eveneens sprake nu a) Draegen bestuurder en (groot)aandeelhouder van dmarcian Inc is en de facto het beleid van dmarcian Inc (mede) bepaalt en b) de Ondernemingskamer een onderzoek heeft gelast naar het binnen dmarcian Europe gevoerde beleid.

4.9.  In het licht van deze omstandigheden moet worden geoordeeld dat de eisen van redelijkheid en billijkheid met zich meebrengen dat de Overeenkomst – in ieder geval bij de huidige stand van zaken, oftewel zolang de OK-procedure nog niet is afgerond – niet, althans niet zonder zwaarwegende reden,

---

[9] Hof Den Haag van 28 januari 2020 ECLI:NL:RBDHA:2018:2158 (Silfi  Roka) r.o. 5.20)

20

kan worden opgezegd. Voor de goede orde: van een zwaarwegende grond voor opzegging is in dit geval geen sprake. Het enkele feit dat tussen partijen op dit moment nog discussie bestaat over de vraag aan wie de intellectuele eigendomsrechten op de software toebehoren, kwalificeert in ieder geval niet als zodanig. Dat is nu juist de reden geweest voor de Ondernemingskamer om voorlopige maatregelen te treffen.

4.10. De conclusie luidt dat de opzegging onrechtmatig en daarmee nietig is. Dmarcian Inc. is en blijft daarom gehouden haar verplichtingen onder de Overeenkomst na te komen. Die verplichtingen omvatten in ieder geval dat zij dmarcian Europe in staat moet stellen om haar distributierechten uit te (blijven) oefenen. Daartoe heeft zij in ieder geval (ononderbroken) toegang nodig tot de (computer)systemen en het SaaS-platform.

*Meer subsidiair: verzoek tot treffen ordemaatregel*
4.11. Voor het geval uw voorzieningenrechter voorshands onvoldoende aannemelijk vindt dat de opzegging onrechtmatig is, verzoekt dmarcian Europe uw voorzieningenrechter – meest subsidiair – gelet op het door de Ondernemingskamer gelaste onderzoek bij wijze van ordemaatregel te bepalen dat de status quo voor de duur van dat onderzoek wordt gehandhaafd en dat dmarcian Europe dus weer onbeperkt toegang tot alle systemen dient te krijgen en dat de samenwerking gedurende die periode niet kan worden beëindigd.

*Aansprakelijkheid Draegen*
4.12. Dmarcian Europe is tevens van mening dat Draegen in strijd handelt met de normen van artikel 2:8 BW. Draegen is aandeelhouder van dmarcian Europe en heeft zich bovendien ook zelf gewend tot de Ondernemingskamer met het verzoek in te grijpen vanwege een mede ook door zijn toedoen ontstane situatie. Die positie brengt naar het oordeel van dmarcian Europe mee dat Draegen hangende de enquêteprocedure de huidige status quo dient te respecteren en dat hij niet –als bestuurder en grootaandeelhouder van dmarcian Inc – feitelijk bewerkstelligt dat de Overeenkomst door dmarcian Inc. wordt opgezegd. Dat deze actie als pressiemiddel dient, mag reeds volgen uit de brief van Draegen zelf.

4.13. Sterker nog, Draegen heeft de verhoudingen verder op scherp gezet door als aandeelhouder in dmarcian Europe een beroep te doen op artikel 4 van de exit agreement, onder de ontbindende voorwaarde dat dmarcian Europe de door dmarcian Inc bij de opzegbrief gevoegde *distribution agreement* en *settlement agreement* accepteert. Hoewel die bepaling geen grond voor beëindiging van de samenwerking tussen dmarcian Inc en dmarcian Europe vormt – zij zijn immers geen partij bij de exit agreement – maar wel grote relevantie heeft voor de samenwerking tussen de aandeelhouders, probeert Draegen daarmee evident de druk op (de aandeelhouders van) dmarcian Europe op te hogen om akkoord te gaan met de voornoemde *distribution agreement* en *settlement agreement*. Het gaat daarbij om een duidelijk vooraf gecoördineerde actie tussen dmarcian Inc. en Draegen in persoon. Dat blijkt alleen al uit het feit dat de brieven van respectievelijk dmarcian Inc. en Draegen luttele minuten na elkaar per e-mail verzonden zijn. Draegen heeft daarmee in strijd gehandeld met de zorgvuldigheid die hij jegens dmarcian Europe in acht behoort te nemen en de normen van artikel 2:8 BW.

4.14. Gezien de gedragingen van gedaagden tot op heden, kan dmarcian Europe niet anders dan concluderen dat dmarcian Inc. en Draegen alles in het werk zullen stellen om zich aan een oordeel

21

van uw voorzieningenrechter te ontrekken. Dat blijkt ook uit de e-mail van de advocaat van dmarcian Inc. in reactie op de aankondiging van dit kort geding. Daarin schrijft hij namens dmarcian Inc.: *"[dmarcian Europe may resolve to initiate injunctive relief proceedings, but Dutch courts have no competence over [dmarcian Inc] and, consequently, a Dutch judgement cannot be enforced against it in its jurisdiction. Consequently, this will be fo no avail.".* Het is daarbij opmerkelijk, en in de ogen van dmarcian Europe opportunistisch, dat ter voorkoming van dit kort geding uitsluitend een beroep wordt gedaan op het ontbreken van rechtsmacht van de Nederlandse rechter.

4.15. Gezien de duidelijke samenhang in het handelen tussen Draegen en dmarcian Europe heeft dmarcian Europe er recht op en belang bij dat ook Draegen verboden wordt verdere (onrechtmatige) handelingen te verrichten die er op gericht zijn haar te benadelen, ten behoeve van dmarcian Inc. – en daarmee Draegen persoonlijk. Ook zijn in dit licht substantiële dwangsommen in het geval van niet nakoming van het door uw voorzieningenrechter te wijzen vonnis op zijn plaats.

## 5. Toepasselijk recht

*De relatie tussen dmarcian Europe en dmarcian Inc,*

5.1. De Overeenkomst kwalificeert aanvankelijk en primair als een distributieovereenkomst.[19] Partijen zijn geen rechtskeuze overeengekomen. Om die reden is op de Overeenkomst het recht van toepassing van het land waar dmarcian Europe als distributeur haar gewone verblijfplaats heeft (art. 4 lid 1 Rome I Verordening[11] jo art. 10:154 BW). dmarcian Europe is gevestigd in Nederland. Dat wil zeggen dat op de Overeenkomst tussen dmarcian Europe en dmarcian Inc. Nederlands recht van toepassing is. Voorts staan de servers waar het Saas-platform van dmarcian Europe op servers in België en Nederland. Ook om die reden moet worden geoordeeld dat Nederlands recht van toepassing is.

*De relatie tussen dmarcian Europe en Draegen*

5.2. De handelingen van Draegen kwalificeren als een onrechtmatige daad. Op een onrechtmatige daad is het recht van toepassing van het land waar de schade zich voordoet (artikel 4 lid 1 Rome II Verordening jo. 10:159 BW).[12] De schade die het gevolg is van het handelen van Draegen doet zich voor in Nederland. Ook op de vorderingen van dmarcian Europe jegens Draegen is derhalve Nederlands recht van toepassing.

## 6. Bevoegdheid van de Nederlandse rechter

6.1. De Nederlandse rechter is op verschillende gronden bevoegd om van dit geschil kennis te nemen.

6.2. Ten eerste geldt dat de Nederlandse rechter op grond van artikel 6 Rv rechtsmacht heeft.

6.2.1. Ten aanzien van de vorderingen van dmarcian Europe jegens dmarcian Inc. geldt dat er sprake is van een verbintenis die voortvloeit uit een overeenkomst. Artikel 6 onder a Rv bepaalt dat de Nederlandse rechter in een dergelijk geval rechtsmacht heeft, indien de verbintenis die aan de eis of het verzoek ten grondslag ligt in Nederland is uitgevoerd of moet worden uitgevoerd. In het geval van een overeenkomt voor de verstrekking van diensten, geldt dat de plaats van de uitvoering in Nederland is gelegen, indien de diensten volgens de overeenkomst in

---

[10] In 2018 is de relatie uitgebreid met toegang tot de broncode ten behoeve van de ontwikkeling als gevolg waarvan gezamenlijk eigendom is gestaan.
[11] VERORDENING (EG) nr. 593/2008 VAN HET EUROPEES PARLEMENT EN DE RAAD van 17 juni 2008 inzake het recht dat van toepassing is op verbintenissen uit overeenkomst (Rome I).
[12] Verordening (EG) nr. 864/2007 van het Europees Parlement en de Raad van 11 juli 2007 betreffende het recht dat van toepassing is op niet-contractuele verbintenissen (Rome II).

22

Nederland verstrekt werden of verstrekt hadden moeten worden (art. 6a Rv). Daarvan is in dit geval sprake, dmarcian Europe was onder de Overeenkomst verantwoordelijk voor de verkoop van de software (en het leveren van de bijbehorende diensten) aan klanten in Europa, Rusland en Afrika (vgl. r.o. 2.5 van de beschikking van de Ondernemingskamer d.d. 7 september 2020). Deze diensten verrichtte dmarcian Europe vanuit haar vestigingsplaats Nederland. De Nederlandse rechter heeft om die reden op grond van artikel 6 lid 1 Rv de bevoegdheid om over dit geschil te oordelen.

6.2.2.    Ten aanzien van Draegen geldt dat er sprake is van vorderingen die gebaseerd zijn op verbintenissen uit onrechtmatige daad. In het geval van verbintenissen uit onrechtmatige daad is de Nederlandse rechter bevoegd indien het 'schadebrengende feit' zich in Nederland heeft voorgedaan of zich kan voordoen (art. 6 onder e Rv). Omdat artikel 6 onder e Rv gebaseerd is op (de voorlopers van) artikel 7 onder 2 Herschikte EEX-Vo[13], is voor de uitleg daarvan de rechtspraak van het Hof van Justitie over de laatstgenoemde bepaling(en) leidend. Uit die rechtspraak volgt dat onder het schadebrengende feit zowel de plaats waar het schadebrengende feit zich heeft voorgedaan wordt verstaan (het Handlungsort), als de plaats waar de schade zich heeft voorgedaan (het Erfolgsort).[14] In dit geval is in ieder geval het Erfolgsort gelegen in Nederland. Om die reden heeft de Nederlandse rechter ook ten aanzien van de vorderingen jegens Draegen op grond van artikel 6 Rv rechtsmacht.

6.3.    Overigens geldt dat ook als dat anders zou zijn, de Nederlandse rechter bevoegd is om over dit geschil te oordelen. Er is sprake van een verzoek tot het treffen van bewarende maatregelen, welke voldoende relevante aanknopingspunten heeft met de Nederlandse rechtsorde. Het geschil draait immers om de opzegging van een overeenkomst die in Nederland moet worden uitgevoerd door een Nederlandse partij (en die dus beheerst wordt door Nederlands recht), en daarmee verband houdende onrechtmatige handelingen. Met die handelingen wordt bovendien getracht een beschikking van de Nederlandse rechter, te weten de Ondernemingskamer, te doorkruisen. In dergelijke omstandigheden kan de bevoegdheid van de Nederlandse rechter op grond van artikel 13 Rv niet worden betwist op de (enkele) grond dat de Nederlandse rechter ten aanzien van een geschil ten principale (beweerdelijk) geen rechtsmacht zou hebben.

6.4.    Tot slot merkt dmarcian Europe op dat haar vorderingen jegens dmarcian Inc. en Draegen een zodanige samenhang bestaat, dat redenen van doelmatigheid een gezamenlijke behandeling rechtvaardigen. Dit houdt in dat indien de Nederlandse rechter rechtsmacht heeft ten aanzien van de vorderingen ten aanzien van één van de gedaagden, hij dat automatisch ook heeft ten aanzien van de andere gedaagden (art. 7 lid 1 Rv).

*Relatieve bevoegdheid Rechtbank Rotterdam*

6.5.    Uw Voorzieningenrechter bent ook relatief bevoegd.

6.6.    Op grond van artikel 102 Rv is in zaken betreffende verbintenissen uit onrechtmatige daad de rechter van de plaats waar het schadebrengende feit zich heeft voorgedaan (mede) bevoegd om over het geschil te oordelen. Het schadebrengende feit doet zich in dit geval voor in de vestigingsplaats van dmarcian Europe, te weten Dordrecht, vanuit waar zij de Overeenkomst uitvoert. Uw Voorzieningenrechter is daarom in ieder geval relatief bevoegd waar het de vorderingen jegens

---

[13] Verordening (EU) nr. 1215/2012 van het Europees Parlement en de Raad van 12 december 2012 betreffende de rechterlijke bevoegdheid, de erkenning en de tenuitvoerlegging van beslissingen in burgerlijke en handelszaken (Herschikte EEX Verordening).
[14] Hof van Justitie 30 november 1976, C-21/76, ECLI:EU:C:1976:166 (Kalimijnen).

23

Draegen betreft. Nu tussen de vorderingen jegens Draegen en dmarcian Inc. een zodanige samenhang bestaat dat redenen van doelmatigheid een gezamenlijke behandeling rechtvaardigen, maakt dit dat uw Voorzieningenrechter ook ten aanzien van de vorderingen jegens dmarcian Inc. relatief bevoegd bent (art. 107 Rv).

6.7.  Voor zover de voorgaande bepalingen niet van toepassing zouden zijn, geldt verder dat uw Voorzieningenrechter op grond van artikel 109 Rv bevoegd bent, nu dmarcian Europe als eiseres in Dordrecht gevestigd is.

## 7.  Bekende verweren van dmarcian Inc.

7.1.  Dmarcian Inc betwist dat zij aan dmarcian Europe een eeuwigdurende, exclusieve licentie op haar software heeft gegeven. Zij betwist verder dat dmarcian Europe auteursrechten op de dmarcian software heeft verworven, althans zij stelt zich op het standpunt dat dmarcian Europe gehouden is die rechten onder door dmarcian Inc te bepalen voorwaarden aan dmarcian Inc over te dragen. Dmarcian Europe is op al deze verweren in het hiervoorgaande ingegaan.

## 8.  Bewijs

8.1.  Ter onderbouwing van haar stellingen verwijst dmarcian Europe naar de bij deze dagvaarding gevoegde producties. Zonder overigens onverplicht enige bewijslast op zich te nemen, biedt dmarcian Europe daarnaast aan haar stellingen verder te bewijzen door alle middelen rechtens.


**OM DEZE REDENEN:**

Het uw Voorzieningenrechter behage om bij vonnis, voor zover mogelijk uitvoerbaar bij voorraad:

Ten aanzien van dmarcian Inc

1.  (a) Primair: dmarcian Inc te gebieden de tussen partijen bestaande overeenkomst onverkort na te komen, totdat deze rechtsgeldig is beëindigd,

(b) Subsidiair: bij wijze van ordemaatregel (i) dmarcian Inc. te gebieden de status quo voor de duur van het door de Ondernemingskamer gelaste onderzoek te handhaven en de tussen partijen bestaande overeenkomst gedurende die periode onverkort na te komen en (ii) dmarcian Inc. te verbieden gedurende die periode de tussen partijen bestaande overeenkomst te beëindigen.

2.  dmarcian Inc te gebieden de blokkade van (de medewerkers van) dmarcian Europe tot het SaaS-platform en de voor de uitoefening van haar bedrijfsactiviteiten vereiste (computer)systemen met onmiddellijke ingang op te heffen en opgeheven te houden totdat de tussen partijen bestaande overeenkomst rechtsgeldig is beëindigd;

3.  dmarcian Inc te veroordelen tot betaling van een dwangsom van EUR 50.000,- per dag dat zij niet, of niet volledig voldoet aan het onder 1 en 2 gevorderde.

Ten aanzien van Draegen

4.  Draegen te veroordelen zich te onthouden van iedere handeling, zelf of via een door hem bestuurde onderneming waaronder expliciet begrepen dmarcian Inc, die de bedrijfsvoering van dmarcian Europe belemmert, totdat dan wel als gevolg van het door de Ondernemingskamer gelaste

24

onderzoek, dan wel als gevolg van een gerechtelijk bodemvonnis, duidelijkheid ontstaat over de inhoud en reikwijdte van de aan dmarcian Europe verstrekte licentieovereenkomst en de eigendom van het auteursrecht op de dmarcian software.

5. Draegen te veroordelen tot betaling van een dwangsom van EUR 50.000,- per dag dat hij niet, of niet volledig voldoet aan het onder 4 gevorderde.

Ten aanzien van dmarcian Inc en Draegen

6. dmarcian Inc en Draegen hoofdelijk te veroordelen in de proceskosten en de nakosten, alle kosten te vermeerderen met wettelijke rente vanaf de datum van het vonnis tot aan de dag der algehele voldoening.

De kosten dezes zijn voor mij, deurwaarder, EUR 85,81

Deze zaak wordt behandeld door mr. V. van Druenen, mr. A. Meijboom en mr. M. Bacon van Kennedy Van der Laan, Postbus 58188 te (1040 HD) Amsterdam, telefoon (020) 5506 688  fax (020) 5506 788, e-mail veerle.van.druenen@kvdl.com.

25

## PRODUCTIES

| | |
|---|---|
| Productie 1 | Beschikkingen Ondernemingskamer d.d. 7 en 10 september 2020 |
| Productie 2 | Uittreksel KvK en handelsregisterhistorie dmarcian Europe |
| Productie 3 | Uittreksels KvK TDX, Groeneweg Beheer en Kalkman Holding |
| Productie 4 | Uittreksel Bulgaars handelsregister dmarcian Bulgaria |
| Productie 5 | Correspondentie tussen partijen die bevestigt dat de ontwikkeling van de software aanvankelijk door dmarcian Inc zou plaatsvinden |
| Productie 6 | Correspondentie met betrekking tot de wetenschap van Draegen van de oprichting en het doel van dmarcian Bulgaria |
| Productie 7 | Akte van overdracht IE rechten dmarcian Bulgaria aan dmarcian Inc. |
| Productie 8 | Verklaring V.P. Kunze over Bulgaars recht |
| Productie 9 | Procesdossier OK procedure |
| Productie 10 | Verzoekschrift TDX en verweerschrift dmarcian Europe |
| Productie 11 | Bericht Harmeling aan aandeelhouders dmarcian Europe d.d. 18 december 2020 |
| Productie 12 | Correspondentie met Ondernemingskamer met betrekking tot benoeming onderzoeker d.d. 27 januari 2021 |
| Productie 13 | Opzeggingsbrief dmarcian Inc d.d. 22 januari 2021, met bijlages |
| Productie 14 | Rapport van accountant dmarcian Inc d.d. 10 augustus 2020 |
| Productie 15 | Exit Agreement |
| Productie 16 | E-mails aan advocaten gedaagden d.d. 25 januari 2021 |
| Productie 17 | E-mails van advocaten gedaagden d.d. 26 januari 2021 |
| Productie 18 | Slack correspondentie tussen Groeneweg en Shannon Draegen (CEO dmarcian Inc) d.d. 29 september 2019 |
| Productie 19 | Deskundigenrapport ICT Recht |

26

Today, the                                                                      two thousand and twenty-one,

at                    hours, at the request of the private limited company **DMARCIAN EUROPE B.V.**, with its
registered office and principal place of business in (3311 JG) Dordrecht at Burgemeester de Raadtsingel
93, choosing its address for service in this matter in (1014 BG) Amsterdam at Molenwerf 16, at the
offices of Kennedy Van der Laan N.V., of which firm attorneys V. van Druenen, A.P. Meijboom and
M.R.S. Bacon have been appointed as counsel and will act as such;

## SUMMONED IN ACCELERATED PRELIMINARY RELIEF PROCEEDINGS:

1. The company incorporated under US law **DMARCIAN, INC.**, with its registered office at 43 S. Broad
Street, Suite 203, Brevard, North Carolina 28712, United States of America,

serving my writ by virtue of Article 55(1) Dutch Code of Civil Procedure (DCCP) with the public official
of the public prosecution service of Rotterdam District Court, location Rotterdam, where I have left two
copies hereof in 3072 AK ROTTERDAM at Wilhelminaplein 100-125, accompanied by translations of
those documents in the English language, with:

employed and present there.

It is requested that this document, together with the translation of such documents into English, be
served on DMARCIAN, INC., having its registered office at 43 S. Broad Street, Suite 203, Brevard, North
Carolina 28712, United States of America, in accordance with Articles 3 to 6 of the Convention on the
Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 15 November
1965 (the "Convention"), by service in accordance with the formalities laid down in the law of the
requested Member State for the service of documents, drawn up in that country and intended for persons
therein, in the form prescribed by that State's law; the (central) authority referred to in Article 6 of the
Convention shall also be requested to return a copy of this writ, together with the declaration referred to
in Article 6 of the Convention.

the costs in the amount of USD 95.00 shall be transferred in a timely manner to Wells Fargo Bank,
account no. 2007107119, stating the Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington
98134 USA stating the company incorporated under the law of its place of establishment DMARCIAN
INC. with its registered office and its principal place of business in 28712 BREVARD, NORTH
CAROLINA, UNITED STATES OF AMERICA at Broad Street 43 S, Suite 203;

Furthermore, a copy of this writ accompanied by the translation of those documents in the English
language, will be sent by me forthwith by registered letter to the address of the aforementioned company
incorporated          under          US          law          DMARCIAN,          INC.;

2. Mr Timothy George **DRAEGEN**, residing at 272 Delphia Drive, Brevard, North Carolina, 28712, United
States of America,

i

serving my writ by virtue of Article 55(1) Dutch Code of Civil Procedure (DCCP) with the public official of the public prosecution service of Rotterdam District Court, location Rotterdam, where I have left two copies hereof in 3072 AK ROTTERDAM at Wilhelminaplein 100-125, accompanied by translations of those documents in the English language, with:

employed and present there.

Requesting that this writ and the documents specified below, accompanied by a English translation of those documents, be served on/notified to Timothy George Draegen, residing at 272 Delphia Drive, Brevard, North Carolina, 28712, United States of America in accordance with Articles 3 through 6 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 15 November 1965, specifically by service or notification with due observance of the formalities laid down in the law of the state addressed for the service of documents drawn up in that country and intended for persons within its territory, also requesting the central authority referred to in Article 6 of the Convention to return a copy of this writ, accompanied by the certificate referred to in Article 6 of the Convention.

the costs in the amount of USD 95.00 shall be transferred in a timely manner to Wells Fargo Bank, account.no. 2007107119, stating the Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington 98134 USA stating Timothy George Draegen, residing in 28712 BREVARD, NORTH CAROLINA, UNITED STATES OF AMERICA at Delphia Drive 272;

Furthermore, a copy of this writ, accompanied by the translation of those documents in the English language, will be sent by me forthwith by registered letter to the address of the aforementioned Timothy George Draegen;

STIPULATING IN THIS SUMMONS THE CONDITIONS THAT;

- Leave to shorten the summons period has been granted under the condition that the summons and translation be served on the defendants by no later than on 29 February 2021 at 14:00 hours
- The defendants are notified of the time and location of the hearing without undue delay, with a copy of the draft summons being sent to the defendants

TO APPEAR:

On 1 February 2021, at 09:00 hours, in person or represented by counsel, at the hearing of the Preliminary Relief Court of the Rotterdam District Court, location Rotterdam, which hearing will be held there at the courthouse at Wilhelminaplein 100-125, 3072 AK Rotterdam

WITH EXPRESS NOTICE THAT:

- If a defendant fails to appear at the hearing, either in person or represented by counsel, and the prescribed time periods and formalities have been observed, the court will declare that defendant to be in default of appearance and will allow the claim set forth below, unless the

2

court deems this claim unlawful or unfounded;

- if at least one of the defendants appears at the hearing and has paid the court fee in good time, one judgment will be rendered between all parties, which will be regarded as a judgment rendered in a defended action;

- upon appearing before the court, each of the defendants will be charged a court fee to be paid within four weeks after the date of appearance;

- the amount of the court fee is stated in the most recent appendix to the Dutch Court Fees in Civil Cases Act, which can be found on the following website: www.kbvg.nl/griffierechtentabel;

- a person who is of limited means will be charged a court fee for persons of limited means, as determined by or pursuant to the law, if at the time at which the court fee is charged they have submitted:

  1. a copy of the decision to grant legal aid as referred to in Article 29 of the Dutch Legal Aid Act or, if this is not possible as a result of circumstances that cannot reasonably be attributed to that person, a copy of the application referred to in Article 24(2) of the Dutch Legal Aid Act, or

  2. a statement from the Legal Aid Board, within the meaning of Article 7(3)(e) of the Dutch Legal Aid Act, showing that their income does not exceed the amounts stated in the order in council by virtue of Article 35(2) of that Act;

- a joint registry fee will be levied once only for defendants appearing through the same counsel and submitting identical statements or conducting an identical defence based on Article 15 of the Court Fees (Civil Cases) Act;

**IN ORDER TO:**

hear it claimed and moved as follows on behalf of the claimant ("**dmarcian Europe**"):

**1. Introduction**

1.1. dmarcian Europe requests the Preliminary Relief Court in these preliminary relief proceedings to award a number of preliminary relief measures serving to lift, with immediate effect, the denial by dmarcian Inc. of the access of employees of dmarcian Europe to the joint computer and other systems, to eliminate the effect of the termination of the partnership between the parties effective 1 February 2021 as given notice of in a letter of 22 January 2021, and to order the defendants to continue the existing partnership unchanged until clarity has been obtained about the terms and conditions of the license granted to dmarcian Europe and the ownership of the copyrights to the current version of the software exploited by the parties, which constitutes the essence of their dispute.

1.2. This case is closely connected to the inquiry proceedings before the Enterprise Court of the Amsterdam Court of Appeal. In those proceedings – to which Draegen is also a party – the Enterprise Court held in a decision of 7 September 2020 that there are well-founded reasons to question whether dmarcian Europe has conducted proper management, which reasons can be found in, put succinctly, the situation, caused by the parties, that the parties have not arranged their partnership, either in general or in terms of the intellectual property rights to software applications developed and to be developed and the licenses granted or to be granted in relation thereto, as

3

well as the scope of such licenses. At the request of both shareholders – Draegen and TDX – the Enterprise Court ordered an investigation into this. Furthermore, the Enterprise Court has intervened by awarding immediate relief, comprising the appointment of a director with deciding vote as well as the transfer of all shares in dmarcian Europe (minus one share per shareholder) for management purposes to a manager. By decision of 10 September 2020, the Enterprise Court appointed H.J.M. Harmeling ('**Harmeling**') as the said director and Y. Borrius as manager. These preliminary relief proceedings are conducted on dmarcian Europe's behalf under the responsibility of Harmeling, in order to ensure the continuity of dmarcian Europe. The Enterprise Court's decisions of 7 and 10 September 2020 are submitted as Exhibit 1 (**Exhibit 1**). dmarcian Europe will discuss those decisions in more detail below.

## 2.  Introduction of the parties

### dmarcian Europe

2.1. dmarcian Europe was incorporated on 21 March 2013 under the name Mailmerk B.V. (**Exhibit 2**). It is engaged in the provision of products and services in the field of e-mail address identity security.

2.2. On 22 January 2016, Mailmerk B.V. entered into a partnership with dmarcian Inc. It change its name to dmarcian Europe on 15 February 2017. Then sole director and shareholder of Mailmerk B.V./dmarcian Europe, The Digital Xpedition (TDX) Holding B.V. ("**TDX**"), offered dmarcian Inc and/or Draegen, in exchange for the partnership, an option to acquire a majority interest in dmarcian Europe for the price of EUR 1. This right was exercised in July 2018, but the shares were not transferred to dmarcian Inc, but to its CEO – Draegen.

2.3. From July 2018 until 7 September 2020, 50.01% of the shares in dmarcian Europe were held by Draegen and 49.55% of the shares were held by TDX. Following the Enterprise Court's decision, the shares, excepting one share per shareholder, were temporarily transferred for management purposes to a third party, Yvette Borrius. In addition, Harmeling was appointed as director with decisive vote alongside TDX.

2.4. The shares in TDX are held by H.J. Kalkman Beheer B.V. (50%) and M. Groeneweg Holding B.V. (50%), the personal holding companies of Mr Martijn Groeneweg ("**Groeneweg**") and Mr Herwert Jette Kalkman ("**Kalkman**"), respectively (**Exhibit 3**).

2.5. dmarcian Europe in turn holds 100% of the shares in the capital of a Bulgarian entity, named dmarcian Bulgaria EOOD ("**dmarcian Bulgaria**") (**Exhibit 4**). Until 12 January 2021, the sole director of dmarcian Bulgaria was Mr Nikolay Georgiev Hristov ("**Hristov**"). Harmeling was registered as second director of dmarcian Bulgaria on 12 January 2021. Both directors have independent authority to represent dmarcian Bulgaria.

### dmarcian Inc

2.6. dmarcian Inc is a US company incorporated on 19 September 2014 and, like dmarcian Europe, is engaged in the provision of products and services in the field of e-mail address identity security. It has developed software that the parties have exploiting together since 2016.

4

2.7. Initially, 100% of the shares in the capital of dmarcian Inc were held by Draegen. A former employee – Charles E. Swenberg – became co-shareholder in 2017 pursuant to an agreement concluded with dmarcian Inc. Proceedings between those parties are currently pending in the United States about the extent of that shareholding. Be that as it may, Draegen to this continues to be the CEO and majority shareholder of dmarcian Inc.

2.8. Contrary to what the names of the entities might suggest, dmarcian Europe is not a subsidiary of dmarcian Inc. The only corporate connection between both companies is the aforementioned majority interest that Draegen acquired in the capital of dmarcian Europe in 2018.

2.9. Represented schematically, the corporate structure of the parties looks as follows:



**The dispute**

2.10. dmarcian Europe and dmarcian Inc have been working together since 2016 in the distribution and licensing of the dmarcian software and the associated services in the field of e-mail address identity security ("**the dmarcian software**").[1]

2.11. The parties offer the dmarcian software as SaaS (Software as a Service). To this end, dmarcian Inc has developed a SaaS platform that can be accessed via the www.dmarcian.com website. Customers can purchase the SaaS via the platform. dmarcian Europe exploits SaaS for customers in Europe, Russia, and Africa; dmarcian Inc does that for North America and South America. New customers click on the website for their region and are then directed to the web environment of the party responsible for that region, which has exclusivity in that respect. The web environment for dmarcian Europe is hosted on servers in Belgium and the Netherlands, controlled by dmarcian Inc.

---

[1] Put very succinctly, owners of internet domain names are able to implement DMARC – a public standardised verification protocol (https://tools.ietf.org/html/rfc7489) aimed at securing the identity of internet mail. The dmarcian software processes DMARC data and indicates what needs to be resolved in terms identity security so that all e-mails belonging to a domain comply and continue to comply with the DMARC data. The domain owner can thereby prevent fake e-mails from being sent from the domain name.

5

2.12.  The website and the SaaS platform are managed by dmarcian Inc, which means that dmarcian Inc regulates the access of dmarcian Europe employees to that platform and has the power to deny dmarcian Europe that access. Therefore, dmarcian Europe is fully dependent on dmarcian Inc for the hosting of the SaaS platform. Consequently, dmarcian Europe if also dependent on dmarcian Inc for its business operations and, in particular, for the access to its customer data and market activities.

2.13.  The dmarcian software is protected by copyright. At the start of the partnership in January 2016, the copyright to the version of the dmarcian software current at that time was vested in dmarcian Inc, or Draegen, its sole director and shareholder at that time, who, according to his own statement, developed the software. At that time, it was agreed that only dmarcian Inc would be developing the software. That was the agreement until mid-2018. By way of illustration, dmarcian Europe submits a message that Groeneweg sent Draegen on 8 June 2017, in which he wrote: "*We agreed that dmarcian Inc will take care of software development*". In another message, of 28 September 2017, Groeneweg wrote the following to Draegen: "*We agreed on 50% each of EU as you know. You also know the terms we agreed on, where you would take care of all development cost and hosting. EU would only focus on selling software and deployment in EU to grow EU.*" **Exhibit 5**

2.14.  So although the parties initially agreed that dmarcian Inc would be responsible for the development of the dmarcian software, the parties reneged on that agreement in mid-2018 and agreed that this development would also be carried out by dmarcian Europe and dmarcian Bulgaria (see 2.16). This means that they extended the terms and conditions of the license at that time. For the purposes of the use of the software by dmarcian Europe and the sale thereof by dmarcian Europe in Europe, Russia and Africa, the parties entered into an oral agreement in January 2016. The parties disagree on the exact substance of their agreement. It emerges from the decision of the Enterprise Court of 7 September 2020 that it has been established between the parties that they agreed on *at least* the following in 2016 (para. 2.5):

-   The fact that dmarcian Europe holds a license for the use and the sale of the software originating from dmarcian Inc.;
-   The fact that dmarcian Europe is responsible for the sale of that software (and the provision of associated services) to customers in Europe, Russia and Africa;
-   The fact that, in exchange, dmarcian Inc. and/or Draegen could purchase the majority interest in dmarcian Europe for payment of EUR 1.

dmarcian Europe will discuss the substance of the agreements made below.

2.15.  Draegen personally exercised the latter option in May 2018. Consequently, he acquired a majority interest of 50.01% in the capital of dmarcian Europe.

2.16.  Since the autumn of 2018, dmarcian Europe, itself and through its wholly-owned Bulgarian subsidiary, has made significant contributions to the development of the dmarcian software and its source code. dmarcian Inc and Draegen were fully aware of and consented to this. To illustrate this, dmarcian Europe submits two messages between Hristov, Draegen and Groeneweg. The first message relates to the incorporation of dmarcian Bulgaria. The business activities listed in dmarcian Bulgaria's deed of incorporation include "software development and implementation". In the second message, Draegen asked Hristov whether he (Draegen) and

6

Groeneweg could pay a visit in Bulgaria because he wanted to expand production capacity. **Exhibit 6**, dmarcian Inc, dmarcian Europe and dmarcian Bulgaria furthermore use a single central source code development platform, which is managed by dmarcian Inc. and to which it has granted dmarcian Europe and dmarcian Bulgaria access (see sections 3.12 et seq. below). Among other things, dmarcian Bulgaria developed the dmarcian software from a two-tier application to a three-tier application, allowing for API accessibility. It can of course be ruled out that dmarcian Inc has not noticed this.

2.17. All costs for the development within dmarcian Europe and dmarcian Bulgaria have been borne by dmarcian Europe. dmarcian Europe and dmarcian Bulgaria have obtained their own copyright to their contributions and, as such, have become co-owners of the current version of the dmarcian software that both companies are currently licensing to users as SaaS solution. dmarcian Bulgaria has transferred its copyrights to dmarcian Europe. dmarcian Europe submits the deed of transfer as **Exhibit 7**. dmarcian also submits a statement by Ms V.P. Kunze, partner at Bulgarian law firm Djingov, Gouginski, Kyutchukov & Velichkov in Sofia, Bulgaria. She states – put succinctly – that the transfer is valid under Bulgarian law and that Harmeling, as director of dmarcian Bulgaria with independent authority, was authorised to effect this transfer (**Exhibit 8**).

2.18. In late 2019, a dispute arose between the parties on the ownership of the rights to the modifications of and additions to the dmarcian software that were developed by dmarcian Europe. According to dmarcian Inc, it emerges from the agreements made between the parties in 2016 that dmarcian Inc is the rightholder to that software, or at least that dmarcian Europe is required to transfer these rights under conditions to be unilaterally imposed by dmarcian Inc. This has been and is being disputed by dmarcian Europe. dmarcian Europe may be willing to cooperate in the transfer or licensing of its copyrights to the software developed by it, but not under the conditions imposed thereon by dmarcian Inc, which, put briefly, sideline dmarcian Europe altogether. It has notified dmarcian Inc, that, without a license, dmarcian Inc. is not allowed to license software applications developed by dmarcian Europe to third parties.

2.19. Apparently, Groeneweg's message did not go down very well with Draegen. Among other things, Draegen, in succession:
- immediately denied dmarcian Europe employees access to the computer and other systems managed by dmarcian Inc (1st blackout)
- migrated the web environment of dmarcian Europe on the website managed by dmarcian Inc (www.dmarcian.com) to a US host. Please note: this means that dmarcian Inc is now hosting all of dmarcian Europe's system and therefore has the power to take down dmarcian Europe's business operations completely. dmarcian Europe describes this as the "nuclear button", which is pressed in part now and is likely to be pressed in full in the event of termination.
- denied dmarcian Europe access to its own domain names <dmarcian.eu> and <dmarcian.net>
- appointed, without authority to do so, a "Director of Software" at dmarcian Europe and dmarcian Bulgaria to whom the software developers of dmarcian Europe and dmarcian Bulgaria had to report.

See, in more detail, paras. 49-65 of TDX's application in the proceedings before the Enterprise Court.

7

2.20. Draegen reversed these measures within 48 hours. Following this coup, the parties tried to resolve their dispute in mutual consultation. In May 2020, dmarcian Europe submitted a comprehensive settlement proposal, which was rejected by Draegen.[2] After a meeting on 3 July 2020, Draegen suddenly requested an AGM with the dismissal of TDX – the sole director and minority shareholder of dmarcian Europe, TDX – and the appointment of a Draegen-nominated director as items on the agenda. TDX had good reasons to assume that this director, following his appointment, would cooperate in the "free" transfer of the copyright from dmarcian Europe to dmarcian Inc, leaving dmarcian Europe with nothing.

2.21. In response, TDX submitted an application to the Enterprise Court in order to prevent its dismissal and irreversible damage to dmarcian Europe. dmarcian Europe submits the case file of these proceedings as Exhibit 7 (**Exhibit 9**). For the background to this dispute and the run-up to those proceedings, it refers to its own procedural documents and those of TDX, which are hereby submitted separately **Exhibit 10** and the decisions rendered by the Enterprise Court in those proceedings (Exhibit 1 to this summons), with dmarcian Europe referring in particular to paras. 2.4. through 2.9. of the Enterprise Court's decision. Where necessary, dmarcian Europe will refer to this case file in this summons and at the hearing.

2.22. As stated above, the Enterprise Court, through decisions rendered on 7 and 10 September 2020 and by way of immediate relief, appointed Harmeling as director and transferred all shares in dmarcian Europe (minus one share per shareholder) for management purposes to the manager (Borrius). In addition, the Enterprise Court ordered an investigation into the management conducted at dmarcian Europe between 1 January 2016 until 20 August 2020. The purposes of the right of inquiry include restoring healthy relationships and obtaining transparency.[3] That is also what the Enterprise Court's intervention in the present case is aimed at.

2.23. Insofar as relevant, the Enterprise Court has based the investigation ordered on the following (emphasis added by counsel):

*'3.4 The Enterprise Court finds as follows. The controversy surrounding the intellectual property rights to the software/software applications developed by dmarcian Europe (and dmarcian Bulgaria) is at the heart of the dispute between the parties. TDX argues that the software/software applications is/are apart from the software developed by dmarcian, Inc., to such extent that the intellectual property rights thereto accrue to dmarcian Europe. According to TDX, the use and sale of the software/software applications by dmarcian, Inc. must be based on a license to be issued by dmarcian Europe. Draegen counters this by arguing that the software developed by dmarcian Europe (and dmarcian Bulgaria) comprises no more than additional features for improved use of the software originating from dmarcian, Inc., so that the intellectual property rights thereto are also vested in dmarcian, Inc. The Enterprise Court argues first and foremost that only the ordinary civil court has jurisdiction to conduct the legal assessment of that dispute. The Enterprise Court is able to conclude, however, that this dispute has a disruptive effect on dmarcian Europe's business; its core business is the development and sale of software and the partnership with dmarcian, Inc. is a necessary condition for that. Nevertheless, this partnership has not been sufficiently provided*

---

[2] Cf. Exhibit 24 to TDX's application
[3] Supreme Court 10 January 1990, NJ 1990/466 (Ogem).

8

for by the parties, either in a general sense or in respect of intellectual property rights to software/software applications developed and to be developed and in particular licenses granted or to be granted in connection therewith, or the scope of such licenses. No unequivocally recorded agreements in this regard are available, consequent to which the partnership has been jeopardised by the present discussion in that regard, presenting a serious impediment to dmarcian Europe's business operations. In the opinion of the Enterprise Court, the existence of the aforementioned situation causes there to be sufficient well-founded reasons to question the management and affairs conducted by dmarcian Europe. As requested by both TDX and Draegen, the Enterprise Court will order an investigation into the management and affairs conducted by dmarcian Europe between 1 January 2016 and 20 August 2020."

2.24.  The Enterprise Court furthermore held the following (para. 3.9):

"For the time being, the Enterprise Court will stay the appointment of the investigator so as to find out whether the dispute can already be resolved through the immediate relief to be granted. Each of the parties or the director or manager appointed by the Enterprise Court may request the Enterprise Court at any time to appoint the investigator."

2.25.  In response to Harmeling's appointment on 10 September 2020, activities were carried out from the United States in the next weekend to completely shut out dmarcian Europe from all systems again, which shutout was fully implemented on 14 September 2020 (2nd blackout). This was therefore the second time that dmarcian Europe was shut off from the systems essential for its business operations. Harmeling immediately held Draegen, in his role as shareholder, to account for this. At the insistence of Harmeling, Draegen eventually – after some days – caused access to most essential systems to be restored to such extent that dmarcian Europe was able to conduct its business again. After many and cumbersome discussions with Draegen, dmarcian Inc. purely through Draegen's intervention, proceeded to grant access to other, but less material, systems. There was never any unimpeded access after 14 September 2020.

2.26.  Harmeling then started looking for ways to arrive at a resolution of the dispute that had arisen between the shareholders of dmarcian Europe. To this end, he spoke to, among others, his fellow director TDX (Groeneweg and Kalkman), with TDX and Draegen as shareholders, he sought contact with his fellow director of dmarcian Bulgaria, and he made every effort to resolve the conflict that had arisen. All of this has been laid down in an e-mail that Harmeling sent the shareholders on 18 December 2020, which dmarcian Europe submits as **Exhibit 11**. However, Draegen soon indicated that he was not prepared to agree on any other solution but the transfer, on his conditions, of the copyright from dmarcian Europe to dmarcian Inc. dmarcian Europe has meanwhile requested the Enterprise Division to urgently appoint an investigator to carry out the investigation ordered on 7 September 2020, which request has now been granted. dmarcian Europe submits the relevant correspondence as **Exhibit 12**.

2.27.  Although the investigation ordered has not started yet and agreements has by no means been reached on the legal situation surrounding the ownership of the intellectual property rights to the current version of the dmarcian software, dmarcian Inc suddenly announced, in a letter of 22 January 2021, that it would terminate the partnership with dmarcian Europe effective 1 February 2021, unless dmarcian Europe were to sign a distribution agreement and settlement agreement;

9

attached to the letter, that are very unfavourable to dmarcian Europe. Put succinctly, under those agreements dmarcian Europe would transfer its copyright in exchange for a licence to those rights, based on which it would have to pay dmarcian Inc no less than 80% (!) of all its income from the sales of the dmarcian software and consultancy services (**Exhibit 13**). As dmarcian Inc and Draegen have also confirmed in the past, 20% is customary, not 80%, and that percentage is to be calculated exclusively on the software distributed. To substantiate this, dmarcian Europe refers to the statement by dmarcian Inc's accountant that was submitted in the inquiry proceedings. The account stated, among other things, the following:

"*20% BV Fees*
*The company provides technology, brand, business model, and leads to the Europe BV and other*
*dmarcian partners. The value of the services provided to other dmarcian partners is 20% of*
*revenue.*
*To have comparable financials between the US and BV, 20% of revenue from BV should be*
*allocated*
*to the US in the form of revenue to US and expense to BV.*" **Exhibit 14**.

2.28.  The unreasonableness and unfairness of these contracts is already evident from the fact that dmarcian Inc itself assumes that dmarcian Europe will not be willing or able to sign them. After all, even though dmarcian Inc conditionally terminated the partnership and indicated that it would not block the access to the computer and other systems until 1 February 2021, it has, in reality, denied the employees of dmarcian Europe access to the computer and other systems with immediate effect from the time it sent the letter – i.e. as of Friday, 22 January 2021 at about 4 pm (3rd blackout). During on all hands meeting on 25 January 2021, for which dmarcian Europe did not receive an invitation, Draegen announced to employees of dmarcian Bulgaria and the employees of dmarcian Inc that the 22 January 2021 blackout of dmarcian Europe was the result of a changed relationship. That means it is getting ahead of the facts as well.

2.29.  In addition to the letter from dmarcian Inc, Draegen, in a letter that was sent by e-mail some minutes after dmarcian Inc.'s letter, invoked Clause 4 of the exit agreement entered into by Draegen and TDX in 2018 upon Draegen's acquisition of the majority interest in dmarcian Europe (**Exhibit 15**). Pursuant to this provision, every shareholder has the right to terminate the co-operation between the shareholders by making an offer for the shares of the other shareholder. If the other shareholder does not accept the offer, that shareholder would be required to buy out the first shareholder. This offer to co-shareholder TDX was made under the condition subsequent that dmarcian Europe agree to dmarcian Inc's demands as stated in the letter of 22 January 2021. This establishes as fact the clear interconnectedness between the shareholder Draegen and the principal dmarcian.

2.30.  All of this happened, as stated, pending the investigation into the management conducted by dmarcian Europe, in particular into the lack of clarity existing in respect of the substance of the licensing agreement and the ownership of the intellectual property rights to the dmarcian software. Also relevant in this respect is that Harmeling informed shareholders on 18 December 2020 to start looking for solutions outside of the shareholders (cf. Exhibit 11). Harmeling in particular announced the establishment of the data room and an independent valuation in order to enable him to comply with his instruction as referred to in para. 3.5 of the Enterprise Court's decision. The defendants' action of 22 January 2021 seems to be the direct consequence of this:

10

2.31.  Insofar as dmarcian Inc relies on a breach as the basis for the termination of the partnership, dmarcian Europe contests that it breached the terms and conditions of that license. At any rate, there can be no question of any breach without the substance of the licensing agreement being established. Insofar as dmarcian Inc were to rely on notice of termination, the parties agreed that the agreement cannot be terminated by notice. Outside of this as well, however, it is not clear in any way why dmarcian Inc cannot await the outcome of the inquiry proceedings (i.e. the investigation and any follow-up phase). Under the circumstances of this case, in dmarcian Europe's opinion, there is not a single legal ground, at least no sufficiently compelling ground, that justifies the termination of the existing continuing performance contract effective 1 February 2021.

2.32.  By denying dmarcian Europe's employees access to the computer and other systems and threatening to unlawfully terminate the continuing performance contract in the very short term, Draegen and dmarcian Inc are trying to force dmarcian Europe on improper grounds to transfer its copyright to the software. Moreover, the present preclusion of dmarcian Europe's access to its customers and known potential customers with whom contact has already been established goes to show that dmarcian Inc aims to take over dmarcian Europe's customer base.  dmarcian Inc is thereby acting in violation of the principles of reasonableness and fairness that it ought to observe towards its contractual partner dmarcian Europe. This is all the more cogent as dmarcian Europe's business operations are fully dependent on the access to the SaaS platform and computer systems that dmarcian Inc must provide dmarcian Europe. Draegen in turn is acting unlawfully towards dmarcian Europe. By facilitating dmarcian Inc's attempts to corner dmarcian Europe, Draegen is not only breaching the standard of due care, but also his obligations under Article 2:8(1) of the Dutch Civil Code.

*Urgent interest*

2.33.  Because of these actions by dmarcian Inc and Draegen, dmarcian Europe is suffering serious and irreversible damage. The sale of the dmarcian software forms the core business of dmarcian Europe. Because of the new blockade, the third one by now, it is unable to access its customer data, unable to serve existing customers at this time, and also unable to follow up on leads for potential new customers. This is causing severe unrest among its employees.

2.34.  Moreover, if the partnership and the licensing agreement were to be terminated effective 1 February 2021, this would mean the end of dmarcian Europe, whose business operations are dependent on the continued existence of the licensing agreement. In that case, bankruptcy would be unavoidable. This would immediately leave 22 employees of dmarcian Europe and dmarcian Bulgaria without a job and might rob the customers of the dmarcian software in Europe, Russia and Africa of access to the dmarcian software.

2.35.  In response to dmarcian Inc's letter of 22 January 2021, dmarcian Europe demanded that dmarcian Inc lift the blockade on its employees and withdraw the termination announced, failing which dmarcian Europe would institute preliminary relief proceedings. Given the serious accusations relating to Draegen personally, Draegen's lawyer was also asked, by e-mail of that same date, to provide the dates on which Draegen would be unable to appear in court (**Exhibit 16**). Both dmarcian Inc and Draegen indicated in an e-mail sent by their lawyers, again following

11

coordination between the parties, that they would not comply with the demands (**Exhibit 17**). This establishes the urgent interest.

2.36. In view of the immediate and irreversible consequences that the actions of Draegen and dmarcian Inc have caused, dmarcian Europe has a sufficiently urgent interest in its claims. After all, all those claims serve to ensure the continued existence of its company and to postpone irreversible consequences until clarity has been obtained, either through the investigation ordered by the Enterprise Court or through a court decision in proceedings on the merits, on the terms and conditions of the licensing agreement and the ownership of the copyrights to the current version of the dmarcian software. dmarcian Inc has no interest whatsoever in changing the *status quo* in anticipation of the solution envisaged by the Enterprise Court, which *status quo* has *de facto* existed ever since December 2019 without any clear practical objections.

2.37. dmarcian Europe will discuss in more detail below why it owns/co-owns the copyrights to the current version of the dmarcian software. In addition, it will discuss in more detail the jurisdiction of this Preliminary Relief Court, the applicable law, and the legal substantiation of its claims. Where necessary, it will explain the above in more detail at the hearing.

2.38. Even though dmarcian Europe believes it is the owner/co-owner of the copyrights to the dmarcian software, this need not be established in these preliminary relief proceedings in order to award the claims. For this to happen, it would be sufficient for dmarcian Europe to prove that there is *at least* a lack of clarity on the question of whether dmarcian Europe is entitled to copyrights to the dmarcian software. The Enterprise Court has confirmed this to be the case. The actions of the defendants, the instruction to Harmeling, and the investigation ordered by the Enterprise Court justify the award of the relief sought.

3. **The content of the licensing agreement and the copyright to the current version of the dmarcian software**

3.1. On 22 January 2016, Draegen, dmarcian Inc., TDX and the former Mailmerk (now: dmarcian Europe) entered into an oral agreement with regard to the use and the distribution of the dmarcian software (the "Agreement").

3.2. Under this Agreement, dmarcian Inc granted dmarcian Europe, in exchange for an option provided to dmarcian Inc and/or Draegen to acquire a majority interest in dmarcian Europe, a perpetual, exclusive license for the use of the dmarcian software and the licensing thereof to customers in Europe, Russia and Africa;

3.3. On the basis of the Agreement, the proceeds from sales of the dmarcian software to customers from these territories accrued exclusively to dmarcian Europe.

3.4. The parties acted in accordance with the Agreement from January 2016 onwards. dmarcian Europe exclusively served the Russian, European and African market and all – at least virtually

12

all – proceeds accrued to it.[4] dmarcian Inc not only acted in accordance with a perpetual and exclusive license, but it also explicitly confirmed the existence thereof in the correspondence between the parties. dmarcian Europe refers in this context to an e-mail Draegen sent on 4 December 2019, in which Draegen replied to a message from Groeneweg in which the latter wrote that, without a licensing agreement, dmarcian Inc is not allowed to license the applications developed by dmarcian Europe (the beginning of the dispute). In that e-mail, Draegen wrote:[5]

*"Martijn, thanks for the input. I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed.".*

3.5. As mentioned above, from 2018 onwards, dmarcian Europe – in consultation with dmarcian Inc – started to focus itself and through its Bulgarian subsidiary on the further development of the (source code of the) dmarcian software. It financed the development of the software itself, both within its own company and within dmarcian Bulgaria. The investments amounted to approximately EUR 900,000 until July 2020. Development costs currently amount to approximately EUR 550,000 per year, being 35% of the total costs incurred by dmarcian Europe. It paid for these costs from its own resources and has not relied on dmarcian Inc. for financing.[6]

3.6. The contributions made by dmarcian Europe and its subsidiary to date include developing the dmarcian software from a two-layer application to a three-layer application so that it would also be API accessible. In addition, dmarcian Europe and dmarcian Bulgaria developed various stand-alone software applications that could be used in combination with the dmarcian software. For a detailed explanation, dmarcian Europe refers to paragraphs 31 through 35 of TDX's application (Exhibit 10).

3.7. dmarcian Inc disputes the assertion that dmarcian Europe is permitted under the license granted to (further) develop the dmarcian software. This is an untenable position. Even though it is true that the dmarcian software would initially only be developed by dmarcian Inc, the parties agreed at a later time that dmarcian Europe and dmarcian Bulgaria would also engage in the development of the software (cf. section 2.13 - 2.17 above). The SaaS solutions provided by dmarcian Inc. and dmarcian Europe to their respective customers are one and the same and consist of the latest software, therefore including the substantial software contributed by dmarcian Europe and dmarcian Bulgaria. Thus, to the extent that the license issued in 2016 did not allow dmarcian Europe to further develop the dmarcian software, the scope of the license has been modified by subsequent developments. There can therefore be no question of any failure to comply with the licensing conditions and this cannot constitute a reason for terminating the existing partnership.

3.8. The defendants also realized that, as a result of this development, copyrights would arise on the part of dmarcian Europe and dmarcian Bulgaria. Discussions were held between the parties as to how to deal with these rights. In that respect, dmarcian Inc did not start from the assumption

---

[4] Cf. TDX's application in the proceedings before the Enterprise Court, paragraph 26. The credit card revenues from the dmarcian Europe application were and are paid in full to dmarcian Inc. due to technical reasons, but those revenues also accrued and accrue to dmarcian Europe. Incidentally, this is a small percentage of the total revenue (about 10%).
[5] Cf. Exhibit 8 to TDX's application in the proceedings before the Enterprise Court.
[6] Cf. paragraph 3.4. - 3.5. and Exhibit 3 to dmarcian Europe's statement of defence and para. 3.1 of the Enterprise Court's decision of 7 September 2020

13

that those rights should be assigned to dmarcian Inc for no consideration. On the contrary, dmarcian Inc acknowledged the existence of the copyrights on the part of dmarcian Inc and acknowledged that the use of those rights by dmarcian Inc required a license, but that this had not yet been agreed upon.

3.9. To substantiate this, dmarcian Europe submits as **Exhibit 18** screenshots of correspondence between Shannon Draegen, the spouse and CEO of dmarcian Inc, and Groeneweg. On 21 August 2019, Shannon Draegen made an overview of the company structure and the – according to her – existing legal situation regarding the copyright to the dmarcian software, for the purpose of an ongoing ISO certification ( ISO27001).



This overview presumes that there is a licensing agreement in place from and to both parties and therefore implies that dmarcian Inc believes – correctly – that copyright to the dmarcian software has accrued to dmarcian Europe.

3.10. Groeneweg responded to this via Slack (a chat function on the SaaS platform):

*"There's currently no licensing Agreement in place from EU to US for the software created in EU. So there should be an arrow only from USA to EU like to APAC with "Eternal License Agreement". We had a plan to merge, but as Chuck didn't agree on it, @Jim and myself decided to move on as agreed on January 22 in 2016 in 2 separate entities. Arrow from US to APAC should be "Temporary License Agreement", at least from what I know."*

Shannon Draegen responded affirmatively with a thumbs up emoji and then prepared the final version of the diagram on 3 September 2019.

14



This therefore shows that there is no license from dmarcian Europe to dmarcian Inc and that this was not only already known to dmarcian Inc's management before December 2019, but that this situation is also confirmed by dmarcian Inc.'s management.

3.11.  In addition, dmarcian Europe refers to the e-mail from Draegen to Groeneweg dated 6 August 2018 in which Draegen himself also recognises that intellectual property rights were created at dmarcian Europe and that agreement should be made about them (cf. para. 2.6 of the Enterprise Court's decision of 7 September 2020):

*There are 2 main parts to consider: 1. (...) 2. Where is global 1F located? (...) About location of IP; since EU has been licensing tech, it is likely impossible to home 1F into the EU by default, even though EU is paying to continue to develop (as US is also paying developers — so it's sort of a mixed issue). This means that some sort of asset transfer has to be made (...) along with a proper valuation of said 1F*.

3.12.  The parties have acknowledged the existence of copyright on the part of dmarcian Europe and dmarcian Bulgaria. However, they have never agreed on what should be done with those copyrights. With this, it cannot be maintained, as the defendants seem to do, that dmarcian Europe is obliged to transfer its copyright on conditions to be imposed unilaterally by dmarcian Inc.

*Copyright on modifications made to the software by dmarcian Europe and dmarcian Bulgaria.*
3.13.  To the extent that dmarcian Europe worked on the dmarcian software, this was done by dmarcian Europe employees, or at least by Kalkman. Pursuant to Article 7 of the Copyright Act, copyrights created in the service of dmarcian Europe accrue to dmarcian Europe. The employment contracts with the employees of dmarcian Europe contain an explicit provision that assigns any copyright to dmarcian Europe. It has already been explained above that the copyrights that were created at dmarcian Bulgaria were validly assigned to dmarcian Europe (cf. 2.17).

15

3.14.  The source code for the dmarcian software is on a repository managed by dmarcian Inc at gitlab.com. In computer science, the term Git is sometimes used to describe a version control system that allows programmers to keep track of changes in the code in an organized manner and to collaborate on writing software. A collection of (source code) files that are all part of the same project is called a repository. Gitlab is an online platform that provides a Git service for maintaining repositories. Thus, the repository shows all modifications or contributions (commits) made on and to the (source) code of the dmarcian software since the first moment.

3.15.  dmarcian Europe instructed the attorney A. Engelfriet of ICT Recht ("the expert") to assess whether the commits added by dmarcian Europe and dmarcian Bulgaria to the source code of the dmarcian software are copyrighted. dmarcian Europe submits the expert's report as Exhibit 19 (**Exhibit 19**).

3.16.  In the report, because of the large number of commits to the source code of the dmarcian software, a numerical approach was chosen. The expert has focused on what is referred to as the Python source code files, because the likelihood of copyright arising as a result of modifications to those files is highest in that case. Given the large number of modifications that both dmarcian Europe and dmarcian Bulgaria subsequently made to the Python source code files, the expert concluded that copyright had been acquired on the commits added thereto.

3.17.  According to Draegen's statement of defence in the proceedings before the Enterprise Court, dmarcian Inc. adopts the position that the parties agreed in December 2016 that dmarcian Europe would assign all copyrights it would acquire as a result of developing the dmarcian software to dmarcian Inc. In this respect, it relies on agreements that were never signed and a single e-mail from Groeneweg of 7 December 2016.[7] dmarcian Europe disputes the assertion that it agreed with dmarcian Inc. on the basis of those documents that all copyrights it would acquire during the partnership would be assigned or licensed to dmarcian Inc. on conditions to be unilaterally determined by the latter.

3.18.  All of these arguments were also presented to the Enterprise Court. In para. 3.4 of this decision of 7 September 2020, the Enterprise Court considered that the assessment of the contents of the licensing agreement and the question who owns the copyright to the dmarcian software must be answered by the regular civil court, but that the existing lack of clarity constitute a reason for ordering an investigation into the policies conducted within dmarcian Europe. The Enterprise Chamber thereby at least endorses that there is a lack of clarity regarding the contents of the licensing agreement and the ownership of the intellectual property rights.

3.19.  In conclusion, dmarcian Europe is of the opinion that, in view of the nature and extent of the commits it and dmarcian Bulgaria have added to the source code of the dmarcian software, the conclusions from the expert report and the transfer of copyright from dmarcian Bulgaria to dmarcian Europe, it is sufficiently plausible for the time being that it has copyright to parts of the dmarcian software and that it should be considered to be the co-owner of the current version of the dmarcian software. However, it is at least certain on the basis of the Enterprise Court's decision that there is a lack of clarity regarding the contents of the licensing agreement and the ownership

---

[7] Cf. Draegen's Statement of Defence in proceedings before the Enterprise Court, paragraph 2.38 and Exhibit 36

16

of the intellectual property rights. The latter alone should mean that the status quo should be maintained until that lack of clarity has been resolved.

**4.  Unlawfulness of termination and liability on the part of Draegen.**

4.1. The agreement and/or partnership between the parties qualifies as a continuing performance contract for an indefinite period of time. The parties did not agree on a termination arrangement.

4.2. According to established case law of the Supreme Court, such an agreement can, *in principle*, be terminated. However, the requirements of reasonableness and fairness may, depending on the nature and contents of the agreement and the circumstances of the case may (i) only permit termination if there is a sufficiently compelling ground for such termination and/or (ii) dictate that a certain notice period must be observed or that termination must be accompanied by the offer to pay compensation or damages.[8]

4.3. In assessing what can be required of the parties in this context according to the standards of reasonableness and fairness, all the circumstances of the case must be taken into account. In this respect, the following is of particular importance:

- The parties' interests: the reasonable interest of the party giving notice of termination in the termination, weighed against the reasonable interest of the party receiving notice of termination in continuation of the contract.

- The nature and term of the agreement and/or relationship: the question of whether the parties have been doing business with each other for a long time and/or whether there is a close and/or exclusive relationship.

- Dependency: the extent to which a party depends on the other party, or its revenue, and whether the continued existence of the business of the party receiving notice of termination is being jeopardized.

- The events leading up to the termination: the way in which the parties cooperated and the confidence that the party receiving notice of termination was allowed to have in the continuation of the agreement – for example, the manner in which the parties expressed themselves to each other in that context – and the reason for the termination.

- Investments: the investments made by a party. These can be compensated by observing a certain notice period or – if that is not possible – be eligible for compensation.

4.4. The foregoing is without prejudice to the fact that a continuing performance contract is non-terminable according to the parties' intentions.

*Primarily: the parties agreed that the Agreement is non-terminable*

4.5. In this case, it does not follows from the parties' intentions that the Agreement and/or their partnership cannot be terminated (or at least only under very special circumstances, which are not

---

[8] Cf. Supreme Court, 2 February 2018, ECLI:NL:HR:2018:141 (Goglio v SMQ Group) para. 3.6.1 et seq.

17

at issue here). After all, the parties agreed on a *perpetual* license (cf Draegen's e-mail under 3.4 and Shannon Draegen's 2nd overview under 3.10) in exchange for a majority interest in dmarcian Europe. This already shows that the parties had the intention that the license and therefore the distribution rights of dmarcian Europe in principle cannot be terminated.

4.6. In addition, dmarcian Europe is of the opinion that it has since become the co-copyright holder of the current version of the dmarcian software. This in any case prevents the termination of the operating agreements made.

*Alternatively: the Agreement cannot – under the current circumstances – be terminated, or can only be terminated with an urgent reason.*

4.7. To the extent that the Agreement would be terminable according to the parties' intentions, (alternatively) in light of the requirements of reasonableness and fairness and the relevant circumstances of this case, the Agreement cannot – in the current course of events – be terminated, or cannot be terminated without an urgent reason, which is lacking.

4.8. In this context, in addition to what has been noted above in the context of the parties' intentions, the following circumstances are of importance:

- There is an exclusive Agreement, which has existed for at least five years. Moreover, it involves a very close partnership. The parties' business operations are highly intertwined, as evidenced by, among other things, the (domain) names used by the parties and the presence of a source code development platform.

- The operation of the dmarcian software forms the core business of dmarcian Europe. Its business is fully designed to distribute that software and all of its customer data – and data from potential customers – is contained in the back-end of the SaaS application managed by dmarcian Inc. The continued existence of dmarcian Europe is therefore dependent on the maintenance of license and distribution rights it has acquired under the Agreement and the maintenance of access to that application. Termination of the Agreement will undoubtedly lead to its bankruptcy, resulting in all of its employees being laid off and its customers suffering considerable losses. dmarcian Europe therefore has a very significant interest in the continuation of the relationship.

- dmarcian Europe has made significant investments in the development of the dmarcian software. These investments have not been passed on to dmarcian Inc. dmarcian Inc. was aware of this and benefits from it by – without being entitled to do so – offering the software developed by and on the instructions of dmarcian Europe to third parties.

- dmarcian Inc has no legally relevant interest whatsoever in (immediate) termination of the Agreement. The only reason why it is now terminating the Agreement is because it wants to see dmarcian Europe with its hands tied in order to get it to agree to a transfer of the intellectual property rights and a distribution agreement under conditions that are very unfavourable for dmarcian Europe.

18

- The latter is all the more cogent now that there is at least a lack of clarity about the ownership of the intellectual rights to the software. In its decision, the Enterprise Court ordered an investigation into the course of events at dmarcian Europe in that regard. The Enterprise Court has also appointed a temporary director, who has been explicitly instructed to obtain clarity on the intellectual property rights and to try to reach an amicable solution between the parties involved (Enterprise Court Decision dated 7 September 2020, para. 3.5 and 3.6). The defendants' actions make it very difficult for this appointed director to carry out their tasks and present the investigator – after he will have been appointed – with a foregone conclusion, if the lack of clarity about the intellectual property rights has been resolved in the meantime by dmarcian Europe forcibly transferring those rights to dmarcian Inc. It is not clear why dmarcian Inc could not be required to at least await the actions taken by the temporarily appointed director or the investigation ordered by the Enterprise Court, at least until clarity has been obtained in proceedings on the merits about the ownership of the intellectual property rights to the current version of the dmarcian software.

- Moreover, by terminating the agreement, dmarcian Inc is acting unlawfully towards dmarcian Europe because it therefore benefits from the violation of standards by Draegen in respect of dmarcian Europe. Briefly put, this violation of standards lies in the fact that Draegen, as shareholder of dmarcian Europe, was obliged towards dmarcian Europe and other stakeholders to maintain the status quo during the investigation, which he had applied for himself. He failed to perform that obligation as he used his position as director and major shareholder of dmarcian Inc to terminate the partnership, or to exercise pressure on dmarcian Europe (as regards the violation of standards, see also sections 4.12 and 4.13 below). dmarcian Inc would not be able to terminate the partnership if its director and major shareholder, in his capacity of major shareholder of dmarcian Europe, had complied with his obligation to ensure that the status quo would be maintained during the investigation ordered. Under Dutch law, benefiting from a violation of standards by another party (in this case: Draegen) constitutes an independent unlawful act if there is knowledge of the violation of standards and additional circumstances.[9] These requirements are met in this case. That dmarcian Inc. has knowledge of the violation of standards is already evident from the coordination of dmarcian Inc. and Draegen with regard to the letters and e-mail sent by the lawyers of dmarcian Inc. and Draegen on 22 January 2021 and 26 January 2021, respectively (see section 2.26 above). The said additional circumstances – besides the mere knowledge of the violation of standards – are also at issue now that a) Draegen is director and major shareholder of dmarcian Inc and in fact co-determines the policy of dmarcian Inc and b) the Enterprise Court ordered an investigation into the policy conducted within dmarcian Europe.

4.9. In the light of these circumstances, it must be held that the requirements of reasonableness and fairness imply that the Agreement – in any case in the current course of events, or as long as the proceedings before the Enterprise Court have not been completed – cannot be terminated, or at least not without a compelling reason. For the record: there is no compelling reason for termination in this case. The mere fact that the parties are currently still in dispute about who is the owner of the intellectual property rights to the software in any case does not qualify as such. This has exactly been the reason for the Enterprise Court to grant preliminary relief.

---

[9] The Hague Court of Appeal, 28 January 2020, ECLI:NL:RBDHA:2018:2158 (Silfi – Roka) par 5.20

19

4.10. The conclusion is that the termination is unlawful and thus invalid. dmarcian Inc. therefore is and remains obliged to perform its obligations under the Agreement. Those obligations in any case include that it must allow dmarcian Europe to continue to exercise its distribution rights. For this purpose, it in any case requires uninterrupted access to the computer systems and the SaaS platform.

*As a second alternative: request to take disciplinary action*

4.11. Should this preliminary relief court find it insufficiently plausible at this time that the termination is unlawful, dmarcian Europe requests this Preliminary Relief Court – as a final alternative – to determine by way of disciplinary action, in view of the investigation ordered by the Enterprise Court, that the status quo be maintained for the duration of that investigation and that dmarcian will therefore be granted unlimited access to all systems and that the partnership cannot be terminated during that period.

*Liability on the part of Draegen*

4.12. dmarcian Europe is also of the opinion that Draegen is acting in violation of the standards of Article 2:8 DCC. Draegen is shareholder of dmarcian Europe and, moreover, applied to the Enterprise Court himself, requesting it to intervene because of a situation that has arisen partly due to his actions. In the opinion of dmarcian Europe, that position entails that Draegen has to respect the current status quo pending the investigation proceedings and that he does not – as a director and major shareholder of dmarcian Inc. – actually bring about the termination of the Agreement by dmarcian Inc. That this act serves as a means of pressure follows from the letter of Draegen himself.

4.13. In fact, Draegen also put the relations on edge by, as shareholder in dmarcian Europe, relying on Clause 4 of the exit agreement, on the condition subsequent that dmarcian Europe accepts the distribution agreement and settlement agreement attached to the letter of termination by dmarcian Inc. Although that provision does not constitute a ground for termination of the partnership between dmarcian Inc and dmarcian Europe – as they are not parties to the exit agreement – but does have great relevance for the cooperation between the shareholders, Draegen is clearly trying to increase the pressure on dmarcian Europe and its shareholders to induce them to agree to the above-mentioned distribution agreement and settlement agreement. This is a clearly pre-coordinated action between dmarcian Inc. and Draegen in person. This is apparent from the mere fact that the letters from dmarcian Inc. and Draegen, respectively, were sent by e-mail within minutes of each other. Draegen has therefore acted in violation of the care he should exercise towards dmarcian Europe and the standards of Article 2:8 DCC.

4.14. In view of the defendants' conduct thus far, dmarcian Europe can only conclude that dmarcian Inc. and Draegen will make every effort to evade a judgment from this Preliminary Relief Court. This is also evident from the e-mail from dmarcian Inc.'s lawyer in response to the notice of these preliminary relief proceedings. In that e-mail, he wrote the following on behalf of dmarcian Inc: "*[dmarcian Europe may resolve to initiate injunctive relief proceedings, but Dutch courts have no competence over [dmarcian Inc] and, consequently, a Dutch judgement cannot be enforced against it in its jurisdiction. Consequently, this will be to no avail.*".

20

4.15. In this context, it is remarkable, and in dmarcian Europe's view opportunistic, that in order to avoid these preliminary relief proceedings, the lack of jurisdiction of the Dutch court is exclusively relied on. Given the clear connection in the acts between Draegen and dmarcian Europe, dmarcian Europe is entitled to and has an interest in ensuring that Draegen is also prohibited from performing any further (unlawful) acts aimed at prejudicing it, for the benefit of dmarcian Inc. - and thereby Draegen personally. Substantial penalties for failing to comply with the judgment to be rendered by the Preliminary Relief Court are also appropriate in this light.

## 5. APPLICABLE LAW

*The relationship between dmarcian Europe and dmarcian Inc.*

5.1. The Agreement initially and primarily qualifies as a distribution agreement.[10] The parties have not agreed on a choice of law. For this reason, the Agreement is governed by the laws of the country in which dmarcian as a distributor has its habitual residence (Article 4(1) Rome I Regulation[11] in conjunction with Article 10:154 DCC). dmarcian Europe has its registered office in the Netherlands. This means that the Agreement between dmarcian Europe and dmarcian Inc. is governed by Dutch law. Furthermore, the servers hosting dmarcian Europe's SaaS platform are located on servers in Belgium and the Netherlands. Also for this reason Dutch law is applicable.

*The relationship between dmarcian Europe and Draegen*

5.2. Draegen's acts qualify as an unlawful act. This unlawful act is subject to the laws of the country in which the damage occurs (Article 4(1) Rome II Regulation in conjunction with Article 10:159 DCC).[12] The damage resulting from Draegen's actions occurs in the Netherlands. The claims of dmarcian Europe against Draegen are therefore also be governed by Dutch law.

## 6. Jurisdiction of the Dutch court

6.1. The Dutch court has jurisdiction to hear this dispute on various grounds.

6.2. First, the Dutch court has jurisdiction on the basis of Article 6 DCCP.

6.2.1.   With respect to dmarcian Europe's claims against dmarcian Inc., there is an obligation arising from an agreement. Article 6(a) DCCP stipulates that the Dutch court has jurisdiction in such a case, if the obligation underlying the claim or request has been performed or is to be performed in the Netherlands. In the event of a contract for services, the Netherlands is considered to be the place of performance if the contract stipulates that the services were provided or should have been provided in the Netherlands (Article 6a DCCP). This applies int his case. Under the Agreement, dmarcian Europe was responsible for the sale of the software and the provision of the accompanying services to customers in Europe, Russia and Africa (cf. para. 2.5 of the Enterprise Court's decision dated 7 September 2020). dmarcian Europe performed these services from its place of business, the Netherlands. For this reason, the Dutch court has jurisdiction to hear this dispute pursuant to Article 6(1) DCCP.

---

[10] In 2018, the relationship expanded to include access to source code for development purposes, as a result of which joint ownership was created.
[11] REGULATION (EC) No 593/2008 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of 17 June 2008
on the law applicable to contractual obligations ("Rome I").
[12] Regulation (EC) no. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II).

21

6.2.2.  As regards Draegen, the claims are based on obligations arising from an unlawful act. In the event of obligations arising from an unlawful act, the Dutch court has jurisdiction if the "harmful event" occurred or may occur in the Netherlands (Article 6(e) DCCP). Because Article 6(e) DCCP is based on (the predecessors of) Article 7(2) Recast Brussels I Regulation[13], the case law of the ECJ on the latter provision(s) is guiding for the interpretation thereof. It follows from that case law that the harmful event means both the place where the harmful event occurred (the *Handlungsort*) and the place where the damage occurred (the *Erfolgsort*).[14] In this case, the *Erfolgsort* is in any event located in the Netherlands. The Dutch court therefore also has jurisdiction over the claims again Draegen pursuant to Article 6 DCCP.

6.3. Incidentally, even if this were different, the Dutch court would still have jurisdiction to hear this dispute. There is a request to take protective measures, which has sufficient relevant points of reference with the Dutch legal system. After all, the dispute revolves around the termination of an agreement to be performed in the Netherlands by a Dutch party – which is thus governed by Dutch law – and related unlawful acts. These actions, moreover, seek to thwart a decision by the Dutch court, namely the Enterprise Court. In such circumstances, the jurisdiction of the Dutch court cannot be contested on the basis of Article 13 DCCP on the sole ground that the Dutch court allegedly lacks jurisdiction over a dispute in the principal action.

6.4. Finally, dmarcian Europe notes that its claims against dmarcian Inc. and Draegen are so closely related that reasons of efficiency justify a joint hearing. This means that if the Dutch court has jurisdiction over the claims against one of the defendants, it also has jurisdiction with regard to the other defendants (Article 7(1) DCCP).

**Territorial jurisdiction Rotterdam District Court**

6.5. This Preliminary Relief Court also has territorial jurisdiction.

6.6. Pursuant to Article 102 DCCP, in cases concerning obligations arising from an unlawful act, the court in the place where the harmful event occurred (also) has jurisdiction to rule on the dispute. In the present case, the harmful event occurs in the place of business of dmarcian Europe, namely in Dordrecht, from where it performs the Agreement. This Preliminary Relief Court therefore in any case has territorial jurisdiction in so far as it concerns the claims against Draegen. Now that the claims against Draegen and dmarcian Inc. are so closely related that reasons of efficiency justify a joint hearing, this Preliminary Relief Court also has territorial jurisdiction with regard to the claims against dmarcian Inc. (Article 107 DCCP).

6.7. In so far as the previous provisions would not be applicable, it also applies that this Preliminary Relief Court has jurisdiction pursuant to Article 109 DCCP, as dmarcian Europe is based in Dordrecht as claimant.

7. KNOWN DEFENCES OF DMARCIAN INC.

7.1. dmarcian Inc disputes the assertion that it has granted dmarcian Europe a perpetual, exclusive license to its software. It also disputes the assertion that dmarcian Europe acquired copyrights to the dmarcian software, or at least it adopts the position that dmarcian Europe is obliged to assign

---

[13] Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Recast Brussels I Regulation).
[14] Court of Justice 30 November 1976, C-21/76, ECLI:EU:C:1976:166 (*Mines de Potasse d'Alsace*).

22

those rights to dmarcian Inc under conditions to be determined by dmarcian Inc. dmarcian Europe has already responded to these defences above.

8.  PROOF

8.1. To substantiate its assertions, dmarcian Europe refers to the exhibits attached to this summons. Without voluntarily assuming any burden of proof, dmarcian Europe also offers to furnish additional proof of its assertions by all lawful means.

FOR WHICH REASONS:

may it please this Preliminary Relief Court, in a judgment immediately enforceable regardless of any appeal, in so far as possible, to:

In respect of dmarcian Inc.

1.  (a) primary claim: order dmarcian Inc to fully comply with the agreement existing between the parties, until it has been terminated in a legally valid manner;

    (b) in the alternative: by way of disciplinary action (i) order dmarcian Inc to maintain the status quo for the duration of the investigation ordered by the Enterprises Court and to fully comply with the agreement existing between the parties during that period and (ii) prohibit dmarcian Inc. to terminate the agreement between the parties during that period.

2.  order dmarcian Inc to lift the blockade of the employees of dmarcian Europe to the SaaS platform and the computer and other systems required for the execution of its business activities with immediate effect and to keep it lifted until the agreement existing between parties has been terminated in a legally valid manner;

3.  order dmarcian Inc. to pay a penalty of EUR 50,000 for each day that it does not, or does not fully, comply with what is claimed at 1 and 2

In respect of Draegen

4.  order Draegen to refrain from any acts, performed by himself or through a company managed by him, explicitly including dmarcian Inc, that obstruct the business operations of dmarcian Europe, until, or as a result of the investigation ordered by the Enterprise Chamber, or as a result of a judgment on the merits, clarity has been provided about the contents and scope of the licensing agreement granted to dmarcian Europe and the ownership of the copyright to the dmarcian software.

5.  order Draegen to pay a penalty of EUR 50,000 for each day that he does not, or does not fully, comply with what is claimed at 4.

in respect of dmarcian Inc. and Draegen

6.  order dmarcian Inc and Draegen to jointly and severally pay the costs of the proceedings and the subsequent costs, to be increased by statutory interest from the day of the judgment until the day of payment in full.

The costs incurred by me, bailiff, are EUR 85,81

23

This case is being handled by V. van Druenen, A. Meijboom and M. Bacon van Kennedy Van der Laan, P.O. Box 58188 st (1040 HD) Amsterdam, telephone (020) 5506 688, fax (020) 5506 788, e-mail veerle.van.druenen@kvdl.com.

24

## EXHIBITS

Exhibit 1:      Decisions Enterprises Court dated 7 and 10 September 2020

Exhibit 2:      Extract Chamber of Commerce and history dmarcian Europe

Exhibit 3:      Extracts Chamber of Commerce TDX, Groeneweg Beheer and Kalkman Holding

Exhibit 4:      Extract Bulgarian Chamber of Commerce dmarcian Bulgaria

Exhibit 5:      Correspondence between the parties confirming that the software would initially developed by dmarcian Inc.

Exhibit 6:      Correspondence with regard to Draegen's knowledge of the incorporation and objective of dmarcian Bulgaria

Exhibit 7:      Deed of transfer IP rights dmarcian Bulgaria to dmarcian Europe

Exhibit 8:      Statement of V.P. Kunze re Bulgarian law

Exhibit 9:      Procedural file proceedings Enterprises Court

Exhibit 10:     Application and memorandum of oral arguments TDX + statement of defence and memorandum of oral arguments dmarcian Europe

Exhibit 11:     Message Harmeling to shareholders dmarcian Europe dated 18 December 2020

Exhibit 12:     Correspondence with Enterprises Court re the appointment of the investigator dated 27 January 2021

Exhibit 13:     Termination letter dmarcian Inc. dated 22 January 2021 with exhibits

Exhibit 14:     Report accountant dmarcian Inc. dated 10 August 2020

Exhibit 15:     Exit Agreement

Exhibit 16:     E-mails to lawyers defendants dated 25 January 2021

Exhibit 17:     E-mails to lawyers defendants dated 26 January 2021

Exhibit 18:     Slack correspondence between Groeneweg and Shannon Draegen (CEO dmarcian Inc.) dated 29 September 2019

Exhibit 19:     Expert Report ICTRecht

25

# Judgment

**COURT OF ROTTERDAM**

Commerce and Port Team

case number / case list number: C/10/612223 / KG ZA 21-63

**Judgment in interim relief proceedings dated 01 February 2021**

in the matter of

The private company with limited liability **DMARCIAN
EUROPE B.V.,**
having its registered office in Dordrecht,
claimant,
attorney: *mr.* M.R.S. Bacon in Amsterdam,

versus

1.  the legal entity incorporated under foreign law **DMARCIAN INC.,**
    having its registered office in Brevard (North Carolina, United States of America)
2   **TIMOTHY GEORGE DRAEGEN,**
    residing in Brevard (North Carolina, United States of America),
defendants,
having failed to appear.

Below, the parties will be referred to as "dmarcian Europe", "dmarcian Inc." and
"Draegen".

1.  **The Proceedings**

1.1  The course of the proceedings is apparent from:
–   the subpoena of 29 January 2021, with exhibits;
–   the oral hearing on 01 February 2021;
–   the supplementary exhibits submitted during the oral hearing.

1.2  Pronouncement of judgment was fixed for today.

**Exhibit F**

2. **The Adjudication**

2.1   With regard to the facts and the claims reference is made to the arguments in the attached copy of the subpoena.

2.2   dmarcian Inc. and Draegen have failed to appear in the proceedings. With regard to the question of whether leave to proceed in default can be granted against them, the following is considered.

2.3   The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters of 15 November 1965 established in The Hague (the "Hague Service Convention") is applicable. Both the United States and the Netherlands are parties to this Convention.

2.4   In accordance with the Hague Service Convention on Jurisdiction and the Implementation Act of the Convention in conjunction with Section 55 subsection 1 of the Code of Civil Procedure, dmarcian Europe have delivered the writ addressed to dmarcian Inc. and Draegen on 29 January 2021 by delivering the writ to the public prosecutor's office at the Court of Rotterdam, leaving two copies of the writ and requesting that the writ be served on the defendants and/or be notified on the defendants in accordance with Articles 3 through 6 of the Hague Service Convention by service or notification in the manner prescribed by the laws of the United States of America for the service or notification of documents drawn up in that country and intended for persons residing in that country.
      In addition, dmarcian Europe had a copy of the subpoena – with an English translation – sent by emails of 29 January 2021 to (the director of) dmarcian Inc. and Draegen on the email addresses used by them (since the Enterprise Section proceedings to be referred to below) and to the Dutch attorneys of dmarcian Inc. and Draegen.

2.5   There is no evidence that the subpoena was served or delivered in person to the defendant in accordance with Article 15(1) (and 2) of the Hague Service Convention. Pursuant to Article 15(3) of the Hague Service Convention, the court hearing an application for interim relief may grant leave to proceed in default of appearance against a defendant domiciled abroad without it being necessary, in urgent cases, to prove that the conditions of Article 15(1) of the Hague Service Convention have been met. However – with due regard for the required urgency – it will have to be ensured, as much as possible in accordance with the objective of the Hague Service Convention, that an issued writ has actually reached the addressee and – if, as in this case, it concerns a subpoena – in time so that this addressee still has the opportunity to put forward a defense (see *inter alia* Supreme Court, 14 December 2007, ECLI:NL:HR:2007:BB7192).

2.6   On behalf of dmarcian Inc., by emailed letter dated 22 January 2021 T. Jansen, attorney in Amsterdam, conditionally terminated the agreement with dmarcian Europe as of 01 February 2021, and gave notice that as of that date dmarcian Europe will no longer have access to the (computer) systems.
      In an emailed letter of that same day to a (fellow) shareholder of dmarcian Europe, F. Henke and P.A. Josephus Jitta, attorneys in Amsterdam, referred to this termination letter on behalf of Draegen (CEO of dmarcian Inc.). By mails dated 25 January 2021 on behalf of dmarcian Europe, attorney V. van Druenen demanded dmarcian Inc. and Draegen via their (Dutch) attorneys to restore access to the systems. She also announced that interim relief proceedings would be brought. By mails dated 26 January 2021, the attorneys of dmarcian Inc. and Draegen informed

dmarcian Europe that their clients would not comply with this demand. By mail dated 27 January 2021, Draegen's attorney informed dmarcian Europe that his client would not elect domicile at his office.

2.7    In view of the termination letter dated 22 January 2021, the (by now partially implemented) denial of access of dmarcian Europe to the (computer) systems and the loss alleged by dmarcian Europe, the urgency of the relief sought by dmarcian Europe is sufficiently plausible.

2.8    Furthermore, it is sufficiently plausible that the subpoena sent to the (usual) e-mail addresses of dmarcian Inc. and Draegen and their attorneys have reached dmarcian Inc. and Draegen in time and that they were able to take note of it. The following aspects have been considered in this adjudication: (i) that the termination of the agreement and the notice of termination of the access to the systems were sent by the Dutch attorney of dmarcian Inc.; (ii) that Draegen was aware of this termination and the deadlines given, as appears from the e-mail of his (Dutch) attorney; (iii) that prior to these interim relief proceedings the Dutch attorneys of dmarcian Inc. and Draegen have corresponded on this matter. Given the deadlines set by dmarcian Inc. and Draegen and the communication via their (Dutch) attorneys, the (digital) dispatch is sufficient guarantee that they have timely received the subpoena, whether or not through their Dutch attorneys.
Under application of Article 15 (3) of the Hague Service Convention, there is sufficient ground to grant leave to proceed in default of appearance.

2.9    As dmarcian Europe and Draegen are domiciled in the United States, the judge in interim relief proceedings must base his competence on the provisions of the Code of Civil Procedure (CCP). With regard to the claims against dmarcian Inc., the judge in interim relief proceedings is competent under Section 6a CCP, as it is plausible that the contractual obligation on which the claim of dmarcian Europe is based (granting access to the systems) must be executed in the Netherlands. With regard to the claims against Draegen, the judge in interim relief proceedings is competent under Section 6e CCP, as it is plausible that the harmful event (the *Erfolgsort*) is located in the Netherlands.

2.10    In view of what is stated in the subpoena, the interim relief judge will apply Dutch law.

2.11    The Court does not consider the claims to be unlawful or unfounded, so that they will be awarded in the manner to be described below.

2.12    In the subpoena, dmarcian Europe asserted that the dispute between the parties concerns the substance of the agreement between dmarcian Europe and dmarcian Inc.. In this context, dmarcian Europe referred to the decision to be referred to below of the Enterprise Section of the Court of Appeal. In view of this, the primary claim under la (performance of the agreement) is insufficiently determinable. Therefore, this claim is not allowable.

2.13    By decision of 7 September 2020 in proceedings between (*inter alia*) dmarcian Europe and Draegen, the Enterprise Section ordered an investigation into the policy and course of affairs of dmarcian Europe. In this decision, the Enterprise Section considered that dmarcian Europe and dmarcian Inc. have not put sufficient regulations in place. Subsequently, the Enterprise Section considered that the parties have at least agreed on the following:

○ that dmarcian Europe has a license for the use and the sale of the software originating from dmarcian Inc.;

○ that dmarcian Europe is responsible for the sale of that software (and the provision of associated services) to customers in Europe, Russia and Africa.

2.14  In view of this, and in view of the ordered investigation and the recent appointment of an investigator, the interim relief judge deems the alternative claim under 1b allowable, on the understanding that this should in any case include the contents of the agreement as established by the Enterprise Section. In line with this allowance, dmarcian Inc. and Draegen, as claimed under 2 and partly under 4, must grant dmarcian Europe access to the (computer) systems necessary to service its customers.

2.15  The term within which dmarcian Inc. must grant this access is set at 24 hours after service of this judgment.

2.16  The penalties claimed will be moderated and maximized as mentioned in the decision.

2.17  As the parties ruled against, dmarcian Inc. and Draegen will be ordered – jointly and severally – to pay the costs of the proceedings. The costs on the part of which dmarcian Europe are estimated at:

| | | |
|---|---|---|
| — service of notice to appear | € | 85,81 |
| — court registry fee | € | 667.00 |
| — attorney's fees | € | 656.00 |
| Total | € | 1,408.81 |

2.18  The subsequent costs and the statutory interest will be allowed as mentioned in the decision.

## 3.    The Decision

The Court, giving judgment in interim proceedings:

3.1.  grants leave to proceed in default  against the defendants who failed to appear;

3.2.  orders dmarcian Inc., as a disciplinary measure, during the investigation ordered by the Enterprise Section, to perform the agreement existing between the parties and prohibits it from terminating that agreement during that period;

3.3.  orders dmarcian Inc. within 24 hours after service of this judgment to lift the blockade of (the employees of) dmarcian Europe to the SaaS platform and the (computer) systems required for the execution of its business activities and to keep it lifted until the existing agreement between the parties has been legally terminated;

3.4.  orders dmarcian Inc. to pay a penalty of €20,000 to dmarcian Europe for each day or part of a day that it fails to comply with the main order issued in operative parts 3.2 and 3.3., until a maximum of €500,000 is reached;

3.5.  orders Draegen to refrain from any action undertaken by himself or through a
      company managed by him, expressly including dmarcian Inc., which impedes the
      business operations of dmarcian Europe, until or as a result of the investigation
      ordered by the Enterprise Section, or as a result of a judgment on the merits, clarity
      has been created about the contents and scope of the license agreement granted to
      dmarcian Europe and the ownership of the IP rights to the dmarcian software;

3.6.  orders Draegen to pay a penalty to dmarcian Europe of €20,000 for each day or part
      of a day that it fails to comply with the main order pronounced in operative part
      3.4., until a maximum of €500,000 is reached;

3.7.  orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs of the
      proceedings, estimated to date at €1,408.81 on the part of dmarcian Europe, plus the
      statutory interest as referred to in Section 6:119 DCC on this amount starting
      fourteen days after service of this judgment until the day of full payment;

3.8.  orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs incurred
      after this judgment, estimated at €163.00 for the attorney's fees, to be increased, on
      condition that dmarcian Inc. and Draegen have not complied with the judgment
      within 14 days after notice was given and service was subsequently effected, by an
      amount of €85.00 for attorney's fees and the costs of serving notice of the judgment,
      and to be increased by the statutory interest as referred to in art. 6:119 DCC on the
      subsequent costs starting fourteen days after service of this judgment until the date of
      payment;

3.9.  declares this judgment provisionally enforceable up to here;

3.10.  dismisses all other claims.


This judgment was rendered by Judge P. de Bruin and pronounced in open court on
1 February 2021.

Dossiernummer: L2102720/AMS
Inzake: DMARCIAN INC., /DMARCIAN EUROPE B.V.

Laatste dag: 06-04-2021

DMARCIAN EUROPE B.V.

Burgemeester de Raadtsingel 93
3311 JG  DORDRECHT

Afdrukdatum: 6-4-2021

**Exhibit G**

1

# VERZETDAGVAARDING IN KORT GEDING

Vandaag, de zesde april tweeduizendééneentwintig

## OP VERZOEK VAN:

de rechtspersoon naar vreemd recht **DMARCIAN INC.**, gevestigd en kantoorhoudend in Brevard, North-Carolina aan het adres 43 S. Broad Street, Suite 203 (NC 28712), de Verenigde Staten van Amerika, **OPPOSANT**, die in deze zaak woonplaats kiest op het kantooradres van Lexence N.V. in Amsterdam aan de Amstelveenseweg 500 (1081 KL), van welk kantoor mr. T.S. Jansen in deze zaak als advocaat wordt gesteld,

> Heb ik, Hendrikus Oude Elferink, gerechtsdeurwaarder
> te Amsterdam en aldaar kantoorhoudende aan de
> Hogehilweg 4,

## IN KORT GEDING GEDAGVAARD:

de besloten vennootschap met beperkte aansprakelijkheid **DMARCIAN EUROPE B.V.**, statutair gevestigd en kantoorhoudend in Dordrecht aan het adres Burgemeester de Raadtsingel 93 (3311 JG), **GEOPPOSEERDE**, die in deze zaak woonplaats kiest op het kantooradres van Kennedy Van der Laan N.V. in Amsterdam aan de Molenwerf 18 (1014 BG), van welk kantoor mrs. V. van Druenen, M.R.S. Bacon en A. Meijboom in deze zaak als advocaten zijn gesteld, aldaar exploot gedaan en afschrift hiervan gelaten aan:

aldaar werkzaam        *mw. E. kuperus*

## OM:

Op 10 mei tweeduizendééneentwintig om 13:00 uur, in persoon of vertegenwoordigd door een advocaat te verschijnen op de openbare civiele terechtzitting van de voorzieningenrechter van de rechtbank Rotterdam, locatie Rotterdam, rechtsprekende in kort geding, die alsdan en aldaar zal worden gehouden in één van de zalen van het gerechtsgebouw aan de Wilhelminaplein 100-125, 3072 AK Rotterdam;

## EN AANGEZEGD:

dat opposant verzet instelt tegen het verstekvonnis van de voorzieningenrechter van de rechtbank Rotterdam, gewezen op 1 februari 2021 en verbeterd bij herstelvonnis van 2

47463/7162344.3                                                              1/8

**Lexence**
advocaten & notarissen

februari 2021 onder zaak- en rolnummer C/10/612223 / KG ZA 21-63, tussen geopposeerde als eiseres en opposant gezamenlijk met de heer **TIMOTHY GEORGE DRAEGEN**, wonend in Brevard, North-Carolina aan het adres 272 Delphia Drive, (NC 28712) de Verenigde Staten van Amerika, die in deze zaak woonplaats kiest op het kantooradres van Buren N.V. in Amsterdam aan de Strawinskylaan 1441 (1077 XX), van welk kantoor mrs. F. Henke en P.A. Josephus Jitta in deze zaak als advocaat worden gesteld, als gedaagden (**Verstekvonnis**);

### OM:

verder te procederen naar aanleiding van de op hierna te vermelden gronden aan het eind van deze dagvaarding geformuleerde eis:

**1     INLEIDING**

1.1     Opposant, dmarcian Inc. (**dmarcian**) komt met dit exploot in verzet tegen het op 1 februari 2021 door de voorzieningenrechter van de rechtbank Rotterdam gewezen vonnis (**Verstekvonnis**) tussen eiseres, thans geopposeerde, dmarcian Europe B.V. (**DME**) en dmarcian en Timothy George Draegen (**Draegen**) als gedaagden, thans opposanten.

1.2     Voor alle weren beroept dmarcian zich erop dat de Nederlandse rechter onbevoegd is om van de door DME ingestelde vorderingen kennis te nemen (**Onderdeel 2**). Als DME al in haar vorderingen kan worden ontvangen moeten deze worden afgewezen (**Onderdeel 3**).

**2     INTERNATIONALE ONBEVOEGDHEID**

2.1     Met de als productie 13 bij Dagvaarding overgelegde brief van 22 januari 2021 aan Hub Harmeling, de door de Ondernemingskamer benoemde bestuurder van DME met doorslaggevende stem, heeft dmarcian de samenwerking met DME beëindigd, onder de opschortende voorwaarde dat partijen hun rechtsverhouding niet uiterlijk op 1 februari 2021 zouden hebben geformaliseerd middels de met de brief aangeboden overeenkomsten (of voor partijen aanvaardbare varianten daarop).

2.2     In plaats van overleg, zocht DME in reactie op die brief de confrontatie door dmarcian per e-mail van 25 januari jl. te sommeren tot nakoming, bij gebreke waarvan een kort geding zou worden geëntameerd.

2.3     In reactie op deze sommatie is per e-mail van 26 januari jl. namens dmarcian gesteld dat dmarcian de bevoegdheid van de nadien door DME aangezochte voorzieningenrechter betwist:

*"The position DME is currently in, is the direct result of the misconception of its legal position and its subsequent behaviour since December 2019 that undermined the once promising cooperation between the parties. dmarcian has been fore bearing for over a year now with no movement toward a resolution. As indicated in last Friday's letter, dmarcian is no longer prepared to let DME run its course and the anticipated termination and measures taken last Friday are appropriate to protect dmarcian's legitimate interests. Having read consideration 3.4 of the 7 September 2020 decision and considering*

47463/7162344.3

2/8



*that the appointment of Mr. Harmeling has not resulted in any progress in resolving the conflict between the parties, dmarcian fails to see how the position taken in its letter of last Friday intervenes with the decision of the enterprise chamber.*

*DME may resolve to initiate injunctive relief proceedings, but Dutch courts have no competence over dmarcian and, consequently, a Dutch judgment cannot be enforced against it in its jurisdiction of residence. Consequently, this will be to no avail.*

*The appropriate way to resolve DME's concerns is by coming to terms with dmarcian."*

2.4    DME stelt in § 6.2.1. Dagvaarding evenwel dat rechtsmacht uit art. 6 Rv zou voortvloeien want DME *"was onder de Overeenkomst verantwoordelijk voor de verkoop van de software (en het leveren van de bijbehorende diensten) aan klanten in Europa, Rusland en Afrika (vgl. r.o. 2.5 van de beschikking van de Ondernemingskamer d.d. 7 September 2020). Deze diensten verrichtte dmarcian Europe vanuit haar vestigingsplaats Nederland."*

2.5    DME miskent met deze redenering evenwel dat art. 6 sub a Rv enkel rechtsmacht verschaft indien de *verbintenis die aan de eis of het verzoek ten grondslag ligt* in Nederland is of moet worden uitgevoerd.

2.6    Dat is evident niet het geval.

2.7    DME vordert in dit kort geding immers veroordeling van dmarcian om de *"bestaande overeenkomst onverkort na te komen"*, althans *"de status quo te handhaven"*, totdat deze overeenkomst (of de door de Ondernemingskamer gelaste enquête) is geëindigd, en om de *"blokkade van DME tot het SaaS-platform en de voor de uitoefening van haar bedrijfsactiviteiten vereiste (computer)systemen met onmiddellijke ingang op te heffen en opgeheven te houden"*, op straffe van dwangsommen.

2.8    Nakoming van deze vorderingen moet in de Verenigde Staten van Amerika (**VS**) worden uitgevoerd, het land waar dmarcian is gevestigd en haar bedrijfsactiviteiten uitoefent.

2.9    Nota bene: de aanname in rov. 2.9 Verstekvonnis *"dat de contractuele verbintenis die aan de eis van dmarcian Europe ten grondslag ligt (het toegang verschaffen tot de systemen) in Nederland moet worden uitgevoerd"* is derhalve feitelijk onjuist.

2.10    dmarcian is niet actief (geweest) in Nederland en haar platform draait ook niet (op een server) in Nederland.

2.11    Wellicht dat deze onjuiste aanname is gebaseerd op de stelling van DME in § 5.1 Dagvaarding:

*"Voorts staan de servers waar het Saas-platform van dmarcian Europe op servers in België en Nederland. Ook om die reden moet worden geoordeeld dat Nederlands recht van toepassing is."*

2.12    Deze stelling ziet evenwel op servers van DME. Niet op die van dmarcian.



2.13   Bij gebreke van rechtsmacht op grond van art. 6 sub a Rv kan geen bevoegdheid voor het treffen van bewarende of voorlopige maatregelen aan art. 13 Rv worden ontleend, zoals DME ten onrechte doet in § 6.3 Dagvaarding.

2.14   Evenmin kan rechtsmacht aan art. 7 Rv worden ontleend.

2.15   Los van het feit dat de voorzieningenrechter (ook) geen rechtsmacht over Draegen heeft, hebben de tegen hem ingestelde vorderingen sub 4 en 5 geen zelfstandige betekenis naast de op dmarcian sub 1 tot en met 3 gepretendeerde vorderingen. Om die reden valt ook niet in te zien welk in rechte te respecteren belang (in de zin van art. 3:303 BW) DME bij deze vorderingen heeft.

2.16   Deze vorderingen zijn dus enkel ingesteld met het doel om Draegen als ankergedaagde te gebruiken en op de grondslag van art. 7 Rv rechtsmacht over dmarcian te scheppen (vgl. § 6.4 Dagvaarding). Die misbruikelijke opzet mag vanzelfsprekend niet in rechte worden gehonoreerd en onder deze omstandigheden kan van voldoende samenhang tussen de vorderingen op gedaagden, zoals art. 7 Rv vereist, geen sprake zijn.

2.17   dmarcian concludeert derhalve dat de Nederlandse rechter onbevoegd is om van de door DME jegens haar gepretendeerde vorderingen kennis te nemen.

**3    AFWIJZING VORDERINGEN DME**

3.1   DME vindt de grondslag voor haar vorderingen tot nakoming en toegang tot het dmarcian platform in de door haar gestelde, beweerdelijk op 22 januari 2016 door Tim Draegen, dmarcian, TDX en het toenmalige Mailmerk (thans DME) gesloten mondelinge overeenkomst (vgl. § 3.1 Dagvaarding):

*"Onder deze Overeenkomst heeft dmarcian Inc aan dmarcian Europe, in ruil voor een aan dmarcian Inc en/of Draegen verstrekt optierecht om een meerderheidsbelang in dmarcian Europe te verwerven een eeuwigdurende, exclusieve licentie verstrekt voor het gebruik van de dmarcian software en de licentiering daarvan aan klanten in Europa, Rusland en Afrika;"* (§ 3.2 Dagvaarding).

3.2   Los van het feit dat Tim Draegen, dmarcian, TDX en DME op 22 januari 2016 geen rechtshandeling(en) hebben verricht, heeft dmarcian een andere visie op de afgesproken wederzijdse verplichtingen van dmarcian en DME.

3.3   Die visie is weergegeven onder het kopje *"The Contract"* van het als **Productie 2** overgelegde Memorandum of Law van 25 maart 2021 (**MoL**). Kort en goed volgt daaruit dat in een serie e-mails met bijlagen, waaronder de *Proprietary Information and Inventions Agreement* (**PIIA**) en de *Mutual Nondisclosure Agreement* (**MNDA**), afspraken blijken over een samenwerking tussen dmarcian en DME, waarvan de meest kenmerkende prestatie is dat dmarcian een licentie heeft verschaft aan DME voor het gebruik van dmarcian software.

3.4   Dat de licentieverlening door dmarcian, en niet de verkoopactiviteiten van DME, de rechtsverhouding tussen partijen het meest karakteriseert, volgt niet alleen uit de stellingen van DME zelf (vgl. o.a. § 1.1, § 2.14, § 2.31, § 2.33, § 2.34, § 3.2, § 3.3, § 3.4 en § 3.10 Dagvaarding) maar ook uit rov. 2.5 van de als productie 7 bij

47463/7162344.3                                                                                    4/8



Dagvaarding overgelegde beschikking van 7 september 2020 van de Ondernemingskamer en het gegeven dat partijen geen afspraken hebben gemaakt over de wijze waarop DME de gelicentieerde software in haar territorium verkoopt.

3.5     DME redeneert derhalve ten onrechte in § 5.1 Dagvaarding dat de rechtsverhouding *"aanvankelijk en primair als een distributieovereenkomst"* moet worden aangemerkt.

3.6     Deze stelling is niet nader onderbouwd, is niet in lijn met de rest van de Dagvaarding en enkel betrokken om naar het doel te redeneren dat Nederlands recht *in casu* van toepassing zou zijn omdat de distributeur geacht wordt de meest kenmerkende prestatie te leveren en DME in Nederland haar gewone verblijfplaats heeft.

3.7     In de omstandigheden van dit geval wordt dus op grond van art. 4 lid 2 van Verordening (EG) nr. 593/2008 (**Rome I**) vermoed dat de overeenkomst het nauwst verbonden is met de VS, het land waar dmarcian, de partij die de kenmerkende prestatie moet verrichten, haar hoofdbestuur heeft.

3.8     Dit vermoeden wordt versterkt door het gegeven dat de samenwerking software en merk- en beeldrechten tot onderwerp heeft die in de VS zijn ontwikkeld en door Amerikaanse intellectuele eigendomsrechten worden beschermd (vgl. ook onder *"Plaintiff's Business and Intellectual Property"* in het MOL). Dat de nauwste verbondenheid met de VS en niet met Nederland bestaat, volgt te meer uit het feit dat het dmarcian platform, waarop vordering sub 2 ziet, door dmarcian in de VS wordt beheerd en dat de PIIA en MNDA worden beheerst door Amerikaans recht.

3.9     De rechtsverhouding tussen dmarcian en DME wordt dus beheerst door Amerikaans recht (art. 4 leden 2 en 4 Rome I).

3.10    Naar dat recht moet dus ook de in § 4.20 Dagvaarding ten onrechte als conclusie gepresenteerde centrale vraag in dit kort geding worden beantwoord (vgl. art. 12 Rome I) of:

*"de opzegging onrechtmatig en daarmee nietig is (..) [en] Dmarcian Inc. (..) daarom gehouden [is] haar verplichtingen onder de Overeenkomst na te komen."*

3.11    DME's uiteenzetting over de rechtspraak van de HR inzake opzegging van duurovereenkomsten in § 4.2 e.v. Dagvaarding doet dus niet terzake.

3.12    Dat geldt ook voor haar beroep op redelijkheid en billijkheid, ten betoge dat de rechtsverhouding niet door dmarcian zou kunnen worden beëindigd mede vanwege de enquêteprocedure bij de Ondernemingskamer (vgl. 4.7 e.v. Dagvaarding).

3.13    Los van het feit dat dmarcian geen partij is in die procedure (en voor een ordemaatregel jegens haar daarin dus ook geen grondslag kan worden gevonden, anders: § 4.11 Dagvaarding), gelden de artt. 6:2 en 6:248 BW niet in de rechtsverhouding tussen partijen.

3.14    De bevoegdheid tot beëindiging van dmarcian moet immers naar Amerikaans recht worden beoordeeld. dmarcian's beweegredenen voor de beëindiging blijken



ondubbelzinnig uit haar als productie 13 bij Dagvaarding overgelegde brief van 22 januari 2021 aan Hub Harmeling van DME:

*"Following your appointment by decision of the Enterprise Chamber of 10 September 2020 as director of dmarcian Europe B.V. (DME), dmarcian has on various occasions urged the necessity of immediate interventions at the DME level. Reference is made to the 14 and 16 September 2020 e-mails sent by dmarcian's US counsel and the subsequent course of events. Unfortunately, these calls to action were to no avail.*

*Consequently, the unwarranted circumstances that have existed since December 2019 continue. From a business continuity perspective, dmarcian is no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to DME, whereas DME refuses to recognise and respect the proceeds of dmarcian's business efforts, i.e. challenging dmarcian IP rights, transferring operational control of dmarcian.eu and generally denying the arrangements set out in the December 2016 e-mails that were constituent of the cooperation between dmarcian and DME.*

*dmarcian has considered under which conditions it is prepared to continue its cooperation with DME.*

*These conditions have been set out in the attached Distribution Agreement and Settlement Agreement. You will appreciate that the Distribution Agreement changes the scope of the cooperation between the parties considerably. This is explained by the breach of trust caused by the sequence of events triggered by DME in December 2019. Moreover, you will appreciate that the Settlement Agreement serves to formalize and settle the constituent arrangements referred to above.*

*Please inform me whether DME will agree to the attached agreements before **1 February 2021, 17:00 CET**.*

*If the agreements are not in place by then, dmarcian will terminate the cooperation between the parties with immediate effect as per 1 February 2021. This means that, from that day on, all access to the dmarcian systems will be terminated and the use of the dmarcian brand name, domain names, other IP rights and materials is no longer allowed.*

*I can imagine that these demands may appear strict but I trust that you, as a seasoned IP lawyer, understand that under the current circumstances dmarcian does not have any other option to force a breakthrough.*

*Please feel free to contact me for a further explanation if necessary."*

3.15 Nu DME niet bereid bleek de rechtsverhouding tussen partijen te formaliseren door aanvaarding van de door dmarcian aangeboden overeenkomsten of in onderhandeling te treden met dmarcian over een voor haar wél aanvaardbare regeling, is de samenwerking tussen partijen per 1 februari jl. geëindigd.

3.16 Dat dmarcian groot belang bij de door haar geëffectueerde beëindiging heeft (vgl. § 4.8 Dagvaarding) en naar Amerikaans recht tot die beëindiging bevoegd was, volgt uit het als **Productie 2** overgelegde MoL en de als **Producties 3** en **4** overgelegde verklaringen van Shannon Draegen en Tim Draegen.

3.17 Kort en goed volgt uit die processtukken dat de beëindiging zijn primaire rechtsgrond vindt in de wanprestatie van DME onder de in 2016 gemaakte afspraken omtrent dmarcian's gerechtigdheid tot doorontwikkelingen op haar software. Daarnaast heeft DME sinds december 2019 geprobeerd om zich op oneigenlijke en onrechtmatige wijze het bedrijfsdebiet van dmarcian toe te eigenen. Deze omstandigheden rechtvaardigen

Lexence
advocaten & notarissen

de beëindiging van de samenwerkin per 1 februari jl. (en overigens het in de VS gevraagde "*injunctive relief*").

3.18  Uit genoemde documentatie volgt ook dat dmarcian betwist dat partijen een niet-opzegbare samenwerking zouden zijn aangegaan, omdat in correspondentie sprake was van een "*perpetual license*" of om andere redenen. dmarcian heeft nooit de bedoeling gehad DME niet-opzegbare rechten te verschaffen (anders: § 4.5 Dagvaarding) en voor een dergelijke vermogensoverheveling bestond (en bestaat) ook geen enkele zakelijke rechtvaardiging.

3.19  Anders dan DME in § 4.6 Dagvaarding impliceert, ziet dmarcian niet in hoe DME's claim mede-auteursrechthebbende te zijn op bepaalde doorontwikkelingen van dmarcian's software in de weg zou staan aan beëindiging van de samenwerking tussen partijen. Een dergelijke gerechtigdheid, als al aannemelijk, staat immers los van de feitelijke status van de samenwerking tussen partijen.

3.20  Nu dmarcian tot beëindiging van de samenwerking tussen partijen bevoegd was, bestaat er geen rechtsgrond voor de door DME op dmarcian gepretendeerde vorderingen en moeten de door DME gevraagde voorzieningen worden geweigerd.

3.21  Overigens meent dmarcian dat zij door de samenwerking met DME rechtsgeldig te beëindigen niet tegelijkertijd onrechtmatig jegens DME kan handelen door te profiteren van een normschending van Draegen jegens DME (vgl. § 4.8 Dagvaarding).

3.22  Immers, niet valt in te zien hoe eenzelfde gedraging in de *contractuele* rechtsverhouding tussen partijen aanvaardbaar is maar tegelijkertijd strijd kan opleveren met een jegens diezelfde (contracts)partij op grond van de wet in acht te nemen betamelijkheidsnorm.

3.23  Los van samenloop perikelen, is de argumentatie van DME gegrond op de onjuiste aanname dat:

"*dmarcian Inc (..)  de samenwerking niet [zou] kunnen beëindigen als haar bestuurder en grootaandeelhouder zich, in zijn hoedanigheid van (groot)aandeelhouder van dmarcian Europe, had gehouden aan zijn verplichting om ervoor te zorgen dat de status quo gedurende het gelaste onderzoek zou worden gehandhaafd*" (§ 4.8 Dagvaarding).

3.24  dmarcian heeft wel degelijk zonder betrokkenheid van Draegen tot beëindiging kunnen besluiten. Vanwege zijn dubbelrol was Draegen namelijk al sinds oktober 2020 binnen dmarcian niet meer verantwoordelijk voor de rechtsverhouding met DME. In dit verband is DME per e-mail van 28 oktober 2020 meegedeeld:

"*Thanks Hub  --  Some thoughts below.  My client has formed an Executive Committee of the Board of Directors, made up of Shannon Draegen, to deal with this matter.*"

3.25  Overigens ziet dmarcian, bij gebreke van een daartoe strekkende voorziening van de Ondernemingskamer, niet in hoe Draegen op de door DME gestelde wijze verplicht zou kunnen worden om de status quo te handhaven.



3.26 dmarcian concludeert derhalve dat de door DME gevraagde voorzieningen, bij gebreke van een enige rechtsplicht van dmarcian jegens DME daartoe, moeten worden geweigerd.

**4    BEWIJSMIDDELEN EN BEWIJSAANBOD**

4.1 Voor zover in het kader van dit kort geding bewijsverrichtingen zullen plaatsvinden, biedt dmarcian aan al haar stellingen, onder protest van gehoudenheid daartoe, te bewijzen door alle middelen rechtens, waaronder het in het geding brengen van nadere schriftelijke bescheiden.

**MITSDIEN:**

de voorzieningenrechter van de rechtbank Rotterdam, voor zover mogelijk uitvoerbaar bij voorraad:

1. het Verstekvonnis vernietigt en bepaalt dat dmarcian is ontheven van de veroordeling die bij verstek tegen haar is uitgesproken;

2. geopposeerde niet-ontvankelijk te verklaren in haar vorderingen, althans haar deze vorderingen te ontzeggen; en

3. DME te veroordelen in de kosten van beide instanties, te vermeerderen met de nakosten van € 157, één en ander te voldoen binnen veertien dagen na dagtekening van het te dezen te wijzen vonnis, en voor het geval en - voor het geval voldoening van de (na)kosten niet binnen de gestelde termijn plaatsvindt - te vermeerderen met de wettelijke rente over de (na)kosten te rekenen vanaf bedoelde termijn voor voldoening.

De deurwaarderskosten in verband met dit exploot zijn: Eur 85,81

Deze zaak wordt behandeld door mr. drs. T.S. Jansen van Lexence N.V. Advocaten & Notarissen, Amstelveenseweg 500 (1081 KL Amsterdam), tel.: 020 5736 812, fax: 020 5736 884, e-mail t.jansen@lexence.com.

47463/7162344.3                                                                                    8/8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.

        Plaintiff,

   v.

DMARCIAN EUROPE BV

        Defendant.

PLAINTIFF'S MOTION TO EXTEND
TIME FOR FILING OF SUPPLEMENTAL
EVIDENCE

---

NOW COMES the Plaintiff, by and through its undersigned counsel, and hereby moves to extend time to make an additional supplemental filing of evidence through April 9, 2021. In support of this Motion, the Plaintiff shows the Court as follows:

1. In its Order dated March 31, 2021 (Doc. #12, p. 14), the Court allowed Plaintiff until April 7, 2021 to submit additional evidence in support of its Motion for Preliminary Injunction.

2. The Plaintiff is filing additional evidence on April 7, 2021. However, in order to further address the Court's questions regarding the foreign proceedings, the Plaintiff wishes to submit filings made separately by Plaintiff dmarcian, Inc. and by Tim Draegen individually on April 6, 2021 in the Rotterdam Court proceedings referred to in Defendant's March 29, 2021 submissions (Doc. #10, 4; Doc #10-2) which filings challenge the Rotterdam Court's February 1, 2021 default judgment and interim relief order.

1

3.     Plaintiff wishes to make those two filings part of the Court's preliminary injunction record but requires additional time to translate such documents to English. Plaintiff is informed that such translation will be complete by April 9, 2021.

4.     Plaintiff's counsel has conferred with Defendant's counsel, who consents to this extension.

WHEREFORE, the Plaintiff prays the Court for an extension to file the translated Opposition filing in the Rotterdam proceedings through April 9, 2021.


This the 7<u>th</u> day of April, 2021.

<div style="text-align:right">

*/s/ Pamela S. Duffy*
Pamela S. Duffy, N.C.S.B. No. 18329
*pduffy@sharplesslaw.com*
Sharpless McClearn Lester Duffy, PA
200 S. Elm Street, Suite 400
Greensboro, NC 27401
Telephone:  (336) 333-6389
*Attorney for Plaintiff*

</div>

OF COUNSEL:

<div style="text-align:right">

*/s/ David Dorey*
David Dorey, DE #5283
Blank Rome, LLP
Dorey@BlankRome.com
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6418
*Attorney for Plaintiff*

</div>

2

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing MOTION was served upon counsel for all other parties to this action listed below pursuant to N.C. R. Civ. P.5(b) by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorney for dmarcian Europe BV*


This the 7th day of April, 2021.


/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21 -CV-00067

DMARCIAN, INC.

            Plaintiff,

     v.

DMARCIAN EUROPE BV

            Defendant.

FIRST AMENDED COMPLAINT

Plaintiff dmarcian, Inc. ("Plaintiff" or "dmarcian Inc.") hereby amends its Complaint[1] as a matter of right pursuant to Rule 15 of the Federal Rules of Civil Procedure and alleges as an action against dmarcian Europe BV, a Dutch private company ("Defendant" or "dmarcian BV" or "BV") as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This Fourteen Count Complaint is an action for preliminary and permanent injunctive relief and monetary damages for (i) breach of written contract, (ii) alternatively, breach of oral contract, (iii) copyright infringement in violation of Title 17 United States Code, (iv) infringement of a Federally Registered Trademark in violation of §32 of the Lanham Trademark Act of 1946 (the "<u>Lanham Act</u>"), as amended, 15 U.S.C. Section 1051 *et seq*.; (v) the use of false designations of origin in violation of §43(a) of the Lanham Act, 15 U.S.C. § 1125; (vi) defamation; (vii) misappropriation of trade secrets; (viii) computer trespass; (ix) tortious interference with contract; (x) tortious interference with prospective economic advantage; (xi)

---

[1] A redline showing the amendments is filed herewith as Exhibit D for convenience.

1

violation of the Defense of Trade Secrets Act; (xii) common law trademark infringement; (xiii) unjust enrichment; and (xiv) unfair or deceptive business practices in violation of N.C. Gen. Stat. §75-1.1.

2.      Plaintiff is the owner of a software product that provides email validation to customers to protect their accounts from phishing attacks (described in greater detail below). Defendant is a business partner who has hijacked Plaintiff's business as part of efforts to separate European operations from Plaintiff's operations.  In doing so, Defendant has engaged in multiple and brazen infringements of Plaintiff's intellectual property rights and has embarked on a scheme to deceive customers to move from Plaintiff's platform to Defendant's platform by: cloning the content and appearance of Plaintiff's website; using Plaintiff's trademarks; falsely advertising Plaintiff's executives and employees as ongoing members of Defendant's team to falsely bolster Defendant's apparent expertise; and misrepresenting to customers that there was a data breach in order to induce them to shift away from Plaintiff's platform to Defendant's platform.  Absent emergent relief to protect Plaintiff's intellectual property and business, continued conduct by Defendant will result in total destruction of Plaintiff's brand, business and reputation.

## THE PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff dmarcian, Inc. is a Delaware corporation formed in 2014 with principal place of business in Brevard, North Carolina.

4.      Plaintiff alleges that at all times relevant herein, Defendant dmarcian Europe BV is a Dutch private company with offices at 3311 JG Dordrecht, Burgemeester de Raadtsingel 93, enrolled at the Netherlands Chamber of Commerce, number 57518793.

5.      This Court has exclusive subject matter jurisdiction over this action pursuant to 17 U.S.C. §101 et seq., and 28 U.S.C. §§ 1331, 1338(a), 1338(b) and 1367(a), pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1121 and 1125, pursuant to the Defense of Trade Secrets Act, 18 U.S.C. §1832 et seq.  and under the supplemental jurisdiction of the Lanham Act, among other things.

2

6.      This Court has supplemental jurisdiction over the State law claims asserted herein because they form part of the same case and controversy as the claims arising under Federal law.7.

This Court has personal jurisdiction over dmarcian Europe BV on several grounds.  The Defendant has contracted with Plaintiff within this state, the contract and agreements at issue herein have a substantial connection to this state, and Defendant has created continuing obligations between itself and the residents of this forum.  In addition, the contract's negotiations contemplated future consequences of the parties' agreement, the terms of the contract and the parties' actual course of dealing (including without limitation a substantial part of the contract's performance necessarily occurs, is based in, and emanates from North Carolina, and Defendant's representatives have visited Plaintiff's offices in North Carolina for training and planning purposes under said agreement) establish that the parties' agreement has a substantial connection with North Carolina so that jurisdiction exercised over Defendant in this Court is consistent with Due Process.

8.      Further, the source code at issue in this dispute, while maintained on a cloud-based platform, is owned, controlled and maintained by Plaintiff from its North Carolina offices, and all customer relationships Defendant enjoyed/profited from using the Plaintiff's source code are maintained and serviced from Plaintiff's North Carolina-based principal place of business.

9.      Further, most if not all financial transactions (customers paying for the use of the Plaintiff-owned software) run through Plaintiff's North Carolina office and internal computer infrastructure and software systems.

10.     Simply put, Defendant could not and cannot possibly realize the ill-gotten gains from its infringing activities and contract breaches without the services and work on all such transactions coming from and flowing through Plaintiff's North Carolina office.

11.     The following diagram illustrates that all transactions at issue with Defendant necessarily and integrally involve, and cannot exist without Plaintiff's North Carolina-based foundational support and maintenance.  The top row lists customer activities after the customer takes action in response to the first marketing hit, through the trial period, and then final sign up

3

and payment.  The second row outlines Plaintiff's indispensable involvement in providing all marketing worldwide and capturing customer leads (all of which, *worldwide,* come through and are developed, established, routed but permanently maintained from Plaintiff's North Carolina office) and Plaintiff's continuing North Carolina-based customer maintenance activities.  And the third row outlines, once Plaintiff routes BV customer leads to BV in Europe, BV's first involvement—on the back end--after such routing.



12.     Plaintiff's customer base includes multinational companies which have a presence in both Europe and the United States.  Defendant's misuse of Plaintiff's brand and IP to service such customers in Europe necessarily and adversely impacts Plaintiff's relationships with those same customers in the United States.

13.     Venue is proper in this district because, among other reasons, under 28 U.S.C. §1391(c)(3) a defendant not resident in the United States may be sued in any judicial district.  <u>See also</u> *In re HTC Corporation*, 888 F.3d 1349 (2018).

4

## **FACTUAL ALLEGATIONS**

### I.  **DMARC, and Pioneering Development by Tim Draegen**

14.    Plaintiff is a leading technology company in DMARC email protection products and services.

15.    DMARC, which stands for "Domain-based Message Authentication, Reporting & Conformance," is an email authentication policy and reporting protocol.  It is essentially an email validation system that vests organizations with greater control over their email channels, and it protects their brands from being used in phishing[2] attacks.

16.    Ubiquitous, untrustworthy email solicitations that appear to come from—but are not from—valid, legitimate organizational sites tarnish that organization's brand and reputation.

17.    Thus, implementation of a DMARC service is invaluable to a company that seeks to prevent use and abuse of its valid domain by others to launch such cyber-attacks.

18.    The native XML format in which DMARC data is transmitted is not intended for human consumption.

19.    Plaintiff's predecessor provided DMARC services since the DMARC specification's 2012 inception.

20.    Plaintiff's DMARC SaaS[3] platform receives, processes and classifies mail observed from its customers' domain namespaces and makes sense of such data for its customers.  Plaintiff's platform visualizes the data in powerful and meaningful ways so its customers can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of their domains.

---

[2] "Phishing" involves the use of deceptive emails that appear to be (but is actually not) from an organization's valid domain/website to gather personal information.

[3] "SaaS," which stands for "Software as a Service," is a cloud-based service that runs a software application (like dmarcian's platform) through an internet browser, as opposed to the user downloading for use the software to a desktop computer or business network.

5

21.     In addition to aggregating DMARC data, Plaintiff's platform provides domain administration teams with the necessary features to adopt DMARC with clarity. The dmarcian reporting platform sits atop a very accurate source classification engine and affords users with assurances of the true origin of a particular mail stream.

22.     From small governmental organizations to Fortune 500 companies, Plaintiff dmarcian, Inc. has an international track record for helping organizations across the globe and of all sizes successfully deploy DMARC.

23.     Plaintiff's former Chief Executive Officer, Tim Draegen, was a primary author of DMARC and, among other things, wrote the Outbound Deployment Guide for a non-profit DMARC advocacy group called OTA (Online Trust Alliance) in late 2012.

24.     Until recently, Plaintiff was owned and operated by Tim Draegen and his wife, Shannon Draegen. Recently, Tim Draegen—who owns a majority interest in the Defendant-- stepped down as CEO of Plaintiff. Shannon Draegen is now the Plaintiff's CEO.

25.     One might say that Tim Draegen is the father of the DMARC interoperability standard and convention. He pioneered its development and worldwide implementation. And this work and reputation is exactly why a Dutch gentleman named Martijn Groeneweg, who ultimately partnered with Draegen to form the Defendant (as outlined below), reached out to and connected with Draegen to do DMARC business together.

26.     While at Cisco Systems as a Standards Engineer during 2007-2008, Tim Draegen conceptualized what is now known as the DMARC email authentication model. From late 2009 until DMARC was made public in early 2012, Tim worked on DMARC's core design team, from concept to specification, from prototyping to proving the technology through production deployment among top US financial institutions.

6

27.     In partnership with the Financial Services Roundtable (now known as the Bank Policy Institute or BPI), in February 2013, Tim co-authored the seminal "Email Authentication Policy and Deployment Strategy for Financial Services Firms".

28.     To facilitate worldwide adoption of DMARC, from late 2011 to early 2013, Tim chaired the Online Trust Alliance's Email Authentication Committee (now a part of The Internet Society), authoring documents such as the "OTA Deployment Guide - Outbound Email Authentication" and earning the "Online Trust Alliance's Member of the Year" in October of 2012.

29.     Recognizing that great technology still requires dedicated advocacy and professional support, Tim founded dmarcian.com in early 2012 to provide DMARC tools and services to organizations of all sizes across the globe.

30.     Tim then worked to grow the company without outside investment, traveled when needed to advocate and educate regarding DMARC, formed partnerships with non-profit technology advocacy groups, and continued to marshal the technology as Chair of the Internet Engineering Task Force's DMARC Working Group from 2014-2019.  Tim's professional work and dmarcian's established brand has resulted in a steady stream of business without the need for traditional outbound or "cold calling" sales strategies.

31.     Prior to doing business with Plaintiff, Defendant and its sponsors had no commercial DMARC experience whatsoever.

## II. **The Contract**

32.     In or about 2013, Plaintiff and Mr. Groeneweg started talking about a way that they could do business together.  Mr. Groeneweg had a small company providing consulting services regarding email marketing, not involving DMARC.

33.     Mr. Groeneweg initiated contact with Plaintiff in 2013 when he reached out directly to Mr. Draegen at Plaintiff's North Carolina home office and, through a series of email and text messages, and over several months, Plaintiff and Defendant (with Mr. Groeneweg forming Defendant for the purpose of entering into the agreement discussed herein), in or around January

7

2016, entered into a contract (the "<u>Contract</u>") that included, among others, the following key points:

       (a)     A new entity would be created in the Netherlands in order to promote dmarcian products and services in the EU.

       (b)     Messrs. Groeneweg and Draegen would split ownership of the entity with Draegen having controlling ownership.[4]  Draegen agreed to this part-ownership in order to incentivize Groeneweg to help expand DMARC throughout the European Union ("EU").

       (c)     Once Plaintiff fielded new customer inquiries from around the world, Plaintiff would route such appropriate customers to the Dutch entity who would best benefit from a point of contact closer to the customer for sales and service, although all aspects of operations, technical support and platform maintenance were fully owned and controlled by Plaintiff.

       (d)     Plaintiff granted the Defendant the right to offer and sell Plaintiff's products and services.

       (e)     Plaintiff would continue developing, supplying, and operating the DMARC SaaS services, products, and technology for all customers from its North Carolina home office.

       (f)     Plaintiff would manage from North Carolina all email domains, manage combined information technology services, and would supply sales leads to Defendant.

       (g)     Initially, Plaintiff provided its proprietary DMARC source code to Defendant for continued product and software development efforts by a group of Bulgarian developers, and in exchange, Defendant agreed that all original and newly-developed products, software, copyrights, trade secrets, intellectual property, and technical development would continue to be owned by (with IP rights from developed products accruing to) Plaintiff, and would be assigned to and owned by Plaintiff.  After some time of operation, Defendant was able to fund continued development (after subsidies from Plaintiff in the form of foregone license fees) and as further consideration for the assignment back to Plaintiff of the IP rights, Plaintiff

---

[4] Plaintiff's CEO, Mr. Draegen, owns a majority of the equity in Defendant.

8

agreed to continue not to charge Defendant licensing fees (which Defendant clearly had the ability to pay).

(h)     dmarcian Inc. also agreed to provide the BV with all operational costs and functions including business development until the BV could self-sustain (i.e., Defendant would be 100% subsidized by Plaintiff until the Defendant was able to contribute to development costs which did not occur until early 2017).

34.     In fact, once the parties agreed to these concepts, the following occurred:

(a)     Defendant was formed using an existing Dutch legal entity partially owned by Groeneweg.

(b)     Messrs. Groeneweg and Tim Draegen eventually split ownership of the newly formed entity with Draegen having controlling ownership as follows:

>   i.    Tim Draegen owns 50.01% of Defendant
>   ii.   The Digital Xpedition Holding B.V. ("TDX") is a 49.99% shareholder of Defendant
>   iii.  Individuals Martin Groeneweg and Herwert Kalkman each own 50% of TDX.

(c)     The Plaintiff fielded all leads in North Carolina and routed certain leads to the Dutch entity (the Defendant) which began serving customers in the European Union, Russia and Africa that Plaintiff.

(d)     Plaintiff continued developing, supplying, and operating the DMARC SaaS services, products, and technology from its North Carolina home location.

(e)     Plaintiff managed from North Carolina all email domains, managed and combined information technology services, and supplied a steady stream of sales leads to Defendant, on which Defendant capitalized.

(f)     And, as planned, rather than paying royalties to Plaintiff, Defendant's contribution was to fund further development of Plaintiff's source code, including *inter alia* efforts

9

by a group of Bulgarian developers with the understanding that all such work product of Defendant and/or the Bulgarian developers was to be assigned to and belong to Plaintiff.

### III. The Breach

35.      However, eventually, Defendant betrayed Plaintiff.

36.      Prior to December 2019, Defendant and the Bulgarian developers made changes to the Code on Plaintiff's servers in the US in a manner that was integrated with changes being made by the US Team and Plaintiff thereby controlled and had possession of all such source code.  Commencing in or around December 2019, and continuing up to the present, Defendant began asserting for the first time in the parties' relationship that new code developed by Defendant's employees and the Bulgarian developers belonged to BV and not Plaintiff. Defendant's assertions triggered a conversation between Plaintiff and Defendant about needing a formal assignment of any such development work consistent with the original agreement. When Plaintiff made that request, Defendant, through Groenewig, refused.

37.      Defendant refused to remedy the breach unless the minority shareholder TDX which is 50% owned by the only managing director and sole member of the Defendant's Board—received a buyout offer from Plaintiff or its principals.

38.      Defendant used Plaintiff's products, software, copyrights, trade secrets, intellectual property, and technology for years with no payments required to be made Plaintiff based on the Defendant's agreement to assign any intellectual property rights to Plaintiff. Defendant's refusal to acknowledge Plaintiff's intellectual property rights in all such work product by Defendant and the Bulgarian Developer in December of 2019 and its refusal to abide by the agreement and assign the work to Plaintiff resulted in absolutely no consideration whatsoever being paid to Plaintiff for Plaintiff's contributions to the agreement.

39.      Worse, Defendant began an intricate plan.  As described below, Defendant forcibly commandeered and used the Plaintiff's source code and other intellectual to break entirely from Plaintiff's platform and operations.  Defendant stole Plaintiff's protected software

10

code, and it created and developed websites and domains that are intentionally confusingly similar to (and actually cloned) Plaintiff's unique brand and Mark (as defined below). In essence, Defendant cloned Plaintiff's business, stole and improperly implemented Plaintiff's intellectual property, capitalized on Plaintiff's global brand, and stole and misappropriated Plaintiff's trade secrets, confidential information and customer lists and database to profit exclusively on Plaintiff's assets, to Plaintiff's compete exclusion and detriment.

## IV. <u>The Copyright</u>

40.     Before reviewing these illegal efforts, understanding the development, establishment, and protection of Plaintiff's intellectual property rights is critical.

41.     The dmarcian products, software, intellectual property, source code, and technology (the "<u>dmarcian Code</u>") was authored by, and is owned by, Plaintiff, and the Plaintiff is the sole owner in all copyrights to the dmarcian Code.

42.     Other than the Contract, Defendant had no agreement with Plaintiff authorizing it to make, use, or sell, the dmarcian Code.

43.     On or about February 18, 2021, Plaintiff filed a registration claim for the dmarcian Code with the United States Copyright Office.

44.     The registration has been accepted and confirmed by the Copyright Office and it bears Registration number TX0008941559.

## V.  <u>The Trademark</u>

45.     Plaintiff is the owner of the federally registered trademark DMARCIAN® with Federal Trademark Registration No. 5,702,379 (sometimes referred to herein as "<u>Plaintiff's Mark</u>"). Plaintiff first used this trademark in 2012, and the mark has been registered with the United States Patent and Trademark Office since 2019. (A copy of the federal registration is attached hereto as **Exhibit A).**

46.     Plaintiff's Federal Trademark Registration is current, outstanding and valid.

<p style="text-align:center">11</p>

47.     Continuously since in or about 2012, Plaintiff has used the DMARCIAN® mark to identify its products, services and software for ensuring the security of electronic mail services and to distinguish them from those offered by others, by, among other things, prominently displaying Plaintiff's Mark on its websites, advertising, business communications, and business documents, among many other things.

48.     In addition to possessing exclusive rights to the registered DMARCIAN mark, by virtue of its use in commerce, Plaintiff also owns common law rights in the  stylized mark (collectively, with the DMARCIAN mark, the "DMARCIAN Mark"). Indeed, Plaintiff has made longstanding, continuous, and exclusive use of the DMARCIAN Mark on its website (located at <dmarcian.com>) and promotional and marketing materials in connection with the provision of its software services.

49.     Through Plaintiff's extensive use and promotion of the DMARCIAN Mark since 2012, the DMARCIAN Mark has become distinctive and famous as the indication of origin of such services.  The DMARCIAN Mark is instantly recognizable and has undoubtedly acquired valuable goodwill.

**VI. Defendant's Intentional, Deliberate, and Willful Infringement and Website Cloning**

50.     In September of 2019, following commencement of some litigation against Plaintiff and others earlier in the year, Mr. Groeneweg suggested restructuring all dmarcian entities with a Dutch holding company parent for asset protection purposes.

51.     Mr. Groeneweg shared his then-recent experience with Dutch-based intellectual property laws and suggested that it might be possible to move intellectual property from the US to a Dutch holding company.

52.     Plaintiff rejected those suggestions since the original agreement required that all intellectual property rights belonged to Plaintiff.  Mr. Draegen reminded Mr. Groeneweg that, during creation of the Bulgarian subsidiary Mr. Draegen had again made clear that all intellectual property rights were to be assigned to Plaintiff.  The matter was not further discussed until

12

Defendant breached in December 2019.

53.     Following the breach in December 2019, Plaintiff's founder and former CEO, Tim Draegen, worked to get Defendant back into compliance with the agreement under which Defendant had the right to offer and sell Plaintiff's products and services in exchange for an assignment of intellectual property.

54.     Rather than taking the breach seriously or working to resolve the breach, the representative of Defendant's managing director, Martijn Groeneweg, made demands that the managing director's interest in Defendant be bought out for an outrageous amount.

55.     When it became clear that Defendant would never voluntarily cure the breach, Mr. Draegen, as majority shareholder in Defendant, called a shareholders' meeting of the Defendant for the purpose of replacing the managing director.

56.     In order to thwart Mr. Draegen's exercise of his majority interest in Defendant to replace the managing director, in or about September 2020, Defendant's managing director, TDX, filed an action with a tribunal in the Netherlands known as the "Enterprise Chamber."

57.     The Enterprise Chamber exists to try to help resolve disputes among owners of a Netherlands entity.

58.     The parties to the Enterprise Chamber proceeding were Defendant, TDX, and Tim Draegen individually.  The Plaintiff dmarcian, Inc. was not a party to these proceedings.

59.     Just before initiating the Enterprise Chamber proceeding, in or around the summer of 2020, Defendant compounded the December 2019 breach by arranging for assignment to Defendant of intellectual property rights from the Bulgarian affiliate.  These were the rights that Defendant agreed to assign to Plaintiff upon development as a condition of and as part of the consideration for Plaintiff providing to Defendant its source code for use and development as part of the original contract.

13

60.    Once the Enterprise Chamber proceeding was initiated, the Enterprise Chamber acknowledged that, since there was no fully integrated agreement, the Defendant was mismanaged, and (i) prevented TDX from being replaced, (ii) appointed Hub Harmeling as an additional managing director of Defendant, and (iii) appointed Yvette Borrius as proxy to hold all ownership interests in Defendant other than 1 share for each of Mr. Draegen and TDX, effectively divesting Mr. Draegen, as majority shareholder, of any control over the affairs of the Defendant.

61.    Mr. Harmeling conflated Mr. Draegen and Plaintiff even though they are, and always have been, two separate legal entities.  Ignoring the legal significance of Plaintiff as a corporation separate and apart from Mr. Draegen individually, and despite Plaintiff having no representation (particularly as a party disconnected from the internal corporate governance affairs and disputes of the Netherlands Defendant) in, or jurisdictional attachment in the Enterprise chamber proceeding, and despite Plaintiff having many stakeholders other than Mr. Draegen, Mr. Harmeling began making demands on Plaintiff, ostensibly through Mr. Draegen.

62.    Despite this disenfranchisement of Mr. Draegen, and despite that Plaintiff was not involved and not represented in the Enterprise Chamber proceeding, and as a way of informally seeking to resolve all disputes, Mr. Draegen attempted to discuss and resolve the Defendant's breaches during the fall of 2020.

63.    These efforts were unsuccessful.  The shareholder dispute was not resolved and neither Mr. Harmeling nor Defendant attempted to cure Defendant's breach of its agreement with Plaintiff through assignment of the intellectual property derived from Plaintiff's source code, nor were any other steps taken by Defendant to cure the breach.

**Netherlands Action**

64.    On or about January 22, 2021 Plaintiff notified Defendant that, "dmarcian is no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to," Defendant.

14

65.    Plaintiff offered a draft Settlement Agreement and a draft Distribution Agreement into which it was prepared to enter with Defendant, and informed Defendant that if a new, separate agreement was not reached, "dmarcian will terminate cooperation between the parties with immediate effect as per February 1, 2021."

66.    Defendant did not make any attempt to cure the breach or negotiate new agreements.

67.    Rather, on or about February 1, 2021, Defendant commenced an action against Plaintiff in a Rotterdam court without notice to Plaintiff, without issuance of appropriate legal process and without compliance with due process requirements.  Despite lacking personal jurisdiction over Plaintiff, Defendant sought and the Rotterdam Court issued a mandatory injunction against Plaintiff that for the duration of the Enterprise Chamber proceeding (estimated to be at least another year) required Plaintiff to restore all access to Plaintiff's platform to Defendant's employees until the agreement between the parties is validly terminated._Neither the Defendant nor the Rotterdam Court gave any recognition to Plaintiff's intellectual property rights.  Consistent with their pattern of deceptive, illegal and fraudulent conduct outlined herein, Defendant provided untrue and deceptively misleading/incorrect information to the Rotterdam Court.

68.    The Rotterdam Court (i) made no explanation of what the agreement between the parties included or said, or how it would or could be terminated, (ii) did not inquire about or consider in any way Plaintiff's several claims of intellectual property infringement alleged herein, and (iii) did not take notice that Plaintiff had been claiming breach for over a year.

69.    In contrast to the Defendant's contacts with North Carolina as described herein, the Rotterdam Court has no jurisdiction whatsoever over Plaintiff, nor does that Court have any standing to enforce Plaintiff's US-registered intellectual property rights.  Therefore, the only place that full justice can be done to protect and enforce Plaintiff's rights is in this Court.

<center>15</center>

**Defendant's Illegal Use of Plaintiff's Marks and Copyrighted Code to Deceive and Divert Plaintiff's Customers, and Ultimately to Create its Own Separate Cloned Platform Independent of Plaintiff**

70.     To protect its business pending its efforts to resolve its differences with Defendant, Plaintiff reduced Defendant's access to Plaintiff's cloud platform to allow Defendant to only service existing customers.  In response, Defendant began a calculated effort to put in place various steps to ultimately generate and steal both new and established dmarcian Inc customers through both illegal infringement of Plaintiff's protected rights in its copyright and Marks, AND by falsely and deceptively lying to customers by contending that Plaintiff had compromised their customer data and that they therefore had to move to a new platform.  Those communications falsely implied that the new platform was still maintained by the Plaintiff when in fact it was the Defendant's illegally sponsored platform set up for the purposes of diverting business from Plaintiff to Defendant.

71.     As described in more detail below, Defendant engaged in a three-step process to deceive the public and move new and established dmarcian customers into leaving dmarcian Inc. and moving those customers to Defendant's illegal platform:

(a)     Defendant intentionally copied Plaintiff's website and used Plaintiff's trademarks to trick consumers, customers and potential customers into believing its website is Plaintiff's website;

(b)     Defendant included its own contact information to divert consumers from Plaintiff to Defendant, routing Plaintiff's customers to an infrastructure controlled by Defendant and then routing the customers back to Plaintiff in what is known as a "man in the middle attack";

(c)     Defendant used the cloned website to solicit third parties to purchase Plaintiff's copyrighted software and source code, which also constitutes a confidential and protected trade secret, misleading them into believing that

16

Plaintiff was the party selling and servicing the software despite the fact that

Defendant had diverted the business to its own platform.

72.     In September 2019, while discussing with Mr. Draegen a lawsuit involving

Plaintiff, Mr. Groeneweg suggested that all dmarcian intellectual property ownership could be

transferred to a newly formed BV entity in order to shield it from a possible judgment in the

United States.

73.     If Defendant actually had any interest or rights in any of Plaintiff's intellectual

property, Mr. Groeneweg's suggestion would have made no sense, since intellectual property

resident in the Netherlands and owned by Defendant would have not needed shielding.

74.     Plaintiff is informed, and believes, and thereon alleges that it was in or about

September of 2019 when Defendant made the decision to breach its Agreement with Plaintiff and

refuse to assign the intellectual property it had agreed to assign.

75.     Disputes between the parties grew more pronounced by September 2020.  Despite

the parties' differences, and in order to do what it could within its control to support customer

relationships and protect its own reputation, Plaintiff continued to provide technology, services,

customers, and use of its trademarks to Defendant, while Defendant selfishly continued to refuse

to recognize and respect the proceeds of Plaintiff's business efforts, i.e. Defendant was exploring

transferring operational control of dmarcian.eu and generally denying the arrangements set out in

the parties' agreement.  Defendant continued to refuse or recognize and respect the proceeds of

Plaintiff's  business efforts, i.e. by challenging Plaintiff's IP rights, then stealing and using them,

then transferring to itself operational control of dmarcian.eu, and generally refusing to abide by

the arrangements set out in the December 2016 e-mails that form the basis of the parties'

agreement and which were the foundation of the parties' intended relationship.

76.      Due to Defendant's breaches and its refusal to return to the terms of the original

Contract,  Plaintiff was no longer prepared or able to continue providing technology, services,

customers, and use of its trademarks to Defendant and ceased doing so on January 22, 2021.

17

77.     When the parties' discussions for an amicable resolution were not fruitful and Plaintiff took the aforementioned steps to protect its business in January of 2021, in February and March of 2021 and continuing to present, Defendant sought to take by force what it could not obtain by agreement.  Defendant began a stepped process to establish itself as a separate "dmarcian" company that is confusingly and strikingly similar in website portrayal to Plaintiff, including but not limited to willful Copyright and trademark infringement.

78.     **First,** Defendant created websites which were strikingly similar to plaintiff's website using domain names that had been previously secured for the parties' joint benefit.  The domain names use the protected name "dmarcian" and then the country code for the host site.  Examples include "dmarcian.co.uk," "dmarcian.nl," etc.  Defendant began posting those websites for public access in late February and continuing into March 2021.

79.     The Defendant copied, in many instances word-for-word, the website pages from dmarcian Inc., even, without authorization, populating these pages with the likenesses and backgrounds of more than a dozen of Plaintiff's employees without notice or permission.

80.     Screen shot examples of pages from Plaintiff's dmarcian Inc. site ("dmarcian.com") compared to copied, unauthorized pages of one of Defendant's sites (dmarcian.co.uk) which also advertise, use and employ **without** any authorization the likenesses, experience and reputation of individuals from Plaintiff's organization:

18

Plaintiff's site:                    Defendant's UK site (with offending
                                     individuals associated with
                                     Defendant circled):

          

81.     None of these Plaintiff executives or employees gave any permission to
Defendant to use their likeness (nor did Defendant ask about it or advise it intended to do so) for
Defendant to deceptively induce new and existing customers to engage Defendant through its
cloned websites, rather than through Plaintiff's site and control.  The websites contain many
other strikingly similar pages which are designed to confuse customers into thinking that they
continue to deal with the Plaintiff.

82.     **Second**, Defendant used that cloned website to divert both new and existing
customers, re-routing them to Defendant's independent platform using Plaintiff's protected code,
websites/pages, likenesses, and Marks.

83.     Defendant has now created a platform called "dmarc advisor."  And with that
platform, comprising Plaintiff's copyrighted code (without which Defendant could not possibly
conduct this illegal business), Defendant can fully operate independent of Plaintiff's legitimate
control and influence over its business and its customers that Defendant is stealing through its
deceptively cloned websits and through, misrepresentations to customers regarding Plaintiff's

19

alleged responsibility for data breaches of customer data. There in fact has been no data breach except for the data that *that the Defendant* itself misappropriated.

84.     Specifically, Defendant's representatives have falsely informed established Plaintiff customers (who had been previously routed to Defendant under the parties' agreement) that Plaintiff has allowed a breach of their data, and the Defendant tricked the customers into providing to Defendant access to their accounts on Plaintiff's own platform (which Plaintiff had, since January 22, limited Defendant's access). Defendant then accesses the data (under the deceitful guise that it is the customer accessing its own data) and then downloads and copies that data it draws from Plaintiff's systems to establish those accounts and data *on Defendant's illegal platform.*

85.     Technically speaking, this occurs when Defendant tells a current Plaintiff customer to update their Domain Name Server ("DNS" – essentially the prime source of domain rules) to point its data directly to the DMARC administrator on Defendant's "dmarc advisor" platform. In that way all current and future developed data transfers directly to Defendant's platform and away from Plaintiff's platform and control. Defendant is using the Plaintiff's protected name, Marks, and intellectual property rights to induce current and future customers to send their data to a specific system and platform *that is <u>not</u> Plaintiff's.*

86.     In these ways, Defendant as set up a system that, using Plaintiff's copyrighted code, protected Marks, and Plaintiff's executives' and employees' likenesses (and using their established reputations and DMARC business experience to make current customers think the continuity of control through Plaintiff continues when it clearly is not, and induce new customers to go with Defendant and its internal "experts"—Plaintiff's executives and even the DMARC pioneer himself, Tim Draegen), completely mirrors and transfers the entire business to its own, Plaintiff-excluded control.

20

87.    More recently, dmarcian has expanded the provision of its software services under its widely recognized DMARCIAN Mark, a mark it has used in commerce since at least as early as January 31, 2012.

88.    Recently, Defendant and its principal, Martin Groeneweg, began using Plaintiff's intellectual property (i.e., the DMARCIAN Mark and the source code) to unlawfully solicit business to brazenly operate separate and independent of Plaintiff and Plaintiff's North Carolina-based and maintained operations, while continuing to capitalize on the name and reputation Plaintiff built in the DMARCIAN Mark.

89.    Without Plaintiff's consent or authorization, Defendant used the Dmarcian trademark, trade name, and logo to pass itself off as an affiliate called "dmarcian Europe," which Defendant is not.

90.    Evidence of Defendant's unlawful use can be found on http://dmarcian.nl/. Through that site, Defendant has illegally solicited third parties to purchase Plaintiff's copyrighted software, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.  Defendant removed operational control of the dmarcian.eu domain from dmarcian, Inc. and continues to aggravate by creating and using the dmarcian-europe domain to redirect business away from dmarcian, Inc.

91.    In addition, Defendant's employees proceeded to clone dmarcian.com's marketing website, where most business leads originate, and alter it with false information, such as redirecting all sales, support, partners, and invoices to *dmarcian-europe.com* email addresses and by placing themselves back on the "our team" (initially referencing Plaintiff's "team") page. The cloned platform (dmarc advisor) runs on stolen-from-Plaintiff dmarcian Inc. copyrighted code, and operates on www.dmarcadvisor.com.[5]

---

[5] Compare this illegal, rogue website and platform Defendant created with the Plaintiff's own website: www.dmarcian.com.  They are virtually identical in appearance and content, except the Defendant's site includes prime offender Groeneweg and other BV-connected people as part of "his" team (in addition to the unauthorized use

21

92.     The Defendant's actions have caused significant damage to Plaintiff, including expending hours of employee time to monitor, develop, and make changes to attempt to remedy the Defendant's illegal actions, and time triaging confused and misled customers.

93.     The Plaintiff has suffered and will continue to suffer irreparable harm through the unlawful redirecting of Plaintiff's business to a fraudulent website, which dramatically harms Plaintiff's brand.  The loss of business to the cloned sites is also difficult to quantify and determine because customers will incorrectly associate bad customer experiences with Plaintiff when the Defendant's sites don't work and do not provide easy points of entry for potential customers, or in the event that the security of their data is compromised.  Any defective service by Defendant will be confusingly and mistakenly attributed to Plaintiff due to Defendant's deceptive use of the Plaintiff's Marks.

~~94.~~     Plaintiff sent on February 16, 2021 to Defendant a "cease and desist" letter but to date, Defendant has completely ignored Plaintiff's demands.

95.     The avaricious pattern of conduct did not stop there.  Defendant further deceived the public through its intentional copying of Plaintiff's website to trick consumers, customers and potential customers into believing *its website is Plaintiff's website*.

96.     In fact, ***Defendant included its own contact information*** to divert consumers from Plaintiff to Defendant's separate platform.

97.     Worse, and most egregiously, ***Defendant has solicited third parties to purchase Plaintiff's copyrighted software***, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.

98.     Defendant's continued recalcitrance led to Plaintiff filing a Complaint in accordance with the Uniform Domain Name Dispute Resolution Policy ("UDRP") on February 25, 2021.

_____

of Plaintiff's executives and employees' likenesses, *and* their connection to dmarcian Inc.   There can be no greater, clear, undeniable illustration of these rogue violations than that comparison, and the others contained herein.

22

99.     Defendant does not have any right or license to use Plaintiff's Mark outside of the original parties' agreement.

100.     Defendant's separate use of Plaintiff's Mark in this and other unauthorized and illegal ways is infringing, among other things.

101.     Defendant's infringing use of Plaintiff's Mark includes its name, domain names, advertising materials, and websites, among many other things that it is using in its separate business..

102.     Such infringing use of Plaintiff's Mark by Defendant for its independent business is without permission or authorization of Plaintiff and all such use by Defendant is likely to cause, and actually has caused, confusion, or mistake, or to deceive, and falsely imply Plaintiff's affiliation with and/or sponsorship of such use.

103.     Defendant has known for several years that Plaintiff's Mark is registered in the U.S. Patent and Trademark Office.  Plaintiff has requested that Defendant cease and desist from its acts of trademark infringement.  Defendant refused, and continues to refuse, to cease such acts.

104.     By reason of Defendant's acts alleged herein, Plaintiff has and will suffer damage to its business, reputation and good will and the loss of profits Plaintiff would have made but for Defendant's acts.

105.     Defendant threatens to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to Plaintiff's irreparable damage.  It will be difficult to ascertain the amount of damages which would afford Plaintiff adequate relief for such continuing acts.  Plaintiff's remedy at law, therefore, is not adequate to compensate it for injuries actual and threatened.

**Defendant Engineers Data Breach to Steal Customer Data**

106.     Since February 1, 2021, Defendant has run roughshod through Plaintiff's systems, copying code and data where it could, engaging in rogue communications with Plaintiff's employees, and making operative dozens of domains using the DMARCIAN mark for Defendant's

23

separate business.

107.    GDPR (the General Data Protection Regulation of Europe) requires that all, "[C]ontroller[s] and processor[s] [of confidential data] shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk, including inter alia as appropriate…(b) the ability to ensure the ongoing confidentiality, integrity, availability and resilience of processing systems and services," among many other things.

108.    All users of dmarcian's platforms--including those on the previously Plaintiff-controlled EU platform--agree to dmarcian's Terms, Privacy, GDPR, and other privacy policies when signing up for an account.  This includes all users that Plaintiff eventually routed to Defendant for handling per their original arrangement.  EU credit card payers become Plaintiff's customers, and some after routing from Plaintiff become Defendant's customers (when they pay for services by check or wire with Defendant getting them to sign their contract).

109.    Defendant's actions since February 1, 2021 have caused, and continue to cause, a violation of GDPR, which subjects Plaintiff to potential liability under GDPR Article 82.  And as described below, Defendant has falsely stated to Plaintiff's customers that Plaintiff has failed to protect their personal data and that data has been compromised, when it is the Defendant's actions that have caused that to occur.

110.    An example of this just occurred on March 5, 2021.  On that date, Defendant updated the DNS (defined below) entry for "ag.dmarcian.eu" to point to infrastructure outside of dmarcian Inc.'s control, specifically for email that is destined to "CUSTOMER-TOKEN@ag.dmarcian.eu".  Through this method, Defendant gave itself access to Plaintiff's customer data to which it had no legal right.  In other words, Defendant is intercepting customer data that it never (and does not now) have a right to.

111.    In the days preceding the filing of this Complaint, Defendant also falsely represented to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

24

and falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and that Defendant is in charge of development.  A copy of Defendant's false messages to customers is attached hereto as **Exhibit B.**

112.    In addition, there are countless dmarcian Inc. (Plaintiff) users on the Defendant's fraudulent european platform that are having their data routed to infrastructure controlled by Defendant, and then Defendant at times routes the data back to dmarcian's real platform. This is a "man in the middle attack" that effectively results in Defendant stealing confidential, privileged customer data in violation of confidentiality obligations to acquire and use for its own platform moving forward, and to steal and then sustain those dmarcian Inc. customer relationships.

113.    These unauthorized Defendant actions also may violate Plaintiff's US-based SOC2 security controls, obliging Plaintiff to inform all "affected" customers, which means every single new customer coming to Plaintiff's site via dmarcian.eu (which still points to our platform) and existing customers of the past few years.  The cost to remedy and potential exposure for these fraudulent actions committed intentionally and knowingly by Defendant are enormous.

<div align="center">

**COUNT ONE**
**(Breach of Written Contract)**

</div>

114.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

115.    Plaintiff and Defendant entered into the Contract for the terms set forth above and the Contract was supported by consideration.

116.    In or around December 2019 Defendant breached the Contract, has failed and refused to cure such breach, is still in breach, and that breach is continuing (collectively, the "Breach"), insofar as Defendant has and continues to use Plaintiff's intellectual property without assigning back to Plaintiff any further developed software and without paying any other consideration for the previously permitted use of Plaintiff's intellectual property.

117.    Through the time of the Breach and thereafter, Plaintiff fully performed its

<div align="center">25</div>

obligations under the Contract.

118.    Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

## COUNT TWO
### (Breach of Oral Contract)

119.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

120.    Pleading in the alternative to a writing, Plaintiff asserts that the Contract was agreed and confirmed several times by Plaintiff and Defendant orally in conversations.

121.    Plaintiff and Defendant orally entered into the Contract and the Contract was supported by consideration as outlined previously.

122.    In or around December 2019 Defendant committed the Breach.

123.    Through the time of the Breach and thereafter, Plaintiff fully performed its obligations under the Contract.

124.    Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

## COUNT THREE
### (Copyright Infringement; 17 U.S.C. §501)

125.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

126.    Plaintiff owns the copyright in the dmarcian Code.

127.    Defendant has infringed Plaintiff's copyright in the dmarcian Code through its continued use, copying, sales, and distribution of the dmarcian Code, and Defendant's infringement continues through the present.

128.    Defendant's use of the dmarcian Code is without permission or authorization of Plaintiff.

129.    Defendant's acts are willful, intentional, and in disregard of Plaintiff's exclusive rights in the dmarcian Code.

26

130.    Following the Breach Plaintiff has demanded that Defendant cease and desist all such infringing use of the dmarcian Code, but Defendant has failed and refused and continues to fail and refuse to cease such infringing use.

131.    Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

132.    Unless enjoined by this Court, Defendant's acts of infringement will continue.

133.    As a further direct and proximate result of Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).

134.    Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

135.    Defendant's deliberate and wrongful acts of infringement have caused and continue to cause great injury and damage to Plaintiff's exclusive rights, which injury and damage cannot be adequately quantified.  As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer irreparable damage for which there is no adequate remedy at law

136.    As a result of such infringement, Plaintiff is entitled to damages, costs of suit, reasonable attorney's fees, and injunctive relief against Defendant.

## <u>COUNT FOUR</u>
### (Trademark Infringement Under The Lanham Act, 15 U.S.C. §1114)

137.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

138.    Defendant has infringed Plaintiff's Mark in interstate and international commerce by various acts, including continued use of Plaintiff's Mark in its name, continued use of Plaintiff's Mark in several domain names including dmarcian.eu, dmarcian.co.uk, finance.dmarcian.eu, among many others.

139.    Defendant's use of Plaintiff's Mark in this manner was done so to advertise, promote, offer and market Defendant's alleged independent services and DMARC platform on the internet.

140.    Such use was without authorization or permission of Plaintiff.

141.    Defendant's willful use of Plaintiff's registered Mark is likely to cause confusion or mistake among consumers, customers, and their employees as to the origin, sponsorship or approval of Defendant's goods or services.

142.    The foregoing deceptive, intentional and willful acts constitute infringement of Plaintiff's exclusive rights in its Mark in violation of 15 U.S.C. § 1114.

143.    Defendant's unauthorized use of Plaintiff's Mark has caused, is causing, will continue to cause, and is likely to cause, confusion or mistake or to deceive as to the source or origin of Defendant's products and services and as to the relationship between Plaintiff and Defendant.

144.    Plaintiff has demanded that Defendant cease and desist all such infringing, confusing and improper use of any and all confusingly similar marks, and Defendant has failed and refused and continues to fail and refuse to cease such improper use.

145.    Defendant's heretofore alleged acts of trademark infringement have been committed with the intent to cause confusion, mistake and to deceive.

146.    Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

147.    Unless enjoined by this Court, Defendant's acts of infringement will continue.

148.    As a result of such infringement, Plaintiff is entitled to damages, costs of suit and injunctive relief against Defendant.

28

## COUNT FIVE
### (False Designation under Section 43(a) of The Lanham Act, 15 U.S.C. §1125(a))

149.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

150.    Defendant is intentionally using Plaintiff's Mark as part of its company name and in doing business in interstate and international commerce, with the false designation and representation that it is affiliated with Plaintiff.

151.    This use of Plaintiff's Mark is a false designation of origin which is likely to cause, and actually has caused, confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, or approval of Defendant's products and services.

152.    This use by Defendant of Plaintiff's Mark and Defendant's false designation of origin have actually caused confusion among those with whom Plaintiff does business.

153.    These acts by Defendant are in violation of Plaintiff's rights under 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a), in that Defendant has used and is using a false designation of origin, a false or misleading description and representation of fact which is likely to cause confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, and approval of Defendant's services and commercial activities by Plaintiff.

154.    Defendant committed these acts willfully, intentionally and maliciously.

155.    Unless enjoined by this Court, Defendant will continue its acts of false designation of origin.

156.    Moreover, as a direct and proximate result of Defendant's counterfeiting of the Plaintiff's Mark, Plaintiff is entitled to reasonable attorney's fees pursuant to 15 U.S.C. § 1117(b). In addition, at Plaintiff's election, Plaintiff is entitled to the maximum statutory damages pursuant to 15 U.S.C. § 1117(c).

29

157.    As a result of Defendant's acts, Plaintiff has suffered and continues to suffer substantial harm, and is entitled to damages, costs and other remedies against Defendant.

## COUNT SIX
### (Defamation)

158.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

159.    Defendant has made false statements of fact to Plaintiff's customers and potential customers concerning Plaintiff which are damaging to its reputation:

a. a Setting up cloned websites which use Plaintiff's marks and the likenesses and information of Plaintiff's employees to falsely represent that Plaintiff's employees and executive continue to be involved in Defendant's business, and to falsely suggest that the customers continue to do business with Plaintiff when in fact it is Defendant's pirated business site;

b. Asserting that Plaintiff has had a data breach requiring Plaintiff's customers to move to a new platform, namely Defendant's pirated and unlawful new platform.

c. Falsely representing to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

d. Falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and falsely representing the extent of its responsibility for development of the Code.

160.    Defendant's defamatory statements have and proximately caused actual damages to Plaintiff in an amount to be proven at trial, and were also willful, wanton and malicious so as to warrant punitive damage.

30

**COUNT SEVEN**
**(Misappropriation of Trade Secrets)**

161.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

162.    Plaintiff is the owner of certain Trade Secrets, including:

(a) The source code for dmarcian;

(b) The customer database which includes all historical customer data, customer service requirements such as data that exposes threats and reports Plaintiffs to the customers of the various threats which is then used to provide better protection to the customers' infrastructure and protection of their domain presence, and separates the threats from legitimate mail;

(c) Account registrations for new customers or potential customers who sign up for a trial in the platform;

(e) Business and market intelligence which comes from all account registrations for new customers or potential customers in trial on the platform;

(f) The application database which includes all customer internet domains, reporting preferences, and all customers DMARC XML data as well as DMARC forensic data; and,

(c) Sales leads information from prospective customers who contacted Plaintiff.

163.    Defendant knew or should have known of the Trade Secrets.

164.    The Trade Secrets are not known or made available to the public, nor are they readily ascertainable through independent development.

165.    Plaintiff takes reasonable measures to protect the Trade Secrets from disclosure, including but not limited to:

(a) Taking security measures including protecting customer data from disclosure through logins and passwords, and two factor authentication to verify those passwords, and redundant identity checks before support is given to any

31

account;

(b)  Yearly penetration tests to make sure no one can get into the site or access the Plaintiff's code;

(c)  Protecting source code by restricting access to a need to know basis;

(d)  Plaintiff has adopted Terms of Service and a Privacy Policy;

(e)  Plaintiff's employees are required to signed confidentiality agreements and NDAs and appropriate use policies.

166.    Defendant had the specific opportunity acquire the Trade Secrets through access to Plaintiff's cloud database acquired during its business and contractual relationship with Plaintiff in which Plaintiff entrusted Defendant with login and password access for the purposes of sales and servicing of Plaintiff's European customers.

167.    Defendant did in fact acquire and use the Trade Secrets for its own and separate benefit without the Plaintiff's express or implied consent or authority, and thereby misappropriated the Plaintiff's trade secrets within the meaning of N.C.G.S. §66-152.

168.    Plaintiff is entitled to a preliminary injunction against the continued misappropriation and misuse of its Trade Secrets pursuant to N.C.G.S. §66-154(a).

169.    Plaintiff has suffered actual damages proximately caused by Defendant's misappropriation of Plaintiff's trade secrets in an amount to be proven at trial pursuant to N.C.G.S. §66-154(b).

170.    Defendant's misappropriation of trade secrets was willful and wanton and Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C.G.S. §66-154(c).

171.    Defendant's misappropriation was in bad faith and was willful and wanton, and Plaintiff is therefore entitled to recover its attorneys' fees from Defendant pursuant to N.C.G.S. §66-154(d).

32

## COUNT EIGHT
### (Computer Trespass)

172.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

173.    Plaintiff has a subscription to a service that controls a server which stores the data. Employees of both Plaintiff and Defendant, as well as employees of the Bulgarian developer, each had a dmarcian.com email address [i.e. Plaintiff's email account] which everyone logged into as a centrally located email address.  These individuals used their dmarcian.com credentials to get what the needed from the Code to make further developments to the Code.  Upon information and belief, Defendant used this access to misappropriate Code for its own purposes and to store it on a platform separate from Plaintiff's system contrary to the parties' agreement and past practice.  In or about 2021, upon information and belief Defendant began to utilize such Code for its own separate purposes.

174.    Defendant has unlawfully accessed Plaintiff's computer networks without authority and with the intent to make or cause an unauthorized copy of Plaintiff's customer data produced by the computer networks that receive DMARC data and is attempting to send it to Defendant's platform. In January of 2021, Defendant's employees were attempting to exploit a bug in Plaintiff's system to try work around Plaintiff's access controls and gain access to new customer data.

175.    Defendant's conduct constitutes computer trespass within the meaning of N.C.G.S. §14-458.

176.    Plaintiff suffered actual damages as a result of Defendant's computer trespass and is entitled to recover such damages pursuant to N.C.G.S. §1-539.2A.

33

## COUNT NINE
### (Tortious Interference with Contract)

177.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

178.    All customers of Plaintiff as well as Defendant come through Plaintiff's site and accept Plaintiff's terms of service.  When they sign up for either a trial or an account, there is a digital registration with Plaintiff for each such customer. This occurs before any customers is sent over to Defendant for continued service, and those original terms of service continue to apply. Plaintiff has valid contracts with its customers to provide services to such customers on a monthly or a yearly basis or multiyear period.

179.    Defendant knew of Plaintiff's terms of service with said customers by virtue of Defendant's prior work with Plaintiff, referrals made by Plaintiff to Defendant, and Defendant's access to Plaintiff's database.

180.    Defendant intentionally induced Plaintiff's existing customers to switch from Plaintiff's platform to Defendant's platform, thereby effectively terminating the Plaintiff's services to such customers and diverting their business from Plaintiff to Defendant.

181.    Defendant induced Plaintiff's customers to switch platforms by:

(a) Misleading them into believing that they were continuing to deal with Plaintiff by use of a false and deceptive website which cloned the information, look, and appearance of Plaintiff's website and falsely identified Plaintiff's personnel as working for Defendant.

(b) Defendant put up a banner or notification on their platform instructing customers to "update" their DMARC records to dmarcadvisor.com as opposed to dmarcian.com, falsely suggesting that it was necessary due to a purported data breach.  A copy of such banner is attached hereto as **Exhibit C.**

34

(c)    Making false statements as set forth in **Exhibit B** about Defendant's involvement and responsibility for development of Plaintiff's Code.

182.    Defendant's actions in inducing the Plaintiff's customers to leave Plaintiff's platform were without justification.

183.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

184.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

185.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to interfere with its contracts with customers, and Plaintiff is entitled to a preliminary and permanent injunction.

<div align="center">

**COUNT TEN**
**(Tortious Interference with Prospective Economic Advantage)**

</div>

186.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

187.    Prospective customers interested in Plaintiff's DMARC product and services contact Plaintiff through its website and sign up for trials.

188.    Information about prospective customers who have signed up for trials gets funneled into sales leads as shown in the diagram in Paragraph 10 herein.

189.    Plaintiff typically has approximately an average of 800 customers a month who sign up for trials, and of those customers approximately 40% become ongoing customers of Plaintiff.

190.    Plaintiff reasonably expects that customers who sign up for trials will grow into a continued customer relationship.

191.    Defendant obtained information about sales leads and prospective customers who signed up for trial periods which have a presence in Europe.  Defendant diverted such customers to its own independent platform.

<div align="center">35</div>

192.    Defendant diverted those prospective customers by misleading them into thinking they were continuing to deal with Plaintiff based on their misleading cloned website and other communications.

193.    Defendant thereby intentionally induced the prospective customers not to do business with Plaintiff and instead misappropriated such prospective customers for themselves through wrongfully obtaining information from Plaintiff's system and through misleading information provided to such customers as described above.

194.     Defendant intentionally induced Plaintiff's prospective customer away from Plaintiff's platform and diverted them to Defendant's platform.

195.    Defendant's new and unauthorized website makes it appear to the customers that they are doing business with Plaintiff when in fact the Defendant acquired the new accounts to the exclusion of Plaintiff.

196.    Defendant's actions in inducing the Plaintiff's prospective customers to do business with Defendant and not to do business with Plaintiff was without justification.

197.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

198.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

199.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to misappropriate Plaintiff's prospective customers, and Plaintiff is entitled to a preliminary and permanent injunction.

### COUNT ELEVEN
### (Defend Trade Secrets Act - 18 USC §1836)

200.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint as though fully set forth herein.

201.    Plaintiff's Trade Secrets constitute trade secrets within the meaning of 18 U.S.C. § 1839(3) because they derive independent economic value as a result of not being generally

36

known.

202.    Plaintiff has taken reasonable measures to protect the secrecy of Plaintiff's Trade Secrets, including limiting access to individuals and entities subject to duties of confidence and with a need to know specific Plaintiff's Trade Secrets, restricting access to computer systems and physical locations where Plaintiff's Trade Secrets are stored, and using passwords and physical security measures to restrict access to Plaintiff's Trade Secrets.

203.    Defendant misappropriated Plaintiff's Trade Secrets by disclosing (including among themselves) and/or continuing to use those trade secrets for their separate purposes, while knowing and/or having reason to know that Plaintiff's Trade Secrets were acquired by Defendant pursuant to the parties' Agreement and under circumstances giving rise to a duty to maintain their secrecy and limit their use to purposes for the parties' joint benefit.

204.    Defendant's use and disclosure of Plaintiff's Trade Secrets for its separate business purposes was without permission from Plaintiffs.

205.    Defendant has used the Plaintiff's Trade Secrets in interstate and/or foreign commerce within the meaning of 18 U.S.C. §18 U.S.C. §1836(b)(1).

206.    Under 18 U.S.C. §1837, this Act applies to conduct occurring outside of the United States because an act in furtherance of the offense was committed in the United States, including but not limited to:  (a) accessing Plaintiff's data located in the United States; and (b) marketing the Trade Secrets to customers in the United States through its website instructing US customers or prospective customers to register with Defendant's separate platform.

207.    Plaintiff has suffered, is suffering, and will continue to suffer irreparable harm as a result of Defendant's ongoing use and/or disclosure of Plaintiff's Trade Secrets, have no adequate remedy at law, and are entitled to an injunction requiring return of and prohibiting any further use or disclosure of Plaintiff's Trade Secrets or any information derived therefrom, pursuant to 18 U.S.C. § 1836(b)(3)(A).

208.    Plaintiff is entitled to recover an award of damages for actual loss caused by

37

Defendant's unauthorized disclosure and/or use of Plaintiff's Trade Secrets, including but not limited to lost market share, licensing revenue, and profits.

209.    Plaintiff is further entitled to recover any unjust enrichment not already computed with actual loss that was received by Defendant as a result of Defendant's unauthorized disclosure and/or use of Plaintiff's Trade Secrets.

210.    Because Defendant willfully and maliciously misappropriated Plaintiff's Trade Secrets, Plaintiff is entitled to recover an award of exemplary damages up to two times the sum of actual loss and unjust enrichment damages and an award of Plaintiffs' attorney fees pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D).

<div align="center">

**COUNT TWELVE**
**(Common Law Infringement)**

</div>

211.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint as though fully set forth herein.

212.    By virtue of having used and continuing to use dmarcian's Trademarks, Plaintiff has acquired common law rights therein.

213.    Defendant's unauthorized use of Plaintiff's Marks in connection with Defendant's directly competing business infringes Plaintiff's common law trademark rights and is likely to cause confusion, mistake, or deception among clients, who will believe that Defendant's business and services originate from, are affiliated with, or are sponsored by Plaintiff or *vice versa* when, in fact, they no longer are.

214.    Defendant's use of Plaintiff's Marks is likely to unfairly divert trade away from Plaintiff and to damage Plaintiff's goodwill, business, and reputation.

215.    As a direct and proximate result of Defendant's infringement of common law trademark rights, Plaintiff has been and will continue to be damaged in an amount to be proven at trial, in a manner and amount that cannot be fully quantified or compensated in economic terms and for which there is no adequate remedy at law. Such irreparable harm will continue unless and until Defendant's acts complained of herein are enjoined during the pendency of this

<div align="center">

38

</div>

action and permanently thereafter.

## COUNT THIRTEEN
### (Unjust Enrichment – In the Alternaative to Counts I & II)

216.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint as though fully set forth herein.

217.    In the alternative, Plaintiff conferred to Defendant a substantial benefit from use of Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information.

218.    Defendant's use of Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information was not gratuitous.

219.    Defendants' use of Plaintiffs Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information is measurable because Defendant has made substantial revenue from and continue to derive pecuniary gain through the unauthorized use, and Defendant also previously generated revenue for Plaintiff from credit card sales.

220.    Defendant consciously accepted the benefits gained from unauthorized use of the Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information.

221.    Defendant has been and continues to be unjustly enriched by use of the Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information.

222.    As a direct and proximate result of Defendant's unjust actions, Plaintiff is entitled to recover an amount at least equal to the amount of the revenues Defendant unjustly received from use of Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary

39

information.

## COUNT FOURTEEN
### (Unfair or Deceptive Business Practices)

200.    Plaintiff realleges and incorporates herein by references paragraphs 1-114 and paragraphs 138-222 of this complaint as though fully set forth herein.

201.    Defendant's conduct as set forth in Counts Four through Thirteen of the Complaint is unfair and deceptive within the meaning of N.C. Gen. Stat. §75-1.1.

202.    Defendant's unfair and deceptive conduct is in and affecting commerce.

203.    Defendant's unfair and deceptive conduct proximately caused actual damages to Plaintiff.

204.    Plaintiff is entitled to recover treble damages from Defendant pursuant to N.C.G.S. §75-16.

205.    Plaintiff is entitled to recover its reasonable attorneys' fees from Defendant pursuant to N.C.G.S. §75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff dmarcian, Inc. prays for judgment against Defendant dmarcian Europe BV. as follows:

A.    Entry of a preliminary injunction, to be effective throughout the pendency of this action, enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1)    from making, using, distributing, and selling the dmarcian Code.

(2)    from directly or indirectly using the Plaintiffs DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive;

(3)    from infringing Plaintiff's copyright in the afore-described computer program/software; and

40

(4)    from otherwise unfairly competing with Plaintiff.

B.    Entry of a permanent injunction perpetually enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1)    from making, using, distributing, and selling the dmarcian Code.

(2)    from engaging in any other activity constituting an infringement of the dmarcian Code;

(3)    from directly or indirectly using Plaintiff's DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive; and

(4)    from otherwise unfairly competing with Plaintiff.

(5)    from engaging in any other activity constituting an infringement of Plaintiff's Mark or constituting unfair competition with Plaintiff; and

(6)    from assisting, aiding and abetting any other person or business entity in engaging in any activities referred to in subparagraphs (1) through (5) above.

C.    Entry of judgment ordering that all labels, signs, prints, promotions, advertisements, letterhead, business cards, collateral literature and media, domain names, and web pages in the possession or control of Defendant bearing Plaintiff's Mark and all plates, molds, matrices and other means of making the same, shall be delivered to Plaintiff for destruction.

D.    Entry of judgment requiring transfer from Defendant to Plaintiff of all dmarcian domains and that are not otherwise destined for destruction.

E.    Entry of judgment requiring Defendant, within thirty days after the service of judgment upon it, to file with the Court, and serve upon counsel for Plaintiff, a written report under

41

oath setting forth in detail the manner in which Defendant has complied with paragraphs A through C above.

F.      Damages according to proof for Defendant's Breach of the written Contract.

G.      In the alternative, Damages according to proof for Defendant's Breach of the oral Contract.

H.      Entry of judgment finding that Defendant, through its copying, use, reproduction, distribution, and sales of the dmarcian Code has infringed Plaintiff's copyright in the dmarcian Code under 17 U.S.C. §501;

I.      Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has infringed Plaintiff's registered mark under 15 U.S.C. §1114;

J.      Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has created false designations of origin and false or misleading descriptions of fact in violation of 15 U.S.C. §1125(a);

K.      Entry of judgment that the unfair or deceptive acts or practices of Defendant were committed willfully or knowingly, and that Plaintiff be awarded up to three times its actual damages together with its costs and attorney's fees as a result of the same;

L.      Entry of judgment requiring Defendant to account to Plaintiff for any and all profits derived by Defendant from the sale of its services and for all damages sustained by Plaintiff by reason of Defendant's infringement and unfair competition complained of herein.

M.      Entry of judgment awarding Plaintiff punitive and exemplary damages due to Defendant's wilful acts and infringement complained of herein.

42

N.      Entry of judgment awarding Plaintiff its attorney's fees and costs incurred in the prosecution of this action pursuant to the Lanham Act, 15 USC §1117, and pursuant to 17 U.S.C. §505, together with such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims or issues so triable.

This the 7th day of April, 2021.

<div style="text-align:right">

/s/ Pamela S. Duffy_____
Pamela S. Duffy, N.C. Bar. No. 18329
*pduffy@sharplesslaw.com*
Sharpless McClearn Lester Duffy, PA
200 S. Elm Street, Suite 400
Greensboro, NC 27401
Telephone: (336) 333-6389
Attorney for Plaintiff

OF COUNSEL:

/s/ David Dorey _____
David Dorey, DE #5283
Blank Rome, LLP
Dorey@BlankRome.com
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6418
Attorney for Plaintiff

</div>

43

*CERTIFICATE OF SERVICE*

I hereby certify that the foregoing First Amended Complaint was served upon counsel for all other parties to this action listed below pursuant to N.C. R. Civ. P.5(b) by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorney for dmarcian Europe BV*

This the 7th day of April 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
SHARPLESS McCLEARN LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiff*

44

STATE OF NORTH CAROLINA

TRANSYLVANIA COUNTY

**VERIFICATION**

    I, Shannon Draegen, declare under the pains and penalties of perjury that the facts set forth in the foregoing First Amended Complaint are true except those matters and things stated upon information and belief, and as to those matters and things, I believe them to be true.

    This the ___7th___ day of _____April_____, 2021.

*Shannon Draegen*

_____

Shannon Draegen

Document Ref: UFZX6-LZZPQ-PDFKF-PQSIF

Page 1 of 1

# Signature Certificate

Document Ref.: UFZX6-LZZPQ-PDFKF-PQSIF

Document signed by:



Verified E-mail:
shannon@dmarcian.com

IP: 68.235.242.215    Date: 07 Apr 2021 20:15:51 UTC

*Shannon Draegen*

Document completed by all parties on:
07 Apr 2021 20:15:51 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



-484-

# United States of America

## United States Patent and Trademark Office

# DMARCIAN

**Reg. No. 5,702,379**

**Registered Mar. 19, 2019**

**Int. Cl.: 9**

**Trademark**

**Principal Register**

dmarcian, Inc. (DELAWARE CORPORATION)
Po Box 1007
Brevard, NORTH CAROLINA 28712

CLASS 9: Software for ensuring the security of electronic mail

FIRST USE 1-31-2012; IN COMMERCE 1-31-2012

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY
PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 88-062,994, FILED 08-02-2018



Director of the United States
Patent and Trademark Office



EXHIBIT
A

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:** Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at h ttp://www.uspto.gov.

**NOTE:** A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at http://www.uspto.gov.



# @marcian

**CLICK HERE TO ACTIVATE YOUR ACCOUNT ON OUR SAFE NEW PLATFORM: 1) TYPE YOUR EMAIL ADDRESS 2) CLICK "RESET PASSWORD"**

It is important for you to know that more than 50% of the dmarcian application (the use of which was always shared between the cooperating parties) was in fact developed by our development teams in Dordrecht (Netherlands) and Varna (Bulgaria). In addition, more than 80% of development capacity since 2018 as well as future development capacity of dmarcian software is managed out of dmarcian Europe.

Dmarcian, Inc. is spreading misleading information about the relation between dmarcian, Inc. and dmarcian Europe BV regarding licensing and software ownership. If you receive such information, we are grateful if you would share such information with us via securityofficer@dmarcadvisor.com.

In case you would like to read more about the mentioned dispute regarding licensing and software ownership, please read the Enterprise Court ruling of September 2020: https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:GHAMS:2020:2536.

**Of course we offer you assistance**

We apologize for the inconvenience caused as a result of the actions mentioned above. We are committed to taking our user's data security seriously and, consequently, we see no other way of guaranteeing your data privacy and business continuity for the future.

In case any of the above is unclear, or if you would like (free) assistance from one of our DMARC experts, please do not hesitate to contact us at support@dmarcadvisor.com. For inquiries about the data breach, you can reach out to our security officer at securityofficer@dmarcadvisor.com. We will help you in any way we can to make the transition as smooth as possible.

We hope to welcome you soon on our safe new platform!

Kind regards,

The board of dmarcian Europe BV

© 2021 Dmarcian.eu, Dmarcian Europe BV

EXHIBIT
_B_
tbbbies



dmarcian We help people deploy DMARC

As of GDPR compliance, we strongly advise to update your DMARC records:

Please change your RUA to <your-unique-token>@ag.eu.dmarcadvisor.com. Please change your RUF to <your-unique-token>@fr.eu.dmarcadvisor.com.
If this is already the case, you can ignore this message. If you have questions, please contact support@dmarcadvisor.com

## Get Started On Your Free Trial

So that we can offer you the trial experience that will best serve your needs, please complete the form below. You will receive an email upon creating your account, asking you to confirm. From there, we will email you important information relevant to your free trial and provide support if needed.

If this account is for personal use, with less than 10,000 messages per month and no more than 2 domains, it will qualify for our Free pricing tier.

Email Address*

You will use it to login into your account.

Domain Name*

You can always change it or add more domains to your account later.

Enterprise

Select the type of account you would like to trial.

You are registering with

dmarcadvisor Europe/Africa/Russia

EXHIBIT

tabbies

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21 -CV-00067

DMARCIAN, INC.

      Plaintiff,

  v.

DMARCIAN EUROPE BV

      Defendant.

FIRST AMENDED COMPLAINT

---

   Plaintiff dmarcian, Inc. ("Plaintiff" or "dmarcian Inc.") hereby amends its Complaint[1] as a matter of right pursuant to Rule 15 of the Federal Rules of Civil Procedure and alleges as an action against dmarcian Europe BV, a Dutch private company ("Defendant" or "dmarcian BV" or "BV") as follows:

**NATURE OF THE ACTION**

   1.  This FourteenEleven Count Complaint is an action for preliminary and permanent injunctive relief and monetary damages for (i) breach of written contract, (ii) alternatively, breach of oral contract, (iii) copyright infringement in violation of Title 17 United States Code, (iv) infringement of a Federally Registered Trademark in violation of §32 of the Lanham Trademark Act of 1946 (the "Lanham Act"), as amended, 15 U.S.C. Section 1051 *et seq.*; (v) the use of false designations of origin in violation of §43(a) of the Lanham Act, 15 U.S.C. § 1125; (vi) defamation; (vii) misappropriation of trade secrets; (viii) computer trespass; (ix) tortious interference with contract; (x) tortious interference with prospective economic advantage; (xi)

---

[1] A redline showing the amendments is filed herewith as Exhibit D for convenience.

1

violation of the Defense of Trade Secrets Act; (xii) common law trademark infringement; (xiii) unjust enrichment; and (xiv~vi~) unfair or deceptive business practices in violation of N.C. Gen. Stat. §75-1.1.

2.      Plaintiff is the owner of a software product that provides email validation to customers to protect their accounts from phishing attacks (described in greater detail below). Defendant is a business partner who has hijacked Plaintiff's business as part of efforts to separate European operations from Plaintiff's operations.  In doing so, Defendant has engaged in multiple and brazen infringements of Plaintiff's intellectual property rights and has embarked on a scheme to deceive customers to move from Plaintiff's platform to Defendant's platform by: cloning the content and appearance of Plaintiff's website; using Plaintiff's trademarks; falsely advertising Plaintiff's executives and employees as ongoing members of Defendant's team to falsely bolster Defendant's apparent expertise; and misrepresenting to customers that there was a data breach in order to induce them to shift away from Plaintiff's platform to Defendant's platform.  Absent emergent relief to protect Plaintiff's intellectual property and business, continued conduct by Defendant will result in total destruction of Plaintiff's brand, business and reputation.

## THE PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff dmarcian, Inc. is a Delaware corporation formed in 2014 with principal place of business in Brevard, North Carolina.

4.      Plaintiff alleges that at all times relevant herein, Defendant dmarcian Europe BV is a Dutch private company with offices at 3311 JG Dordrecht, Burgemeester de Raadtsingel 93, enrolled at the Netherlands Chamber of Commerce, number 57518793.

5.      This Court has exclusive subject matter jurisdiction over this action pursuant to 17 U.S.C. §101 et seq., and 28 U.S.C. §§ 1331, 1338(a), 1338(b) and 1367(a), pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1121 and 1125, pursuant to the Defense of Trade Secrets Act, 18 U.S.C. §1832 et seq. and under the supplemental jurisdiction of the Lanham Act, among other things.

2

6.      This Court has supplemental jurisdiction over the State law claims asserted herein because they form part of the same case and controversy as the claims arising under Federal law.

7.      This Court has personal jurisdiction over dmarcian Europe BV on several grounds. The Defendant has contracted with Plaintiff within this state, the contract and agreements at issue herein have a substantial connection to this state, and Defendant has created continuing obligations between itself and the residents of this forum.   In addition, the contract's negotiations, contemplated future consequences of the parties' agreement, the terms of the contract and the parties' actual course of dealing (including without limitation a substantial part of the contract's performance necessarily occurs, and is based in, and emanates from North Carolina, and Defendant's representatives have visited Plaintiff's offices in North Carolina for training and planning purposes under said agreement) establish that the parties' agreement has a substantial connection with North Carolina so that jurisdiction exercised over Defendant in this Court is consistent with Due Process.

8.      Further, the source code at issue in this dispute, while maintained on a cloud-based platform, is owned, controlled and maintained by Plaintiff from its North Carolina offices, and all customer relationships Defendant enjoyed/profited from using the Plaintiff's source code are maintained and serviced from Plaintiff's North Carolina-based principal place of business.

9.      Further, most if not all financial transactions (customers paying for the use of the Plaintiff-owned software) run through Plaintiff's North Carolina office and internal computer infrastructure and software systems.

10.     Simply put, Defendant could not and cannot possibly realize the ill-gotten gains from its infringing activities and contract breaches without the services and work on all such transactions coming from and flowing through Plaintiff's North Carolina office.

11.     The following diagram illustrates that all transactions at issue with Defendant necessarily and integrally involve, and cannot exist without Plaintiff's North Carolina-based foundational support and maintenance.  The top row lists customer activities after the customer

3

takes action in response to the first marketing hit, through the trial period, and then final sign up and payment. The second row outlines Plaintiff's indispensable involvement in providing all marketing worldwide and capturing customer leads (all of which, *worldwide,* come through and are developed, established, routed but permanently maintained from Plaintiff's North Carolina office) and Plaintiff's continuing North Carolina-based customer maintenance activities. And the third row outlines, once Plaintiff routes BV customer leads to BV in Europe, BV's first involvement—on the back end--after such routing.



12. Plaintiff's customer base includes multinational companies which have a presence in both Europe and the United States. Defendant's misuse of Plaintiff's brand and IP to service such customers in Europe necessarily and adversely impacts Plaintiff's relationships with those same customers in the United States.

13. Venue is proper in this district because, among other reasons, under 28 U.S.C. §1391(c)(3) a defendant not resident in the United States may be sued in any judicial district. See also *In re HTC Corporation*, 888 F.3d 1349 (2018).

4

## FACTUAL ALLEGATIONS

### I.   DMARC, and Pioneering Development by Tim Draegen

14.     Plaintiff is a leading technology company in DMARC email protection products and services.

15.     DMARC, which stands for "Domain-based Message Authentication, Reporting & Conformance," is an email authentication policy and reporting protocol.  It is essentially an email validation system that vests organizations with greater control over their email channels, and it protects their brands from being used in phishing[2] attacks.

16.     Ubiquitous, untrustworthy email solicitations that appear to come from—but are not from—valid, legitimate organizational sites tarnish that organization's brand and reputation.

17.     Thus, implementation of a DMARC service is invaluable to a company that seeks to prevent use and abuse of its valid domain by others to launch such cyber-attacks.

18.     The native XML format in which DMARC data is transmitted is not intended for human consumption.

19.     Plaintiff's predecessor provided DMARC services since the DMARC specification's 2012 inception.

20.     Plaintiff's DMARC SaaS[3] platform receives, processes and classifies mail observed from its customers' domain namespaces and makes sense of such data for its customers.  Plaintiff's platform visualizes the data in powerful and meaningful ways so its customers can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of their domains.

---

[2] "Phishing" involves the use of deceptive emails that appear to be (but is actually not) from an organization's valid domain/website to gather personal information.

[3] "SaaS," which stands for "Software as a Service," is a cloud-based service that runs a software application (like dmarcian's platform) through an internet browser, as opposed to the user downloading for use the software to a desktop computer or business network.

5

21.     In addition to aggregating DMARC data, Plaintiff's platform provides domain administration teams with the necessary features to adopt DMARC with clarity. The dmarcian reporting platform sits atop a very accurate source classification engine and affords users with assurances of the true origin of a particular mail stream.

22.     From small governmental organizations to Fortune 500 companies, Plaintiff dmarcian, Inc. has an international track record for helping organizations across the globe and of all sizes successfully deploy DMARC.

23.     Plaintiff's former Chief Executive Officer, Tim Draegen, was a primary author of DMARC and, among other things, wrote the Outbound Deployment Guide for a non-profit DMARC advocacy group called OTA (Online Trust Alliance) in late 2012.

24.     Until recently, Plaintiff was owned and operated by Tim Draegen and his wife, Shannon Draegen. Recently, Tim Draegen—who owns a majority interest in the Defendant-- stepped down as CEO of Plaintiff. Shannon Draegen is now the Plaintiff's CEO.

25.     One might say that Tim Draegen is the father of the DMARC interoperability standard and convention. He pioneered its development and worldwide implementation. And this work and reputation is exactly why a Dutch gentleman named Martijn Groeneweg, who ultimately partnered with Draegen to form the Defendant (as outlined below), reached out to and connected with Draegen to do DMARC business together.

26.     While at Cisco Systems as a Standards Engineer during 2007-2008, Tim Draegen conceptualized what is now known as the DMARC email authentication model. From late 2009 until DMARC was made public in early 2012, Tim worked on DMARC's core design team, from concept to specification, from prototyping to proving the technology through production deployment among top US financial institutions.

6

27.    In partnership with the Financial Services Roundtable (now known as the Bank Policy Institute or BPI), in February 2013, Tim co-authored the seminal "Email Authentication Policy and Deployment Strategy for Financial Services Firms".

28.    To facilitate worldwide adoption of DMARC, from late 2011 to early 2013, Tim chaired the Online Trust Alliance's Email Authentication Committee (now a part of The Internet Society), authoring documents such as the "OTA Deployment Guide - Outbound Email Authentication" and earning the "Online Trust Alliance's Member of the Year" in October of 2012.

29.    Recognizing that great technology still requires dedicated advocacy and professional support, Tim founded dmarcian.com in early 2012 to provide DMARC tools and services to organizations of all sizes across the globe.

30.    Tim then worked to grow the company without outside investment, traveled when needed to advocate and educate regarding DMARC, formed partnerships with non-profit technology advocacy groups, and continued to marshal the technology as Chair of the Internet Engineering Task Force's DMARC Working Group from 2014-2019.  Tim's professional work and dmarcian's established brand has resulted in a steady stream of business without the need for traditional outbound or "cold calling" sales strategies.

~~30~~31.    Prior to doing business with Plaintiff, Defendant and its sponsors had no commercial DMARC experience whatsoever.

## II.  **The Contract**

32.    In or about 2013~~2015~~, Plaintiff and Mr. Groeneweg started talking about a way that they could do business together.  Mr. Groeneweg had a small company providing consulting services regarding email marketing, not involving DMARC.

33.    Mr. Groeneweg initiated contact with Plaintiff in 2013 when he reached out directly to Mr. Draegen at Plaintiff's North Carolina home office and, through a series of email and text messages, and over several months, Plaintiff and Defendant (with Mr. Groeneweg forming Defendant for the purpose of entering into the agreement discussed herein), in or around January

7

2016, entered into a contract (the "<u>Contract</u>") that included, among others, the following key points:

      (a)    A new entity would be created in the Netherlands in order to promote dmarcian products and services in the EU.

      (b)    Messrs. Groeneweg and Draegen would split ownership of the entity with Draegen having controlling ownership.[4]  Draegen agreed to this part-ownership in order to incentivize Groeneweg to help expand DMARC throughout the European Union ("EU").

      (c)    Once Plaintiff fielded new customer inquiries from around the world, Plaintiff would route such appropriate customers to the Dutch entity who would best benefit from a point of contact closer to the customer for sales and service, although all aspects of operations, technical support and platform maintenance were fully owned and controlled by Plaintiff.

      (d)    Plaintiff granted the Defendant the right to offer and sell Plaintiff's products and services.

      (e)    Plaintiff would continue developing, supplying, and operating the DMARC SaaS services, products, and technology for all customers from its North Carolina home office.

      (f)    Plaintiff would manage from North Carolina all email domains, manage combined information technology services, and would supply sales leads to Defendant.

      (g)    Initially, Plaintiff provided its proprietary DMARC source code to Defendant for continued product and software development efforts by a group of Bulgarian developers, and in exchange, Defendant agreed that all original and newly-developed products, software, copyrights, trade secrets, intellectual property, and technical development would continue to be owned by (with IP rights from developed products accruing to) Plaintiff, and would be assigned to and owned by Plaintiff.  After some time of operation, Defendant was able to fund continued development (after subsidies from Plaintiff in the form of foregone license fees) and as further consideration for the assignment back to Plaintiff of the IP rights, Plaintiff

---

[4] Plaintiff's CEO, Mr. Draegen, owns a majority of the equity in Defendant.

<div align="center">8</div>

agreed to continue not to charge Defendant licensing fees (which Defendant clearly had the ability to pay).

(h)    dmarcian Inc. also agreed to provide the BV with all operational costs and functions including business development until the BV could self-sustain (i.e., Defendant would be 100% subsidized by Plaintiff until the Defendant was able to contribute to development costs which did not occur until early 2017).

34.    In fact, once the parties agreed to these concepts, the following occurred:

(a)    Defendant was formed using an existing Dutch legal entity partially owned by Groeneweg.

(b)    Messrs. Groeneweg and Tim Draegen eventually split ownership of the newly formed entity with Draegen having controlling ownership as follows:

      i.    Tim Draegen owns 50.01% of Defendant

      ii.    The Digital Xpedition Holding B.V. ("TDX") is a 49.99% shareholder of Defendant

      iii.    Individuals Martin Groeneweg and Herwert Kalkman each own 50% of TDX.

(c)    The Plaintiff fielded all leads in North Carolina and routed certain leads to the Dutch entity (the Defendant) which began serving customers in the European Union, Russia and Africa that Plaintiff.

(d)    Plaintiff continued developing, supplying, and operating the DMARC SaaS services, products, and technology from its North Carolina home location.

(e)    Plaintiff managed from North Carolina all email domains, managed and combined information technology services, and supplied a steady stream of sales leads to Defendant, on which Defendant capitalized.

(f)    And, as planned, rather than paying royalties to Plaintiff, Defendant's contribution was to fund further development of Plaintiff's source code, including *inter alia* efforts

by a group of Bulgarian developers with the understanding that all such work product of Defendant and/or the Bulgarian developers was to be assigned to and belong to Plaintiff.

### III. The Breach

35.     However, eventually, Defendant betrayed Plaintiff.

36.     Prior to December 2019, Defendant and the Bulgarian developers made changes to the Code on Plaintiff's servers in the US in a manner that was integrated with changes being made by the US Team and Plaintiff thereby controlled and had possession of all such source code.  Commencing in or around December 2019, and continuing up to the present, Defendant began asserting for the first time in the parties' relationship that new code developed by Defendant's employees and the Bulgarian developers belonged to BV and not Plaintiff. Defendant's assertions triggered a conversation between Plaintiff and Defendant about needing a formal assignment of any such development work consistent with the original agreement. When Plaintiff made that request, Defendant, through Groenewig, refused.

37.     Defendant refused to remedy the breach unless the minority shareholder TDX which is 50% owned by the only managing director and sole member of the Defendant's Board—received a buyout offer from Plaintiff or its principals.

38.     Defendant used Plaintiff's products, software, copyrights, trade secrets, intellectual property, and technology for years with no payments required to be made Plaintiff based on the Defendant's -agreement to assign any intellectual property rights to Plaintiff. Defendant's refusal to acknowledge Plaintiff's intellectual property rights in all such work product by Defendant and the Bulgarian Developer in December of 2019 and its refusal to abide by the agreement and assign the work to Plaintiff resulted in absolutely no consideration whatsoever being paid to Plaintiff for Plaintiff's contributions to the agreement.

39.     Worse, Defendant began an intricate plan.  As described below, Defendant forcibly commandeered and used the Plaintiff's source code and other intellectual to break entirely from Plaintiff's platform and operations.  Defendant stole Plaintiff's protected software

10

code, and it created and developed websites and domains that are intentionally confusingly similar to (and actually cloned) Plaintiff's unique brand and Mark (as defined below). In essence, Defendant cloned Plaintiff's business, stole and improperly implemented Plaintiff's intellectual property, capitalized on Plaintiff's global brand, and stole and misappropriated Plaintiff's trade secrets, confidential information and customer lists and database to profit exclusively on Plaintiff's assets, to Plaintiff's compete exclusion and detriment.

## IV. <u>The Copyright</u>

40.    Before reviewing these illegal efforts, understanding the development, establishment, and protection of Plaintiff's intellectual property rights is critical.

41.    The dmarcian products, software, intellectual property, source code, and technology (the "<u>dmarcian Code</u>") was authored by, and is owned by, Plaintiff, and the Plaintiff is the sole owner in all copyrights to the dmarcian Code.

42.    Other than the Contract, Defendant had no agreement with Plaintiff authorizing it to make, use, or sell, the dmarcian Code.

43.    On or about February 18, 2021, Plaintiff filed a registration claim for the dmarcian Code with the United States Copyright Office.

44.    The registration has been accepted and confirmed by the Copyright Office and it bears Registration number TX0008941559.

## V. <u>The Trademark</u>

45.    Plaintiff is the owner of the federally registered trademark DMARCIAN® with Federal Trademark Registration No. 5,702,379 (sometimes referred to herein as "<u>Plaintiff's Mark</u>"). Plaintiff first used this trademark in 2012, and the mark has been registered with the United States Patent and Trademark Office since 2019. (A copy of the federal registration is attached hereto as **Exhibit A).**

46.    Plaintiff's Federal Trademark Registration is current, outstanding and valid.

11

47.    Continuously since in or about 2012, Plaintiff has used the DMARCIAN® mark to identify its products, services and software for ensuring the security of electronic mail services and to distinguish them from those offered by others, by, among other things, prominently displaying Plaintiff's Mark on its websites, advertising, business communications, and business documents, among many other things.

48.    In addition to possessing exclusive rights to the registered DMARCIAN mark, by virtue of its use in commerce, Plaintiff also owns common law rights in the dmarcian stylized mark (collectively, with the DMARCIAN mark, the "DMARCIAN Mark"). Indeed, Plaintiff has made longstanding, continuous, and exclusive use of the DMARCIAN Mark on its website (located at <dmarcian.com>) and promotional and marketing materials in connection with the provision of its software services.

49.    Through Plaintiff's extensive use and promotion of the DMARCIAN Mark since 2012, the DMARCIAN Mark has become distinctive and famous as the indication of origin of such services.  The DMARCIAN Mark is instantly recognizable and has undoubtedly acquired valuable goodwill.

**VI. Defendant's Intentional, Deliberate, and Willful Infringement and Website Cloning**

50.    In September of 2019, following commencement of some litigation against Plaintiff and others earlier in the year, Mr. Groeneweg suggested restructuring all dmarcian entities with a Dutch holding company parent for asset protection purposes.

51.    Mr. Groeneweg shared his then-recent experience with Dutch-based intellectual property laws and suggested that it might be possible to move intellectual property from the US to a Dutch holding company.

52.    Plaintiff rejected those suggestions since the original agreement required that all intellectual property rights belonged to Plaintiff.  Mr. Draegen reminded Mr. Groeneweg that, during creation of the Bulgarian subsidiary Mr. Draegen had again made clear that all intellectual property rights were to be assigned to Plaintiff.  The matter was not further discussed until

12

Defendant breached in December 2019.

53.    Following the breach in December 2019, Plaintiff's founder and former CEO, Tim Draegen, worked to get Defendant back into compliance with the agreement under which Defendant had the right to offer and sell Plaintiff's products and services in exchange for an assignment of intellectual property.

54.    Rather than taking the breach seriously or working to resolve the breach, the representative of Defendant's managing director, Martijn Groeneweg, made demands that the managing director's interest in Defendant be bought out for an outrageous amount.

55.    When it became clear that Defendant would never voluntarily cure the breach, Mr. Draegen, as majority shareholder in Defendant, called a shareholders' meeting of the Defendant for the purpose of replacing the managing director.

56.    In order to thwart Mr. Draegen's exercise of his majority interest in Defendant to replace the managing director, in or about September 2020, Defendant's managing director, TDX, filed an action with a tribunal in the Netherlands known as the "Enterprise Chamber."

57.    The Enterprise Chamber exists to try to help resolve disputes among owners of a Netherlands entity.

58.    The parties to the Enterprise Chamber proceeding were Defendant, TDX, and Tim Draegen individually.  The Plaintiff dmarcian, Inc. was not a party to these proceedings.

59.    Just before initiating the Enterprise Chamber proceeding, in or around the summer of 2020, Defendant compounded the December 2019 breach by arranging for assignment to Defendant of intellectual property rights from the Bulgarian affiliate.  These were the rights that Defendant agreed to assign to Plaintiff upon development as a condition of and as part of the consideration for Plaintiff providing to Defendant its source code for use and development as part of the original contract.

13

60.      Once the Enterprise Chamber proceeding was initiated, the Enterprise Chamber acknowledged that, since there was no fully integrated agreement, the Defendant was mismanaged, and (i) prevented TDX from being replaced, (ii) appointed Hub Harmeling as an additional managing director of Defendant, and (iii) appointed Yvette Borrius as proxy to hold all ownership interests in Defendant other than 1 share for each of Mr. Draegen and TDX, effectively divesting Mr. Draegen, as majority shareholder, of any control over the affairs of the Defendant.

61.      Mr. Harmeling conflated Mr. Draegen and Plaintiff even though they are, and always have been, two separate legal entities.  Ignoring the legal significance of Plaintiff as a corporation separate and apart from Mr. Draegen individually, and despite Plaintiff having no representation (particularly as a party disconnected from the internal corporate governance affairs and disputes of the Netherlands Defendant) in, or jurisdictional attachment in the Enterprise chamber proceeding, and despite Plaintiff having many stakeholders other than Mr. Draegen, Mr. Harmeling began making demands on Plaintiff, ostensibly through Mr. Draegen.

62.      Despite this disenfranchisement of Mr. Draegen, and despite that Plaintiff was not involved and not represented in the Enterprise Chamber proceeding, and as a way of informally seeking to resolve all disputes, Mr. Draegen attempted to discuss and resolve the Defendant's breaches during the fall of 2020.

63.      These efforts were unsuccessful.  The shareholder dispute was not resolved and neither Mr. Harmeling nor Defendant attempted to cure Defendant's breach of its agreement with Plaintiff through assignment of the intellectual property derived from Plaintiff's source code, nor were any other steps taken by Defendant to cure the breach.

**Netherlands Action**

64.      On or about January 22, 2021 Plaintiff notified Defendant that, "dmarcian is no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to," Defendant.

14

65.     Plaintiff offered a draft Settlement Agreement and a draft Distribution Agreement into which it was prepared to enter with Defendant, and informed Defendant that if a new, separate agreement was not reached, "dmarcian will terminate cooperation between the parties with immediate effect as per February 1, 2021."

66.     Defendant did not make any attempt to cure the breach or negotiate new agreements.

67.     Rather, on or about February 1, 2021, Defendant commenced an action against Plaintiff in a Rotterdam court without notice to Plaintiff, without issuance of appropriate legal process and without compliance with due process requirements.  Despite lacking personal jurisdiction over Plaintiff, Defendant sought and the Rotterdam Court issued a mandatory injunction against Plaintiff that for the duration of the Enterprise Chamber proceeding (estimated to be at least another year) requireding Plaintiff to restore all access to Plaintiff's platform to Defendant's employees until the agreement between the parties is validly terminated.  Neither the Defendant nor the Rotterdam Court gave any recognition to Plaintiff's intellectual property rights.  Consistent with their pattern of deceptive, illegal and fraudulent conduct outlined herein, Defendant provided untrue and deceptively misleading/incorrect information to the Rotterdam Court.

68.     The Rotterdam Court (i) made no explanation of what the agreement between the parties included or said, or how it would or could be terminated, (ii) did not inquire about or consider in any way Plaintiff's several claims of intellectual property infringement alleged herein, and (iii) did not take notice that Plaintiff had been claiming breach for over a year.

69.     In contrast to the Defendant'sss' contacts with North Carolina as described herein, the Rotterdam Court has no jurisdiction whatsoever over Plaintiff, nor does that Court have any standing to enforce Plaintiff's US-registered intellectual property rights.  Therefore, the only place that full justice can be done to protect and enforce Plaintiff's rights is in this Court.

15

**Defendant's Illegal Use of Plaintiff's Marks and Copyrighted Code to Deceive and Divert Plaintiff's Customers, and Ultimately to Create its Own Separate Cloned Platform Independent of Plaintiff**

70.     To protect its business pending its efforts to resolve its differences with Defendant, Plaintiff reduced Defendant's access to Plaintiff's cloud platform to allow Defendant to only service existing customers.  In response, Defendant began a calculated effort to put in place various steps to ultimately generate and steal both new and established dmarcian Inc customers through both illegal infringement of Plaintiff's protected rights in its copyright and Marks, AND by falsely and deceptively lying to customers by contending that Plaintiff had compromised their customer data and that they therefore had to move to a new platform.  Those communications falsely implied that the new platform was still maintained by the Plaintiff when in fact it was the Defendant's illegally sponsored platform set up for the purposes of diverting business from Plaintiff to Defendant.

71.     As described in more detail below, Defendant engaged in a three-step process to deceive the public and move new and established dmarcian customers into leaving dmarcian Inc. and moving those customers to Defendant's illegal platform:

(a) Defendant intentionally copied Plaintiff's website and used Plaintiff's trademarks to trick consumers, customers and potential customers into believing its website is Plaintiff's website;

(b) Defendant included its own contact information to divert consumers from Plaintiff to Defendant, routing Plaintiff's customers to an infrastructure controlled by Defendant and then routing the customers back to Plaintiff in what is known as a "man in the middle attack";

(c) Defendant used the cloned website to solicit third parties to purchase Plaintiff's copyrighted software and source code, which also constitutes a confidential and protected trade secret, misleading them into believing that

16

Plaintiff was the party selling and servicing the software despite the fact that Defendant had diverted the business to its own platform.

72.    In September 2019, while discussing with Mr. Draegen a lawsuit involving Plaintiff, Mr. Groeneweg suggested that all dmarcian intellectual property ownership could be transferred to a newly formed BV entity in order to shield it from a possible judgment in the United States.

73.    If Defendant actually had any interest or rights in any of Plaintiff's intellectual property, Mr. Groeneweg's suggestion would have made no sense, since intellectual property resident in the Netherlands and owned by Defendant would have not needed shielding.

74.    Plaintiff is informed, and believes, and thereon alleges that it was in or about September of 2019 when Defendant made the decision to breach its Agreement with Plaintiff and refuse to assign the intellectual property it had agreed to assign.

75.    Disputes between the parties grew more pronounced by September 2020.  Despite the parties' differences, and in order to do what it could within its control to support customer relationships and protect its own reputation, Plaintiff continued to provide technology, services, customers, and use of its trademarks to Defendant, while Defendant selfishly continued to refuse to recognize and respect the proceeds of Plaintiff's business efforts, i.e. Defendant was exploring transferring operational control of dmarcian.eu and generally denying the arrangements set out in the parties' agreement.  Defendant continued to refuse or recognize and respect the proceeds of Plaintiff's  business efforts, i.e. by challenging Plaintiff's IP rights, then stealing and using them, then transferring to itself operational control of dmarcian.eu, and generally refusing to abide by the arrangements set out in the December 2016 e-mails that form the basis of the parties' agreement and which were the foundation of the parties' intended relationship.

76.     Due to Defendant's breaches and its refusal to return to the terms of the original Contract,  Plaintiff was no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to Defendant and ceased doing so on January 22, 2021.

17

77.    When the parties' discussions for an amicable resolution were not fruitful and Plaintiff took the aforementioned steps to protect its business in January of 2021, in February and March of 2021 and continuing to present, Defendant sought to take by force what it could not obtain by agreement.  Defendant began a stepped process to establish itself as a separate "dmarcian" company that is confusingly and strikingly similar in website portrayal to Plaintiff, including but not limited to willful Copyright and trademark infringement.

78.    **First,** Defendant created websites which were strikingly similar to plaintiff's website using domain names that had been previously secured for the parties' joint benefit.  The domain names use the protected name "dmarcian" and then the country code for the host site. Examples include "dmarcian.co.uk," "dmarcian.nl," etc.  Defendant began posting those websites for public access in late February and continuing into March 2021.

79.    The Defendants copied, in many instances word-for-word, the website pages from dmarcian Inc., even, without authorization, populating these pages with the likenesses and backgrounds of more than a dozen of Plaintiff's employees without notice or permission.

80.    Screen shot examples of pages from Plaintiff's dmarcian Inc. site ("dmarcian.com") compared to copied, unauthorized pages of one of Defendant's sites (dmarcian.co.uk) which also advertise, use and employ **without** any authorization the likenesses, experience and reputation of individuals from Plaintiff's organization:

18

Plaintiff's site:

Defendant's UK site (with offending individuals associated with Defendant circled):




81.     None of these Plaintiff executives or employees gave any permission to Defendant to use their likeness (nor did Defendant ask about it or advise it intended to do so) for Defendant to deceptively induce new and existing customers to engage Defendant through its cloned websites, rather than through Plaintiff's site and control.  The websites contain many other strikingly similar pages which are designed to ~~cause~~ confuse customers into thinking that they continue to deal with the Plaintiff.

82.     **Second**, Defendant used that cloned website to divert both new and existing customers, re-routing them to Defendant's independent platform using Plaintiff's protected code, websites/pages, likenesses, and Marks.

83.     Defendant has now created a platform called "dmarc advisor."  And with that platform, comprising Plaintiff's copyrighted code (without which Defendant could not possibly conduct this illegal business), Defendant can fully operate independent of Plaintiff's legitimate control and influence over its business and its customers that Defendant is stealing through its deceptively cloned websits and through, misrepresentations to customers regarding Plaintiff's

19

alleged responsibility for data breaches of customer data.  There in fact has been no data breach except for the data that *that the Defendant* itself misappropriated.

84.    Specifically, Defendant's representatives have falsely informed established Plaintiff customers (who had been previously routed to Defendant under the parties' agreement) that Plaintiff has allowed a breach of their data, and the Defendant tricked the customers into providing to Defendant ~~their~~ access to their accounts on Plaintiff's own platform (which Plaintiff had, since January 22, limited Defendant's access).  Defendant then accesses the data (under the deceitful guise that it is the customer accessing its own data) and then downloads and copies that data it draws from Plaintiff's systems to establish those accounts and data *on Defendant's illegal platform.*

85.    Technically speaking, this occurs when Defendant tells a current Plaintiff customer to update their Domain Name Server ("DNS" – essentially the prime source of domain rules) to point its data directly to the DMARC administrator on Defendant's "dmarc advisor" platform.  In that way all current and future developed data transfers directly to Defendant's platform and away from Plaintiff's platform and control.  Defendant is using the Plaintiff's protected name, Marks, and intellectual property rights to induce current and future customers to send their data to a specific system and platform *that is <u>not</u> Plaintiff's.*

86.    In these ways, Defendant as set up a system that, using Plaintiff's copyrighted code, protected Marks, and Plaintiff's executives' and employees' likenesses (and using their established reputations and DMARC business experience to make current customers think the continuity of control through Plaintiff continues when it clearly is not, and induce new customers to go with Defendant and its internal "experts"—Plaintiff's executives and even the DMARC pioneer himself, Tim Draegen), completely mirrors and transfers the entire business to its own, Plaintiff-excluded control.

20

87.    More recently, dmarcian has expanded the provision of its software services under its widely recognized DMARCIAN Mark, a mark it has used in commerce since at least as early as January 31, 2012.

88.    Recently, Defendant and its principal, Martin Groeneweg, began using Plaintiff's intellectual property (i.e., the DMARCIAN Mark and the source code) to unlawfully solicit business to brazenly operate separate and independent of Plaintiff and Plaintiff's North Carolina-based and maintained operations, while continuing to capitalize on the name and reputation Plaintiff built in the DMARCIAN Mark.

89.    Without Plaintiff's consent or authorization, Defendant used the Dmarcian trademark, trade name, and logo to pass itself off as an affiliate called "dmarcian Europe," which Defendant is not.

90.    Evidence of Defendant's unlawful use can be found on http://dmarcian.nl/. Through that site, Defendant has illegally solicited third parties to purchase Plaintiff's copyrighted software, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.  Defendant removed operational control of the dmarcian.eu domain from dmarcian, Inc. and continues to aggravate by creating and using the dmarcian-europe domain to redirect business away from dmarcian, Inc.

91.    In addition, Defendant's employees proceeded to clone dmarcian.com's marketing website, where most business leads originate, and alter it with false information, such as redirecting all sales, support, partners, and invoices to *dmarcian-europe.com* email addresses and by placing themselves back on the "our team" (initially referencing Plaintiff's "team") page. The cloned platform (dmarc advisor) runs on stolen-from-Plaintiff dmarcian Inc. copyrighted code, and operates on www.dmarcadvisor.com.[5]

---

[5] Compare this illegal, rogue website and platform Defendant created with the Plaintiff's own website: www.dmarcian.com.  They are virtually identical in appearance and content, except the Defendant's site includes prime offender Groeneweg and other BV-connected people as part of "his" team (in addition to the unauthorized use

21

92.     The Defendant's actions have caused significant damage to Plaintiff, including expending hours of employee time to monitor, develop, and make changes to attempt to remedy the Defendant's illegal actions, and time triaging confused and misled customers.

93.     The Plaintiff has suffered and will continue to suffer irreparable harm through the unlawful redirecting of Plaintiff's business to a fraudulent website, which dramatically harms Plaintiff's brand.  The loss of business to the cloned sites is also difficult to quantify and determine because customers will incorrectly associate bad customer experiences with Plaintiff when the Defendant's sites don't work and do not provide easy points of entry for potential customers, or in the event that the security of their data is compromised.  Any defective service by Defendant will be confusingly and mistakenly attributed to Plaintiff due to Defendant's deceptive use of the Plaintiff's Marks.

94.     Plaintiff sent on February 16, 2021 to Defendant a "cease and desist" letter but to date, Defendant has completely ignored Plaintiff's demands.

95.     The avaricious pattern of conduct did not stop there.  Defendant further deceived the public through its intentional copying of Plaintiff's website to trick consumers, customers and potential customers into believing *its website is Plaintiff's website*.

96.     In fact, ***Defendant included its own contact information*** to divert consumers from Plaintiff to Defendant's separate platform.

97.     Worse, and most egregiously, ***Defendant has solicited third parties to purchase Plaintiff's copyrighted software***, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.

98.     Defendant's continued recalcitrance led to Plaintiff filing a Complaint in accordance with the Uniform Domain Name Dispute Resolution Policy ("UDRP") on February 25, 2021.

---

of Plaintiff's executives and employees' likenesses, *and* their connection to dmarcian Inc.   There can be no greater, clear, undeniable illustration of these rogue violations than that comparison, and the others contained herein.

22

99.    Defendant does not have any right or license to use Plaintiff's Mark outside of the original parties' agreement.

100.    Defendant's separate use of Plaintiff's Mark in this and other unauthorized and illegal ways is infringing, among other things.

101.    Defendant's infringing use of Plaintiff's Mark includes its name, domain names, advertising materials, and websites, among many other things that it is using in its separate business..

102.    Such infringing use of Plaintiff's Mark by Defendant for its independent business is without permission or authorization of Plaintiff and all such use by Defendant is likely to cause, and actually has caused, confusion, or mistake, or to deceive, and falsely imply Plaintiff's affiliation with and/or sponsorship of such use.

103.    Defendant has known for several years that Plaintiff's Mark is registered in the U.S. Patent and Trademark Office.  Plaintiff has requested that Defendant cease and desist from its acts of trademark infringement.  Defendant refused, and continues to refuse, to cease such acts.

104.    By reason of Defendant's acts alleged herein, Plaintiff has and will suffer damage to its business, reputation and good will and the loss of profits Plaintiff would have made but for Defendant's acts.

105.    Defendant threatens to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to Plaintiff's irreparable damage.  It will be difficult to ascertain the amount of damages which would afford Plaintiff adequate relief for such continuing acts.  Plaintiff's remedy at law, therefore, is not adequate to compensate it for injuries actual and threatened.

**Defendant Engineers Data Breach to Steal Customer Data**

106.    Since February 1, 2021, Defendant has run roughshod through Plaintiff's systems, copying code and data where it could, engaging in rogue communications with Plaintiff's employees, and making operativeestablishing dozens of domains using the DMARCIAN mark for

23

Defendant's separate business.

107.    GDPR (the General Data Protection Regulation of Europe) requires that all, "[C]ontroller[s] and processor[s] [of confidential data] shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk, including inter alia as appropriate…(b) the ability to ensure the ongoing confidentiality, integrity, availability and resilience of processing systems and services," among many other things.

108.    All users of dmarcian's platforms--including those on the previously Plaintiff-controlled EU platform--agree to dmarcian's Terms, Privacy, GDPR, and other privacy policies when signing up for an account.  This includes all users that Plaintiff eventually routed to Defendant for handling per their original arrangement.  EU credit card payers become Plaintiff's customers, and some after routing from Plaintiff become Defendant's customers (when they pay for services by check or wire with Defendant getting them to sign their contract).

109.    Defendant's actions since February 1, 2021 have caused, and continue to cause, a violation of GDPR, which subjects Plaintiff to potential liability under GDPR Article 82.  And as described below, Defendant has falsely stated to Plaintiff's customers that Plaintiff has failed to protect their personal data and that data has been compromised, when it is the Defendant's actions that have caused that to occur.

110.    An example of this just occurred on March 5, 2021.  On that date, Defendant updated the DNS (defined below) entry for "ag.dmarcian.eu" to point to infrastructure outside of dmarcian Inc.'s control, specifically for email that is destined to "CUSTOMER-TOKEN@ag.dmarcian.eu".  Through this method, Defendant gave itself access to Plaintiff's customer data to which it had no legal right.  In other words, Defendant is intercepting customer data that it never (and does not now) have a right to.

111.    In the days preceding the filing of this Complaint, Defendant also falsely represented to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

24

and falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and that Defendant is in charge of development.  A copy of Defendant's false messages to customers is attached hereto as **Exhibit B.**

112.    In addition, there are countless dmarcian Inc. (Plaintiff) users on the Defendant's fraudulent european platform that are having their data routed to infrastructure controlled by Defendant, and then Defendant at times routes the data back to dmarcian's real platform. This is a "man in the middle attack" that effectively results in Defendant stealing confidential, privileged customer data in violation of confidentiality obligations to acquire and use for its own platform moving forward, and to steal and then sustain those dmarcian Inc. customer relationships.

113.    These unauthorized Defendant actions also may violate Plaintiff's US-based SOC2 security controls, obliging Plaintiff to inform all "affected" customers, which means every single new customer coming to Plaintiff's site via dmarcian.eu (which still points to our platform) and existing customers of the past few years.  The cost to remedy and potential exposure for these fraudulent actions committed intentionally and knowingly by Defendant are enormous.

<div align="center">

**COUNT ONE**
**(Breach of Written Contract)**

</div>

114.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

115.    Plaintiff and Defendant entered into the Contract for the terms set forth above and the Contract was supported by consideration.

116.    In or around December 2019 Defendant breached the Contract, has failed and refused to cure such breach, is still in breach, and that breach is continuing (collectively, the "Breach"), insofar as Defendant has and continues to use Plaintiff's intellectual property without assigning back to Plaintiff any further developed software and without paying any other consideration for the previously permitted use of Plaintiff's intellectual property.

117.    Through the time of the Breach and thereafter, Plaintiff fully performed its

<div align="center">25</div>

obligations under the Contract.

118.    Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

<div align="center">

**COUNT TWO**
**(Breach of Oral Contract)**

</div>

119.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

120.    Pleading in the alternative to a writing, Plaintiff asserts that the Contract was agreed and confirmed several times by Plaintiff and Defendant orally in conversations.

121.    Plaintiff and Defendant orally entered into the Contract and the Contract was supported by consideration as outlined previously.

122.    In or around December 2019 Defendant committed the Breach.

123.    Through the time of the Breach and thereafter, Plaintiff fully performed its obligations under the Contract.

124.    Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

<div align="center">

**COUNT THREE**
**(Copyright Infringement; 17 U.S.C. §501)**

</div>

125.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

126.    Plaintiff owns the copyright in the dmarcian Code.

127.    Defendant has infringed Plaintiff's copyright in the dmarcian Code through its continued use, copying, sales, and distribution of the dmarcian Code, and Defendant's infringement continues through the present.

128.    Defendant's use of the dmarcian Code is without permission or authorization of Plaintiff.

129.    Defendant's acts are willful, intentional, and in disregard of Plaintiff's exclusive rights in the dmarcian Code.

<div align="center">

26

</div>

130.     Following the Breach Plaintiff has demanded that Defendant cease and desist all such infringing use of the dmarcian Code, but Defendant has failed and refused and continues to fail and refuse to cease such infringing use.

131.     Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

132.     Unless enjoined by this Court, Defendant's acts of infringement will continue.

133.     As a further direct and proximate result of Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).

134.     Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

135.     Defendant's deliberate and wrongful acts of infringement have caused and continue to cause great injury and damage to Plaintiff's exclusive rights, which injury and damage cannot be adequately quantified.  As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer irreparable damage for which there is no adequate remedy at law

136.     As a result of such infringement, Plaintiff is entitled to damages, costs of suit, reasonable attorney's fees, and injunctive relief against Defendant.

### COUNT FOUR
**(Trademark Infringement Under The Lanham Act, 15 U.S.C. §1114)**

137.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

138.     Defendant has infringed Plaintiff's Mark in interstate and international commerce by various acts, including continued use of Plaintiff's Mark in its name, continued use of Plaintiff's Mark in several domain names including dmarcian.eu, dmarcian.co.uk, finance.dmarcian.eu, among many others.

27

139.    Defendant's use of Plaintiff's Mark in this manner was done so to advertise, promote, offer and market Defendant's alleged independent services and DMARC platform on the internet.

140.    Such use was without authorization or permission of Plaintiff.

141.    Defendant's willful use of Plaintiff's registered Mark is likely to cause confusion or mistake among consumers, customers, and their employees as to the origin, sponsorship or approval of Defendant's goods or services.

142.    The foregoing deceptive, intentional and willful acts constitute infringement of Plaintiff's exclusive rights in its Mark in violation of 15 U.S.C. § 1114.

143.    Defendant's unauthorized use of Plaintiff's Mark has caused, is causing, will continue to cause, and is likely to cause, confusion or mistake or to deceive as to the source or origin of Defendant's products and services and as to the relationship between Plaintiff and Defendant.

144.    Plaintiff has demanded that Defendant cease and desist all such infringing, confusing and improper use of any and all confusingly similar marks, and Defendant has failed and refused and continues to fail and refuse to cease such improper use.

145.    Defendant's heretofore alleged acts of trademark infringement have been committed with the intent to cause confusion, mistake and to deceive.

146.    Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

147.    Unless enjoined by this Court, Defendant's acts of infringement will continue.

148.    As a result of such infringement, Plaintiff is entitled to damages, costs of suit and injunctive relief against Defendant.

## COUNT FIVE

**(False Designation under Section 43(a) of The Lanham Act, 15 U.S.C. §1125(a))**

149.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

150.    Defendant is intentionally using Plaintiff's Mark as part of its company name and in doing business in interstate and international commerce, with the false designation and representation that it is affiliated with Plaintiff.

151.    This use of Plaintiff's Mark is a false designation of origin which is likely to cause, and actually has caused, confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, or approval of Defendant's products and services.

152.    This use by Defendant of Plaintiff's Mark and Defendant's false designation of origin have actually caused confusion among those with whom Plaintiff does business.

153.    These acts by Defendant are in violation of Plaintiff's rights under 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a), in that Defendant has used and is using a false designation of origin, a false or misleading description and representation of fact which is likely to cause confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, and approval of Defendant's services and commercial activities by Plaintiff.

154.    Defendant committed these acts willfully, intentionally and maliciously.

155.    Unless enjoined by this Court, Defendant will continue its acts of false designation of origin.

156.    Moreover, as a direct and proximate result of Defendant's counterfeiting of the Plaintiff's Mark, Plaintiff is entitled to reasonable attorney's fees pursuant to 15 U.S.C. § 1117(b). In addition, at Plaintiff's election, Plaintiff is entitled to the maximum statutory damages pursuant to 15 U.S.C. § 1117(c).

29

157.   As a result of Defendant's acts, Plaintiff has suffered and continues to suffer substantial harm, and is entitled to damages, costs and other remedies against Defendant.

### COUNT SIX
### (Defamation)

158.   Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

159.   Defendant has made false statements of fact to Plaintiff's customers and potential customers concerning Plaintiff which are damaging to its reputation:

a. a Setting up cloned websites which use Plaintiff's marks and the likenesses and information of Plaintiff's employees to falsely represent that Plaintiff's employees and executive continue to be involved in Defendant's business, and to falsely suggest that the customers continue to do business with Plaintiff when in fact it is Defendant's pirated business site;

b. Asserting that Plaintiff has had a data breach requiring Plaintiff's customers to move to a new platform, namely Defendant's pirated and unlawful new platform.

c. Falsely representing to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

d. Falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and falsely representing the extent of its responsibility for development of the Code.

160.   Defendant's defamatory statements have and proximately caused actual damages to Plaintiff in an amount to be proven at trial, and were also willful, wanton and malicious so as to warrant punitive damage.

30

## COUNT SEVEN
### (Misappropriation of Trade Secrets)

161.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

162.    Plaintiff is the owner of certain Trade Secrets, including:

(a) The source code for dmarcian;

(b) The customer database which includes all historical customer data, customer service requirements such as data that exposes threats and reports Plaintiffs to the customers of the various threats which is then used to provide better protection to the customers' infrastructure and protection of their domain presence, and separates the threats from legitimate mail;

(c)  Account registrations for new customers or potential customers who sign up for a trial in the platform;

(e) Business and market intelligence which comes from all account registrations for new customers or potential customers in trial on the platform;

(f) The application database which includes all customer internet domains, reporting preferences, and all customers DMARC XML data as well as DMARC forensic data; and,

(c) Sales leads information from prospective customers who contacted Plaintiff.

163.    Defendant knew or should have known of the Trade Secrets.

164.    The Trade Secrets are not known or made available to the public, nor are they readily ascertainable through independent development.

165.    Plaintiff takes reasonable measures to protect the Trade Secrets from disclosure, including but not limited to:

(a) Taking security measures including protecting customer data from disclosure through logins and passwords, and two factor authentication to verify those passwords, and redundant identity checks before support is given to any

31

account;

(b)  Yearly penetration tests to make sure no one can get into the site or access the Plaintiff's code;

(c)  Protecting source code by restricting access to a need to know basis;

(d)  Plaintiff has adopted Terms of Service and a Privacy Policy;

(e)  Plaintiff's employees are required to signed confidentiality agreements and NDAs and appropriate use policies.

166.    Defendant had the specific opportunity acquire the Trade Secrets through access to Plaintiff's cloud database acquired during its business and contractual relationship with Plaintiff in which Plaintiff entrusted Defendant with login and password access for the purposes of sales and servicing of Plaintiff's European customers.

167.    Defendant did in fact acquire and use the Trade Secrets for its own and separate benefit without the Plaintiff's express or implied consent or authority, and thereby misappropriated the Plaintiff's trade secrets within the meaning of N.C.G.S. §66-152.

168.    Plaintiff is entitled to a preliminary injunction against the continued misappropriation and misuse of its Trade Secrets pursuant to N.C.G.S. §66-154(a).

169.    Plaintiff has suffered actual damages proximately caused by Defendant's misappropriation of Plaintiff's trade secrets in an amount to be proven at trial pursuant to N.C.G.S. §66-154(b).

170.    Defendant's misappropriation of trade secrets was willful and wanton and Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C.G.S. §66-154(c).

171.    Defendant's misappropriation was in bad faith and was willful and wanton, and Plaintiff is therefore entitled to recover its attorneys' fees from Defendant pursuant to N.C.G.S. §66-154(d).

32

## COUNT EIGHT
### (Computer Trespass)

172.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

173.    Plaintiff has a subscription to a service that controls a server which stores the data. Employees of both Plaintiff and Defendant, as well as employees of the Bulgarian developer, each had a dmarcian.com email address [i.e. Plaintiff's email account] which everyone logged into as a centrally located email address. These individuals used their dmarcian.com credentials to get what the needed from the Code to make further developments to the Code. Upon information and belief, Defendant used this access to misappropriate Code for its own purposes and to store it on a platform separate from Plaintiff's system contrary to the parties' agreement and past practice. In or about 2021, upon information and belief Defendant began to utilize such Code for its own separate purposes.

174.    Defendant has unlawfully accessed Plaintiff's computer networks without authority and with the intent to make or cause an unauthorized copy of Plaintiff's customer data produced by the computer networks that receive DMARC data and is attempting to send it to Defendant's platform. In January of 2021, Defendant's employees were attempting to exploit a bug in Plaintiff's system to try work around Plaintiff's access controls and gain access to new customer data.

175.    Defendant's conduct constitutes computer trespass within the meaning of N.C.G.S. §14-458.

176.    Plaintiff suffered actual damages as a result of Defendant's computer trespass and is entitled to recover such damages pursuant to N.C.G.S. §1-539.2A.

33

## COUNT NINE
### (Tortious Interference with Contract)

177.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

178.    All customers of Plaintiff as well as Defendant come through Plaintiff's site and accept Plaintiff's terms of service.  When they sign up for either a trial or an account, there is a digital registration with Plaintiff for each such customer. This occurs before any customers is sent over to Defendant for continued service, and those original terms of service continue to apply. Plaintiff has valid contracts with its customers to provide services to such customers on a monthly or a yearly basis or multiyear period.

179.    Defendant knew of Plaintiff's terms of service with said customers by virtue of Defendant's prior work with Plaintiff, referrals made by Plaintiff to Defendant, and Defendant's access to Plaintiff's database.

180.    Defendant intentionally induced Plaintiff's existing customers to switch from Plaintiff's platform to Defendant's platform, thereby effectively terminating the Plaintiff's services to such customers and diverting their business from Plaintiff to Defendant.

181.    Defendant induced Plaintiff's customers to switch platforms by:

(a) Misleading them into believing that they were continuing to deal with Plaintiff by use of a false and deceptive website which cloned the information, look, and appearance of Plaintiff's website and falsely identified Plaintiff's personnel as working for Defendant.

(b) Defendant put up a banner or notification on their platform instructing customers to "update" their DMARC records to dmarcadvisor.com as opposed to dmarcian.com, falsely suggesting that it was necessary due to a purported data breach.  A copy of such banner is attached hereto as **Exhibit C.**

34

(c)    Making false statements as set forth in **Exhibit B** about Defendant's involvement and responsibility for development of Plaintiff's Code.

182.    Defendant's actions in inducing the Plaintiff's customers to leave Plaintiff's platform were without justification.

183.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

184.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

185.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to interfere with its contracts with customers, and Plaintiff is entitled to a preliminary and permanent injunction.

## COUNT TEN
### (Tortious Interference with Prospective Economic Advantage)

186.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

187.    Prospective customers interested in Plaintiff's DMARC product and services contact Plaintiff through its website and sign up for trials.

188.    Information about prospective customers who have signed up for trials gets funneled into sales leads as shown in the diagram in Paragraph 10 herein.

189.    Plaintiff typically has approximately an average of 800 customers a month who sign up for trials, and of those customers approximately 40% become ongoing customers of Plaintiff.

190.    Plaintiff reasonably expects that customers who sign up for trials will grow into a continued customer relationship.

191.    Defendant obtained information about sales leads and prospective customers who signed up for trial periods which have a presence in Europe.  Defendant diverted such customers to its own independent platform.

35

192.    Defendant diverted those prospective customers by misleading them into thinking they were continuing to deal with Plaintiff based on their misleading cloned website and other communications.

193.    Defendant thereby intentionally induced the prospective customers not to do business with Plaintiff and instead misappropriated such prospective customers for themselves through wrongfully obtaining information from Plaintiff's system and through misleading information provided to such customers as described above.

194.    Defendant intentionally induced Plaintiff's prospective customer away from Plaintiff's platform and diverted them to Defendant's platform.

195.    Defendant's new and unauthorized website makes it appear to the customers that they are doing business with Plaintiff when in fact the Defendant acquired the new accounts to the exclusion of Plaintiff.

196.    Defendant's actions in inducing the Plaintiff's prospective customers to do business with Defendant and not to do to business with Plaintiff was without justification.

197.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

198.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

199.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to misappropriate Plaintiff's prospective customers, and Plaintiff is entitled to a preliminary and permanent injunction.

**COUNT ELEVEN**
**(Defend Trade Secrets Act - 18 USC §1836)**

200.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint as though fully set forth herein.

201.    Plaintiff's Trade Secrets constitute trade secrets within the meaning of 18 U.S.C. § 1839(3) because they derive independent economic value as a result of not being generally

36

known.

202.    Plaintiff has taken reasonable measures to protect the secrecy of Plaintiff's Trade Secrets, including limiting access to individuals and entities subject to duties of confidence and with a need to know specific Plaintiff's Trade Secrets, restricting access to computer systems and physical locations where Plaintiff's Trade Secrets are stored, and using passwords and physical security measures to restrict access to Plaintiff's Trade Secrets.

203.  Defendant misappropriated Plaintiff's Trade Secrets by disclosing (including among themselves) and/or continuing to use those trade secrets for their separate purposes, while knowing and/or having reason to know that Plaintiff's Trade Secrets were acquired by Defendant pursuant to the parties' Agreement and under circumstances giving rise to a duty to maintain their secrecy and limit their use to purposes for the parties' joint benefit.

204.    Defendant's use and disclosure of Plaintiff's Trade Secrets for its separate business purposes was without permission from Plaintiffs.

205.  Defendant has used the Plaintiff's Trade Secrets in interstate and/or foreign commerce within the meaning of 18 U.S.C. §18 U.S.C. §1836(b)(1).

206.    Under 18 U.S.C. §1837, this Act applies to conduct occurring outside of the United States because an act in furtherance of the offense was committed in the United States, including but not limited to:  (a) accessing Plaintiff's data located in the United States; and (b) marketing the Trade Secrets to customers in the United States through its website instructing US customers or prospective customers to register with Defendant's separate platform.

207.  Plaintiff has suffered, is suffering, and will continue to suffer irreparable harm as a result of Defendant's ongoing use and/or disclosure of Plaintiff's Trade Secrets, have no adequate remedy at law, and are entitled to an injunction requiring return of and prohibiting any further use or disclosure of Plaintiff's Trade Secrets or any information derived therefrom, pursuant to 18 U.S.C. § 1836(b)(3)(A).

208.   Plaintiff is entitled to recover an award of damages for actual loss caused by

37

Defendant's unauthorized disclosure and/or use of Plaintiff's Trade Secrets, including but not limited to lost market share, licensing revenue, and profits.

209.    Plaintiff is further entitled to recover any unjust enrichment not already computed with actual loss that was received by Defendant as a result of Defendant's unauthorized disclosure and/or use of Plaintiff's Trade Secrets.

210.    Because Defendant willfully and maliciously misappropriated Plaintiff's Trade Secrets, Plaintiff is entitled to recover an award of exemplary damages up to two times the sum of actual loss and unjust enrichment damages and an award of Plaintiffs' attorney fees pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D).

### COUNT TWELVE
### (Common Law Infringement)

211.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint as though fully set forth herein.

212.    By virtue of having used and continuing to use dmarcian's Trademarks, Plaintiff has acquired common law rights therein.

213.    Defendant's unauthorized use of Plaintiff's Marks in connection with Defendant's directly competing business infringes Plaintiff's common law trademark rights and is likely to cause confusion, mistake, or deception among clients, who will believe that Defendant's business and services originate from, are affiliated with, or are sponsored by Plaintiff or *vice versa* when, in fact, they no longer are.

214.    Defendant's use of Plaintiff's Marks is likely to unfairly divert trade away from Plaintiff and to damage Plaintiff's goodwill, business, and reputation.

215.    As a direct and proximate result of Defendant's infringement of common law trademark rights, Plaintiff has been and will continue to be damaged in an amount to be proven at trial, in a manner and amount that cannot be fully quantified or compensated in economic terms and for which there is no adequate remedy at law. Such irreparable harm will continue unless and until Defendant's acts complained of herein are enjoined during the pendency of this

38

action and permanently thereafter.

## COUNT THIRTEEN
### (Unjust Enrichment – In the Alternaative to Counts I & II)

216.    Plaintiff realleges and incorporates herein by reference the foregoing paragraphs of this complaint as though fully set forth herein.

217.    In the alternative, Plaintiff conferred to Defendant a substantial benefit from use of Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information.

218.    Defendant's use of Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information was not gratuitous.

219.    Defendants' use of Plaintiffs Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information is measurable because Defendant has made substantial revenue from and continue to derive pecuniary gain through the unauthorized use, and Defendant also previously generated revenue for Plaintiff from credit card sales.

220.    Defendant consciously accepted the benefits gained from unauthorized use of the Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information.

221.    Defendant has been and continues to be unjustly enriched by use of the Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary information.

222.    As a direct and proximate result of Defendant's unjust actions, Plaintiff is entitled to recover an amount at least equal to the amount of the revenues Defendant unjustly received from use of Plaintiff's Marks, Plaintiff's Copyright, Plaintiff's Trade Secrets, and access to Plaintiff's databases, support resources, website support and content, and proprietary

39

information.

## COUNT FOURTEEN~~ELEVEN~~
### (Unfair or Deceptive Business Practices)

200.    Plaintiff realleges and incorporates herein by references paragraphs 1-114 and paragraphs 138-2~~2~~200 of this complaint as though fully set forth herein.

201.    Defendant's conduct as set forth in Counts Four through Thirteen~~Ten~~ of the Complaint is unfair and deceptive within the meaning of N.C. Gen. Stat. §75-1.1.

202.    Defendant's unfair and deceptive conduct is in and affecting commerce.

203.    Defendant's unfair and deceptive conduct proximately caused actual damages to Plaintiff.

204.    Plaintiff is entitled to recover treble damages from Defendant pursuant to N.C.G.S. §75-16.

205.    Plaintiff is entitled to recover its reasonable attorneys' fees from Defendant pursuant to N.C.G.S. §75-16.1.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff dmarcian, Inc. prays for judgment against Defendant dmarcian Europe BV. as follows:

A.    Entry of a preliminary injunction, to be effective throughout the pendency of this action, enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1)    from making, using, distributing, and selling the dmarcian Code.

(2)    from directly or indirectly using the Plaintiffs DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive;

(3)    from infringing Plaintiff's copyright in the afore-described computer program/software; and

40

(4)    from otherwise unfairly competing with Plaintiff.

B.    Entry of a permanent injunction perpetually enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

      (1)    from making, using, distributing, and selling the dmarcian Code.

      (2)    from engaging in any other activity constituting an infringement of the dmarcian Code;

      (3)    from directly or indirectly using Plaintiff's DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive; and

      (4)    from otherwise unfairly competing with Plaintiff.

      (5)    from engaging in any other activity constituting an infringement of Plaintiff's Mark or constituting unfair competition with Plaintiff; and

      (6)    from assisting, aiding and abetting any other person or business entity in engaging in any activities referred to in subparagraphs (1) through (5) above.

C.    Entry of judgment ordering that all labels, signs, prints, promotions, advertisements, letterhead, business cards, collateral literature and media, domain names, and web pages in the possession or control of Defendant bearing Plaintiff's Mark and all plates, molds, matrices and other means of making the same, shall be delivered to Plaintiff for destruction.

D.    Entry of judgment requiring transfer from Defendant to Plaintiff of all dmarcian domains Defendant and that are not otherwise destined for destruction.

E.    Entry of judgment requiring Defendant, within thirty days after the service of judgment upon it, to file with the Court, and serve upon counsel for Plaintiff, a written report under

41

oath setting forth in detail the manner in which Defendant has complied with paragraphs A through C above.

      F.      Damages according to proof for Defendant's Breach of the written Contract.

      G.      In the alternative, Damages according to proof for Defendant's Breach of the oral Contract.

      H.      Entry of judgment finding that Defendant, through its copying, use, reproduction, distribution, and sales of the dmarcian Code has infringed Plaintiff's copyright in the dmarcian Code under 17 U.S.C. §501;

      I.      Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has infringed Plaintiff's registered mark under 15 U.S.C. §1114;

      J.      Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has created false designations of origin and false or misleading descriptions of fact in violation of 15 U.S.C. §1125(a);

      K.      Entry of judgment that the unfair or deceptive acts or practices of Defendant were committed willfully or knowingly, and that Plaintiff be awarded up to three times its actual damages together with its costs and attorney's fees as a result of the same;

      L.      Entry of judgment requiring Defendant to account to Plaintiff for any and all profits derived by Defendant from the sale of its services and for all damages sustained by Plaintiff by reason of Defendant's infringement and unfair competition complained of herein.

      M.      Entry of judgment awarding Plaintiff punitive and exemplary damages due to Defendant's wilful acts and infringement complained of herein.

42

N.      Entry of judgment awarding Plaintiff its attorney's fees and costs incurred in the

prosecution of this action pursuant to the Lanham Act, 15 USC §1117, and pursuant to 17 U.S.C.

§505, together with such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury of all claims or issues so triable.


This the ___ day of April, 2021.


*/s/ Pamela S. Duffy*_____
Pamela S. Duffy, N.C. Bar. No. 18329
*pduffy@sharplesslaw.com*
Sharpless McClearn Lester Duffy, PA
200 S. Elm Street, Suite 400
Greensboro, NC 27401
Telephone: (336) 333-6389
Attorney for Plaintiff

OF COUNSEL:


*/s/ David Dorey* _____
David Dorey, DE #5283
Blank Rome, LLP
Dorey@BlankRome.com
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6418
Attorney for Plaintiff

### *CERTIFICATE OF SERVICE*

I hereby certify that the foregoing First Amended Complaint was served upon counsel for all other parties to this action listed below pursuant to N.C. R. Civ. P.5(b) by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorney for dmarcian Europe BV*

This the _____ day of April, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
SHARPLESS McCLEARN LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiff*

44